UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | DOCKET NO. 07-12063-JLT |
| | ) | |
| WAYNE HUNT | ) | |
| | ) | |

## **MEMORANDUM IN SUPPORT OF RESPONDENT'S MOTION TO DISMISS**

Timothy Watkins
    B.B.O. # 567992
Ian Gold
    B.B.O. # 665948
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Tel: 617-223-8061

TABLE OF CONTENTS

Introduction. . . . . . . . . . . . . . . . . . . . . . . . 1

    1.  Statutory Procedures. . . . . . . . . . . . . . 1

    2.  Sexually Dangerous Person. . . . . . . . . . . .3

    3.  Facial Challenges. . . . . . . . . . . . . . . .4

I.    THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT
    EXCEEDS CONGRESS' POWER UNDER ARTICLE I, SECTION 8
    AND IS INCONSISTENT WITH THE TENTH AMENDMENT. . . . . . . .4

    1.  The Act Exceeds Congress' Commerce Clause
        Power Because It Does Not Regulate The
        Use Of Interstate Commerce Channels,
        Instrumentalities Of Or Persons And
        Things In Interstate Commerce, Or Activities
        Substantially Affecting Interstate Commerce. . . . . .6

    2.  The Act Exceeds Congress' Commerce Power
        Because Even If It Regulates An Activity
        The Activity Does Not Substantially
        Affect Interstate Commerce. . . . . . . . . . . . . . 9

    3.  The Act Exceeds Congress' Power Under
        The Necessary and Proper Clause Because
        It Does Not Facilitate The Exercise of
        Any Enumerated Power. . . . . . . . . . . . . . . . .14

    4.  The Act Exceeds Congress' Power Under The
        Necessary and Proper Clause Because It
        Conflicts With The Federalist Structure
        Of The Constitution. . . . . . . . . . . . . . . 27

    5.  Conclusion. . . . . . . . . . . . . . . . . . .31

II.  THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT
    DENIES DEFENDANTS' RIGHT TO EQUAL PROTECTION
    OF THE LAWS. . . . . . . . . . . . . . . . . . . . . . .31

    1.  The Act is Subject to Strict Scrutiny. . . . . . . 32

    2.  The Act Denies Defendants Equal Protection

Of The Laws Because The Class of All
Federal Prisoners Is Not Rationally Related
To the Governmental Purpose of Incapacitating
Sexually Dangerous Persons. . . . . . . . . . . . .34

3.   The Act Denies Defendants Equal Protection
Of The Laws By Arbitrarily Imposing Greater
Burdens On Federal Prisoners With A Particular
Type Of Mental Disorder. . . . . . . . . . . . . . 36

4.   Conclusion. . . . . . . . . . . . . . . . . . . .40

III.   THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT
SUBJECTS DEFENDANTS TO CRIMINAL PROCEEDINGS
WITHOUT AFFORDING THEM REQUIRED CONSTITUTIONAL
PROTECTIONS. . . . . . . . . . . . . . . . . . . . . .40

1.   Congress Intended to Act to Establish
Criminal Proceedings. . . . . . . . . . . . . . . .41

2.   The Act Is So Punitive In Purpose And
Effect That It Must Be Considered A
Criminal Statute. . . . . . . . . . . . . . . . . .44

3.   The Act Fails to Provide The
Constitutional Protections Required
In Criminal Proceedings. . . . . . . . . . . . . . 49

     a)   Ex Post Facto Clause. . . . . . . . . . . . 49

     b)   Fourth Amendment. . . . . . . . . . . . . . 50

     c)   Fifth Amendment. . . . . . . . . . . . . . .51

     d)   Sixth Amendment. . . . . . . . . . . . . . .51

     e)   Eighth Amendment. . . . . . . . . . . . . . 52

4.   Conclusion. . . . . . . . . . . . . . . . . . . .52

IV.   THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT
DENIES DEFENDANTS DUE PROCESS OF LAW. . . . . . . . . 53

1.   The Act Violates Due Process Because it
Authorizes Indefinite Commitment of
Persons Who Have Never Been Convicted
of or Charged With a Sex Offense . . . . . . . . . 53

2.  The Act Deprives Defendants of Due
    Process of Law Because it Deprives them
    of Liberty Without a Preliminary Hearing
    or "Probable Cause" Determination. . . . . . . . . 57

3.  The Act Denies Defendants Due Process
    Of Law Because It Fails To Provide For
    Adequate Notice, Proof Beyond A
    Reasonable Doubt, And Trial By Jury. . . . . . . . 60

4.  Conclusion. . . . . . . . . . . . . . . . . . . .68

V.  THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT
    VIOLATES DUE PROCESS AND CONTRAVENES ARTICLE I,
    SECTION 1 BY FAILING TO ADEQUATELY DEFINE KEY
    TERMS. . . . . . . . . . . . . . . . . . . . . . . . .68

VI. THE ACT IS A FACIALLY UNCONSTITUTIONAL DENIAL
    OF DUE PROCESS OF LAW BECAUSE THE EXPERT TESTIMONY
    IT REQUIRES IS INSUFFICIENTLY RELIABLE TO PROVIDE
    THE CLEAR AND CONVINCING EVIDENCE NEEDED FOR
    COMMITMENT AS A SEXUALLY DANGEROUS PERSON. . . . . . . .72

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . .84

RESERVATION OF RIGHTS. . . . . . . . . . . . . . . . . 84

REQUEST FOR ORAL ARGUMENT. . . . . . . . . . . . . . . 85

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA      )
                              )
            v.                )      DOCKET NO.  07-12063-JLT
                              )
                              )
WAYNE HUNT                    )

**MEMORANDUM IN SUPPORT OF RESPONDENT'S MOTION TO DISMISS**

Respondent respectfully submits this memorandum of law in support of his motion to dismiss commitment proceedings.  For reasons described below, the statutory provisions that make up the Jimmy Ryce Civil Commitment Program are facially unconstitutional.

**INTRODUCTION**

The Jimmy Ryce Civil Commitment Program (hereinafter "the Act"), enacted as part of the Adam Walsh Child Protection and Safety Act of 2006[1] and codified at Title 18, Sections 4247 and 4248, authorizes and provides procedures for the potentially lifetime commitment of a "sexually dangerous person" in the custody of the Bureau of Prisons (BOP) or the Attorney General (AG).

1.   Statutory Procedures

_____

[1]     42 U.S.C. § 16901, et. seq.

-1-

Upon certification by the AG or the Director of the BOP that a prisoner is a "sexually dangerous person," and the filing of that certification with the clerk of the district court, the prisoner is held pending a court hearing. See 18 U.S.C. § 4248(a). There is no requirement that a prisoner have ever been convicted of or charged with a sexual offense to be certified as a sexually dangerous person. See 18 U.S.C. § 4247(a)(5), (6). The Act does not require that the initial certification take any particular form or contain any particular information, nor does it require that the certification be filed at a specific time before the prisoner's regularly scheduled release date. Id. The Act does not provide for a preliminary hearing or any finding of probable cause for the certification decision by a neutral magistrate. Id.

Between the initial certification and the hearing on the merits, the certificate is served on the prisoner, his counsel, and the government. Id. Additionally, the district court, "may order that a psychiatric or psychological examination" be conducted, "and that a psychiatric or psychological report be filed with the court" pursuant to Section 4247(b) and ©. See § 4248(b). Up to 75 days are allotted for completion of the evaluation once it is ordered by the court. See § 4247(b).

At the hearing on the merits, the prisoner shall be represented by counsel and has the right to testify and present

-2-

evidence, to subpoena witnesses on his behalf, and to confront and cross-examine any testifying witnesses.  See § 4247(d).  If the court finds that the prisoner is a sexually dangerous person by clear and convincing evidence, he is committed to the custody of the AG.  See § 4248(d).  The prisoner has no statutory right to have a jury determine whether he is a sexually dangerous person.  See § 4248©; § 4247(d).

The Act provides procedures for review of the prisoner's condition.  See § 4247(e)(1)(b).  Those procedures provide for an annual paper report, but do not require regularly scheduled court hearings.  Id.  The prisoner is barred from petitioning for his discharge within six months of a court finding that he remains, by a preponderance of the evidence, a sexually dangerous person.  See § 4248(e); § 4247(h).

2.   "Sexually Dangerous Person"

A "sexually dangerous person" is one, "who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others."  § 4247(a)(5).  "Sexually dangerous to others" means, "that the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released."  § 4247(a)(6).

3.    <u>Facial Challenges</u>

Defendants raise a number of facial challenges to the Act:

I.    The Act exceeds Congress' authority under Article I,
      Section 8 and is inconsistent with the Tenth Amendment;

II.   The Act denies defendants equal protection of the laws;

III.  The Act subjects defendants to criminal proceedings
      without providing required constitutional protections;

IV.   The Act denies defendants due process of law by failing
      to provide necessary procedural protections;

V.    The Act denies defendants due process of law and
      illegitimately delegates legislative authority by
      failing to adequately define key terms; and

VI.   The Act denies defendants due process of law because
      the expert testimony it requires is insufficiently
      reliable to provide the clear and convincing evidence
      needed for commitment as a sexually dangerous person.

## I.    THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT EXCEEDS CONGRESS' POWER UNDER ARTICLE I, SECTION 8 AND IS INCONSISTENT WITH THE TENTH AMENDMENT.

"Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution." <u>United States v. Morrison</u>, 529 U.S. 598,607 (2000); <u>See also</u> <u>Marbury v. Madison</u>, 1 Cranch 137, 176 (1803) ("The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written."). Congress' powers are enumerated in the eighteen clauses of Article I, Section 8 of the Constitution. <u>See</u> U.S. Const. Art. I § 8. Of the eighteen clauses, only two are relevant to this case – the Commerce Clause

-4-

and the Necessary and Proper Clause.  <u>See</u> U.S. Const. Art. I § 8, cl. 3 & cl. 18.[2]

The Commerce Clause grants Congress the authority, "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  Art. I § 8, cl. 3.  The Necessary and Proper Clause empowers Congress, "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its powers, "and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."  Art. I § 8, cl. 18.

The Tenth Amendment makes explicit that powers not enumerated to Congress, the Executive, or the Judiciary, "are reserved to the States respectively, or to the people."  U.S. Const., Amend. X.  The Supreme Court has articulated two tests to determine whether a statute is consistent with the Tenth Amendment.  "In some cases the Court has inquired whether an Act of Congress is authorized by one of the powers delegated to Congress in Article I of the Constitution."  <u>New York v. United States</u>, 505 U.S. 144, 155 (1992) (citations omitted). "In other cases the Court has sought to determine whether an Act of Congress invades the province of state sovereignty reserved by

---

[2]     The defendants assume that the government will not rely on obviously irrelevant powers of Congress, <u>e.g.</u>, the Spending Clause and the Copyright Clause.  <u>See</u> U.S. Const. Art. I § 8, cl. 1 & cl. 8.

the Tenth Amendment."  <u>New York</u>, 505 U.S. at 155 (citations omitted).

Thus, if the Act is a constitutional exercise of congressional authority, that authority must derive from the Commerce Clause or the Necessary and Proper Clause.  If the statute cannot be justified under either clause, or if it upsets the federalist balance of government established by the Constitution, then it is also inconsistent with the Tenth Amendment.

For the reasons that follow, the defendants maintain that the Act is not authorized by the Commerce Clause or the Necessary and Proper Clause and that it therefore constitutes an <u>ultra vires</u> usurpation by the federal government of the police power that the Constitution commits to the states.

1.  <u>The Act Exceeds Congress' Commerce Clause Power Because It Does Not Regulate The Use Of Interstate Commerce Channels, Instrumentalities Of Or Persons And Things In Interstate Commerce, Or Activities Substantially Affecting Interstate Commerce.</u>

The Commerce Clause empowers Congress to regulate "three broad categories of activity."[3]  <u>United States v. Lopez</u>, 514 U.S. 549, 558 (1995)(citations omitted).  "First, Congress may regulate the use of the channels of interstate commerce."  <u>Lopez</u>, 514 U.S. at 558 (citations omitted).  Second, Congress may

--------

[3]     Hereinafter the three "<u>Lopez</u> categories."

regulate and safeguard the instrumentalities of interstate commerce, and persons and things in interstate commerce, even if they are threatened only by intrastate activities.  See Lopez, 514 U.S. at 558 (citations omitted).  Third, Congress possesses, "the power to regulate those activities...that substantially affect interstate commerce."  Lopez, 514 U.S. at 559 (citation omitted).

Thus, to determine whether Congress acted within its Commerce Clause authority in enacting the Act this Court must determine whether the statute fits within one of the three Lopez categories, supra.

The Act provides for the commitment as "sexually dangerous person(s)" of defendants in the custody of the Bureau of Prisons or the Attorney General, incompetent defendants, or defendants against whom all charges have been dismissed because of their mental condition.  See 18 U.S.C. § 4248(a).  The statute thus pertains only to persons in federal custody and does not regulate the use of the "channels" of interstate commerce as required by the first Lopez category.  Cf. United States v. Darby, 312 U.S. 100 (1941) (upholding Fair Labor Standards Act as regulation of use of channels of interstate commerce preventing shipment of goods produced under substandard working conditions); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241 (1964) (upholding public accommodations section of Civil Rights Act of

-7-

1964 as regulation of use of interstate commerce channels by travelers).

Because it affects only federal prisoners, the Act does not regulate or protect instrumentalities, persons, or things "in" interstate commerce and it does not fall under the second Lopez category.  Cf. Shreveport Rate Cases, 234 U.S. 342 (1914) (regulation of rates charged by interstate carriers permissible as regulation of instrumentalities of interstate commerce); Southern R. Co. v. United States, 222 U.S. 20 (1911) (upholding Safety Appliance Act mandating safety features for vehicles to be used in interstate commerce).[4]

The Act also does not fit within the third Lopez category, under which Congress is permitted to regulate "activities" substantially affecting interstate commerce.  In fact, the Act does not regulate "activities" at all.  The statute merely governs the disposition of federal prisoners based on their past conduct, present mental state, and predictions about their future

---

[4] Indeed, the Fourth Circuit in United States v. Comstock, 551 F.3d 274 (4th Cir. 2009) noted that Section 4248 "contains no jurisdictional requirement limiting its application to commercial or interstate activities.  Nor does the Government suggest that § 4248 targets the channels or interstate commerce or persons and things in interstate commerce."  Thus, the Court concluded, it could uphold § 4248 under the Commerce Clause only if it found that it regulates activities that substantially affect interstate commerce, a question which it subsequently answered in the negative.  Id. at 279.

conduct.  No present, recent, imminent, or ongoing activity by a prisoner is required to render the statute applicable to him. See 18 U.S.C. §§ 4248 & 4247; Cf., N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1 (1937)(approving National Labor Relation Act's regulation of intrastate unfair labor practices by fourth largest steel producer in nation); Maryland v. Wirtz, 392 U.S. 183 (1968) (upholding application of Fair Labor Standards act to individuals employed by any "enterprise" involved in interstate commerce).  Hence, the Act does not regulate "activities" within the reach of the Commerce Clause at all.

    2.   The Act Exceeds Congress' Commerce Power Because Even
         If It Regulates An Activity The Activity Does Not
         Substantially Affect Interstate Commerce.

    Although the Respondent maintains that the Act does not regulate "activities" at all, a very liberal reading of the statute might yield a contrary conclusion.  Specifically, the Act defines a "sexually dangerous person," in part, as, "a person who has engaged or attempted to engage in sexually violent conduct or child molestation..."  See 18 U.S.C. § 4247(5).  A permissive interpretation of the statute thus might construe it as regulating the "activities" of sexually violent conduct and child molestation.

    Assuming *arguendo* that the Act does regulate these activities, the question remains whether sexually violent conduct

and child molestation "substantially affect" interstate commerce
as required to make the law a legitimate assertion of Congress'
Commerce Clause authority under the third <u>Lopez</u> category.  <u>Lopez</u>
and another recent Supreme Court case, <u>United States v. Morrison</u>,
answer this question in the negative.

In <u>Lopez</u>, the Supreme Court struck down, as beyond Congress'
Commerce Clause authority, the Gun-Free School Zones Act of 1990
(GFSZA), which criminalized possession of a firearm within a
school zone.  <u>See</u> <u>Lopez</u>, 514 U.S. at 551.  The Court's
invalidation of the statute rested on five grounds.

First, GFSZA was a criminal statute having nothing to do
with commerce or any economic endeavor.  <u>See</u> <u>id</u>. at 561.  Second,
GFSZA was not an essential part of a larger scheme of economic
regulation, such that the invalidation of the prohibition on
intrastate gun possession would undermine the overall regulatory
plan.  <u>See</u> <u>id</u>.  Third, GFSZA did not contain a federal
jurisdictional element that could ensure, in any given case, that
the intrastate gun possession at issue actually did
"substantially affect" interstate commerce.  <u>See</u> <u>id</u>. at 561-62.
Fourth, Congress had not compensated for the lack of a federal
jurisdictional element by making findings substantiating the
posited nexus between intrastate gun possession and interstate
commerce.  <u>See</u> <u>id</u>. at 562-63.  Fifth, the arguments purporting to

demonstrate the substantial effects of intrastate gun possession on interstate commerce relied on a conjectural string of inferences that, if indulged, would upset the federal structure erected by the Constitution.  See id. at 567 ("To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States.").

Five years after Lopez, the Supreme Court reaffirmed the reasoning of that case in United States v. Morrison, 529 U.S. 598.  The Morrison court ruled that a civil damages provision of the Violence Against Women Act (VAWA) that permitted victims of intrastate gender-motivated violence to sue their attackers in federal court exceeded Congress' authority under the Commerce Clause.  See Morrison, 529 U.S. at 601-02.  The Court emphasized that it was rejecting, "...the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce" and noted that it was so holding despite the "numerous" Congressional findings supporting VAWA.  Id. at 614-17.  Moreover, the Court again disavowed the piling of inference upon inference to demonstrate a substantial affect on interstate commerce, finding

-11-

that approach, "...unworkable if we are to maintain the Constitution's enumeration of powers":

> The Constitution requires a distinction between what is truly national and what is truly local...The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States...Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.

Id. at 615-18 (citations omitted).

The reasoning of Lopez and Morrison fully applies to the Act. Like the statutes in those cases, the Act regulates non-economic intrastate activities – sexually violent conduct and child molestation – and it is not an integral part of a larger scheme of economic regulation. Moreover, Congress did not include a federal jurisdictional element in the Act, and it did not make findings supporting a nexus between sexually violent conduct, child molestation, and interstate commerce. Finally, as with the statutes in Lopez and Morrison, any connection between the sexually violent conduct and child molestation regulated by the Act and interstate commerce must rest on a long chain of speculative inferences – e.g., that the specter of child molestation discourages parents from taking their children to unknown places, or from moving to new areas, thereby depressing

-12-

the interstate tourism and housing markets.  Thus, because it regulates conduct that does not substantially affect interstate commerce, the Act cannot be upheld as an exercise of Congress' Commerce Clause power under the third Lopez category.

As discussed below, to date one appellate court has addressed the question of whether the Act is a valid exercise of legislative authority.  United States v. Comstock, 551 F.3d 274 (4th cir. 2009). In Comstock, as in all of the published cases involving the constitutionality of Section 4248, the government has relied primarily upon the Necessary and Proper Clause.  See Comstock, 551 F.3d at 279 (noting that the "Government barely mentions the Commerce Clause in its lengthy briefs.") However, the Fourth Circuit noted that, while the "Necessary and Proper clause reaches broadly, . . . it does so only to effectuate powers specifically enumerated in the Constitution." Id. at 280. As the Commerce Clause was the only possible enumerated power upon which the government could rely, the Fourth Circuit in Comstock analyzed whether Section 4248 was a valid exercise of Congress' authority under the Commerce Clause.

Applying the principles of the Lopez and Morrison cases to Section 4248, the Fourth Circuit held that "Supreme Court precedent thus compels the conclusion that § 4248 does not constitute a valid exercise by Congress of its Commerce Clause

power . . . Federal commitment of 'sexually dangerous persons'
may well be - like the suppression of guns in schools or the
redress of gender-motivated violence - a sound proposal as a
matter of social policy.  But policy justifications do not create
congressional authority.  *Morrison*, 529 U.S. at 627, 120 S.Ct.
1740.  Hence, § 4248 lies beyond Congress's Commerce Clause
authority." Comstock, 551 F.3d at 280.  See also United States v.
Tom, 448 F.Supp.2d 931, 935-938 (D. Minn. 2008) (same).


    3.   The Act Exceeds Congress' Power Under The Necessary And
         Proper Clause Because It Does Not Facilitate The
         Exercise Of Any Enumerated Power.

    The seminal case interpreting the Necessary and Proper
Clause is M'Culloch v. Maryland, 17 U.S. 316 (1819).  The
question before the Court in M'Culloch was whether Maryland had
the right to tax a branch of the Bank of the United States
located within that state.  See M'Culloch, 17 U.S. at 318-19.  To
answer that question, the Court first needed to decide whether a
statute incorporating a Bank of the United States was a, "...
constitutional law(s) enacted by congress to carry into effect
the powers vested in the national government." Id. at 323.  If
so, then Maryland would, "...have no power, by taxation or
otherwise, to retard, impede, burden, or in any manner control"
this legitimate exercise of power by the national sovereign.  Id.

The Court began by noting that the Constitution does not deny to the national government "incidental or implied powers." Id. at 406.  Instead, "...whether the particular power which may become the subject of contest, has been delegated to the one government, or prohibited to the other...depend(s) on a fair construction" of the Constitution as a whole.  Id. at 406-07.

Looking at the relevant constitutional provisions, the Court noted that Congress' enumerated powers include the authority, "...to lay and collect taxes; to borrow money; to regulate commerce; to declare and conduct a war; and to raise and support armies and navies."  Id. at 407.  Given these incontestable fiscal powers of Congress, the Court concluded that Congress must impliedly have the authority to create a national bank because the existence of a national bank would assist Congress in the exercise of those powers and, "[t]he power being given, it is the interest of the nation to facilitate its execution."  Id. at 408 & 424.

Thus, the existence of enumerated congressional powers implies the allied power to take measures necessary and proper – or "plainly adapted to" – their execution, provided that the measures chosen do not contravene another constitutional prohibition.  Id. at 421.

-15-

The legitimacy of a claim of authority under the Necessary and Proper Clause depends on whether the action asserted to be "necessary and proper" in fact facilitates the execution of an enumerated power.  Any authority Congress possesses under the Necessary and Proper Clause is entirely derivative of, and adjunctive to, authority bestowed by another specific, enumerated power of the national government.

To date one appellate court has addressed the question of whether the Act is a valid exercise of legislative authority. United States v. Comstock, 551 F.3d 274 (4th Cir. 2009). In Comstock, as in each of the six district court cases addressing section 4248,[5] the Government asserted that the Necessary and Proper Clause authorizes Section 4248.  The Comstock court, however, held that Section 4284 was not sufficiently tied to the exercise of any enumerated power, and that it was not a proper exercise of any power possessed by Congress.  Comstock, 551 F.3d

---

[5] Prior to the Fourth Circuit's decision in Comstock, several lower addressed the issue of whether Section 4248 was a valid exercise of legislative power.  Compare United States v. Tom, 558 F.Supp.2d 921, 938, 941 (D. Minn. 2008)(holding that Congress lacked authority to enact § 4248) and United States v. Comstock, 507 F.Supp.2d 522 (E.D.N.C. 2007)(same) with United States v. Carta, 503 F.Supp.2d 405 (D. Mass. 2007)(holding that Section 4248 was a valid exercise of legislative power), and United States v. Shields, 522 F.Supp.2d 317 (D. Mass. 2007)(same), United States v. Abregana, 574 F.Supp.2d 1123, 1133-1134 (same); United States v. Dowell, No. CIV-06-1216-D, 2007 WL 5361304 at *7 (W.D. Okla. Dec. 5, 2007)(same).

at 284.  In doing so, the Court rejected the Government's
arguments that Congressional authority under the Necessary and
Proper clause was derived from Congress' power to enact criminal
statutes and its power to prevent criminal conduct.

a.   <u>The Power to Prosecute</u>

One of the categories of individuals subject to commitment
under Section 4248 are those committed to the custody of the
Attorney General pursuant to § 4241(d), which allows the temporary
commitment of individuals suffering from a mental disease or
defect rendering them incompetent to stand trial.  Thus, in
previous cases addressing the constitutionality of Section 4248,
the Government has relied on <u>Greenwood v. United States</u>, 350 U.S.
366 (1956) for the position that the Necessary and Proper Clause
authorizes the federal government to maintain custody of
individuals still subject to prosecution, like individuals subject
to commitment under § 4248 by way of a previous commitment under §
4241(d).

In <u>Greenwood v. United States</u>, the Supreme Court upheld
Congress's power to civilly commit an incompetent individual
pursuant to 18 U.S.C. §§ 4246 through 4248.  At the time Section
4244 (now 4241) provided that the involuntary commitment of such a
defendant must last, "...until sanity is restored, or until the

-17-

prisoner's condition is so improved that he will not endanger the officers, property, or other interests of the United States..." Greenwood, 350 U.S. at 368-69.  Eschewing a broad holding, the Court held that, "...in the context of this case" the defendant's indefinite commitment was, "...plainly within congressional power under the Necessary and Proper Clause." Id. at 375.  The defendant was in the custody of the federal government legitimately, and the power authorizing his initial and continued detention remained:

> The petitioner came legally into the custody of the United States.  The power that put him into such custody – the power to prosecute for federal offenses – is not exhausted.  Its assertion in the form of the pending indictment persists...The fact that at present there may be little likelihood of recovery does not defeat federal power to make this initial commitment of the petitioner. We cannot say that federal authority to prosecute has now been irretrievably frustrated.

Id.  Thus, because of the continued pendency of the indictment against him, the defendant's ongoing commitment in Greenwood was necessary and proper to assist the Executive in fulfilling its enumerated power to "...take Care that the Laws be faithfully executed." U.S. Const. Art. II § 3.

In Comstock, Shields, and Carta, the Government claimed that the holding in Greenwood renders constitutional the application of Section 4248 to incompetent federal defendants.  However, the Government obscured several crucial distinctions between

Greenwood's commitment and the commitment of a "sexually dangerous person" under Section 4248.

In Greenwood, the mental disorder leading to the defendant's commitment was the *same* mental disorder that rendered him incompetent to stand trial.  Thus, Greenwood's commitment was Necessary and Proper because it aimed to restore him to competency so that he could face a federal indictment.  Id. at 375.  A Section 4248 commitment, by contrast, need bear no relationship to the mental disorder giving rise to a defendant's incompetence to stand trial. Unlike the statute in Greenwood, Section 4248 does not contemplate a restoration to competency and consequent prosecution.  Compare Greenwood, 350 U.S. at 369 n. 4 with 18 U.S.C. § 4248.  More importantly, the Greenwood Court made repeated references to the fact that two court appointed psychiatrists had found Greenwood sane and competent to stand trial, and noted that "their testimony illustrates the uncertainty of diagnosis in this field and the tentativeness of professional judgment.  The only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment, even about a situation as unpromising as petitioner's." Id. at 375.  Because the holding was premised on the view that commitment was *not*

certain to be indefinite, the Government reaches beyond the Greenwood Court's holding in suggesting that the case sanctions the *indefinite* detention of persons who are found "sexually dangerous to others" under Section § 4248.

Other cases analyzing the federal competency scheme both before and after <u>Greenwood</u> have articulated similar limits on federal power under it, relying on a nexus between the defendant's mental illness and his violation of the federal criminal law to justify federal commitment, or ruling as <u>Greenwood</u> did that it is the extant possibility of federal prosecution that legitimizes the commitment.  See <u>e.g.</u> <u>United States v. Sahhar</u>, 917 F.2d 1197, 1203 (9th Cir. 1990) (indefinite detention of incompetent and dangerous federal criminal defendant justified because mental illness resulted in violation of federal criminal law prohibiting threats to President); <u>Higgins v. United States</u>, 205 F.2d 650, 652-53 (9th Cir. 1953) (federal government has authority to temporarily commit incompetent federal defendants awaiting trial but must release them when, after a "reasonable time," they have not regained competency); <u>Kitchens v. Steele</u>, 112 F.Supp. 383, 387 (W.D. Mo. 1953) (power of federal government to indefinitely commit incompetent federal defendant hinges on now obsolete language of Section 4247 requiring showing that if released, "he will probably

-20-

endanger the safety of the officers, the property, or other interests of the *United States...*") (emphasis added).

The district court in <u>Comstock</u> analyzed <u>Greenwood</u> and noted that <u>Greenwood</u> opinion was limited, and did not reach the issue of Congressional authority to civilly commit a prisoner as to for whom the power to prosecute is, in fact, exhausted.  The court noted that "[it] has not located any case law actually addressing a challenge to Congress' authority to enact such a civil commitment scheme designed to commit, among others, prisoners whose sentences are about the expire and with respect to whom the power to prosecute has arguably been exhausted simply to prevent generalized, nonspecific harm to the public." <u>Comstock</u>, 507 F.Supp.2d at 533 n. 7.  The Fourth Circuit similarly concluded that "*Greenwood* only approved the federal civil commitment of persons who had been charged with federal crimes but found incompetent to stand trial and for whom no state would take custody. *Greenwood* certainly did not approve the federal civil commitment of persons like [the respondents] - who have stood trial, been convicted, and fully served all federal prison sentences.  Accordingly, because no federal prosecution has been frustrated here, we cannot sustain § 4248 under *Greenwood*." <u>Comstock</u>, 551 F.3d at 284.

The Comstock Court also distinguished United States v. Plotts, 347 F.3d 873, 878 (10th Cir. 2003), which the government relied on for the proposition that section 4248 was Necessary and Proper to the executive's constitutionally delegated law enforcement powers. In Plotts, the Tenth Circuit upheld a DNA collection scheme applicable to an individual as a condition of his supervised release, concluding that the DNA Act was a valid exercise of Congressional power under the Necessary and Proper clause.  The district court in Comstock noted that there was a rational link between the provisions of the DNA Act and the enforcement of a valid federal criminal law: "Unlike the DNA Act, § 4248 is not an investigative tool and it does not aid in the prosecution or enforcement of federal criminal laws.  Rather, it provides indefinite detention or commitment of persons who have not necessarily been convicted of sexually violent crimes or child molestation to prevent the future commission of sexually violent acts and child molestation."  Comstock, 507 F.Supp.2d at 534.  The Court also noted that, because the DNA Act was applicable as a condition of supervised release, "it regulates the federal government's interaction with persons in federal custody during the terms of their sentences.  It does not attempt to regulate the behavior or constrain the liberty of individuals after the expiration of the sentences they served for their criminal conditions as § 4248 does."  Id.  The Fourth Circuit also rejected

-22-

the government's reliance on Plotts, noting that the DNA Act at issue in Plotts was constitutional under Congress's power to "'fashion *penalties* for the violation of valid *federal laws*,' or because of its power to 'aid the Executive in prosecuting those who . . . *violate federal criminal laws'* . . . Neither of these rationales supports 4248 because commitment under 4248 constitutes no part of a person's 'penalt[y]' or 'prosecut[ion]' for the violation of 'federal criminal laws.'" Comstock, 551 F.3d at n. 9. (citations omitted, emphasis in original).

For the foregoing reasons, Greenwood and Plotts do not support the government's arguments that the Necessary and Proper Clause authorizes Congress to enact Section 4248.

b.   The Power to Prevent Criminal Conduct

In previous cases addressing the constitutionality of Section 4248, the government also argued that Congress's power to commit individuals under the statute derives from its power to prevent the commission of criminal conduct.  The Government has relied on United States v. Perry, 788 F.3d 100 (3rd Cir, 1986) in which the Third Circuit upheld a presumption of the Bail Reform Act that certain defendants pose a threat to "the safety of the community" if granted pre-trial release as a necessary and proper means of preventing violations of federal criminal law.  The Government argued that Perry provided a source of authority for the

proposition that the Necessary and Proper Clause grants Congress
the power to prevent the commission of federal sex crimes.

The pre-trial detention scheme at issue in Perry is
distinguishable from § 4248 in several ways. In Perry, the
presumption of detention was triggered only for those individuals
charged with serious violations of one of four federal drug and
firearms statutes.  The statute was construed narrowly and the
court explicitly based its holding on its conclusion that the
statute "address[ed] only danger to the community from the
likelihood that the defendant will, if released, commit one of the
proscribed federal offenses." Perry, 788 F.3d at 111.  "Thus, in
Perry, the court perceived an explicit federal interest, i.e. the
prevention of specific federal crimes, and a distinct nexus
between the federal crimes with which the individuals in Perry
were charged and the presumption that those individuals would
commit one of the enumerated federal crimes again if not
committed."  Comstock, 507 F.Supp.2d at 537.

Unlike Perry, under § 4248 any federal prisoner is eligible
for certification as a sexually dangerous person, regardless of
the nature of his pending federal charges or federal conviction.
To be subject to the Act, it is not necessary for a potential
committee to stand accused or convicted of a federal sex offense.
Indeed, the Act does not require the existence of a pending
federal indictment of any kind for its operation.

-24-

The <u>Comstock</u> Court found this a significant distinction. First, it noted that Congress's constitutional authority to enact criminal laws is constrained by the requirement that such laws have a federal nexus.  Consequently, federal sex crimes have specific jurisdictional elements incorporated in them.  It then noted that it was the purview of the states to deal with "underlying conduct . . . sexually violent conduct stripped of the jurisdictional bases that typically enable Congressional criminalization and regulation." <u>Comstock</u>,507 F.Supp.2d at 539. Finally, the Court concluded that "Section 4248, unlike the statute at issue in *Perry*, is a statute broadly designed to authorize commitment to protect the general welfare of the community, a power that the *Perry* court believed was not within the scope of Congressional authority."  <u>Id</u>. at 538.

The Fourth Circuit was also not persuaded by the government's claim that Section 4248 was a necessary and proper exercise of its power to prevent the commission of criminal conduct, holding that "[S]ection 4248 thus sweeps far too broadly to be a valid effort to prevent federal criminal activity."  <u>Comstock</u>, 551 F.3d at 282. The Fourth Circuit noted that the government's reliance on <u>Perry</u> was misplaced because the Bail Reform Act contained a clear connection between the pretrial detentions and the Government's interest in preventing federal crime. <u>Comstock</u>, 551 F.3d at 282 (noting that the Bail Reform Act authorized pretrial detention

only if the court finds a likelihood that the detainee would commit one of four specific federal offenses).  The Court found the government's inability to demonstrate a connection to the federal criminal laws fatal to its argument:

> In contrast, §4248 contains no such connection: it does not refer to any federal crime, let alone require the Government to demonstrate that a person presents a risk of committing a specific federal crime.  Indeed, under § 4248, the federal government may commit a person even though he has never been convicted by any court - state or federal - of any crime of sexual violence.  Section 4248 only requires that the Government demonstrates that an individual in United States custody is 'sexually dangerous,' which encompasses *any* 'sexually violent conduct' - regardless of whether state or federal law criminalizes this conduct.  *See* 18 U.S.C. § 4247(a)(6)(2006)

> At its core, the Government's argument attempts to 'pile inference upon inference' so as to 'convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States.' *Lopez*, 514 U.S. at 567, 115 S.Ct. 1624.  Were we to accept the government's logic, Congress could authorize the civil commitment of a person on a showing that he posed a general risk of *any* sexually violent conduct, even though not all, or even most, of this potential conduct violated federal law.  This argument would convert the federal government's limited power to criminalize narrow forms of sexual violence into the general power to regulate all sexual violence, including acts which violate no criminal statute. Congressional power does not reach so far.

Comstock, 551 F.3d at 283.

Thus, the Fourth Circuit concluded that § 4248 was not a necessary and proper extension of Congress' power to prevent criminal conduct.

Section 4248 is an expansive assertion of national power untethered to any constitutional grant of authority and depending for its invocation only on the chance and arbitrary circumstance that a potential committee find himself in the custody of the Attorney General or the Bureau of Prisons. See 18 U.S.C. § 4248(a).  This happenstance occurrence is simply inadequate to imbue the government with the authority it seeks in the Act.  As such, Section 4248 exceeds Congress' power under the Necessary and Proper Clause.

4.    The Act Exceeds Congress' Power Under The Necessary And
      Proper Clause Because It Conflicts With The Federalist
      Structure of the Constitution

The Necessary and Proper Clause is merely an instrumentality for effectuating enumerated Congressional powers, and a law claimed to be necessary and proper is neither if it conflicts with another constitutional provision.  See Printz v. United States, 521 U.S. 898, 923-24 (1997)("When a 'La[w]...for carrying into Execution' the Commerce Clause violates the principle of state sovereignty reflected in the various constitutional provisions...it is not a 'La[w]...*proper* for carrying into Execution the Commerce Clause,' and is thus...'merely [an] ac[t] of usurpation' which deserve[s] to be treated as such.'" (citations omitted)); M'Culloch, 17 U.S. at 421 (even if end of legislation is constitutional, means employed to achieve end must

-27-

be consistent, "with the letter and spirit of the constitution" and must not be prohibited by it).

As argued supra, the Act is not a necessary and proper means of facilitating any enumerated power, and it is unconstitutional for that reason.  Beyond that, however, the Act is also unconstitutional because it upsets the federal structure of government established by the Constitution.

"'The several states in their character as parens patriae have general power and are under the general duty of caring for insane persons.  The prerogative is a segment of the police power.'" Higgins v. United States, 205 F.2d 650, 653 (9th Cir. 1953) (citation omitted); See also Gonzalez v. Oregon, 126 S.Ct. 904, 923 (2006) (federalism permits the states, "'great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort and quiet of all persons.'"); Morrison, 529 U.S. at 618 (founders denied federal government police power); Lopez, 514 U.S. at 566-67 (plenary police power retained by states and denied to Congress by the Constitution). Courts have repeatedly recognized that Congress, in enacting the federal competency statutes, observed the federalist limitations imposed by the Constitution by limiting their applicability to the few circumstances in which a genuine federal interest was present. See United States v. Charters, 829 F.2d 479, 487 (4th Cir. 1987) ("As the legislative history unequivocally states, Congress

-28-

considered the care and custody of the mentally ill to be a state function and not a task for the federal government."); <u>United States v. Baker</u>, 807 F.2d 1315, 1324 (6th Cir. 1986) (Congress placed limitations on use of Section 4246 commitment procedures because it believed, "...that it 'is essentially the function of the States' to provide care and treatment to mentally ill individuals whose sentences are about to expire or who no longer face federal charges because of their illness."); <u>United States v. Clark</u>, 617 F.2d 180, 184 n. 5 (9th Cir. 1980) ("The determination of legal competency by a federal court is limited to the purposes of a criminal trial in that court...The passage of 18 U.S.C. ss 4244 and 4246 was not intended to be an invasion of the general field of lunacy, which is reserved to the states.").

    In contrast to the federal competency statutes, which apply in limited circumstances and even mandate continuing efforts by the Attorney General to find state placements for committed individuals,[6] the Act is a limitless encroachment into an area that is traditionally and properly the domain of the states. Applying to anyone in the custody of the Attorney General or the Bureau of Prisons, it does not contain the inherent limitations on application of Section 4246, nor does it require repeated efforts by the Attorney General to find state placement for committees. <u>Compare</u> 18 U.S.C. § 4246(a), (d) <u>with</u> 18 U.S.C. § 4248(a), (d).

---

    [6]    <u>See</u> 18 U.S.C. § 4246(d).

<u>See also</u>, <u>Comstock</u>, at 551 F.3d at 283-8 (noting that the portion
of § 4246 which was addressed and upheld by <u>Greenwood</u> applied to
individuals for whom the current power to prosecute was not
exhausted and required the Attorney General to determine that
suitable arrangements for State custody were not available before
the federal government could undertake commitment).[7]  In addition,
the Act effects this major change in the distribution of power
between the federal and state governments even though Congress has
not provided any evidence – "an express statement of pre-emption
or...pervasive regulation" of the area of mental health, for
example – that this shift was its "clear and manifest" goal in
passing the Act.  <u>Commonwealth of Massachusetts v. Federal Deposit
Insurance Corporation</u>, 102 F.3d 615, 622 (1st Cir. 1996); <u>See
also</u>, <u>Puerto Rico Department of Consumer Affairs v. Isla Petroleum
Corp.</u>, 485 U.S. 495, 500 (1988). In the absence of such evidence,
this Court should not deem constitutional the radical revision of
the federal structure that is the result of the Act:

> Congress's perceived need for the sort of civil
> commitment statute at issue here does not create
> constitutional power where none exists. *See Morrison*,
> 529 U.S. at 627, 120 S.Ct. 1740.  Congress must instead

---

[7]While § 4246 also purports to allow the federal government to
civilly commit persons in federal custody whose sentences have
expired, the <u>Comstock</u> Court also correctly notes that provision was
neither at issue nor addressed by the Supreme Court in <u>Greenwood</u>.
<u>Comstock,</u> 551 F.3d at 284.

seek alternative, constitutional means of achieving what
may well be commendable objectives.

The power claimed by § 4248 - forcible, indefinite civil
commitment - is among the most severe wielded by any
government.  The Framers, distrustful of such authority,
reposed such broad powers in the states, limiting the
national government to specific enumerated powers.
'[T]hat those limits may not be mistaken, or forgotten,
the constitution is written .' *Marbury v. Madison*, 5
U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803).  Section
4248 thus cannot be sustained as an exercise of
Congress's authority under the Commerce Clause or any
other provision of the Constitution.

Comstock, 551 F.3d at 284.

5.   Conclusion

The Act is not a valid exercise of Congress' Commerce Clause

power, nor is it a law Necessary and Proper to the exercise of

another enumerated power of the national government. Furthermore,

it represents a limitless expansion of the federal government into

an area of sovereignty reserved to the states.  The Act thus

exceeds Congress' power under Article I, Section 8 of the

Constitution and is inconsistent with the Tenth Amendment.  It is

therefore facially unconstitutional.

**II.   THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT DENIES
       DEFENDANTS' RIGHT TO EQUAL PROTECTION OF THE LAWS.**

The Equal Protection Clause of the Fourteenth Amendment

commands that "no state shall deny to any person within its

jurisdiction the equal protection of the laws," which is

"essentially a direction that all persons similarly situated

should be treated alike."  City of Cleburne v. Cleburne Living

Center, 473 U.S. 432, 439 (1985) (internal citation and quotation marks omitted).  A federal law that violates equal protection is likewise unconstitutional because "if a classification would be invalid under the Equal Protection Clause of the Fourteenth Amendment, it is also inconsistent with the due process requirement of the Fifth Amendment." Johnson v. Robison, 415 U.S. 361, 366 n.4 (1974).

Here, the Act violates equal protection in two separate ways. First, the Act arbitrarily singles out a class of persons – all federal prisoners, whether or not ever convicted of a sex crime – as eligible for possible lifetime civil commitment as "sexually dangerous."  Second, the Act arbitrarily subjects one class of mentally ill federal prisoners – those with a disorder that results in a "serious difficulty in refraining from sexually violent conduct or child molestation" – to greater procedural and substantive burdens than those imposed on mentally ill federal prisoners whose disorder poses a generic "substantial risk of serious bodily injury to another person."

1.   The Act Is Subject to Strict Scrutiny.

Neither of these classifications can pass constitutional muster, regardless of the level of scrutiny the Court applies. Nevertheless, the Court should apply strict scrutiny in evaluating the Act.

-32-

The "Supreme Court has not squarely addressed the appropriate level of scrutiny to apply to civil commitment statutes." Hubbart v. Knapp, 379 F.3d 773, 781 (9th Cir. 2004).  Ordinarily "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest" or government purpose.  Cleburne, 473 U.S. at 440.  However, classifications of a suspect class, e.g., race, national origin, and laws that impinge on fundamental rights are subject to strict scrutiny and can be sustained only if narrowly tailored to serve a compelling state interest.  See Id. (holding mentally retarded persons not suspect class and no fundamental right in zoning ordinance at issue, but strict scrutiny required when "laws impinge on personal rights protected by the Constitution"); Kramer v. Union Free School District No. 15, 395 U.S. 621 (1969) (voting rights); Shapiro v. Thompson, 394 U.S. 618 (1969) (interstate travel); Skinner v. Oklahoma ex rel Williamson, 316 U.S. 535 (1942) (sterilization of certain offenders).

Because civil commitment may result in a lifetime deprivation of liberty, strict scrutiny should apply.  See Foucha v. Louisiana, 504 U.S. 71, 85-86 (1992) ("Freedom from physical restraint being a fundamental right, the State must have a particularly convincing reason, which it has not put forward, for such discrimination against insanity acquittees who are no longer

-33-

mentally ill."). Here, in any event, the Act fails even under the more relaxed "rational basis" standard.

   2.   <u>The Act Denies Defendants Equal Protection Of The Laws
        Because The Class Of All Federal Prisoners Is Not
        Rationally Related To The Governmental Purpose Of
        Incapacitating Sexually Dangerous Persons</u>.

The Act authorizes the Attorney General or the Director of the Bureau of Prisons to certify as "sexually dangerous" persons who are in the custody of the Bureau of Prisons, persons who have been committed to the custody of the Attorney General after being found incompetent to stand trial, or persons against whom criminal charges have been dismissed solely for reasons related to mental condition. <u>See</u> 18 U.S.C. § 4248(a). Put another way, the Act potentially subjects every federal prisoner, simply by virtue of being a federal prisoner, to an evaluation process that can result in lifetime civil commitment.

The class of persons in federal custody bears no correlation, let alone a rational relation, to the governmental purpose of incapacitating "sexually dangerous" individuals. "Based upon the most recent data . . . it is estimated that rape and sexual assault offenders account for about 1% of those serving time in Federal Prisons." <u>Sex Offenders and Offense</u>, Bureau of Justice Statistics (revised 2/6/1997) at 16-17. This is hardly surprising; since the federal government lacks a general police power to prosecute violent crime, the federal prison population contains relatively few sexually violent offenders and child

-34-

molesters.  See e.g, United States v. Morrison, 529 U.S. 598, 618
(2000) ("[W]e can think of no better example of the police power,
which the Founders denied the National Government and reposed in
the States, than the suppression of violent crime and vindication
of its victims.").

There is simply no logical nexus between the class of all
federal prisoners and the purpose animating the Act; the fact that
a person may have robbed a bank or distributed narcotics has no
bearing on the question of whether that person should be subject
to evaluation for possible civil commitment as a sexually
dangerous person.  Notably, in contrast, the pre-existing federal
civil commitment scheme is more narrowly targeted and may be
invoked only against persons in custody who are already
hospitalized for treatment of mental illness.  See 18 U.S.C. §
4246.

All persons in federal prison are subject to commitment
proceedings under the Act at the pleasure of the director of the
Bureau of Prisons.  Persons outside of federal prison can never be
subjected to such proceedings.  As the Supreme Court has noted,
the government "discriminates . . . in violation of the Equal
Protection Clause of the Fourteenth Amendment" when it can invoke
a particular civil commitment proceeding simply because the target
"at one time committed a criminal act."  Foucha, 504 U.S. at 84-85
.  Likewise here, the Act denies defendants equal protection of

the laws because it arbitrarily exposes only those who happen to
be in federal custody – for the most part, persons who have
committed a federal crime – to commitment as "sexually dangerous"
under the Act.  In other words the Act arbitrarily exposes all
federal prisoners - and nobody else - to possible lifetime
commitment in the absence of any nexus between federal prisoners
and the sexually dangerous persons the Act seeks to incapacitate.

  3.  <u>The Act Denies Defendants Equal Protection Of The Laws
      By Arbitrarily Imposing Greater Burdens On Federal
      Prisoners With A Particular Type Of Mental Disorder</u>.

     Under the Act, federal prisoners with a particular type of
mental disorder – one resulting in "serious difficulty in
refraining from sexually violent conduct or child molestation," 18
U.S.C. 4247(a)(6) – are subjected to a civil commitment scheme
that confers fewer procedural rights and imposes more substantive
burdens than the pre-existing civil commitment scheme applicable
to federal prisoners who pose some other kind of "substantial risk
of serious bodily injury to another person," 18 U.S.C. 4246(a).
Thus, individuals who are mentally ill and "sexually dangerous"
are denied rights granted to persons who are mentally ill and
dangerous in some other respect.  This type of discrimination
among purportedly "dangerous" mentally ill federal prisoners
violates the Equal Protection Clause.  <u>See</u> <u>e.g.</u>, <u>Baxstrom v.
Herold</u>, 383 U.S. 107 (1966); <u>Humphrey v. Cady</u>, 405 U.S. 504
(1972); <u>Jackson v. Indiana</u>, 406 U.S. 715 (1972).

The civil commitment scheme created by the Act differs from the pre-existing federal civil commitment scheme codified at Title 18, Section 4246 in at least two important ways:

First, the pre-existing civil commitment scheme applies only to persons in custody who are already hospitalized. The Act, in contrast, contains no such requirement and may be invoked against any person in custody. Compare 18 U.S.C. § 4246 (pre-existing commitment scheme) with 18 U.S.C. § 4248 (the Act as codified). The hospitalization requirement is important because there are multiple substantive and procedural hurdles that the government must clear before a prisoner can be hospitalized in the first place. See 18 U.S.C. § 4245 (provision governing hospitalization of prisoners alleged to have mental disorder requiring treatment). Among other things, a prisoner may object to hospitalization, which automatically stays any transfer. See id. At that point, the government may move for a hearing, which the court shall grant only upon determination that there is "reasonable cause to believe that the person is suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility." Id. The court may order hospitalization only after a full hearing, at which the government bears the burden of proof by a preponderance of the evidence. See id. Persons subject to commitment under section 4246 thus have

had the benefit of access to extensive legal proceedings that persons subject to commitment under the Act do not enjoy.

Second, the pre-existing commitment scheme requires ongoing efforts by the Attorney General to transfer committed persons to state custody.  See 18 U.S.C. § 4246(d) ("The Attorney General shall continue periodically to exert all reasonable efforts to cause such a State to assume such responsibility for the person's custody, care and treatment."  The Act contains no parallel provision.  See 18 U.S.C. 4248(d).

There is no rational basis for these distinctions, as Supreme Court precedent demonstrates.  In Baxstrom, for example, the Supreme Court struck down a New York law that subjected prisoners nearing release who are suspected of mental illness to a different civil commitment procedure than non-prisoners suspected of mental illness.  Specifically, in contrast to other mentally ill persons, prisoners were not afforded the right to a jury trial on the question of their sanity and were not afforded a judicial proceeding to determine whether commitment should be to a civil or correctional mental hospital.  See 383 U.S. at 111-12.  The Court explained:

> Equal protection does not require that all persons be
> dealt with identically, but it does require that a
> distinction made have some relevance to the purpose for
> which the classification is made.  Classification of
> mentally ill persons as either insane or dangerously
> insane of course may be a reasonable distinction for
> purposes of determining the type of custodial or medical
> care to be given, but it has no relevance whatever in the

> context of the opportunity to show whether a person is
> mentally ill at all.  For purposes of granting judicial
> review before a jury of the question whether a person is
> mentally ill and in need of institutionalization, there is
> no conceivable basis for distinguishing the commitment of
> a person who is nearing the end of a prison term from all
> other civil commitments.

Id.  Here, the distinction between Sections 4246 and 4248 among

purportedly "dangerous" mentally ill prisoners has even less of a

rational basis than the state's efforts in Baxstrom to distinguish

the "civilly insane" from the "criminally insane."

Similarly, in Jackson, the Court struck down an Indiana statute

that subjected pretrial detainees to a lower commitment standard

and more stringent release standard than those applicable to

persons not charged with offenses.  The Court explained:

> Baxstrom held that the State cannot withhold from a few
> the procedural protections or the substantive requirements
> for commitment that are available to all others . . . .
> [W]e hold that by subjecting [petitioner] to a more
> lenient commitment standard and to a more stringent
> standard of release than those generally applicable to all
> others not charged with offenses, and by thus condemning
> him in effect to permanent institutionalization without
> the showing required for commitment or the opportunity for
> release afforded [to all others], Indiana deprived
> petitioner of the equal protection of the laws . . . .

406 U.S. at 729-30.

Finally, in Cady, the Supreme Court applied the Baxstrom line

of cases to a state sex offender commitment statute by remanding

for an evidentiary hearing a constitutional challenge to a

Wisconsin law that failed to provide the right to a jury trial in

proceedings to extend a commitment.  The Court noted:

-39-

The equal protection claim would seem to be especially persuasive if it develops on remand that petitioner was deprived of a jury determination, or of other procedural protections, merely by the arbitrary decision of the State to seek his commitment under one statute rather than the other.

405 U.S. at 512.  The very same potential for arbitrary and discriminatory "statute shopping" is present here because the government can circumvent the rights embedded in Sections 4245 and 4246 by seeking commitment under the Act.

    4.   <u>Conclusion</u>

The Act denies defendants equal protection of the laws because it classifies them, as federal prisoners, in a fashion that bears no rational relationship to a legitimate governmental interest.  Additionally, it denies defendants equal protection of the laws by arbitrarily subjecting them to greater burdens and providing them with fewer protections than other allegedly dangerous, mentally ill persons in federal custody.  For those reasons, the Act is facially unconstitutional.

**III.  THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT SUBJECTS DEFENDANTS TO CRIMINAL PROCEEDINGS WITHOUT AFFORDING THEM REQUIRED CONSTITUTIONAL PROTECTIONS.**

"The categorization of a particular proceeding as civil or criminal 'is first of all a question of statutory construction.'" <u>Kansas v. Hendricks</u>, 521 U.S. 346, 361 (1997) (citation omitted). The first step in the process of statutory construction is to determine if Congress intended the law to establish civil or criminal proceedings.  <u>See</u> <u>Hendricks</u>, 521 U.S. at 361.  To make

-40-

this determination, a court must examine the text and structure of the statute to ascertain whether Congress, "'...indicated either expressly or impliedly a preference for one label or the other.'" Smith v. Doe, 538 U.S. 84, 93 (2002) (citation omitted).

Even if the legislature has labeled a statute "civil" that designation will not control where, "'the statutory scheme [is] so punitive in either purpose or effect as to negate [the State's] intention' to deem it 'civil.'" Hendricks, 521 U.S. at 361 (citation omitted).  To determine whether a statute is so punitive in purpose or effect that it qualifies as a criminal law notwithstanding its civil label, the Supreme Court has listed a number of factors for lower courts to consider:

> Whether the sanction involves an affirmative disability or
> restraint, whether it has been historically regarded as
> punishment,   whether it comes into play only on a
> finding of scienter, whether its operation will promote
> the traditional aims of punishment - retribution and
> deterrence, whether the behavior to which it applies is
> already a crime, whether an alternative purpose to which
> it may rationally connected is assignable for it, and
> whether it appears excessive in relation to the
> alternative purpose assigned...

Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963).

1.  Congress Intended The Act To Establish Criminal
    Proceedings.

On the face of the Act the lone factor weighing in favor of a determination that Congress intended it to establish civil proceedings is that it entitled the Act, "Civil commitment of a sexually dangerous person."  18 U.S.C. § 4248.  On the other hand,

there are two powerful indications that Congress intended the Act to establish criminal proceedings.

First, Congress' definitions of key terms make it abundantly clear that the Act, like any criminal statute, is primarily intended to protect the public.  Congress provided that a "sexually dangerous person" is someone, "who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous <u>to others</u>."  § 4247(a)(5) (emphasis added).  "Sexually dangerous to others" means, "that the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released."  § 4247(a)(6).  The Act is thus focused on the preventive incarceration of persons alleged to be predisposed to commit criminal acts against others to the exclusion of concern for the welfare and protection of the committee himself.  This distinguishes the Act from a traditional civil commitment scheme, in which concern for the welfare of the committed person is equal to, or paramount over, concern for the safety of third parties.  Cf. <u>Addington v. Texas</u>, 441 U.S. 418, 420 (1979) (Texas commitment statute provided for hospitalization for committee's "own welfare and protection *or* the protection of others")(emphasis added).

-42-

Second, Congress placed the Act in Title 18 of the United States Code, governing crimes and criminal procedure. See 18 U.S.C. § 4248. The Act was passed as one part of the Adam Walsh Child Protection and Safety Act of 2006 (Walsh Act). See 42 U.S.C. § 16901, et. seq. The Walsh Act consists of forty-eight separate statutes that are all related, in various ways, to the control of sex offenders and the protection of children. See, e.g., 42 U.S.C. § 16914 (listing sex offender biographical information to be included in national registry); 42 U.S.C. § 16987 (making available grants for online child safety programs to states, localities, and non-profit organizations). Of those forty-eight statutes *only six*, including Section 4248, were placed in the federal criminal code. See 18 U.S.C. § 2250 (criminal penalties for failure to register as a sex offender); § 3299 (eliminating statute of limitations for child abduction and sexual offenses involving children); § 2257A (criminalizing failure to keep records of simulated sexual conduct); § 2260A (providing additional penalty for registered sex offenders who commit sex crimes); § 2252C (criminalizing the use of deception to lure viewers to online pornography).

Thus, the Act keeps company in Title 18 with five other Walsh Act statutes, all of which either criminalize sex-related conduct, enlarge the time for prosecution of sex crimes, or provide for augmented punishment for sex offenders. Had Congress  intended

-43-

the Act to establish civil proceedings, it could easily have placed the statute in Title 42, governing the public health and welfare, with the other forty-two statutes comprising the Walsh Act.  That Congress chose not to do so is decisive evidence that it intended the Act to establish criminal proceedings. <u>Compare</u> <u>Kansas v. Hendricks</u>, 521 U.S. 346, 361 (1997) (Kansas sex offender commitment statute placed in the Kansas probate code).

Third, the fact that the Act focuses almost exclusively on detention for public safety and not the treatment of the offender, demonstrates that it is criminal.  Although it may be true that preventative detention of the dangerously mentally ill does not "necessarily" constitute criminal punishment, <u>Hendricks</u>, 521 U.S. at 363, where, as here, treatment of the committee is at best a secondary concern of the Government, the "legislative scheme begins to look punitive."  <u>Id</u>. At 381 (Breyer, J. dissenting) (noting that the Act at issue explicitly deferred diagnosis, evaluation, and commitment proceedings until a few weeks prior to the "anticipated release" of a previously convicted offender from prison).

      2. <u>The Act Is So Punitive In Purpose And Effect That It Must Be Considered A Criminal Statute</u>.

The conclusion that Congress intended the Act to establish criminal proceedings is only supported by an application of the <u>Mendoza-Martinez</u> factors, which demonstrates that the Act does, in

-44-

fact, establish criminal proceedings that punish "sexually dangerous person(s)."

First, the Act obviously imposes an affirmative disability or restraint – if committed, a "sexually dangerous person" is subject to an indefinite term of detention.  See 18 U.S.C. § 4248(d), (e).  Release from incarceration may be "conditional" upon the offender's ongoing compliance with a treatment regime and the offender may be re-institutionalized for straying from the ordered treatment.  § 4248(f).  Thus, like a probationer or a defendant on supervised release, even when he is at liberty a sexually dangerous person is subject to affirmative restraints.

Second, the indefinite detention by the federal government of sexually dangerous persons is decidedly the kind of sanction that has historically been regarded as punishment.  As the Supreme Court has noted, "[I]t is indisputable that involuntary commitment to a mental hospital after a finding of probable dangerousness to self or others can engender adverse social consequences to the individual.  Whether we label this phenomena 'stigma' or choose to call it something else is less important than that we recognize that it can occur and that it can have a very significant impact on the individual." Addington v. Texas, 441 U.S. 418, 425-26 (1979).  In the case of the Act, this stigma is augmented by branding as a "sexually dangerous person" and indefinite banishment from society, a measure that has long been regarded as

-45-

punishment.  See Lawrence M. Friedman, Crime and Punishment In American History 40 (1993) (banishment, or total exclusion from the community, was colonial punishment for the permanently dangerous and repeat offenders).

Third, commitment under the Act comes into play only on a finding of scienter.  The statute requires that the court find, by clear and convincing evidence, that the potential committee is a "sexually dangerous person."  18 U.S.C. § 4248(d).  To make that finding, the court must determine by clear and convincing evidence that the committee has, "engaged or attempted to engage in sexually violent conduct or child molestation..."  18 U.S.C. § 4247(a)(5).

Although the statute does not define "sexually violent conduct," presumably Congress did not intend, absurdly, to incarcerate persons who engaged in objectionable sexual conduct by mistake or accident.  Thus, the finding that a committee has engaged in sexually violent conduct or child molestation necessarily represents a finding that the conduct was engaged in with a culpable mental state akin to the mens rea of a criminal statute.  See e.g., 18 U.S.C. § 2241(a) (aggravated sexual abuse requires perpetrator to "knowingly" use force or threats to cause another to engage in sexual acts); 18 U.S.C. § 2251A (prohibited transfers of custody of children requires transfer be made with knowledge that child will be used in sexually explicit visual

depiction or with intent that child engage in sexual act for purpose of producing such visual depiction).

Fourth, indefinite commitment of sexually dangerous persons serves the purposes of retribution and deterrence.  The statute predicates incarceration and stigmatizing denomination as a "sexually dangerous person" on a finding that the committee has committed, or attempted to commit, conduct amounting to a crime. It therefore serves a retributive purpose.  <u>See</u> Note, <u>Toward A Constitutional Definition of Punishment</u>, 80 Colum. L. Rev. 1667, 1678-81 (1980) ("Punishment is the deprivation of legal rights in response to a prior offense for the purpose of deterrence and social condemnation.").

And, the Act serves the purpose of both general and specific deterrence - general deterrence by dissuading other sexually dangerous persons from engaging in prohibited conduct, and specific deterrence both by the physical incapacitation of the committee for the duration of his incarceration, and by influencing him not to re-offend and risk re-commitment.  <u>See</u> <u>United States v. Brown</u>, 381 U.S. 437, 458 (1965) ("One of the reasons society imprisons those convicted of crimes is to keep them from inflicting future harm, but that does not make imprisonment any the less punishment."); 4 W. Blackstone, <u>Commentaries</u> 11-12 (incapacitation as a purpose of criminal punishment).

-47-

Fifth, although the Act does not define "sexually violent conduct," the term is presumably meant to indicate behavior amounting to a crime, as the term "child molestation" certainly does.  Thus, the Act applies to behaviors that are already criminal.

Sixth, it is impossible to conclude that an alternative purpose to punishment may rationally be assigned to the Act.  The government refuses to provide the defendants with any information concerning what treatment, if any, will be offered to committees under the Act.  This refusal leaves a record devoid of any suggestion of an alternative purpose for the statute.  See Hendricks, 521 U.S. at 382 (Breyer, J., dissenting) (focus on treatment, "...as a kind of touchstone helping to distinguish civil from punitive purposes, is not surprising, for one would expect a nonpunitive statutory scheme to confine, not simply in order to protect, but also in order to cure.").

Seventh, assuming that the claimed alternative purpose for the Act will be treatment, the statutory scheme is excessive in relation to that purpose.  The statute mandates commitment on a finding of sexual dangerousness without considering whether gradations of dangerousness might warrant less restrictive approaches in some cases.  See § 4248(d).  Additionally, the statute fails to provide reasonable review procedures, mandating only an annual paper report on the committee's condition, rather

-48-

than providing for more frequent reports or hearings.  See §
4247(e)(B).  This infrequency of review is compounded by the
provision denying committees the right to petition for their
release within six months of a court finding that they remain
sexually dangerous.  § 4247(h).

     3.   The Act Fails To Provide The Constitutional Protections
          Required In Criminal Proceedings.

Because it establishes criminal proceedings, the Act should
provide for the full panoply of protections offered criminal
defendants by the Constitution, as follows.

     a.   Ex Post Facto Clause

Article I Section 9 prohibits Congress from passing any ex
post facto law.  See U.S. Const. Art. I § 9.  An ex post facto law
is a law, "'which imposes a punishment for an act which was not
punishable at the time it was committed; or imposes additional
punishment to that then prescribed.'" Weaver v. Graham, 450 U.S.
24, 28 (1981) (citation omitted).

The Act creates the additional punishment of indefinite
federal incarceration for sexually violent conduct or child
molestation that took place before its passage. Additionally, if
the undefined terms "sexually violent conduct" and "child
molestation" are construed to apply to conduct that was not
criminalized at the time it was committed, the Act will punish
acts for which punishment was not prescribed at the time of

-49-

commission.  Under either scenario, the Act is an unconstitutional violation of the ex post facto clause.

      b.   <u>Fourth Amendment</u>

The Act authorizes the detention, pending a court hearing, of a potential committee on the certification of the Attorney General, his designee, or the Director of the Bureau of Prisons. <u>See</u> § 4248(a).  The statute does not specify the evidentiary burden a certification must satisfy, nor does it call for the evidence prompting the potential committee's incarceration to be evaluated by a neutral magistrate.  <u>Id</u>.; <u>Gerstein v. Pugh</u>, 420 U.S. 103, 114 (1975) ("[T]he Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest.").  The Act thus effects a de facto arrest without a showing of probable cause.  <u>See</u> <u>Dunaway v. New York</u>, 442 U.S. 200, 212-13 (1979); <u>United States v. Trueber</u>, 238 F.3d 79, 93 (1st Cir. 2001).

Any and all evidence or statements tainted by this unconstitutional seizure must therefore be excluded from trial on the issue of sexual dangerousness.  <u>See</u> <u>Brown v. Illinois, 422 U.S. 590</u>, 603-04 (1975); <u>Wong Sun v. United States</u>, 371 U.S. 471, 484-85 (1963).  It is the government's burden to demonstrate that the evidence on which it seeks to rely is not tainted by the illegal seizure.  <u>See</u> <u>Brown</u>, 422 U.S. at 604 (<u>citing</u> <u>Nardone v. United States</u>, 308 U.S. 338, 342 (1939)).

-50-

c.   Fifth Amendment

The Act authorizes incarceration in excess of one year in a penitentiary-like setting.  It is therefore arguably an "infamous crime" for which grand jury indictment is required.  See United States v. Colt, 126 F.3d 981, 984-86 (7th Cir. 1997); See also Fed. R. Crim. P. (a)(1)(B).

Moreover, the potential committee enjoys the Fifth Amendment's protections against self-incrimination.  Thus, if the government wishes to interrogate a potential committee, it must first provide Miranda rights.  See  Miranda v. Arizona, 384 U.S. 436, 444 (1966).  Any statements obtained without benefit of Miranda warnings, or in disregard of a committee's invocation of his right to remain silent or to speak with an attorney, must be excluded from evidence against him.  See United States v. Browne, 891 F.2d 389, 394 (1st Cir. 1989); United States v. Downing, 665 F.2d 404, 406 (1st Cir. 1981).  Moreover, these protections apply even to interrogations occurring during incarcerations unrelated to the Act.  See Mathis v. United States, 391 U.S. 1 (1968); Palmigiano v. Baxter, 510 F.2d 534 (1st Cir. 1975).

d.   Sixth Amendment

The committee is entitled to a speedy and public trial and to a determination of the facts of his case by an impartial jury of his peers.  See Barker v. Wingo, 407 U.S. 514 (1972); Waller v. Georgia, 467 U.S. 39 (1984); Duncan v. Louisiana, 391 U.S. 145

(1968).  The indictment in his case must include all of the essential elements of the offense of being a sexually dangerous person as well as sufficient information and detail so that he may be protected against double jeopardy.  See United States v. Resendiz-Ponce, 127 S.Ct. 782 (2007).  The committee enjoys the right to confront the witnesses against him, and the right to compulsory process to secure the testimony of his own witnesses.  See Crawford v. Washington, 541 U.S. 36 (2004); United States v. Scheffer, 523 U.S. 303 (1998).  Finally, the committee is entitled to the assistance of counsel upon the filing of the certification document, which constitutes the beginning of formal adversarial proceedings.  See Moran v. Burbine, 475 U.S. 412 (1986).

> e.   Eighth Amendment

The committee enjoys a right to bail that is not excessive and, assuming he is ultimately found to be a sexually dangerous person, the penalty imposed on him must not be grossly disproportionate to the gravity of his offense as measured by evolving standards of decency.  See United States v. Montalvo-Murillo, 495 U.S. 711 (1990); Roper v. Simmons, 543 U.S. 551 (2005).

> 4.   Conclusion

Congress intended the Act to establish criminal proceedings and, in fact, proceedings under the Act are so punitive in purpose and effect that it must be considered a criminal law.  The Act is

therefore facially unconstitutional because it subjects Defendants to criminal proceedings without providing them with the protections afforded criminal defendants under the Constitution.

**IV.   THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT DENIES DEFENDANTS DUE PROCESS OF LAW.**

The Fifth Amendment to the United States Constitution provides that "no person shall be . . . deprived of . . . liberty . . . without due process of law."  Key elements of due process, recognized over centuries, include the requirements that deprivations of liberty must be based only on reliable evidence, that an individual must be afforded a prompt hearing before a judge to test the basis for a deprivation of liberty, and that the procedures employed in a proceeding are calculated to minimize the risk of an erroneous deprivation of liberty and other interests.

1.   The Act Violates Due Process Because it Authorizes Indefinite Commitment of Persons Who Have Never Been Convicted of or Charged with a Sex Offense.

In order to commit a person as "sexually dangerous" under the Act, the Court must find that the respondent, "has engaged or attempted to engage in sexually violent conduct or child molestation."  18 U.S.C. § 4247(a)(5).  Notably, the Act neither defines these terms nor requires that the prior conduct finding be predicated on an actual criminal conviction or charge, in stark contrast to similar statutes that have survived constitutional challenges.  The lack of such critical components – clearly

defined statutory terms and indicia of reliability conferred by criminal proceedings – violates Defendants' right to due process.

Because the Act authorizes indefinite detention, heightened procedural safeguards must apply.  As the Supreme Court has observed:

> [G]overnment detention violates th[e Due Process] Clause unless the detention is ordered in a <u>criminal</u> proceeding with adequate procedural protections, or, in certain special and narrow nonpunitive circumstances, where a special justification, such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint.

<u>Zadvydas v. Davis</u>, 533 U.S. 678, 690 (2001) (internal citations and quotation marks omitted).  The Court consistently has:

> upheld preventive detention based on dangerousness <u>only</u> when limited to specially dangerous individuals and subject to strong procedural protections. . . . . In cases in which preventive detention is of potentially indefinite duration, we have also demanded that the dangerousness rationale be accompanied by some other special circumstance, such as mental illness, that helps to create the danger.

<u>Id</u>. at 691.

In <u>Kansas v. Hendricks</u>, 521 U.S. 346 (1997), the Court evaluated whether a sex offender commitment statute satisfied these rigorous procedural requirements.  Specifically, the Court held that any civil commitment of a "sexually dangerous individual" must: (1) take place pursuant to proper procedures and evidentiary standards; (2) involve a finding of dangerousness to one's self or others; and (3) couple that proof of dangerousness

-54-

with proof of some additional factor such as mental illness or mental abnormality.  See Kansas v. Crane, 534 U.S. 407, 409 (2002) (discussing Hendricks).

The Court emphasized that the statute at issue in Hendricks "unambiguously requires a finding of dangerousness" and provides that "[c]ommitment proceedings can be initiated only when a person has been convicted of or charged with a sexually violent offense." Hendricks, 521 U.S. at 357 (emphasis added).  This requirement of a prior criminal process plays a crucial gatekeeping role.  As the Court has noted in substance on multiple occasions in a variety of circumstances, "there is a vast difference between accepting the validity of a prior judgment of conviction entered in a prior proceeding in which the defendant had a right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required facts under a lesser standard of proof." Apprendi v. New Jersey, 530 U.S. 466, 496 (2000).  Indeed, the "fact that person has been found, beyond a reasonable doubt, to have committed a criminal act" was a key reason why the Court upheld a civil commitment scheme for defendants who have been acquitted by reason of insanity.  See United States v. Jones, 463 U.S. 354, 364 (1983).

Consistent with this understanding of due process requirements, most if not all states to implement civil commitment provisions for sex offenders require a prior criminal charge

and/or conviction for a sexually violent crime.   See e.g., Ariz
Rev. Stat § 36-3701(7)(a); Calif. Welf. & Inst. Code § 6600(a)(1);
Fla. Stat. Ann. § 394.910(10)(a); 725 Ill. Comp. Stat. 207/5(f);
Iowa Code § 229.A2(11); Kan Stat. Ann § 59-29a02(a); Mass. Gen.
Laws ch. 123A, § 1; Mo. Rev. Stat § 632.480(5)(a); N.J. Stat. Ann.
§ 30:4-27.26; S.C. Code Ann. § 44-48-10(1); Tex Health & Safety
Code Ann. § 841.003; Va. Code Ann. § 37.2-900; Wash Rev. Code §
71.09.20(16); Wis Stat. § 980.01(7).  The fact "that a practice is
followed by a large number of states is . . . plainly worth
considering in determining whether the practice offends some
principle of justice so rooted in the traditions and conscience of
our people as to be ranked as fundamental." Schall v. Martin, 467
U.S. 253, 268 (1984) (internal quotation marks omitted).

     The requirement of a conviction is also eminently sensible as
a prudential matter.  Without such a predicate, the decisonmaker
in a civil commitment proceeding could be required to make factual
findings based on allegations of conduct decades in the past.

     By neglecting such a basic procedural and substantive
safeguard, the Act is "only a step away from substituting
confinements for dangerousness for our present system which, with
only narrow exceptions and aside from permissible confinements for
mental illness, incarcerates only those who are proved beyond a
reasonable doubt to have violated a criminal law." Foucha, 504
U.S. at 83.2.

-56-

2.   The Act Deprives Defendants of Due Process of Law
     Because it Deprives them of Liberty Without a
     Preliminary Hearing or "Probable Cause" Determination.

Defendants are currently detained beyond the dates when they were to have been released from custody imposed by criminal conviction and judgment.  This detention, pursuant to the civil commitment provisions of the Act, must comport with the requirements of due process.  See Vitek v. Jones, 445 U.S. 480, 491-92 (holding that civil commitment entails "a massive curtailment of liberty" and that "it is undeniable that protected liberty interests would be unconstitutionally infringed absent compliance with the procedures required by the Due Process Clause.") (internal citations and quotation marks omitted).

Even if defendants were still in custody under their criminal sentences they would be entitled to due process protection upon their certification as "sexually dangerous persons."  In addition to actual physical restraint, courts have noted that civil commitment implicates due process because of the accompanying social stigma, See Addington v. Texas, 441 U.S. 418, 425-26 (1979) and the various impositions required by treatment.  See Vitek, 480 U.S. at 492.  Moreover, designation as "sexually dangerous" is, itself, "precisely the type of 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life' that the Supreme Court held created a protected liberty

interest." <u>Neal v. Shimoda</u>, 131 F.3d 818, 830 (9th Cir. 1997) (citation omitted).

In short, both the initial certification of defendants as "sexually dangerous" and their continued detention past their scheduled dates of release from criminal custody represent deprivations of liberty that trigger due process protections.

Furthermore, given the time allowed for a court-ordered psychiatric evaluation, the complexity of factual and scientific proof at issue, and the schedules of counsel and the court, Defendants are likely, as a practical matter, to spend many months in detention before the court is able to hold a full hearing on the merits and make a final commitment determination.

A key component of due process is the right of a person whose liberty is curtailed to a prompt hearing before a neutral decisonmaker in order to test the basis and validity of the restriction. For example, "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." <u>Gerstein v. Pugh</u>, 420 U.S. 103, 114 (1975).  It is also "well-settled that the Fourth Amendment's protections against unreasonable searches and seizures apply to the involuntary hospitalization of persons for psychiatric reasons." <u>Ahern v. O'Donnell</u>, 109 F.3d 809, 815 (1st Cir. 1997).  Absent extraordinary circumstances, the probable cause hearing ordinarily should be held within 48 hours

of detention.  See County of Riverside v. McLaughlin, 500 U.S. 44, 56-58 (1991).

Notably, most if not all state civil commitment schemes for sex offenders expressly include a requirement for a judicial probable cause determination at the outset of proceedings.  For example, the Kansas statute approved by the Supreme Court in Kansas v. Hedricks, 521 U.S. 346 (1997), requires an adversarial probable cause hearing within 72 hours of filing a petition.  See Id. at 352 n.7; see also K.S.A. § 59-29a05(b).  Other state laws incorporate similar requirements.  See e.g., Ariz. Rev. Stat. § 36-3705 (Arizona); Cal. Wel. & Inst. Code § 6602(a) (California); Fl. Stat. ch. 394.915 (Florida); 725 Ill. Comp. Stat. 207/30 (Illinois); Iowa Code § 229A.5 (Iowa); Mass. Gen. Laws ch. 123A, § 12© (Massachusetts); Minn. Stat. § 253B.07, Subd. 7 (Minnesota); Mo. Rev. Stat. § 632.489 (Missouri); N.H. Rev. Stat. § 135-E:7 (New Hampshire); N. J. Stat § 30:4-27.28 (New Jersey); N.D. Cent. Code § 25-03.3-11 (North Dakota); S.C. Code Ann. § 44-48-80 (South Carolina); Va. Code. Ann. § 37.2-906 (Virginia); Wash. Rev. Code. § 71.09.040 (Washington); Wis. Stat. § 980.04 (Wisconsin); See also Schall, 467 U.S. at 268 (holding that state practice can be an important indicator of what due process requires).

-59-

3.   The Act Denies Defendants Due Process Of Law Because It
     Fails To Provide For Adequate Notice, Proof Beyond A
     Reasonable Doubt, And Trial By Jury.

The failure of the Act to mandate adequately detailed notice of the proposed basis for commitment, proof beyond a reasonable doubt, and a jury trial creates an unjustifiable risk that potential committees will be erroneously deemed sexually dangerous persons and deprived of their liberty.  Three Supreme Court decisions illustrate the necessity of these missing procedural protections to proceedings under the Act.

In Application of Gault, the Court held that due process required, inter alia, the provision of constitutionally adequate notice of charges in a juvenile case.  See 387 U.S. 1, 33-34 (1967).  Although recognizing the value of informality and a rehabilitative emphasis in juvenile proceedings, the Court rested its decision on the "reality" of the juvenile process, in which, "[a] boy is charged with misconduct.  The boy is committed to an institution where he may be restrained of liberty for years."  Id. at 27.  In light of the substantial liberty interest at stake, the Court held that notice, "...must 'set forth the alleged misconduct with particularity.'" Id. at 33 (citation omitted).

Three years after Gault, the Court in In re Winship held that due process required proof beyond a reasonable doubt of delinquency in juvenile proceedings.  See 397 U.S. 358, 368 (1970).  The Court rejected the, "'...civil label-of-convenience

which has been attached to juvenile proceedings'" and again based
its holding on the reality of juvenile adjudications, in which a
child may be stigmatized by a finding that he violated the
criminal law and may be committed to an institution.  <u>Winship</u>, 397
U.S. at 365-67.  The Court could not tolerate the imposition of
these consequences, "...on proof insufficient to convict him were
he an adult."  <u>Id</u>. at 367.

Lastly, in <u>Duncan v. Louisiana</u> the Court held that the right
to trial by jury is "fundamental to the American scheme of
justice," and thus applicable to the States.  391 U.S. 145, 149-
50.  <u>Duncan</u> was, of course, a criminal case decided under the
Sixth and Fourteenth Amendments.  <u>See</u> <u>id</u>. at 146-50.
Nevertheless, the Court's rationale for its holding is  applicable
to the due process clause and proceedings under the Act:

> Providing an accused with the right to be tried by a jury
> of his peers gave him an inestimable safeguard against
> the corrupt or overzealous prosecutor and against the
> compliant, biased, or eccentric judge... Beyond this, the
> jury trial provisions in the Federal and State
> Constitutions reflect a fundamental decision about the
> exercise of official power - a reluctance to entrust
> plenary powers over the life and liberty of the citizen to
> one judge or to a group of judges.

<u>Id</u>. at 156.

In salient respects, a proceeding under the Act starkly
resembles the juvenile delinquency proceedings in <u>Gault</u> and
<u>Winship</u> and the criminal trial in <u>Duncan</u>.

As with a criminal law, the overarching concern of the Act is the protection of the public.  By definition, a "sexually dangerous person...is sexually dangerous to others."  § 4247(5).  Thus, unlike a traditional civil commitment scheme, there is no mention in the Act of the potential committee constituting a danger to himself, and no suggestion that commitment is for his welfare.  Cf. Addington v. Texas, 441 U.S. 418, 420 (1979) (Texas commitment statute provided for hospitalization for committee's "own welfare and protection *or* the protection of others")(emphasis added).

Moreover, the Act mirrors criminal and juvenile delinquency laws by requiring that the government prove that the potential committee perpetrated a criminal act.  See § 4248(d) (court must find prisoner to be a sexually dangerous person to commit him) and § 4247(5) ("'sexually dangerous person'" means, *inter alia*, a person *who has engaged or attempted to engage* in sexually violent conduct or child molestation...") (emphasis added).[8]  This requirement of a factual finding of criminal behavior distinguishes the Act from traditional civil commitment laws, under which evidence of criminal or quasi-criminal behavior might be introduced as symptomatic of a mental illness, but not because

---

[8]     The Act does not define the terms "sexually violent conduct" or "child molestation."  The defendants assume that the words of the statute are to be given their usual meaning and concludes that the terms are intended to refer to behavior that is generally considered criminal.

a criminal act was a statutory element to be proved. <u>Cf</u>.
<u>Addington</u>, 441 U.S. at 420 (proof of threatening and assaultive
behavior not required to be proved by commitment statute but
introduced at trial).

Finally, the finding of criminal conduct required by the Act
and the consequent labeling of the committee as a "sexually
dangerous person" entail serious consequences, beyond
incarceration, that are similar to those that follow upon a
juvenile adjudication or a criminal conviction.  Like a
"delinquent" or a "felon," the committee will be stigmatized by
his denomination as a "sex offender."  That stigmatizing
designation may, depending on the particular circumstances, be
accompanied by significant burdens, such as the obligation to
register with law enforcement, to refrain from living in certain
areas, and to tolerate harassment.  <u>See</u> <u>e.g.</u>, 42 U.S.C. § 16901
(declaring purpose of federal government to protect the public
from sex offenders and offenders against children by establishing
national registration scheme); Iowa Code § 692A.2A (barring sex
offenders from residing within 2000 feet of any school); <u>Doe v.
Pataki</u>, 919 F.Supp. 691, 697 (S.D.N.Y. 1996) (recounting incidents
of harassment of sex offenders).

The similarity of proceedings under the Act to the
proceedings in <u>Gault</u>, <u>Winship</u>, and <u>Duncan</u> counsels that similar
procedural protections should apply in all four settings.  To

determine whether due process requires the implementation of a particular procedural safeguard, this court must weigh:

> ...the private interest that will be affected by the official action...the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

The private interest of the potential committee under the Act is to avoid an erroneous and indefinite deprivation of his liberty, the unwarranted stigma of being found to be a sexually dangerous person who has committed criminal sexual conduct, and the serious social consequences of such an erroneous labeling.

Absent adequate notice, proof beyond a reasonable doubt, and trial by jury, the risk that an erroneous deprivation of the potential committee's private interests will occur is high.

Inadequate notice not describing with particularity the specific allegation the committee is expected to meet hampers his defense.  For example, the timely and thorough investigation of witnesses will be compromised because counsel will not be adequately informed of the facts requiring investigation, and counsel will not be able to properly prepare to confront the government's witnesses if they are vaguely identified or the relevance of their testimony is unclear.

A clear and convincing evidence burden of proof, while
perhaps adequate in a traditional commitment proceeding focused on
the welfare of the committee and not involving a finding of
criminal conduct, does not, "adequately instruct the factfinder
concerning the degree of confidence our society thinks he should
have in the correctness of factual conclusions" in a proceeding
under the Act, where a finding of criminal conduct is a predicate
to indefinite incarceration.  <u>Winship</u>, 397 U.S. at 370.

Nor is the clear and convincing evidence standard adequate to
guard against erroneous deprivations of liberty under a statute
that predicates indefinite incarceration on controversial
predictions of future dangerousness.  <u>Compare</u>, <u>Heller v. Doe by
Doe</u>, 509 U.S. 312, 321-24 (1993) (recognizing that difficulties
inherent in diagnosing mental illness and predicting future
dangerousness require a higher burden of proof for commitment than
is required for commitment of the mentally retarded, who are more
readily diagnosed) with <u>Addington</u>, 411 U.S. at 428-29 (declining
to require reasonable doubt standard in traditional civil
commitment scheme providing, "...layers of professional review and
observation of the patient's condition," that would, "provide
continuous opportunities for an erroneous commitment to be
corrected.") and 18 U.S.C. § 4247(e)(1)(B), (e)(2), (h) (providing
only annual paper review of committee's condition, barring
committee-initiated discharge petitions within six months of a

court determination that committee shall not be discharged, and requiring only that facility director "shall inform" committees of "any" rehabilitation programs that may be available).

Recognizing the inadequacy of any lower standard, approximately half of the states that have enacted laws authorizing the commitment of sex offenders require proof beyond a reasonable doubt in their commitment proceedings.  See Ariz.Rev. Stat. § 36-3707; Cal. Welfare & Inst. Code § 6604; 725 Ill. Comp. Stat. 207/35(f); Iowa Code § 2297A.7(4); Kan. Stat. Ann.§ 59-29a10; Mass. G.L. ch. 123A § 14(d); S.C. Code Ann. § 44-48-100; Tex Health & Safety Code § 841.062; Wis. Stat. § 980.05(3)(a).[9]

---

[9]     For similar and related reasons, the discharge provision at Section 4248(e) violates due process.  The provision provides that if, after hearing, the court finds by a preponderance of the evidence that, "...the person's condition is such that he will not be sexually dangerous to others" he shall be released unconditionally or with conditions, as the case may require.  § 4248(e)(1), (2).  A substantially identical provision at § 4246(e)(1), (2) has been held by at least one court to place the burden of showing "recovery" on the committee.  See United States v. McCallister, 963 F.Supp. 829 (D.Minn. 1997).

If Section 4248(e) is interpreted to place the burden of proving that he is no longer sexually dangerous on the committee, it violates due process because this burden-shifting unjustifiably risks the possibility that his commitment will be wrongly protracted.  If, on the other hand, Section 4248(e) is interpreted to place the burden on the government to show that the committee remains sexually dangerous, the provision violates due process by permitting continued incarceration on a preponderance of the evidence standard, rather than by a proof beyond a reasonable doubt standard.  On either interpretation, the Act denies the committee due process and is facially unconstitutional.

In addition, two district courts have held that applying a clear and convincing standard to the determination of whether an individual "engaged or attempted to engage in sexually violence conduct or child molestation" violates the potential committee's due process rights.  See Comstock, 507 F.Supp.2d at 559; Shields, 522 F.Supp.2d at 329.

Given the politically and emotionally charged nature of any proceeding relating to "sexually dangerous person(s)," due process requires that the potential committee be given the opportunity to have the facts of his case, and the application of the law to those facts, determined by a jury of his peers who can be screened for their impartiality and objectivity, who are not subject to the same political and institutional pressures as prosecutors and judges, and who can benefit from one another's input and reflections on the case.

Finally, the governmental interest in dispensing with the proposed additional procedures is slight.  Very little cost, either monetary or in terms of effort, should be involved in making the certification document a clear and sufficiently detailed statement of the allegation the government intends to prove. The application of the burden of proof beyond a reasonable doubt standard imposes no fiscal burden on the government and cannot be said to otherwise hamper governmental objectives, since the United States clearly has no interest in committing someone

who is not, in fact, a "sexually dangerous person."  Finally, although the provision of a jury trial obviously entails a monetary commitment, that expenditure must pale in significance before the enhanced reliability offered by the collective wisdom of a group of impartial citizens.

    4.   <u>Conclusion</u>

Because the Act fails to require a sex offense charge or conviction as a predicate for indefinite commitment, dispenses with a preliminary hearing or probable cause finding prior to imposing detention, and does not mandate adequate notice, proof beyond a reasonable doubt of sexual dangerousness, and trial by jury, it denies Defendants due process of law.  For these reasons, it is facially unconstitutional.

**V.   THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT  VIOLATES DUE PROCESS AND CONTRAVENES ARTICLE I, SECTION 1 BY FAILING TO ADEQUATELY DEFINE KEY TERMS.**

Defendants maintain that the statutory language in Title 18, Section 4247(a)(5) and (a)(6) (defining the terms "sexually dangerous person" and "sexually dangerous to others") fails to adequately define those critical terms.  This failure renders Title 18, Section 4248 unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution, and delegates legislative responsibility to the

-68-

finder of fact in derogation of Article 1 §1 of the United States
Constitution.

As the Supreme Court warned in <u>Panama Refining Co. v. Ryan</u>,
293 U.S. 388, 421 (1935) in terms as relevant today as they were
then:

> Undoubtedly legislation must often be adapted to complex
> conditions involving a host of details with which the
> national Legislature cannot deal directly.  The
> Constitution has never been regarded as denying to the
> Congress the necessary resources of flexibility and
> practicality, which will enable it to perform its function
> in laying down policies and establishing standards , while
> leaving to selected instrumentalities the making of
> subordinate rules within prescribed limitations and the
> determination of facts to which the policy as declared by
> the Legislature is to apply.  Without capacity to give
> authorization of that sort we should have the anomaly of a
> legislative power which in many circumstances calling for
> its exertion would be but a futility.  But the constant
> recognition of the necessity and validity of such
> provisions and the wide range of administrative authority
> which has been developed by means of them cannot be
> allowed to obscure the limitations of the authority to
> delegate, if our constitutional system is to be
> maintained.

Accordingly, a statute must provide an "intelligible principle to
which the person or body authorized [to act] is directed to
conform".  <u>Id</u>. at 430.

Here, the statute fails to provide that "intelligible
principle."  While it requires a causal nexus between the "serious
mental illness, abnormality, or disorder" and the "serious
difficulty in refraining from sexually violent conduct" by
requiring that "serious difficulty" must result from "serious

mental illness," it neither defines nor cross references a
definition of those terms.

Nor does the Act provide any criteria or standards for the
executive or judicial branches to use in devising regulations or
uniform standards to determine whether a person should be
committed for what could be, literally, the rest of his life.
There are potentially as many definitions of the terms as there
are district court judges.  Defendants submit that these unguided,
open ended bases for an indefinite civil commitment provide no
bounds to delegated authority and constitute a congressional
abrogation of the legislative function, devolving it upon the
executive and judicial branches of government.

A statute is void for vagueness not only when it fails to
provide fair notice of its scope to the individual, but also where
it, "permits and encourages an arbitrary and discriminatory
enforcement of the law."  Papachristou v. City of Jacksonville,
405 U.S. 156, 170 (1972);  See also Grayned v.City of Rockford,
408 U.S. 104, 108-109 (1972) ("....if arbitrary and discriminatory
enforcement is to be prevented, laws must provide explicit
standards for those who apply them.  A vague law impermissibly
delegates basic policy matters to policemen, judges, and juries
for resolution on an *ad hoc* and subjective basis, with the
attendant dangers of arbitrary and discriminatory applications.");
Fantasy Book Shop, Inc. v. City of Boston, 652 F.2d 1115, 1119

(1st Cir. 1981) (licensing ordinance providing that license may be denied if it would, "otherwise significantly harm the legitimate protectable interests of the affected citizens of the city" and that, "no application shall be denied if the anticipated harm is not significant or if the likelihood of its occurrence is remote" is facially invalid as vague); Goldy v. Beal, 429 F.Supp. 640, 648 (M.D.Pa. 1976) (Pennsylvania involuntary commitment statute, requiring that person be in need of care to warrant commitment, promulgated impermissibly vague standard: "Such lack of specificity in a statute that authorizes an interference with the constitutionally protected right of physical liberty places insufficient limits on the discretion of officials who are responsible for its implementation, with the result that there is nothing in the statute to prevent it from being enforced arbitrarily.  Such a result amounts to vagueness that violates due process.").

"Serious difficulty" and "serious mental illness" are not self defining.  Other statutes employing the modifier "serious" define their terms.  For example, Title 18 Sections 43, 1365, 2119, 2332(b), and Title 21, Section 841, inter alia, all employ the term "serious bodily injury".  They do not leave the definition of that term to every member of the executive or judiciary acting on an ad hoc basis.  "Serious bodily injury" is specifically statutorily defined.  See 18 U.S.C. §43(d)(4);

§1365(h)(3); 21 U.S.C §802(25).  In another instance, the term "serious drug offense" is specifically defined in Title 18 Section 924(e)(2).

Nor does the Act define "sexually violent conduct" or "child molestation."  See § 4247(a)(5), (6).  In this respect, it is as unlike state sex offender commitment statutes as it is unlike the federal statutes cited, *supra*.  To take just a few examples, Kansas, Illinois, Washington, and Massachusetts all define the terms "sexually violent offense" or "sexual offense."  See KSA §29a02 (e); 725 ILCS 207/5(e); RCWA 71.09.020; M.G.L. c.123A §1.

Because the Act neither defines key terms itself nor directs those who are charged with applying it to another source of definitional authority, it is unconstitutionally vague in violation of due process and it illegitimately delegates legislative authority in contravention of Article I, Section 1. The statute is facially unconstitutional.

**VI.  THE ACT IS A FACIALLY UNCONSTITUTIONAL DENIAL OF DUE PROCESS OF LAW BECAUSE THE EXPERT TESTIMONY IT REQUIRES IS INSUFFICIENTLY RELIABLE TO PROVIDE THE CLEAR AND CONVINCING EVIDENCE NEEDED FOR COMMITMENT AS A SEXUALLY DANGEROUS PERSON.**

Under the Kansas sexually violent predator act addressed in Hendricks v. Kansas, 521 U.S. 346 (1997), civil commitment required proof that a person was convicted of or charged with a sexually violent offense and suffered from a mental abnormality or personality disorder, "which makes a person likely to engage in

the predatory acts of sexual violence." 521 U.S. at 357.[10]   As construed by the Supreme Court, the statute required a finding of future dangerousness and linked it to a mental abnormality or personality disorder, "that makes it difficult, if not impossible, for the person to control his dangerous behavior." 521 U.S. at 358.  The Court held such a finding sufficient to meet due process standards.  In Kansas v. Crane, 534 U.S. 407 (2002) the Court again addressed the Kansas statute, holding that the state need not establish a complete lack of volitional control to comport with due process standards; proof of serious difficulty was sufficient.

As the Supreme Court has recognized in addressing state civil commitment statutes, factual issues are, "only the beginning of the inquiry.  Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists".  Allen v. Illinois, 478 U.S. 364, 371 (1986) (citation omitted);  See also KSA §59-29a05 and 29a06; 725 ILCS 207/10, 207/25, 207/30, and 207/35; RCWA 71.09.040 and 0.50; MGLA c.123A §§ 1,13 and 14; NH Rev. Stat. §§135-E:3 and E:9 for illustrative state statutes requiring

---

[10]  It also provided for a jury trial, employed a proof beyond a reasonable doubt standard, required care and treatment for a person confined, provided for a yearly review and allowed the individual to petition for release at any time.

evaluations by qualified examiners and authorizing the retention of such examiners by the defendant in sexually dangerous or sexually violent person commitment proceedings.

The Supreme Court has also recognized the many inadequacies of such expert psychiatric/psychological predictive testimony.  In Addington the Court rejected a requirement of proof beyond a reasonable doubt for civil commitment because: "Given the lack of certainty and the fallibility of psychiatric diagnoses, there is a serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous."  441 U.S. at 429.  Yet, in Heller v. Doe by Doe, 509 U.S. 312, 321-322 (1993), the Court upheld Kentucky's use of a lower standard of proof in commitments for mental retardation (clear and convincing evidence) than for commitment based on mental illness (beyond a reasonable doubt) because mental retardation is easier to diagnose than mental illness and, therefore, imposing a higher burden of proof for mental illness commitments would lessen the risk of an erroneous commitment.  The Court also noted difficulties in predicting future violent behavior by the mentally ill, recognizing that "...many psychiatric predictions of future violent behavior by the mentally ill are inaccurate." Id. at 324.

Notwithstanding the recognized inaccuracy of psychiatric predictions of future dangerousness, in Barefoot v. Estelle, 463

-74-

U.S. 880, 896 (1983) the Supreme Court rejected defendant's contention that future dangerousness could not be established by psychiatric testimony.[11]   However, the question and statute addressed in <u>Barefoot</u> differed significantly from the question and statute at issue here. There, the question addressed by psychiatric testimony was the probability of the defendant's commission of future criminal acts of violence that would constitute a continuing threat to society, <u>see</u> 463 U.S. at 894 – a question that the Court had held in <u>Jurek v. Texas</u>, 428 U.S. 262 (1996) was one a jury could consider in determining whether the death penalty should be imposed because it permitted consideration of mitigating circumstances and, therefore, did not violate the Eighth and Fourteenth Amendments to the United States

---

[11]   As noted in <u>Barefoot v. Estelle</u>, 463 U.S. 880, 920 (1983) the American Psychological Association (APA) took the position in 1983 that psychiatric testimony concerning the  prediction of future dangerousness was inadequate because its best estimate was that psychiatric predictions of long-term future dangerousness were wrong in two out of every three cases. In declining to bar this testimony, the Court pointedly noted that the rules of evidence in place at the time would generally allow its admission: "[T]he rules of evidence generally extant at the federal and state levels anticipate that relevant, unprivileged, evidence should be admitted and its weight left to the fact finder, who could have the benefit of cross examination and contrary evidence by the opposing party." <u>Id</u>. at 898.  However, the Court signaled that the evolution of science and the law might cause it to revisit its decision, stating: "We are unconvinced, however, *at least as of now*, that the adversary process cannot be trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness, particularly when the convicted felon as an opportunity to present his own side of the case." (emphasis added).

Constitution.  It was not a question requiring the presentation of psychiatric testimony.  Indeed, in Jurek, no psychiatric testimony was presented at sentencing.  Jurek, 428 U.S. at 267; Barefoot, 463 U.S. at 897. Unlike the issue to be decided here, the issue in Jurek and Barefoot did not require proof of mental illness or abnormality in the defendant or require proof of a causal connection between that diagnosis and the probability that the defendant would be unable to stop himself from committing criminally violent acts.

Here, the definitions of "sexually dangerous person" and "sexually dangerous to others" in Section 4247(a)(5) and (a)(6) used for civil commitment, require proof that the person has engaged in or attempted to engage in described conduct and that he, "suffers from a serious mental illness, abnormality or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation". Section 4247(b) provides that  psychiatric or psychological examinations shall be conducted by a licensed or certified psychiatrist or psychologist.  While the first component of the definition of "sexually dangerous person" is thus a question of historical fact (has a person engaged in or attempted to engage in particular conduct), the second component -- whether a person suffers from, "a serious mental illness, abnormality, or disorder, as a result of which he would have serious difficulty in

refraining from sexually violent conduct or child molestation if
released" -- is a combination of mental state and prediction.
Indeed, it requires a prediction about future conduct for an
individual who, in many cases, has been incarcerated for a number
of years and whose predicate conduct occurred many years earlier.
Accordingly, unlike the statute addressed in <u>Barefoot</u>, expert
psychiatric or psychological testimony is an integral component of
the federal civil commitment statute for sexually dangerous
persons.

Defendants maintain that while psychiatric or psychological
evidence is necessary for commitment under the statute – to
establish the requisite "serious mental illness" etc. and causally
link that illness to the requisite, "serious difficulty in
refraining from sexually violent conduct or child molestation if
released," Sections 4247(a)(5) and (a)(6)– the available science
in the field is not sufficiently reliable to meet the current
evidentiary standards established by <u>Daubert v. Merrell Dow
Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) and <u>Kumho Tire Co.,
Ltd. v. Carmichael</u>, 526 U.S. 137 (1999).  In sum, because mental
health professionals cannot reliably evaluate whether an
individual's  mental illness will result in serious difficulty in
refraining from certain conduct if the person is released, and
because the statute requires clear and convincing evidence of that
"serious difficulty", denies defendants due process of law by

subjecting them the unjustifiable risk of an erroneous deprivation
of liberty based on unreliable evidence.

In Daubert, the Court addressed the standard for the
admission of expert testimony in the context of scientific expert
testimony, concluding that the Federal Rules of Evidence
superseded the "general acceptance in the field" Frye[12] test and
placed limitations on the admissibility of expert testimony. 509
U.S. at 587,589.  The Court construed Fed. R. Evid. 702 as
imposing a gatekeeping obligation on the trial judge.  The trial
judge:

> must determine at the outset, pursuant to Rule 104(a),
> whether the expert is proposing to testify to (1)
> scientific knowledge that (2) will assist the trier of
> fact to understand or determine a fact in issue.  This
> entails a preliminary assessment of whether the reasoning
> or methodology underlying the testimony is scientifically
> valid and of whether that reasoning or methodology
> properly can be applied to the facts on issue.

509 U.S. at 592-593.  The Court set out some "general
observations" to assist the lower courts.  A "key question" is
whether the theory or technique has been tested.  Id. at 593.
Another "pertinent consideration" is whether it has been subjected
to peer review and publication.  Id. at 593-594.  The court also,
"ordinarily should consider the known or potential rate of
error...and the existence and maintenance of standards controlling

---

[12]  Frye v. United States, 54 App.D.C. 46, 293 F. 1013
(1923).

the technique's operation..." Id. at 594.  General acceptance
within the relevant scientific community may still be relevant.
Id.  The focus of the "flexible" inquiry is, "solely on principles
and methodology..." Id. at 595.

In Kumho Tire, the Court addressed Daubert's application to
experts testifying based on "technical" and "other specialized"
knowledge", concluding that the gatekeeping obligation also
applied in these areas.  Id. at 141-142.  The gatekeeping focus is
on reliability: "The objective of that [gatekeeping] requirement
is to ensure the reliability and relevancy of expert testimony."
Id. at 152.  The centrality of reliability in evaluating the
admissibility of expert testimony is illustrated by the following
cases.

In United States v. Velarde, 214 F.3d 1204 (10th Cir. 2000)
the district court's failure to determine the  reliability of
expert testimony concerning allegations of child sexual abuse – a
pediatrician's testimony that the alleged victim's behavior and
statements were consistent with child abuse notwithstanding the
absence of physical evidence, and a psychologist's testimony that
the alleged victim's behavior was consistent with child abuse and
that she found no evidence that the alleged victim was subject to
lying or overexaggerated fantasizing  – required reversal and a
new trial.

In <u>United States v. White Horse</u>, 316 F.3d 769 (10th Cir. 2003) defendant was charged with sexually molesting his six year old son.  The court affirmed the district court's exclusion of a psychologist's testimony that the defendant did not have a sexual interest in underage boys. His testimony was based, in part, on an "Abel Assessment", a test which combines scores resulting from a person's viewing slides of clothed and partially clothed people and the results of a questionnaire designed to detect sexual behavior and willingness to admit to experiencing common social problems, and then subjects the combined score to three predictive equations, "in order to predict the likelihood that the subject is sexually interested in children under fourteen and that he would lie about his interest."  316 F.3d at 774-775.  Noting that there was no evidence that the slides had been tested with a statistically significant sample of Native Americans, that none of the slides contained pictures of Native Americans, and that a study stated that incest only cases had been excluded from the testing of two of the three predictive equations, the court agreed with the district court that the assessment was neither scientifically valid nor a good fit for the specific case. <u>Id.</u>.

In <u>United States v. Powers</u>, 59 F.3d 1460 (4th Cir. 1995) the court concluded that the penile plethysmograph test lacked sufficient reliability for admission in defendant's trial on incest abuse charges. <u>See</u> <u>also</u> <u>Doe ex rel. Rudy-Glanzer v.</u>

Glanzer, 232 F.3d 1258, 1266 (9th Cir. 2000) (no indicia of reliability to support admission of plethysmograph test as evidence at trial).  The Powers court also found proposed evidence that defendant did not meet the profile of a fixated pedophile was properly excluded in his trial for incest abuse because it failed to meet Daubert's relevancy test.  The psychologist would have testified that 40% of the time incest abusers exhibit characteristics of fixated pedophiles while defendant did not.  As the court concluded: "At most, this evidence would have shown only that [defendant] did not belong to a group that comprised forty percent of incest abusers....To be relevant, this testimony must show, in a very real way, that *because* [defendant] did not share a characteristic common to a large minority of incest perpetrators, he was less likely to be an incest perpetrator himself."  In the absence of a proffer of evidence to link a non-proclivity for pedophilia with a non-proclivity for incest the testimony was properly excluded.  59 F.3d at 1471-1472.

The Daubert decision and the accumulating research showing the unreliability of predictions of future dangerousness have led some courts to conclude that expert testimony regarding future dangerousness is now, contrary to Barefoot, inadmissible under the Federal Rules of Evidence.  For example, writing in a capital case in which the government alleged the aggravating factor of future dangerousness, the District Court of Massachusetts (Wolf, J.)

engaged in a lengthy analysis of the intersection between <u>Daubert</u>
and expert testimony regarding future dangerousness, concluding
that "[d]evelopments in the law and more recent scientific
research suggest that expert testimony on future dangerousness
would be *inadmissible* under the Federal Rules of Evidence . . ."
<u>United States v. Sampson</u>, 335 F.Supp.2d 166, 218 (D. Mass. 2004)
(emphasis added).[13]  <u>See also</u> <u>Flores v. Johnson,</u> 210 F.3d 456, 464
(5th Cir. 2000) (Garza, J., concurring) ("On the basis of any
evidence thus far presented to a court, it appears that the use of
psychiatric evidence to predict a murderer's 'future
dangerousness' fails all five <u>Daubert</u> factors."). In addition to
these cases, a variety of law review articles have questioned the
continuing admissibility of future dangerousness predictions after
<u>Daubert</u>.[14]

---

[13]In <u>Sampson</u> the issue before the Court was whether the
aggravating factor of future dangerousness should be submitted to
the jury.  The Court acknowledged that its decision to submit
this aggravating factor to the jury was controlled by the United
States Supreme Court's decision in <u>Jurek v. Texas</u>, 428 U.S. 262
(1976), which upheld a death penalty statute with an aggravating
factor of "future dangerousness."  However, the Court opined that
"[t]his court's experience in this case, however, suggests that
it may now be appropriate for the Supreme Court to revisit
<u>Jurek</u>." <u>Sampson</u>, 335 F.Supp.2d at 218.  The Court went on to
discuss the reliability of expert testimony regarding future
dangerousness  in great detail, concluding "[t]hus, this court
would probably have excluded any expert evidence offered on
future dangerousness because its probative value would have been
outweighed by the danger of creating unfair prejudice."  <u>Id.</u> at
220.

[14]<u>See</u> Clayton Skaggs, *Note, Kansas' Sexual Predator Act and
the Impact of Expert Predictions: Psyched Out by the Daubert*

If expert testimony regarding future dangerousness is insufficiently reliable to be admitted under Daubert, it must necessarily fail to prove future sexual dangerousness by a clear and convincing standard. Daubert, of course, requires only that the proponent of such evidence establish its relevance and reliability by a preponderance of the evidence before a court may admit it.  See Daubert, 509 U.S. at 593 n. 10 (citing Bourjaily v. United States, 483 U.S. 171, 175-76 (1987)); Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1107 (11th Cir. 2005); Bourne v. Town of Madison, 2007 WL 1447672 at 3 (D.N.H. 2007). Section 4248, however, mandates that the government must prove that an individual is a sexually dangerous person by *clear and convincing* evidence – a significantly more stringent standard than a preponderance burden.  If, therefore, expert testimony bearing on the issue of sexual dangerousness cannot be shown to be reliable even under the lesser preponderance standard,

_____

*Test*, 34 Washburn L.J. 320, 342 (1995) (assessing psychiatric predictions under the four identified Daubert factors, and concluding "a trial judge applying the Daubert Court's 'general observations' would find the expert predictions inadmissible"); Erica Beecher-Monas & Edgar Garcia-Rill, *Danger at the Edge of Chaos: Predicting Violent Behavior in a Post-Daubert World,* 24 Cardozo L. Rev. 1845 (2003); Thomas Regnier, *Barefoot in Quicksand: The Future of "Future Dangerousness" Predictions in Death Penalty Sentencing in the World of Daubert and Kumho*, 37 Akron L. Rev. 469, 488 (2004).  See also Michael H. Gottesman, *From Barefoot to Daubert to Joiner: Triple Play or Double Error*, 40 Ariz. L. Rev. 753, 755 (1998) (arguing generally that Daubert will require the exclusion of psychiatric predictions and that Daubert cannot be squared with Barefoot.).

-83-

then *ipso facto* it can never reliably prove sexual dangerousness by the more rigorous clear and convincing evidence standard of section 4248.  Since evidence of scientific risk assessment cannot demonstrate sexual dangerousness by the statutorily required clear and convincing evidence standard, the admission of expert testimony on that subject violates due process.  Simply put, the admission of expert testimony known to be inadequate to meet the burden of proof in this proceeding will violate due process because it will subject the respondent to an unjustifiable risk that he will be erroneously deprived of his liberty.

Freedom from physical restraint "has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." Foucha v. Louisiana, 504 U.S. 71, 80 (1992).  The Act, which restrains a person potentially for the remainder of his lifetime based on a prediction of sexual dangerousness that cannot be rendered reliable even by using the best available tools and information violates due process and is facially unconstitutional.

## CONCLUSION

For the foregoing reasons, the Act is facially unconstitutional and must be struck down.

## RESERVATION OF RIGHTS

To protect their right to adequately respond to any government pleadings and arguments, Respondent reserves the right

to supplement, amend, or alter these arguments, or to advance new arguments.  Respondent further reserves the right to introduce further evidence in support of these and any other arguments he may advance.

## **REQUEST FOR ORAL ARGUMENT**

Respondent hereby request oral argument in support of this Motion.

WAYNE HUNT

By his attorney,

/s/ Ian Gold
Ian Gold
   B.B.O. # 665948
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Tel: 617-223-8061

CERTIFICATE OF SERVICE

         I hereby certify that this document filed through the
ECF system will be sent electronically to the registered
participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non
registered participants on February __, 2009

                                    /s/ Ian Gold
                                    Ian Gold