1
      UNITED STATES DISTRICT COURT
       DISTRICT OF MASSACHUSETTS
2
 * * * * * * * * * * * * * * *
3 UNITED STATES OF AMERICA  *
             *
4      Petitioner, *
      vs.     *  CRIMINAL ACTION
5           *  No. 07-12063-JLT
 WAYNE HUNT      *
6     Respondent. *
             *
7 * * * * * * * * * * * * * * *

8    BEFORE THE HONORABLE JOSEPH L. TAURO
      UNITED STATES DISTRICT JUDGE
9      **DAY ONE OF NONJURY TRIAL**

10 A P P E A R A N C E S

11    OFFICE OF THE UNITED STATES ATTORNEY
     1 Courthouse Way, Suite 9200
12    Boston, Massachusetts 02210
     for the United States
13    By:  Mark J. Grady, AUSA
       Jennifer A. Serafyn, AUSA
14

15    FEDERAL DEFENDER OFFICE
     408 Atlantic Avenue
16    Boston, Massachusetts 02110
     for the Respondent
17    By:  Ian Gold, Esq.
       Timothy Watkins, Esq.
18

19          Courtroom No. 22
           John J. Moakley Courthouse
20          1 Courthouse Way
           Boston, Massachusetts 02210
21          April 27, 2009
           10:10 a.m.
22

23
      CAROL LYNN SCOTT, CSR, RMR
24      Official Court Reporter
    One Courthouse Way, Suite 7204
25    Boston, Massachusetts 02210
       (617) 330-1377

1                              **I N D E X**

2

3    **WITNESS:**          **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**

4    OPENING STATEMENT BY MR. GRADY................PAGE  4

5    OPENING STATEMENT BY MR. GOLD.................PAGE 27

6                        * * * * * * * * * *

7    LUIS ROSELL

8      By Mr. Grady     39
       By Mr. Gold                170
9

10

11

12                          **E X H I B I T S**

13

14   **GOVERNMENT'S:**

15

16        No. 1-28  Agreed Upon Exhibits            39
                    Per the Exhibit List

17

18        No. O   Sexual Offense Chronology        48
                  of Wayne Hunt

19

20        No. F   Records from the U.S. Parole     55
                  Commission

21

22        No. C   Psychiatric Evaluation           56
                  dated 3/15/77

23

24        No. K   State Police Records             64

25

No. G    Records from New York           88
         State Division of Parole

No. E    Records from Oneida             90
         Correctional Facility

No. H    DSM-IV-TR diagnostic features   97
         for Antisocial Personality
         Disorder

No. I    DSM-IV-TR diagnostic features   97
         for Pedophilia

No. A    Staff Summary from U.S.         168
         Department of Justice,
         Bureau of Prisons,
         Classification Study

No. B    Court Memorandum dated 7/10/64 168

No. N    Order dated 5/15/80            169

1                        **P R O C E E D I N G S**

2              **THE CLERK:**  All rise for the Honorable Court.

3              **THE COURT:**  Good morning, everybody.

4              (Whereupon, the Court and the Clerk conferred.)

5              **THE COURT:**  Good morning, everybody, again.  Are we

6    all set to proceed?

7              **MR. GRADY:**  Yes, we are.

8              **THE CLERK:**  This is civil action No. 07-12063,

9    United States of America versus Wayne Hunt.

10             Counsel please identify themselves for the record.

11             **MR. GRADY:**  Good morning, Your Honor.  Mark Grady

12   and Jennifer Serafyn on behalf of the United States.

13             **THE COURT:**  Good morning.

14             **MR. GOLD:**  Good morning, Your Honor.  Ian Gold and

15   Timothy Watkins of the Federal Defender Office for Wayne

16   Hunt.

17             **THE COURT:**  Okay.  Do you have an opening

18   statement?

19             **MR. GRADY:**  We do, Your Honor.

20             **THE COURT:**  Okay.

21              **OPENING STATEMENT BY MR. GRADY**

22             **MR. GRADY:**  Your Honor, for the past 35 years there

23   have been two constants in Mr. Wayne Hunt's life.  He has

24   either been sexually victimizing prepubescent children or he

25   has been incarcerated and unable to do so.  There has been

1    no middle ground.  He has either been in jail or he has been

2    victimizing children.  Neither probation nor parole nor

3    pending charges nor the virtual certainty of being returned

4    to prison has deterred Mr. Hunt in the slightest.

5          Over the last 35 years when Mr. Hunt has not been

6    incarcerated, he has sexually abused by his own admission at

7    least 30 different children.  For many of these children

8    Mr. Hunt's sexual offending was not a one-time event.  He

9    sexually abused many of these children as young as seven on

10   a weekly if not daily basis over a period of months if not

11   years.

12         Mr. Hunt has sexually abused these children on

13   dozens if not hundreds of occasions.

14         **THE COURT:**  Excuse me one second.

15         (Pause in proceedings.)

16         **THE COURT:**  Forgive me.  Go ahead.

17         **MR. GRADY:**  No problem.

18         Your Honor, the Court is familiar with the elements

19   the government must prove.  We must show that Mr. Hunt has

20   engaged in past acts of child molestation.  We must show

21   that Mr. Hunt presently suffers from a serious mental

22   illness, abnormality or disorder.  And we must show that

23   because of that serious illness, abnormality or disorder

24   Mr. Hunt will have serious difficulty in refraining from

25   further acts of child molestation.

1          The evidence you are going to hear concerning

2    Mr. Hunt's past acts is going to leave no doubt whatsoever

3    as to the first element, Your Honor.  And I will recount

4    briefly Mr. Hunt's past offenses.

5          You are going to hear evidence, you're going to

6    have evidence in the form of certified convictions,

7    transcripts and admissions of Mr. Hunt himself that over the

8    past 35 years Mr. Hunt has sexually molested over thirty

9    children.

10         You are going to have evidence that in 1973 at age

11   27 Mr. Hunt had his first encounter with the law for a

12   sexual offense.  He was arrested in California for molesting

13   two 11-year old boys he had met while working at a carnival.

14         You are going to learn that Mr. Hunt pled guilty to

15   one count of a lesser included offense of a knowing

16   molesting of a child.  You will learn that even prior to his

17   first encounter with law enforcement Mr. Hunt had two

18   additional victims ages 12 and another male, a young boy, 12

19   to 16 in early 1973.

20         You're going to have certified copies of the

21   testimony of those 11-year old children in that 1973 case,

22   Your Honor.  And they will describe for you the nature of

23   Mr. Hunt's sexual offending.

24         Briefly Mr. Hunt fondled one of the boys and the

25   genitals of one of boys and attempted to fondle the genitals

1    of another.  And, in fact, in addition to that testimony you

2    are going to hear admissions from Mr. Hunt the conduct in

3    question actually involved Mr. Hunt performing oral sex on

4    one of the 11-year old boys.

5         You're going to learn that Mr. Hunt's next

6    encounter with the law was in 1976 when he was arrested in

7    Louisiana for kidnapping a 12-year old boy.  But between

8    this time he's sentenced in 1973 in California and he was

9    given three years probation and told to stay away from

10   children.

11        During that period, between 1973 and 1976, you are

12   going to have evidence but not in the form of formal

13   charges, these are going to be in the form of admissions by

14   Mr. Hunt that he had between 15 and 20 additional child/boy

15   victims during this period.

16        You are going to hear that during this period

17   Mr. Hunt fled his probation in California.  He absconded

18   within two weeks of being placed on probation.  Probation

19   did not deter this defendant.

20        He moved to Louisiana where he ended up --

21   undertook teaching as a karate instructor.  You are going to

22   learn that both -- there were charges pending in various

23   counties in Louisiana at the time of his arrest for federal

24   kidnapping charges.

25        You are going to hear Mr. Hunt's acknowledgment

1    that during this time while he was teaching karate he

2    molested at least four of the children that he was teaching.

3            You're going to learn that in August of 1976

4    Mr. Hunt kidnapped a 12-year old boy from Louisiana taking

5    him to Mississippi, across state lines, and was arrested by

6    the FBI.

7            You're going to hear Mr. Hunt's acknowledgment that

8    the purpose and his intent in committing this kidnapping

9    offense was to sexually molest the boy.  So the evidence

10   will show at least with respect to the federal criminal

11   conviction that there was no sexual assault during the

12   course of that kidnapping.

13           You're going to learn that Mr. Hunt was sentenced

14   to ten years in prison in 1977 and he served approximately

15   five of those.  He was released in September 1981 and was on

16   federal parole at the time he moved to New York State.

17           And within nine to ten months, beginning in the

18   summer of 1982 Mr. Hunt began victimizing a new group of

19   between 12 and 14 children between the ages of 7 and 13.

20           You are going to hear evidence that beginning in

21   the summer of 1982 Mr. Hunt began his abuse of a minor whose

22   initials I'll use pursuant to the Court's rules G.D. whom

23   Mr. Hunt by his own admission sexually abused on a daily

24   basis from the summer of 1982 until his eventual arrest in

25   August of 1985.

1          Now, Your Honor, there were, in fact, dozens of

2     victims that Mr. Hunt sexually victimized between 1982 and

3     1985 but this does not come to the attention of law

4     enforcement until April of 1985.  And at that point Mr. Hunt

5     is charged with two counts of sodomy against two minor

6     prepubescent boys.

7          Mr. Hunt made bail on those charges in May of 1985.

8     And when Mr. Hunt made bail, he immediately absconded.  He

9     absconded from those charges.  He absconded from his federal

10    probation.  Mr. Hunt proceeded to commit a number of crimes

11    in order to first evade law enforcement and further to allow

12    him to continue to offend against children.

13          Mr. Hunt stole a power generator.  He stole an

14    all-terrain vehicle.  And he set up a campsite in a remote

15    part of northern New York where he could both evade law

16    enforcement and continue to sexually offend.  And I say

17    "continue to sexually offend" because Mr. Hunt brought a

18    12-year old boy and a 14-year old boy with him when he fled

19    from authorities in May of 1985.

20          And when the State Police finally tracked him down

21    in August of 1985, they found those boys at the campsite.

22    Mr. Hunt was arrested later that day at a nearby bus stop.

23          You're going to learn, Your Honor, that at the time

24    the police located Mr. Hunt's campsite, in addition to

25    finding the stolen generator and the stolen ATV and the two

1    boys for whom Mr. Hunt would later be convicted of

2    kidnapping, they found dozens of pictures.  And these were

3    pictures of Mr. Hunt engaged in sexual acts with

4    prepubescent children and pictures of prepubescent children

5    engaged in sexual acts with each other.

6         And the New York State Police through what can only

7    be described as excellent police work canvassed nearby towns

8    and neighborhoods.  And they through this work began

9    identifying the victims depicted in the photos.  And through

10   this work they identified an additional 13 or 14 victims

11   depicted in the photos and that led to the filing of a

12   60-count indictment in Rensselaer County, New York against

13   Mr. Hunt involving charges of kidnapping, using children in

14   a sexual performance, promoting the sexual performance of a

15   child and multiple counts of sodomy both in the first and

16   second degree in New York State.

17        You're going to learn that after his arrest in

18   August of 1985 Mr. Hunt pled guilty if you recall to those

19   original April 1985 sodomy charges.  He pled guilty to one

20   of those two in late 1985.  He pled guilty to the larceny

21   charges with respect to the power generator and was

22   sentenced to two to four years.

23        You're going to learn some two years later Mr. Hunt

24   pled guilty to 18 counts of that 60-count indictment that

25   developed from finding those two boys at the campsite and

1    those pictures.

2           You're going to learn that he pled guilty to two

3    counts of kidnapping in the second degree, a 12- and a

4    14-year old boy.  And you're going to learn that he pled

5    guilty to four counts of using a child in a sexual

6    performance depicting them in the pictures, three counts of

7    agreeing to promote those or sell those pictures for money,

8    six counts of sodomy in the first degree involving children

9    between the ages, boys between the ages of 7 and 10 years

10   old, involving Mr. Hunt engaging in both oral and anal sex

11   with those boys, and three counts of sodomy in the second

12   degree involving boys between the ages of 11 and 13, Your

13   Honor.

14          Mr. Hunt was sentenced to a cumulative sentence of

15   12 and a half to 25 years.  He served that sentence in the

16   New York State Prison System.  And he would then later be

17   violated on his federal parole from the 1977 kidnapping

18   charges which is how he ended up in federal custody, Your

19   Honor.

20          But even in New York State Prison Mr. Hunt

21   continued to attempt to gratify his pedophilic interests.

22   You're going to learn that in 1998 while incarcerated at the

23   Woodbourne Correctional Facility -- you're actually going to

24   hear from the guard himself -- Mr. Hunt was found in

25   possession of about a dozen pictures of young children

1    hidden on a computer that Mr. Hunt used.  And these are

2    pictures depicting prepubescent children including young

3    boys in bathing suits while in prison.

4            In short, Your Honor, the evidence that Mr. Hunt

5    has engaged in past acts of child molestation will be both

6    overwhelming and indisputable.

7            And, Your Honor, the government must also show that

8    Mr. Hunt suffers from a serious mental illness, abnormality

9    or disorder.  And like the evidence as to Mr. Hunt's acts of

10   child molestation, this evidence is going to be overwhelming

11   and indisputable.

12           Every expert you are going to hear from in this

13   case will tell you that Mr. Hunt is properly diagnosed today

14   as a pedophile, a diagnosis, a mental disorder recognized by

15   the American Psychiatric Association in its *Diagnostic and*

16   *Statistical Manual of Mental Disorders*, fourth edition.  And

17   to use the absolutely technical term, *Text Revised*.

18           Every one of those experts will tell you that

19   pedophilia is a serious mental disorder as that term is

20   defined in the Adam Walsh Act.

21           Now, they're going to tell you or you may hear

22   evidence that because Mr. Hunt has been incarcerated since

23   1985 that there are reasons to question that diagnosis.

24   Your Honor, the evidence is going to utterly refute the

25   notion that that diagnosis is any less valid today than it

1     was when Mr. Hunt was first placed into custody.

2          You're going to see in the *Diagnostic and*

3     *Statistical Manual* the American Psychiatric Association

4     itself, it states, and I quote, "The course of pedophilia is

5     usually chronic, especially those attracted to males."

6          Now, I will suggest, Your Honor, that the evidence

7     will show that the diagnosis of pedophilia is as valid today

8     as it was in 1985 or it would have been even prior when

9     Mr. Hunt was engaged in sexually offending.

10         First, this is evidenced amply but not only by

11    Mr. Hunt's unrelenting and prolific offenses against

12    children.

13         You are going to hear evidence in this case and you

14    will hear actually from I believe every expert, including

15    the defense's expert, that sexual attraction to children is

16    an enduring quality much like sexual orientation, whether

17    heterosexual or otherwise.  It is not something that goes

18    away and it is not something that fades with time.

19         Now, you're also going to hear evidence that this

20    diagnosis is particularly appropriate because Mr. Hunt's

21    pedophilia is particularly ingrained.  And the reason,

22    you're going to hear some explanation of why this is.

23         You're going to learn that every aspect, virtually

24    every aspect of Wayne Hunt's life when not incarcerated was

25    directed towards furthering his pedophilic interests.  He

1    chose professions that provided him ready access to

2    children.  He ran a carnival business.  He worked as a

3    karate instructor.  He formed relationships with the parents

4    of these children so as to better have access to the

5    children.

6              You're going to see records indicating that

7    Mr. Hunt by his own admission went out of his way to form

8    relationships with the parents and relatives of these

9    children so that he could be seen as someone, a "white

10   knight" in his own words, someone who could take care of the

11   kids, take care of the kids in lieu of the parents so he

12   could gain access.

13             You're going to hear, and as I said, Your Honor,

14   not probation, not parole, not current charges, not the

15   virtual certainty of being incarcerated and certainly not

16   past incarceration has deterred Mr. Hunt in the slightest.

17   His pedophilia is ingrained.

18             And, indeed, I have described situations in which

19   Mr. Hunt when even committing seemingly nonsexual crimes,

20   stealing an ATV, stealing a power generator, all of these

21   things, even seemingly nonsexual crimes were in furtherance

22   of his pedophilic interests.

23             Even in prison, Your Honor, Mr. Hunt continued to

24   act to attempt to gratify his pedophilic interests in

25   children.

1          You're going to learn with respect to those

2     pictures, those were materials Mr. Hunt was prohibited from

3     having.  He couldn't have those in his cell.  Mr. Hunt gets

4     in trouble in prison because he was hiding then.  He was

5     hiding them on the computer.  And the only reason -- well,

6     strike that, Your Honor.

7          The evidence is going to show you that Mr. Hunt was

8     hiding them because he didn't want anyone to know of his

9     continuing interest in children.

10         Just as the evidence of Mr. Hunt's past sexual

11    offenses is both indisputable and overwhelming, Your Honor,

12    I suggest the evidence in this case will be the same as to

13    the diagnosis.

14         Now, Your Honor, the government must also show that

15    Mr. Hunt will have serious difficulty refraining from

16    further acts of child molestation.  I would suggest in this

17    particular case, Your Honor, that the evidence I have

18    described to this point is itself alone enough to find

19    beyond clear and convincing evidence that Mr. Hunt would

20    have serious difficulty refraining in the unrelenting, the

21    unrepentant, the prolific nature of Mr. Hunt's offending.

22         He has offended against children virtually every

23    moment he has been out of prison.  That itself is enough to

24    show by clear and convincing evidence to this Court that

25    Mr. Hunt would have serious difficulty in refraining from

1    further acts of child molestation.

2           But that is not the only evidence you are going to

3    hear on this issue.  You're going to hear from three experts

4    the government will call in the field of sex offender risk

5    assessment.  Two of these experts, Dr. Katz and Dr. Rosell,

6    were appointed in this case at the request of Mr. Hunt.  And

7    you're also going to hear from a government expert.

8           Each of these experts, including the two experts

9    that were appointed in this case at the request of Mr. Hunt,

10   are going to tell you that in their professional judgment to

11   a reasonable degree of professional certainty Mr. Hunt will

12   have serious difficulty refraining in further acts of child

13   molestation.

14          Now, you're going to hear about the methodologies

15   by which these experts have reached this conclusion.  Each

16   relies in varying degrees, and some certainly more than

17   others, upon characteristics of Mr. Hunt that have been

18   shown through empirical studies of thousands of sex

19   offenders to correlate to a higher risk that they will

20   reoffend sexually.

21          You're going to hear how researchers in the field

22   of sex offender risk assessment have undertaken studies of

23   the characteristics of thousands, if not on occasion tens of

24   thousands, of sex offenders.  And they have identified

25   characteristics that are shared or that correlate to

1    reoffense, characteristics that are shared by those sex

2    offenders who are known to have gone out and committed new

3    sex offenses.

4         And you're going to hear how these studies have led

5    to the creation of what are called actuarial models.  And

6    what these models have done is identify the most

7    statistically significant factors that correlate to a risk

8    of recidivism.  And they have taken them, put them in a form

9    of a test and allowed individuals conducting sex offender

10   risk assessments to determine by asking a series of

11   questions the extent to which an individual, in this case

12   Mr. Hunt, shares the characteristics of the group of sex

13   offenders we know in the past went out and sexually

14   reoffended again.

15        In this case -- and I'll just give one example --

16   on the most commonly utilized test in the field, the

17   Static-99, Mr. Hunt receives a score of 11 out of a possible

18   12.  And what does that mean?  What is that going to tell

19   you, Your Honor?

20        Well, this tells us several things about Mr. Hunt.

21   First, he is in the highest possible risk group that is

22   measurable.  In fact, quite literally Mr. Hunt is off the

23   chart.  He scores so high there weren't enough people in the

24   original sample to come up with a score for those people.

25   The risk percentiles that accompany these scores only go up

1    to ten.   Quite literally Mr. Hunt is off the chart.

2           Second, for the six thousand plus sex offenders

3    that were used to create the risk profiles under the

4    Static-99, Mr. Hunt is in the 99.98 percentile.   And that

5    means basically that if you took a random sample of one

6    hundred of those individuals, no one would ever score higher

7    than Mr. Hunt.   02 percent of the time you would have an

8    individual scoring higher.

9           So with respect to that group of sex offenders that

10   they used to created the Static-99 Mr. Hunt scores as high

11   or higher than every single one of them.

12          Second, you are going to hear about risk

13   projections.   When the creator, when the researchers in the

14   field of sex offender risk assessment created these

15   actuarial models -- and, again, I'll use the Static-99, the

16   most commonly used actuarial model in the field -- they were

17   able to because they followed thousands upon thousands of

18   sex offenders, for a period of years, determined what -- how

19   often did individuals who shared the same score as Mr. Hunt

20   reoffend.

21          So what the Static-99 can also tell us, not only

22   that Mr. Hunt vis-a-vis other sex offenders is higher risk,

23   has more factors that correlate to recidivism, they can give

24   us exact percentages of the group that share the score of

25   Mr. Hunt, how they recidivated.

 1          Now, that's not actually true for Mr. Hunt.  When I

 2     said he's off the scale, the best we can do is to say

 3     individuals that scored a ten have certain percentages.  The

 4     test doesn't go as high as individuals who score 11.  There

 5     weren't enough people in the original sample that scored 11

 6     to even generate the numbers, Your Honor.

 7          But for individuals who scored 10 on the Static-99,

 8     you are going to hear testimony that the group of sex

 9     offenders they studied recidivated within a five-year period

10     at a rate between 34.9 percent and 50 percent and at the

11     ten-year window at a rate of between 49.7 and 59.9 percent.

12          And what this basically means, stating it another

13     way, for every one hundred offenders randomly selected with

14     the same -- with a ten, 34 to 50 would reoffend in five

15     years, 50 to 60 would reoffend within ten.

16          You are also going to hear in this case, however,

17     Your Honor, about characteristics which have been shown

18     through empirical studies to reduce risk.  The two most

19     salient in this case will be the issues of treatment.  Sex

20     offender treatment has been empirically shown in some

21     studies, not all, to reduce the risk of recidivism.  Age is

22     the other.

23          It is generally recognized in the field of sex

24     offender research, it is generally recognized across the

25     board for general criminality that as offenders age, the

1    risk of recidivism goes down.

2         And I'll deal first with treatment because that is

3    the most easily dealt with in this case.  None of the

4    experts you are going to hear from, Your Honor -- Mr. Hunt

5    underwent six months of treatment in 2003.  None of the

6    experts, the defense experts included, are going to tell you

7    the treatment presents a significant adjustment of risk for

8    Mr. Hunt.

9         And generally speaking what you are going to hear

10   is that for an individual whose pedophilia is as ingrained

11   as Mr. Hunt, an individual who offended for decades against

12   children, six months of sex offender treatment is not enough

13   to significantly reduce his risk.  They do not suggest that

14   more treatment could not but you're generally going to hear

15   from every single one of the experts in this case that six

16   months simply is not enough in their opinion.

17        The much more salient point, Your Honor, and

18   truthfully the only point in which this trial is going to

19   have very much dispute at all is the issue of Mr. Hunt's

20   age.  You are going to hear, and, in fact, every government

21   expert, every expert the government is going to call is

22   going to tell you that as -- it's generally recognized that

23   for all sex offenders recidivism goes down with age.  And

24   many peer reviewed published studies of sex offenders over

25   the age of 60 have shown very little recidivism rates when

1    one looks at rapists and child molesters together.

2           Every one of the government's experts will tell you

3    I reduced Mr. Hunt's risk based on his age.  I considered

4    this a significant protective factor when I reviewed whether

5    or not Wayne Hunt would have serious difficulty in

6    refraining from further acts of child molestation.

7           But for all of the experts you were going to hear

8    from that will be called by the government, two of whom were

9    appointed at the request of Mr. Hunt himself, they're all

10   going to tell this Court it's simply not enough for Wayne

11   Hunt.

12          First, because of Mr. Hunt himself.  Because

13   Mr. Hunt is, and in this regard, Your Honor, even if we

14   assumed -- and you're going to hear how studies and peer

15   reviewed published studies call into question whether, what

16   is generally true, the notion that as individuals age

17   recidivism goes down.

18          There are studies that call into question whether

19   this is true of all types of offenders, specifically

20   extrafamilial child molesters.  And when I say

21   "extrafamilial," individuals who offend against victims

22   outside of their families.  They're generally recognized to

23   be higher risk than incest offenders, Your Honor.  You will

24   hear that in the testimony.

25          But generally speaking there have been studies that

1   call into question the notion that the same general

2   principle, risk declines with age, applies to extrafamilial

3   child molesters.  And specifically there are studies that

4   call into question the notion that this risk declines for

5   high-risk extrafamilial child molesters.

6          Indeed, there are studies that show, generally

7   speaking there have been studies that showed recidivism

8   rates for offenders over 60 of less than ten percent.  But

9   one study conducted here with respect to individuals who had

10  been committed in Massachusetts as sexually violent

11  predators under state laws had shown for offenders under 60,

12  not only was there not -- and I'm directing the Court

13  specifically to the chart on the bottom on of the page

14  highlighted (indicating).

15         Not only was there no linear decline after age 34,

16  high-risk extrafamilial child molesters, they actually

17  increased their offending from ages 18 to 30, from a

18  percentage of approximately 20 percent to over 45 percent

19  between the ages of 30 and 40.  They continued to have

20  vigorously offended at about a 35, just over a 35 percent

21  rate between the ages of 40 and 50 and continued to reoffend

22  well over 20 percent between the ages of 50 and 60 and

23  continued to reoffend at just over a 16 and a half percent

24  rate over age 60.

25         So that's one of the reasons you are going to hear

1     that the government's experts simply don't believe that

2     Mr. Hunt's age despite the general research is enough in

3     this case.

4             Another problem with the research, Your Honor, is

5     that when you begin or you try to study sex offenders like

6     Wayne Hunt, that is, individuals who are over age 60 and who

7     the actuarials identify as being high risk, you begin to

8     talk about populations that are incredibly small.

9             You're going to hear, for instance, about an

10    article by the researcher that developed the Static-99 I

11    have been referring to in testimony.  And in 2006 he

12    conducted a study of whether or not the Static-99 accurately

13    predicted the recidivism rates of older offenders.

14            I don't know if I can -- maybe I will just pick the

15    part that I'm most interested in, Your Honor, and zoom in on

16    it.

17            When we looked at 60 and older offenders, and the

18    highlighted line is individuals that have been deemed to be

19    high risk, out of a group of several thousand offenders,

20    there were only 11 who are both 60 and by scoring are high

21    risk.  There are only 11.  And they reoffended, one

22    reoffended.  But you're also going to hear something

23    about -- you can see that percentage of 9.1 percent, Your

24    Honor.

25            And you're going to hear, however, about that

1    number next to it, 17 percent.  And even the defense expert

2    in this case is going to acknowledge that given the limited

3    number of samples, that that number has particular

4    significance here.  It means plus or minus 17 percent.

5         You're going to hear that that is what they call

6    the confidence interval.  And what that means is that as a

7    statistician we can be 95 percent sure that the recidivism

8    rate is actually within 9.1 percent plus or minus 17.

9         So you are going to hear even the defense's expert

10   acknowledge that with respect to this study the recidivism

11   rate could be as high as 26 or 27 percent for sex offenders

12   over the age of 60.

13        And another problem with this, Your Honor, is that

14   this particular study you will learn conflates rapists and

15   sex offenders.  That is the third reason why one would call

16   into question the notion that Mr. Hunt's age alone can

17   possibly lead to the conclusion that he would not reoffend

18   or would not have serious difficulty refraining.

19        And that is because there is no age at which child

20   molesters stop offending.  It hasn't been shown.  You're

21   going to hear examples, in this particular case you're going

22   to hear examples of an 88-year old recidivist, child

23   molester.

24        You are going to hear that one of the published

25   peer reviewed studies in 2002, one of the offenders who went

1    out and reoffended over the age of 60 was released at

2    72-years old from prison and reoffended within a year.

3    Again, a child molester.

4          What you're going to hear is that for that group

5    over the age of 60 who do reoffend, they are predominantly,

6    if not nearly exclusively, extrafamilial child molesters.

7          You are going to hear testimony about general

8    studies of sex offenders and the decline.  You are going to

9    hear that they conflate rapists who it is generally

10   recognized almost never offend over age 60 with child

11   molesters.  And what you end up with are artificially low

12   rates, Your Honor.

13         For these reasons, while you are going to hear, and

14   the government's experts will recognize that Mr. Hunt's age

15   is a very significant factor, it is simply not enough of a

16   factor for Wayne Hunt.  And it is about at the end of the

17   day Wayne Hunt, the extent and the nature of his offending

18   lead these experts to conclude that the age effect is

19   insufficient.

20         The frequency of his offending on daily occasions

21   over periods of years focused almost exclusively on

22   children.  You're going to hear that, in fact, the pattern

23   of his offending is abhorrent even within the pedophilic

24   community.

25         You are going to learn that Mr. Hunt is highly

1    unusual in offending against multiple victims at the same

2    time because pedophiles are concerned about being caught.

3    It's one thing to look at one child and say don't tell.  It

4    is another to look if Mr. Hunt has, after engaging in sex

5    with three or four children, to say you don't tell, you

6    don't tell, you don't tell, you don't tell, you don't tell,

7    you don't tell.

8         Mr. Hunt is abhorrent in virtually every aspect

9    that can be measured.  He is high risk, so high risk to be

10   off the charts.  He offended in an abhorrently frequent

11   manner.  He offended on parole, on probation.  Nothing has

12   deterred him, Your Honor.

13        At the end of the day when the Court is asked to

14   assess whether Mr. Hunt will have serious difficulty

15   refraining, the Court will have by the admission of the

16   government's experts the general admission that age reduces

17   recidivism but this general principle -- and it's stated

18   better by Dr. Carl Hanson who you will hear is one of the

19   most preeminent, if not the preeminent, researcher in the

20   field of sex offender recidivism.

21        And he states in his own 2006 article assessing

22   whether the Static -- excuse me -- a 2006 article assessing

23   whether the Static-99 accurately predicts recidivism rates

24   for older sex offenders over 60:

25             "The overall finding that age reduces the risk of

1    most offenders does not preclude the existence of a select

2    few offenders on whose risk remains unacceptably high as

3    long as they're physically capable."

4          And what you're going to hear, not from all of the

5    experts but from some of the experts who credit the

6    testimony, you are going to hear from the defense that age

7    reduces risk, that Mr. Hunt is so much of an outlier,

8    Mr. Hunt is so high risk that no matter what the general

9    statistic tells us he still would have serious difficulty

10   refraining.

11         Thank you.

12         (Pause in proceedings.)

13         **THE COURT:**  Go ahead.

14              **OPENING STATEMENT BY MR. GOLD**

15         **MR. GOLD:**  This is, of course, preventive

16   detention.  This type of proceeding is supposed to be the

17   exception to the rule that we handle criminal behavior in a

18   particular way by proving crimes by a high standard of proof

19   and after a crime is committed.

20         What the government is proposing to do here is to

21   detain Mr. Hunt based on the prediction that he will commit

22   future acts of child molestation.

23         Much of this case is not disputed as the government

24   said.  We don't dispute that Mr. Hunt persistently molested

25   children over the course of this 10-, 11-, 12-year period.

1    That's not -- it was, of course, behavior that when we hear

2    about it in narrative form right here in the courtroom

3    elicits outrage.  There no dispute about that.

4          But, of course, these incidents are 25 years in the

5    past.  He has served a prison sentence.  We are going to be

6    talking about this incident in 1998 and what that means, its

7    diagnostic significance and the rest of that.  But what we

8    have is a long and continued unremarkable period of time in

9    prison.  Mr. Hunt has served about half of his life in

10   prison.

11         The question is can the government justify

12   continuing to detain him by a showing that he continues to

13   be dangerous at a particular level.  And it's the

14   respondent's position that they just don't have the numbers.

15         Now, Your Honor, it's come up, the way it was

16   discussed by the government in the, in its opening argument,

17   I would like to ask the Court's indulgence to play just a

18   short video clip as part of my opening.

19         THE COURT:  Is it going to be evidence in the case,

20   the video clip?

21         MR. GOLD:  The evidence --

22         THE COURT:  First, let me ask this:  Is there any

23   objection?

24         MR. GRADY:  I've never seen it, Your Honor, so I

25   would have to object.

1          **MR. GOLD:**  Well, let me give a little bit more

2     detail.

3          **THE COURT:**  Usually we don't show anything to the

4     trier of fact until it has gone into evidence.

5          **MR. GOLD:**  This is a cultural reference which I

6     think is in the background.  It came up during the -- it's a

7     clip from the movie *Spinal Tap*.  So it's a part of the

8     common culture and something that came about during the

9     deposition in this matter.

10          And I think the reason I want to show it is because

11     it succinctly illustrates some of our arguments here about

12     the effect of these numbers on the participants in the case.

13          **MR. GRADY:**  Your Honor, the government would object

14     to using, whether it be cultural references or not, and the

15     purpose -- it seems like just a cheap trick here and it will

16     not add anything --

17          **THE COURT:**  Well, I am not going to subscribe to

18     the cheap trick characterization.  But it just basically --

19     it is not going to be shown to the trier of fact unless it

20     is going to come into evidence.  You are not going to be

21     able to get it into evidence I guess so --

22          **MR. GOLD:**  No, I wouldn't want to do that.  I think

23     I can achieve the same effect just by talking about it.

24          **THE COURT:**  Well, why don't you do that then.

25          **MR. GOLD:**  *Spinal Tap* is the, if the Court is not

1    familiar with it, it's one of the early mock documentaries.

2    It's by Rob Reiner.  And it follows a fictional heavy metal

3    band and is a send-up of that, a send-up of the culture of

4    heavy metal, glam rock and also documentaries fawning over

5    rock and roll stars.

6            And so it's a fictional group of British heavy

7    metal artists.  There is a scene where the director who is

8    interviewing one of the players was showing him around his

9    collection of, he's got a large collection of guitars and

10   things of that nature.  He's pointing all the different

11   things out.  And he has a special amplifier.  And he notices

12   and he shows the director.  He says, This is a very special

13   amplifier.  And the camera focuses in on all the knobs that

14   are on the amplifier.  And he points out, he says they all,

15   normally they go to ten, these go to eleven.  So that when

16   you're playing and you really need a little something extra

17   to really get over to the audience, you can turn it up a

18   little bit.

19           Now, a lot of the humor of this is captured in the

20   way it's acted out between the director Rob Reiner and the

21   guitar player but he says, the director says, Well, is that

22   louder?  And the guitar player says, Yes, it's a little

23   louder, of course, it goes to 11.  He said, Well, why don't

24   you just make 10 louder and then make, have that be the

25   highest number.  And the guitarist doesn't understand and he

1    just says, But these go to 11.

2           And that captures the basic argument that we make

3    about age, which is that, yes, Mr. Hunt is a sex offender

4    with a high score on one of the available actuarial

5    instruments that we'll hear testimony about but at his age

6    11 is not very loud anymore.  It is simply not a high-risk

7    number.

8           Now, the testimony that we're going to take in,

9    there will be three witnesses from the government:

10   Dr. Rosell who was proposed by the defense, someone who

11   typically does defense work and will be testifying today; a

12   Dr. Katz, a psychiatrist who will testify tomorrow, the

13   government's expert.

14          And then the defense has two experts that we'll be

15   putting on.  The first is Dr. Joseph Plaud who is a

16   researcher and also someone who frequently participates in

17   this kind of case as a testifying witness mostly for the

18   defense.

19          And then a Dr. Howard Barbaree who is one of the

20   leading lights in this field about risk assessment of sex

21   offenders and also the impact of age on sex offender

22   recidivism risk and the questions that are presented to

23   these forensic psychologists who come in and testify about

24   the risk posed in a particular case.

25          So he is not, we are presenting him not as someone

1    with a particular ax to grind but simply someone who is

2    going to be able to provide to the Court evidence regarding

3    the background of risk assessment and the impact of age on

4    these assessments.

5         Now, what we are going to learn is that, the chief

6    finding that we start out with in these cases is that

7    forensic psychologists and psychiatrists have been

8    participating in court proceedings like this one for a long

9    time giving predictions about what someone is going to do,

10   predictions of future dangerousness.  It happens in capital

11   trials.  It happens in the civil commitment context.  And it

12   also happens in these special sex offender post sentence

13   commitment hearings.

14        Now, the finding that all the experts, perhaps save

15   the testifying -- the psychiatrist who will be testifying

16   tomorrow will say is that we studied ourselves, the

17   clinicians studied the clinicians.  What we found out is

18   that clinicians are very bad at predicting future

19   dangerousness.  Even ones who you would expect would not be

20   bad, people who have been fully educated, people who have

21   been, had years to accumulate experience are no better than

22   graduate students.  And most of them are not very good in

23   terms of predicting dangerousness.  They tend to be subject

24   to the same sorts of biases and effects that anyone else,

25   any layperson would be, for example, provocative

1    information.

2          The government's selected expert will testify or

3    has testified in the deposition in this matter that

4    clinicians when they are presented with emotionally salient

5    information will tend to be conservative in their decision

6    making.  And that finding led to the production of these

7    more empirically-based methods of doing this type of thing.

8          What the psychologists and psychiatrists are going

9    to be saying is that we have moved toward an empirically

10   based way of doing this.  We don't just come in.  We are not

11   a priesthood giving the Court our sort of oracular opinions

12   about what should be done with a particular person.  We're

13   basing what we say on data.  And we can present the data to

14   you and show it to you.

15         This has led to what people in the field called

16   transparency where it used to be psychiatric and

17   psychological opinions were totally opaque.  Now they're

18   based on this information.

19         The government in its opening said what I thought

20   was a pretty extraordinary thing which is that they thought

21   they could stop, the government could stop with just a

22   description of the offending as it occurred 25 years ago and

23   a diagnosis of pedophilia, which is not essentially in

24   dispute in this case, it would be kind of pointless to

25   dispute that.  What we're talking about is the intensity of

1    the sexual drive and things like that in a 63-year old man.

2    That is what we are talking about.

3           But they could stop there without any evidence as

4    to what the relative or absolute risk of Mr. Hunt, what

5    degree of risk he poses of reoffending.

6           Our basic position, there are two factors in the

7    case:  His age and the fact that he has been a compliant

8    prisoner who participated in a treatment program which he

9    completed because it was a brief hit the street program.  It

10   was when his release from prison was being contemplated, he

11   participated in that.

12          The witness who will be testifying today,

13   Dr. Rosell acknowledges that he did quite well and was off

14   to a very good start in that.

15          Now, the impact of age -- and the government did a

16   good job I think of isolating what the issue is that is

17   going to be in contest in this case, is what is the impact

18   of age on the risk assessments that they're going to give.

19          The government's chief witness is, so subscribes to

20   the idea that the actuarials are the best way to provide

21   information to a court about what the future risk is that

22   she now does a pure actuarial approach and says that the

23   actuarials are the best that she can do for example.

24          The other two witnesses testified about the

25   actuarials in kind of different keys or different tones.

1    But what the thrust of our argument is, throughout the

2    cross-examinations of these experts and when we present

3    evidence on Mr. Hunt's behalf is that the age -- the impact

4    of the age data on these instruments that they claim are the

5    best, best information we have about predicting or assessing

6    the risk that someone poses cannot be underestimated.

7         Dr. Barbaree will testify that -- well, there is

8    two things.  There is a group of researchers, and the

9    government referred to them, who say that age should not be

10    accounted.  There are different means that we can state

11    about, there are different methods that we can put forward,

12    statistical methods to say that age in certain circumstances

13    shouldn't be taken into account when looking at these

14    actuarial instruments.

15         But the overwhelming trend of the evidence is that

16    criminal behavior, sexual behavior, sexual offending

17    behavior declines with age.

18         Now, what that means with respect to these risk

19    assessments is that it completely undermines them.  And we

20    are going to hear testimony about two things.  Dr. Barbaree

21    is going to testify that every research study that has been

22    done shows this decline that we would expect.

23         Second, when we look at the actuarial instruments,

24    in fact, age is so embedded in them they are when properly

25    analyzed essentially working as proxies for age.  That is,

1    young offenders are higher risk, older (ph.) offenders are

2    lower risk.

3         And if you are going to go about an

4    empirically-based method of assessing risk and not just kind

5    of giving us our -- giving us a lay opinion, well, then you

6    have to have some empirically defensible method to take

7    account for it.

8         And what the government claimed that their

9    witnesses do is exactly what we claim that they do, which is

10   they acknowledge it as a factor and then they simply say

11   that is not enough by their own lights.  But what they are

12   doing to justify their high-risk prediction in the first

13   place is apparently not relying on the conduct but how the

14   conduct translates into these instruments.  And then they're

15   just not, they're declining to adjust it for age.  But that

16   is simply inappropriate.

17        The numbers when applied to Mr. Hunt are not

18   correct.  That is our argument and that is what we will be

19   able to demonstrate, they are incorrect.  The correct

20   numbers are the ones that have been age adjusted.

21        A plausible number was presented to the Court

22   during the government's opening statement.  It is a 9.1

23   percent recidivism rate with high-risk offenders over 60

24   with a confidence interval of 17 percent, which gives us a

25   zero to 26 percent range.

1              I mean, in that sample that is the best that is

2      being done.  The recidivism numbers that are being attached

3      to Mr. Hunt are much higher than that by the state's (sic)

4      experts here.  And then they reserve to themselves whether

5      they're going to make an adjustment, basically either a

6      thumb's up or a thumb's down on Mr. Hunt whether they think

7      age has played a factor in the case or not.

8              But our argument is going to be if you are going to

9      be using this group data to make these, to provide this

10     information to the Court, you can't stop using group data

11     when it comes to age.  Age is something that is just

12     embedded in the entire project.

13             I just want to comment very briefly about the

14     witnesses and then I'll sit down, Your Honor.

15             Dr. Rosell and Dr. Katz -- Dr. Rosell is someone

16     who primarily works for the defense.  He was proposed and

17     appointed by the defendant.  He is someone who, we will

18     attempt to show is someone who is not doing what we say an

19     expert should be doing which is digesting information and

20     putting a plausible interpretation on it to the Court.  He

21     is simply doing the same type of opaque judgment that the

22     field is supposed to have moved beyond.

23             Dr. Katz is a psychiatrist.  He is simply not

24     familiar with a lot of the data that is going to be

25     discussed with the other witnesses in the case and is

1    essentially just giving his thumb's up or thumb's down to

2    the Court.  Essentially what the government just did, said

3    this is a bad case of pedophilia, he's not ready to be let

4    go.

5            But, again, remembering the burden of proof, the

6    government just doesn't have the data.  That's our position.

7    They need to justify continuing to detain a 63-year old man

8    who served an entire prison sentence, who owes (ph.) parole

9    until the year 2012 in the State of New York, probably the

10   most onerous conditions that one has ever seen, and saying

11   that that risk management is simply not sufficient.  This

12   man is so dangerous that he needs to be confined in this

13   exception while the exception to the, what otherwise happens

14   in the Criminal Justice System.

15           And with that I will sit down.

16           **THE COURT:**  Okay.  Call your first witness.

17           **MR. GRADY:**  Your Honor, the government would call

18   the respondent's own designated examiner Dr. Luis Rosell.

19           If you will give me a moment to get him?

20           **THE COURT:**  Yes.

21           (Pause in proceedings.)

22           **THE COURT:**  How do you spell his name again?

23           **MR. GRADY:**  Luis, L-U-I-S, Rosell, R-O-S-E-L-L.

24                       **LUIS ROSELL, Sworn**

25           **THE CLERK:**  Thank you.  You may be seated.

1          **MR. GRADY:**  Your Honor, before I proceed there are

2    28 agreed exhibits.  I would move to introduce those into

3    evidence at this time.

4          **THE COURT:**  Okay.  Tell us the number, the

5    designation.

6          **MR. GRADY:**  1 to 28.

7          **THE COURT:**  1 to 28.

8          **MR. GRADY:**  The first two binders that the clerk

9    has are agreed exhibits.

10         **THE COURT:**  Okay.  1 to 28 come in without any

11   objection.

12         **MR. GRADY:**  Thank you, Your Honor.

13         **(Exhibit Nos. 1-28 received in evidence.)**

14                   <u>**DIRECT EXAMINATION**</u>

15   BY MR. GRADY

16   **Q.**  Dr. Rosell, could you please state your name for the

17   record and spell your last name.

18   **A.**  Luis Rosell, R-O-S-E-L-L.

19         **MR. GRADY:**  Has the witness been sworn?

20         **THE CLERK:**  Yes.

21   BY MR. GRADY

22   **Q.**  Can you briefly -- strike that.

23         Can you take a look at Exhibits 3 and 4 in the

24   first of the three binders in front of you.

25         Can you just tell me what they are very quickly?

1    **A.**   The report that I submitted for this case and my vitae.

2    **Q.**   And can you briefly recount for the Court without going

3    into every detail your educational background?

4    **A.**   I have a bachelor's degree in psychology from the

5    Catholic University of America, a master's degree in

6    clinical psychology from the University of Cincinnati and a

7    doctorate in psychology from the Miami Institute of

8    Psychology.

9    **Q.**   And, again, because your CV is in evidence, can you

10   describe briefly, recount any relevant professional

11   experience?

12   **A.**   Most specific to sex offenders, I have been working in

13   one way or another with sex offenders since 1989.  I began

14   working at the Maryland Division of Correction at the

15   Reception Center.  They had a Sex Offender Program there, 24

16   beds inside the facility.  So I did individual group therapy

17   there.

18            Eventually I also did outpatient group treatment in

19   Baltimore City with the Johns Hopkins Sexual Disorders

20   Clinic.

21            And then when I moved to Miami to pursue my

22   doctorate, I also did outpatient sex offender treatment for

23   two years with both English- and Spanish-speaking sex

24   offenders.

25            While I was working on my doctorate I did my

1    dissertation on the issue of pedophilia.

2            Eventually I moved to Iowa in 1998 to be the Sex

3    Offender Treatment Director for the Iowa Department of

4    Corrections.  And I held that position for three and a half

5    years until 2002 when I resigned my position to go into

6    private practice as a forensic psychologist.

7    **Q.**  Since you went into private practice in 2002, have

8    you -- or strike that.

9            What, if any, work have you done in the field of

10   sex offender risk assessment?

11   **A.**  The work I have done, besides other work as a forensic

12   psychologist, in federal cases and in state cases about

13   competency and diminished capacity and child pornography and

14   disability evaluations, et cetera.  I have also done a great

15   amount of work with sexual violent predator and sexual

16   violent persons laws in several states in the United States.

17   **Q.**  And you've, in fact, testified previously in federal

18   court in similar proceedings to this; correct?

19   **A.**  I have, yes.

20   **Q.**  In the matter of U.S. versus Abregana?

21   **A.**  Correct.

22   **Q.**  In your professional career approximately how many

23   occasions have you been called upon to testify as an expert,

24   whether -- with respect to issues of sexual dangerousness?

25   **A.**  About 80 times I believe.

1   **Q.** And in those cases were you recognized by the courts as

2   an expert?

3   **A.** Yes.

4   **Q.** Were you ever not recognized to be an expert in the

5   field?

6   **A.** No, I have not.

7   **Q.** And aside from testimony you've provided, on

8   approximately how many occasions have you conducted a sex

9   offender risk assessment?

10  **A.** In all those cases and then I consulted and worked on at

11  least over 200 cases so far dealing with SVP law. And so in

12  every one of those I conduct some sort of risk assessment.

13  **Q.** Okay. And generally speaking, if we were to break it

14  down just to percentages, approximately how frequently would

15  you find individuals that you've reviewed in the past to be

16  dangerous and how often would you find them to be not

17  dangerous?

18  **A.** About 35 percent of the time on average I find them to

19  be dangerous.

20  **Q.** Okay. And conversely 65 percent not dangerous?

21  **A.** Correct.

22  **Q.** Now, with respect to this case, I just want to talk very

23  briefly about your general conclusions. You were asked to

24  undertake an evaluation under 18 U.S.C. 4247 and 4248;

25  correct?

1   **A.**   Yes.

2   **Q.**   And you were asked three questions:  Whether Mr. Hunt

3   had engaged in past acts of child molestation; whether

4   Mr. Hunt suffered from a serious mental disorder; and

5   whether Mr. Hunt would have serious difficulty as a result

6   of that disorder in refraining from further acts of child

7   molestation.

8           Could you just tell us very briefly generally

9   speaking what were your conclusions?

10  **A.**   I found that Mr. Hunt has the diagnosis of pedophilia

11  which in my opinion does make it difficult for him to

12  refrain from sexually violent conduct in the future if he

13  were to be released.

14  **Q.**   And you have reached that conclusion with a reasonable

15  degree of medical certainty?

16  **A.**   Yes, I have.

17  **Q.**   And with respect to the question of whether Mr. Hunt had

18  engaged in past acts of child molestation, what was your

19  conclusion?

20  **A.**   Well, based on my review and interview with him and his

21  report, he has engaged in past acts of sexual molestation.

22  **Q.**   Okay.  Can you briefly explain for me how it is you came

23  to be involved in this case?

24  **A.**   I was contacted by Mr. Gold to do an evaluation for the

25  Court.

1   **Q.**  And do you know if you were appointed by the Court?

2   **A.**  Yes, I was.

3   **Q.**  And do you know the title you were appointed?

4   **A.**  I think court evaluator or -- I'm not sure exactly the

5   title.

6   **Q.**  Okay.  Now, did you perform a psychological evaluation

7   of Mr. Hunt for the purpose of forming your opinion?

8   **A.**  Yes.

9   **Q.**  Okay.  Did you prepare a written report?

10   **A.**  I did.

11   **Q.**  And that is Exhibit 3?

12   **A.**  Correct.

13   **Q.**  Did Mr. Hunt make himself available to you for a

14   clinical interview?

15   **A.**  Yes, he did.

16   **Q.**  And when did that take place and how long was he

17   interviewed?

18   **A.**  November 20th, about three and a half hours.

19   **Q.**  Okay.  And do you know if Mr. Hunt was interviewed by

20   other psychologists or psychiatrists for purposes of

21   conducting a risk assessment?

22   **A.**  At that time when I saw him, he had, I think he had been

23   evaluated by Dr. Katz.  I'm not totally sure.  I know

24   Dr. Phenix did a report but -- should I step away?  Is

25   that --

1    Q.   No, you're good.   Just don't hit anything.

2    A.   I haven't been so that's why I was wondering if I needed

3    to go -- I'm sorry.

4              Dr. Phenix conducted -- Dr. Phenix did a report but

5    did not interview him.   And I'm not sure about Dr. Katz.

6    But since then I know Dr. Plaud has conducted an interview

7    and written a report also.

8    Q.   Have you had an opportunity in preparing for your

9    testimony today to review the expert reports of all of the

10   other experts in this case?

11   A.   Yes, I have.

12   Q.   And have you had an opportunity to review what

13   deposition testimony exists for all of those experts?

14   A.   Yes, I have reviewed -- I can't remember if I reviewed

15   Dr. Phenix's or not but I did review Dr. Plaud's and

16   Dr. Katz's.

17   Q.   But you have seen the reports of Dr. Katz, Dr. Plaud,

18   Dr. Phenix and Dr. Barbaree?

19   A.   I have, yes, sir.

20   Q.   Have you had an opportunity or -- strike that.

21             Before preparing your initial report were you

22   provided documentation by the United States?

23   A.   Yes, about 1530 pages I believe.

24   Q.   And since the time that you prepared your report and

25   today were you provided additional materials by the

1    government?

2    **A.**   Yes, another 500 pages or so.

3    **Q.**   And these were Bates stamped pages 1 to 2,067?

4    **A.**   Correct.

5    **Q.**   And that represents in addition to the expert reports,

6    the deposition testimony, the universe of documents you have

7    reviewed; correct?

8    **A.**   Yes, sir.

9    **Q.**   In general terms what was included in the documents that

10   were provided by the United States to you for your review?

11   **A.**   It consisted of police reports, corrections reports,

12   victim statements from police interviews, sex offender

13   treatment records from New York.  That's pretty much it.  I

14   mean, a lot of, mostly official records related to, you

15   know, the crimes in California and Louisiana and New York.

16   **Q.**   And were these materials that you received and the Bates

17   stamp 1 to page 2,067 the type of documents that are

18   typically relied upon by sex offender experts conducting

19   risk assessments?

20   **A.**   Yes.

21   **Q.**   Now, directing your attention to what is Exhibit O in

22   the third of the binders you have.

23          Do you have that?

24   **A.**   Yes.

25   **Q.**   Can you tell me what that is?

1    **A.**   The Sexual Offense Chronology of Mr. Hunt.

2    **Q.**   And if counsel would just allow me to ask a couple

3    leadings questions.

4        When you and I got together and went over the 2,000

5    plus pages of materials, you had an opportunity to review

6    this summary of Mr. Hunt's sexual offending; did you not?

7    **A.**   Correct.

8    **Q.**   And this is an accurate summary of Mr. Hunt's sexual

9    offending; is that correct?

10   **A.**   Yes.

11   **Q.**   Okay.  And the chronology marked as Government Exhibit O

12   represents an accurate summary of the facts of past offenses

13   that you relied upon in forming your opinion; is that

14   correct?

15   **A.**   Yes, sir.

16   **Q.**   And are these an accurate summary of the 2,000 plus

17   pages with respect to Mr. Hunt's summary of sexual

18   offending?

19   **A.**   Yes.

20       **MR. GRADY:**   Your Honor, I would move to admit

21   Government Exhibit O as both a summary exhibit and as facts

22   underlying the expert's opinion under Rule 1006, Rule 703,

23   just as a matter of how the Court accepts the expert

24   testimony, and under Rule 611 which is just, the Court has

25   the inherent control or the ability to allow the form of the

```
 1   evidence that comes in.
 2             THE COURT:  Any objection?
 3             MR. GOLD:  The respondent has no objection.
 4             THE COURT:  Okay.  It comes in.
 5             (Government's Exhibit No. O received in evidence.)
 6   BY MR. GRADY
 7   Q.  Now, with respect to Mr. Hunt's history of sexual
 8   offending --
 9             MR. GRADY:  We'll try to be brief, Your Honor, but
10   it is very long and it needs to be reflected in at least one
11   witness's testimony so I beg the Court's indulgence in going
12   through this.
13             THE COURT:  Go right ahead.
14   BY MR. GRADY
15   Q.  Can you, Doctor, in the chronology that you have been
16   provided, can you describe for me -- let me just rephrase
17   the question.
18             Mr. Hunt was first arrested in 1973; is that
19   correct?
20   A.  Yes.
21   Q.  Okay.  Prior to that what, if any, sexually offending
22   conduct exists from the records based on -- and you can draw
23   from the records or the summary.  What, if any, sexual
24   offending did Mr. Hunt engage in prior to his first arrest
25   in 1973?
```

1    **A.**  Well, in my interview with him he indicated he had two

2    victims prior to those for which he was adjudicated on in

3    that same year.

4    **Q.**  Okay.  Can you describe briefly the nature and

5    circumstances of that conduct?

6    **A.**  Well, similar to his other types of victims, they were

7    young males.  The first one he mentioned was between 11 and

8    12 years old that he had met at a mall and they engaged in

9    mutual oral sex.  He said it happened one time.

10            And then the other one was a 14-year old boy who he

11   had met at a carnival.  And they engaged in mutual

12   masturbation and oral sex and this happened two to three

13   times.

14   **Q.**  Okay.  And you were also provided records of the matter

15   of <u>California versus Wayne Hunt</u> -- whoops. It's a small

16   table -- California Superior Court action 42920.  Those are

17   in evidence as Exhibit 25.

18   **A.**  Correct.

19   **Q.**  Okay.  Can you briefly, whether from the records or from

20   the summary chronology that's been introduced into evidence,

21   describe for us what do the records reveal about how that

22   proceeding came about when Mr. Hunt was arrested and what

23   happened?

24   **A.**  He was arrested.  He had two victims.  Let me get the --

25   two boys about 11 and 12 years old.  He had met them at a

1    carnival.  One boy he had performed oral sex on and the

2    other one he had touched or fondled outside the clothing.

3    **Q.**  Okay.

4    **A.**  According to what he had told me.  The record indicates

5    that he -- no, the record pretty much consists of the same

6    thing.

7    **Q.**  Okay.  And when you say "the record," you mean there was

8    testimony from the two 11-year old victims; correct?

9    **A.**  Correct.

10   **Q.**  Is that right?

11   **A.**  Yes.

12   **Q.**  Okay.  Mr. Hunt was represented by counsel, had an

13   opportunity to cross-examine them?

14   **A.**  Correct.

15   **Q.**  With respect to -- or strike that.

16           What, if anything, do the records reveal about the

17   sentence Mr. Hunt received?

18   **A.**  He received three years probation.

19   **Q.**  And what, if anything, do the records reflect with

20   respect to the charge or the charges to which he pled

21   guilty?

22   **A.**  He pled guilty of -- it was a lesser, it was a

23   misdemeanor violation.

24   **Q.**  A knowing molesting of a child; correct?

25   **A.**  Correct.

1   **Q.**  Now, what, if anything, did the records reveal about

2   whether Mr. Hunt complied -- well, strike that.

3          What, if any, special conditions of probation were

4   issued?

5   **A.**  That he had to stay away from underaged children, no

6   unsupervised contact.

7   **Q.**  Okay.  In addition to the traditional standard terms of

8   don't commit any crimes?

9   **A.**  Yes.

10  **Q.**  And what do the records reveal about whether Mr. Hunt

11  complied with that probation and its terms?

12  **A.**  The records indicate that within eleven days he ceased

13  reporting to the PO and eventually within, a little over two

14  months later he -- they sought an arrest for him and he was

15  arrested in November of '93 or a warrant was put out.

16  **Q.**  Okay.  Now, what, if anything, do the records reflect

17  with respect to that probation violation?  How was it

18  ultimately resolved?

19          And, again, it's in the chronology.

20  **A.**  That he was -- that he failed to report.  It's not clear

21  whether he committed another offense or not.

22  **Q.**  Directing your attention specifically to the chronology

23  with the, there is an entry under California records that

24  begins on or about March 7, 1977.

25  **A.**  Yes.

1    **Q.**  What does that relate to?

2    **A.**  It wasn't until almost four years later that a warrant

3    was, I'm not sure what the legal term is, whether it was --

4    it came to fruition because they hadn't found him.

5    **Q.**  What happened in March of 1977?

6    **A.**  He was arrested on another crime.

7    **Q.**  Okay.  And what did the California court do as a result?

8    **A.**  I believe they just, since he had a new federal crime, I

9    don't believe they -- there was any consequence to it.

10   **Q.**  If I may, Counsel, he was found in violation and

11   sentenced to time served; is that correct?

12   **A.**  Oh, okay.

13   **Q.**  Is that correct?

14   **A.**  Right.  Like I said, there wasn't any consequence to it.

15   He didn't get additional time based on that.

16   **Q.**  Now, Mr. Hunt's next arrest occurs in 1976; correct?

17   **A.**  Yes.

18   **Q.**  Okay.  And based on your review of the records, based on

19   your interview with Mr. Hunt, what, if any, information can

20   you relay to us about his sexual offending between his

21   release in 1973 and his next arrest in 1976?

22   **A.**  There was an arrest in 1975 for indecent liberties with

23   a child in South Holland, Illinois.  But there is no

24   disposition to the offense and the circumstances are

25   unknown.

1          So I asked Mr. Hunt specifically about that and he

2    stated that I hadn't done anything wrong and that he got

3    involved in a sweep.  The police were I guess arresting a

4    bunch of people, I'm not sure.  He didn't get into much more

5    detail than that but they were arresting a bunch of people

6    and he was one of them.

7    **Q.**  Okay.  What, if anything, do the records or did your

8    interview reveal with respect to where Mr. Hunt went from

9    California and what he did as a job?

10   **A.**  He was working at a carnival.

11   **Q.**  Okay.  If you were to look at page 10 of the summary,

12   specifically a section entitled, "Sexual Offenses between

13   1975 and 1976."

14   **A.**  You're talking about my report or the summary?

15   **Q.**  The summary.

16   **A.**  The chronology?

17   **Q.**  Yes.

18   **A.**  There isn't a page 10.

19   **Q.**  I'm sorry.  I apologize.  I'm looking at my notes rather

20   than the document.

21          Is there a section entitled, "Sexual Offenses from

22   1975 to 1976"?

23   **A.**  Yes.

24   **Q.**  With respect to the period between 1973 and 1976, what,

25   if anything, does it indicate about Mr. Hunt undertaking

1    work as a karate instructor?

2    **A.**   Oh, yes.  Mr. Hunt indicated he was working as a karate

3    instructor.  It's not really clear whether there were

4    charges.  He says there were charges but then they were

5    dropped.  But at the same time he did admit to offending to

6    at least four, possibly six children while he was the

7    instructor.

8    **Q.**   Okay.  And directing your attention to what's in the

9    third binder, Exhibit F for identification.

10        Can you tell me what those are?

11   **A.**   These are charges from Terrebonne Parish in Louisiana.

12   **Q.**   The first page, what is the first page of Exhibit F?

13   **A.**   This is a certificate.

14   **Q.**   From who?

15   **A.**   From the attorney in the Office of the General Counsel

16   for the United States Parole Commission.

17   **Q.**   Okay.  These are -- Exhibit F are portions of the

18   records of the United States Parole Commission records with

19   respect to Mr. Hunt; is that correct?

20   **A.**   Correct.

21   **Q.**   Okay.  And were these materials provided to for your

22   review?

23   **A.**   Yes.

24   **Q.**   And are these materials typically relied upon by

25   individuals conducting risk assessments for sex offenders?

1    **A.**   Yes.

2           **MR. GRADY:**   Your Honor, I would move to admit

3    Government Exhibit F.

4           **MR. GOLD:**   No objection.

5           **THE COURT:**   Okay.  It comes in.

6           **(Government's Exhibit No. F received in evidence.)**

7    BY MR. GRADY

8    **Q.**   Directing your attention to the first page after that

9    certificate of Exhibit F, what, if anything, does it

10   indicate with respect -- strike that.

11          What is this document?

12   **A.**   The Post-Sentence Report from 1977 that indicates that

13   Mr. Hunt had three charges of aggravated rape, six charges

14   of indecent behavior with juveniles and one charge of

15   aggravated crime against nature pending in Terrebonne

16   Parish, Louisiana.

17   **Q.**   Okay.  And what, if any, charges existed in St. Landry

18   Parish, Louisiana?

19   **A.**   That was one charge of contributing to the delinquency

20   of a juvenile and one charge of an aggravated crime against

21   nature.

22   **Q.**   If you could take at look at what's been previously

23   marked in the third binder in front of you as Government

24   Exhibit C, could you tell me what that document is?

25   **A.**   United States Department of Justice, Bureau of Prisons,

1   Psychiatric Evaluation, March 15, 1977.

2   **Q.**  Was this a document that was provided to you for your

3   review by the United States Government?

4   **A.**  Yes.

5   **Q.**  And is this the type of document typically relied upon

6   in the field of sex offender research and risk assessment?

7   **A.**  Yes.

8        **MR. GRADY:**  Your Honor, the government would move

9   to admit Exhibit C.

10        **THE COURT:**  Any objection?

11        **MR. GOLD:**  Your Honor, if I could just have one

12   moment?

13        **THE COURT:**  Yes.

14        (Pause in proceedings.)

15        **MR. GOLD:**  No objection.

16        **THE COURT:**  Okay.  It comes in.

17        **(Government's Exhibit No. C received in evidence.)**

18   BY MR. GRADY

19   **Q.**  Directing your attention to that document, specifically

20   under the section "Background Information," can you read for

21   us what the document says with respect to Mr. Hunt's

22   offending between the period of 1976 or January -- just read

23   the section entitled "Background Information."

24   **A.**   "Mr. Hunt indicated that for the past 20 years he has

25   been involved in pedophilic activity, such as masturbatory

1    practices with boys between the ages of 8 years old to 15

2    years old, but he prefers a boy who is 12 years old, thin,

3    medium height and neatly dressed.  Most frequently Mr. Hunt

4    masturbates the boys, but at times the boy will masturbate

5    him and he will sleep with the boy, but he denies kissing or

6    hugging with the boy while in bed.  As an example, Mr. Hunt

7    indicates that from January 1976, until his arrest in

8    September, 1976, he has had masturbatory practices with

9    about 15 to 20 different boys and up to 25 times with the

10   same boy.  He considers his pedophilic activities the root

11   of all of his troubles, such as having to move at least

12   three times each year, spending a lot of money for the boys

13   such as buying another boat, maintaining a house and his

14   problems with the law."

15   **Q.**  I'm also just going to direct your attention briefly to

16   what has been marked as Government Exhibit 25 -- excuse

17   me -- 24 already in evidence.  It's in the second binder.

18           If you were to go to the last --

19   **A.**  What number was that, sir?

20   **Q.**  24.

21   **A.**  24, thank you.

22   **Q.**  The third to last page of that exhibit.

23           Actually, you know what, I can spare you from even

24   going to look for it.

25           This (indicating) is the third to last page of

1    Exhibit 24.  Can you read or indicate for the record the

2    portion of the report beginning, "On August 11, 1976."

3    **A.**  "On August 11, 1976 I spoke to Captain Henry Swan,

4    Juvenile Officer, for Terrebonne Parish Sheriff's Office,

5    Houma, Louisiana, and he advised that Wayne Robert Hunt is

6    known to him.  He advised that since July 27, 1976 his

7    department has been conducting an investigation based upon

8    complaints of six juvenile complainants that Hunt sexually

9    molested them.  Swan advised that Hunt was a karate

10   instructor for the Parks and Recreation Department in

11   Chauvin, Louisiana.  It was while he was an instructor

12   there, teaching classes to juveniles, that he molested the

13   victims.  Swan advised that according to the statements

14   given by the children at Chauvin, Hunt's pattern is to give

15   the intended victim a 'pill' that makes them drowsy.  One of

16   the victims alleged that Hunt committed sodomy with him.

17   All of the victims at Chauvin are males, aged 10 to 12.

18   Swan advised that Hunt fled from Chauvin prior to August 4,

19   1976 after he received a telephone call from one of the

20   victim's mother's who threatened to shoot him."

21   **Q.**  That's enough.

22        With respect to -- there is a mention of a firearm

23   in this.

24        What, if any, mention was there to you in your

25   interview with Mr. Hunt about a firearm in the course of his

1  kidnapping conviction?

2  **A.**  That he admitted having one but it wasn't loaded.  And

3  he never used it or showed it to the victims.

4  **Q.**  Okay.  Moving forward, if one were to look at U.S.

5  Government Exhibit 24, what is that?

6       We were just there.

7  **A.**  In the same book?

8       Okay.

9       The first page?

10  **Q.**  Yes, just what is it?  Strike that.

11       If you will permit me, are these the certified

12  records of the United States District Court for the Western

13  District of Louisiana with respect to the matter of United

14  States versus Wayne Hunt, 1977?

15  **A.**  Yes.

16  **Q.**  1976.

17       And what, if anything, generally speaking -- well,

18  strike that.

19       Based on your interview, based on your review of

20  the documents can you describe for me the circumstances

21  under which, that led to Mr. Hunt's kidnapping conviction in

22  1976-77?

23  **A.**  Mr. Hunt befriended a boy and took him from Louisiana to

24  some other states for about five weeks.

25  **Q.**  Okay.  And how old was this boy?

1    **A.**  Let me just make sure I get the right age.

2           12 to 13.

3    **Q.**  And based on the certified court records was the age 12?

4    **A.**  12, yes.

5    **Q.**  Okay.  And with respect to your interview of Mr. Hunt,

6    what, if anything, did he say to you about his motive for

7    committing this kidnapping?

8    **A.**  He said he wanted to have sex with him.

9    **Q.**  Okay.  What, if anything, do the records indicate with

10   respect to, within the official record, whether Mr. Hunt

11   sexually molested a boy?

12   **A.**  It appears according to the boy that he did not.  He was

13   not sexually molested.

14   **Q.**  Do you credit that?

15   **A.**  Well, the boy said that.  It's possible that it didn't

16   happen.  It's also possible that the boy may have been

17   embarrassed to admit that anything happened.

18         So it's just, you can just, you just have to go

19   with what the record says.  But given his experience with

20   other boys prior to this and since that crime, it may be

21   questionable but that's what the boy said.

22   **Q.**  Okay.  What do the records reflect about the disposition

23   of the federal kidnapping charges?  Again, if you would

24   refer to the summary, it may be a quick, easy answer.

25   **A.**  He received a 10-year federal sentence.

1    **Q.**  Okay.  And what do the records reflect about how long he

2    served of that sentence?  Strike that.

3            Among the records you received were records of the

4    Federal Parole Commission; correct?

5    **A.**  Correct.

6    **Q.**  Okay.  Those have been introduced into evidence?

7    **A.**  Yes.

8    **Q.**  Directing your attention to those records, Government

9    Exhibit F, at pages -- I'm sorry.

10           **MR. GRADY:**  I apologize, Your Honor.  Thirty

11   seconds and I'll have this moving along again.

12           (Pause in proceedings.)

13   BY MR. GRADY

14   **Q.**  Looking at pages 1017 and 1018, what do the records

15   reflect about when Hunt was released from federal prison on

16   parole?

17   **A.**  He was released in September of 1981 so he served about

18   four years and four months.

19   **Q.**  All right.  Did you also receive certified court records

20   relative to two separate indictments of Hunt in New York in

21   1985?

22   **A.**  Yes.

23   **Q.**  For sexual offenses?

24   **A.**  Correct.

25   **Q.**  Those are in evidence.

1         Did you also receive certified copies of the

2    records of the New York State Police with respect to its

3    investigation of Wayne Hunt?

4    **A.**  Yes, I received those after I -- if you're referring to

5    the, I think they're the last four or five hundred pages of

6    Bates stamped, I received those after I had written my

7    report.

8    **Q.**  Okay.  Can you take a look at Exhibit K in the third

9    binder in front of you.  And I ask you to tell me what that

10   document is.

11   **A.**  New York State Police --

12   **Q.**  Okay.  Let me ask it this way:

13        Are those the records that you received from the

14   New York State Police?  Via the United States?

15   **A.**  Yes.

16   **Q.**  Okay.  And that first page, that's a certificate that

17   these are true and accurate copies of the New York State

18   Police records; correct?

19   **A.**  Correct, they have statements from the victims in New

20   York.

21   **Q.**  And they detail the nature of the State Police

22   investigation?

23   **A.**  Correct.

24   **Q.**  With respect to the field of sex offender risk

25   assessment, are these the type of documents typically relied

1    upon in the field of conducting sex offender risk

2    assessment?

3    **A.**  Yes.

4         **MR. GRADY:**  Your Honor, the government would move

5    to introduce the New York State Police records.  They are

6    certified copies.

7         **THE COURT:**  Any objection?

8         (Whereupon, counsel conferred.)

9         **MR. GRADY:**  Well, Your Honor, I was just conferring

10   with my colleague Mr. Watkins about it.  The witness did

11   testify that he developed his opinion prior to looking at

12   these records so I'm not sure about them coming through this

13   witness.

14        **THE COURT:**  Well, you can ask him whether he has

15   changed his opinion after he read them.

16   BY MR. GRADY

17   **Q.**  Doctor, have you had an opportunity to review those

18   records since you prepared your report?

19   **A.**  Yes, sir.

20   **Q.**  And is your opinion as you testified today based in part

21   upon your additional review of those records?

22   **A.**  Could you repeat the question?

23   **Q.**  Sure.

24        Did the information contained in those records

25   contribute to your opinion as you provided it today in

1    testimony?

2    **A.**  Yes.

3                **THE COURT:**  I will let them in.

4                **MR. GRADY:**  Thank you.

5                **THE CLERK:**  What was that document number, please?

6                **MR. GRADY:**  I can't keep all these straight.  I'm

7    sorry, Zita.

8                It's Government Exhibit K.

9                **THE CLERK:**  K.  Thank you.

10               **(Government's Exhibit No. K received in evidence.)**

11   BY MR. GRADY

12   **Q.**  Did you also receive copies of sex offender treatment

13   Mr. Hunt underwent in 2003?

14   **A.**  Yes, I did.

15   **Q.**  Those are in evidence.

16               Can you just take a quick look at Exhibit 23 in

17   evidence and tell me what it is?  Just for the record.

18   **A.**  Department of Correctional Services, Oneida,

19   O-N-E-I-D-A, Correctional Facility, State of New York.

20   **Q.**  Okay.  Take a look at those records and tell me what

21   they are.

22   **A.**  These are the records that I reviewed, evaluations of

23   his treatment progress and his treatment work where he wrote

24   down his victims and --

25   **Q.**  That's enough.

1          Those are the treatment records?

2   **A.**   Yes.

3   **Q.**   Doctor, drawing your attention back to the chronology

4   and the rest of Mr. Hunt's offenses, what do the records

5   reflect, what does your interview reflect Mr. Hunt did after

6   being released from prison in September 1981?

7          Where did he go?  Start with that.

8   **A.**   He went back to New York.

9   **Q.**   Okay.  And what, if anything, do the records, your

10  review of those, your interview with Mr. Hunt, what does it

11  indicate with respect to when Mr. Hunt began sexually

12  abusing children again?

13  **A.**   Within a year.  It was about nine months when he

14  began -- he was released in September so it was the fall of

15  '81 and then the summer of '82 he began sexually offending

16  again.

17  **Q.**   Okay.  Now, in the course of the documents you've

18  reviewed, Mr. Hunt has provided himself some descriptions of

19  sexual offending and sexual offenses he's committed against

20  some of these children; is that correct?

21  **A.**   Correct.

22  **Q.**   Directing your attention to Government Exhibit 23 in

23  evidence -- or strike that.

24         Based upon the indictment, conviction records,

25  police report and the transcripts in evidence, have you been

1    able to form or have you been able to discern the nature of

2    Mr. Hunt's offending against an individual minor with the

3    initials G.D.?

4    **A.**   You said G.D.; right?

5    **Q.**   G.D., yes.

6    **A.**   Yes.  In the summer of '82 this was a minor who was

7    actually 7 years old when the offending began based on his

8    birthdate and 1987 -- 1982, because he was born in November

9    of '74.  And so this is one of the victims from that summer.

10   **Q.**   And Mr. Hunt was later convicted of sexually abusing

11   G.D.; correct?

12   **A.**   Correct.

13   **Q.**   Now, returning to Exhibit 23, if you could look at

14   Page 1352.

15          What, if anything, does that record indicate with

16   respect to Mr. Hunt's offenses against G.D.?

17   **A.**   It's his self-report to what the offenses consisted of.

18   **Q.**   Can you tell me what it says?

19   **A.**   "G. lived with me for four years.  G. became my

20   surrogate son."

21   **Q.**   Without using the minor's full name.

22   **A.**   Oh, I'm sorry.

23   **Q.**   Just use initials.

24   **A.**   "He became my surrogate son or so my distorted thinking

25   went.  I would manipulate him into body massages, fondling,

1    masturbation.  I would force his mouth on my penis and my

2    mouth on his penis.  I would force my penis into his anus.

3    I would direct to him take pictures of sex acts.  I would

4    coerce him into performing sex with others and recruit

5    others for me to sexually offend.  For the four years I

6    sexually offended G.D. I had manipulated him into feeling

7    with me all his problems were solved.  This was my

8    distortion because in all reality I was his problem and not

9    a solution to any problem of his."

10   **Q.**  And with respect to the length and extent in nature of

11   the offending what, if anything, is indicated on page 1338

12   of those records?

13        If you were to look at the screen (indicating).

14   **A.**  He started -- "G.D. started living with me in the summer

15   of '82."

16   **Q.**  Okay.  And directing your attention to page 1339, what,

17   if anything, does it indicate about the length and nature

18   and the extent of the offending against G.D.?

19   **A.**  "This was a four-year abuse cycle with these people."

20   **Q.**  Continuing.

21   **A.**  "There is no telling how many times we had sex.  In

22   G.D.'s case at least some type of abuse almost daily."

23   **Q.**  From the summer of 1982 until Mr. Hunt's eventual arrest

24   in 1985?

25   **A.**  Correct.

1    **Q.**  From the age that G.D. was seven in the summer of 1982?

2    **A.**  Until he was probably ten or, yeah, three years would be

3    ten.

4    **Q.**  And just for the record, at page 1592 of the New York

5    State Police records does that contain G.D.'s date of birth?

6    **A.**  You said 1592?

7    **Q.**  Yes.

8    **A.**  Is that in -- that's --

9    **Q.**  The New York State Police exhibit.

10   **A.**  Right.  That's -- oh, here it is.

11   **Q.**  Directing your attention to the screen, page 1592 at the

12   bottom, G.D., eleven?

13   **A.**  11/XX/74.

14   **Q.**  Thank you.

15           Do the sex offender -- strike that.

16           Do the records reflect sexual abuse to a minor by

17   the initials J.Z.?

18   **A.**  Yes.

19   **Q.**  And directing your attention to pages 1348 to 1350 of

20   the treatment records.  Can you describe or read the

21   description provided by Mr. Hunt of his offending behavior

22   against J.Z.?

23   **A.**  "My relationship with J.Z. started in October 1982.  My

24   offending J.Z. sexually started when I manipulated him into

25   asked to ride along with me to pick up rides and concessions

from Leeds, New York to Albany.  It was a Sunday morning.  I
tore --" and then there is bunch blocked out.

    And then, "I tore down Friday night and started
moving equipment to my winter quarters and putting some
small rides and concessions at Northway Mall.  J.Z. got his
grandmother's permission to go with me for the weekend.  I
even spoke with the grandmother.  I had my new Peterbilt
with a sleeper and J.Z. and I headed to Leeds to pick up a
trailer.  J.Z. and I talked about him until we were on the
thruway.  We stopped at the Batamore Rest Area for food
where I walked with J.Z. with my hand and arm around his
shoulders.  We got back on the thruway and I asked J.Z. if
he wanted to help me steer the truck, which, of course, any
boy would.  He jumped over on my lap as we were driving and
I rubbed his legs, then stomach and groin area.  I unbuckled
his belt and unsnapped his pants and unzipped him.  I then
went inside his pants and rubbed his stomach and legs
eventually went into his briefs and rubbed his penis and
testicles.  This went on for a while and I worked his pants
down to his ankles and fondled him for a while.  When we
reached Leeds, I was sexually aroused.  No one was on the
lot so I told J. we could go in the sleeper which we did.  I
removed his clothes.  I turned him on his stomach and rubbed
his back lightly with my fingers going down to his legs and
buttocks.  I turned him over and done the same thing.  I

1    manipulated him into doing this to me.  I then forced his

2    penis in my mouth and manipulated him into putting his mouth

3    on my penis.  I then coerced him into letting me put my

4    penis into his anus.  I was sexually abusive with J.Z. for

5    four years doing the same basic sex acts but just changing

6    the positions I used.  I also would have J.Z. bring other

7    friends from the mall he was hustling with.  This was at my

8    direction and J.Z. would have sex with many other boys and

9    also take pictures of sexual acts.  I could not even guess

10   how many times we had sex or J.Z. had sex with others at my

11   direction.  He very seldom missed spending part of every

12   weekend with me.  He would also spend most holidays and

13   summer vacations living with me.  J.Z. recruited many of my

14   victims --"

15   **Q.**  That's enough.  If you want, you can continue.  Is it

16   relevant beyond that?

17   **A.**  No, no.

18   **Q.**  Doctor, with respect to -- based on the records, can you

19   tell me how young or what age J.Z. was at the time the

20   sexual abuse began?

21   **A.**  Based on his birthdate which was 12/XX/72, and this

22   began in October of '82, so he was basically 9 years, 10

23   months when he first met him and then up until he was like

24   12, until he was arrested, 12, 13.

25   **Q.**  Directing your attention to page 1318 of those records.

1          What, if anything, do the sex offender treatment

2    records reflect with respect to Mr. Hunt's abuse of a minor?

3    **A.**   Did you say 1318 or 1380?

4    **Q.**   1318.  You can even just look at the screen.

5    **A.**   Oh, okay.

6    **Q.**   Minor's initials S.H.

7          What does it say?

8    **A.**   "I sexually offended S.H. by forcing, through

9    manipulation, mutual masturbation and fondling.  I forced

10   through coercion and manipulation my mouth on his penis, his

11   mouth on my penis and my penis in his anus.  I also coerced

12   through manipulation to bring other hustlers to me for me

13   for sexual gratification."

14   **Q.**   On page 1333 what, if anything, does it indicate with

15   respect to the offending against S.H. and another minor with

16   the initials P.S.?

17   **A.**   P. and S. were brothers, S. being the eldest.  And I

18   will note here that when I met S. when he was on probation

19   for sodomy with his youngest brother J.  This is just a fact

20   and not transferring any blame to him.  Shortly after

21   setting up at Northway Mall, J.Z. brought P. and S. around.

22   From observation and talking with all these boys I

23   discovered S. was in all actuality the pimp or manager as P.

24   and J. referred to him.  Being the largest he would make the

25   deal and collect the cash before either one would go with a

1    man or a client.  There were about ten boys in this male

2    prostitution ring but I only had a relationship with these

3    three and then later one other.  I sexually abused all three

4    together over a four-year period.  S. was the exception, I

5    would only be with him once in a while.  He was too busy

6    running his business."

7    **Q.**  Directing your tension to page 1319, again, what, if

8    anything, do the records reflect with respect to Mr. Hunt's

9    description of offenses against H.R.?

10   **A.**  "H.R., age 12.  I sexually offended H. by coerced mutual

11   full body massages with him, mutual masturbation, forcing

12   through manipulation my penis into his mouth and my mouth on

13   his penis and my penis into his anus.  Furthermore, under my

14   direction he would photograph others in sexual acts and

15   participate in sex with others."

16   **Q.**  And what about J.R. at the bottom of the page?

17   **A.**  "J.R., age 8.  J. was H.'s brother, who I sexually

18   offended, J.'s brother H. to have sex with him."

19   **Q.**  Based upon the certified conviction records that you

20   have been provided and based upon the treatment records --

21   strike that -- the State Police records indicating dates of

22   birth, do you know how old H.R. and J.R. were at the time of

23   Mr. Hunt's offenses?

24            (Witness reviewed document.)

25   **A.**  I don't have -- I have got ages of some other ones.  I

1    don't have H.R.

2    **Q.**  Page 4 of your summary would indicate that on page 1593

3    of the State Police reports there is a date of birth of

4    September 1974.

5    **A.**  Okay.  So he was -- I'm not sure what, it doesn't say

6    what year that occurred.  So '74, then he had to be, if it

7    was -- if he was born in '74, then he was probably in the

8    age range of 9, 10 or 11.

9    **Q.**  Directing your attention to page 1353 of those records,

10   what, if anything, does it say about his relationship with

11   H.R. and how long it went on?

12   **A.**  Three-year relationship.

13   **Q.**  Okay.

14   **A.**  So that means that probably '82 to '85 and if he was

15   born -- so the 8 to 11 range.

16   **Q.**  And his younger brother at the time that Mr. Hunt

17   directed him to have sex with his brother J.R.?

18   **A.**  Yes.  J.R. was probably seven or eight.

19   **Q.**  Thank you.

20            Directing your attention to pages 1352 and 1353.

21   Do those pages include a description of Mr. Hunt's offending

22   behavior against two victims initials H.D. and LA?

23   **A.**  Yes.

24   **Q.**  What does it say?  Well, strike that.

25            Before we move on, H.D. and LA are two individuals

1  Mr. Hunt was convicted of kidnapping in 1985; is that

2  correct?

3  **A.**  Correct.

4  **Q.**  Okay.  What does it say with respect to H.D. and L.A.?

5  **A.**  "H.D. and L.A. would stay with me on and off for four

6  years.  I would sexually abuse them by forcing them into

7  fondling me and each other, masturbating myself and each

8  other, by placing my penis in their mouths or their penis in

9  my mouth or their penis in each other's mouth.  I would also

10 force my penis in their anus.  I would direct them to have

11 sex with others and manipulate them to take pictures of

12 these acts.  L.A. and H.D. also went with me when I jumped

13 bail and went to Macina.  The taking of them with me for

14 sexual gratification led to the kidnap charges."

15 **Q.**  Thank you.

16      And do you recall based on the records of

17 conviction and those State Police records how old were L.A.

18 and H.D. at the time of the kidnapping charges?

19 **A.**  L.A. was 12 years old and H.D. was 14.

20 **Q.**  And if the offending Mr. Hunt is describing went on for

21 three or four years, how old were they when the offending

22 began?

23 **A.**  L.A. would probably be about 8 and a half or 9 and H.D.

24 would be probably around 11.

25 **Q.**  Okay.  Now, this isn't all of the victims Mr. Hunt had

1    in the 1985 offense period; is it?

2    **A.**   No.

3    **Q.**   Approximately how many victims was Mr. Hunt convicted of

4    ultimately in the 1985 indictments?  And how many did he

5    acknowledge to you in his interview with you?

6    **A.**   I'd say, I think it was 14 maybe but I may be wrong.

7    Because I know he told me about eight other victims, he

8    acknowledged to me eight other victims that he knew ages,

9    between ages 9 and 14 from the mall.

10   **Q.**   Okay.  Can you explain that to me, what do you mean?

11   Eight other victims beyond what was contained in the

12   indictment?

13   **A.**   Yes.

14   **Q.**   And ages, between the ages of 9 and 14?

15   **A.**   Correct.

16   **Q.**   During the same period 1982 to 1985 between his release

17   from federal prison and his arrest in 1985?

18   **A.**   Yes.

19   **Q.**   Okay.  What, if any -- or strike that.

20         Now, based on the records you have been provided or

21   were even just referring to the chronology, the summary

22   that's in evidence of Mr. Hunt's offending, Exhibit O, when

23   was Mr. Hunt first arrested after being released from

24   federal prison?

25   **A.**   Not till 1985.

1    **Q.**  Do you recall what month?

2    **A.**  April.

3    **Q.**  And he was charged in April with what based on the

4    records?

5    **A.**  Sodomy with a 13-year old boy.

6    **Q.**  And what, if anything, do the records reflect with

7    respect to whether Mr. Hunt made bail?

8    **A.**  He made bail.

9    **Q.**  What, if anything, do the records reflect with respect

10   to whether Mr. Hunt made his next court appearance?

11   **A.**  He did not.

12   **Q.**  At the time Mr. Hunt was released from federal prison,

13   what, if any, status did he have with respect to federal

14   parole?  Was he on, was he not on parole?

15   **A.**  He was on parole.

16   **Q.**  What, if any, indication exists in the records,

17   specifically those of the Federal Parole Commission,

18   concerning whether Mr. Hunt continued to comply with the

19   terms of his parole after his arrest in April of 1985?

20   **A.**  He did not.

21   **Q.**  How did he not comply?

22   **A.**  Well, he left the area so he did not check in.  He did

23   not report.  He obviously changed his address.  I think he

24   left wherever he was living and he went out to live in a

25   camper.

1    **Q.**  Okay.  So warrants issued both in the state proceedings

2    for failure to appear and to the federal parole proceedings

3    for failure to comply with the parole; correct?

4    **A.**  Correct.

5    **Q.**  Now, if you could just take a quick look at Government's

6    Exhibit D.  Can you tell me what that is?

7            Or, again, if I'm permitted --

8    **A.**  It's the United States Parole Commission --

9    **Q.**  Is that a copy of the United States District Court for

10   the Southern District of New York sitting in the matter of

11   United States versus -- excuse me -- Wayne Hunt versus The

12   United States Parole Commission?

13   **A.**  Yes.

14        **MR. GRADY:**  Your Honor, I'd move to introduce

15   Government Exhibit D, just it outlines some facts and

16   summarizes things --

17        **THE COURT:**  Any objection?

18        **MR. GOLD:**  Your Honor, this is a judicial decision.

19   I'm not sure -- I think the Court could take notice of it

20   but we would object to it coming in as an exhibit.

21        **THE COURT:**  What is it a summary of?

22        **MR. GRADY:**  It's the United States District Court

23   decision involving parole proceedings for Mr. Hunt, Your

24   Honor.  It contains various facts the government would -- I

25   would suggest it summarizes very quickly --

1          **THE COURT:**  I don't think it comes into evidence. I

2     think it is just something to refer to.

3          **MR. GRADY:**  You can take judicial notice of it,

4     Your Honor, please.

5          **THE COURT:**  Yes.

6          **MR. GRADY:**  Thank you.

7          And similarly there are two other decisions of the

8     New York Court of Appeals involving Hunt's sentencing in

9     1985.  It was originally vacated and then reimposed and

10    upheld.

11         **THE COURT:**  You may argue those or bring them to my

12    attention.  I don't think they come in as exhibits.

13         **MR. GRADY:**  Thank you, Your Honor.

14    BY MR. GRADY

15    **Q.**  Now, with respect to that decision Wayne Hunt versus the

16    U.S. Parole Commission, a decision of the United States

17    District Court involving an individual, is that something

18    that could be typically relied upon by individuals

19    conducting a sex offender risk assessment?

20    **A.**  To the extent that it provides information regarding a

21    person's sex offending history, yes.

22    **Q.**  Okay.  And this particular document summarizes the

23    history of Mr. Hunt's parole proceedings rather clearly;

24    correct?

25    **A.**  Correct.

1          **THE COURT:**  Why don't we take a five-minute break.

2    Okay.

3          **MR. GRADY:**  Certainly.

4

5          (Recess.)

6

7          **THE CLERK:**  All rise for the Honorable Court.

8          **THE COURT:**  All set?

9          (Whereupon, the Court and the Clerk conferred.)

10         **THE COURT:**  Did you have a motion that you wanted

11   to make on the record?

12         **MR. GRADY:**  There is, Your Honor.

13         **THE COURT:**  Go ahead.

14         **MR. GRADY:**  The witness has been inadvertently,

15   obviously not in violation of the court order, mentioning

16   the full name of the first names of minor victims.  I would

17   ask that with the agreement of defense counsel that when the

18   transcript issue is transcribed, that it be redacted down to

19   simply the victim's initials.

20         **THE COURT:**  And the court reporter understands

21   that?

22         **THE COURT REPORTER:**  Yes, Judge.

23         **THE COURT:**  Okay.  I will allow that motion.

24         **MR. GRADY:**  Thank you, Your Honor.

25         And respect to dates of births, while it is

1    necessary I think to put them on the record formally, when

2    the transcript is again produced, I would ask that the dates

3    be redacted just down to the month and year of birth for

4    purposes of the transcripts.

5             **THE COURT:**  Any objection to that?

6             **MR. GOLD:**  No objection.

7             **THE COURT:**  Okay.  That is allowed too.

8             **MR. GRADY:**  Thank you.

9             **THE COURT:**  Do you want to continue?  Go ahead.

10            **MR. GRADY:**  Thank you, Your Honor.

11                          **LUIS ROSELL, Resumed**

12                    **DIRECT EXAMINATION, (Cont'd.)**

13   BY MR. GRADY

14   **Q.**  Returning to, I was questioning you about the number of

15   victims between 1982 and 1985.

16            With respect to the indictment there was some 12 to

17   14; is that correct?

18   **A.**  Correct.

19   **Q.**  And in your interview Mr. Hunt acknowledged 12 to 14; is

20   that correct?

21   **A.**  Yes.

22   **Q.**  Now, you mentioned earlier some eight additional

23   victims?

24   **A.**  They may have been probably within that 12 to 14.

25   **Q.**  So there was confusion there, there weren't 8 in

```
1    addition to the 12 to 14; correct?

2    A.   No.

3    Q.   Okay.  But there were, and the records reflect,

4    additional victims beyond those for whom Mr. Hunt was

5    convicted; correct?

6    A.   Correct.

7    Q.   Okay.  And with respect to those victims, there are

8    descriptions of the conduct for each of those victims in

9    Mr. Hunt's sex offender records in evidence; correct?

10   A.   Correct.

11   Q.   And in the State Police records; correct?

12   A.   Yes.

13         MR. GRADY:  And, Your Honor, I'm going to -- I

14   think the Court has a sense of the nature of it.  I don't

15   need to go into through every offense in the materials.

16   They are in evidence.

17         THE COURT:  You can try your case any way you want

18   to.  It is up to you.

19         MR. GRADY:  Thank you, Your Honor.

20   BY MR. GRADY

21   Q.   I believe when we broke I was asking you when Mr. Hunt

22   was first arrested after being released from federal prison

23   in 1981.  And you indicated April; is that correct?

24   A.   That is when he was indicted and arrested on those

25   charges.
```

1    **Q.**  And what, if any, criminal -- or strike that.

2         What, if any, steps did Mr. Hunt take upon fleeing

3    in May of 19- -- strike that.

4         What does the record reflect with respect to what

5    Mr. Hunt did in May?

6    **A.**  After his release on bail he failed to report to his

7    federal parole officer and failed to report his change of

8    address.  And then he went with two of the boys that we just

9    mentioned for which he was -- it was L.A. and H.D. -- he

10   went with them to an undisclosed area.

11   **Q.**  Okay.  What part -- strike that.

12        What, if any, supplies, what, if anything, do the

13   records reflect with respect to what Mr. Hunt did in

14   preparation for going to this remote location?

15   **A.**  He went in with a trailer and then he had stolen an ATV

16   and a generator.

17   **Q.**  Okay.  In the materials that you reviewed and Mr. Hunt's

18   interview with you, he acknowledged that he was later

19   convicted of grand larceny with respect to the generator?

20   **A.**  Correct.

21   **Q.**  He received a two-to four-year sentence?

22   **A.**  Yes.

23   **Q.**  Okay.  And with respect to this remote location, what,

24   if any, description exists in the records?  Is it a

25   campsite?

1   **A.**  Yes.

2   **Q.**  Okay.  And what do the records reflect with respect to

3   when and how Mr. Hunt was caught in August of 1985?

4   **A.**  He was caught at a truck stop.

5   **Q.**  Okay.  And at the time, what, if anything, do the State

6   Police records reflect with respect to how they located the

7   campsite?

8   **A.**  I can't recall now.  I'd have to take a look at how that

9   happened.

10  **Q.**  If you were to look at the summary, Exhibit O, would

11  that refresh your recollection perhaps?

12  **A.**  Yes.

13  **Q.**  Okay.  Why don't you just take a look at that?

14          (Witness reviewed document.)

15  **Q.**  The bottom of pages 4 and 5.

16  **A.**  They were -- the police were investigating the area and

17  they found the two juveniles at the campsite by Mr. Hunt's

18  vehicle.

19  **Q.**  Okay.  They located or had a report of Mr. Hunt's

20  license plate and found his pickup truck; correct?

21  **A.**  Correct.

22  **Q.**  At the campsite?

23  **A.**  Yes.

24  **Q.**  And they found two juveniles L.A. and H.D. there?

25  **A.**  That's true.

1  **Q.**  And later in the day they found Mr. Hunt at a nearby bus

2  stop?

3  **A.**  Yes.

4  **Q.**  Okay.  And that's detailed in the chronology in

5  evidence; correct?

6  **A.**  Correct.

7  **Q.**  Okay.  Now, what, if anything, did they find at the

8  campsite at the time of Mr. Hunt's arrest in August of 1985?

9  **A.**  They found numerous photographs of sexual behavior with

10  young males.

11  **Q.**  What, if anything, do the State Police records indicate

12  that the State Police did with those photographs?  What, if

13  any, investigation did the State Police pursue?

14  **A.**  What they did was they looked at all the photographs and

15  then started basically canvassing the area, I guess the

16  closest town, and started to identify the children who were

17  in the photographs.

18  **Q.**  And as a result of these efforts, were they able to

19  identify the victims?

20  **A.**  Based on that they were able to interview the victims

21  and then that's how all the counts and charges came about.

22  **Q.**  And you have been provided with a 60-count indictment

23  that was issued against Mr. Hunt as a result of the

24  investigation of those victims?

25  **A.**  Correct.

**Q.**   Now, again, the initial charges from April of 1985,

what, if any, disposition was there of those?  Before we get

to the 60-count indictment.

**A.**   He pled guilty in November of that year.

**Q.**   1985?

**A.**   To sodomy, yes.

**Q.**   And what was the sentence?

**A.**   Two to four years.

**Q.**   Okay.  And what, if anything, do the records reflect

with respect to the disposition of the 60-count indictment

that resulted from the investigation of the photographs

found at Mr. Hunt's campsite?

**A.**   He entered a plea of guilty to 18 counts of the 60-count

indictment.

**Q.**   Okay.  And if you were or if you needed to, looking at

page 5 of the summary offense, can you tell us basically

what counts he pled guilty to and the children involved?

**A.**   Counts 1 and 2, the crime of kidnapping first degree,

which was reduced to charges of kidnapping in the second

degree as part of the plea.  This was the kidnapping of L.A.

and H.D.

        Then as to Counts 3 through 6, charge the crime of

using a child in sexual performance, he pled guilty.  The

behavior occurred in between June and August of 1984.  This

was with 9-year old G.D., 9-year old H.R. and 13- and

14-year old J.S. and an 11-year old boy J.Z.  He had been engaging in sexual performances when he was taking the photographs.

As to Counts 7 through 9 charging the crime of promoting the sexual performance of a child, he pled guilty between May and July of 1984 offering or agreeing to promote photographs depicting a 12-year old boy, J.S., a 12-, 13-year old girl L.W., and an 11-year old boy J.Z., engaging in sexual conduct.

Count 11 charged the crime of sodomy in the first degree.  He pled guilty to between December 1984 and January 1985 engaging in deviant sexual intercourse with a 10-year old boy G.D., such conduct involving Hunt performing oral and/or anal sex upon G.D.

Counts 13 through 16, sodomy in the first degree, he pled guilty, between June and August of 1984 engaging in deviant sexual intercourse with a ten-year old boy J.F., a 7-year old boy J.R., a 9-year old boy H.R., and an 8-year old boy A.W., such conduct involving Hunt performing oral and/or anal sex upon J.F., J.R., H.R. and A.W.

Count 19, crime of sodomy in the first degree, pled guilty to in August of 1984 engaging in deviant sexual intercourse with a 10-year old boy P.W., such conduct involving Hunt performing oral sex upon P.W.

Count 22, charging sodomy in the second degree,

1  Hunt pled guilty to between May and July of 1984 engaging in

2  deviant sexual intercourse with a 13-year old male J.S.,

3  such conduct involving Hunt performing oral sex upon J.S.

4  Count 25, sodomy in the second degree.  He pled

5  guilty between June and August of 1984, deviant sexual

6  intercourse with a 12-or 13-year old male J.S., such conduct

7  involving Hunt performing oral sex upon J.S.

8  Count 26 charging sodomy in the second degree, Hunt

9  pled guilty, between November and December 1984, engaging in

10  deviant sexual intercourse with an 11-year old male, P.S.,

11  such conduct involving Hunt performing oral and/or anal sex

12  upon P.S.

13  **Q.**  What, if anything, do the records reflect as to the

14  sentences Mr. Hunt received?

15  **A.**  Hunt was sentenced to 12 and 1/2 half years to 25 years

16  incarceration on Counts 1 to 2, kidnapping in the second

17  degree and Counts 11, 13 through 16 and 19, sodomy first

18  degree; 7 and 1/2 to 15 years incarceration on Counts 3

19  through 6, use of a child in a sexual performance; 3 and 1/2

20  to 7 years incarceration on Counts 7 through 9, promoting

21  sexual performance of a child, and Counts 22, 25 and 26,

22  sodomy second degree.

23  All sentences were ordered to be served concurrent.

24  **Q.**  Was that a sentence later vacated on appeal, reimposed

25  and then upheld by the New York Appellate Courts?

1    **A.**  Yes.

2    **Q.**  Okay.  I ask you to take a look at Exhibit G of the

3    third binder in front of you.

4           What is Exhibit G?

5    **A.**  Certification by the Assistant Counsel of the New York

6    State Division of Parole.

7    **Q.**  And contained within that entire document are portions

8    of the New York State Parole records provided to you for

9    your review; correct?

10   **A.**  Correct.

11   **Q.**  And your opinion today formed, is formed or relies in

12   some part upon your review of those records; is that

13   correct?

14   **A.**  Yes.

15   **Q.**  And are these materials that are typically relied upon

16   in the field of sex offender recidivism risk assessment?

17   **A.**  Yes.

18         **MR. GRADY:**  Your Honor, I'd move to introduce

19   Government Exhibit G.

20         **THE COURT:**  Any objection?

21         **MR. GOLD:**  No objection.

22         **(Government's Exhibit No. G received in evidence.)**

23   BY MR. GRADY

24   **Q.**  Directing your attention to the first page after the

25   certification, what, if anything, does that record indicate

1    with respect to the issue of how long Mr. Hunt would be on

2    parole in New York?

3    **A.**   He will be on parole until 7/11/2012.

4    **Q.**   Thank you.

5           Now, I'm going to want to jump ahead a few years.

6    Do the records you were provided include certified copies of

7    disciplinary records from the New York State Department of

8    Corrections?

9    **A.**   Yes, sir.

10   **Q.**   I want to direct your attention to what's been marked

11   for identification as Government Exhibit E in the third

12   binder in front of you.

13   **A.**   You said E; correct?

14   **Q.**   E.

15   **A.**   Yes.

16   **Q.**   And can you tell me what those are?

17   **A.**   It's a certification of New York State Department of

18   Corrections records from Oneida Correctional Facility.

19   **Q.**   Okay.  And what are those records in Exhibit E?

20   **A.**   They're called Inmate Misbehavior Reports.

21   **Q.**   And are they with respect to any particular individual?

22   **A.**   They're of Mr. Hunt.

23   **Q.**   Thank you.

24       **MR. GRADY:**  Your Honor, just for the Court's

25   edification, I'd actually like to submit the original

1    copies.  There are photographs in there that did not scan

2    well and translate into the exhibits so I'd ask the Court to

3    use in lieu of the scanned copies the original certified

4    copies.

5               **THE COURT:**  Any objection to this?

6               **MR. GOLD:**  No objection.

7               **THE COURT:**  Okay.  It comes in.

8               **(Government's Exhibit No. E received in evidence.)**

9    BY MR. GRADY

10   **Q.**  Directing your attention to that exhibit, can you

11   describe for me what those records describe?

12   **A.**  They are about -- they occurred in April of 1998.  He

13   was at the Woodbourne facility and pictures were found.

14   **Q.**  Okay.  Can you describe for me what, if anything, the

15   records indicate about what types of pictures they were?

16   **A.**  Well, there are pictures of -- there is a picture of a

17   man who looks like Mr. Hunt, or I assume is Mr. Hunt.  It

18   doesn't say it is him but it kind of looks like him, a

19   slender man, with his arm around a boy.  A boy maybe 12

20   years old.  I'm not sure.

21   **Q.**  Okay.

22   **A.**  And then there is pictures of three males, one of them

23   is probably 12, 13.  The other one seems a little older but

24   I think he's probably 18, 17, with long hair.  They were

25   part of a group, a music group.  I forget the name of the

1   music group.

2   **Q.**   Hanson?

3   **A.**   Hanson, that's it.

4          And there is -- well, these are copies, as you can

5   tell; but there is a picture of two people on a horse, a

6   young girl on it or a young boy.  I don't know if he's a

7   young boy or not.  I can't see the face.

8          **MR. GRADY:**   If I can give him the originals, Your

9   Honor?  May I approach?

10          **THE COURT:**   Yes.

11          **MR. GRADY:**   Thank you.

12          (Whereupon, the original photographs were handed to

13   the witness.)

14          **THE WITNESS:**   Thank you.

15   **A.**   There is a picture of a -- yes, the picture on the horse

16   are two people, a boy and it looks like they're maybe from

17   Central America.  He's got a Mexican hat on.  And maybe he

18   is 15 and the girl maybe looks about 10 or 11 and they're

19   riding a horse like maybe at a festival because they're

20   dressed in costume.

21          There is a picture of a boy looking maybe 10 years

22   old rollerblading.  And he has got his -- he is squatting

23   down with one leg spread to the right on his rollerblades.

24          And a boy who looks about 5 years old or so pulling

25   a little wagon on the beach.

1          There is another picture of a boy in a bathing

2     suit.  He probably looks around 10 or 11.  Then there is

3     another boy in a, like a Speedo bathing suit with his leg up

4     against the wall and he's looking at the camera.  He might

5     be the 11, 12 13 age range.

6          Then there is a picture like, more of a silhouette,

7     it's a picture of a mother pushing on a stroller two very

8     little children, maybe four and two years old.

9          And then pictures of two boys, maybe 6, 7 or 8

10    years old, sitting in like a park or in a campsite.  It

11    looks like the woods.  And they're just sitting there.

12         So those are the pictures.

13    **Q.**  Thank you.

14         And directing your attention specifically to

15    Page 978 of the exhibit.  The originals are not Bates

16    stamped.  If you want to use the originals, it would be the

17    second page.

18    **A.**  Okay.

19    **Q.**  There are findings made by -- or strike that.

20         What is that document?  What does it reflect?

21    **A.**  The Misbehavior Report.

22    **Q.**  Now, the State of New York, Department of Correctional

23    Services, disposition rendered page.  If you were to look at

24    978 Bates stamped material.

25    **A.**  Okay.  I will go to that.

1              The description of charges was unauthorized

2      literature, the property in unauthorized area and

3      contraband.

4      **Q.**  And what, if any, disposition are there for those

5      charges?

6      **A.**  He was found guilty of unauthorized literature and

7      guilty of property in an unauthorized area, not guilty of

8      contraband.

9      **Q.**  Okay.  Doctor, I want to direct your attention to two

10     pages, three pages in the incident report at page 981.

11              And can you tell me how, if at all, we can discern

12     which conduct correlates to which charges and which findings

13     of guilt?

14     **A.**  Well, it says that during a routine frisk of the

15     Woodbourne facility computer/network program area in the

16     school some pictures of young children, mostly boys, were

17     found on a computer used solely by inmate Wayne Hunt.  These

18     pictures were --

19     **Q.**  Next to that description is there a numerical charge

20     No. 1.22?

21     **A.**  Yes.

22     **Q.**  Okay.  And if we go back to the findings of the

23     Disciplinary Committee, there is a charge 113.22, and there

24     is next to it property in an unauthorized area; is that

25     correct?

1   **A.**   Correct.  So that's when he was found guilty of the

2   property.

3   **Q.**   And with respect to the other three, the other two

4   charges, there are similar numbers in the incident report

5   next to the conduct relevant to that charge and those charge

6   numbers are reflected in the discipline issued sheet; is

7   that correct?

8   **A.**   Correct.

9   **Q.**   Okay.  And based upon that what conduct was Mr. Hunt

10   found guilty of, what conduct was he found not guilty of?

11   **A.**   So he was found guilty of the unauthorized literature

12   and the property in an unauthorized area but not the

13   contraband.

14   **Q.**   Okay.  And the unauthorized property -- unauthorized

15   literature and property in an unauthorized area -- strike

16   that.

17          The property in an unauthorized area referred to

18   what conduct?

19   **A.**   The pictures of the young children.

20   **Q.**   Okay.  What does that incident -- well, strike that.

21          Based on your review of the materials provided to

22   you, based on your interview with Mr. Hunt and based upon

23   your review of the reports and deposition testimony of the

24   other experts, have you formed an opinion to a reasonable

25   degree of professional certainty about the question of

1   whether Mr. Hunt has engaged in child molestation in the

2   past?

3   **A.**   My opinion is he has.

4   **Q.**   Okay.   Thank you.

5          Now, you were also asked, Dr. Rosell, to evaluate

6   whether Mr. Hunt suffered from a serious mental disorder; is

7   that correct?

8   **A.**   Correct.

9   **Q.**   Based on your review of the records, did you form any

10  opinion to a reasonable degree of professional certainty

11  about whether Mr. Hunt suffered from a serious mental

12  illness, abnormality or disorder?

13  **A.**   Yes.

14  **Q.**   What is that opinion?

15  **A.**   I believe he has the diagnosis of pedophilia.

16  **Q.**   Okay.   Where do you derive the criteria for diagnosing

17  that disorder?

18  **A.**   From *the Diagnostic and Statistical Manua*l of the

19  American Psychiatric Association.   It's usually abbreviated

20  as DSM and it's IV-TR which means text revision but it's

21  known as the DSM.

22  **Q.**   Let's take a look at exhibits -- strike that.

23          Did you also diagnose Mr. Hunt with antisocial

24  personality disorder?

25  **A.**   Yes.

**Q.**  With respect to your finding of future dangerousness,
what, if any, role does that diagnosis have?

**A.**  The ASPD?

**Q.**  Yes.

**A.**  Not that much.

**Q.**  Okay.  Directing your attention to Exhibits I and J,
actually H and I in the binder, the third binder in front of
you, can you take a look at those two documents and tell me
what they are?

**A.**  H is a photocopy of the DSM's diagnostic features for
antisocial personality disorder.  And I is the DSM's
diagnostic criteria for pedophilia.

**Q.**  Okay.  These are materials typically relied upon by
experts in the field of sex offender risk assessment; are
they not?

**A.**  Well, it's more about diagnostic as opposed to risk
assessment but --

**Q.**  Are those, they're all done in --

**A.**  They're basically, they're commonly used by
psychologists, psychiatrists, mental health workers when
dealing with, any time you deal with a patient when you're
doing, when you have a private practice and you, third-party
payment, you need to have a diagnosis so you use the DSM.
The DSM is used by a lot of people, not just by people doing
risk assessment.

1    **Q.**  Okay.

2    **A.**  But it is used by evaluators.

3    **Q.**  Used by the entire psychiatric and psychological

4    community?

5    **A.**  Correct.

6    **Q.**  And it provides universal definition or universal --

7    yeah, universal definitions of various diagnoses?

8    **A.**  Correct.

9    **Q.**  So that everyone knows that you're talking about the

10   same thing?

11   **A.**  Yes.

12   **Q.**  Okay.

13          **MR. GRADY:**  Your Honor, I move to introduce

14   Exhibits H and I.

15          **MR. GOLD:**  No objection.

16          **THE COURT:**  It comes in.  They come in.

17          **MR. GRADY:**  Thank you.

18          **(Government's Exhibit No. H received in evidence.)**

19          **(Government's Exhibit No. I received in evidence.)**

20   BY MR. GRADY

21   **Q.**  New, beginning with your pedophilia diagnosis, looking

22   specifically at Exhibit I, what are the criteria in the DSM

23   for pedophilia?

24   **A.**  That over a six-month period the person has recurrent,

25   intense sexually arousing fantasies, urges or behaviors

1    involving sexual activity with a prepubescent child.

2    Prepubescent is usually defined as someone who is like 13

3    years old.  That's what the age cutoff is.  That's a whole

4    other issue but that's what the DSM uses it as.

5    **Q.**  Okay.  What's the next criteria?

6    **A.**  The person has acted on these sexual urges, or the urges

7    or fantasies cause marked distress on interpersonal

8    difficulty.

9    **Q.**  And the last?

10   **A.**  That the person is at least 16 years of age and at least

11   5 years older than the child or children in Criterion A.

12   **Q.**  Does Mr. Hunt meet these criteria?

13   **A.**  In my opinion he does.

14   **Q.**  And can you describe for me in general why it is that

15   you believe in your professional opinion Mr. Hunt meets

16   these criteria?

17   **A.**  Well, based on his behavior over an extended period of

18   time, the pervasiveness, the frequency, the duration of the

19   behaviors that he engaged in with that age group that ranged

20   from as young as 7 to 11, 12 years old, which would fit the

21   criteria.

22   **Q.**  Okay.

23   **A.**  And as a qualifier, he would be considered sexually

24   attracted to males, and males meaning the victim type.  And

25   also since he did have relationships with adults, it would

1    be considered nonexclusive type.  Just as a qualifier.

2    **Q.**  Those are types or qualifications?

3    **A.**  Yes, just to provide you more information so you know

4    what type of offender he is.  Given that the great majority

5    of his victims were males, he would be considered sexually

6    attracted to males.

7    **Q.**  Okay.  Directing your attention to that section of the

8    DSM dealing with pedophilia, what, if anything, does it say

9    about the anticipated duration of the diagnosis of

10   pedophilia?

11   **A.**  Well, there are some diagnoses that wane, that go --

12   **Q.**  Well, let me see if I can ask you the question.

13          Directing your attention to this page (indicating),

14   what does the DSM say with respect to expected course of the

15   diagnosis?

16   **A.**  The DSM indicates that the course is usually chronic

17   especially in those attracted to males.

18   **Q.**  Okay.  And by "chronic," that means enduring?

19   **A.**  Correct.

20   **Q.**  Now, as we sit here today, do you believe that Mr. Hunt

21   suffers from pedophilia?

22   **A.**  Yes.

23   **Q.**  Okay.  What, if anything, did Mr. Hunt tell you in your

24   interview about his present sexual attractions or interests?

25   **A.**  He indicated that his sexual attraction -- I asked him,

1    you know, what his fantasies or arousal level is and he

2    said, he indicated he masturbated once every three months.

3            And when I said what he fantasized about, he

4    indicated that it was adult males and adult females.

5    **Q.**  Doctor, do you believe him?

6    **A.**  Well, based on his history of offending and given that

7    he is not just offending on a few children here and there,

8    it was -- it seemed like his whole life was about being with

9    these kids and documenting it and having them interact with

10   each other in a sexual manner and then sexually with

11   himself.

12           The behavior and the way it's described by the

13   children usually occurred right away when they had just met.

14   At least some of them have documented that.  For someone

15   that had such a significant interest, an orientation that

16   way towards the children, for it to dissipate over time is

17   questionable.

18           The fact that he has been locked up since '85 but

19   then in '98 it was documented that he still had pictures and

20   so he's still interested in that type of individual, and

21   that's been, that was 11 years ago.  So I find it somewhat

22   difficult to believe.

23           Then when I asked him if he were released how he

24   would handle it and he basically said that he knows how to

25   handle his -- at one point he was saying that he doesn't

1    have the attraction and then at another point he says I know

2    how to handle my urges.

3           So either, that means that you, either you have it

4    or you don't possibly, it's not likely going to dissipate

5    while I still have it but I know how to handle it, which

6    could be the case.  And there are individuals who still have

7    that attraction and that's why I believe he still does have

8    that attraction.  And then maybe he feels he can handle it.

9           But to say that he doesn't have the attraction

10   anymore, I find that unlikely.

11   **Q.**  In your reports and at deposition in this matter you

12   indicated that Mr. Hunt's pedophilia is ingrained.  What did

13   you mean by that?

14   **A.**  Well, based on, as I just mentioned, the pervasiveness,

15   the behaviors, it wasn't just, I mean, I've seen, I've

16   evaluated lots of individuals.  I have treated hundreds of

17   individuals and I have seen the extent of pedophilia.  And

18   this is one of the more extreme cases of pedophilia in that

19   what he would do to have access to children and he even, in

20   his own words, how much it was costing him because he was

21   paying them, with these kids who, some of them he called

22   hustlers.  Well, maybe they were hustlers.  7-year olds,

23   8-year olds hustling, I mean, I don't know if that's

24   possible.  Maybe it is.  Maybe in different parts of the

25   country.  But somehow he was able to create this amazing

1    climate to fulfill his needs.

2           And, you know, not every sex offender goes to that

3    extent.  Some do and some don't.  Some offend in different

4    manners.  But I feel that, that's the main reason why I feel

5    it's still there.

6           And I have already forgot what the question was so

7    I apologize.

8    **Q.**  That's all right.  It was about describing what you

9    meant by the pedophilia.

10   **A.**  Oh, about being ingrained.  And that's why I believe

11   it's ingrained.

12   **Q.**  Now, you're familiar with treatment for sex offenders;

13   correct?

14   **A.**  Yes, sir.

15   **Q.**  Does treatment cure an individual of their sexual

16   attraction to children?

17   **A.**  In some occasions it may depending on how strong the

18   person's attraction is.  A person may be able to find

19   different ways to address that and so there may be a

20   possibility.  But if they really have this attraction, it's

21   not likely going to change the same way a heterosexual

22   attraction to females or a homosexual attraction to males is

23   not likely going to go away for any reason if you're

24   oriented in that fashion.

25          And so for it to go away to say a person can be

1  cured of something they really like, it would be very, very

2  difficult.  There may be some occasions but maybe the

3  individuals who aren't that, don't have it that severe.

4  **Q.**  With respect --

5  **A.**  But treatment, you know, to say the word that they're

6  cured, I prefer to use the term, you know, "managed," they

7  can manage their problems in an appropriate manner as

8  opposed to saying "cured."  It is all going to depend on the

9  individual.

10        I mean, there is thousands and thousands of sex

11 offenders but they're not all the same.  So I don't like

12 saying none of them can be cured and I don't like to say

13 none of them or all of them can be.  But that's just my

14 philosophy as opposed to other people believe that there is

15 no hope and they all can be -- no one can ever be treated.

16 **Q.**  Well, with respect to Mr. Hunt's claims of no longer

17 being attracted to children, and in specific reference to

18 the fact that he underwent treatment in the year 2003, do

19 you believe that in Mr. Hunt's case that he has been cured

20 of his sexual attraction to children?

21 **A.**  No, I do not think so.  The treatment he did, he did get

22 involved in treatment.  I think that was a positive thing.

23 It was fairly short term because that was what was offered

24 him.  But he did begin to acknowledge his problems.  He was

25 open and honest about it.  He acknowledges as I have already

1    read significant portions of his treatment and I included a

2    lot of it in my report.

3            At the same time, if you go through the treatment

4    and you see that he is using the same terms over and over

5    about coercing and manipulating, I'm not sure if they told

6    him the first time he wrote that he didn't use enough of

7    those terms and then he put them in.  I don't know.

8            But he knows -- he's aware that what he has done is

9    wrong.  Whether he can never do that again, that's the

10   ultimate question.

11   **Q.**  What vis-a-vis the issue of cure would be the expected

12   prognosis for an individual like Mr. Hunt?  Would we expect

13   a cure at all?

14   **A.**  Well, this population, this type of offender, as it's,

15   you know, the DSM indicates it and the research indicates

16   it, have the higher, higher rates of recidivism.

17   Individuals who are attracted to boys have the highest rate

18   as opposed to adult rapists or offenders who victimize young

19   girls.  They just happen to have the highest rate.

20           And that's why the actuarial instruments that we

21   can talk about later, there is -- it's aggravating if you

22   have a male victim as opposed to female victims.  So they

23   are more difficult --

24   **Q.**  Moving to the issue of treatment and cure, are we

25   looking at a situation at the individual case of Mr. Hunt

1   where he could be cured or are we talking about managing the

2   urges?

3   **A.**  It would be more about managing the urges.  That's what

4   the goal is.  To ever say someone is cured is kind of

5   like -- when you have an alcoholic, you never say someone is

6   cured.  They have to always manage, or a drug addict or a

7   gambler or someone who is a serial adulterer who wants to

8   stop, or whatever.  Whatever behavior somebody has that

9   they're trying to change, you may never say, well, they're

10  just cured of it.  They have to constantly learn how to

11  manage it.

12        And so once you think you're cured of it, then you

13  might slip and not be as watchful and vigilant and it may

14  be -- may lead you down the wrong path.  So by always being

15  aware of your problem, that's how treatment is usually

16  handled as opposed to we're going to totally cure this

17  person because that's less likely to occur.

18  **Q.**  Just directing your attention briefly back to Exhibit H.

19  Can you describe for me generally speaking what is the

20  disorder of antisocial personality disorder, why is it that

21  you diagnosed Mr. Hunt with it and what, if any, relevance

22  that that diagnosis may have to your findings of future

23  sexual dangerousness?

24  **A.**  Well, this is a diagnosis -- well, the definition just

25  to have it for the record, a pervasive pattern of disregard

1    for and violation of the rights of others that begins in

2    childhood or early adolescence and continues in adulthood.

3    And then there is a list of criteria which deal with, you

4    know, people's behavior, you know, not following social

5    conventions, lack of empathy, being irritable, impulsive,

6    aggressive.

7    **Q.**  Very briefly how does Mr. Hunt meet these criteria?

8    **A.**  Well, he met the criteria because, first of all, you

9    need to have -- there has got to be some type of conduct

10   before age of 15 to meet the criteria for an adult.  The

11   behavior has to have occurred early in life.

12        So if all of a sudden you're in your 20s and you

13   start engaging in those behaviors, you wouldn't meet the

14   criteria because it has to have been behavior that's been

15   witnessed beforehand.

16        And there are records the he did have, I mean, he

17   had a problematic childhood but then he also, his behavior

18   was also problematic and he engaged in some disruptive

19   conduct before age 15 so that he was found to have a

20   childhood disorder.  It's not really clear what they meant.

21        It seems to me, sounds like, more like a conduct

22   disorder which is commonly found in individuals who later

23   have ASPD.

24        And so, you know, it's a diagnosis commonly found

25   in prison.  About 60 to 75 percent of guys who are in prison

1    have this diagnosis, if not more.  So it's not uncommon to

2    see it.  But -- and not every person who I have ever

3    diagnosed with pedophilia has ASPD.

4    **Q.**  What's significant about its presence here then?

5    **A.**  Well, the fact that, besides just committing the sexual

6    offending, you know, the kidnapping in Louisiana, I mean,

7    most sex offenders never commit a kidnapping.  Most

8    pedophiles don't commit a kidnapping.  You're basically, you

9    know, in some states kidnapping is, you're looking at life.

10   It is a real serious crime.  And you take somebody for five

11   weeks, that's pretty significant.

12          That separates sex offenders from like a different

13   type of criminal.  So you're really going against the law.

14          And in the type of, you know, the lifestyle he was

15   leading in the carnival.  No offense to carnival people but,

16   you know, I have worked in lots of prisons and lots of

17   people who have been in prison have worked in carnivals.

18   It's just a coincidence I guess.

19          But the carnival, they're moving from town to town.

20   It's a transient kind of lifestyle, which is common because

21   it's kind of like they have their own -- they're not

22   following regular rules like most people do, which there is

23   nothing totally wrong with that as long as they're not

24   breaking the law.

25          But he is engaged in behaviors that distinguish him

1   from other types of offenders and that's why he met the

2   criteria.

3          And, granted, there are some sex offenders, there

4   is many who also are found to be ASPD but in this case I

5   felt he did meet the criteria.

6   **Q.**   And what is its relevance, both in evaluating Mr. Hunt

7   individually and projecting his future sexual dangerousness,

8   if any?

9   **A.**   The ASPD?

10   **Q.**   Yes?

11   **A.**   Well, the ASPD, unlike the course we just mentioned in

12   the DSM that talks about the crime, of course, of

13   pedophilia, the ASPD has been known to remit in the fourth

14   decade so usually as people get older, 40s, 50s, 60s, their

15   behavior begins to change.  They get older and so they're

16   found to be less, you know, commit less crimes.  So that's

17   why the ASPD I don't feel is that big of an issue.

18          While in prison he's been pretty much a stand-up

19   offender (sic) -- I mean inmate.  He really doesn't have a

20   lot of reports in 20 some years which is pretty positive

21   given you're in a prison where lots of things can occur.

22          So overall his behavior has been compliant to the

23   rules of the institution but with the exception of a '98

24   situation which you could blame that on his other diagnosis.

25          So I feel that ASPD in his case really isn't that

1    big of an issue.

2    **Q.**  With respect to future dangerousness?

3    **A.**  Correct.

4    **Q.**  But pedophilia certainly is?

5    **A.**  Yes.

6    **Q.**  Okay.  Is pedophilia a serious mental disorder in your

7    opinion?

8    **A.**  Yes.

9    **Q.**  Okay.  I'd like to just move ahead to your evaluation of

10   Mr. Hunt's future sexual dangerousness.  Can you describe

11   for us the general methodology that you follow in conducting

12   or making a decision about this aspect of your opinion?

13   **A.**  Well, if there is records, I reviewed records.  In this

14   case there was over 1500 pages of records.  I reviewed

15   those.  I reviewed the evaluations that have been already

16   conducted.  So I reviewed Dr. Katz and Dr. Phenix's

17   evaluation.  And then I set up a time to interview the

18   individual.  And I evaluated Mr. Hunt on November 20th.

19          And then I write my report.  I take into account, I

20   look at the actuarial issue.  I look at the, using the

21   Static-99, and then I look at some dynamic factors.  I look

22   at treatment.  I look at the issue of age.  And then I come

23   to my decision.

24   **Q.**  Okay.

25   **A.**  That's the short version.

1    **Q.**  How long have you used that method and why do you use

2    that method?

3    **A.**  I have been using the same method for many years except

4    for the issue of the Static-99.  I didn't use it as I'm

5    using it now until about the last, within the last year.

6    **Q.**  Okay.  Doctor, what is an actuarial tool, generally

7    speaking?

8    **A.**  Actuarial tools is when through the use of a statistical

9    analysis you get groups of individuals where you have a

10   fixed follow-up time and you have a known outcome.  And then

11   you have predictor variables that have been able to

12   distinguish recidivists from nonrecidivists.  And then you

13   loop those together to create a scale or a measure.

14         So, and then once you have that measure and those

15   items, then you score all these individuals for that group

16   that you know that you have the known outcome.  Then every

17   individual is going to have a score and based on that score

18   and whether they recidivated or they didn't recidivate,

19   there will be a probability estimate that will correspond to

20   a cut score.

21         So, for example, the Static-99 has ten items.

22   **Q.**  Before we get into the details of it, have there been

23   actuarial models developed for the use in the field of sex

24   offender risk assessments?

25   **A.**  Yes, there have.

1    **Q.**   What are some of those?

2    **A.**   Well, getting back to the history, the first one was not

3    specific to sex offenders.  It was for violence and called

4    the Violence Risk Appraisal Guide, the VRAG and then the

5    SORAG, which is the Sex Offender Risk Appraisal Guide, which

6    has also been used with sex offenders but also violent

7    offenders.

8         Those were like the original ones.  And then you

9    had the RRASOR, R-R-A-S-O-R, which is the Rapid Risk

10   Assessment for Sex Offender Recidivism.

11   **Q.**   When was that developed?

12   **A.**   That was developed in 1998, '99, around that time.  And

13   that was four items.  It was just how many priors you had,

14   did you have a male victim, was any of your victims

15   unrelated and are you under or over the age of 25.  So it

16   was just four items.  It is a short instrument.  But it's

17   been found, it was found to be somewhat reliable.

18         And then from there, that was created by

19   Dr. Hanson.  He teamed up with Dr. Thornton who was from

20   England but now he's working in the states.  And they

21   combined this other instrument called the Structured

22   Anchored Clinical Judgment, SAC-J, S-A-C dash J.  And then

23   they came up with ten items.

24         So the Static-99 which came out in 1999, it's an

25   easy thing to remember, has ten items.  Four of them are the

1    RRASOR and then six other items.  And so that's the

2    instrument that has been used the most.

3         There is another instrument called the MnSOST-R

4    which is the Minnesota Sex Offender Screening Tool Revised.

5    That has 16 items.  That has, was -- there was a lot of hope

6    that it would be really good because it has some dynamic

7    factors because, as the name suggests, the Static is made up

8    of historical factors they can't change.  It's static so

9    it's fairly, usually fairly easy to score.  There is always

10   some issues involved.

11        But the MnSOST-R actually takes into account

12   treatment, issues for substance abuse and sexual abuse or,

13   yes, sex offender treatment, and unemployment and then also

14   has age.  So there is some dynamic factors.

15        The MnSOST-R has had some issues.  It hasn't been

16   published nearly as well, cross-validated nearly as well.

17   So there has been concerns.  I don't use it.

18        And then -- I'm trying to see if I'm forgetting

19   any.

20        Those are --

21   **Q.**  The Static-2002?

22   **A.**  Yes.  Well, yes, the Static-2002 is the newest version

23   of the Static-99 and it's taken years to develop it.  I

24   mean, that's why I guess it's called the 2002 but it still

25   hasn't really -- some people have begun to use it I guess.

1    I haven't used it yet.

2         But what they did, they removed some of the items

3    from the Static-99 and then they added some items.  So now

4    there is a total of 13 different items.  And that one also

5    takes, one of the big changes is that it takes into account

6    age at a different way than the first Static.

7         So those are pretty much the instruments that are

8    used in the SVP world and also in the, just the sex offender

9    parole, probation uses these measures also.

10   **Q.**  You mentioned the Static-99 has the actuarial model that

11   you yourself utilized; correct?

12   **A.**  Correct.

13   **Q.**  Are you familiar with the studies, peer reviewed

14   publications, the like, that have validated the use of the

15   Static-99 for this purpose?

16   **A.**  Yes.

17   **Q.**  And approximately how many cross-validation studies have

18   there been of the Static-99?

19   **A.**  There has been, that have been published I think it's

20   maybe 30 some.  There is a longer list but a lot of those

21   haven't been published in peer reviewed journals.

22        So you often hear, you hear, oh, there is over 65

23   or 70; but if you look at the list, you can see some of them

24   have just been presented at conferences and/or waiting to be

25   published or maybe somebody's thesis or dissertation.

1    **Q.**  And when we say they have been cross-validated, what

2    does that mean?

3    **A.**  What it means is that it is, to determine if the

4    instrument has any validity, it's easy to have it work with

5    your population because you can, you're moving things around

6    to make sure it shows some distinguishing factor between

7    those who have recidivated and those who didn't.

8          So there is a thing in statistics called

9    capitalization to chance which means that it's going to work

10   for your group.  I'm going to give it to these hundred

11   people and I'm going to -- because I know them or whatever,

12   I'm going to make it work.

13         Now let's see if it works with these hundred

14   people.  And a lot of times it won't work nearly as well and

15   then there is, the other term is called "shrinkage" so --

16   **Q.**  So cross-validation involves applying the same

17   principles and statistics to different groups of sex

18   offenders than those involved in the development of the

19   test; correct?

20   **A.**  Correct.  So it's kind of like if I gave this medicine

21   to these people and now I want to give it to these people to

22   make sure it works for everybody so then I can say it

23   actually works.  If it only works for this group because

24   they just all happen to live in the same environment where

25   they were more conducive to this medication, that's not --

```
1    so basically you want to have, to have validity, it has to

2    be -- it can't just work in your lab.  It has to work in

3    some other lab.

4              And so --

5    Q.  Let me ask the question.

6              On approximately 30 occasions the results and the

7    predictive validity of the Static-99 have been tested.  What

8    has been the result of those 30 tests?

9    A.  That it's shown moderate predictive validity based on

10   the statistical formula which has been used which is the

11   ROC.

12   Q.  What does it mean that it shows moderate predictive

13   validity?

14   A.  That it's able to distinguish -- that the instrument

15   itself has been able to distinguish recidivists from

16   nonrecidivists in a moderate predictive validity.

17   Q.  Okay.

18   A.  And so that's the good part of it, yes.

19   Q.  Okay.  Has the Static-99 gained general acceptance

20   within the community of professionals conducting sex

21   offender risk assessments?

22   A.  Yes, with the majority.  There was some detractors.  I

23   mean, I was a detractor for many years.  There is still

24   problems with it.  I'm never going to say it's the be all

25   and end all.  But it's just, it's a way to find relative
```

 1   risk compared to when we didn't have -- when we had less

 2   understanding.

 3          But there is still problems with it.  As with

 4   everything there is always some problems with it.

 5          **THE COURT:**  Does it meet the substantial likelihood

 6   test?

 7          **THE WITNESS:**  How do you mean?  What do you mean,

 8   sir?

 9          **THE COURT:**  Well, I mean you are talking about

10   moderate, moderate reliability?  My burden here is something

11   different.  The government has to --

12          **MR. GRADY:**  Let me see if I can illuminate that.

13          **THE COURT:**  Do you understand what I am trying to

14   get at?

15   BY MR. GRADY

16   **Q.**  What does "moderate" mean in the context of statistical

17   analysis as opposed to "moderate" in general context?

18   **A.**  The reason they use the term "moderate predictive

19   validity" is that they're using this statistical computation

20   called the Receiver Operator Characteristic.  And that's

21   called the ROC.

22          The ROC is a formula where if I take a group of sex

23   offenders and I randomly select a recidivist and I compare

24   that and I randomly select a nonrecidivist, what percentage

25   of the time is this number going to be higher on this

1    instrument than this number over here, the nonrecidivist.

2    And if you get a .7 or a .80, .7 or .75, that's considered

3    moderate predictive validity.  If it was .5, if every time I

4    pulled out one from here and I pulled one out of here and it

5    was always .5, then it's chance, then I'm not distinguishing

6    at all.  The instrument is drek.

7    **Q.**  Let me see if I can help the Court a bit here.

8         The Receiver Operating Characteristics is a measure

9    that basically goes from .5 to 1; correct?

10   **A.**  Correct.

11   **Q.**  And if you score a .5, you are basically flipping a

12   coin, it's 50/50?  You have no discriminatory power

13   whatsoever; correct?

14   **A.**  Correct.

15   **Q.**  And as you progress further up the chart from .5 to .01,

16   which would be perfect validity, you come up to

17   approximately .75; correct?

18   **A.**  Correct.

19   **Q.**  And that means that for about seven out of ten sex

20   offenders or slightly more you'd correctly identify a

21   recidivist as higher risk than a nonrecidivist -- you'd

22   correctly identify a recidivist as being higher risk than a

23   nonrecidivist; right?

24   **A.**  The instrument would.

25   **Q.**  Yes.  Okay.

```
 1              Now --

 2         MR. GRADY:  Does that help the Court at all?

 3         THE COURT:  It does.

 4         MR. GRADY:  Okay.

 5    BY MR. GRADY

 6    Q.  Okay.  You indicated it is moderate.  Now, the term

 7    "moderate predictive ability," that's a statistical term.

 8         THE COURT:  How long are you going to be with this

 9    witness on direct?

10         MR. GRADY:  I am going to try to -- I probably have

11    another 45 minutes, an hour tops, Your Honor.

12         THE COURT:  All right.  Not just five minutes?

13         MR. GRADY:  No.

14         THE COURT:  Okay.  Why don't we recess.

15              Now, we have something scheduled for 2:15.  I am

16    going to kick that back to 2:30.  I have got somebody coming

17    in for lunch and I don't think it will take that long.

18              So why don't we meet at 2:30.  The other matter

19    won't take that long.

20              All right.  See you then.

21         MR. GRADY:  Thank you, Your Honor.

22

23              (Luncheon recess.)

24

25
```

1              **AFTERNOON PROCEEDINGS**

2         **THE COURT:**  All right.  Are you all set to go?

3         **MR. GOLD:**  I think we need Mr. Hunt.

4         (Pause in proceedings.)

5         (Whereupon, Mr. Hunt entered the courtroom.)

6         **THE COURT:**  All right, everybody.  We are back.

7         **MR. GRADY:**  If I may, Your Honor?

8         **THE COURT:**  Go ahead.

9         **MR. GRADY:**  Thank you.

10             **LUIS ROSELL, Resumed**

11         **DIRECT EXAMINATION, (Cont'd.)**

12   BY MR. GRADY

13   **Q.**  Doctor, when we left off, you were discussing some of

14   the validations of the Static-99 and its use as a moderate

15   predictor for sexual recidivism.

16         You were mentioning at the time that we left off

17   that there were certain criticisms of these actuarial

18   models.  Can you describe for the Court what some of those

19   criticisms are?

20   **A.**  Some of the criticisms besides the issue that I brought

21   up before about the fact that they're static, they're

22   historical and that they don't change so they're less likely

23   to measure someone's risk level over a longer period of time

24   if the person changes in any specific way so that is not

25   going to be taken into account.

1           The other issue was that in those cross-validated

2     studies, even though the ROC showed moderate predictive

3     validity, the probability estimates weren't always stable.

4     In other words, the 5- and 10-year follow-ups, more so the

5     5-year initially had lower estimates than the developmental

6     sample.  So basically, although the instrument was still

7     having the same ability to discriminate between recidivists

8     and nonrecidivists, the probability estimates themselves

9     were lower than in the developmental simple.

10          For example, the developmental sample over a 5-year

11    period if you score 6 or above, the estimate was 39 percent

12    over a 5-year period.  Other studies found that they were

13    lower than that.

14          So that was one of the criticisms regarding the

15    instrument.

16    **Q.**  With respect to specifically -- well, strike that.

17          What was, in terms of when the offenders committed

18    their offenses, what was the composition of the underlying

19    sex offenders that went into the creation of the Static-99?

20    When did they commit their offenses?

21    **A.**  The developmental sample consisted of basically seven

22    different groups from Canada and the United Kingdom between

23    1958 and 1993.

24          In the developmental sample there were 1,086

25    subjects, in that sample --

1    **Q.**  I'm sorry.  Are you all set, Doctor?

2    **A.**  Yes.

3    **Q.**  I apologize for interrupting you.

4          With respect to criticisms that the base rate

5    offense for this statistic in this underlying sample from

6    the 1995s to the 1990s, with respect to criticisms that that

7    didn't reflect sex offenders today, what, if anything, have

8    the developers of the Static-99 test done to address those

9    criticisms?

10   **A.**  What they have done is, most recently in the last year

11   and a half they have looked at newer samples, mostly in

12   Canada and in England, some other countries in Europe and

13   then one sample out of the United States, actually in

14   Massachusetts.

15          And they have looked at -- so they have enlarged

16   the developmental, the new norm, the new sample has more

17   subjects in it.  And they are finding that there is, as

18   other studies had shown previously, that although the

19   scores, basically that the scores -- the percentage

20   corresponding to the scores had gone down.

21   **Q.**  Okay.  I think I sort of need to explain for the Court a

22   little bit of what you are talking about.

23   **A.**  Sure.

24   **Q.**  I'm just going to show you a document.  I don't think it

25   needs to be admitted necessarily.

1          Can you tell me what this is?

2     **A.**   This is the coding form for the Static-99.

3     **Q.**   Okay.  And you scored Mr. Hunt on this; correct?

4     **A.**   Yes.

5     **Q.**   Okay.  Just with respect to the questions that are

6     there, why is it that the Static-99 asks about youth?  The

7     first question.

8     **A.**   Because in that sample that was the age where there was

9     significant discriminating between recidivists and

10    nonrecidivists, or there was more -- there had to be a line,

11    like in the MnSOST-R it's 31 and the Static-99 it's 25.

12    That's where they showed the most ability to discriminate

13    between recidivists and nonrecidivists.

14    **Q.**   Okay.  Very simply, younger individuals are more likely

15    to reoffend, they get a point?

16    **A.**   Correct.

17    **Q.**   Okay.  Why does it ask about index nonsexual violence?

18    What does that mean by the way?  How do you score that?

19    **A.**   Index nonsexual violence means if there is a violent act

20    such as an assault, aggravated battery, kidnapping,

21    whatever, there is a list of violent offenses that are

22    nonsexual in nature that occur during the index offense.

23    **Q.**   Okay.  And when you say "index offense," that's the

24    offense governing the most recent incarceration?

25    **A.**   Correct.

1   **Q.**  Okay.  And with respect to the other questions, prior

2   nonsexual violence, why is that on there?

3   **A.**  That means that a person has had a prior either battery,

4   aggravated assault, kidnapping, et cetera, a violent offense

5   that could be, most likely is nonsexual.  It's not related

6   to sex.  It's just a different -- because it's been found

7   with sex offenders that, in the study, we see in the

8   Static-99, we look for, like I mentioned earlier about

9   predictor variables that discriminate recidivists from

10  nonrecidivists and that's what they came up with.

11  **Q.**  Okay.  So to sum up, each of these questions asks about

12  a characteristic that was determined in the original sample

13  to correlate to an increased risk of recidivism?

14  **A.**  Correct.  There is a correlation with sexual recidivism.

15  **Q.**  Okay.  Now, you mentioned under the original norms, how

16  did you originally score individuals before these new recent

17  norms you described?

18  **A.**  The scoring has not changed.

19  **Q.**  Okay.  How did -- what was -- can you describe for me

20  how it is one determines high, medium and low risk under the

21  old norms?  Very briefly.

22  **A.**  Under the old norms high risk was considered anybody who

23  scored a six or above.  And because they had a limited

24  number of individuals who scored 7, 8, 9, 10, 11 and 12, the

25  range is 0 to 12, they collapsed it into one large group of

 1   six plus.  Then four, five were considered moderate high and

 2   then two, three are considered moderate and then low is zero

 3   to one.

 4   **Q.**  Okay.  Based on the new sample, what, if anything, has

 5   changed about the identification of -- or strike that.

 6        Based on the new 6,000 person sample, what, if

 7   anything, have the developers been able to do with respect

 8   to scores higher than six?

 9   **A.**  They had enough subjects that they felt comfortable with

10   the corresponding probability estimates that they have been

11   able to now go from zero to ten.

12   **Q.**  Okay.  Can you just describe briefly how it is -- or

13   strike that.

14        What's different about this new group of the 6700

15   plus sex offenders that's different from the developmental

16   sample?

17   **A.**  Many of the samples are more recent, within the last

18   decade or decade and a half.  They're looking at 5- and

19   10-year follow-ups instead of 5, 10 and 15 years.  So that

20   is one of the problems with it but at least they have 5- and

21   10-year numbers.

22        They have groups within the large sample, they have

23   also divided it up into two subgroups that are considered

24   the high-risk group and then the preselected low-risk group

25   which is abbreviated CSC.  It's some -- I forget exactly

1    what the CSC stands for.  It's the Canadian Services --

2    Correctional Services of Canada I believe.

3            And so what they have done is they discriminated

4    the two groups based on whether there was treatment

5    participation, antisocial behavior while in prison, and I'm

6    trying to remember if there was one other factor that they

7    discriminated the two groups from.

8            That's basically what we've been told at this time.

9    There hasn't been a lot of information regarding what

10   discriminates.  They listed resistance to sustained

11   rehabilitative effort, expelled from treatment, treatment

12   dropout, antisocial behavior during current sentence.

13   That's how they're kind of labeling the ones who are

14   considered in the high-risk group as opposed to the other

15   risk group, the lower-risk group which basically indicates

16   treatment participation and limited programming, cooperative

17   but proportionate, programming not provided.  That's the

18   lower-risk group.

19           And so basically they had two groups --

20           **MR. GOLD:**  Objection, Your Honor.  It's not -- it

21   appears the witness is reading.  It's not clear what is

22   being read from.

23           **THE COURT:**  You are not to read something --

24           **THE WITNESS:**  Oh, I'm sorry.

25           **THE COURT:**  -- you can read it to refresh your

1    recollection.  And then you only read it to see if you can

2    refresh your recollection.

3              **THE WITNESS:**  Okay.  I'm sorry, Your Honor.

4              **THE COURT:**  That is okay.

5    **A.**  So that's -- what they have done differently is, besides

6    the two groups, they have added higher risk, they have had

7    numbers that go into the higher numbers that they didn't

8    have before, corresponding estimates that --

9    **Q.**  Using just the score sheet you have in front of you,

10   what did you score Mr. Hunt on question one?

11   **A.**  A one.

12   **Q.**  He is age 18 to 24?

13   **A.**  No, I'm sorry.  He scored a zero on that.  I apologize.

14   **Q.**  What about question two?

15   **A.**  One.

16   **Q.**  Question three?

17   **A.**  A one.

18   **Q.**  Question four?

19   **A.**  A one.

20   **Q.**  Question five?

21   **A.**  A three.

22   **Q.**  And on the remaining questions one point each; correct?

23   **A.**  Yes.

24   **Q.**  What was the total score for Mr. Hunt on the Static-99?

25   **A.**  Eleven.

1    **Q.**  Okay.  What does that score of 11 tell us based on these

2    new norms?

3            Strike that.

4            What does the score of 11 tell us, Doctor?

5    **A.**  Well, it's scoring very, very high.  As I mentioned

6    earlier, the range is 0 to 12 and there are very few who

7    score 10, 11 or 12.  I have never seen a 12.  An 11 is about

8    as high as I have seen.

9    **Q.**  In the twenty plus years you've been working -- or

10   strike that.

11           How long have you been using the Static-99 test?

12   **A.**  Well, it's been around for ten years so I have seen

13   scores for the last ten years.

14   **Q.**  Ever seen an 11?

15   **A.**  No, I have not.

16   **Q.**  In the developmental sample, are you aware of how many

17   11s were scored out of those 6700 individuals?

18   **A.**  In the original sample I'm not aware of how many there

19   were but I believe it was a very small number.  They had

20   small numbers of 8s, 9s and 10s and 11s.  That's why they

21   couldn't have enough -- if they would have had more numbers,

22   they probably would have collapsed it to maybe a 7 plus or

23   an 8 plus.

24   **Q.**  I think my question must have been bad or misunderstood.

25           In the 6700-person sample --

1    **A.**   Oh, okay.

2    **Q.**   -- how many 11s were there?

3    **A.**   My understanding is there aren't any and that's why they

4    have gone zero to ten.

5    **Q.**   No one of the 6700 sex offender study, including the

6    special high-risk groups, scored as high as 11?

7    **A.**   As far as I know, no one scored an 11.

8    **Q.**   With respect to -- so if we look -- strike that.

9            I'd ask you to look at what's been marked as

10   Government Exhibit --

11           **MR. GRADY:**  Just one moment, Your Honor.

12           **THE COURT:**  Yes.

13           (Whereupon, counsel conferred.)

14           **MR. GRADY:**  May I approach the witness, Your

15   Honor --

16           **THE COURT:**  Yes.

17           **MR. GRADY:**  -- with a small snapshot of our

18   exhibit?

19           **THE COURT:**  Okay.

20   BY MR. GRADY

21   **Q.**   I'm going to show you a document and ask you, just tell

22   me if you know what that is?

23           **MR. GRADY:**  I'll have the court mark it after.  I'm

24   sorry, Your Honor.

25           **THE COURT:**  That is all right.

1    **A.**   That's are the new norms.  They've come out with 16

2    different tables called the Static-99 Recidivism Tables.

3    And they have it broken down in a variety of ways, both 5-

4    and 10-year follow-ups, broken down for not just sex

5    offending but for violence, for rapists, for child

6    molesters.  So they have numerous, like I said, there is 16

7    different charts.

8    **Q.**   Okay.  Those are the new revised norms on the Static-99?

9    **A.**   Correct.

10   **Q.**   Okay.

11          **MR. GRADY:**  May I approach again, Your Honor?

12          **THE COURT:**  Yes.

13   BY MR. GRADY

14   **Q.**   Now, how high do these scores go on these new norms?

15   **A.**   Till ten.

16   **Q.**   Okay.  So how would you suggest that we interpret the 11

17   using the charts?

18   **A.**   Well, that is what makes it somewhat problematic, the

19   fact that there are no 11s to compare it to.

20          One way to look at it is just to score him as a

21   ten.

22   **Q.**   Okay.  What would be or how would we look at these

23   documents in terms of evaluating -- what do these new norms

24   tell this Court about individuals who scored a ten in terms

25   of their recidivism rates?  Or do you need the documents?

1   **A.**   No.   The new norms, like I said, there is several

2   different tables so it depends on which one you look at.

3   **Q.**   We're looking at sex offender recidivism.

4   **A.**   Right.   Sex offender recidivism.   Within that, I mean,

5   there is the complete sample.   If you look at the complete

6   sample, the range would be for the 5 years I think 51

7   percent, the 10 years is 66 percent, with the --

8   **Q.**   Let's stop right there for a second.

9          What does that mean, the 5-year is 51 percent and

10   the 10-year is 66 percent?   Out of a hundred people like

11   Mr. Hunt -- or strike that.

12          Out of a hundred people who scored a ten, what

13   would happen?

14   **A.**   Fifty.

15   **Q.**   Fifty what?

16   **A.**   Out of one hundred fifty would have recidivated in five

17   years.

18   **Q.**   Okay.   And what does it mean, the 66 percent with

19   respect to a 10-year date?

20   **A.**   That 66 would have.

21   **Q.**   Okay.   Now, that's from the general --

22   **A.**   The complete sample.

23   **Q.**   The complete sample.

24          Is that how the developers -- or strike that.

25          What, if any, information have you been given,

1    learned, attended a presentation on the application of these

2    new recidivism norms?  What information have you gotten on

3    that issue?

4    **A.**   The developers are recommending looking at not the

5    complete sample but the logistic regression estimates from

6    the 5- and 10-year high-risk and -- the high-risk sample.

7    **Q.**   Okay.  And do you know what those numbers are for the 5-

8    and 10-year period?

9    **A.**   34 percent and then 50 percent.

10   **Q.**   For five?

11   **A.**   For five years.  And then ten years -- well, no, it's 34

12   percent for the low risk, 50 percent for the high risk at

13   five years.  And then the ten years are 49 percent for the

14   low risk and 59.9 percent for the high risk.

15   **Q.**   Okay.  So what -- if I understand you to be -- let me

16   see if I have got this clear.

17          The developers of the Static-99 have suggested that

18   the data be used to, or the data suggests that the 5-year

19   recidivism rate is between 34 percent and 49 percent?

20   **A.**   34 and 50, yes.

21   **Q.**   Okay.  And where do you assign a particular individual

22   on that spectrum depends upon where you assign them or the

23   individuals, whether you consider the individual to be more

24   like a high-risk group or more like a normal group of sex

25   offenders?

1    **A.**  Correct.

2    **Q.**  Okay.  And what are the numbers with respect to a

3    10-year minimum?

4    **A.**  49 percent and 59 percent.

5    **Q.**  Okay.  And similarly the developers of the study have

6    told you what with respect to placing an individual within

7    that spectrum?

8    **A.**  You have to then look at the individual and try to

9    figure out based on the information that they've provided

10   you on how they discriminated these two groups of samples,

11   how this individual falls into that group.

12   **Q.**  Okay.  What is the information in the sense of how does

13   the Static-99 data that we've just discussed inform your

14   opinion as to Mr. Hunt's sexual dangerousness?

15   **A.**  Well, it's what's commonly looked at as the starting

16   point.  If the instrument does not tell you about the

17   individual's absolute risk, it definitely tells you about

18   the relative risk when compared to other individuals.

19        And so when you compare them to other individuals,

20   he scores higher than pretty much everyone else.

21   **Q.**  Okay.

22   **A.**  That's just the raw numbers.  If you look at 6,000

23   people or even if there was a thousand people, very few

24   people scored an 11.  Very few people scored a 10.

25   **Q.**  Now, just to be clear, the base or the study samples

1    that went into the creation of this item were solely

2    convicted sex offenders; correct?

3    **A.**   Correct.

4    **Q.**   Okay.  So that among the convicted sex offenders, when

5    you say this test discriminates, what do you mean?

6    **A.**   It discriminates from -- I'm not understanding the

7    question.

8    **Q.**   Okay.  You had just said that the score of 11 tells you

9    something about Mr. Hunt relative to other sex offenders?

10   **A.**   Yes.

11   **Q.**   How does it do that?  What does it tell us?

12   **A.**   Well, it just tells you that he scored higher, for

13   whatever reason, he scored basically on every item except

14   for one.  And so not every sex offender scores that high.

15   They don't have every item marked off.

16          So that's why I mentioned, you know, from a

17   relative standpoint he scores higher than everyone else.

18   **Q.**   Okay.  Well, let me just see if I can clarify what that

19   means.  These questions attempt to identify the extent to

20   which Mr. Hunt shares characteristics which have been

21   mathematically shown to correlate to a higher risk of

22   recidivism; correct?

23   **A.**   Correct.

24   **Q.**   And with respect to this test and every question but the

25   fact of whether he is under or over the age of 25, Mr. Hunt

1     has every single one of the statistical characteristics

2     which the developers of these tests concluded correlate to

3     higher risk of recidivism; correct?

4     **A.**   That's true.

5     **Q.**   And -- I'm going to stop there.

6            With respect to -- in addition to the Static-99

7     data, you described it as a starting point, what other

8     factors did you consider?  What other information did you

9     consider besides Mr. Hunt's history, the documents and the

10    Static-99?

11    **A.**   Well, again, as I mentioned earlier, I considered the

12    treatment, how much treatment, how much I felt they

13    understood about their treatment, the issue of age.  And

14    then I also looked at other dynamic factors that have been

15    shown to have some relationship with sexual recidivism.

16    **Q.**   Okay.  When you say it has been shown to have some

17    relationship, what do you mean?

18    **A.**   Well, this is just another area that's --

19    **Q.**   Are you relying on peer reviewed articles or are you

20    relying on your own research?

21    **A.**   No, there is research that has shown that there is some

22    relationship with dynamic factors related to sexual

23    recidivism.

24    **Q.**   Let me back up a little bit further, Doctor.

25            What is a dynamic factor as compared to the static

1    factors listed on the Static-99?

2    **A.**   Dynamic factors are factors that will change and can be

3    measured such as a person's attitude, their behavior.  So

4    the issue with -- because of the problem we have with the

5    Static-99 and that it doesn't measure anything dynamic.  And

6    so one of the criticisms was it's always going to stay the

7    same, the person's scores are never going to change.  There

8    has been a lot of research looking at dynamic factors,

9    especially when you're talking about community-based sex

10   offenders, whether they are doing better or when can they

11   finally get off supervision, et cetera.

12        So there has been a lot of research looking at

13   that.  The unfortunate part is that the latest research is

14   showing that the dynamic factors don't really add much

15   predictive validity to already actuarially-based assessments

16   which is somewhat unfortunate.

17        But there are, those factors appear to be important

18   but in some research it's showing that it's not really

19   helping as much as we thought it would in terms of making a

20   prediction.

21   **Q.**  With respect to your opinion in this case, what dynamic

22   factors did you consider and how did you value them?

23   **A.**   Well, I looked at some of the factors that have been

24   looked at -- that have been studied that formed this

25   instrument called the Stable 2007 which looks at dynamic

1    factors.  And there was a list of those that I included in

2    my report.

3    **Q.**  Can you just tell us what those factors are, whether any

4    of them had a significant impact on your decision in this

5    matter or -- excuse me -- your opinion in this matter?

6    **A.**  Capacity for relationships, stability, I thought that

7    even though Mr. Hunt has had a relationship with an adult

8    woman, it did not seem to be that much of a significant

9    relationship given that the whole time he was involved he

10    was committing sex offenses with boys.

11        The issue of hostility towards women does not seem

12    to be an issue.

13        Lack of concern for others.  Obviously during his

14    offending it was pretty clear that that was a problem or it

15    was pretty clear it was a problem.  How that applies to him

16    currently may be more difficult to assess.

17        General self-regulation.  He appears to be able to

18    control his behavior while he's incarcerated.

19        There hasn't been much impulsivity.

20        He was very clear about his poor cognitive problem

21    solving in the past.  Throughout all his treatment work he

22    acknowledged, you know, he was making poor choices but he

23    was continuing to feed into those poor choices over and over

24    again.

25        Whether that is totally relevant, evident right

1    now, once again, he has been incarcerated so it's hard to

2    tell.

3          The whole issue of sexual self-regulation.

4    Obviously it was an extreme problem while he was in the

5    community.  The evidence of it while he was in prison that

6    we know of would be the 1998 situation.  We don't know how

7    long he had those pictures but there does not appear to be

8    any evidence since 1988 whether he's had, he's possessed

9    those pictures again.

10         So that issue was definitely -- well, there was a

11   huge concern in the past.  Whether that is currently a

12   problem is hard to tell.  And that's the main issue that

13   we're here for.

14         The issue of cooperation with supervision.  While

15   in prison he's been fine but in the community he did not

16   cooperate with supervision on more than one occasion.  He

17   did not, even thirty some years ago back in California he

18   immediately disregarded the rules back then and then that

19   continued in other types of places where he was on

20   supervision.

21         There are a few factors that apply to him.

22   **Q.**  Would those mitigate or aggravate risk?

23   **A.**  It can -- in my opinion it's -- the ones that are the

24   most aggravating would be the sexual self-regulation but

25   based in the past.  Like I said, his behavior while in

1    prison has been fine but he really hasn't had -- he hasn't

2    had access to any type of victim.  And he did have

3    photographs in the past while in prison.  So that's a

4    difficult one to try to ascertain because there is both

5    issues involved in terms of there was some good but there is

6    also some problems with that.

7           The other factors, because he has been well behaved

8    in prison, it's harder to determine what would happen upon

9    release regarding the way he would comport himself.

10   **Q.**  Doctor, what is the SVR-20?

11   **A.**  It's a research guided clinical measure that looks at 20

12   factors that have been found to have some relationship with

13   sexual recidivism in some research.

14          And unlike an actuarial instrument where you score

15   the person and then there is a corresponding probability

16   estimate, you just look at the, look -- count up how many

17   there are for both sides, like good or is it present or may

18   be present or not present and then try to make some

19   determination from an overall perspective looking at what

20   aspects -- the factors that are present, what aspect of it

21   is significant.

22          And so I also looked at those factors.  And out of

23   the 20 he had about 12 or 13 of them that were there, that

24   were evident based on his past behavior obviously.

25   **Q.**  What did that signify to you?

1    **A.**  Well, that, you know, that consistent with what we found

2    with the actuarial instrument, that he has had significant

3    offending and with that goes these other problems that are

4    itemized in there.

5    **Q.**  Okay.  Doctor, what, if any, peer reviewed studies exist

6    with respect to the issue of whether the SVR-20 is useful in

7    predicting sex offender recidivism?

8    **A.**  There has been just a few studies, not as many as

9    compared to the actuarials.  But in one of the meta-analysis

10   that was conducted looking at all types of assessment

11   instruments, including clinical judgment, it was found -- it

12   was a small group.  It was only three studies -- but they

13   did find that the ROC was within moderate predictive

14   validity.

15          So it does have some --

16          **THE COURT:**  Was within what?  Moderate?

17          **THE WITNESS:**  Moderate predictive validity similar

18   to how the Static mentioned earlier between 70 and 75.  But,

19   once again, it was only three studies but it was, at least

20   it was something, more than something than it not being.

21   BY MR. GRADY

22   **Q.**  Why did you use it in this case -- strike that.

23          Well, first of all, why did you use it in this

24   case?

25   **A.**  Well, it's because I use it in pretty much -- well, I

1   used to use another instrument that was similar to it, the

2   RSVP, but now I use it because I use it in all the cases I

3   do pretty much.

4   **Q.**  What information can it rely -- excuse me -- what

5   information can it relay and what information, if any, did

6   it relay to you in this case?

7   **A.**  It gives you an understanding of other factors that were

8   not measured in the Static-99 so --

9   **Q.**  Such as?  Give the Court an example.

10   **A.**  Well, some of the items are, you know, relationship

11   problems, deviant sexual arousal which really isn't

12   specifically addressed in the Static-99.

13        I mean, you made an assumption, if a person has so

14   many priors, then you can make that assumption with or

15   without the Static-99.  But that's one of the issues on

16   there.

17        Supervision failure --

18   **Q.**  Okay.  That's enough, thank you.

19        And it is in your report --

20   **A.**  Yes.

21   **Q.**  -- in evidence?

22   **A.**  Yes.

23   **Q.**  Thank you.

24        Dr. Rosell, in addition to Stable 2007 factors and

25   the SVR-20, what, if other, dynamic or changeable factors

1  did you consider with respect to your risk assessment of

2  Mr. Hunt?

3  **A.**  Well, in any case where a person is over the age of 50 I

4  always talk about age.

5  **Q.**  What, if any, treatment did Mr. Hunt have?

6  **A.**  Oh, I'm sorry.

7  **Q.**  Was that a factor?

8  **A.**  Treatment.  Well, treatment, as I mentioned earlier, he

9  did participate in the six-month program in New York.  His

10  overall ratings were fairly positive and he did acknowledge

11  his offenses.

12       The concern is is that the program was a short-term

13  program or it was just a short program.  And given the

14  amount of victims he had, the years that he offended, I just

15  felt that that program wouldn't be enough in my opinion to

16  have made, have a treatment effect for him and so I believe

17  that wasn't enough to mitigate.

18  **Q.**  Okay.  Doctor, what, if any, is the typical length of a

19  sex offender treatment program?

20  **A.**  On average most, at the DOC level they can go from I

21  guess six months in New York to the program that I used to

22  run at the prison was between 15 and 24 months, depending on

23  how fast the guys went through it.  That's about average.

24       There is a program at the Wisconsin DOC which is

25  three years.  In Washington State it's 14 months.

1          In terms of Canada some of the programs are 14

2     months.  Some of them are 7 months.  So it ranges.

3     Q.  What is the length of programming you would like to see

4     Mr. Hunt complete for you to make any adjustments with

5     respect to treatment?

6     A.  Well, I think programming, at least two years minimum

7     programming I think, at least at a minimum.  I think that's

8     a good length.

9     Q.  Okay.  Now, before I interrupted you asking about

10    treatment, Doctor, you mentioned that in any case

11    individuals over 50 you consider age; correct?

12    A.  Correct.

13    Q.  Can you describe for me what consideration you undertook

14    of Mr. Hunt's age and then perhaps we'll discuss that a bit

15    more based on your answer?

16    A.  What consideration did I make?

17    Q.  How did you consider it in this particular case?

18    A.  Okay.  Well, this is an issue that has been significant

19    in the research since 2001 when the first research study

20    came out looking at age with sex offenders.  Dr. Hanson put

21    it on his website until he eventually published it in 2002.

22          At that time he showed that as individuals got

23    older, as sex offenders got older, the research showed that

24    the recidivism rate would go down.  And this was consistent

25    with other research that we've shown with violent

1    recidivists, general recidivists, nonsexual recidivists.

2         It's not uncommon, as I mentioned earlier, like the

3    ASPD, as individuals get older, the crime rate goes down in

4    those groups.

5         Since then there has been several other studies.

6    In 2003 Dr. Barbaree looked at Hanson's numbers and

7    replotted them and showed a decrease also.  There has been

8    research by Dr. Prentky.  Dr. Prentky has done research on

9    it, Dr. Wollert, Dr. Fazel, F-A-Z-E-L, in Sweden, they

10   looked at it.

11        More recently there was a research study in New

12   Zealand by Skelton.  So there has been lots of research that

13   is showing a decline with age with sex offenders.

14   Q.  Okay.  And do you generally in your professional opinion

15   credit this research?

16   A.  Yes, I believe, I mean, it exists.  The only drawbacks

17   is that there has been smaller numbers so a lot of

18   individuals will say, well, they discount it because the

19   samples sizes are so small that it's hard to generalize when

20   you're talking small samples.

21   Q.  When you say we're talking small samples, I believe you

22   explained that already.

23        When studies have looked at "sex offenders,"

24   putting the item in quotes, have they looked at, when they

25   say sex offenders recidivate less with age, are they talking

1    about particular classes?  Are they talking about the group

2    generally?  And what makes up that group generally when they

3    use that term in that context?

4    **A.**  Well, some studies have broken it down into child

5    molesters, rapists, or even mixed.  But usually it's just

6    either child molesters or rapists.  So some studies have

7    gotten into more detail.

8         Other studies, for example, in 2006 Dr. Hanson was

9    able to -- because of -- was able to come out and break it

10    down by risk categories.  So he had age groups like 20 to

11    35, 35 to 50 and 50 to 60 and 60 and above but he also had

12    low, medium and high based on the static score.

13         So, for example, the recidivism rate for somebody

14    over 60 who is high risk was very low.  But he only had 11

15    people in the study so that was --

16    **Q.**  Let me back you up.  We're getting way way down the road

17    from my question.

18         My question is when these studies use the term "sex

19    offenders" generally, and there is a decline in sex offender

20    recidivism, are they using the term -- if they use the term

21    "sex offenders," are they using, describing the particular

22    group or are they describing all sex offenders, child

23    molesters?

24    **A.**  Well, that's what I was getting to.  In that study they

25    did not -- Dr. Hanson did not distinguish.  He just had sex

1   offenders.

2   **Q.**  Okay.

3   **A.**  But in other studies, for example, Dr. Prentky's study,

4   he divided it.  He has rapists and then he also has child

5   molesters.

6   **Q.**  Okay.  In addition --

7   **A.**  But he doesn't have it by risk category.

8   **Q.**  Okay.

9   **A.**  See, that's the thing.  You want to have it all.  You

10  want to have, you know, by risk but then the problem is is

11  that as you break it down, then the numbers get smaller and

12  smaller because you have child molesters over 60 --

13  **Q.**  Doctor, let me tell you something.  You understand this

14  incredibly well.  Okay.  When you talk about it, you know

15  what you're talking about.  The rest of us have to catch up.

16  **A.**  That's why I'm trying to explain it.

17  **Q.**  I know -- Doctor, when I attempt to ask you questions

18  limiting what I'm asking about, I'm attempting to build a

19  bridge for people in this courtroom, the judge included,

20  that don't understand the science of this, myself included.

21          And we need to get from where my questions are to

22  where you are talking about small sample sizes.  And it's

23  actually a very difficult thing for us to do not knowing the

24  science as well you do.

25          So I'd just --

1    **A.**   Okay.

2    **Q.**   -- appreciate if I ask questions, don't jump ahead

3    because it doesn't allow the Court, the witnesses and the

4    other people in this room to follow you the way that I hope

5    that they could if you answer the questions.

6         Okay?

7    **A.**   Okay.  I'm sorry.

8    **Q.**   No problem.

9         Doctor, just speaking very generally about the

10   studies of sex offenders and the decline in sex offender

11   recidivism that reduces, that goes down with age, when the

12   studies say sex offender recidivism declines with age, are

13   they talking about all sex offenders or subgroups?

14   **A.**   Depending on the study most likely all sex offenders.

15   **Q.**   Okay.  But in addition there are studies that have

16   broken down that demographic of sex offenders and they have

17   looked at different groups; correct?

18   **A.**   Correct.

19   **Q.**   Okay.  What other groups did they look at when they

20   began to break down the term "sex offenders"?

21   **A.**   Child molester and then rapist.

22   **Q.**   Okay.

23   **A.**   Or child victims and rapists.

24   **Q.**   Okay.  And even within the context of the description of

25   individuals as being child molesters, are there particular

1    groups that you need to separate -- do studies even separate

2    those out more further?  With respect to child molesters as

3    to the type of victim?

4    **A.**  With age I can't recall if there has ever been one that

5    broke it down in -- you're taking about gender victim?

6    **Q.**  Extrafamilial or interfamilial.

7    **A.**  Oh, yes.  Well, the original study by Hanson looked at

8    incest offenders, extrafamilial offenders and then rapists.

9    So they did break that up.

10   **Q.**  What is the significance or why would researchers want

11   to separate out rapists, child molesters and -- first of

12   all, why would researchers want to separate out numbers for

13   rapists and child molesters?

14   **A.**  Because they're different, they're a different type of

15   offender.

16   **Q.**  Okay.  And they may have different reoffense patterns?

17   **A.**  Correct.

18   **Q.**  Okay.  And why would one want to break out extrafamilial

19   from interfamilial child molesters in studying the effect of

20   age?

21   **A.**  Because if they're true incest offenders and they're

22   true extrafamilial offenders, then they're going to have

23   different rates also.

24   **Q.**  Okay.  So generally speaking studies have confirmed that

25   sex offenders, and then we're talking about the whole group,

1    recidivate less with age; correct?

2    **A.**   Correct.

3    **Q.**   Okay.  What -- and you are familiar with the work of

4    Dr. Barbaree?

5    **A.**   Yes.

6    **Q.**   Okay.  And do you agree with his conclusions?

7    **A.**   That in general that the recidivism rate goes down, yes.

8    **Q.**   Okay.  What -- or strike that.

9           Is there any dispute or can you describe for me

10   what, if any, dispute there is within the community

11   conducting these sex offender risk assessments about the

12   effect of age?  Are there researchers that don't agree that

13   age should reduce risk?

14   **A.**   There is basically one, there is one study that has

15   actually looked at statistics, was a Dr. Thornton's study

16   that looked at 40- to 59-year olds.  And he showed that

17   there was not a decline.  However, he broke it down to 40-

18   to 59-year olds so we don't know if the ones who recidivated

19   were more in the first decade or the second.  So it's not

20   totally clear.

21          But the only person who writes about it doesn't

22   really research it, he reviews articles and then critiques

23   them, is Dr. Doren.  And he is the one who goes around

24   saying that age isn't really an issue.  That it shouldn't be

25   even considered.

1    **Q.**  In your view what should be done with age generally

2    speaking?

3    **A.**  Generally speaking I consider it to be an issue in risk

4    assessment.

5    **Q.**  Okay.  And generally speaking what do the studies that

6    you have reviewed and what did the studies that you credit

7    require you to do with older offenders?

8    **A.**  Well, to take it into account, to take into account age.

9    However, the instruments themselves don't usually take it

10   into account.  Well, the new Static-2002 does but overall

11   the other instruments do not take it into account so you

12   basically have to adjust the actuarial on your own then.

13   **Q.**  Okay.  And you would for an older offender adjust

14   downward?

15   **A.**  Correct.

16   **Q.**  Okay.  Is there some clear consensus in the professional

17   community that conducts sex offender risk assessments how

18   you should make this adjustment?

19   **A.**  No, there's no way, there is no clear way to like how do

20   you adjust it, how much do you adjust it down.  I mean,

21   Dr. Barbaree I'm sure will mention it when he testifies that

22   you multiply by a given number per year so that would be one

23   way to do it.  So the numbers are going to get lower as the

24   person gets older.

25          Dr. Wollert in his does a Bayesian analysis using a

1    theorem formula.  And that's another way that it can be

2    incorporated.

3         But when you're doing it that way, you're

4    basically, you're disregarding everything else about the

5    individual.  You're not really taking into account who the

6    person is.

7    **Q.**  Has there -- well, what is the general consensus that

8    has developed with respect to the effect of age -- strike

9    that.

10        Just to summarize, experts generally agree that

11   recidivism goes down with age but there is no agreed

12   methodology by which to apply that; is that correct?

13        **MR. GOLD:**  Objection to the leading question.

14        **THE COURT:**  No, I will let him have it.

15   **A.**  I think, other than the two ways I just mentioned, I

16   can't think of -- I have never gotten, I have never read an

17   article or gotten an email that says let's do it this way

18   regarding how to incorporate age.

19        So it's -- other than the two ways that

20   Dr. Barbaree and Dr. Wollert have published in terms of how

21   to incorporate that into your evaluation.

22   **Q.**  But those are not universally accepted by everybody; are

23   they?

24   **A.**  Not by everybody, no.

25   **Q.**  Okay.  Now, I want to come back to the notion of

1    separating out child molesters and rapists.  What, if any,

2    patterns -- or strike that.

3           What, if any, relationship between age and

4    recidivism is observed for rapists as a subset of sex

5    offenders as they age?

6    **A.**  Between rapists and -- I'm sorry, could you --

7    **Q.**  What is the general observation of the connection

8    between age and recidivism as rapists age?

9    **A.**  That it goes down even more so than for child molesters.

10   **Q.**  It goes down in the linear fashion?

11   **A.**  Correct.

12   **Q.**  What, if any, studies -- or strike that.

13          What, if any, studies exist that suggest that child

14   molesters may not exhibit a linear decline like rapists?

15   **A.**  Well, like I said, most studies show that there is a

16   decline.  The Thornton study is an exception.  The Prentky

17   study is more straight across up until, I forget, I think

18   it's the mid 40s --

19   **Q.**  Okay.  You mentioned --

20   **A.**  -- it goes back down.

21   **Q.**  You mentioned the Prentky study.

22   **A.**  Right.

23   **Q.**  You're referring to a 2007 published article in the

24   *Journal of Sex Abuse* by Dr. Robert Alan Prentky and Austin

25   Lee; correct?

1   **A.**   Correct.

2   **Q.**   Dr. Prentky, who is that?

3   **A.**   He is actually a professor now at Fairleigh Dickinson

4   University in New Jersey.  He is a well-known psychologist,

5   researcher.  He's published in numerous journals on a

6   variety of topics regarding sex offenders, juvenile sex

7   offenders.  He's a very bright individual.

8   **Q.**   Published articles with Dr. Barbaree?

9   **A.**   He's published articles with Dr. Barbaree, yes.

10  **Q.**   Okay.  And do you believe his work to be scientifically

11  valid, worthwhile?

12  **A.**   Yes.  He has done cases in Iowa and Missouri.  He's

13  testified in many states regarding a lot of different

14  issues.

15  **Q.**   Doctors Prentky and Lee in 2007 published an article on

16  the recidivism rates of high -- well, strike that.

17         Individuals who had been committed, civilly

18  committed Massachusetts law; correct?

19  **A.**   Correct.

20  **Q.**   Okay.  And how would you describe that class of

21  individuals vis-a-vis other sex offenders?

22  **A.**   I believe, if I remember correctly, the average -- they

23  each had at least two to three prior convictions.  They were

24  considered sexually dangerous years ago.  So they were a

25  fairly high-risk group.

1    **Q.**  Okay.  And do you recall -- I'm just going to show you

2    page 48 of that document -- what the findings were with

3    respect to whether recidivism rates for extrafamilial child

4    molesters were, by virtue of having been civilly committed

5    deemed to be high risk, what were the findings with respect

6    to whether the recidivism rate went up or down from 18 to 30

7    to age 30 to 40?

8    **A.**  What they found, as you can see, that although there is

9    a decline, it's not nearly as precipitous as the decline for

10   the rapists.

11   **Q.**  What was the finding with respect to recidivism rates

12   for 18- to 30-year olds versus 30- to 40-year olds?

13   **A.**  I'm sorry, 18 --

14   **Q.**  Did the rate go up or down?

15   **A.**  Well, yeah, the rate went up as opposed to straight

16   across for the rapists.

17   **Q.**  Okay.  So when we look at the other line here that isn't

18   highlighted, that's the rapists; correct?

19   **A.**  Correct.

20   **Q.**  And there there is a downward trend from age 18 to 30

21   all the way down to 60 plus.  There is no point at which

22   that increases; correct?

23   **A.**  Correct.

24   **Q.**  Okay.  With respect to the child molesters, what is the

25   difference between the 18- to 30-year olds and the 30- to

1    40-year olds?

2    **A.**  Well, the recidivism rate was, went from 20 to 40

3    percent.

4    **Q.**  So it doubled?

5    **A.**  Yes.

6    **Q.**  It actually went up as the offenders got older; correct?

7    **A.**  Yes.  Well, they were still under 40.

8    **Q.**  And it stayed at nearly 35 percent from ages 40 to 50?

9    **A.**  Correct.

10   **Q.**  And over twenty percent from ages 50 to 60?

11   **A.**  Correct.

12   **Q.**  So when I asked, Doctor, what, if any, studies existed

13   to suggest that extrafamilial child molesters, specifically

14   high-risk extrafamilial child molesters do not exhibit the

15   linear decline or linear association between age and lower

16   recidivism risk, is there such a study?

17   **A.**  Yes, I think I mentioned it.

18   **Q.**  Okay.  What other studies besides this and

19   Dr. Thornton's?

20   **A.**  I can't -- I know --

21   **Q.**  Let me change the question.  That's fine.

22        Dr. Barbaree has published extensively on the

23   notion that generally speaking sex offender recidivism

24   declines with age.  Are you familiar with Dr. Barbaree's

25   2003 article?

1    **A.**   Yes.

2    **Q.**   Does Dr. Barbaree parse out in his 2003 article child

3    molesters, rapists or does he talk about all sex offenders?

4    **A.**   I think he parses, he separated them out because in that

5    study he was replotting Dr. Hanson's study from the year

6    before which did have the three groups.

7    **Q.**   So that's one way in which we would -- strike that.

8            Why would we want to parse out child molesters if

9    we were looking at Wayne Hunt?  Why would we want to

10   separate out data on rapists?

11   **A.**   Because that's the category he falls under.

12   **Q.**   Okay.  And we're concerned that rapists might behave

13   differently?

14   **A.**   Correct.

15   **Q.**   And even within the category of child molesters, if we

16   wanted to find the group that most resembled Mr. Hunt, we

17   would want to look at high-risk sex offenders; correct?

18   **A.**   Correct.

19   **Q.**   Individuals that were measured by the actuarials or in

20   the example of the Massachusetts study, by prescreening and

21   having the civilly committed as being high risk; correct?

22   **A.**   Yes.

23   **Q.**   Okay.  Now, you mentioned there are small sample sizes.

24   When you attempt to look in these studies at individuals who

25   are most like Wayne Hunt, that are both 60 plus and high

1    risk, what do you mean when you say there are small sample

2    sizes and what effect does that have on your opinion?

3    **A.**  Well, the bottom line is that there are small sample

4    sizes.  I mentioned 11 in the Hanson study.

5           The other studies do not break down whether they

6    were high risk or not.

7           You can assume that the Prentky study were high

8    risk based on their history but we don't know exactly what

9    their Static scores were.  They may have been 5s, 6s maybe,

10   we don't know.

11          You can assume that they may have been, given the

12   fact that if they were extrafamilial child molesters,

13   they're going to get a point.  For unrelated they're going

14   to get a point.  Maybe they were a stranger.  They're going

15   to have at least two priors.  So there is four points right

16   there.  So we can assume they're probably at least a four,

17   maybe a five or a six.  So there is -- but there was 12

18   people in that study.

19          So that's, there is just not a lot of -- and then

20   the other studies I can't remember -- I can't, I don't

21   believe, because if they were, I would remember, whether

22   they had been found to be high risk as well as plus over 60.

23   **Q.**  Okay.  Dr. Hanson who developed the Static-99 published

24   an article addressing specifically the question of whether

25   it could be applied to individuals that were over the age of

1    60; correct?

2    **A.**  Right.  There is one other bit of data but it hasn't

3    been published and it was just sent to me, that there are

4    more subjects in the plus six with a percentage but I don't

5    even know how long the follow-up is.  But that hasn't been

6    published yet.

7    **Q.**  Do you recall or know what was the average Static-99

8    score of individuals studied in the Hanson 2006 study?

9    **A.**  Of the age study of his?

10    **Q.**  Yes.

11    **A.**  What the average Static was?  No, I can't recall that

12    number.

13    **Q.**  Less than eleven?

14    **A.**  Well, the average score, yeah, it would have to be.  The

15    average score of the development sample of the Static-99 is

16    3.2 so the average score probably, I don't know, 3.5, maybe

17    4, I don't know.

18    **Q.**  Do you have the article?  Could you find it?

19    **A.**  No, I don't have the article with me.

20          **MR. GRADY:**  May I approach, Your Honor?

21          **THE COURT:**  Yes.

22          (Whereupon, a document was handed to the witness.)

23    **A.**  Do you know if it's in here?

24    **Q.**  I thought you did.

25          We'll come back to that.

1          Doctor, researchers -- or Dr. Hanson in that

2     article breaks out what he then terms as high-risk offenders

3     which are six plus; correct?

4     **A.**   Correct.

5     **Q.**   And how many six plus offenders are over the age of 60?

6     **A.**   Eleven.

7     **Q.**   Okay.  And that generates a recidivism rate of what?

8     **A.**   Two of them recidivated so it's 9.1.

9     **Q.**   Okay.  Now, when we look at that data in that article --

10         **MR. GRADY:**  Maybe I can, if I can approach again,

11     Your Honor?

12         **THE COURT:**  Yes.

13     **A.**   I found -- okay, here it is.  There is 2.6.

14     **Q.**   Okay.

15     **A.**   They haven't broken --

16         (Whereupon, counsel and the witness were talking

17     simultaneously.)

18     **Q.**   And how did they break (ph.) that sample?

19     **A.**   Over a, almost a thousand people.  They have it broken

20     down --

21     **Q.**   I will put it up on screen.

22         In his 2006 article, first of all, what was the

23     general conclusion of the article?  By Dr. Hanson, 2006.

24     **A.**   Well, he was able to show, as you can see, this was

25     describing the earlier.  I guess -- I was describing earlier

1  that Dr. Hanson broke down not just by age but also by risk

2  level.  On the left you have low, moderate low, moderate

3  high.

4  **Q.**  For the moment put aside the chart.

5  What was the general conclusion that Dr. Hanson

6  reached with respect to whether the Static-99 could be

7  applied to older offenders?

8  **A.**  The way I interpreted it is that he demonstrated that it

9  could be applied to lower offenders -- to older offenders

10  and he showed a decrease.  And that's why he broke it down

11  like he did, to provide us more information.

12  **Q.**  What is this chart and what does it tell us, Doctor?

13  **A.**  Well, it answers questions that we had after his first

14  study and other studies about age where we said, well, how

15  do we know if they were high risk.  You know, just because

16  they're 60 they could have been a static of one.

17  **Q.**  Okay.  Within this chart we want to look at people most

18  like Wayne Hunt.  We want to look at the group of 11, 60 and

19  older and that scored six plus; correct?

20  **A.**  Correct.

21  **Q.**  The highlighted line under 60 and older?

22  **A.**  Okay.

23  **Q.**  And there were only 11 of those in that over a thousand

24  people; correct?

25  **A.**  Correct.

1    **Q.**  And the recidivism rate you mentioned was 9.1 percent.

2    I'm more interested, Doctor, in what is that number next to

3    it?  The plus or minus?

4    **A.**  That's the confidence interval.

5    **Q.**  What does that mean?

6    **A.**  A confidence interval is when you estimate the

7    likelihood of groups, the individuals within a group for a

8    specified range, the true value of what that person is going

9    to score.

10           You are never going to know the true value so

11   you're going to have within that range.  For example, like

12   the confidence interval during the election, everything was

13   plus or minus 3.1 or whatever.  That's what the range is.

14           So since you're never going to have the true value,

15   then you want to have within that range.  So this basically

16   goes up to the 17 so you would add 17 plus 9.

17   **Q.**  Well, what is the range that we can be 95 percent sure

18   actually represents the recidivism rates for high-risk older

19   offenders based on this chart?

20   **A.**  It would have to be 0 to 26.

21   **Q.**  Okay.  So the recidivism rate for this observed group of

22   11 is 9.1; correct?

23   **A.**  Correct.

24   **Q.**  But given that we're only talking about 11 people, in

25   order to translate that into a larger group, you have to

1    build in a margin of error?

2    **A.**   Correct.

3    **Q.**   And that's what these plus or minuses are; correct?

4    **A.**   Correct.

5    **Q.**   So, in fact, what that statistic shows is that we can be

6    95 percent sure that someone who is 60 or older can score as

7    a six or higher on the Static-99, would recidivate at

8    somewhere between 0 and 26 percent?

9    **A.**   Correct.

10   **Q.**   Okay.  Now, this article here doesn't, does it break

11   down the six plus to between child molesters and rapists?

12   **A.**   No.

13   **Q.**   Okay.  Now, interesting that, Doctor, what is the

14   percentage of rapists that recidivate over age 60?

15   **A.**   I don't know if there is, other than Dr. Prentky's

16   study, I don't know if there is a study that's looked at

17   specific rapists after 60.

18   **Q.**   If we go back to Dr. Prentky's study and we look at high

19   risk, now, there were rapists and child molesters; correct?

20   **A.**   Correct.

21   **Q.**   What was the recidivism rate for rapists at 60 plus?

22   **A.**   Zero.

23   **Q.**   Okay.  And what was the recidivism rate -- so the

24   recidivism rate for rapists is significantly lower in

25   high-risk offenders over age 60 for rapists than it is for

1   child molesters?

2   **A.**   Correct.

3   **Q.**   Is that consistent -- how, if at all, is that consistent

4   with other studies you've reviewed?

5   **A.**   That's fairly consistent.  As I have mentioned, there

6   hasn't been -- the other studies don't break it down but it

7   is just, when people get over 60, most individuals -- rape

8   is a different type of crime than child molestation.  You

9   need to be -- there is a lot more force involved.  There is

10   a lot more physical coercion that needs to happen as opposed

11   to child molestation.  So that's maybe one of the other

12   reasons why the rate is lower.

13   **Q.**   But generally speaking this finding of zero percent at

14   60 plus for rapists is consistent with other studies of

15   which you are aware of?

16   **A.**   As I mentioned, there haven't been that many because

17   they don't break them down so there is very few that

18   actually break them down.

19   **Q.**   With respect to Dr. Hanson's 2002 and 2006 studies on

20   the effect of age in older sex offenders, are you aware of

21   the type of crimes that were committed by the individuals

22   that did recidivate over age 60?  Were they child molesters?

23   Were they rapists?

24   **A.**   In Hanson's study I don't believe he broke it down.  But

25   I may be wrong.  I'd have to take a look at it again.

1   **Q.**  Okay.  Do you recall in a 2002 study who the oldest

2   recidivist was?

3   **A.**  It was a child molester.

4   **Q.**  He was released at age 72 and reoffended at age 73; is

5   that correct?

6   **A.**  I can't remember the numbers but I know it was a child

7   molester.

8   **Q.**  Are you familiar yourself with offenders in your own

9   practice in Minnesota (sic) where in your work --

10   **A.**  Iowa.

11   **Q.**  In Iowa.

12        In your own work are you familiar with any

13   offenders who have recidivated over the age of 60?

14   **A.**  I know in my evaluations and in knowing of cases that

15   there are individuals who have reoffended over the age of

16   60.

17   **Q.**  Are these child molesters or rapists?

18   **A.**  Child molesters.

19   **Q.**  Universally?

20   **A.**  In the last five years -- and this is not from my own

21   work, just because I read the newspapers -- I remember there

22   had been one rapist, he was 69 and he committed a rape.  But

23   he was 69 years old.

24   **Q.**  But that one you read about in the newspaper?

25   **A.**  I read that in the newspaper.

1    **Q.**  How many child molesters are you aware of having

2    reoffended over the age of 60?  In your professional --

3    **A.**  I'm familiar with one individual who is civilly

4    committed but I never evaluated him.  I'm just aware of him.

5    **Q.**  Okay.

6    **A.**  But most of the individuals -- I'm familiar with this

7    case and maybe one other.

8    **Q.**  Okay.  Why is it that the general findings that age

9    reduces sex offender recidivism doesn't compel the

10   conclusion in your opinion that Mr. Hunt is not dangerous?

11   **A.**  Well, in most cases of this type I usually find that an

12   individual, especially if they're this old, there has been

13   just two other cases where I came up with the same

14   conclusion based -- there was always some other reason.

15         And in this case I believe it's based mostly on his

16   sex offending history, the extent of it, the pattern of

17   offending and his actuarial score which in my opinion makes

18   him different than almost most sex offenders that are out

19   there.

20         And so that was the final decision because this was

21   a difficult decision for me to make because in most cases

22   when someone is over 60, there has to be something else that

23   is going to convince me because I do believe in the age

24   issue.

25         But in this case I was not able to -- I found

 1    myself making a different decision.

 2    **Q.**  Okay.

 3            Just you mentioned that ordinarily you find that an

 4    individual's age -- who are you ordinarily working for?

 5            **THE COURT:**  You ordinarily what?

 6            **MR. GRADY:**  Working for.

 7            **THE COURT:**  No, before that.

 8    BY MR. GRADY

 9    **Q.**  You mentioned that ordinarily you would find age to be a

10    dispositive factor.

11            **MR. GRADY:**  I'm sorry, Your Honor.

12    **A.**  I'm hired primarily by the defense attorneys in sexually

13    violent person and sexually dangerous person cases.

14            (Pause in proceedings.)

15            **MR. GRADY:**  If I may just have a moment, Your

16    Honor, I may be close to being done.

17            (Pause in proceedings.)

18    BY MR. GRADY

19    **Q.**  Based on your review of the materials provided to you,

20    your interview of Mr. Hunt and your review of the other

21    expert's report, do you have an opinion as to whether

22    Mr. Hunt would have serious difficulty in refraining from

23    further acts of child molestation?

24    **A.**  Yes.

25    **Q.**  What is that opinion?

1    **A.**  I believe he would.

2    **Q.**  And is that the opinion you've reached to a reasonable

3    degree of professional certainty?

4    **A.**  Yes.

5    **Q.**  Okay.  Now, there has been a great deal of mention of

6    percentages and recidivism rates.  Do you believe -- or

7    strike that.

8         What is the question you believe is asked and what

9    is the relationship between that question and these

10   percentages that we've heard?

11   **A.**  Well, the question is will he have difficulty from

12   refraining from future sexually violent behavior.  But the

13   statute does not give us direction, give an evaluator a

14   direction in terms of the issue of likelihood unlike other

15   states, you know, in state court it's usually --

16   **Q.**  How have other statutes approached the issue with

17   respect to recidivism rates?

18   **A.**  Oh, there has been substantial probability.  There is

19   more likely than not.  There is much more likely than not.

20   There is likely.

21        So that's how -- likely is California.  More likely

22   than not is Iowa.  Substantial probability is Illinois.

23   Much more likely than not is Wisconsin and they went to more

24   likely than not.

25   **Q.**  All of those are asking for more likely than not to

1    recidivate?

2    **A.**   Correct.

3    **Q.**   Rather than simply asking the question of whether an

4    individual will have serious difficulty refraining; correct?

5    **A.**   Right.

6         **MR. GRADY:**   I'm just going to take one second and

7    ask my cocounsel if I have forgotten anything.

8         (Whereupon, counsel conferred.)

9         **MR. GRADY:**   Oh, Your Honor, just a couple of

10   exhibits I'd like to put in through this witness.   I

11   apologize.

12   BY MR. GRADY

13   **Q.**   If you can take a look at Government Exhibit A and tell

14   me what that is?

15        **MR. GRADY:**   They were objected to, Your Honor, so I

16   believe I have to ask him.

17   **A.**   A?

18   **Q.**   Yes.

19   **A.**   It's a Staff Summary from the United States Department

20   of Justice, BOP Classification Study.

21   **Q.**   Okay.   Is that one of the documents you were provided in

22   this case for your review?

23   **A.**   Yes.

24   **Q.**   Is that the type of document typically relied upon by

25   experts in the field of sex offender recidivism risk

1    assessment?

2    **A.**  Yes, sir.

3          **MR. GRADY:**  Your Honor, I'd move to admit

4    Exhibit A.

5          **MR. GOLD:**  No objection.

6          **THE COURT:**  It comes in.

7          **(Government's Exhibit No. A received in evidence.)**

8    BY MR. GRADY

9    **Q.**  Can you take a look at Exhibit B and tell me what that

10   is?

11   **A.**  It is a Court Memorandum regarding general court martial

12   dated July 10, 1964.

13   **Q.**  Are these records that were provided to you?

14   **A.**  Yes, sir.

15   **Q.**  And are these typical materials or, excuse me, are these

16   materials typically relied on by individuals in the field of

17   sex offender risk assessment in making their determinations?

18   **A.**  Yes.

19         **MR. GRADY:**  Your Honor, I'd move to admit

20   Exhibit B.

21         **MR. GOLD:**  No objection.

22         **THE COURT:**  Okay.  It comes in.

23         **(Government's Exhibit No. B received in evidence.)**

24         **MR. GRADY:**  I would move to introduce the revised

25   Static-99 Recidivism Rates.

1          **MR. GOLD:**  Objection, Your Honor.  Those haven't

2     been published in any peer reviewed publication.  I don't

3     think they come in.

4          **THE COURT:**  Well, he has referred to them

5     substantially in his testimony.  I will let it in.

6          **THE CLERK:**  What exhibit number was that?

7          **MR. GRADY:**  It doesn't have one actually, Zita.

8     That was the one that I messed up.  I'll get it to you as

9     soon as I am done. I apologize to you and the Court.

10         **THE CLERK:**  Okay.

11    BY MR. GRADY

12    **Q.**  Can you just take a look at Government Exhibit N in the

13    third binder and tell me if you recognize what that is?

14    **A.**  United States District Court, Northern District of

15    Georgia, <u>Wayne Hunt versus Jack Hanberry, Warden</u>.

16    **Q.**  Okay.  These -- are these materials that were provided

17    among the Bates stamped materials given to you?

18    **A.**  Yes.

19    **Q.**  And are these documents typically relied upon by experts

20    in the field of sex offender recidivism risk assessment?

21    **A.**  Yes.

22         **MR. GRADY:**  Your Honor, move to admit this exhibit.

23         **MR. GOLD:**  No objection.

24         **THE COURT:**  It comes in.

25         **(Government's Exhibit No. N received in evidence.)**

1          **MR. GRADY:**  Thank you.

2          I have no further questions, Your Honor.

3          **THE COURT:**  Okay.

4          **MR. GOLD:**  May I inquire from here, Your Honor?

5          **THE COURT:**  Sure.  Any place you are comfortable.

6          (Pause in proceedings.)

7                          <u>**CROSS-EXAMINATION**</u>

8    BY MR. GOLD

9    **Q.**  Good afternoon, Dr. Rosell.

10   **A.**  Good afternoon, Mr. Gold.

11   **Q.**  Dr. Rosell, we have met before; haven't we?

12   **A.**  Yes.

13   **Q.**  We have met a couple of times.  We have met at

14   conferences for the Sex Offender Commitment Offense

15   Association; right?

16   **A.**  Correct.

17   **Q.**  And that is basically a collection of psychologists and

18   lawyers who are engaged in doing defense of sex offender

19   commitments?

20   **A.**  Correct.

21   **Q.**  You have worked extensively with my old boss at the

22   Committee for Public Counsel Services Greg Ball; right?

23   **A.**  Yes, years ago.  Not lately but, yes, years ago.

24   **Q.**  And I contacted you several months ago to engage your

25   services for this case?

1    **A.**  Correct.

2    **Q.**  Now, we have never worked together before this; right?

3    **A.**  That's true.

4    **Q.**  How long have you been doing these assessments,

5    Dr. Rosell?

6    **A.**  It will be seven years next month.

7    **Q.**  Seven years next month you have been doing sexually

8    dangerous persons assessments?

9    **A.**  SVP, sexually violent person, sexually violent predator

10   depending on the state.

11   **Q.**  But you have been in the field of sex offender or as a

12   psychologist working with sex offenders since 1989?

13   **A.**  Right, twenty years.

14   **Q.**  Now, you've provided treatment to sex offenders?

15   **A.**  Yes.

16   **Q.**  Now, you said on your direct testimony that you had a

17   doctorate; is that right?

18   **A.**  Correct.

19   **Q.**  But you have a different type of doctorate than a Ph.D?

20   **A.**  That's true.

21   **Q.**  Is that right?

22   **A.**  Yes.

23   **Q.**  What kind of doctorate do you have?

24   **A.**  It's called a PsyD.  It's a doctorate in psychology.

25   **Q.**  And there is a difference between a Ph.D and a PsyD;

1    isn't there?

2    **A.**   Yes.

3    **Q.**   And part of the difference is that a PsyD is more of a,

4    someone who is interested in becoming a practitioner than a

5    Ph.D who might be interested in doing or trained to do more

6    pure research?

7    **A.**   Correct.

8    **Q.**   And one of the things that happens in a psychology

9    program is that you are trained in the skills to become a

10   psychologist; right?

11   **A.**   Correct.

12   **Q.**   Among those skills are statistical analysis and things

13   of that nature; right?

14   **A.**   That's true.

15   **Q.**   Now, you had training in statistical analysis when you

16   were getting your PsyD; didn't you?

17   **A.**   That's true.

18   **Q.**   Did you have the same amount of training as a Ph.D

19   candidate or less?

20   **A.**   Maybe one or two courses less.

21           One of the other big differences is that the

22   dissertation isn't as rigorous from a scientific standpoint.

23   For example, I did my dissertation, it was a case study so I

24   didn't have to do a research project of hundreds of

25   subjects.  I just did one subject.

1   **Q.**   And I was going to ask you about that.  You had

2   mentioned that during your deposition testimony in this

3   case --

4   **A.**   Okay.

5   **Q.**   -- your dissertation was a case study of one pedophile;

6   correct?

7   **A.**   Correct.

8   **Q.**   And so that's very different than the type of research

9   that someone or the type of research that we're talking

10  about today?

11  **A.**   Correct.

12  **Q.**   And that might be considered more --

13  **A.**   Rigorous.

14  **Q.**   Well --

15  **A.**   My dissertation was less rigorous.

16  **Q.**   Was more subjective, would you agree with that

17  characterization?

18  **A.**   Well, not so much subjective.  I did do some statistical

19  stuff but it wasn't -- let's just say it wouldn't get

20  published in a journal of any reputation.

21  **Q.**   Now, you testified during the deposition in this matter,

22  and I think you've testified on your direct testimony today,

23  that you typically work for the defense; right?

24  **A.**   Yes.

25  **Q.**   And, but you don't clear everyone who's referred to you?

1  **A.**  Oh, no.

2  **Q.**  In fact, you have a rate that you maintain?

3  **A.**  It's usually around 35 percent if you average it out, a

4  confidence interval of five maybe.  It's usually around 35

5  percent.

6  **Q.**  So about 65 percent of those cases you do participate in

7  the case?

8  **A.**  Well, I find the person is not SVP and then I write a

9  report and I go to court and testify.

10  **Q.**  Now, you provided us financial information when you

11  responded to our requests for documents during the

12  deposition period in this case?

13  **A.**  Yes.

14  **Q.**  And is it fair to say that this is -- the majority of

15  the work that you do right now is SVP or SDP evaluations?

16  **A.**  It's about 60 to 65 percent.  35 percent is for other

17  forensic evaluations.  I do a lot of work for the Federal

18  Defender Association in Iowa, doing competency evaluations,

19  child pornography evaluations or mental health.  So I do a

20  lot of work with them.  I do work with other private

21  attorneys on juvenile sex offender evaluations.

22       So I do other kinds of cases but this is a large

23  part of it.  It breaks down to about 65 to 35.

24  **Q.**  And is it fair to say that this area of work if you can

25  get it is fairly lucrative?

1  **A.**  Yes.

2  **Q.**  And it's sort of a growth industry in, among clinical

3  psychologists who are in this area; is that a

4  characterization that you have heard?

5  **A.**  I guess for some people it is, if they know, you know,

6  if they know what they're doing.  I didn't -- I worked with

7  sex offenders ten years before I knew what SVP was so other

8  people have begun working doing these types of cases without

9  having the background.

10      So it didn't -- I didn't get into it with this in

11  mind because when I started Washington State didn't have the

12  law.  And they were the first ones in '91 to have the law.

13      So I started two years before the law ever existed.

14  The way it is now anyway.

15  **Q.**  The diagnoses in this case is pedophilia and antisocial

16  personality disorder?

17  **A.**  Correct.

18  **Q.**  Now, you testified about antisocial personality

19  disorder, that there is a phenomenon know as "burnout"?

20  **A.**  Correct.

21  **Q.**  Do you recall that?

22  **A.**  Yes.

23  **Q.**  And what that means essentially is that you can qualify

24  for the diagnosis as long as you live but that you may be

25  less likely to act out on the diagnosis as you get older?

1    **A.**  Correct.  Yes, the diagnosis is behaviorally based.  So

2    if the behaviors are no longer present, then it's likely

3    that, you know, the diagnosis might even change.

4    **Q.**  Now, when you diagnose someone, you use the *Diagnostic*

5    *and Statistical Manual*; right?

6    **A.**  Correct.

7    **Q.**  And that is a standard nosology I think is the term for

8    people, psychologists in the United States; right?

9    **A.**  Correct.

10   **Q.**  Now, you drafted a report in this case which has been

11   admitted as Exhibit 3.  If I could direct your attention to

12   your report.

13   **A.**  Yes.

14           (Pause in proceedings.)

15   **Q.**  And if I could turn your attention to page 17, the

16   bottom of that page going on to page 18 where it says

17   "Diagnosis."

18   **A.**  Yes.

19   **Q.**  So when you begin your diagnosis, you start off by

20   saying, "The clinical diagnosis of a mental disorders in the

21   DSM-IV-TR does not exist for legal purposes.  The legal

22   definition involves impairments and emotional or,"

23   presumably of, "emotional or volitional capacity"?

24   **A.**  Correct.

25   **Q.**  The report goes on to read, "These areas are not covered

1    in the DSM nomenclature.  The DSM-IV-TR's use of forensic

2    settings," there is a citation to page Roman Numeral xxxiii,

3    "reads:  It is precisely because impairments, abilities and

4    disabilities vary widely within each diagnostic category

5    that assignment of a particular diagnosis does not imply a

6    specific level of impairment or disability.  The DSM also

7    states the fact that an individual's presentation meets the

8    criteria for a DSM diagnosis does not carry any necessary

9    implication regarding the individual's degree of control

10   over the behaviors that may be associated with the disorder.

11   Even when diminished control over one's behavior is a

12   feature of the disorder, having the diagnosis in itself does

13   not demonstrate that a particular individual is or was

14   unable to control his or her behavior at a particular time."

15         That is a quotation direct from the DSM-IV; right?

16   **A.**  Yes, sir.

17   **Q.**  And you include that in your report for a particular

18   reason.  It's important information for the consumer of your

19   report to have; correct?

20   **A.**  Right.

21   **Q.**  And it's essentially the same as you were testifying on

22   your direct testimony, that you can have a diagnosis of

23   antisocial personality disorder, for example, but have it at

24   a certain level at a particular age where it's not the same

25   as a younger person, for example?

1   **A.**  Correct.

2   **Q.**  Now, you diagnosed Mr. Hunt also with pedophilia; right?

3   **A.**  Correct.

4   **Q.**  Now, this statement that we just read, of course,

5   applies to every diagnosis in the DSM; right?

6   **A.**  Correct.

7   **Q.**  And what it says is you could have a diagnosis but that

8   that doesn't answer the question of whether you can or

9   cannot control your behavior?

10  **A.**  That's true.

11  **Q.**  Now, there is one aspect to this problem, isn't there,

12  that the question of control is partly a, almost a legal or

13  moral question; right?

14  **A.**  Yes.

15  **Q.**  And what I mean by that is whether someone is

16  controlling their behavior is, has long been recognized in

17  the field of psychiatry as one in which psychiatrists or

18  psychologists are -- have difficulty answering; is that a

19  fair statement?

20  **A.**  Correct.

21  **Q.**  And there is a statement in the, that the American

22  Psychiatric Association that's often cited in this area,

23  telling the difference between an irresistible impulse and

24  an impulse not resisted is like telling the difference

25  between twilight and dusk; right?  Or twilight and -- dusk

1    and dawn or something along those lines; correct?

2    **A.**  (Witness nodded.)

3    **Q.**  Now, in this case you looked at different -- well, so

4    the question of whether someone can control their behavior

5    is one in which you looked at Mr. Hunt's behavior and you

6    concluded that he was not in control of his behavior when he

7    was committing the offenses that we've heard described;

8    right?

9    **A.**  That he definitely demonstrated a difficulty refraining

10   himself back then.  When he was committing the offenses.

11   **Q.**  Now, again, keeping in mind that you can have the

12   diagnosis but that that doesn't mean that you would have a

13   certain impairment or ability to control your impulses, it

14   is certainly possible that Mr. Hunt remains a pedophile but

15   has a certain amount of control over his behavior that he

16   didn't previously?

17   **A.**  You mean in terms of he can have a diagnosis but not

18   meet the criteria or not having difficulty to refrain?  Is

19   that what you're asking?

20   **Q.**  Let me ask it a different way.

21        You made reference to Dr. Howard Barbaree; right?

22   **A.**  (Witness nodded.)

23   **Q.**  And he is a prolific researcher in this area; right?

24   **A.**  Yes.

25   **Q.**  And by "area," I mean the area of sex offender

1   recidivism, sex offender -- and the issue of age and sex

2   offender recidivism; right?

3   **A.**   Very much so.

4   **Q.**   Now, when you talked about pedophilia before, we talk

5   about it as a, something like a sexual orientation; right?

6   **A.**   Yes.

7   **Q.**   Now, having a sexual orientation is a bit different than

8   having one of the paraphilias; isn't it?

9   **A.**   I guess it depends.

10  **Q.**   Well, pedophilia itself, the diagnostic criteria insists

11  on a certain level of intensity; right?

12  **A.**   Yes.

13  **Q.**   And that seems to imply a certain level of present

14  distress or intrusive thoughts or something along those

15  lines; right?

16  **A.**   Yes.

17  **Q.**   So you could have the diagnosis in your history and not

18  have presently intrusive thoughts; right?

19  **A.**   That's true.

20  **Q.**   And one of the phenomenon that we're going to be talking

21  about a lot is this documented decline in libido with age?

22  **A.**   Okay.

23  **Q.**   And is that a finding in the research with which you're

24  familiar?

25  **A.**   Yes.

1   **Q.**  Dr. Barbaree has looked at the decline in testosterone

2   in all different types of men as men age; right?

3   **A.**  Correct.

4   **Q.**  And testosterone is importantly implicated in libido;

5   right?

6   **A.**  Correct.

7   **Q.**  And so it is certainly possible that you could have the

8   diagnosis of pedophilia and not have it by history and not

9   have it at a certain high level many years after your last

10  act; right?

11  **A.**  Yes, that is possible.

12  **Q.**  And, in fact, the research that Dr. Barbaree has

13  conducted would lead us to expect that most men's level of

14  sexual arousal declines regularly as they age; right?

15  **A.**  Yes.

16  **Q.**  And so for that reason we would expect the same

17  phenomenon to be happening with Mr. Hunt as he aged; right?

18  **A.**  You would expect since he is an older man that it would

19  also go down.  But it's not, not everybody's libido goes

20  down.  I mean, on average it does go down but there is

21  always exceptions.

22  **Q.**  That's right.  But, I mean, that's what we're talking

23  about here, what the available research tells us.  And what

24  it tells us is that libido as a general matter in most

25  people declines with age?

1    **A.**   Yes.

2    **Q.**   And that, therefore, without knowing anything else, when

3    we look at someone, we would expect their libido to decline

4    with age?

5    **A.**   Without knowing anything else, yes.

6    **Q.**   Before you finished your testimony, your direct

7    testimony, the government asked you about this question of

8    what the statute requires.  Do you recall that?

9    **A.**   Yes.

10   **Q.**   And the statute appears to have three elements:  The

11   qualifying act element, the diagnostic element and then this

12   serious difficulty controlling behavior element?

13   **A.**   Yes.

14   **Q.**   Now, you did a risk assessment in this case; correct?

15   **A.**   Yes.

16   **Q.**   Why?

17   **A.**   To give me better understanding and to quantify his past

18   behavior and to assist me in trying to make my decision for

19   what's going on currently.

20   **Q.**   Did you consider it important to your answering the

21   question that the statute asked?

22   **A.**   Yes.

23   **Q.**   In what way?

24   **A.**   To try to answer the question regarding the individual's

25   difficulty refraining from a way of looking at his history

1  and then, therefore, the likelihood of the behavior

2  occurring again in the future.

3  **Q.**  But now this issue of serious difficulty refraining from

4  behavior, I mean, we just talked about that as kind of a

5  moral issue; right?

6  **A.**  (Witness nodded.)

7  **Q.**  And this risk assessment doesn't directly answer the

8  question of whether someone is having difficulty or whether

9  they're just acting on their behavior; right?

10  **A.**  That's true.

11  **Q.**  Now, was the risk assessment necessary to your opinion

12  in this case?

13  **A.**  I felt it had, there was definitely a factor to it, yes.

14  **Q.**  There was a factor to it?

15  **A.**  I mean, I incorporated that into my final decision, yes.

16  **Q.**  Well, your final decision, when you say your "final

17  decision," you mean the decision whether Mr. Hunt should be

18  committed or not?

19  **A.**  Yes.

20  **Q.**  Now, methods of predicting future behavior have been a

21  subject of intense study in the field of psychology; is that

22  a fair statement?

23  **A.**  Yes.

24  **Q.**  And that goes back many, many years; right?

25  **A.**  Right.

1   **Q.**   An often cited work in this area is a work from 1954 by

2   Paul Meehl talking about different means of predicting

3   behavior.   Are you familiar with that?

4   **A.**   Yes.

5   **Q.**   And that work described what are called mechanical

6   methods of predicting future behavior versus clinical

7   methods; right?

8   **A.**   Right.

9   **Q.**   And clinical methods are sort of what we expect

10   psychologists in the ordinary course to do, size up a

11   situation based on their experience and give an assessment;

12   right?

13   **A.**   Right.

14   **Q.**   Mechanical methods are more like SATs or something like

15   that; right?

16   **A.**   Right.

17   **Q.**   Now, it's often recognized in the field that clinical

18   judgment, these clinical assessments, when it comes to

19   dangerousness, have been shown to be less accurate than the

20   mechanical methods; isn't that right?

21   **A.**   Correct.

22   **Q.**   And that's in all sorts of contexts; right?

23   **A.**   Yes.

24   **Q.**   That's not just with sex offender recidivism but all

25   types of criminal reoffending; right?

1   **A.**  That's true.

2   **Q.**  And other types of human activity; right?

3   **A.**  Right.

4   **Q.**  Such as school performance?

5   **A.**  Correct.

6   **Q.**  Now, one of the things that type of assessment allows us

7   to do is to improve the accuracy of certain types of

8   decisions; right?

9   **A.**  Right.

10   **Q.**  And accuracy is important; right?

11   **A.**  Right.

12   **Q.**  And when I say -- well, withdrawn.

13        Are you familiar with the difference between

14   dangerousness and risk assessment?

15   **A.**  What do you mean by "dangerousness"?

16   **Q.**  Well, "dangerousness," is that a diagnostic concept?

17   **A.**  Depending on how it's being used.

18   **Q.**  Well, if when we say someone is dangerousness, we are --

19   what are we saying?

20   **A.**  If you say someone is dangerous, then you're making a

21   value judgment and you're saying that there is a likelihood

22   of something is going to occur with that individual.

23   **Q.**  Well, isn't it something that has happened in psychology

24   that they have made their answer to the question of whether

25   someone is or is not dangerous more sophisticated?  Is that

1   a fair characterization of what has been happening in the

2   field of psychology?

3   **A.**  Yes.

4   **Q.**  And by that I mean that instead of giving up or down

5   decisions about dangerousness, you have this promulgation of

6   different aspects of what it means to be dangerous, for

7   example, the actual risk of future harm; right?

8   **A.**  Right.

9   **Q.**  And part of determining the actual risk of future harm

10  has been the development of these actuarial instruments that

11  we talked about?

12  **A.**  Correct.

13  **Q.**  Now, just to go back very briefly over that terrain that

14  you discussed on your direct testimony, Dr. Carl Hanson is

15  an often cited researcher in this area; right?

16  **A.**  Correct.

17  **Q.**  And part of psychology's concern is to be more accurate

18  in the risk assessments or as part of psychology is

19  concerned to be more accurate in the risk assessments, he

20  began to research the area of sex offender recidivism in

21  particular; right?

22  **A.**  Yes, he did.

23  **Q.**  And an often cited study in this area is something

24  called "the Meta-Analysis," "the Meta-Analysis;" right?

25  **A.**  Correct.

1  **Q.**  And "Meta-Analysis" is a means of doing the literature

2  review basically but quantifying it; right?

3  **A.**  What you're doing is you're doing a study of studies.

4  **Q.**  A study of studies.  And you're quantifying the other

5  studies in some way so that you can sort of extract what

6  they're all saying as a group; right?

7  **A.**  And in this case he was trying to find out what were the

8  factors that are correlated with sexual recidivism, general

9  recidivism and violent recidivism.

10  **Q.**  And what he isolated in that study was literally dozens

11  of factors; right?

12  **A.**  There are many dozen, several dozens, yes.

13  **Q.**  And what he did was he demonstrated these factors in a

14  series of tables; right?

15  **A.**  Correct.

16  **Q.**  And this study came out in 1998; right?

17  **A.**  It was published in '98.  It first was on his website in

18  '96 and then '98 published, yes.

19  **Q.**  And what it does is it shows these correlations between

20  risk factors and the risk of recidivism; right?

21  **A.**  That's true.

22  **Q.**  And among these risk factors are the risk factors that

23  were talked about in the Static-99; right?

24  **A.**  Correct.

25  **Q.**  Now, the first thing he did was he developed the RRASOR;

```
 1    right?

 2    A.   Yes.

 3    Q.   And that is the Rapid Risk Assessment or Rapid

 4    Assessment for Sex Offender Recidivism risk; right?

 5    A.   Very good.

 6    Q.   And when he developed that, he first started with seven

 7    factors; is that right?

 8    A.   I don't know if it was seven.

 9    Q.   But he ended up taking --

10    A.   If you say so.

11    Q.   -- some out which did not increase the predictive

12    accuracy of the tool; right?

13    A.   Right.

14    Q.   And he ended up with this simple instrument of four

15    different factors; right?

16    A.   Correct.

17    Q.   Now, a few years later he developed the Static-99 in

18    association with someone else; right?

19    A.   With Dr. Thornton, yes.

20    Q.   Dr. Thornton.  And that was also, they added those four

21    factors to some other factors that they had; right?

22    A.   Correct.

23    Q.   Now, what they did was they ran it on a bunch of people;

24    right?

25    A.   They found seven groups of sex offenders that they had
```

1    5- and 10-year and 15-year rates on and then they scored

2    them all.  It was done retrospectively.

3    Q.  So they developed the instrument on a sample of people?

4    A.  Correct.

5    Q.  And that was what's called the development sample?

6    A.  Yes.

7    Q.  Now, you have been testifying in cases like that, like

8    this since about that time; right?

9    A.  My first time testifying was in late 2002.

10   Q.  Now, this field has been controversial from the very

11   beginning, right, sex offender risk assessment?

12   A.  Yes.

13   Q.  Very contentious; is that fair to say?

14   A.  Yes, because it all occurred at the same time as the SVP

15   law.  So it was this confluence of lawyers getting involved,

16   which they usually hadn't gotten involved nearly as much as

17   before.

18        Plus more and more states, by the time '98 rolled

19   around we had about six or seven states with the law.  And

20   since then now we have 20 states and now it's a federal law.

21   Q.  Right.  So this all begins, basically there is a law

22   passed in Washington State in 1990; right?

23   A.  Correct.

24   Q.  In then another in Kansas?

25   A.  Minnesota '94, Wisconsin '94, Iowa '98, Illinois '98, so

1    on and so on.

2    **Q.**  But now starting toward the end of the decade the whole

3    project is picking up steam; is that fair to say?

4    **A.**  Yes.

5    **Q.**  Around this time in 2002 --

6         **THE COURT:**  Excuse me just one second.

7         (Pause in proceedings.)

8         **THE COURT:**  Go ahead.

9    BY MR. GOLD

10   **Q.**  Around this time in 2002 a book came out by Dr. Dennis

11   Doren called *Evaluating Sex Offenders, the Manual for Civil*

12   *Commitments and Beyond*; right?

13   **A.**  Correct.

14   **Q.**  Right.  And there's a growing amount of interest and

15   demand in this area; right?

16   **A.**  Correct.

17   **Q.**  Now, the use of these actuarial instruments in these

18   proceedings has been also a contested issue; right?

19   **A.**  Very much.

20   **Q.**  Now, the point of the actuarial instruments is that they

21   allow you to have a better idea of someone's or one point of

22   someone's risk than clinical judgment; right?

23   **A.**  Correct.

24   **Q.**  And one of the reasons they do that is because they give

25   you these forecasts, these estimates of probability; right?

1    **A.**   Yes.

2    **Q.**   Now, you testified on direct that you had up until very

3    recently not been using any of these actuarial instruments;

4    right?

5    **A.**   Correct.

6    **Q.**   And when you testified in these types of cases, you

7    testified about their limitations; right?

8    **A.**   That's true.

9    **Q.**   And they have tons of limitations; right?

10   **A.**   Yeah, they have some limitations.

11   **Q.**   Well, you mentioned some of them.  But now you have

12   changed your approach to the actuarials; right?

13   **A.**   Yes, but I'm still aware of the limitations.

14   **Q.**   And what you say you do now with the actuarial is that

15   you use it as a starting point; right?

16   **A.**   Correct.

17   **Q.**   So your position now is that it's providing good

18   information to the Court within its limitations; right?

19   **A.**   Yes.

20   **Q.**   And so when the Court looks at or the Court wants to

21   decide what the risk posed by an individual is, you as a

22   professional coming into this court are saying the

23   Static-99, for example, is providing good information;

24   right?

25   **A.**   It's not the best but it's providing some information.

1    As I have said, it's not -- it's the best we have.  It's not

2    the best thing there is because it's impossible to have that

3    1.0 predictability of any instrument.  So it's going to have

4    its limitations.

5    **Q.**  Now, there was a lot of talk about Mr. Hunt scoring

6    quite high on the Static-99; right?

7    **A.**  Yes.

8    **Q.**  Now, perhaps you can clarify this for me.  This is --

9    there are some items on the Static-99 that can be coded in

10   this research in the absence of other information; is that

11   right?

12   **A.**  What do you mean coded in the absence of other

13   information?

14   **Q.**  Well, for example, the files may not be complete; right?

15   **A.**  That's true.

16   **Q.**  So, for example, researchers conducting research on the

17   Static-99 may find a sample in which they don't have the

18   information to code certain items?  For example, long-term

19   relationship; right?

20   **A.**  That's been one of the most problematic items and that's

21   why they eliminated it from the 2002.  But, yes, it's always

22   the hardest, the hardest one because many of these guys, how

23   do you document whether how long you live with somebody

24   unless -- sometimes it is documented and other times it

25   isn't.

1    **Q.**  So that item is gone now; right?

2    **A.**  In the 2002, yes.

3              **THE COURT:**  All right.  We are going to recess

4    until tomorrow, please.  What time?

5              **THE CLERK:**  Ten o'clock.

6              **THE COURT:**  Ten o'clock tomorrow morning, please.

7              You are all excused.  Thank you.

8

9

10              (WHEREUPON, the proceedings were recessed at 4:30

11              p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Carol Lynn Scott, Official Court Reporter for

the United States District Court for the District of

Massachusetts, do hereby certify that the foregoing pages

are a true and accurate transcription of my shorthand notes

taken in the aforementioned matter to the best of my skill

and ability.



                    /S/CAROL LYNN SCOTT


        _____

                    CAROL LYNN SCOTT
                  Official Court Reporter
                 John J. Moakley Courthouse
               1 Courthouse Way, Suite 7204
                Boston, Massachusetts 02210
                     (617) 330-1377