```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2
      * * * * * * * * * * * * * * *
 3    UNITED STATES OF AMERICA     *
                                   *
 4               Petitioner,       *
                    vs.            *        CIVIL ACTION
 5                                 *        No. 07-12063-JLT
      WAYNE HUNT                    *
 6               Respondent.       *
                                   *
 7    * * * * * * * * * * * * * * *

 8            BEFORE THE HONORABLE JOSEPH L. TAURO
                   UNITED STATES DISTRICT JUDGE
 9                 DAY THREE OF NONJURY TRIAL

10    A P P E A R A N C E S

11            OFFICE OF THE UNITED STATES ATTORNEY
              1 Courthouse Way, Suite 9200
12            Boston, Massachusetts 02210
              for the United States
13            By:  Mark J. Grady, AUSA
                   Jennifer A. Serafyn, AUSA
14

15            FEDERAL DEFENDER OFFICE
              408 Atlantic Avenue
16            Boston, Massachusetts 02110
              for the Respondent
17            By:  Ian Gold, Esq.
                   Timothy Watkins, Esq.
18

19                              Courtroom No. 22
                                John J. Moakley Courthouse
20                              1 Courthouse Way
                                Boston, Massachusetts 02210
21                              April 29, 2009
                                10:10 a.m.
22

23
                    CAROL LYNN SCOTT, CSR, RMR
24                     Official Court Reporter
                  One Courthouse Way, Suite 7204
25                  Boston, Massachusetts 02210
                         (617) 330-1377
```

1                              <u>I N D E X</u>

2

3       <u>WITNESS:</u>           <u>DIRECT</u>    <u>CROSS</u>    <u>REDIRECT</u>    <u>RECROSS</u>

4       AMY PHENIX

5         By Ms. Serafyn    4                    176
          By Mr. Gold                  89
6

7

8                          * * * * * * * * * *

9

10                          <u>E X H I B I T S</u>

11      <u>GOVERNMENT'S:</u>                              <u>IN EVD.</u>

12

13          No. P   Static-99 Recidivism Tables,    53
                    the new norms
14

15          No. Q   Norms for Static-2002           59

16

17

18

19

20

21

22

23

24

25

1                       <u>P R O C E E D I N G S</u>

2              **THE CLERK:**  All rise for the Honorable Court.

3              **THE COURT:**  Good morning, everybody.

4              **COUNSEL:**  Good morning, Judge.

5              **THE COURT:**  Sit down, please.

6              (Whereupon, the Court and the Clerk conferred.)

7              **MR. WATKINS:**  It will just be five, at the most ten

8      minutes, Your Honor.

9              **THE COURT:**  That is okay.  Not with Nancy Gertner.

10             **MR. WATKINS:**  I'm sorry?

11             **THE COURT:**  Not with Nancy.

12             (Laughter.)

13             **THE COURT:**  You can tell her I said that.  She is

14     one of my very, very best friends in the whole world.  I

15     love her.  But she loves to say that -- somebody told her

16     that she had three minutes to make a speech and she said I

17     can't even say good morning in three minutes.

18             (Laughter.)

19             **MR. WATKINS:**  That's true.  Really all I have to do

20     is set up another attorney to make sure that --

21             **THE COURT:**  We will let you go.

22             **MR. WATKINS:**  Thank you.

23             **THE COURT:**  Is there anything else?

24             **THE CLERK:**  No, Judge.  We're all set.

25             **THE COURT:**  Okay.  All right.  We don't have the

```
1    jury to look for.  We will just start.
2             (Laughter.)
3             MS. SERAFYN:  Good morning, Your Honor.
4             THE COURT:  Good morning.
5             MS. SERAFYN:  The government calls Dr. Amy Phenix.
6             THE COURT:  Okay.  Dr. Phenix.
7             THE CLERK:  Right over there (indicating), please.
8                        AMY PHENIX, Sworn
9             THE CLERK:  Thank you.  You may be seated in that
10   box (indicating).
11                      DIRECT EXAMINATION
12   BY MS. SERAFYN
13   Q.  Good morning, Dr. Phenix.  Could you please state and
14   spell your name for the record.
15   A.  Amy Phenix, A-M-Y P-H-E-N-I-X.
16   Q.  Dr. Phenix, what is your occupation?
17   A.  I am a clinical psychologist in private practice.
18   Q.  And are you a licensed psychologist?
19   A.  Yes.
20   Q.  How long have you been licensed and in what states?
21   A.  Licensed since 1992 in California, licensed in the state
22   of Washington since about 2005 and licensed in the state of
23   Florida since about 2005.
24   Q.  And what is the nature of your work as a licensed
25   psychologist?
```

1    **A.**   I'm a forensic psychologist and I evaluate sexual

2    offenders for the purpose of sex offender statutes.

3    **Q.**   How long have you been evaluating sex offenders?

4    **A.**   Since 1995.

5    **Q.**   And do you stay current on the literature in the field

6    of sex offenders generally and sex offender recidivism

7    specifically?

8    **A.**   Yes.

9    **Q.**   Have you published any articles in this area?

10   **A.**   I have published a few articles.

11   **Q.**   And are those articles listed on your CV?

12   **A.**   They are.

13   **Q.**   I'd like to turn your attention to the first binder in

14   front of you, tab No. 6.  This has already been admitted

15   into evidence but can you just identify this document for

16   us?

17   **A.**   That would be my curriculum vitae.

18   **Q.**   And in addition to the publications that are listed in

19   your curriculum vitae -- actually let me back up a minute.

20        Are any of those publications peer reviewed?

21   **A.**   Yes.

22   **Q.**   How many have been peer reviewed?

23   **A.**   Three.

24   **Q.**   And what does it mean to be peer reviewed?

25   **A.**   It means that individuals who are experts in the field

1    on the Editorial Board or appointed by the Editorial Board

2    review articles submitted for publication to ensure that

3    they meet the standards, professional standards necessary

4    for publication.   Recommendations are given for

5    modifications of the article prior to publication.

6    **Q.**   And in addition to those articles that you have

7    published, have you given any presentations or training

8    sessions in the area of sex offender recidivism?

9    **A.**   Yes.

10   **Q.**   And can you just describe some of those generally for

11   us, specifically to what organizations or groups are you

12   presenting?

13   **A.**   I present to professional organizations in forensic

14   psychology and law enforcement.   I present on the use of

15   actuarial instruments to measure sex offender risk, sex

16   offender risk assessment, diagnostic issues, legal clinical

17   issues in regard to testifying regarding sex offender cases.

18   **Q.**   And have you ever testified in court about your opinions

19   that you've derived from these evaluations that you have

20   done on sex offenders?

21   **A.**   Yes.

22   **Q.**   And can you ballpark how many times you have testified

23   in court about your evaluations?

24   **A.**   About 170 times.

25   **Q.**   And has this testimony included the diagnosis of mental

1   illnesses, abnormalities or disorders?

2   **A.**   Yes, always.

3   **Q.**   And has this testimony included your opinion on the risk

4   of recidivism that a particular offender would pose if

5   released?

6   **A.**   Yes, it has.

7   **Q.**   Have you testified for both the prosecution and the

8   defense?

9   **A.**   Yes.

10   **Q.**   And can you give us an idea of what percentage of your

11   testimony have been for the prosecution versus for the

12   defense?

13   **A.**   Most of my testimony has been for the prosecution,

14   particularly earlier in my career when I worked for the

15   State of California.

16          The last couple of years I'd say about twenty

17   percent of my cases have been for the respondent.

18   **Q.**   Have you ever failed to qualify as an expert in a case

19   in which you have been proffered as an expert?

20   **A.**   No.

21   **Q.**   In this case have you rendered an opinion as to whether

22   Mr. Hunt is a sexually dangerous person?

23   **A.**   Yes.

24   **Q.**   And what is that opinion?

25   **A.**   I believe that he is.

1    **Q.**  And is that opinion given to a reasonable degree of

2    professional certainty?

3    **A.**  Yes.

4    **Q.**  And did you write a report in this case that

5    memorializes your opinion?

6    **A.**  I did.

7    **Q.**  I'd like you to turn in the same binder that you were

8    looking at to tab 5.  And, again, this has already been

9    admitted into evidence as Exhibit 5 but could you identify

10   this document for us?

11   **A.**  Yes, this would be the report that I wrote in the case

12   of Wayne Hunt dated September 10, 2008.

13   **Q.**  And before you wrote this report in September of 2008

14   did you review any materials?

15   **A.**  Yes, I did.

16   **Q.**  What type of materials did you review?

17   **A.**  I reviewed any of the criminal records in the case,

18   charging documents, Presentence Investigations Reports,

19   conviction documents, police reports that involved sex

20   offenses or other criminal history.

21          I also reviewed the Department of Correction

22   records which would include the medical records and the

23   documentation of his progress in the Department of

24   Corrections.

25          I reviewed any psychiatric information that was

1     available from various hospitalizations, also from the

2     Department of Corrections, and information about parole or

3     probation violations from the Parole Department or

4     Department of Community Supervision.  And I reviewed work

5     records that were available.

6              And I think that's pretty much a summary of the

7     records I looked at.

8     **Q.**  And did you review any of the reports submitted by the

9     other court-designated examiners or experts in this case?

10    **A.**  Yes, I reviewed them.

11    **Q.**  And are all of the documents that you just mentioned,

12    are those the types of documents that clinicians typically

13    reasonably rely on in forming their opinions about sexual

14    dangerousness?

15    **A.**  Yes.

16    **Q.**  Did you review any documents after you submitted your

17    report?

18    **A.**  Yes, I did receive some additional discovery, quite a

19    bit of additional discovery that primarily addressed -- that

20    had more thorough records regarding charging documents and

21    police reports about his past offenses.

22    **Q.**  And did any of those documents that you reviewed after

23    you submitted your report, did any of those documents change

24    your opinion in this case?

25    **A.**  No.

1    **Q.** You mentioned actuarial instruments earlier.  Did you

2    score any actuarial instruments in this case?

3    **A.** Yes, I scored three.

4    **Q.** Which instruments did you score?

5    **A.** I scored the Static-99, the Static-2002, a new

6    instrument, and the Minnesota Sex Offender Screening Tool

7    Revised, what I'll call the Mn-SOST-R.

8    **Q.** And other than scoring those actuarials, did you do

9    anything else as part of your evaluation to form your

10    opinion in this case?

11    **A.** Yes, I looked at a number of dynamic or changeable risk

12    factors that are generally the targets of treatment to see

13    how those might affect his overall risk of sexual reoffense

14    as well.

15    **Q.** Did you interview Mr. Hunt?

16    **A.** I did not.

17    **Q.** Why not?

18    **A.** I was not permitted to interview him.  He declined.

19    **Q.** And, in fact, there was a court order preventing you

20    from interviewing Mr. Hunt; is that right?

21    **A.** That's right.  I was not permitted by court order.

22    **Q.** Now, in the past have you evaluated whether someone is a

23    sexually dangerous person without conducting an interview of

24    that person?

25    **A.** Yes, it's not uncommon.

1    **Q.**  So if it's not uncommon, is it an accepted practice in

2    your field to form an opinion about sexual dangerousness

3    without an interview?

4    **A.**  Well, it's accepted to the extent that you would have

5    sufficient discovery or records on a case.  So if you have

6    sufficient records to provide important information about

7    diagnoses and also to be able to examine the actuarial

8    instruments and code them, you can come to conclusions

9    without having an interview.

10            Ethically if you do not have enough information,

11   records from the past, then you would not be able to do

12   that.

13            In this case there was no problem.  I had quite

14   sufficient records to be able to come to the conclusion

15   without the interview.

16   **Q.**  Now, Dr. Phenix, are you familiar with the Adam Walsh

17   Act, specifically 18 U.S.C, Sections 4247 and 4248?

18   **A.**  Yes.

19   **Q.**  In your opinion has Mr. Hunt engaged in or attempted to

20   engage in sexually violent conduct or child molestation in

21   the past?

22   **A.**  Yes.

23   **Q.**  And do you describe Mr. Hunt's past child molestation or

24   sexually violent conduct in your report?

25   **A.**  I do.

1    **Q.**  And is that opinion, is your opinion based on a

2    reasonable degree of professional certainty?

3    **A.**  Yes.

4    **Q.**  And on what do you base your opinion that Mr. Hunt has

5    committed sexually violent conduct or child molestation in

6    the past?

7    **A.**  I base that on both his admissions as well as a

8    multitude of charges and convictions as well for sexual

9    molest behavior with children.

10    **Q.**  I'd like to focus your attention on the third binder up

11    there that has letter exhibits A through O.  I'd just like

12    to point you to tab O and just ask you if you have seen that

13    document before?  This has already been admitted into

14    evidence as Exhibit O.

15    **A.**  Yes, I have.

16    **Q.**  And what is that document?

17    **A.**  It's a chronology of his, basically his sex offending

18    from the time that he was first detected sex offending in

19    1973 to the time that he was committed on his last sex

20    offense in 1985.

21    **Q.**  And is this document Exhibit O a fair and accurate

22    summary of the sex offenses that Mr. Hunt has committed

23    based on your review of all the records in this case?

24    **A.**  Yes.

25    **Q.**  Now, in your opinion, Dr. Phenix, does Mr. Hunt suffer

1   from a serious mental illness, abnormality or disorder?

2   **A.**   Yes.

3   **Q.**   Is that opinion given to a reasonable degree of

4   professional certainty?

5   **A.**   It is.

6   **Q.**   And what does Mr. Hunt suffer from?

7   **A.**   I believe he suffers from pedophilia, sexually attracted

8   to boys, exclusive type, as well as antisocial personality

9   disorder.

10   **Q.**   I want to start first with the pedophilia.  You said

11   pedophilia, sexually attracted to boys, exclusive type.

12   What does that mean, "exclusive type"?

13   **A.**   "Exclusive type" would indicate if he also has sexual

14   arousal to adults, either same sex, to males, or opposite

15   sex, to females.

16          It's not unusual for individuals with pedophilia to

17   also be sexually aroused to an adult partner.

18          In my examination of Mr. Hunt's history, while he

19   has a 15-year history of what he described as, in the

20   records at least, as on-and-off relationship with a Kathy,

21   which is the mother of two of his children, I think there is

22   no question that he is engaged in sexual activity obviously

23   with Kathy.  He has two children.

24          He reported in his upbringing in his teens or early

25   twenties that he really struggled with his attraction to

1   boys, that he was not attracted to females, that he wanted

2   to engage in sexual activity with females or be in a

3   relationship because it would look more normal and more

4   acceptable.  And I believe that that was the nature of his

5   relationship with Kathy, is that he does not really have

6   arousal to adult females even though he has been engaged in

7   sex with an adult female over a number of years.

8           But he has subsequently after breaking up with

9   Kathy, that relationship ended ultimately and he was mostly

10  gone from the relationship.  He was away working.  He was

11  working in the carnival.  He was traveling.  He was not

12  really there very much.  That he then engaged exclusively in

13  sexual activity with prepubescent and pubescent boys.

14          So I think that his primary arousal is to

15  prepubescent and post-pubescent boys.  I would say that he

16  is, has exclusive pedophilia and does not have significant

17  arousal to adult males or females at all.

18  **Q.**  How do you go about making this diagnosis of pedophilia,

19  sexually attracted to boys, exclusive type?

20  **A.**  By looking -- in two ways.  First, by looking at the

21  history of the sexual behaviors with children and teenagers

22  and to look at the frequency and duration of that behavior

23  which establishes a pattern for him over a lifetime of

24  sexual arousal to children.

25          Also, and that's evident by the multitude of sex

1    offenses, charges, convictions and also by his own

2    admissions.   I mean, this is a person who early on in the

3    '70s admitted that he was sexually aroused to boys.   That

4    this arousal to boys caused him multiple problems, financial

5    problems from paying them to engage in sex with him and

6    buying things for them, getting him in trouble with the law.

7           And so he has admitted over many years and while

8    recently, most recently in treatment in custody he talked

9    about his lifelong attraction to children.

10           And, furthermore, the evidence is overwhelming in

11    that way when, in terms of the frequency of offending

12    against boys, how much time it consumed in his life, that he

13    was so involved that he got involved in pornography with

14    children, taking pictures, trading pictures with others and,

15    furthermore, having literature from NAMBLA, Man-Boy Love

16    Association, which is an association that believes that this

17    behavior should be legal and furthers this behavior for men

18    who are aroused to children.

19    **Q.**   Now, is this diagnosis of pedophilia that you made, is

20    it a current diagnosis?

21    **A.**   It's absolutely a current diagnosis, yes.

22    **Q.**   And how is it a current diagnosis if Mr. Hunt has been

23    incarcerated for the last twenty or so years?

24    **A.**   Right.   The course of pedophilia is lifelong.   It's just

25    like a sexual orientation that any person has.   So if you

1    find yourself attracted to the opposite sex in your teens or

2    the same sex and then you ultimately have that sexual

3    orientation throughout your life, you can act on that or not

4    act on that.  But that sexual orientation stays with a

5    person.  And this is just very much like the disorder of

6    pedophilia.  It's a sexual orientation, sexual arousal to

7    children.

8            Normal people don't find that one day, for example,

9    at age 40 or 50 or 60 that your sexuality changes somehow.

10   And it's the same with individuals with this mental

11   disorder.

12           So he will be aroused to children throughout his

13   life until he dies.  That will be the course of pedophilia

14   for him.

15           And, furthermore, when offenders are sexually

16   aroused to children, it's not unusual to see them go into

17   custody, come out of custody as has happened in this case

18   and immediately start offending again.

19           So, for example, if someone is in custody for four

20   and a half years, they don't have to even have pictures of

21   children to be reinforcing pedophilic fantasies and urges

22   which characterize the disorder.  So what they will do is to

23   think back about past victims, past offending.  They will

24   fantasize about those victims.  They'll masturbate to those

25   and then for many years just continue to reinforce their

1    pedophilic fantasies and urges or visualizing children on

2    television with no one knowing that while they're in prison

3    or in custody and then masturbating to those fantasies.

4         So in that way it reinforces the disorder for years

5    even though they have no availability to children.

6    **Q.**  Now, you just mentioned that pedophilia is a lifelong

7    orientation I think you said.  Can it ever remit?

8    **A.**  In some offenders it can -- I would never say it's in

9    remission because, like I said, it's very difficult to know

10   internally in someone's mind what's going on.

11        But there are types of offenders who tend to offend

12   more often when they're overwhelmed or stressed that tend

13   not to experience constant fantasies and urges of children.

14        So, in other words, if they're having difficulties,

15   their marriage breaks up, they're having trouble with their

16   job, then that stress and overwhelm gets linked to

17   experiencing increased sexual fantasies and urges that are

18   deviant.  And they would be more likely actually to act out

19   during that time.

20        There are other individuals with pedophilia that I

21   believe, for example, in this case, where the person just

22   struggles constantly with sexual fantasies and urges about

23   children.  They don't remit.  They don't go away.  They stay

24   very, very constant.  We see remission of those as very

25   pervasive fantasies and urges to molest children.  We see

1    improvement with medications that reduce libido such as

2    Depo-Provera, antiandrogen medications; but other than that

3    it's very difficult to get those fantasies and urges to

4    remit.

5    **Q.**   I'd like to draw your attention to what has been

6    admitted as Exhibit I in the binder in front of you.   And

7    there are two pages there at Exhibit I.

8            Can you identify this document for us?

9    **A.**   Yes, this would be the criteria that describes the

10   course of pedophilia and the diagnostic criteria for

11   pedophilia contained in the *Diagnostic and Statistical*

12   *Manual of Mental Disorders, Fourth Edition, Text Revision.*

13   **Q.**   Okay.   And I'd like to just focus you on -- I'll put it

14   up on the screen here.

15           I'd like to just focus you on the last two

16   sentences on the first page where it says, "The course is

17   usually chronic, especially in those attracted to males.

18   The recidivism rate for individuals with pedophilia

19   involving a preference for males is roughly twice that for

20   those who prefer females."

21           Do you see that?

22   **A.**   Yes.

23   **Q.**   So, Dr. Phenix, if the course of pedophilia is chronic,

24   especially for those attracted to males, does that mean that

25   every person who has pedophilia and is attracted to males is

1    a sexually dangerous person who would have difficulty

2    controlling those pedophilic urges?

3    **A.**  No, every case is different.  It depends on the strength

4    of the sexual fantasies and urges.  It depends on the

5    circumstances in which a person molests males.  It could be

6    that an individual is experimenting with their sexuality and

7    finds themself attracted to boys and then molests against a

8    boy and does not find it arousing.  Or that they find their

9    behavior abhorrent and they decide never to act out on that.

10         But if we look at larger groups of sex offenders,

11   particularly those that offend against extrafamilial

12   victims, outside the family, then clearly there is a higher

13   recidivism rate for those who target boys.

14   **Q.**  Dr. Phenix, are you aware that Mr. Hunt now claims that

15   he is attracted to adult males?

16   **A.**  I was aware that in more recent medical records that

17   he's reported that he was bisexual and that he was going to

18   engage when he got out in a consensual -- a partner with --

19   a consensual relationship with an age appropriate partner.

20   **Q.**  Now, I want to just talk to you briefly about all the

21   documents that you have reviewed in this case.

22         In those documents did you see any references to

23   Mr. Hunt's sexual attraction to or sexual activity with

24   young boys?

25   **A.**  Yes.

1    Q.  And in all of the records that you reviewed in this

2    case, did you see indications of Mr. Hunt's sexual

3    attraction to or involvement with adult females?

4    A.  To the one relationship.  He talked early in his

5    development about not being attracted to females.  He

6    nonetheless engaged in a 15-year on-and-off relationship.  I

7    have no information about the amount of time he spent in

8    that relationship but he had two children.  So, yes, there

9    was some evidence of that.

10   Q.  And this is with the woman named Kathy that you

11   mentioned earlier?

12   A.  Right.

13   Q.  And, Dr. Phenix, in all of the records that you reviewed

14   in this case did you see any references to Mr. Hunt's sexual

15   attraction to or involvement with adult males?

16   A.  None.  There is no evidence that he is sexually aroused

17   to adult males.

18   Q.  And do you find it credible that Mr. Hunt says that if

19   he is released he would like to engage in sexual

20   relationships with adult men?

21   A.  I find it credible to the extent that I know that he

22   would like to change his sexuality.  No one wants to live

23   with the sexual arousal to children.

24        I, however, believe that what he says is not

25   realistic for him.  That he is not aroused to adult males,

1    or adult females in my opinion, and that those will not be

2    satisfying viable sexual partners for him.

3    **Q.**   Now, in addition to pedophilia I think you testified

4    that you also diagnosed Mr. Hunt with antisocial personality

5    disorder; is that right?

6    **A.**   Yes, I did.

7    **Q.**   And how did you go about making that diagnosis?

8    **A.**   First to examine if there is a history of conduct

9    disorder or misbehavior, childhood misbehavior, criminal

10   misbehavior, acting out behavior prior to the age of

11   fifteen.

12          And then furthermore this would be, again, a

13   lifelong disorder where a person sexually violates the

14   rights of other people, has attitudes that allows them to do

15   that.  It's associated with longterm incarceration, jail,

16   prison, forensic mental health facilities.

17          And it's typically, traits of antisocial

18   personality disorder would be a person who lies and is

19   dishonest, who manipulates and cons other people, who has

20   low remorse for other people that they've hurt and harmed

21   through their criminal behavior.  And they're oftentimes

22   involved in aggressive behavior, fighting, violence, that

23   kind of thing.

24   **Q.**   And I'd just like to turn your attention to Exhibit H in

25   the binder in front of you and just ask if you can tell us

1    what that document is?

2    **A.**   Yes, this would be the diagnostic description and

3    criteria for antisocial personality disorder from the

4    DSM-IV-TR.

5    **Q.**   And does Mr. Hunt meet the diagnostic criteria for

6    antisocial personality disorder in your opinion?

7    **A.**   Yes, he does.

8    **Q.**   And why does he meet the diagnostic criteria for

9    antisocial personality disorder?

10   **A.**   Well, he has certainly evidence of conduct disorder and

11   not having conduct disorder as a child.   As a matter of

12   fact, when he was hospitalized, he received a diagnosis of

13   conduct disorder when he was fifteen years of age.

14           But he is a young man who was disciplined, got in

15   trouble for, as the state hospital records indicate, lying,

16   stealing.   He set, was suspected of setting two fires in his

17   home.   He stole money.   He stole a gun.   An electric saw in

18   one particular burglary.

19           He had a history also of running away from home.

20   As a youngster in his mid teens he was arrested for breaking

21   and entering at age 15.

22           So we have sufficient evidence of conduct disorder

23   for him.

24   **Q.**   And are there criteria in the DSM in addition to conduct

25   disorder that Mr. Hunt meets?

1    **A.**  Yes, as an adult this is an individual who has been

2    arrested for property crimes, a multitude, as we know, of

3    sex offenses, so he's spent much of his life either on

4    community supervision or incarcerated for his criminal

5    behavior.

6         He has a history as a youth of getting into fights

7    and being aggressive towards others.  He has a lengthy

8    history of impulsivity.  He was very transient in his life.

9    He worked traveling, first shorter-term jobs, traveled quite

10   a bit and then in the carnival where he was, you know, all

11   over the United States.  Molesting in most of the

12   jurisdictions, in several different jurisdictions along the

13   way, exhibiting significantly impulsive behavior.

14        He is a person who has really not shown any

15   significant remorse over the years for his offending.  He

16   would get into trouble molesting time and time again.

17        And individuals who are remorseful or feel badly

18   for the behavior stop doing that.  And in his case there

19   wasn't anything that really stopped him.  As a matter of

20   fact, his offending escalated significantly and he violated

21   the rights of so many children by the time he was arrested

22   in 1985 indicating just really a striking lack of remorse

23   for the hurt and harm he perpetrated upon children.

24   **Q.**  And is this diagnosis of antisocial personality disorder

25   a current diagnosis?

1    **A.**   It's a current diagnosis, yes.

2    **Q.**   Dr. Phenix in your opinion as a result of the pedophilia

3    and antisocial personality disorder that you diagnosed

4    Mr. Hunt with, would Mr. Hunt have serious difficulty in

5    refraining from sexually violent conduct or child

6    molestation if he were released?

7    **A.**   Yes, I would certainly believe he will.

8    **Q.**   And is that opinion given to a reasonable degree of

9    professional certainty?

10   **A.**   Yes, it is.  First of all -- in a number of ways.

11   First of all, considering the severity of his

12   pedophilia over the years.  This is a person who is very

13   very driven by his fantasies and urges, who has demonstrated

14   essentially no ability to contain himself despite the urges

15   and fantasies, has acted out so compulsively on his

16   fantasies and urges throughout the years.

17   Since his course is lifelong, he has had a

18   six-month intervention in terms of treatment, wholly

19   insufficient for someone with such extensive lust behaviors

20   in the past such as severe paraphilia, pedophilia.  And so

21   he has never exercised volitional control in his history and

22   now he is in a custody setting where there are no children.

23   And the passage of time would not significantly

24   change his drive to molest children.  It might be somewhat

25   reduced because of his age.  But this was a person in his

1    40s who was offending with multiple children multiple times

2    a day every day.  So this is a person with such strong

3    drives that it is impossible for me to believe that he would

4    have sufficient controls today to control that.

5          And, furthermore, he offended against children in

6    the community even when he was under the strictest

7    supervision.  So he was in the community.  He knew he had

8    gotten in trouble.  He knew he had a punishment.  He was

9    placed on parole or he was out on bail.  And this is a

10   person who absconded community supervision and then quickly

11   begins to reoffend again.

12         So there have been no measures that we have today

13   that have been demonstrated for him to be effective in

14   helping to stop him from acting out on his fantasies and

15   urges and arousal to children.

16   **Q.**  Are you familiar with the term "risk assessment"?

17   **A.**  Yes.

18   **Q.**  What is a "risk assessment"?

19   **A.**  A "risk assessment" is considering the research-derived

20   risk factors that we know when present increase the risk of

21   future sexual reoffense, determining the presence or absence

22   of those risks factors, an overall risk level for a sex

23   offender and some general probabilities of sexual reoffense.

24   **Q.**  And what are some research-derived risk factors?

25   **A.**  Well, the most robust or the strongest risk factor would

1    be prior sex offenses.  That, for example, in one actuarial

2    instrument counts three times the weight of predictive

3    future sexual reoffense as other items.  In other words, has

4    the person committed a sex offense, been detected, been

5    sanctioned and then goes out and does it again.

6    **Q.**  And did you do a risk assessment in this case?

7    **A.**  Yes.

8    **Q.**  And why did you do a risk assessment in this case?

9    **A.**  I did a risk assessment in this case to determine his

10   overall level of risk to go on to commit another sex offense

11   in the future.

12   **Q.**  And how do psychologists go about performing a risk

13   assessment in a case like this?

14   **A.**  Well, myself, you know, the way that I go about it is to

15   score a multitude, a number of actuarial instruments that

16   have all been tested or validated.  In other words, they

17   help me to know if this person is low, medium or high risk

18   to go on to reoffend.

19   **Q.**  I think I asked a bad question.

20         Are there different methodologies that

21   psychologists can use in conducting risk assessments?

22   **A.**  Yes.

23   **Q.**  Okay.  And what are some of those methodologies?

24   **A.**  The first would be to simply call upon your experience

25   to make a judgment as to the level of risk of the person.

1    We consider case factors.  We consider an interview with the

2    person.  And you consider the past records and then come to

3    some conclusion based on your knowledge in the field or past

4    experience to determine whether the person is -- meets the

5    criteria of the law.

6    **Q.**  And is there a term for that methodology that you just

7    described?

8    **A.**  That would be using clinical judgment.

9    **Q.**  Okay.  And other than clinical judgment, are there any

10   other methodologies that psychologists could use in

11   performing a risk assessment?

12   **A.**  There's two other methods that a person could use.  The

13   first would be to look at the research which has identified

14   certain risk factors that when present increase the risk of

15   future sexual reoffense and just make a list of them and

16   look at that list of risk factors.  And the more that are

17   present, basically the higher the risk.

18           Or, to use actuarial instruments that take those

19   risk factors that research says predict future sexual

20   reoffense, that weights each one of them statistically for

21   what they contribute to future sexual reoffense, then you

22   can add those weights up to come up with an overall risk

23   for, you can come up with an overall risk level and some

24   general probabilities of sexual reoffense.  And that would

25   be what we call pure actuarial assessment.

1    **Q.**  And which, if any, of those methodologies is the

2    preferred methodology in the field when evaluating sex

3    offenders?

4    **A.**  Currently the pure actuarial method is the preferred

5    method.  That doesn't mean that you don't consider specific

6    case factors.  You always would but the primary overall risk

7    level comes from scoring actuarial instruments.

8    **Q.**  And what method did you use in this case?

9    **A.**  I used that method.

10   **Q.**  And that's the pure actuarial method?

11   **A.**  Yes.

12   **Q.**  Now, has your methodology or has the methodology that

13   you used changed or evolved at all over time?

14   **A.**  Yes, it's evolved throughout the time I've been working

15   in this field.

16   **Q.**  And has your methodology evolved at all since you have

17   been working on this case?

18   **A.**  Yes.

19   **Q.**  Okay.  And can you describe that for us?

20   **A.**  Yes.  First of all, the Static-2002 is a new actuarial

21   instrument that was not validated or used or released for

22   use when I was originally working on this case.  So I

23   subsequently scored that instrument.

24          And, furthermore, for the Static-99 which is the

25   most widely used actuarial instrument for sexual reoffense,

1   it has new norms.  In other words, it has the same exact

2   items as it had before.  It has a total score that you get

3   in the same exact way.  It has risk levels, low, medium,

4   high, associated with that score that are the same.  But it

5   also has probabilities of sexual rearrest that are based now

6   on what we call contemporary samples, more recent releases

7   from prisons and forensic hospitals.

8          The probabilities of sexual reoffense we used to

9   use with the Static-99 came from samples that were released,

10  large groups of sex offenders that were released from

11  prisons and forensic hospitals in the '70s and '80s.  And

12  these new probabilities of sexual rearrest come from samples

13  of sex offenders released much more recently.

14  **Q.**  So let's talk a little bit about the two Static

15  actuarials that you mentioned, the Static-99 and the

16  Static-2002.

17         First, who developed the Static-99?

18  **A.**  Dr. Carl Hanson and Dr. David Thornton.

19  **Q.**  And what does the Static-99 consist of?

20  **A.**  It consists of ten risk factors that have been shown in

21  the research to predict future sexual reoffense.

22  **Q.**  And can you give us an example of what some of those

23  empirically established risk factors are?

24  **A.**  Yes.  Some of them have to do with a person's sex

25  offending history and factors we know are related to sexual

```
 1    deviance.  That would be prior sex offenses, the strongest

 2    predictor, future sexual reoffense, that would be having

 3    noncontact sex offenses like exhibitionism and voyeurism

 4    besides having contact sex offenses, and then factors having

 5    to do with the type of victim.

 6         So male victims you would get a risk point because

 7    you're higher risk than if you just have female victims.

 8    And also items related to the relationship.  If you have

 9    stranger victims and unrelated victims, you're significantly

10    higher risk than if you have interfamilial or incest types

11    of victims.

12         The instrument also has some items that are related

13    to criminality because we know just a history of criminal

14    factors predicts future sexual reoffense as well.  That

15    would be items like nonsexual violence in a person's history

16    and the time of the most recent sex offense or prior to

17    that.  And also just the number of what we call sentencing

18    dates or adjudications.  Total number of any type of offense

19    being adjudicated predicts future sexual reoffense.

20         Also age, an age factor.  Younger offenders are

21    higher risk than older offenders.

22         And one item that has to do with relationships.  So

23    if a person has a committed relationship and lives in that,

24    consistently in that relationship, not on and off but

25    consistently for over a two-year period, that would indicate
```

1    lower risk.

2              So those are the factors on the Static-99.

3    Q.  And what does the word "static" mean?

4    A.  "Static" means not changeable.  So these factors once

5    present in a person's history can never go away.  So if you

6    have two prior sex offenses, you always have two prior sex

7    offenses.  You could get more.  It could go up.  But it

8    could never go down.  So these are static factors or

9    historical factors.

10   Q.  Why is it that psychologists use an instrument that

11   seems to rely heavily on or look at historical factors?

12   A.  Well, they're the strongest predictors of future sexual

13   reoffense.  Factors that are changeable like the dynamic

14   risk factors, those do not as strongly predict who will go

15   on to reoffend.

16   Q.  And has the Static-99 been cross-validated?

17   A.  Yes, it has been validated 63 times on international

18   samples all over the world, many, many different types of

19   samples of sex offenders.

20   Q.  And what does it mean to be cross-validated?

21   A.  These instruments are developed on a sample of sex

22   offenders.  And the sample on which the instrument is

23   developed should predict pretty well because it was

24   developed on that sample.  But if you test this instrument

25   after it's developed on a new sample of sex offenders, the

1    ability to predict sexual reoffense generally goes down

2    some.  We call that shrinkage.

3         So we have to make sure when we develop an

4    instrument, an actuarial instrument, that it works well for

5    many different types of sex offenders in different

6    jurisdictions.  And the more often you establish that, the

7    more confident I feel that it predicts well for the person

8    I'm evaluating.

9         So you want to validate it or cross-validate it on

10   many different samples as possible to know that it

11   generalizes to most sex offenders.

12   **Q.**  And are there known error rates associated with the

13   Static-99?

14   **A.**  Yes.

15   **Q.**  Okay.  And has the Static-99 gained general acceptance

16   in the psychological community?

17   **A.**  Oh, yes.

18   **Q.**  And what role, if any, have you played with respect to

19   the Static-99?

20   **A.**  I am the second author of the Coding Rules, how you

21   score this in the clinical field.

22   **Q.**  And when did those Coding Rules come out?  Did they come

23   out at the same time as the instrument?

24   **A.**  The original Coding Rules came out in 1999.  I was the

25   first author on those and then they were revised in 2003.

1    And the primary author is Andrew Harris on those.

2    **Q.**  Now, we heard from another witness in this case that the

3    Static-99 has moderate predictive accuracy.  Do you agree

4    with that?

5    **A.**  Yes.

6    **Q.**  Okay.  And what does that mean?

7    **A.**  When we do these validations and test the instrument on

8    all these different samples of sex offenders, we're looking

9    to see how valid is it.  Does it -- how well does it predict

10   future sexual reoffense in these different samples.  And we

11   have a measure of predictive accuracy.  It's a statistical

12   measure of predictive accuracy that tells us how well the

13   instrument can discriminate between high-risk offenders and

14   low-risk offenders.

15          High-risk offenders should have high scores on the

16   actuarial instrument and low-risk offenders should have low

17   scores on the actuarial instrument.

18          So the better that the instrument does that, the

19   higher the predictive accuracy.

20          Now, it's measured numerically so predictive

21   accuracy of the Static-99, if you average lots of these

22   validation studies, it is about .68 to, you know, .75.  The

23   higher the closer to one, the better the predictive

24   accuracy.

25          If it was one, if would be perfect predictive

1   accuracy.  It could tell us every time if a person is high

2   risk or low risk.  Okay.

3         But we don't have any actuarial instruments that

4   measure future sexual reoffense with that type of predictive

5   accuracy, that one, that perfect prediction.

6         So the way you can kind of understand how well they

7   do, what is moderate rather than perfect predictive

8   accuracy, what you can say is that if the predictive

9   accuracy is .70, that means about 70 percent of the time the

10  instrument is going to be able to tell us that a high-risk

11  offender has a high score and a low-risk offender has a low

12  score.  It will be able to separate out offenders.

13        But about 30 percent of the time the instrument

14  will be inaccurate in doing that.  So it says it's a high

15  score but he may be moderate or low risk.

16  **Q.**  Is it fair to say -- I know you said that there are no

17  instruments that are perfect.  But is it fair to say that

18  the Static-99 is the best that you have in terms of

19  predictive accuracy?

20  **A.**  Well, actually the Static-99, the Mn-SOST-R and the

21  Static-2002 all have moderate predictive accuracy.  They're

22  all the same.

23        The issue is if I don't use an actuarial instrument

24  what would be my predictive accuracy.  Okay.  This is to see

25  how much better it is with an actuarial instrument.

1          If I don't use an actuarial instrument, my

2    predictive accuracy is about .50, 50 percent.  So that's

3    like flipping a coin.  All right.

4          And we want to improve on that.  The only way we

5    have been able to improve on that is to use these research

6    established risk factors.  And so what the actuarial

7    instruments can do is to help increase my predictive

8    accuracy on any particular case by about 20 percent.  So

9    that's a big help than if I, I'm certainly more accurate

10   with the actuarial instrument than if I didn't use it.

11   **Q.**  I think you testified that you did score the Static-99

12   in this case for Mr. Hunt; is that right?

13   **A.**  Yes.

14   **Q.**  Okay.  And what is the range of scores that a person can

15   receive on the Static-99?

16   **A.**  That would be 0 to 12.

17   **Q.**  And is there an average score that sex offenders receive

18   on the Static-99?

19   **A.**  About a two.

20   **Q.**  And what was Mr. Hunt's score?

21   **A.**  Eleven.

22   **Q.**  I'd like to draw your attention to Exhibit 26 in the

23   binder in front of you.

24          (Pause in proceedings.)

25          **MR. WATKINS:**  Would this be a good time to break,

```
 1   Your Honor?
 2           THE COURT:  When are you supposed to be down there?
 3           MR. WATKINS:  At eleven o'clock.
 4           THE COURT:  Okay.  Yes.  Why don't you go so you
 5   are on time.  Take your time.  Give them our best wishes.
 6           MR. WATKINS:  I will.
 7           THE COURT:  Okay.  We will take a break.
 8   Mr. Watkins has another commitment with one of my colleagues
 9   that we are going to honor.
10
11           (Recess.)
12
13           THE CLERK:  All rise for the Honorable Court.
14           THE COURT:  All set?
15           THE CLERK:  Yes, Judge.
16           (Whereupon, the Court and the Clerk conferred.)
17           THE COURT:  Sit down, please.
18           Okay.  You are all set, Mr. Watkins?
19           MR. WATKINS:  I am, thank you.
20           THE COURT:  All right.  Good.
21           Go ahead.
22                      AMY PHENIX, Resumed
23                   DIRECT EXAMINATION, (Cont'd.)
24   BY MS. SERAFYN
25   Q.  Dr. Phenix, before the break we were talking about the
```

1    Static-99 that you scored for Mr. Hunt.  I'd like to turn

2    your attention to what has been admitted as Exhibit 26.  A

3    copy is up here on the screen (indicating).

4            Can you identify this document for us?

5    **A.**  Yes, that's the Static-99 scoring worksheet.

6    **Q.**  Okay.  And is this the worksheet that you scored for

7    Mr. Hunt in this case?

8    **A.**  Yes.

9    **Q.**  Now, I'd like to go through the scores if we can

10   briefly.  So can you just explain to us what No. 1 is?  It

11   says, "Risk factor, young."  Just explain that to us and

12   then explain to us what score you gave Mr. Hunt for that

13   category.

14   **A.**  This is the age item on the Static-99.  So if an

15   offender is under 25 years, he's lower risk, a zero, over 25

16   years of age.  Obviously Mr. Hunt is 62 so he received a

17   score of zero, no risk point.

18   **Q.**  And what about risk factor No. 2, "single"?

19   **A.**  This asks if he has ever lived with a lover for at least

20   two years in a consistent live-in relationship.  He had

21   reported in the records that he, the most he ever lived with

22   Kathy was for one year.  That even though it lasted fifteen

23   years, it was on and off so that he was not in a consistent

24   relationship with her so I gave him a point, one.

25   **Q.**  And what about item No. three, index nonsexual violence,

1    what does that mean?

2    **A.**   That asks at the time of the most recent sex offense,

3    that would be his 1985 offense, did he also get convicted of

4    nonsexual violence.  And in this case he was convicted of

5    kidnap so he gets a risk point of one.

6    **Q.**   And what do we know about the kidnapping offense in 1985

7    in terms of the motivation for that offense?

8    **A.**   That was a sexual motivation.  He kidnapped two boys --

9    well, he brought two boys with him which was -- to his

10   residence for the purpose of sexual victimization.

11   **Q.**   So why is it that for item No. 3 the kidnapping counts

12   as index nonsexual violence if there was a sexual motivation

13   to the offense?

14   **A.**   Well, that's a double dip.  So in the Coding Rules an

15   offense that has sexual motivation if by title is nonsexual

16   violence would also count as nonsexual violence.

17   **Q.**   Now, you just referred to the Coding Rules.  Are those

18   the same Coding Rules that you coauthored?

19   **A.**   Yes.

20   **Q.**   Okay.  So moving on to risk factor No. 4, "prior

21   nonsexual violence," what is that risk factor looking at and

22   what score did Mr. Hunt receive there?

23   **A.**   Well, it's also predictive if they have nonsexual

24   violence convictions prior to the most recent sex offense.

25            In this case there was a prior conviction also for

1    kidnap, the federal offense for which he went into federal

2    custody in 1977.

3    Q.   Now, item No. 5 looks to me like you can actually get

4    three points maximum on that item; is that right?

5    A.   Right.  It's the only item that goes zero to three risk

6    points versus zero to one.

7    Q.   And why is that?

8    A.   That's because prior sex offenses is the strongest

9    predictor of future sexual reoffense.  It predicts with

10   three times the strength as the other risk factors.

11   Q.   Okay.  Now, in item No. 5 underneath the column that

12   says "Codes," it looks like there are two separate

13   categories.  One category is "charges" and the other

14   category is "convictions"?

15   A.   That's right.

16   Q.   Okay.  And why are those two separate categories there?

17   A.   Statistically both charges and convictions predict

18   future sexual reoffense.

19          For example, a person could get a risk point only

20   having charges, never having a conviction for a sex offense

21   because statistically it's not infrequent that the

22   individual has actually committed a sex offense.  So we know

23   statistically that charges will predict future sexual

24   reoffense as well as convictions.  But you need more charges

25   to weigh out the convictions, less convictions.

1  **Q.**  So in this item No. 5, is it either charges or

2  convictions, you can look at one or the other?

3  **A.**  Yes.  And you choose which is highest.

4  **Q.**  Okay.  And what score did Mr. Hunt receive in item

5  No. 5, prior sex offenses?

6  **A.**  He received a score of three.

7  **Q.**  Okay.  And how did you come up with that score of three?

8  **A.**  In this case he had many, many more charges than

9  convictions.  So in counting up, I counted up 14 sexual

10  charges, knowing that he received what, 11 charges in 1976

11  in Louisiana, never adjudicated, because he was then

12  arrested for the kidnap and put into federal custody.

13       So he had a number of sex charges there in 1973, a

14  sex charge in California.  And then ultimately he had --

15  not -- in calculating this I would not be including the

16  60-count charges for the most recent offense because we

17  don't count the index sex offense.

18       So if I added up all the charges, including the

19  Louisiana -- I'm sorry, the Illinois charge which was never

20  adjudicated, I have a total of 14 charges for him and only a

21  few convictions.  But that would total, six plus charges

22  would equal a three or the highest risk point on this item.

23  **Q.**  And just for the record, what is the index offense in

24  this case?

25  **A.**  The index offense is always -- it should say index sex

1    offense -- is the most recent sex offense that the person

2    committed.  That would have been 1985.

3    **Q.**  Moving on to item No. 6, the risk factor is "prior

4    sentencing dates."  And then it says in parentheses

5    "excluding index."  What does that mean?

6    **A.**  That means prior to the 1985 sex offense how many times

7    did he go to court and get some type of sanction:  A fine,

8    probation, parole, some type of sanction.

9        And in looking at his criminal history, he has not

10   only sex offenses but offenses for, let's see, breaking and

11   entering.  He has an offense for a fraudulent check.  So all

12   totaled, excluding, with new information, excluding his

13   military charges which were for desertion and breaking the

14   rules, excluding that he would have five prior sentencing

15   dates before the most recent sex offense.  And if you have

16   four or more, you get a risk point of one.

17   **Q.**  And why did you exclude the charges from the Navy?

18   **A.**  I excluded those because the Coding Rules say that if

19   they commit some offense that is chargeable in the community

20   outside of the military, then you count that as a sentencing

21   date.

22       If it is an offense that is military related, like

23   desertion, breaking military rules that would not ordinarily

24   be against the law, then that would not count as a

25   sentencing date.

1   **Q.**  And item No. 7 says "any convictions for noncontact sex

2   offenses."  What does that mean?

3   **A.**  That means offenses like exhibitionism, voyeurism, child

4   pornography, offenses where there is no intent to touch the

5   child.  And that could be at any time, at the time of the

6   index sex offense, prior to the index sex offense.

7          And he was convicted of promoting a sexual

8   performance and use of child in sexual performance with this

9   picture taking activities and directing children to have

10  sex.

11  **Q.**  So what score did Mr. Hunt get for item No. 7?

12  **A.**  One.

13  **Q.**  Okay.  And then item No. 8 is "any unrelated victims."

14  What does that mean?

15  **A.**  Right.  There is two victim items:  Unrelated and

16  stranger.

17          Unrelated means it's not essentially a blood

18  relative, a close relative.  And that, meaning it's someone

19  who is unrelated to him.  That would be higher risk than

20  someone who was a blood relative.  That would be the lowest

21  risk.

22          So he received a risk point for all of his victims

23  were unrelated.

24  **Q.**  And how do you know that unrelated victims equal higher

25  risk?

1    **A.**  Well, we look at large groups of sex offenders released

2    to the community and graph who has -- what the relationship

3    was to the victim, so whether it was incest, unrelated or

4    stranger.  So we know that before offenders are released to

5    the community.

6            If you look to see who reoffends, statistically the

7    highest reoffense will be a stranger victim, people with a

8    history of stranger victims.

9            The second highest reoffense will be individuals

10   with unrelated victims.

11           And the lowest reoffense rate consistently in study

12   after study is those who have victims who are blood

13   relatives.

14   **Q.**  In item No. 9, the question there, the risk factor there

15   is "any stranger victims."  How do we know what or who

16   constitutes a stranger?

17   **A.**  A stranger will be someone you have not known for 24

18   hours.  It's for, a 24-hour period is the cutoff for this

19   instrument.

20           And in 1973 he had an offense against two boys he

21   met that day at the carnival and then he molested them.

22   Those would have been stranger boys.  There may have been

23   many others but it's difficult to tell from the records

24   about the 1986 offense.

25   **Q.**  And then finally item No. 10, the risk factor there is

1    "any male victims."

2            First of all, why is that a risk factor?

3    **A.**  Because statistically offenders who have offended

4    against males are higher risk than those who have only

5    offended against females.

6            So that's why females is not on here.  That would

7    be lower risk.

8            And having one extrafamilial male victim increases

9    the risk of future sexual reoffense.

10   **Q.**  And what score did Mr. Hunt get on item No. 10?

11   **A.**  Well, a one.  All of his victims were males except for

12   one known female.

13   **Q.**  And adding up -- well, after you come up with the score

14   for each of these ten items, do you then total the score?

15   **A.**  Yes.

16   **Q.**  All right.  And what score did Mr. Hunt get here?

17   **A.**  Eleven.

18   **Q.**  Okay.  Now, there is something at the bottom of this

19   worksheet that I have just been covering up so that we could

20   focus on the risk factor items.  But there is something on

21   the bottom that says, "Translating Static-99 scores into

22   risk categories."

23           What does this chart mean?

24   **A.**  Well, this is where we can calculate, compare to other

25   large groups of sex offenders what is his risk level:  Low,

1   medium, or high, compared to other sex offenders.

2   **Q.**  All right.  And is this chart still accurate today?

3   **A.**  It's accurate to the extent that it categorizes risk

4   level: low, medium or high.  Those cutoff scores and the

5   identified risk level is accurate.

6        But the probabilities of sexual reoffense for five,

7   ten and fifteen years are no longer in use.

8   **Q.**  So looking at this table, can you just take us through

9   the label for the risk category Mr. Hunt fits into?

10  **A.**  He would be high risk so any score that was six or

11  above, and the instrument goes up to twelve, would be

12  considered high.

13  **Q.**  So I'm going to see if I can sort of draw a line here on

14  this.

15       Just to be clear for the record, I think you

16  testified that everything to the left of the line that I

17  have just drawn -- so the Static-99 score and then the label

18  for risk category is still accurate; is that right?

19  **A.**  That's correct.

20  **Q.**  Okay.  But everything to the right of the green line

21  here (indicating) that is on the screen, where it says

22  sexual recidivism, five years, ten years and fifteen years,

23  those are no longer the most up-to-date figures; is that

24  right?

25  **A.**  Yes.

1    **Q.**  Okay.  Now, if those figures on the right there for

2    five, ten and fifteen years of recidivism are no longer

3    accurate today, do we have figures that have replaced those?

4    **A.**  Yes, we have new, new probabilities of sexual reoffense

5    based on more contemporary samples of sex offenders released

6    in the '90s mostly.  And 2000.

7    **Q.**  And where do those new figures that you just described,

8    where do those come from?

9    **A.**  Those were provided in a presentation and on the website

10   of Dr. Carl Hanson who works for the Solicitor General of

11   Canada.  And so through the government organization, they

12   published this data.  This was initially released in

13   November of last year at a professional presentation.

14   **Q.**  And Dr. Hanson, is he the author of the Static-99?

15   **A.**  Yes.

16   **Q.**  I'm putting up on the screen here a chart.  And I just

17   ask you if you can identify this document for us?

18   **A.**  This document is what we call the new norms.  And these

19   are the new probabilities of sexual reoffense for each

20   cutoff score on the Static-99.  We can now have separate

21   probabilities of sexual rearrest for scores of zero to ten.

22   We used to only be able to determine different probabilities

23   from zero to six.  You see that on the old table.

24        But now these are the probabilities, not only for a

25   5-year prediction but if the individual has left the

1    community for ten years with a certain cutoff score, what

2    would be their probability of being arrested for a sex

3    offense.

4    **Q.**   So these numbers here, is it fair to say that these

5    numbers replace the numbers that are listed in the chart on

6    your Static-99 scoring sheet?

7    **A.**   That's right.

8    **Q.**   Okay.  Now, these new norms that I have up here on the

9    screen, have these new norms been cross-validated?

10   **A.**   Yes, those came from a new validation of the Static-99.

11   **Q.**   Okay.  And are there known error rates associated with

12   these new norms?

13   **A.**   Yes, yes.  Always with these probabilities of sexual

14   reoffense, if you apply them to someone not in the study,

15   their probability of sexual reoffense for any given cutoff

16   score would be somewhat above or somewhat below those

17   probabilities and those, what we call confidence intervals.

18   Those are available for all of these values.

19   **Q.**   And these new norms that are up on the screen here, have

20   they gained general acceptance within the psychological

21   community?

22   **A.**   Yes, I would certainly say so.  Dr. Hanson has advised

23   to replace the old probabilities with these new norms.

24   **Q.**   Okay.  You alluded to this earlier but I just want to be

25   clear.  So before Mr. Hunt, his score of 11, we could only

1    look at six plus; is that right?

2    **A.**   Yes.

3    **Q.**   Okay.   And now with these news norms, it looks like we

4    have numbers or scores that go up to ten?

5    **A.**   Yes.   These are calculated somewhat differently than the

6    old numbers.   And because of that we are able to break out 6

7    to 10 now where we were not before.

8    **Q.**   And can you just explain for us -- I will try to circle

9    it here -- what these samples are at the top?   It says,

10    "Routine CSC sample" and then it says, "Preselected

11    high-risk samples."   What do those mean?

12    **A.**   Yes.   The probabilities now associated with sexual

13    rearrest on the Static-99 are essentially anchored by two

14    samples, types of sex offenders.

15         One sample comes from the Correctional Service of

16    Canada.   And it's basically a large sample of sex offenders

17    that were in prisons in Canada and were subject to intensive

18    treatment.   They had a lot of rehabilitative programming in

19    Canadian custody.   And so they attended at least two years

20    of very intensive, all-day programming, not just sex

21    offender treatment.   Part of it was sex offender treatment

22    certainly but also additional treatment programs and things

23    like anger management and criminal behavior.   It was quite a

24    comprehensive treatment program.

25         Furthermore, these individuals to be in the program

1    needed to have appropriate conduct so they were generally

2    not troublemakers or violating rules.  And when they were

3    released to the community, they had a lot of human services

4    that were provided to them to help them adjust back into the

5    community, provide for residence, for jobs and for support

6    as they integrated back into the community.

7            And what we see from the sample, routine CSC sample

8    is that they have relatively low reoffense rates compared to

9    some other groups of sex offenders as a result.

10   **Q.**  And what is the other sample that's listed there, the

11   preselected high-risk samples?

12   **A.**  In validating the instrument this time and testing it on

13   the 17 samples they tested it on, they saw a number of

14   samples of sex offenders in certain jurisdictions that had

15   quite high reoffense rates.  Higher than average.

16           And so what they realized is that, you know, one

17   reoffense rate, for example, in five years with the score of

18   11 is not going to be as informative as breaking it down to

19   the type of offender you're evaluating and determining if

20   they were low or higher risk offenders.

21           So they identified five of the samples of sex

22   offenders that were, that had very high reoffense rates in

23   general if you averaged them all.  And these offenders had

24   some characteristics that made it not surprising that they

25   reoffended more often.  They were people who were kept --

1    identified as more dangerous offenders, for example, and

2    kept to their maximum date and not let out on good time.

3         They were individuals who were psychiatric

4    problems, developmental disabilities.  They were people who

5    were kept to their max dates sometimes because they were

6    violating so many rules in prison that they just kept them

7    in prison.

8         So these five samples were identified as high risk.

9    So now in interpreting the probability of future sexual

10   reoffense, the risk level for each cutoff score is anchored

11   by lower probabilities and higher probabilities with the

12   individual that you're evaluating likely having a range of

13   risk somewhere within, a level of risk somewhere within that

14   range, a low risk to high risk.

15        And that is how we report them now, not just one

16   number that we used to report.

17   **Q.**  So what is the significance, if any, of Mr. Hunt's score

18   of 11 on the Static-99?

19   **A.**  Well, the primary significance is how high it is.  It

20   only goes up to a 12.  A very, very small subset of

21   individuals will get a score of 11.  And that means having

22   so many of the risk factors present and they almost get the

23   total max score.

24        And we know that a score of six and above, 6 to 12,

25   is in the high-risk range.  So first we know it's a

1    high-risk sex offender on this actuarial instrument.

2    Q.   And looking specifically at the range of recidivism that

3    you explained based on these new norms, what do we know, if

4    anything, about the range of recidivism for someone like

5    Mr. Hunt with a score of 11?

6    A.   Well, that would be the highest probability for sexual

7    reoffense or quoted for the instrument.  That being for five

8    years sexual recidivism for the study sample, not for

9    Mr. Hunt but Mr. Hunt is similar to the study sample, of

10   34.9 percent to 50 percent in about five years probability

11   of being arrested for a new sex offense.  It goes up at ten

12   years to 49.7 or close to 50 percent, to 59.9, close to 60

13   percent.  And these are the highest probabilities for the

14   instrument.

15   Q.   Now, you just said that these probabilities are for

16   being rearrested for a sexual offense; is that right?

17   A.   Yes.

18   Q.   Okay.  Now, what about simply committing additional sex

19   offenses that go undetected?  Are those types of sexual

20   offenses captured within the norms that are on the screen?

21   A.   No, this would be probably truly of being arrested, not

22   thought to be offending, not questioned by police.  And we

23   know that most sex offenses go undetected.

24        We have studies if you asked offenders who are

25   convicted of an offense how many did you really do or molest

1    or rape, they report significantly more than that.

2           Survey studies of individuals in the community of

3    thousands and thousands of people demonstrate that most sex

4    offenses go undetected.  So these probabilities will be an

5    underestimate of the true risk for a sex offender to

6    reoffend.

7    **Q.**  And what information, if any, do we have about

8    undetected versus detected sex offenses that Mr. Hunt has

9    committed in the past?

10   **A.**  Mr. Hunt has reported many more victims than he was

11   detected for.  He was charged for 14 victims that never

12   resulted in adjudication.

13          So certainly in the case of Mr. Hunt there have

14   been undetected offenses that didn't result in adjudication.

15   **Q.**  Now, there are two different year or time spans here;

16   right?  There is a five-year and a ten-year?

17   **A.**  There is.

18   **Q.**  Okay.  And what are the recidivism rates for someone

19   with a score of 11 over a 10-year period?

20   **A.**  That would be 49.7 percent of being rearrested to 59.9

21   or 60 percent.

22   **Q.**  Dr. Phenix, did you rely on these norms in forming your

23   opinion in this case?

24   **A.**  Yes, I did.

25          **MS. SERAFYN:**  Your Honor, I'd like to move these

1    Static-99 Recidivism Tables, the new norms, into evidence.

2    I believe that a similar version has come in as Exhibit L

3    through Dr. Rosell but I think that these are a lot easier

4    to understand and interpret and Dr. Phenix has relied on

5    these.

6              **THE COURT:**  Any objection?

7              **MR. GOLD:**  I don't have -- no objection, Your

8    Honor.

9              **THE COURT:**  All right.  They come in.

10             **THE CLERK:**  That number is that?

11             **THE COURT:**  Next in order.

12             **MS. SERAFYN:**  Can we do Exhibit P?

13             **THE CLERK:**  Sure.

14             **(Government's Exhibit No. P received in evidence.)**

15   BY MS. SERAFYN

16   **Q.**  Now, Dr. Phenix, are you familiar with an article by

17   Dr. Hanson entitled, *"Does Static-99 Predict Recidivism*

18   *Among Older Sexual Offenders"*?

19   **A.**  Yes.

20   **Q.**  Okay.  And are you familiar with this chart (indicating)

21   from that article?

22   **A.**  Yes.

23   **Q.**  Okay.  Now, we have seen this chart a lot in the last

24   couple of days.  And my question for you is how do the new

25   norms that we were just looking at that are Exhibit P, how

1     do those new norms sort of jibe with the norms that we have

2     here for someone who scores high on the Static-99 and is 60

3     and older?

4     **A.**   Well, they don't jibe.  First of all, this sample is

5     much smaller than the current norms.  So this -- these

6     calculations looking at low-, medium- and high-risk sex

7     offenders according to age groups needs to be replicated

8     with the new data, which is a much bigger sample.  It will

9     be as a result more informative than this is.

10             When you look at, characteristically only about ten

11    percent of large groups of sex offenders are in the

12    high-risk range.  So for samples like this, there is only a

13    handful of offenders who are in the 60 and older age group

14    who have a high score on the Static-99.  There is 11.  And

15    some of those were individuals who raped, not individuals

16    who child molested.

17             So this data is not as informative as it would be

18    if we had larger samples, which we ultimately will have but

19    that information isn't available at this time.

20    **Q.**   Can you just remind us, how many sex offender

21    evaluations have you done in your career?

22    **A.**   Oh, probably about 500.

23    **Q.**   And how many evaluations have you done of those 500

24    where you scored the Static-99?

25    **A.**   Probably 250.

1   **Q.**  And of those 250 how many times have you seen a score of

2   11?

3   **A.**  It's rare.  I rarely see a score of 11.

4   **Q.**  Now, in addition to the Static-99, I think you testified

5   that you also scored the Static-2002; is that right?

6   **A.**  I did.

7   **Q.**  And why did you score Mr. Hunt on the Static-2002?

8   **A.**  Well, each of these three instruments have somewhat

9   different items.  They have some similar items.  They have

10  some different items.

11          And so what I look for is converging evidence.  If

12  I get one instrument that says high risk or low risk, I am

13  going to look at other validated instruments with similar

14  predictive accuracy to see if they agree.  And if they don't

15  agree, then I want to look and see perhaps why.

16  **Q.**  What's the difference between the Static-99 and the

17  Static-2002?

18  **A.**  Well, first of all, there is a number of new items added

19  to the Static-2002.  And the Static-2002 is divided up into

20  categories that are meaningful.  It's not just a list of ten

21  risk factors associated to sexual reoffense but it's risk

22  factors in categories that make it a little easier to

23  understand where the risk is coming from.

24          For example, there is a category of persistence of

25  sex offending.  And that would be more applicable to

1   actually someone like Mr. Hunt who has been a long-time

2   persistent sex offender or sexual specialist.

3         There is a category for criminality.  And then you

4   can see when you score the Static-2002 are they loading on

5   mostly just being a criminal, criminality factors, or are

6   they loading on the sexual deviance factors which tend to be

7   more persistent over time.

8   **Q.**  And has the Static-2002 been cross-validated?

9   **A.**  Yes, it was validated on eight international samples.

10  **Q.**  And are there known error rates associated with the

11  Static-2002?

12  **A.**  Yes, there are.

13  **Q.**  Okay.  And has the Static-2002 gained general acceptance

14  within the psychological community?

15  **A.**  Yes.  It's new but it's beginning to be widely used.

16  **Q.**  And what is the range of scores that an individual can

17  receive on the Static-2002?

18  **A.**  Zero to 14.

19  **Q.**  And what score did Mr. Hunt receive on the Static-2002?

20  **A.**  A score of ten.

21  **Q.**  I'd like to show you what has been marked as Exhibit 27

22  or what is Exhibit 27 in evidence.

23        I'm just putting it up on the screen here.

24        Do you recognize this (indicating)?

25  **A.**  Yes, the scoring sheet for the Static-2002.

1    **Q.**   Okay.  And it's two pages; right?

2    **A.**   Yes.

3    **Q.**   Okay.  Now, you recently noticed a mistake on the 2002

4    scoring; is that right?

5    **A.**   Yes.

6    **Q.**   Okay.  And can you just tell us what that mistake was?

7    **A.**   It was a conversion mistake.  So instead of, I counted

8    up five points on the criminality factors.  This page is the

9    criminality factors, five points, and put a five in there

10   instead of a three.

11          And if you look at the conversion, you should take

12   a score of five or six on this, that would be a lot of

13   criminality.  It should be a total risk score of three, not

14   five.

15   **Q.**   Okay.  So originally -- and I'm just putting your

16   original Static-2002 scoring sheet down.

17          For the general criminality section you had come up

18   with five and you just wrote the number five down here;

19   right?

20   **A.**   Right.

21   **Q.**   And you came up with a total score of 12?

22   **A.**   Yes.

23   **Q.**   Is that right?

24   **A.**   Yes.

25   **Q.**   But now after you noticed your error, you changed the

1    five to a three and the score of 12 to a 10; is that right?

2    **A.**  Yes.

3    **Q.**  Okay.  Now, what's the significance, if any, of a score

4    of ten on the Static-2002?

5    **A.**  Well, a score of nine and above is in the high-risk

6    range.  So, again, this is consistent with the Static-99 in

7    terms of now two instruments saying he's high risk for

8    sexual rearrest.

9    **Q.**  And does the Static-2002 have recidivism norms

10   associated with it just like the norms we were looking at

11   for the Static-99?

12   **A.**  Right.  They would be the same norms, right.

13   **Q.**  Now, when you say they're the same norms, are they the

14   exact same numbers or do you just mean that they also have

15   norms?

16   **A.**  It wouldn't be the exact same numbers unless it was the

17   exact same test so because it's a different test, it's still

18   based on the same norms, samples of CSC lower risk and high

19   risk.  So it's still those groups of low risk and high risk

20   but the numbers will be different because it's a different

21   instrument.

22   **Q.**  So I'm putting a document here on the screen.  Are these

23   the norms for the Static-2002?

24   **A.**  Yes.

25   **Q.**  Okay.  So given Mr. Hunt's score on the Static-2002,

1    what are the recidivism rates associated with, I think I

2    have a 12 highlighted there but now you said that his score

3    is an 11?  I mean, I'm sorry, a 10?

4    **A.**  A 10, yes.

5    **Q.**  Okay.  So what are the recidivism rates associated with

6    a score of ten on the Static-2002?

7    **A.**  25.4 in 5 years to 37.8 probability of sexual rearrest.

8    And for ten years, 30.5 to 45.5 percent.

9        **MS. SERAFYN:**  Your Honor, I'd like to move these

10   norms for the Static-2002 into evidence as Exhibit Q.

11       **MR. GOLD:**  No objection.

12       **THE COURT:**  Okay.

13       **(Government's Exhibit No. Q received in evidence.)**

14   BY MS. SERAFYN

15   **Q.**  Now, Dr. Phenix, in addition to the Static-99 and the

16   Static-2002 you scored one other actuarial instrument; is

17   that right?

18   **A.**  Yes.

19   **Q.**  And what instrument was that?

20   **A.**  The Mn-SOST-R.

21   **Q.**  And why did you score the Mn-SOST-R in addition to these

22   tow other actuarials?

23   **A.**  It's very well established in the field, it's been used

24   for a long time and that has moderate predictive accuracy.

25   It has different items than the other two instruments so,

1    again, I'm looking at converging evidence.

2    **Q.**  And has the Mn-SOST-R been cross-validated?

3    **A.**  Yes, it has.

4    **Q.**  And are there known error rates associated with that

5    instrument?

6    **A.**  Yes.

7    **Q.**  And has the Mn-SOST-R gained general acceptance in the

8    psychological community?

9    **A.**  Yes.

10   **Q.**  Okay.  So how is the Mn-SOST-R similar to or different

11   from the two Static instruments?

12   **A.**  Again, there are some static factors here that you don't

13   see on the other instruments.  For example, has an offender

14   ever committed his offense in a public place.  This would

15   tap in to how risky the person is.  If they do it outside

16   their home, they're more likely to get caught.

17          It looks at the breakdown of various age groups.

18   We have multiple age groups that you offend against, the

19   score would be higher.  So it's looking at some different

20   items.

21          There is also four items that they consider dynamic

22   or changeable items.  So this is the combination of static

23   risk factors 12 with four more changeable or dynamic risk

24   factors.

25   **Q.**  I'd like to show you what has been admitted into

1    evidence as Exhibit 28.  Is this your scoring sheet for the

2    Mn-SOST-R?

3    **A.**  Yes.

4    **Q.**  Okay.  And what score did Mr. Hunt get on that

5    Mn-SOST-R?

6    **A.**  A 14.

7    **Q.**  And what's the significance, if any, of a score of 14 on

8    this instrument?

9    **A.**  That's in the range that we call refer.  The scores on

10   his instrument for low risk would be plus three and below, a

11   medium risk of four to seven, a high risk would be eight and

12   above.  And then there is a category 13 and above called

13   refer.  And in Minnesota this is the cutoff that if they

14   receive a score of 13 or above, they would be automatically

15   referred for evaluation for their sexually violent predator

16   law.

17   **Q.**  And aren't there percentages of sexual recidivism

18   associated with this instrument just like the ones that we

19   saw for the Static-99 and the Static-2002?

20   **A.**  Yes, there is old -- again, these have changed.  There

21   is old percentages and new percentages based on a newer

22   sample of inmates in the Department of Corrections in

23   Minnesota.

24   **Q.**  And what percentages are associated with a score of 14

25   on this instrument?

1    **A.**   The older percentages would be for a sample that was not

2    subject to intensive community supervision.  That would be

3    72 percent probability of sexual rearrest in six years.

4         The more contemporary samples which measure a

5    six-year period but it's for offenders who have been subject

6    to intensive community supervision are lower, they're about

7    40 percent probability of sexual rearrest in six years.

8         So you would consider for the period of time the

9    offender is on community supervision to have that lower

10   probability of about 40 percent and when that community

11   supervision is lifted or ends, then you would consider the

12   true risk to be the original probability, the 72 percent.

13   **Q.**   So we've talked a lot about these three different

14   actuarial instruments that you scored here.  So I just want

15   to sort of sum up on the actuarial instruments.  What do all

16   of these three different actuarial instruments tell us in

17   this case about, Mr. Hunt?

18   **A.**   That he's a high-risk sex offender if released.

19   **Q.**   Dr. Phenix, I want to move on to what you discussed in

20   your report as dynamic factors.  Can you just explain for us

21   what dynamic factors are?

22   **A.**   These are the factors that are changeable.  You can

23   reduce them.  And if you reduce them, you reduce the

24   person's overall risk.  And so these would be treatment

25   targets.  In sex offender treatment programs these factors

1    should be addressed so that the person has lower risk once

2    released.

3    **Q.**  And where do these dynamic factors come from?

4    **A.**  They came from a very large study called the Dynamic

5    Risk Project.  It was a study that examined offenders who

6    had been released to the community in all of Canada, Iowa

7    and Alaska.  And the individuals who reoffended while on

8    community supervision were evaluated to determine what

9    factors were present that increased their risk to reoffend

10   once released from community supervision.  And these were

11   the factors that -- most of the top of them had the best

12   predictive ability.

13   **Q.**  So if you look at the actuarial instruments and

14   determine that Mr. Hunt is a high-risk sex offender if

15   released, why don't you just stop there?

16   **A.**  Because today we would look at the dynamic risk factors

17   to try to help make a determination within the range of risk

18   on the Static-99 and Static-2002 where he would fall.

19        We know what his cutoff score is.  We know that

20   there are probabilities associated with reoffense but we

21   have a range.  It could be in the lower range or it could be

22   in the higher range for that cutoff score.

23        And the more dynamic risk factors are present for

24   him would make him more like the higher-risk group and the

25   less that are present would make him more like the

1   lower-risk group.

2   **Q.**  So when you say that you're looking to see where he fits

3   within the range, do you mean -- and I'm just putting back

4   up on the screen Exhibit P, the Static-99 recidivism

5   tables -- do you mean that you're trying to determine where

6   he fits within this range here that I circled?

7   **A.**  Exactly, like the lower-risk or like the higher-risk

8   offender.

9   **Q.**  And which dynamic risk factors did you consider in this

10  case?

11  **A.**  Well, it was a little bit difficult for me to consider

12  all the factors since I haven't had an interview with

13  Mr. Hunt and I don't know his current circumstances in terms

14  of his release plan.  But I did consider the presence of

15  social support in the community, who does he have to help

16  him readjust to the community under such a limited time.

17  Offenders with more social support do better.  They offend

18  less often.

19          And I was able to ascertain about that that he

20  apparently has two adult daughters and that he has had

21  contact with one of his daughters.  But because I haven't

22  interviewed him, it's really difficult for me to know if he

23  has an adequate release plan.

24  **Q.**  So it sounds like you considered this social support as

25  a dynamic factor.  But how does that affect Mr. Hunt's risk,

1    if at all?

2    **A.**   Well, individuals who have more stability once they're

3    released to the community, people -- in the past if you look

4    at many offenders, it is who they associate with in the

5    community and if they associate with people who use drugs

6    and alcohol, individuals who have criminal pasts,

7    individuals who maybe don't know their criminal history and

8    their sex offending history, therefore, they can't provide

9    some help and protection.  They may bring their kids over to

10   babysit and not knowing that the individual is a sex

11   offender.

12        So if the individual has supportive people in the

13   community who know their history and can help them to adjust

14   back to the community and to prevent loneliness and

15   rejection, some of the negative emotional experiences that

16   can trigger sex offenders to reoffend, if they have that

17   positive support, then they will -- those offenders will

18   have lower risk of sexual reoffense.

19   **Q.**   But do you know -- do you have any information about

20   social support that Mr. Hunt might have other than the

21   daughter that you mentioned that he has contact with?

22   **A.**   Nothing.

23   **Q.**   And do you have any information on the level of contact

24   he's had with that daughter?  For example, has she visited

25   him in prison?

1   **A.**  I have no reliable information on that.

2   **Q.**  Okay.  What other dynamic factors do you consider other

3   than social support?

4   **A.**  One factor that I kind of do have more information on is

5   intimate, what we call intimacy deficits.

6   **Q.**  And what are intimacy deficits?

7   **A.**  That would be individuals who have had difficulty

8   establishing or maintaining meaningful longer-term

9   relationships in the community, intimate relationships.

10          Offenders we know from the Static-99 who have a

11  live-in relationship for longer than two years are lower

12  risk and offenders who have options, for example, outside of

13  molesting children or intimacy are going to be lower risk.

14          So for Mr. Hunt, he said from early on that he

15  wasn't sexually aroused to women, that he engaged in that

16  activity to be more socially acceptable.  It wasn't a good

17  source of meeting his intimacy needs.

18          He was gone frequently from that relationship.  It

19  was on and off.  It was turbulent.  So it didn't really

20  serve his intimacy needs.  And so what he turned to, this is

21  particularly from 1991 to 1985, was to have all of his

22  intimacy needs met by prepubescent and post-pubescent boys

23  on a constant constant basis.

24          And we see a good deal for him of another aspect of

25  intimacy deficits and that is emotional identification with

children.  So he doesn't have arousal to an appropriate

partner.  He then turned for years to an inappropriate

partner.  And, furthermore, he lived his life around those

children.  He was consumed with them.

He not only had sexual activity with them but all

of his activities were activities involved with kids.  When

he became a karate instructor, that's a place that he sought

a lot of victims.  That he would have motorcycles and these

boys would be interested.  He would take them all kinds of

places, to Astroworld or Disneyland or places that the kids

would enjoy.

So his whole life was like a child's life

essentially.  And all of his associations, rather adult

associations, were children.

And so this emotional identification with children

is this just another marker of having significant intimacy

deficits.

I don't see anything that has really changed for

Mr. Hunt over the years other than time passed with

incarceration that will help him to establish appropriate

relationships and maintain them.  He's never done that in

his life.

**Q.**  Any other dynamic factors that you considered here?

**A.**  Well, I considered the extent to which problems with

sexual self-regulation might still be present or perhaps

1    mitigated (ph.) by his age and by length of time that he has

2    been incarcerated.

3    **Q.**  And what was your opinion about Mr. Hunt's ability for

4    capacity for sexual self-regulation?

5    **A.**  Well, we know that it was dismal prior to 1995 when he

6    went into custody.  This is a person who spent all day every

7    day engaging in sexual activity, voyeuristic activity,

8    viewing children having sex, making child pornography.  He

9    was consumed with that.

10          So in his 40s this is a person who was highly

11   sexually preoccupied.  Research would indicate that

12   individuals who sex offend have, tend to have higher libido,

13   higher sex drives than normal men.  And certainly we saw

14   this in the case of Mr. Hunt.

15          So he was so highly sexually preoccupied in his

16   40s.  The question would be to what extent has that

17   persisted for him over time.

18          We know with males as they age that there are

19   gradual reductions of testosterone associated with gradual

20   reductions in libido and sexual interest.  It certainly

21   doesn't go away but it may decrease over time.

22          So it is plausible that currently Mr. Hunt has less

23   sexual preoccupations certainly than he did in his 40s in

24   the community.  But he was so overwhelmingly preoccupied at

25   that time, you know, I still have concerns once he's

1    released to the community that he may still be engaging, for

2    example, in the use of child pornography.  He is very

3    proficient on the computer, or feeling the need to seek out

4    children again.

5    **Q.**  And are there other dynamic factors that you considered?

6    **A.**  I considered his cooperation with supervision.  This is

7    a kind of double-edged sword for Mr. Hunt.  He again has had

8    violation of probation.  He has jumped bail right before he

9    was finally arrested and apprehended for his most recent sex

10   offense in the community.  So he does not have a good

11   history of cooperation with supervision in a community when

12   he's been released.

13        On the other hand, while in custody he has had very

14   few violations of custodial rules and so that would be

15   positive.  Unfortunately when he did have a violation of

16   custodial rules, it was a sexually-related violation where

17   he had in 1997 pictures of -- or 1998 pictures of boys

18   secreted away in a file on his computer, under a file under

19   his name Wayne.  And there were these suggestive pictures or

20   pictures that could clearly be used for masturbatory

21   purposes.

22        So while he has not violated significant rules and

23   has had good work components and been productive in prison,

24   there is still indications, at least with that violation, at

25   least ten years ago, that there were, are concerns that he

1    remains sexually preoccupied.

2    **Q.**  I think you listed one more dynamic risk factor in your

3    report, general self-regulation.  Is that a factor that you

4    considered?

5    **A.**  It is a factor that I considered.  That would be the

6    individual's ability to control his impulsivity.  And in

7    this case I've talked about my opinion that Mr. Hunt was

8    highly impulsive in the community in terms of seeking out

9    victims for sexual molest and highly impulsive in terms of

10   absconding very quickly away from any kind of supervision.

11        So generally with age impulsivity goes down.

12   That's what one would expect.

13        On the other hand, he has not been released to the

14   community to really know to what extent he has better

15   controls over his behavior.  If you look at his

16   institutional behavior, certainly he has not -- there have

17   not been signs of troubling impulsivity within the

18   institution.  But being in the community is quite different.

19        And, furthermore, problem solving skills, good

20   judgment is another component of this risk factor.  He in

21   the past, as we know, has exhibited poor judgment in terms

22   of continuing to reoffend and the risky behavior that he has

23   engaged in.

24        He's had -- what's changed since he's been

25   incarcerated?  There have been some very, some individual

1    treatment.  I have ten visits with a psychiatrist in prison

2    in the early '90s.  And then he engaged in a six-month

3    treatment program in custody for sex offenders.

4         So I guess the question is the extent to which he's

5    benefited from that treatment, that it's helped him to have

6    better judgment about his behavior and his choices that he

7    makes when left to his own devices.

8         I didn't interview him and I haven't interviewed

9    treatment providers so it is difficult for me to know that.

10   Q.  So now that we know that Mr. Hunt has many of these

11   empirically validated dynamic risk factors, what does that

12   tell us about Mr. Hunt's overall risk?

13   A.  Right.  I think Mr. Hunt, based on his presence of so

14   many risks factors, based on having a number of dynamic risk

15   factors is similar because of that to the higher-risk

16   sample.  However, he also has some characteristics of the

17   lower-risk sample and so I needed to consider that when I

18   placed him within the range of risk.

19   Q.  And when you talk about that range of risk, again, are

20   you talking about those norms that are admitted as Exhibit P

21   for the Static-99?

22   A.  Right.  Exactly.  For example, is he closer to the

23   sample that had a 49 or 50 percent reoffense rate or is he

24   closer to the high-risk sample that had about a 60 percent

25   reoffense rate in ten years.

1   **Q.**   So based on the dynamic factors that you just described,

2   are you adjusting Mr. Hunt's risk outside of these numbers

3   or within the range?

4   **A.**   No, I would not adjust them outside.  It's definitely

5   within the range that I would adjust them in.

6   **Q.**   Now, in addition to the dynamic factors in your report,

7   you also mentioned something called protective factors; is

8   that right?

9   **A.**   Yes.

10   **Q.**   And what are protective factors?

11   **A.**   Those are factors that if present could reduce the risk

12   of a future sexual reoffense.

13   **Q.**   And are protective factors different from the dynamic

14   factors that you testified about?

15   **A.**   Yes.

16   **Q.**   And what are the protective factors that you considered

17   here?

18   **A.**   Well, the factors that was most important to the

19   protective factors, one would be has he been in the

20   community, for example, am I looking at a person on

21   community supervision.  If he's been in the community for

22   ten years offense free, then he would have half the risk

23   from the day that he was released.

24          So I look at how long he has been in the community

25   offense free.  That doesn't pertain to Mr. Hunt because he

 1     hasn't been released to the community to be offense free.

 2          But the factor that's most important in terms of

 3     protective factors would clearly be his age because of the

 4     research that says for an older offender that the risk of

 5     sexual reoffense may be reduced.

 6     **Q.**  So it sounds like you considered Mr. Hunt's age as part

 7     of your evaluation in this case; is that fair?

 8     **A.**  Yes.

 9     **Q.**  Why did you consider Mr. Hunt's age?

10     **A.**  Because there are a number of studies now, nine or ten

11     studies that have looked at aging and sex offending and

12     have -- they have differing findings but a collection of

13     them demonstrate that with age offenders who rape,

14     extrafamilial child molesters have reduced rates of sexual

15     reoffense.

16     **Q.**  Now, are there any leading researchers in the area of

17     age as it relates to sexual recidivism?

18     **A.**  Oh, yes.

19     **Q.**  Okay.  And can you give us an idea of some of those

20     leading researchers?

21     **A.**  Dr. Carl Hanson, Dr. David Thornton, Dr. Barbaree,

22     Dr. Langton.  There is a number of them that have been doing

23     recent research on age.

24     **Q.**  And what, if anything, does Dr. Hanson, the author of

25     the Static-99, tell us about age as it relates to sexual

1    recidivism?

2    **A.**   Dr. Hanson did the first age study in 2002 that showed

3    for all sex offenders that with age there was a reduction in

4    sexual reoffense.

5    **Q.**   Now, you referenced earlier nine or ten studies that

6    have been done on age.  Have these studies been published?

7    **A.**   Almost all of them have been published.  There is a

8    couple in press but they're available.

9    **Q.**   And have these studies been peer reviewed?

10   **A.**   Yes.

11   **Q.**   And can you give us a general sense of what these nine

12   or ten studies on age tell us?

13   **A.**   Well, there is a number of studies that show a similar

14   trend, reduction in sexual reoffense over the lifetime

15   essentially.  So they'll -- in all of this research there is

16   a particularly risky group and that would be the one

17   measured on the Static-99 under 25 years of age.  It's a

18   particularly risky group.

19          But after that, into the 30s and thereafter, from

20   the 30s the sexual recidivism with each discrete age group

21   tends to be lower, was significantly lower reoffense rates

22   after age 60, although based on very small samples of sex

23   offenders.

24          So that's one general finding.  That's been

25   replicated, for example, Dr. Barbaree replicated that study

1    that Dr. Hanson conducted.  And there have been a few other

2    studies with similar findings.

3            There are, however, different findings in different

4    studies.  For example, there is a study -- and I think it's

5    particularly pertinent to this case for Mr. Hunt -- and that

6    is a study that looked at a large group of sex offenders,

7    over 7,000 sex offenders reoffending as they age.

8            And they divided the group into offenders who

9    reoffended primarily because they're antisocial or criminal,

10   they tend to have less sex offenses but more versatile

11   criminal background, that group versus the sexual

12   specialists.  And they divided it by number of prior

13   sentencing occasions for sex offenses.

14           So if there is one sentencing occasion, one-time

15   sex offense, they looked at the recidivism rate for that and

16   those with two sex offenses and those with three sex

17   offenses in the past.

18           And they found that those sexual specialists, those

19   with three sex offense adjudications in the past tended to

20   have maintained their risk through the middle years.  So

21   instead of this decrease in recidivism for every advancing

22   age group, they found with criminal offenders that's exactly

23   what happened.  Those were the one prior -- one sex offense.

24   They reduced their risk over age.  But those sexual

25   specialists with, like Mr. Hunt with three sex offenses

1    maintain about a 50 percent reoffense rate throughout their

2    middle years for the 30s through age 59.

3          So they identified that not every offender sees

4    this significant reduction in risk for sexual reoffense by

5    reason of age.

6          There are no replications of that study yet.  But

7    it was informative about offenders who are sexual

8    specialists.

9          Then there is a final group of researchers, well

10   known, Harris and Rice out of Canada, who advised to have no

11   reduction with age in terms of risk for sexual reoffense and

12   found that the risk factor that was most predictive was age

13   at first sex offense.  And they deny that the aging process

14   of a sex offender is predicative of future sexual reoffense.

15         So there is three camps, if you will.

16   **Q.**  And just referring to the last camp that you mentioned

17   that advocates not reducing age or, I'm sorry, that

18   advocates not reducing the recidivism as age increases, is

19   that a camp that you followed here in this case?

20   **A.**  No.  I have reviewed the research but I do believe that

21   there is sufficient evidence that there is some reduction in

22   risk for reoffense that should be considered outside of the

23   actuarial for advanced age.  And we consider 60 and over in

24   terms of this research.

25         So I did consider a reduction of risk based on age.

**Q.**  And I want to go back to sort of the second camp that
you were talking about.  You said that there was an age
study that you felt was most relevant to Mr. Hunt's case.
Which study is that?

**A.**  That would be the Thornton, et al, study.

**Q.**  Okay.  And why do you think that that study is the most
relevant to Mr. Hunt?

**A.**  Because I think there really are more than two but
certainly two distinct groups of sex offenders.  If you look
at large groups of sex offenders, most of them are low to
moderate risk.  Most of them have low to moderate scores on
actuarial instruments.  And most of them are one-time sex
offenders.

          And one -- a sex offense happens for a variety of
reasons.  You know, if someone is robbing houses and they
fall upon a woman in the house and decide to rape her, this
isn't a person with a mental disorder that drives him to do
that.  He just takes what he wants when he wants it.

          And so those offenders are not compelled by
fantasies and urges or deviant arousal and, hence, not
likely to repeat that as a sexual specialist would.

          A person who experiences these fantasies and urges
but do not remit from them, that have compelled them time
and time again irregardless of the sanctions, the punishment
to continue in that behavior.

1              And so I think that it's valuable research to

2      demonstrate reoffense differences for different types of sex

3      offenders and not to kind of naively lump them all together

4      as if they're all the same.

5      Q.  Now, the study that you're referring to by David

6      Thornton, is it a study entitled, "*Age and Sexual*

7      *Recidivism, A Variable Connection*"?

8      A.  Yes.

9      Q.  From the *Journal of Research and Treatment*?

10     A.  Yes.

11     Q.  And this a study on which you relied in forming your

12     opinion in this case?

13     A.  Yes.

14     Q.  Now, Dr. Phenix, are you aware, you know, we've heard a

15     lot over the past two days about offenders who are 60 and

16     above.  And it seems like 60, age 60 has been thrown out as

17     a sort of cutoff score.

18              Are you aware of any sex offenders over age 60 who

19     have reoffended?

20     A.  Sure.

21     Q.  And where does that knowledge or information about

22     offenders over age 60, where does that come from?

23     A.  Well, several places.  I have had cases of offenders who

24     are over 60 when they reoffended, familial child molest.

25              But, furthermore, if you look, for example, the

1    first age study we had by Hanson in 2002, if you look at the

2    sample 60 and over, there was 131 subjects in that age group

3    60 and older.  And five of those subjects reoffended.  This

4    is the mixed group of sex offenders, rape and child molest.

5            Five subjects over 60 reoffended in that sample.

6    And they were all individuals who committed child molest.

7    The oldest offender was 72.

8    **Q.**  And are you familiar with Dr. Howard Barbaree?

9    **A.**  Yes.

10   **Q.**  Okay.  And are you familiar with an article that he

11   wrote or a chapter that he wrote in a book called *Sexual*

12   *Deviance*?

13   **A.**  Yes.

14   **Q.**  And the chapter that Dr. Barbaree actually coauthored is

15   called *Sexual Deviance Over the Lifespan*?

16   **A.**  Yes.

17   **Q.**  And in that chapter there is a chart.  Are you familiar

18   with this chart from that chapter by Dr. Barbaree?

19   **A.**  Yes.  This is the chart from the 2002 Hanson first age

20   study.  He just took it out of that study and put it in this

21   chapter just to demonstrate that trend reduction with age

22   with sexual reoffense.

23   **Q.**  And I have highlighted some portions of this chart here.

24   Can you just explain for us what this is showing in the

25   highlighted section here (indicating) from the age category

1   of 60 to 69 to 70 plus?

2   **A.**   Right.   These are curves of reoffense for different age

3   categories.   And if we look at the applicable one here, that

4   would be the extrafamilial child molest.   And they have the

5   highest reoffense rates throughout their lifetime.   As you

6   can see, it's the top, the top three offense rate.

7        And on the left we have the recidivism rates.   So

8   they start out at a very young age with recidivism rates

9   from 20 to 25 percent.   And that gradually reduces over

10  time.

11       And then we get to age 60, to age 70 where you see

12  that line going down to essentially zero recidivism.   This

13  is, by the time they get to age 60, there is a small sample,

14  there is 131 sex offenders still left.   They're a mixed

15  group of child molest and rape.   And you can see that their

16  recidivism rate goes from about 5 percent or 7 percent down

17  to zero at age 70 when the study is -- when there are no

18  sufficient group of sex offenders to study after age 70.

19  **Q.**   And there is another chart on the next page of

20  Dr. Barbaree's chapter.   Are you familiar with this chart

21  here (indicating)?

22  **A.**   Yes.

23  **Q.**   Okay.   And what does this chart show?

24  **A.**   This chart shows essentially the same thing.   You can do

25  a statistical analysis that takes lines that curve and make

1    an average so it's a straight line.

2         And so it takes that same data that we saw and

3    shows that throughout the lifespan from age 30 up to age 70

4    for this sample, individuals who child molest, rape and

5    incest offenders, that all of them showed reductions over

6    time in sexual reoffense.  These are large groups of sex

7    offenders.

8    **Q.**  So it looks to me from what I have highlighted here that

9    for child molesters between the age of 30 and 40 the line is

10   certainly going down; is that right?

11   **A.**  Yes.

12   **Q.**  Okay.  Which means that recidivism is decreasing for

13   child molesters between the ages of 30 and 40; is that fair?

14   **A.**  Yes, it certainly is.  Extrafamilial child molesters

15   like Mr. Hunt.

16   **Q.**  And in what year was Mr. Hunt born?

17   **A.**  He was born in 1946.

18   **Q.**  And how old was Mr. Hunt between 1982 and 1985?

19   **A.**  Mid 30s to 40.

20   **Q.**  So if he was born in 1946, in 1986 he would have been

21   40; right?  So between 1982 and 1985 he was about 36 to 39

22   years old; is that right?

23   **A.**  That's right.

24   **Q.**  Okay.  Now, what, if anything, do we know about Mr. Hunt

25   and his sexual activities between 1982 and 1985 when he was

1    between 36 and 39 years old?

2    **A.**  Well, he was sexually offending daily.

3    **Q.**  So if we were to plot Mr. Hunt specifically on this

4    chart here, where would his sexual recidivism line be drawn?

5    **A.**  It would have persisted, just like the Thornton study,

6    through the middle.  He would look like an individual who

7    through the middle years there would not be a reduction in

8    recidivism rate.  It would have been, maintained itself

9    consistently.

10   **Q.**  I'd like to show you another chart on the next page of

11   that chapter authored by Dr. Barbaree.  Are you familiar

12   with this chart?

13   **A.**  Yes.

14   **Q.**  Okay.  And this chart looks very similar to me to the

15   one I just had up.  What does this chart show us?

16   **A.**  This chart shows a collection of studies.  Remember I

17   said there were about ten studies and a number of them have

18   looked at age of release and found reductions in recidivism

19   risk for larger groups of sex offenders.

20          And he's simply plotted one on top of the other to

21   show that this trend is similar for all of these studies.

22   **Q.**  So, again, if we were to plot Mr. Hunt specifically on

23   this chart between the ages of about 30 and 40, which I've

24   marked off there (indicating), where would his line showing

25   his sexual recidivism, where would that be plotted?

1    **A.**   He's not on here so it would go across, straight across

2    to where that arrow is.   It wouldn't be going down.   It

3    would just stay consistently like the table in the Thornton

4    study that showed the persistence across the lifespan, at

5    least till the time that he was put in custody.

6    **Q.**   Now, Dr. Phenix, are you aware of any research regarding

7    the use of actuarial instruments with men over age 60?

8    **A.**   Sure.   Yes.

9    **Q.**   Okay.   And what does the research say, if anything,

10   about applying actuarial instruments to men over 60?

11   **A.**   Well, there is not actually a true age cutoff that says

12   yea or nay to use actuarial instruments.   But the research

13   is different for different instruments.

14           For example, for the Static-99, an offender who is

15   over 60 may not capture a reduction in risk if you look just

16   at the probabilities.

17           So, in other words, for no matter what the age of

18   the offender, the cutoff score is accurate and the risk

19   level is accurate.   So an offender who is 70 and has a high

20   risk on the Static-99 is truly high risk compared to an

21   offender who is 70 but has low risk on the Static-99.

22           So the relative risk ranking is going to be

23   accurate for any older age offender.   What will be reduced

24   likely -- and I think we'll see this in the new data when it

25   comes out -- is that the probabilities associated with

1   reoffense are going to be lower than those probabilities

2   that you see listed.  So risk level will be accurate but the

3   probability of sexual rearrest for an older offender 60 or

4   over, 70 or over will be somewhat lower.

5   **Q.**  And when you say "risk level," you mean low, moderate,

6   high?

7   **A.**  Correct.  That will be accurate irregardless of age.

8   **Q.**  Okay.  Now, in your professional opinion can actuarial

9   instruments be used reliably to assess sexual recidivism for

10  men over age 60?

11  **A.**  Yes, yes, because relative risk is accurate.

12  **Q.**  Now, you said that you were familiar with Dr. Barbaree.

13  Are you familiar with a theory of Dr. Barbaree's that you

14  can reduce or you should reduce recidivism levels for men

15  over 60 by a certain percentage or formula for each year

16  above age 60?

17  **A.**  Yes.

18  **Q.**  Okay.  And do you believe that this theory has support

19  in the research?

20  **A.**  No.

21  **Q.**  Okay.  And why don't you think this theory has support

22  in the research?

23  **A.**  Well, I think there is a -- I think there is some

24  reasonable application of that.  I just don't think that

25  it's applicable in a particular case because he's looking at

1    large groups of sex offenders and he's taking averages of

2    reductions of risk from a large group of sex offenders.

3            But I'm looking at a case, a person who has a

4    complex history, who has some expression of mental disorders

5    in combination, maybe multiple mental disorders, who has

6    paraphilias that may be much more severe than another

7    person.

8            So to say that they, that I can figure out their

9    risk based on their age by some formula, I think really -- I

10   don't think we are in a place really to do that.  Every case

11   is different.

12           And that's one thing Dr. Thornton's research

13   showed, is that there were sexual specialists whose risk

14   maintained throughout their middle years and another group

15   that the risk came down.  Unless I look at the case, I don't

16   really know which group that person fits into.  And I think

17   you can make serious mistakes in risk assessment by

18   ascribing to a formula as if everybody is just the same.

19   **Q.**  So it sounds to me like everything you have testified

20   about with respect to age indicates that you did consider

21   Mr. Hunt's age a mitigating factor in this case; is that

22   fair?

23   **A.**  Yes.  Yes, I do.

24   **Q.**  So if you considered Mr. Hunt's age a mitigating factor

25   in this case, why is it or how is it that you have opined

1    that he would have serious difficulty in refraining from

2    sexually violent conduct or child molestation if released?

3    **A.**  Well, because his age does not erase his risk.  He is an

4    individual who may have a modest reduction in my opinion in

5    his overall risk and I would ascribe closer to those

6    lower-risk sample probabilities rather than the higher risk.

7         Before I said he has a number of traits similar to

8    the high-risk samples; but given his age I would consider

9    the lower range in his cutoff score, the probabilities for

10   his cutoff score to be applicable but not to completely

11   override overwhelming evidence telling me that this is a

12   high-risk sex offender when there's been very, very little

13   intervention for him in the time that he's been in custody.

14   **Q.**  And, other than Mr. Hunt's age, are there any other

15   factors that you considered as mitigating factors in this

16   case?

17   **A.**  Not significantly mitigating, no.

18   **Q.**  And did you factor into your assessment the treatment

19   that you alluded to earlier?  You said I believe that

20   Mr. Hunt had six months of sex offender treatment; is that

21   right?

22   **A.**  Yes, I certainly considered his treatment.

23   **Q.**  Okay.  Well, why did you consider the treatment that

24   Mr. Hunt participated in?

25   **A.**  Well, because we have, for example, if you look at the

1    two samples for the Static-99, the low-risk sample and the

2    high-risk sample, with two plus years of intensive treatment

3    we saw lower recidivism rates for those individuals.  And we

4    have studies on treatment, contemporary treatment, current

5    treatment, which shows modest reductions in the overall

6    risk.

7          But in this case I did not believe that the

8    treatment was sufficient and certainly didn't compare it to

9    the two-year intensive program that the CSC sample,

10   lowest-risk sample had.  And I think he still would have

11   significant treatment needs.

12         I say this not having spoken to him or his

13   treatment providers.  I just am familiar with offenders with

14   records, offending records that are lifelong like this.  And

15   it often takes quite awhile to make the same treatment gains

16   that a lower-risk offender would make.

17   **Q.**  And are you aware of the school of thought or a camp

18   within the field of sex offenders that subscribes to the

19   notion that two to four years is an appropriate length of

20   sex offender treatment?

21   **A.**  Yes, I would certainly say in this case absolutely.

22   Very low-risk sex offenders can receive outpatient treatment

23   that is less a period of time than that but certainly in

24   this case that would be a minimum.

25   **Q.**  And do you have any information about whether Mr. Hunt

1    has a plan for his release, if he is released from prison?

2    **A.**   I don't have a structured release plan, no.

3    **Q.**   And are you aware that Mr. Hunt has a period of

4    supervised release remaining in New York after he -- when

5    and if he is released?

6    **A.**   Yes, he has community supervision until 2012, for about

7    three years.

8    **Q.**   And does that three years of supervised release for

9    Mr. Hunt factor into your opinion at all as to whether he

10   would have serious difficulty in refraining if he were

11   released?

12   **A.**   Yes, it does.

13   **Q.**   And how does that factor in your opinion?

14   **A.**   Well, that's protective in a sense.  In the past it

15   hasn't happened to protect Mr. Hunt from reoffending

16   because, of course, he has had supervision in the past but

17   that hasn't stopped him from reoffending.

18          But it still, we see, for example, with the study

19   on the Mn-SOST-R, we see lower rates of recidivism for

20   offenders in general on community supervision.  And given

21   the right community supervision they can provide for someone

22   the support that will help him in a positive way to readjust

23   back into the community.

24          So while I think that that is a positive thing, I

25   think that his particular risk, while it may be reduced on

1    community supervision, it's hard to say because it hasn't in

2    the past but perhaps he is less impulsive now, has better

3    judgment and can better maintain community supervision.

4    Nonetheless, his risk will persist after he is off of

5    supervision.  It's not lengthy enough in my opinion.

6         **MS. SERAFYN:**  May I just have a moment, Your Honor?

7              (Pause in proceedings.)

8         **MS. SERAFYN:**  Nothing further, Your Honor.

9         **THE COURT:**  Okay.  Cross?

10        **MR. GOLD:**  Yes, Your Honor.

11                        **CROSS-EXAMINATION**

12   BY MR. GOLD

13   **Q.**  Good morning, Dr. Phenix.

14   **A.**  Good morning.

15   **Q.**  Dr. Phenix, you testified you have done about 500 of

16   these cases, that was your ballpark estimate?

17   **A.**  Oh, no, evaluations of sex offenders.

18   **Q.**  500 --

19   **A.**  Not just for the purpose of sexually dangerous person or

20   sexually violent person.

21   **Q.**  So 500 evaluations of sex offenders?

22   **A.**  Over the years, yes.

23   **Q.**  You started out your career in this field in California;

24   right?

25   **A.**  Yes.

1    Q.   Now, you have a Ph.D in psychology?

2    A.   Yes.

3    Q.   When you were a psychology student, you weren't studying

4    sex offenders; right?

5    A.   No, I wasn't studying any forensic issues.

6    Q.   But you had an internship or you did a period in a

7    correctional institution while you were still a student;

8    correct?

9    A.   Actually after I got my Ph.D I worked as a clinical

10   intern prior to licensure in a prison.

11   Q.   So after you completed all the credit for the Ph.D you

12   started working in a -- and that was the California Men's

13   Colony?

14   A.   Right, a medium security prison.

15   Q.   And this was your first foray into correctional

16   psychology?

17   A.   Yes.

18   Q.   Now, prior to that you studied psychology as an

19   undergraduate and a master's candidate; correct?

20   A.   Yes.

21   Q.   And your focus then was on behavioral issues around

22   nutrition; right?

23   A.   Health psychology --

24   Q.   Health psychology.

25   A.   -- was a focus, although I didn't specialize in health

1    psychology.  I had a Ph.D in clinical psychology.  And my

2    master's was also just general psychology.  But in terms of

3    my research I worked in health psychology.

4    Q.  Now, when you first started out at the California Men's

5    Colony, you weren't working with sex offenders necessarily

6    there; right?

7    A.  I was actually.  I had individual therapy with a number

8    of sex offenders that I treated over several years.  And I

9    evaluated sex offenders coming in for diagnosis and

10   treatment on issues.

11   Q.  So your job there was to evaluate offenders coming in

12   who presented with some sort of mental health issues?

13   A.  Right.

14   Q.  And among the population that you evaluated there, you

15   evaluated some people who had committed sex offenses?

16   A.  Right.  It was also a protective custody institution so

17   there were a lot of sex offenders referred for housing and

18   treatment.

19   Q.  And you said you were also participating -- at some

20   point during this period in your career, where are we, in

21   the 1990s?

22   A.  Yes, early 1990s, 1989 to 1993.

23   Q.  '89 to 1993.

24       Now, at some point you went to work from the

25   Department of Correction to the parole entity, whatever the

1  agency is called in California?

2  **A.**  Right, the Parole Department.

3  **Q.**  The Parole Department.

4       And so was it at the Parole Department that you

5  were providing treatment to sex offenders or throughout this

6  period?

7  **A.**  In the Parole Department I ran sex offender treatment

8  groups.

9  **Q.**  How many groups?

10  **A.**  I ran two groups.

11  **Q.**  And when you say you ran a group, what did that mean?

12  **A.**  I was the therapist for the group.  They were required

13  to attend sex offender treatment every week.  And I

14  initially evaluated them, placed them into treatment.  And I

15  would meet with them every week for sex offender treatment.

16  **Q.**  And the treatment that was provided was some cognitive

17  behavioral type treatment; is that right?

18  **A.**  Yes.

19  **Q.**  And that's the treatment, kind of informed by the same

20  theories that the treatment that's provided even today;

21  right?

22  **A.**  That's true.

23  **Q.**  But now your treatment in this group was basically

24  facilitating the group discussion; correct?

25  **A.**  Yes, I was the therapist.

1    **Q.**  And helping them negotiate the conflicts that came up as

2    they discussed things in group?

3    **A.**  Sure, and developing strategies not to reoffend.

4    **Q.**  Now, this period of your career -- the two groups met

5    once a week each?

6    **A.**  Yes.

7    **Q.**  And then you did this for about eight or nine months;

8    right?

9    **A.**  Right.

10   **Q.**  After this period in the Parole Department, you went

11   back to the Department of Correction; right?

12   **A.**  Yes.

13   **Q.**  Now, you testified in a deposition in this matter, if

14   I'm not mistaken, that you then went to Atascadero which is

15   the name of a mental health facility in California?

16   **A.**  Yes, it's the largest law forensic facility.

17   **Q.**  It's the largest law forensic facility in California,

18   not just for people with sex offenses but people with mental

19   health issues who are criminally or forensically involved?

20   **A.**  Right.

21   **Q.**  And, so it was my understanding that one of the reasons

22   that prompted you to make that move was that the Department

23   of Corrections wanted to move you somewhere else; right?

24   **A.**  Right.

25   **Q.**  And so you basically applied, you went from the

1    Department of Correction to the Department of Mental Health?

2    **A.**   Yes.

3    **Q.**   And this was in about 1994?

4    **A.**   Yes.

5    **Q.**   Now, sometime in 1995 you were asked by a Dr. Craig

6    Nelson whether you would be interested in working in a sex

7    offender program that was going up; right?

8    **A.**   Yes.

9    **Q.**   Dr. Nelson was someone who was conducting treatment for

10   sex offenders in the California prison system; right?

11   **A.**   Actually he ran a large research program that examined

12   the effectiveness of sex offender treatment in the

13   Department of Mental Health at Atascadero State Hospital.

14   **Q.**   And this, we've actually heard testimony in this case

15   about this treatment program, the acronym that people refer

16   to it by is SOTP; is that right?

17   **A.**   Yes.

18   **Q.**   And that was a treatment program but it was also a large

19   longitudinal study of the effectiveness of treatment, sex

20   offender treatment; right?

21   **A.**   Right.

22   **Q.**   And it was Dr. Nelson along with a researcher named

23   Janice Marques who was -- who were heading up that program;

24   right?

25   **A.**   Yes.

1    **Q.**  Now, you said you knew Dr. Nelson from your time at

2    Atascadero and also from the psychological community, that

3    you had known him before?

4    **A.**  Yes.

5    **Q.**  And now he asked you to head up a program that was

6    starting up because the legislature in California had

7    instituted a sexual predator commitment law; right?

8    **A.**  Right.

9    **Q.**  And that law eventually came into effect in January of

10   1996; right?

11   **A.**  Yes.

12   **Q.**  And so this conversation that you had with Dr. Nelson

13   occurred sometime in 1995?

14   **A.**  Yes.

15   **Q.**  And he wanted you to basically start up the program of

16   psychologists who would be doing the evaluations necessary

17   for the program to be running; right?

18   **A.**  Right.

19   **Q.**  Now, prior to this you had -- you weren't a specialist

20   in sex offender research; right?

21   **A.**  No.

22   **Q.**  And you weren't -- the experience that you had treating

23   sex offenders was the experience that you described to us;

24   right?

25   **A.**  Right.

1    **Q.**  And you hadn't published in the area of sex offender

2    recidivism or anything along those lines prior to this;

3    right?

4    **A.**  Right.

5    **Q.**  And so he just recruited you.  And I think you testified

6    at the deposition you thought because he thought you'd do a

7    good job?

8    **A.**  That's what I think.

9    **Q.**  And so what you did then was, one of the things you did

10   was you started to look at the research in this area and

11   they even provided you with some of the research in this

12   area; right?

13   **A.**  Yes.

14   **Q.**  And among the research in this area was research by

15   Dr. Carl Hanson; right?

16   **A.**  Yes.

17   **Q.**  And Dr. Carl Hanson at this time was doing the research

18   that we've heard about a lot in this case already of looking

19   at studies which had looked at risk factors predictive of

20   sex offense recidivism; right?

21   **A.**  Yes.

22   **Q.**  And circulating in draft form at this time was a, what's

23   called a meta-analysis of the studies that were out there;

24   right?

25   **A.**  Yes.

1   **Q.**  And a meta-analysis is a study of studies; right?

2   **A.**  Yes.

3   **Q.**  There is a phrase in research called a literature review

4   and there are qualitative reviews and quantitative reviews.

5   And a meta-analysis is a quantitative review of the

6   literature; right?

7   **A.**  Yes.

8   **Q.**  And it looks at the other studies that have been done on

9   a particular subject and if they meet certain criteria, it

10  translates then into a number in some way so that we can get

11  a sense of what the literature as a whole is telling us;

12  right?

13  **A.**  Right, statistical interpretation of trends.

14  **Q.**  Now, you very shortly retained Dr. Hanson to consult

15  with you while you were preparing this program; right?

16  **A.**  Yes, I always have retained him to consult with me.

17  **Q.**  Well, but at this time when Dr. Nelson asked you to come

18  start up this program, he gave you literature to review, you

19  became familiar with Dr. Hanson's work and you retained

20  Dr. Hanson; correct?

21  **A.**  Yes.

22  **Q.**  Now, this meta-analysis, this study of studies, hadn't

23  been published yet at this time; right?

24  **A.**  Right.

25  **Q.**  Now, you also testified during your deposition in this

1  case that in October or November there is a meeting of

2  something called the Association for the Treatment of Sexual

3  Abusers or Sex Abusers?

4  **A.**  Yes.

5  **Q.**  And so you went to this.  This was the first time you

6  had gone to one of these meetings; right?

7  **A.**  Yes.

8  **Q.**  You hadn't hitherto been a member of this organization

9  which has these annual meetings; correct?

10  **A.**  Yes.

11  **Q.**  And there you started to make contacts because you were

12  starting this program and this post that you had with the

13  California Department of Mental Health; right?

14  **A.**  Right.

15  **Q.**  And then you wrote up a sort of guideline for the

16  psychologists who would be doing the work; right?

17  **A.**  Yes.

18  **Q.**  And you incorporated Dr. Hanson's work in that manual;

19  right?

20  **A.**  Right.

21  **Q.**  Now, after this period you were a Department of

22  Correction or during this period you were a Department of

23  Mental Health in California employee; right?

24  **A.**  Yes.

25  **Q.**  But you remained an employee for only about two to three

1    years; right?

2    **A.**   Three and a half years.

3    **Q.**   Three and a half years.

4         And then subsequently you became a contract

5    employee but doing similar types of work; correct?

6    **A.**   Right.

7    **Q.**   Continuing to do evaluations but -- and being paid by

8    the California government but not a salaried employee?

9    **A.**   Yes.

10   **Q.**   Now, during this time, the mid '90s, there was no

11   Static-99; correct?

12   **A.**   Right.

13   **Q.**   Because that was developed in 1999; right?

14   **A.**   Right.

15   **Q.**   Dr. Hanson had taken the risk factors that he had

16   assembled and put them in a risk instrument in around 1997.

17   That was called the RRASOR; right?

18   **A.**   Yes.

19   **Q.**   And so when that came out, you started, you incorporated

20   that into your basically instructions for the California

21   people to do their assessments; right?

22   **A.**   Yes.

23   **Q.**   Now, the reason that you were using this tool was

24   because it was thought to be a -- to improve the accuracy of

25   the assessments that you were doing; right?

1   **A.**   Yes, it did.

2   **Q.**   Well, when you say it did, you chose it because research

3   showed it to be more accurate than other types of going

4   about the assessment; right?

5   **A.**   That's right.

6   **Q.**   Now, in fact, the accuracy of the actual decisions that

7   were made by California clinicians has never been studied;

8   right?

9   **A.**   Right.

10  **Q.**   That's something actually that you testified to in a

11  deposition in this matter.   Presumably it could be studied

12  but it just has never been studied; right?

13  **A.**   Right.

14  **Q.**   So we don't know whether starting to use the RRASOR

15  actually improved things or not.   We just assume it did

16  because the research shows that the RRASOR is better than

17  other methods; right?

18  **A.**   Right, in 60 validations, yes.

19  **Q.**   Well, because the RRASOR is more accurate than other

20  methods of predicting recidivism; right?

21  **A.**   Right.

22  **Q.**   Now, you -- at this time -- what did you call what you

23  were doing when you said you were doing risk assessment, in

24  terms of the type of method that you were doing?

25  **A.**   Adjusted actuarial.

1  **Q.**  So during the mid -- after the RRASOR came out, you were

2  doing the adjusted actuarial method?

3  **A.**  Yes.

4  **Q.**  And before the RRASOR came out, it came out in 1997; is

5  that right?

6  **A.**  Yes.

7  **Q.**  And so prior to that you were doing something else;

8  right?

9  **A.**  I'm doing an empirically-guided review of the risk

10  factors.

11  **Q.**  And so that was a process by which you looked at the

12  risk factors which had been validated in Dr. Hanson's

13  research and applied them to a case?

14  **A.**  Dr. Hanson's and others' research, yes, applied them to

15  a case.

16  **Q.**  But when this meta-analysis came out, it became very

17  influential because it was a way of kind of looking at all

18  the research that was out there; right?

19  **A.**  Right, but every factor wasn't in it.  For example, the

20  Hare Psychopathy Checklist-Revised score.  That was a study

21  in Hanson's meta-analysis.  So it was just a collection of

22  what research supported it.

23  **Q.**  And then when the RRASOR came out, you shifted to an

24  adjusted actuarial method which would look at this actuarial

25  which had a percentage recidivism rate attached to it and

1    then make adjustments as were thought to be appropriate;

2    right?

3    **A.**   Yes.

4    **Q.**   Now, thereafter the Static-99 was developed, right, in

5    1999?

6    **A.**   Yes.

7    **Q.**   And the Static-99, you started using that in addition to

8    the RRASOR?

9    **A.**   No, instead of the RRASOR.

10   **Q.**   Instead of the RRASOR.

11          And then -- but you continued to use the adjusted

12   actuarial method; right?

13   **A.**   Yes.

14   **Q.**   Now, and so you're -- looking at your dissertation from

15   your doctorate in philosophy, it was a one-year follow-up of

16   a weight control study comparing behavioral techniques,

17   nutrition information and exercise.  And so -- and that was

18   obviously not related to your current work right now; right?

19   **A.**   No, it was not.

20   **Q.**   But, now, you testified on direct that you had four

21   publications to your credit, three of which were peer

22   reviewed; right?

23   **A.**   Three of those were peer reviewed.

24   **Q.**   Now, peer reviewed when we're talking about research of

25   this kind is a -- involves a process where you conduct

1    research or do some type of writing, you submit it to the

2    editorial board of a journal.  It's given to anonymous

3    reviewers to look and make comments on.  You may revise your

4    work or not depending on those comments.  And then it may or

5    may not be accepted for publication; correct?

6    **A.**  Right.

7    **Q.**  And this is how the production of scholarly and

8    scientific literature goes on; right?

9    **A.**  Right.

10   **Q.**  Now, you are not a researcher person; right?

11   **A.**  Not at all.

12   **Q.**  Not at all.

13          You're a practitioner, would you agree with that?

14   **A.**  Yes.

15   **Q.**  And so these peer reviewed articles that you have here

16   are not research per se; right?

17   **A.**  No, they're not research.

18   **Q.**  The last item there is an article by a, and perhaps you

19   can help me with the pronunciation there, Vognsen?

20   **A.**  Vognsen.

21   **Q.**  J. Vognsen, V-O-G-N-S-E-N, and yourself, "*Antisocial*

22   *Personality Disorder Is Not Enough:  A Reply to Sreenivasan,*

23   *Weinberger and Garrick.*"  Now, that's a publication that you

24   and Dr. Vognsen authored together?

25   **A.**  Yes, it is actually just a reply to a publication.

1    **Q.**  Does a reply to a -- and the publication presumably was

2    a longer piece than this piece is?

3    **A.**  It was longer, yes.

4    **Q.**  Now, was the piece that you were replying to research in

5    this area?

6    **A.**  No, it was more opinion.

7    **Q.**  And your piece was sort of a, taking, staking out a

8    different position about this, some subject; right?

9    **A.**  That's right.

10   **Q.**  And the subject here is whether antisocial personality

11   disorder standing alone as a diagnosis is sufficient to

12   commit someone under these sexually violent predator laws;

13   right?

14   **A.**  Right.

15   **Q.**  And your position or your position and Dr. Vognsen's

16   position is that you need to have some kind of sexual

17   disorder in order to come within the reach of these laws;

18   right?

19   **A.**  Right.

20           **THE COURT:**  How about we take a break now till

21   2:15.  Is that when we come back?

22           **THE CLERK:**  Yes, Judge.

23           **THE COURT:**  Okay.  2:15.

24           **THE CLERK:**  Court is in recess.

25           (Luncheon recess.)

1          **AFTERNOON PROCEEDINGS**

2          **THE CLERK:**  All rise for the Honorable Court.

3          **THE COURT:**  Sit down, everybody, please.

4          Sorry to keep you waiting but we had a stack of

5    motions that I just had to finish before I came back here,

6    so here we are.

7          **MR. GOLD:**  May I, Your Honor?

8          **THE COURT:**  You are ready to cross?  Go ahead.

9          **MR. GOLD:**  Thank you.

10         **THE COURT:**  I keep looking to send in the jury.  I

11   am not quite used to this jury waived.

12         (Laughter.)

13         **THE COURT:**  Go ahead.

14         **MR. GOLD:**  Thank you, Judge.

15              **AMY PHENIX, Resumed**

16            **CROSS-EXAMINATION, (Cont'd.)**

17   BY MR. GOLD

18   **Q.**  Good afternoon, Dr. Phenix.

19   **A.**  Good afternoon.

20   **Q.**  When we left off, we were talking about the peer

21   reviewed publications or the publications that appear on

22   your CV.

23         Both of them that we discussed, the one where you

24   were a coauthor with Dr. Vognsen, and the article where

25   you're a coauthor with a Dr. Sreenivasan and others, are --

1    were not pure research but rather were in the vein of a

2    commentary in the field; right?

3    **A.**   Right.

4    **Q.**   Now, you also are listed here as an author of the Coding

5    Rules for the Static-99?

6    **A.**   Right.

7    **Q.**   And you testified in deposition in this matter that --

8    well, we discussed how you met Dr. Hanson when you were just

9    getting into this work.  Do you recall that?

10   **A.**   Yes.

11   **Q.**   And you were appointed or had the post as the person in

12   California who was managing these assessments when they

13   first started doing them in 1996; right?

14   **A.**   Right, managing the training of the evaluators who did

15   them.

16   **Q.**   And writing the manuals and the paperwork for them to go

17   about their work?

18   **A.**   Right.

19   **Q.**   And when Dr. Hanson was developing this instrument, he

20   asked you to work on the Coding Manual because you had seen

21   many coding type issues; is that right?

22   **A.**   Yes.

23   **Q.**   And the Coding Manual that you have listed there, it's

24   this document right here (indicating)?

25   **A.**   That would be the 2000.  I'd have to look back at the CV

1    and what that said.  Does it say 2000 or 2003?

2    **Q.**  This is at the bottom of page 3 of your CV which is in

3    evidence.  You make reference to the Coding Rules from 2000

4    in which you were the first author.

5    **A.**  That's right.  That would be the correct document, the

6    one you showed.

7    **Q.**  And so for the record, this is a -- first of all, this

8    is not a published document in a peer reviewed journal or

9    anything of that nature; right?

10   **A.**  No, it's a user report on the Solicitor General of

11   Canada's website.

12   **Q.**  And so it's a 15-page document?

13   **A.**  Yes.

14   **Q.**  And it just has basic rules about how to score the ten

15   individual items that we discussed?

16   **A.**  Right.

17   **Q.**  Now, later on this was expanded into a longer Coding

18   Manual; right?

19   **A.**  Yes.

20   **Q.**  And that, you're not the first author on that Coding

21   Manual?

22   **A.**  No.

23   **Q.**  You're listed with Dr. Hanson and Dr. Thornton as one of

24   several authors?

25   **A.**  Right.

1   **Q.**  Did you contribute to the revision?

2   **A.**  Yes.

3   **Q.**  And what did you contribute?

4   **A.**  Well, I contributed a collection of clinical issues and

5   cases that had been brought to my attention over the years

6   between 2000 and 2003 when it was, the new coding was

7   published and added how to code those particular issues to

8   the document as well as reviewing the document multiple

9   times prior to releasing it.

10  **Q.**  Now, Dr.Sreenivasan is listed as a coauthor with you?

11  **A.**  She is.

12  **Q.**  And is she someone who does this type of work in

13  California?

14  **A.**  Yes.

15  **Q.**  Is she a psychologist?

16  **A.**  Clinical psychologist, yes.

17  **Q.**  Now, do you recall being asked to provide information

18  about the money that you earned doing this type of work,

19  evaluating sex offenders, in connection with this case?

20  **A.**  I don't recall, but it's frequently requested from me

21  so.

22  **Q.**  Now, is it fair to say this is a lucrative profession?

23  **A.**  I think I make a good living.

24  **Q.**  And how much did you earn doing sex offender evaluations

25  of this kind last year?

1    **A.**  Last year after office expenses I made about $250,000.

2    **Q.**  Now, you were, when you first started this in 1996 and

3    were doing these evaluations, you were a salaried employee

4    for about three years?

5    **A.**  I was a salaried employee for the state for ten years

6    but doing these evaluations was three and a half of those

7    ten years.

8    **Q.**  Well, that is right.  They started the law in January of

9    1996, right?  And you testified that you were introduced to

10   the field shortly before that in 1995; right?

11   **A.**  Right.

12   **Q.**  And so you were doing evaluations of sex offenders in

13   that capacity since that time; right?

14   **A.**  Yes.

15   **Q.**  And you remained on as a salaried employee for about two

16   to three years after that; right?

17   **A.**  Right.

18   **Q.**  And then you became a contracting psychologist with the

19   California government; right?

20   **A.**  Right.

21   **Q.**  And so what was your, between that period and now, your

22   highest earning year as a contractor?

23   **A.**  I would say the last couple of years.

24   **Q.**  And what was that amount?

25   **A.**  That was, after office expenses, about $250,000, maybe

1    $300,000.

2    **Q.**  And are you familiar with the comment by Dr. Sreenivasan

3    about the amount of money that she was earning in this area?

4    **A.**  Yes, I am.

5    **Q.**  And so at one point on the stand she said she was

6    earning boat loads of money?

7    **A.**  She did.

8    **Q.**  And her salary in question there was over one, or her

9    earnings that year were over one million dollars; correct?

10   **A.**  Right.  That was prior to removing office expenses,

11   right.

12   **Q.**  And this was -- you are aware of this because it was an

13   issue of some notoriety in this area in California; right?

14   **A.**  Well, it was published in the newspaper.

15   **Q.**  Now, you talked about different methods of doing this

16   type of assessment on your direct or during your direct

17   testimony and you said there were three basic kinds.  Do you

18   recall that?

19   **A.**  Yes.

20   **Q.**  There is -- clinical judgment is one kind, an

21   empirically-guided method and then an actuarial method;

22   right?

23   **A.**  Right.

24   **Q.**  And we talked about you had been present as a lot of

25   these methods have been employed by states in this area by

1   virtue of your post in California; right?

2   **A.**   Yes.

3   **Q.**   You saw the empirically-guided method?

4   **A.**   Yes.

5   **Q.**   And then you saw the clinically adjusted actuarial

6   method?

7   **A.**   Yes.

8   **Q.**   And so you have recently changed your method of doing

9   these types of evaluations; right?

10   **A.**   Yes.

11   **Q.**   And so you used to do a clinically adjusted actuarial

12   method but now you do a pure actuarial method; right?

13   **A.**   Yes.

14   **Q.**   And you do that because you have absorbed into your work

15   a research finding that showed that the clinically adjusted

16   or the adjusted actuarial method was not as accurate as the

17   actuarial method without adjustments; right?

18   **A.**   Yes.

19   **Q.**   Dr. Hanson did a study where he looked or compared

20   actuarial predictions of future sexual reoffense with

21   actuarial predictions of future sex offense with these

22   clinical overrides and found that the clinical overrides

23   added noise.  They didn't improve, they actually made the

24   predictions less accurate; right?

25   **A.**   They did.  It was only three studies but it was evidence

1    enough to be cautious about that.

2    **Q.**  Well, it was evidence enough for you to change the

3    method by which you did these evaluations; right?

4    **A.**  Yes.

5    **Q.**  And this was a method that you had been using for many

6    years; right?

7    **A.**  I have.

8    **Q.**  And so it was an important research finding on which you

9    based -- on which you made an important decision in your

10   work?

11   **A.**  I would say so.  I think there is still research to be

12   done in that regard in terms of very experienced evaluators

13   considering factors outside of the actuarials.  I don't

14   think we have an answer to that yet.  But I think there is

15   three studies, there is enough for me to make the decision

16   to not adjust outside.

17   **Q.**  Now, there has been a lot of findings in this area of

18   research that clinical judgment is not accurate; right?

19   **A.**  Well, no more accurate than chance.

20   **Q.**  Well, that's not --

21           **THE COURT:**  No more accurate than what?

22           **THE WITNESS:**  Chance.

23           **THE COURT:**  Chance.

24   BY MR. GOLD

25   **Q.**  And that's the definition of not accurate I would

1    imagine in this area; right?

2    **A.** You could say that.

3    **Q.** You yourself testified on direct examination just a few

4    hours ago that if I were just to decide this issue, I would

5    be no more accurate than chance.  So you really absorbed

6    this research finding; right?

7    **A.** Oh, I believe it's an accurate research finding.

8    **Q.** And so this movement of the research that you have been

9    talking about has been moving toward a goal to being more

10   accurate, more accurate in our predictions of or selection

11   of sexual recidivists from nonrecidivists; is that a fair

12   statement?

13   **A.** Of course.

14   **Q.** Now, you have chosen your method based on this research

15   finding in order to improve the accuracy of the opinions

16   that you give in court; is that correct?

17   **A.** Yes.

18   **Q.** Because the overriding goal is to be accurate; right?

19   **A.** Right.

20   **Q.** Now, you changed your method based on this research

21   finding but you have also been struggling with the issue of

22   coming up with a method based on the research findings and

23   you've drafted a proposed protocol presenting some of your

24   ideas; isn't that right?

25   **A.** I wouldn't say that I was struggling so much as I was

1    trying to articulate the newest method of risk assessment.

2    **Q.**  Well, I didn't mean to put a value judgment in the word

3    "struggling."  But you were trying to solve the problem of

4    how to take these research findings and translate them into

5    accurate judgments in courtrooms like this one; right?

6    **A.**  Right.

7    **Q.**  And I just put up on the screen a document.  Do you

8    recognize it?

9    **A.**  Yes.

10   **Q.**  And this is a document entitled, *"Proposed*

11   *Considerations for Conducting Sex Offender Risk Assessment."*

12   It's entitled, *"Draft, December 14, 2008"* by yourself and a

13   Dr. Dale Arnold.

14         Is that a document that you authored?

15   **A.**  Yes.

16   **Q.**  Now, I asked you about this document during the

17   deposition in this matter.  Do you recall that?

18   **A.**  Yes.

19   **Q.**  And what this document does is it proposes a method of

20   going about risk assessments; right?

21   **A.**  Yes, it's a structure.

22   **Q.**  And it was distributed to other people doing this type

23   of work; right?

24   **A.**  I distributed it at a training in California training

25   the sexually violent predator evaluators.

1    **Q.**  Now, this field is in, would you agree with me that it's

2    in a state of -- and when I say "field," I mean sex offender

3    risk assessment.  It's in a state of flux right now; is that

4    a fair statement?

5    **A.**  You know, there is new data which we have to incorporate

6    into our risk assessments so not in that context it is a

7    state of flux.

8    **Q.**  Well, we have been discussing in this case this issue of

9    the new norms that have come out which give meaning to what

10    the Static-99 risk scores are, for example.  Those are

11    coming out basically right now; right?

12    **A.**  Well, they were released in November of 2008 so they're

13    relatively new, yes.

14    **Q.**  In fact, this document I was discussing with you over

15    the break, the Static-2002 recidivism tables, and I asked

16    you where I could get them.  And you told me they may be

17    posted up on the Solicitor General's website in Canada maybe

18    today?

19    **A.**  Right, but they were released at a presentation in

20    November of 2008, not exactly in this form but those numbers

21    were released.  That data was released.

22    **Q.**  Right.  But it's fair to say that this stuff is coming

23    out, it's rolling out now; right?

24    **A.**  Right.

25    **Q.**  In fact, none of this material that we have been taking

1    about has been produced in a peer reviewed publication yet.

2    A lot of the information you were telling me has been

3    accepted for publication but has not been produced yet in

4    published form; right?

5    **A.**   Right, it takes about two years to get articles

6    published.  So oftentimes in our field they're distributed

7    early once they have been accepted into a publication so

8    that the data can be used until such time they're finally

9    published.

10   **Q.**   Well, now, are you saying that the articles by

11   Dr. Hanson and Dr. Helmus with these new statistical tables

12   and things in them, are they in their final form or have

13   they -- or are they in the peer review process right now?

14   **A.**   No, they have been peer reviewed and they're just

15   waiting for publication.

16   **Q.**   And the basic finding from these new norms is that

17   overall recidivism rates are lower than they were with the

18   old norms; right?

19   **A.**   Yes.

20   **Q.**   And this was a subject of some contention in the field

21   of sex offender recidivism testimony and things like that

22   previously; is that a fair statement?

23   **A.**   Yes, I think it is.

24   **Q.**   In fact, people on the defense side tended to state that

25   the recidivism percentages associated with the Static-99

1    were overestimates for one reason or another while people on

2    the prosecution side of these types of battles said they

3    were stable; right?

4    **A.**   I don't know if that's completely true in terms of who

5    various experts were working for.  But there has been

6    controversy and studies that have looked at the stability of

7    the probabilities for sexual reoffense.

8    **Q.**   Well, the way the Static-99 used to work, it had a score

9    of six and above.  That was what was considered high risk;

10   right?

11   **A.**   It still is, yes.

12   **Q.**   And the recidivism rate associated with the six plus

13   over fifteen years was 52 percent; right?

14   **A.**   Yes.

15   **Q.**   And that was very, and a very important number in those

16   jurisdictions which had a more likely than not threshold for

17   commitment; right?

18   **A.**   It could be, although probabilities under 50 percent

19   could be found to be more likely than not because of

20   undetected offenses and the length of prediction.

21   **Q.**   And these clinical overrides that we've talked about

22   that you have recently abandoned; right?

23   **A.**   Sometimes, yes.

24   **Q.**   Now, those recidivism rates were overestimates; right?

25   **A.**   Well, they were overestimates for contemporary samples.

1    They were accurate estimates for samples released in the

2    '70s and '80s.

3    Q.  Right.  And the principle that we can derive from that

4    is base rates matter; right?

5    A.  Base rates always matter.

6    Q.  Base rates always matter.

7         And you testified in the same way in your

8    deposition in this matter, that the base rate of, in the

9    sample will effect what the recidivism percentages are at

10   each score; right?

11   A.  Correct.

12   Q.  Now, you cited -- I want, just as an example of the

13   change that is going on in this field, it's happening right

14   now in your career to the extent that you drafted a report

15   using the clinically adjusted actuarial methodology; right?

16   A.  Yes.

17   Q.  And you haven't updated that report but you have changed

18   your method; right?

19   A.  Yes.

20   Q.  You now do you, based on a research finding that you

21   found so important that you changed the method by which you

22   do these evaluations, but your conclusion was the same so

23   you did not feel it was necessary to update your report in

24   this matter; right?

25   A.  Actually I didn't update the report because I didn't

1    have time available to do that once this all changed.  I

2    have been in trial kind of constantly and so that is the

3    reason I didn't update it.  But I did reflect in the

4    deposition what my current opinion is and what caused that

5    to change.

6    **Q.**  But the methodology as reflected in this report that you

7    authored is not your current methodology; right?

8    **A.**  Well, the scoring of the actuarial instruments is; but I

9    would not be adjusting the actuarial instruments, which, in

10   fact, I didn't do in this case anyway with factors outside

11   of the actuarial instruments.

12   **Q.**  Now, in your report that you authored --

13        (Pause in proceedings.)

14   **Q.**  You scored the Static-99 and arrived at a score of 11;

15   right?

16   **A.**  Yes.

17   **Q.**  And for the record, this is a copy of your report which

18   has been entered into evidence and I have just put up on the

19   display screen page 23.

20        And you say in this report -- well, first of all,

21   you give the score of 11 and then you say that Mr. Hunt

22   scores in a group who were, who recidivated at a rate of 39

23   percent over 5 years, 45 percent over 10 years, and 52

24   percent over a 15-year period; right?

25   **A.**  Yes.

1   **Q.**  And those are what are called the old norms; right?

2   **A.**  Yes.

3   **Q.**  And that's based on the development sample of actual

4   individuals who presumably offended or reoffended at that

5   rate; right?

6   **A.**  Yes.

7   **Q.**  And these are the norms which are now outdated but they

8   are still in your report but you have updated them with

9   testimony on the stand today?

10   **A.**  And testimony in the deposition I believe.

11   **Q.**  Right.

12        Now, in this article you went on to say that a

13   subsequent study by Dr. Dennis Doren found that those

14   percentages held up in a lot of other studies; right?

15   **A.**  Yes, all except for a score of four.

16   **Q.**  Right.  And then you make reference to this research

17   that we've been taking about which was coming out on a

18   rolling basis with these new norms, new samples where they

19   were finding that the recidivism rate is lower; right?

20   **A.**  Right.

21   **Q.**  And, in fact, this was a reference to an unpublished,

22   looks like a bachelor's thesis by Leslie Helmus and a

23   footnote there, a multisite comparison of the validity and

24   utility of the Static-99 and the Static-2002 for risk

25   assessment with sexual offenders.

1          That's an unpublished bachelor's thesis?

2    **A.**  Correct.

3    **Q.**  And now Leslie Helmus along with Carl Hanson is

4    publishing this material?

5    **A.**  Right.  It's in press, that material.

6    **Q.**  And so Dr. Hanson was Leslie Helmus's thesis adviser?

7    **A.**  Yes.

8    **Q.**  Now, Dr. Doren argued in this article that you cite here

9    that base rates don't matter; right?

10   **A.**  Not for the samples that he examined.

11   **Q.**  Right.  But he used that as a platform, if you will, to

12   argue that base rates should not be found to be an important

13   part of analysis in this type of risk assessment; right?

14   **A.**  He said that for all cutoff scores with a score of four.

15   And he said that the score of four probabilities were

16   overestimates.  But for the other cutoff scores he believed

17   that the base rates were stable.

18   **Q.**  Right.  That the percentages were stable no matter what

19   the underlying base rate?

20   **A.**  Right.

21   **Q.**  Right.

22          And we know that to be incorrect; right?

23   **A.**  Right.  If you use different samples, for example, the

24   ones that Helmus and Hanson have used, that he would find

25   that they were not all stable.  Some of them will be.

1    However, they vary in different samples.

2    **Q.**  Right.  Well, but the principle that we're talking about

3    and that you, yourself, I believe have endorsed is that the

4    underlying base rate, the overall reoffense rate of a group

5    of individuals will affect these Static-99 or these

6    actuarial percentages; right?

7    **A.**  Sure.  Yes.

8    **Q.**  And if you have a high base rate, an overall high, low,

9    medium risk, then your percentages for the Static-99 will go

10   down or up, and if you have a low base rate, they will go

11   down?

12   **A.**  Right.  That's why we use low base rate samples and

13   anchor it by low base rate and high base rate samples.

14   **Q.**  So, in fact, the whole method that's now being put

15   forward for interpreting these scores is based on that

16   principle.  You have the high-risk samples and the low-risk

17   samples; right?

18   **A.**  Right.

19   **Q.**  And the high-risk samples have a higher base rate and

20   the low-risk samples have a lower base rate?

21   **A.**  Correct.

22   **Q.**  But now the -- are you familiar with the average age of

23   both of these samples?

24   **A.**  I don't know the average age off the top of my head.

25   I'd have to look at the data.

1   **Q.**  Well, a principle that we were also discussing that you

2   have discussed is generalizability; right?

3   **A.**  Yes.

4   **Q.**  And that is the principle by which you use a test

5   something like this Static-99 on someone to the extent that

6   the person that you're evaluating is similar to the

7   reference group; right?

8   **A.**  Correct.

9   **Q.**  And that, again, is a principle that you have discussed

10  in the context of this high-risk and low-risk sample; right?

11  **A.**  Yes.

12  **Q.**  A lot of the information that you have put forward about

13  Mr. Hunt has been presented to the Court as a means of

14  helping to determine whether he is more like this high-risk

15  sample or this low-risk sample; right?

16  **A.**  Yes, I tried to make that determination.

17  **Q.**  Now, but the most salient fact in this proceeding is the

18  fact that Mr. Hunt is 63 years old?

19  **A.**  It's a salient fact, yes.

20  **Q.**  And do you know the average age of the entire sample of

21  the new norms?  Well, first of all, the old norms, that the

22  average age was 33 and a half; right?

23  **A.**  Right.

24  **Q.**  Now, the average age of the new norms is a little older;

25  right?

1    **A.**  Slightly.

2    **Q.**  Slightly older?

3    **A.**  I believe so.

4    **Q.**  And do you know what it is?

5    **A.**  I don't recall exactly.  It's a little older.

6    **Q.**  And the low-risk sample, the average age there, you just

7    testified you're not quite sure?

8    **A.**  No, I don't recall the exact age but they're all

9    similar, similar average ages.

10   **Q.**  And so, and, again, the high-risk sample, you don't know

11   the average age of that sample?

12   **A.**  I don't recall the exact average age.

13   **Q.**  But when you're comparing to see whether Mr. Hunt is

14   similar to the high-risk sample or the low-risk sample,

15   isn't age important?

16   **A.**  Age is not one of the factors that can distinguish for

17   me if he is necessarily closer to the high risk or the low

18   risk.  The average age for all of these samples is in the

19   mid 30s.  That's because you're going to get that average on

20   large groups of sex offenders.  You're not going to get ages

21   in the 50s and 60s as averages.

22          Nonetheless, I have to consider if he is more

23   similar to the lower high-risk sample and I may have to

24   consider age outside of that.  But I would always consider

25   his age.  But he is different from the average age of the

1    sample.

2    **Q.**  Well, when you determine whether it's even appropriate

3    to use an instrument like this on a subject, you need to

4    make this generalizability finding; right?

5    **A.**  Right, I do.

6    **Q.**  For example, the rules -- and we discussed this the

7    other day -- of the Static-99 say don't use it on women;

8    right?

9    **A.**  Right.

10   **Q.**  And that's because there were no women in the samples;

11   right?

12   **A.**  Right.

13   **Q.**  And they say don't use it on people under 18; right?

14   **A.**  Yes.

15   **Q.**  And that's because there were no or not enough 18-year

16   olds in the sample; right?

17   **A.**  Right.

18   **Q.**  Right.

19        And so if you were going to try to use it or make

20   sense of it for someone who is eighteen, you would have to

21   make some adjustment.  You would have to do something or you

22   couldn't use it at all; right?

23   **A.**  If they were under 18?

24   **Q.**  Under 18; right.

25   **A.**  Right.

1   **Q.**  Now, as an expert here one of the roles that you have is

2   to look at Mr. Hunt and to synthesize the available research

3   and data and present it to the Court in a way that makes

4   sense; is that a statement you endorse?

5   **A.**  Yes.

6   **Q.**  And in order to do that you are currently now developing

7   a method that makes sense to do this type of risk

8   assessment; right?

9   **A.**  I believe I have a method to do that, yes.

10  **Q.**  And that method is in those protocols that we just

11  discussed; right?

12  **A.**  There is some information there.  It was never meant to

13  be comprehensive but there is some guidelines.

14  **Q.**  Now, when we talked about Dr. Hanson's research a little

15  while ago, this research finding where you said, well, I

16  don't do clinical overrides because there was a research

17  finding that said that clinical overrides make predictions

18  like this less accurate; right?

19  **A.**  I did.

20  **Q.**  And now with respect to your method that you're using

21  right now, obviously there is no research on that method,

22  its accuracy or anything like that; right?

23  **A.**  Correct.

24  **Q.**  I mean, what you're doing is taking the available

25  information, your sense of the field and coming up with a

1   method that makes sense to generate accurate opinions;

2   right?

3   **A.**   I am, on an instrument that demonstrates moderate

4   predictive accuracy.

5   **Q.**   Now, you start out your method, you score three

6   actuarials or four; right?

7   **A.**   Right.

8   **Q.**   And those are the Static-99, the Static-2002, the

9   Mn-SOST-R and also something that we haven't seen called the

10  SORAG; right?

11  **A.**   Yes, I can use all four.

12  **Q.**   Now, when I asked you if it hadn't been researched or

13  validated, we wouldn't expect something like that

14  necessarily to happen, right?  You need to come up with a

15  method that synthesizes the information in the best possible

16  way to come up with a defensible accurate judgment; right?

17  **A.**   Right.  I mean, the instruments have all been validated.

18  Myself scoring three of them and coming up with an overall

19  risk level has not been validated.

20  **Q.**   And you reported recidivism rates associated with the

21  scores; right?

22  **A.**   Yes, a range.

23  **Q.**   And it's your position here that those scores

24  communicate useful information for this case; right?

25  **A.**   Yes, I believe they do.

1    **Q.**  And you said that you do a pure actuarial method when

2    you used to not; right?

3    **A.**  Yes, generally.  I mean, there may be a few case

4    specific factors that are important outside of the

5    actuarials but primarily I maintain the risk level that the

6    actuarials tell me.

7    **Q.**  And this is based on your kind of adherence to this

8    empirical sort of methodology, one of the findings of which

9    is that clinical judgment can be inaccurate; right?

10   **A.**  Yes.

11   **Q.**  And so the percentages that you have are in a sense the

12   best that you can do; right?

13   **A.**  If I want to offer base rates, those would be the most

14   plausible base rates, yes.

15   **Q.**  Now, we've discussed prior to this, prior to today why

16   clinical judgment is bad.  Do you recall that?

17   **A.**  Yes.

18   **Q.**  And you testified in a deposition in this matter that

19   one of the reasons clinical judgment is bad is that research

20   has found that clinicians tend to over predict

21   dangerousness.  Do you recall that?

22   **A.**  Yes.

23   **Q.**  And you said when left to their own devices, they tend

24   to do that; right?

25   **A.**  They could.

1    **Q.** And part of the reason for this is that clinicians, just

2    like anyone else, tend to be influenced by evocative

3    information; right?

4    **A.** Right.  I am not saying all clinicians do that but some

5    that would have less experience might do that.

6    **Q.** Well, a clinician can -- this was one of the reasons

7    that you put forward as an explanation as to why clinical

8    judgment has been found to be no more accurate than flipping

9    a coin; right?

10        **THE COURT:** Than what?

11        **MR. GOLD:** Than flipping a coin.  Than flipping a

12   coin.

13   **A.** Right.

14   **Q.** Now, for the record, I have turned to an image on the

15   device here of your deposition in this matter where you

16   testified --

17        **MS. SERAFYN:** Objection, Your Honor.  This is

18   hearsay.  She's admitted what she testified to during her

19   deposition so it's not being used to impeach her in any way.

20        **THE COURT:** Well, I don't know what it is that he

21   is going to refer to.  I presume that it was something she

22   said at a deposition.  Is that what you are going to say to

23   her?

24        **MR. GOLD:** Yes, I am going to --

25        **THE COURT:** Ask her about something she said?

1          MR. GOLD:  And then ask if she endorses it, yes.

2          THE COURT:  Something that she said or something

3    that someone else said?

4          MR. GOLD:  No, something that she said at her

5    deposition.

6          THE COURT:  Has she changed her mind, is that what

7    you are asking her?

8          MR. GOLD:  I'm asking her if she continues to

9    endorse it, yes.

10         THE COURT:  All right.  Go ahead.

11   BY MR. GOLD

12   Q.  You testified, "When left to their own devices,

13   clinicians would tend to over predict dangerousness, think

14   that someone is dangerous when they're less dangerous than

15   they are.  That would be a tendency."

16         That's what you testified to at the deposition in

17   this matter?

18   A.  Right.

19   Q.  And you continue to endorse that?

20   A.  I do.  I'd like to add that I think it's less

21   experienced evaluators but it certainly has happened.

22   Q.  Well, isn't it an interesting feature of the study of

23   clinicians, it's part of the study in this field, there is a

24   book by a Dr. Garb called *Studying the Clinician*.  Are you

25   familiar with that book?

1  **A.**  No.

2  **Q.**  Well, this study of how clinicians make decisions is

3  actually a field of study in your field; isn't that right?

4  **A.**  Yes.

5  **Q.**  And so are you familiar with research findings that show

6  that even experienced clinicians making these types

7  judgments tend to be no more accurate than graduate

8  students?

9  **A.**  Very old studies about general violence, yes.

10  **Q.**  But you are familiar with those?

11  **A.**  Yes, prior to any actuarial assessments.

12  **Q.**  Well, and, again, the actuarial instruments are

13  improving the accuracy of these types of decisions; right?

14  **A.**  Yes, it's those very old studies they have.

15  **Q.**  Now, we have discussed in this case different ways of

16  accounting for age in a risk assessment like this.

17        Now, in your protocols you make reference to this

18  issue.  I'm going to show you this document (indicating).

19        And for the record I am referring to the protocols

20  document to a numbered section which is entitled, "How do we

21  consider older age given that the Static-2002 more

22  adequately accounts for age."

23        Now, this is a part of this document, you give an

24  outline of the method that is similar to what you've

25  described in your direct testimony today.  And then it ends

1    with a sort of Q and A or question and answer period with

2    Dr. Hanson; right?

3    **A.**   Yes, it was a consultation with him.

4    **Q.**   And because you're consulting with Dr. Hanson as you

5    develop a method to go about doing risk assessments; right?

6    **A.**   Oh, yes, I have been for fifteen years.

7    **Q.**   Right.

8         And the answer is, "The Static-99, Static-2002,

9    Mn-SOST-R and SORAG all consider age within the actuarial

10   instrument.  The Static-2002 is the only instrument that

11   considers aging offenders.  Do not adjust risk for age until

12   70 if using all four instruments.  Carl did not have

13   sufficient sizes of offenders 70 and over to make definitive

14   conclusions.  For offenders who are older, their risk

15   continues if they offended at an older age.  Risk reductions

16   may be appropriate for offenders over 70 who offended many

17   years ago and/or have significant health problems.  The

18   declines with age are empirically informed but the precise

19   nature of the contribution of advanced age in context of

20   other factors has not been resolved in the scientific

21   literature."

22        So this was, again, a document that you distributed

23   to other people doing this type of work; right?

24   **A.**   To the evaluators doing these types of evaluations in

25   California.

1    **Q.**  Right.  And during the deposition in this matter I asked

2    you where that page came from.  Do you recall that?

3    **A.**  Yes.

4    **Q.**  And I asked you what data that 70-year cutoff was based

5    on.  Do you recall that?

6    **A.**  Yes.

7    **Q.**  And when I asked you that, you stated that, "We would

8    have to ask Carl Hanson;" right?

9    **A.**  Right.  He's the one that made the cutoff, although I

10   think it's somewhat explained in the paragraph that you just

11   read.

12   **Q.**  Well, I asked you where the 70-year cutoff came from and

13   why it wasn't a lower age; right?

14   **A.**  Yes.

15   **Q.**  And do you recall -- well, what is the answer to that

16   question?

17   **A.**  What is the answer I gave in the deposition?

18   **Q.**  No, what is the answer to that question?

19   **A.**  And the question being why is the 70-year age a cutoff?

20   **Q.**  Yes.

21   **A.**  Because there comes a time when there is insufficient

22   sample sizes to make any conclusions about whether the

23   instrument probabilities would be useful for that age or

24   not.

25            So age 70, he had said that the sample sizes were

1    too small to make any conclusions about base rates, but

2    under that age he wouldn't adjust the base rates for any

3    given cutoff score.

4    **Q.**  Well, so you are doing these evaluations now and

5    following the advice more or less that you gave at this

6    training?

7    **A.**  More or less, yes.

8    **Q.**  And so you're using this pure actuarial method and

9    you're not adjusting until age 70; right?

10   **A.**  I am adjusting within a range of risk, either to the

11   high end or to the low end or in the middle of the risk

12   range.  So there is an adjustment but there is no adjustment

13   outside of the risk range.

14   **Q.**  Right.  You talked about when you do an assessment like

15   this you get a risk range.  You know something about the

16   high-risk sample.  You know something about the low-risk

17   sample.  You know something about the subject of your

18   evaluation and you try to put them in there; right?

19   **A.**  Right.

20   **Q.**  But with respect to age you don't know the average age

21   of the high-risk sample and you don't know the average age

22   of the low-risk sample; right?

23   **A.**  Well, I know they're in their mid 30s.

24   **Q.**  And so you -- both of those samples were in their mid

25   30s; right?

1    **A.**  I believe so, yes.  I mean, I have seen them.  I just

2    didn't memorize it.

3    **Q.**  And so how then does age become a factor in which you

4    put someone in the range?

5    **A.**  Well, he doesn't have to be -- for the instrument to

6    work, he doesn't have to be the same age as the average age

7    of all the offenders.  But if he departs significantly from

8    the group in terms of age, then age would be a consideration

9    outside of the actuarial instrument.

10           So, for example, in that range, when I consider

11   age, I don't adjust for age within that range if a person is

12   an older offender based on characteristics of the high-risk

13   sample or the low-risk sample.  I simply look at all the

14   research on age and make conclusions that it may not account

15   for age and then conclude that he would be at the lower end

16   of the risk range given the fact that his age departed

17   significantly from the average age.

18   **Q.**  Well, but, Dr. Phenix, that's -- I am just not quite

19   clear on how this works.  We have the high-risk sample and

20   the low-risk sample and both of them have an average age in

21   the mid 30s; right?

22   **A.**  Right.

23   **Q.**  And so that's where the range comes from, low-risk

24   samples with certain qualities, high-risk samples with

25   certain qualities; right?

1   **A.**  Right.

2   **Q.**  And none of those qualities according to you are age

3   because you're not even sure of what the middle age range is

4   of both these samples?

5   **A.**  Well, I'm quite sure that the age range is in the 30s.

6   However, actuarial instruments were developed to rank risk

7   for all sex offenders.  Those risk levels are accurate

8   irregardless of age so you have data that's important.

9           In terms of the base rates, we don't have a study

10  that says for this -- for Mr. Hunt because of his age of 63

11  we ought to go outside the range of those base rates and

12  choose some other probability somewhere.  We don't -- that's

13  not how the instruments work.

14          The instruments give me a range of risk.  And given

15  the factors that are similar to the samples, and perhaps

16  other factors like health issues, I might find him in the

17  lower end of the range or perhaps the higher end of the

18  range.  That's how they work.  I don't just make up base

19  rates because someone got older.

20  **Q.**  Well, the first thing you do is you choose an instrument

21  to help you answer the question that the Court is asking

22  you; right?

23  **A.**  Of course.

24  **Q.**  You can choose your clinical judgment but you told us

25  you don't do that; right?

1    **A.**  No, I would have better predictive accuracy by using

2    these instruments.

3    **Q.**  That's right.  And you choose which instruments to use;

4    right?

5    **A.**  I do.

6    **Q.**  And you have certain reasons that you choose an

7    instrument?  For example, it's been found to be accurate;

8    right?

9    **A.**  Well, it's found to have moderate predictive accuracy

10   and I would choose that.

11   **Q.**  Right.  And just to go over this point briefly again,

12   the instruments do two things.  They communicate two things:

13   Relative risk and then estimates of absolute risk posed;

14   right?

15   **A.**  Right.

16   **Q.**  And relative risk is what this ROC statistic measures,

17   how well these instruments do ranking offenders relative to

18   one another; right?

19   **A.**  Yes.

20   **Q.**  And the ROC, Receiver Operating Characteristic, for all

21   these tests, they're all very similar, says that they're

22   moderately good at that; right?

23   **A.**  Yes.

24   **Q.**  And so that in any case when it's telling us high risk,

25   we're fairly confident that we, in fact, have a high-risk

1   individual; right?

2   **A.**   Right.

3   **Q.**   And then there is this separate issue of what that means

4   because high-risk doesn't communicate much to us; right?

5   **A.**   Oh, I think it communicates quite a bit to us.  I think

6   it's essential that we know that Mr. Hunt, for example, is

7   in the top two percent of offenders in terms of risk when

8   measured on the Static-99.  I think that's really important

9   information so I wouldn't discount that.

10   **Q.**   Well, but I don't think we need an expert to tell us

11   that Mr. Hunt is a high-risk offender especially in 1986

12   when he is, or 1985 when he starts his prison sentence in

13   this case.  But the question here is what "high risk" means

14   in the context of a 63-year old man, right?  Just for the

15   record, Mr. Hunt has turned 63, you're aware of that; right?

16   **A.**   Yes.

17   **Q.**   All right.  And that doesn't change your opinion?

18   **A.**   No.

19   **Q.**   And also for the record, you had testified that Mr. Hunt

20   was offending into his 40s but that is not correct.  He was

21   born in 1946 and he was offending in his late 30s; right?

22   **A.**   Right.

23   **Q.**   Now, and, in fact, in your protocols you say that

24   offenders who offend at an older age remain at high risk

25   into their later ages; right?

1    **A.**   The relative risk regardless of age would be accurate.

2    **Q.**   Right.  But relative risk doesn't change.  So someone

3    who is high risk remains high risk once they're scored high

4    risk on the instrument; right?

5    **A.**   Yes.

6    **Q.**   But absolute risk may change; right?

7    **A.**   Sure.

8    **Q.**   In fact, Dr. Hanson who we've talked about tried to

9    answer this very question in an article entitled, *"Does*

10   *Static-99 Predict Recidivism in Older Offenders;"* right?

11   **A.**   Yes.

12   **Q.**   And the answer is, "It continues to triage," I think

13   that is your word, "effectively but that the recidivism

14   percentages are substantial overestimates;" right?

15   **A.**   Yes.  I don't think we have new estimates for that with

16   the Static-99 today.  But clearly they were for the old

17   probabilities of sexual reoffense.

18   **Q.**   Right.  So are you suggesting when you say that that

19   perhaps we will find something contrary to that in the new

20   norms?

21   **A.**   No, I don't know because we don't have that data.

22   Already the probabilities are more reduced from the original

23   probabilities so I'm not sure what the new data is with this

24   much larger sample of older offenders.  It may be much more

25   important to us.

1    **Q.**  So you would like to have that data, in fact, we

2    discussed this during the deposition; right?

3    **A.**  I would like to have that data.

4    **Q.**  Because that would improve the quality of your

5    assessment; right?

6    **A.**  Yes.

7    **Q.**  Now, but you make decisions in this field without having

8    the data a lot.  For example, you don't have the data as to

9    whether combining actuarials and the method that you use is

10    accurate or effective, you just put it together because you

11    believe in it; right?

12    **A.**  I put together the risk assessment based on actuarial

13    instruments that have all been validated to moderately

14    predict future sexual reoffense.  While I haven't studied

15    the use of three of them together, there is no reason to

16    believe that it would somehow depart from that.

17    **Q.**  Now -- and that's good practice; right?

18    **A.**  I think it's the appropriate method.

19    **Q.**  Now, what you are saying with respect to the impact of

20    age on the new norms, you're hesitant to conclude that those

21    will also be -- we will also find that the recidivism

22    percentages that you reported for Mr. Hunt will be

23    overestimates?

24    **A.**  They may be overestimates.

25    **Q.**  But you're hesitant to conclude that they will be

1    without seeing the data?

2    **A.**   I'm hesitant because we already have low-risk samples

3    involved.  And we before had one value.  We didn't have a

4    low-risk sample and a high-risk sample.  So it is possible

5    that his risk is much more similar to the lower-risk sample

6    and that would then account for his age so that has yet to

7    be determined.

8    **Q.**   But it's also possible that all the recidivism

9    percentages that you have reported as being applicable to

10   Mr. Hunt in providing information to the Court about him are

11   substantial overestimates because of age?

12   **A.**   It's possible they're overestimates as a result of age.

13   **Q.**   Now, for the record, I have turned to an article that

14   we -- the article we have just been discussing by Dr. Hanson

15   which dates from 2006 in published formed, *"Does Static-99*

16   *Predict Recidivism Among Older Offenders."*  And this is, in

17   fact, an article that you referred to in your direct

18   testimony when Ms. Serafyn asked you about it.  Do you

19   recall that?

20   **A.**   Yes.

21   **Q.**   And one of the things you stated about it was that you

22   were hesitant to conclude or make conclusions about it

23   because of small sample size; right?

24   **A.**   With the older offenders, yes.  It's a problem making

25   interpretations from those probabilities, least of all, and

1   also that those values have never been cross-validated.

2   **Q.**  Well, but we are always going to have fewer older

3   offenders; right?

4   **A.**  Well, I think that once the 30 samples involved in the

5   revision of the norms are coded, I would expect to have a

6   reasonable size sample at that point.

7   **Q.**  Well, but fewer older offenders in comparison to younger

8   offenders?

9   **A.**  Oh, sure, but enough to draw stronger conclusions.

10  **Q.**  Right.

11  **A.**  Yes.

12  **Q.**  But, now, the new norms that we have been talking about,

13  this ongoing process of -- because they're not just giving

14  us the raw data with the new Static-99, they're slicing and

15  dicing, they have low-risk samples, high-risk samples and

16  then there is also other samples; right?

17  **A.**  Right.

18  **Q.**  But that raw number is about 6,000 bodies; right?

19  **A.**  Yes.

20  **Q.**  But now this study here, *"Does Static-99 Predict*

21  *Recidivism Among Older Sexual Offenders,"* is 3,425 sexual

22  offenders as a group?

23  **A.**  As a group.

24  **Q.**  Right.  And so that's about half; right?

25  **A.**  It is.  It is half.

1    **Q.**  And, again, I have turned to Table 3 of this study.  And

2    it shows the recidivism rate with a few people of 9.1

3    percent with a confidence interval of plus or minus 17

4    percent in this age range; right?

5    **A.**  Yes.

6    **Q.**  And the confidence interval is a statistical concept

7    that we were talking about earlier in this case which allows

8    us to -- well, in practical terms, we can be 95 percent, if

9    it's a 95 percent confidence interval, 95 percent sure that

10   the correct value will be within the confidence interval;

11   right?

12   **A.**  Right, on anyone else you score.

13   **Q.**  And so in this case it would be 0 to 26 percent; right?

14   **A.**  Right.

15   **Q.**  For high-risk offenders over 60; right?

16   **A.**  Right.

17   **Q.**  And this is a study of the Static-99 based on 3,000

18   people; right?

19   **A.**  Right.  Right.  When we did not have specific

20   probability cutoffs for scores above six so it's based on

21   six, scores of six and above.

22   **Q.**  Well, right.  When you say when we did not have cutoff

23   scores for, percentages for scores above 6, you're referring

24   to something which, something else which happened in this

25   field prior to basically October of last year, six and above

1    were grouped together as high risk; right?

2    **A.**  Right.

3    **Q.**  And you have stated on direct that we should still

4    consider six and above high risk but there are now

5    percentages associated with the different scores?

6    **A.**  Right, higher percentages, yes.

7    **Q.**  Now, but we discussed in this case earlier the concept

8    of confidence interval with respect to those higher scores;

9    right?  Well, you don't know that.

10          And there are confidence intervals related to the

11   scores that you reported; right?

12   **A.**  Yes.

13   **Q.**  But you don't report the confidence intervals in, or you

14   didn't in your direct testimony; right?

15   **A.**  No, I never -- I don't usually report them.

16   **Q.**  But the confidence intervals for the higher scores in

17   the new samples overlap; right?

18   **A.**  Yes, they do.

19   **Q.**  And so -- and, again, this is information which has not

20   yet been -- has appeared in published form; right?

21   **A.**  Right, it's in press.

22   **Q.**  And so the idea that these percentages are communicating

23   different levels of risk is put into question by the fact

24   that the confidence intervals overlap; is that a fair

25   statement?

1    **A.**  I think so.  This happens, confidence intervals

2    overlapping in smaller samples so when you get to the higher

3    scores, we have smaller samples.  So a score of 10 and 11

4    may be similar to each other and probability is not

5    significantly different in 9 or 10, that kind of thing.

6    **Q.**  Now, just before we move off this article, *"Does*

7    *Static-99 Predict,"* it says -- after the table and after the

8    discussion of what Dr. Hanson did to come up with the

9    numbers there is a discussion and a section entitled,

10   *"Implications for Applied Evaluations."*

11          And it states there in the highlighted passage on

12   page 353, "Offenders over age 60 appeared substantially

13   lower risk than expected."  And by "expected," he means by

14   what the Static-99 tables would have you expect; right?

15   **A.**  Yes.

16   **Q.**  There were very few offenders over the age of 60 and the

17   recidivism risk was low even when the Static-99 scores were

18   controlled?

19   **A.**  Yes.

20   **Q.**  What he is saying there is that taking out the high --

21   that they were low for high-, medium- and low-risk

22   offenders; right?

23          I mean they were low for all types of offenders;

24   right?

25   **A.**  Lower for low-, medium- or high-risk older offenders

1    based on 11 individuals of which only a handful were those

2    who child molested.  And I have no information that says any

3    of them had a score of 11 on the Static-99.

4    **Q.**  Well, but we just discussed about doubt whether having

5    an 11 is meaningfully different from having any other

6    conjoining (ph.) score; right?

7    **A.**  Oh, it's clearly different.  There may be overlap with a

8    score above or below it.  But, you know, 11 is almost the

9    max that you can get on the instrument so it clearly is

10   meaningful.

11   **Q.**  Well, you just agreed with me that the confidence

12   interval may overlap with a ten; right?

13   **A.**  Right.  But I didn't say that that of 11 didn't

14   represent high risk, a significantly high risk.  And,

15   furthermore, the new data is now looking at those higher

16   risk scores that have probability.  So I think it's

17   premature to make any conclusions based on this statement,

18   this data until we have new data.

19   **Q.**  Well, but this Court needs to make a decision right now;

20   right?

21   **A.**  Right.

22   **Q.**  And information that you're presenting to the Court --

23   and you presented the information about the old norms as

24   applicable or the new norms as applicable providing useful

25   information about Mr. Hunt; right?

1    **A.**  I believe they do.

2    **Q.**  And you say that you performed a pure actuarial method

3    because it's empirically based and it's giving us useful

4    information about Mr. Hunt?

5    **A.**  It does.

6    **Q.**  And it provides a risk range which you say is sort of

7    bounding your risk opinion because you know that if you

8    start to go outside of it, you're going to be less accurate;

9    right?

10   **A.**  Right.

11   **Q.**  And you have available to you research on age and sexual

12   reoffense; right?

13   **A.**  Yes, I have discussed it today.

14   **Q.**  You have.  And one of the things that you discussed is

15   the research of Howard Barbaree; right?

16   **A.**  Yes.

17   **Q.**  And counsel for the government, Ms. Serafyn, pointed out

18   to you this page (indicating) which is page 47 of

19   Dr. Barbaree and Dr. Blanchard's chapter in the textbook

20   *Sexual Deviance*.

21         This is a standard textbook in the field of sex

22   offender assessment; right?

23   **A.**  Yes.

24   **Q.**  And this is Chapter 3 of that book, *"Sexual Deviance*

25   *Over the Lifespan."*  Page 47 is a reproduction of Carl

1    Hanson's chart from 2002; right?

2    **A.**  Right.

3    **Q.**  Now, what that chart shows is a sample -- I'm going to

4    ask you, Dr. Phenix, do you know how many people were in

5    this study from Hanson in 2002?  About 4,000; right?

6    **A.**  Yes.

7    **Q.**  And Dr. Hanson broke up the, broke up the offenders into

8    groups, extrafamilial child molesters, incest offenders and

9    rapists, and has the different reoffense rates that were

10   recorded there; right?

11   **A.**  Right.

12   **Q.**  And what this shows out of these 4,000 people is a

13   recidivism rate for the extrafamilial child molesters of

14   about 5 percent at the age of 60; right?

15   **A.**  Yes.  A general group, low, low-risk offenders,

16   medium-risk offenders and a handful of high-rise offenders.

17   **Q.**  Well, and that's what we're talking about, the overall

18   base rate with everyone mixed up in it; right?

19   **A.**  Right.

20   **Q.**  But we have discussed, again, how this is an important

21   number, the overall base rate; right?  Because the overall

22   base rate is something that distinguishes the low-risk

23   sample from the high-risk sample in the studies that you are

24   doing now; right?

25   **A.**  No, it just gives an average of everyone's risk level.

1    That is all the base, general base rate it can give you.

2    **Q.**  But we know that the overall general base rate has an

3    effect on what the Static-99 scores are going to be; right?

4    **A.**  Yes.

5    **Q.**  And we know that a low base rate is going to lead to

6    lower Static-99 scores and a high base rate is going to lead

7    to higher Static-99 scores; right?

8    **A.**  Well, yes.

9    **Q.**  And so if we define our class as over 60 offenders, we

10   have right here good information of a plausible base rate;

11   right?

12   **A.**  For the group.

13   **Q.**  That's right.  For the group of about five percent;

14   right?

15   **A.**  A small group, yes, 131 subjects.

16   **Q.**  Well -- now, that base rate is lower than any of the

17   base rates for the low-risk group?

18   **A.**  Clearly.

19   **Q.**  Clearly.

20       And so if we were to define 60-years old as our

21   class, we would assume that the Static-99 scores would be

22   substantially lower than expected; right?

23   **A.**  Right.  That's why it's unusual for Mr. Hunt to have

24   such a high Static-99 score.

25   **Q.**  Well, if we were to assume that the base rate of

1    reoffense in our group is 5 percent because we have chosen

2    60-year old offenders as our group, then we would expect any

3    Static-99 scores associated with that to be substantially

4    lower than expected?

5    **A.**  You would expect that.

6    **Q.**  And, in fact, when Dr. Hanson studied precisely that

7    question with 3,000 offenders in 2006, he came to that

8    result; right?

9    **A.**  I'm sorry, you have to explain what result you're

10   talking about, what results.

11   **Q.**  When Dr. Hanson later, continuing to address and study

12   the question of the impact of age on these assessments, when

13   he studied whether Static-99 even continued to be valuable

14   for the over 60 crowd, he found that the recidivism -- that

15   they continued to rank relative risk?

16   **A.**  Yes.

17   **Q.**  But that high risk in that case was for sixes, over 60

18   years old, was 9.1 percent; right?

19   **A.**  Well, 0 to 27 percent, right.

20   **Q.**  0 to 26 I think we decided; right?

21   **A.**  26 percent.

22   **Q.**  Right.

23        Now, but it's your testimony here today that, A,

24   the recidivism percentages unadjusted for these actuarial

25   instruments that you're using, the Static-99 and the

1    Static-2002, provide good information and, B, one of the

2    reasons they do is that you are not sure what the age

3    research on the new samples is going to show; right?

4    **A.**   I think that the base rate range associated with his

5    high score on the Static-99 provides useful information.  I

6    see him as closer to the low-risk sample rather than the

7    high-risk sample because of his age.  And I base that on the

8    fact that he is older and so he would be closer to a lower

9    base rate sample, not a higher base rate sample.

10   **Q.**   So is it your testimony that Mr. Hunt is now at the

11   lower end of the recidivism percentages that you recorded?

12   **A.**   Well, I believe that was always my testimony.  That he

13   had some characteristics similar I believe I said to both

14   samples but that that range did not fully consider his age.

15   And I would see him closer to the low-risk sample which in

16   this case was, what, about close to 48, 49 percent.

17          But I would not readjust his base rate of

18   reoffending outside of that lower based on, for example, the

19   Static-99 study of older offenders which showed about 0 to

20   27 percent base rate because we just don't have enough data

21   available yet.

22   **Q.**   Well, one thing about these new norms, we said it's

23   6,000 bodies, right, or a little bit above that?  But now

24   they have broken out the bodies that, or the populations

25   that they want evaluators to use into a high-risk group and

1    a low-risk group which are not the entire sample; right?

2    **A.**   Yes.

3    **Q.**   And, in fact, in the high-risk group there is about a

4    thousand people; right?

5    **A.**   Yes.

6    **Q.**   And in the low-risk group there is about a thousand

7    people; right?

8    **A.**   Yes, for the 5-year probabilities and less for the

9    10-year.

10   **Q.**   Okay.  But the study I just showed you from 2006 by

11   Dr. Hanson himself shows you age adjusted base rates for

12   high-risk six and above of 3,000 people?

13   **A.**   Right.

14   **Q.**   Now, we have seen a recommendation in the literature

15   that people evaluating offenders over 40 consider using the

16   2006 tables for this purpose of giving a sense of the

17   absolute risk of an offender such as Mr. Hunt.  Are you

18   familiar with that recommendation?

19   **A.**   That's actually opposed to the recommendation by

20   Dr. Hanson who said that those values have never been

21   cross-validated and should never have been used as absolute

22   values.

23   **Q.**   Well, now, when you say values cross-validated, again,

24   when we're talking about cross-validation, in terms of

25   relative risk ranking, the Static-99 has been replicated and

1  cross-validated many times; right?

2  **A.**  Right.

3  **Q.**  In terms of this absolute risk issue, that's a separate

4  issue entirely; right?

5  **A.**  It is a separate issue.

6  **Q.**  For example, these new norms that we're talking about,

7  they haven't been cross-validated; right?  They're coming

8  out right now?  They are a cross-validation; right?

9  **A.**  Right.  They are a result of a validation.

10  **Q.**  That's right.  And so the Static-99, the recidivism

11  percentages there could very well be the best information on

12  this question that you have available to you; couldn't they?

13  **A.**  I think what they're useful for is to tell you that

14  there is clear trend, that with age there are reductions in

15  recidivism.

16      I would never use those values, and Dr. Hanson

17  advises not to use those values.  Those were not the result

18  of a validation.  They're simply summary statistics of the

19  sample.  But they do tell us important information and that

20  is with advanced age there are reductions in recidivism,

21  sexual recidivism.

22      **THE COURT:**  Do you think that we have covered this

23  many times?

24      **MR. GOLD:**  We have, Your Honor.

25      **THE COURT:**  I mean, this issue, you have gone at it

1    about every possible way that you can go at it.  I suppose

2    you have got a whole stack of cards that provide you with

3    more --

4         **MR. GOLD:**  No, no, I'm finished with these cards,

5    Judge.

6         **THE COURT:**  I fear that you have another stack.

7         **MR. GOLD:**  I do, I do, but I don't have to use them

8    all.

9         **THE COURT:**  I am not trying to hurry you, but, I

10   mean, you have been very thorough and you have gone over the

11   material many times.  You are going to do this so that you

12   can make an argument to me.  And, you know, have you laid a

13   foundation for that argument?  That is the question you want

14   to ask yourself.

15        I don't mean to sound pedantic.  I am just making a

16   suggestion to you that maybe you have covered it enough.

17        **MR. GOLD:**  I --

18        **THE COURT:**  Which doesn't mean that I accept what

19   you are trying to do.  It just means that I think I

20   understand where you are going.

21        **MR. GOLD:**  Good.  With that in mind, Judge, let me

22   look at my little piles and I'll think it through.

23        I do have I think a couple of other points I need

24   to --

25        **THE COURT:**  Go ahead.  Please, this is a very

1    important case to you and to your client.  Take all the time

2    you want.  I just want to make sure that you are not going

3    over something that has been gone over sufficiently for me

4    to at least understand it.

5           **MR. GOLD:**  That's my intention so I appreciate the

6    guidance.

7           **THE COURT:**  All right.  Go ahead.

8           (Pause in proceedings.)

9           **MR. GOLD:**  Judge, same issue but just a --

10          **THE COURT:**  Go ahead.  You don't need my

11   permission.  Anything you think you need to ask, go ahead

12   and ask.

13   BY MR. GOLD

14   **Q.**  You testified that you were familiar with a method for

15   adjusting age that was proposed by Dr. Barbaree; right?

16   **A.**  Yes.

17   **Q.**  And Dr. Barbaree looked at the available research and

18   proposed that if you wanted to take a high-risk number and

19   adjust it for age, you could do this; right?

20   **A.**  Yes.

21   **Q.**  And what you could do is you could look at the age

22   decline, you could come up with what's called a hazard ratio

23   and then you could take that high score and multiply it;

24   right?

25   **A.**  Yes.

1    **Q.** And what you would have then according to Dr. Barbaree

2    is a defensible empirically adjusted number; right?

3    **A.** Yes.

4    **Q.** Now, this is a, a proposal in this vein of coming up

5    with an empirically justified number to give to the Court

6    about absolute risk; right?

7    **A.** That's his proposal.

8    **Q.** And you're familiar with that proposal but you don't

9    endorse it; right?

10   **A.** No.

11   **Q.** And one of the reasons you said that you don't endorse

12   it is because you are looking at an individual case while

13   Dr. Barbaree is looking at groups, something like that?  Is

14   that -- am I mangling your testimony?

15   **A.** No.  I think what he is doing is applying a formula to

16   an individual that may be relevant for groups of individuals

17   but may not tell the whole story in terms of what

18   contributes to risk for an individual.

19   **Q.** Well, but what he is doing is trying to get at this

20   problem which I've been covering the ground of which is this

21   argument that the base rate for older offenders, base rate

22   affects Static-99 scores, base rate for older offenders is

23   low, therefore, these percentages are overestimates for old

24   guys.

25            Now, do you accept that proposition?

1   **A.**   I accept that the data in the case for groups of

2   offenders, that the actuarials may overestimate base rates

3   of sexual reoffense for advanced age offenders.

4   **Q.**   You mentioned a study by Dr. Thornton; right?

5   **A.**   Yes.

6   **Q.**   And Dr. Thornton found that if you have a bunch of prior

7   convictions, your sex offense recidivism rate in the sample

8   that he studied was constant throughout 40 to 59; right?

9   **A.**   Right, about 50 percent.

10  **Q.**   Now, you said that study involves 7,000 individuals;

11  right?

12  **A.**   It involved about 7500.  I don't know, I must have said

13  thousands instead of hundred.  I think it was 7500.

14  **Q.**   You mean 750?

15  **A.**   Yes, 750 offenders, not 7,000 offenders.  I might have

16  said it but I didn't mean it.

17  **Q.**   Right.  It was about 750 offenders?

18  **A.**   Right.

19  **Q.**   But what this study shows -- and for the record, I'm

20  turning to this article by Dr. Thornton which is entitled,

21  *"Age and Sexual Recidivism, A Variable Connection."*  He has

22  a table here, table No. two, where he puts out the

23  recidivism rates for those with no prior sexual sentencing

24  occasions, with one and with two; right?

25  **A.**   Yes.

1    **Q.**  And there is this phenomenon which he talks about as

2    being a sort of plateau in risk and then between 40 and 59;

3    right?

4    **A.**  Right.

5    **Q.**  Now, one thing we don't know about this study, that's a

6    20-year period; right?

7    **A.**  Yes.

8    **Q.**  And so we don't know from reading the study how many

9    people are 40 to 50 and how many people were 50 to 59;

10   correct?

11   **A.**  Right.  He lumped them all together.

12   **Q.**  And then after 60, again, very small number, but we

13   don't have that recidivism rate.  There is a dropoff; right?

14   **A.**  There is a dropoff.  There aren't any, even any sex

15   offenders in here with two prior sex offenses so, yes, I

16   mean, there is just too small a sample to make any

17   conclusions after 60.

18   **Q.**  Right.  Right.

19            But in that chart that Dr. Barbaree prepared that

20   Ms. Serafyn showed you, what we have is this issue of --

21   these are the studies that were existing at the time.  I

22   have now put on page 49, Figure 3.9 of the Barbaree and

23   Blanchard chapter where he has plotted the recidivism rates

24   from the existing studies on sex offender recidivism and

25   age; right?

1    **A.**  Yes.

2    **Q.**  And what he has done is he has taken them, sort of made

3    them equal to each other by making certain adjustments and

4    plotted their recidivism rates on the line; right?

5    **A.**  Yes, he has adjusted them.

6    **Q.**  Right.  And so that's one of the things that we do with

7    statistics is make lines so that we can predict future

8    values; right?

9    **A.**  Well, you can do that, right.  That's what he has chosen

10   to do, take out the high-risk groups to make a regression

11   line that goes straight down.

12   **Q.**  So it's your testimony that he has taken out high-risk

13   groups from this?

14   **A.**  Well, he took out the high-risk group from the Hanson

15   study.  That's why -- that's how it became linear.  He took

16   out the younger age group which had a much higher risk.  And

17   then when he replotted it without the younger age group, it

18   became linear.  The curve became linear.  I mean, it just

19   did that statistically.

20          And for Thornton 2006 he must have averaged the

21   antisocial group and the sexual specialists to have that

22   curve go down because the sexual specialists' regression

23   line would have been straight across.

24   **Q.**  Well, we can ask him what he did when he comes in to

25   testify.  But, now, with respect to the Hanson 2002, he took

1    out the younger offenders and then said it was linear after

2    that?

3    **A.**  Yes.

4    **Q.**  And he was very explicit about that --

5    **A.**  Oh, sure.

6    **Q.**  -- move that he made?

7    **A.**  Right.

8    **Q.**  But what this shows is trend lines in one, two, three,

9    four, five separate studies looking at this decline with

10   age; right?

11   **A.**  Yes.

12   **Q.**  And the whole point of the line is that we would expect

13   it to continue; right?

14   **A.**  Sure.  If you had enough subjects, you know, in the

15   older age group, you would expect a similar trend.  Is that

16   the question?

17   **Q.**  Well, yes.  Are you saying that if there were more

18   subjects, you would expect that the trend would change

19   direction?

20   **A.**  Well, I don't know what it would do.  I thought you

21   meant if it went to an older age.  I don't know if you added

22   new subjects what would happen to it.

23            (Whereupon, counsel conferred.)

24            (Pause in proceedings.)

25   **Q.**  You scored an instrument called the Mn-SOST-R?

1    **A.**  I did.

2    **Q.**  And you testified that -- well, in your report in this

3    matter you reported the recidivism rates associated with the

4    Mn-SOST-R; right?

5    **A.**  Yes.

6    **Q.**  And that was something like 72 percent?

7    **A.**  Yes, that's correct.

8    **Q.**  Is that still good information about Mr. Hunt?

9    **A.**  The 72 percent would be the study sample.  And I

10   reported that not for Mr. Hunt but for the study sample that

11   there was a recidivism rate of 72 percent for a score of 13

12   and above essentially.

13   **Q.**  Well, but what you're doing, if someone is in Mr. Hunt's

14   risk bin on the Mn-SOST-R, it's just called refer; right?

15   **A.**  Yes.

16   **Q.**  And so in order for us to understand what "refer" means,

17   we look to the development sample and to look at what their

18   risk posed by people in that bin is; right?

19   **A.**  Right.  It's the developmental sample plus the

20   validation sample, yes.

21   **Q.**  72 percent?

22   **A.**  It was 72 percent, yes.  The revised norms that I also

23   quoted was 40 percent.

24   **Q.**  Okay.  And so that's a substantial decline.  That's

25   similar to the decline that we saw in the Static-99 samples;

1   right?

2   **A.**   I think it's a little larger.

3   **Q.**   And what is the average age of those new samples?

4   **A.**   I don't know.  It will be similar to in the mid 30s.

5   **Q.**   Okay.  Now, is that material in published form yet?

6   **A.**   No.  It will be a book chapter.  It's been presented at

7   a presentation.  It will be become a book and is being

8   published next year.

9   **Q.**   Now, that is an argument in the field that you referred

10  to -- well, you referred to there being camps about the

11  effect of age.  And one of the camps was there is a decline

12  with age?

13  **A.**   (Witness nodded.)

14  **Q.**   Another was that age is irrelevant, it's age at first

15  offense that's important?

16  **A.**   Right, Harrison and Rice.

17  **Q.**   Now, that's an opinion that you do not endorse; right?

18  **A.**   I think that there is only one study that has addressed

19  that issue.  And so I am waiting to see what further

20  research unfolds about that.  I still believe there is

21  reduction with age.

22  **Q.**   Now, you testified that it would be useful information

23  to have age-related data with the new norms of the

24  Static-99; right?

25  **A.**   Sure.

1    **Q.**  And you -- we have obtained in this case or discussed in

2    this case preliminary age-related data about the new norms.

3    Have you seen that information?

4    **A.**  Yes, I have seen it.  I believe.  Could you be more

5    specific?

6    **Q.**  For the record, I have put up on the screen a document

7    entitled, *"Static-99 Updated Norms Project:  Sexual*

8    *Recidivism by Age Categories."*

9         It's dated February 20, 2009.  Have you ever seen

10   this document?

11   **A.**  Yes.

12   **Q.**  In what context have you seen it?

13   **A.**  It was provided to me in this case and it was provided

14   to me by Leslie Helmus.

15   **Q.**  It was provided to you by Leslie Helmus?

16   **A.**  Right.  I work with Leslie Helmus.  We are working on

17   the Static-2002 project and the Static-99.  I'm on the

18   Coding Rules so we have this information distributed to us

19   when they conduct this research.

20   **Q.**  And so she distributed this very table to you?

21   **A.**  I don't know if it was this very table.  But this is the

22   similar data that I reviewed.  And I received this in

23   discovery on this case.  So I certainly reviewed it then

24   too.

25   **Q.**  Well, for the -- when do you think you received this as

1   discovery in this case?

2   **A.** Oh, gosh.  Within the last few weeks or something like

3   that.

4   **Q.** And what this table shows is data from these new norms

5   that we've been talking about.  And for the record it says

6   all offenders with age data.  And it shows an age category

7   of 60 to 64.9.  It shows a medium Static-99 score which is

8   much lower than Mr. Hunt's, an N of 204 individuals with 11

9   recidivists and a recidivism rate of 5.4 percent; right?

10  **A.** Right.  That's for all offenders.

11  **Q.** That's right.

12  **A.** Yes, yes.

13  **Q.** And then it breaks it into child molesters and it shows

14  a similar rate of four percent in the same age bracket for

15  child molester; right?

16  **A.** Right.

17  **Q.** Now, this is -- do you recognize this document

18  (indicating) that I have put up on the screen, "Static-99

19  Updated Norms Project, Sexual Recidivism by Age Categories,

20  February 25, 2009.  These tables are restricted only to

21  cases with Static-99 scores of six plus"?

22  **A.** I just don't recall if I received this in the discovery.

23  I just don't recall.

24  **Q.** Well, for the record what this reflects is all offenders

25  with the Static-99 score of six in this large sample, the

1   median Static-99 score was 7.1.  The recidivism rate was 8.2

2   percent?

3   **A.**  Right.

4   **Q.**  For that group.

5         And child molesters 10.3 percent?

6   **A.**  Yes.

7   **Q.**  And these are for the high-risk offenders; right?

8   **A.**  Right, Static-99 average of seven.

9   **Q.**  And so this is further data suggesting that the

10  Static-99 scores that you've reported for Mr. Hunt are

11  substantial overestimates of the actual risk he would pose

12  if he were to be released; is it not?

13  **A.**  He has a score of 11.  This is a mean score of 7 so I'm

14  not sure that it can directly translate into a recidivism

15  rate for Mr. Hunt.

16  **Q.**  So it's your opinion that -- then is it your opinion

17  there are -- well, how many 11s are there in the entire

18  sample?

19  **A.**  Almost none.

20  **Q.**  So then should it be applied to him at all?

21  **A.**  Sure, because we have data on recidivism rates for those

22  with a score of 11.  There were sufficient numbers that you

23  could get, you could average if you collapse it with a score

24  of 10 and above, 10, 11 and 12 together.  That data becomes

25  reliable to use.  Of course you can use it.

1   **Q.**  Well, and that is, in fact, what's being done here;

2   right?

3   **A.**  Well, I don't know that there was anyone with a score of

4   11 in this sample.  Again, it's a very small sample.  49 for

5   all offenders which I wouldn't use, I wouldn't use those

6   values.  I'd use those for those with child molest as

7   offenses.  And there were only 29 subjects.  Three of them

8   reoffended.

9        So clearly there is a reduction in recidivism with

10   age just like I've been talking about.  I just can't apply

11   these numbers to an individual case.  That's not the purpose

12   of this.

13   **Q.**  But you applied the numbers which apply to 37-year olds

14   or people in their mid 30s in this case?

15   **A.**  I said that those values clearly were the recidivism

16   rates for the study sample and for the study sample with

17   that score.

18        (Pause in proceedings.)

19   **Q.**  As a psychologist you're, like any number of other

20   professionals, bound by ethics; right?

21   **A.**  Right.

22   **Q.**  Now, and you're also a member of the Association for the

23   Treatment of Sexual Abusers; right?

24   **A.**  No.

25   **Q.**  Oh, you're not?

1    **A.**   No.

2    **Q.**   But you previously were?

3    **A.**   I was.

4    **Q.**   Right.  And the Association for the Treatment of Sexual

5    Abusers promulgates codes about how to do this type of

6    assessment; right?

7    **A.**   General guidelines, they do, yes.

8    **Q.**   And they recommend best practices and things like that?

9    **A.**   Of course.

10   **Q.**   And your attempt to come up with an empirically valid

11   method to do these assessments is your attempt at devising

12   best practices to do these assessments; right?

13   **A.**   Right.

14   **Q.**   Now, in your opinion is doing one of these assessments

15   based on clinical judgment, even seasoned clinical judgment,

16   without more in compliance with psychological methods?

17   **A.**   It wouldn't be based on current recommendations of

18   evaluation.

19   **Q.**   And so it would be -- and why would that threaten to or

20   why could that potentially be an ethical violation?

21   **A.**   I don't believe it would be an ethical violation.  It

22   simply would not be as accurate in general as using more

23   current techniques.

24           However, half the time clinical opinion is correct.

25   And so it's possible that someone could make an accurate and

1    reasonable prediction based on clinical opinion but it would

2    not be in general as accurate as using current methods.

3    **Q.**  Well, don't you have an obligation to choose the best

4    research method or tool for a particular task as a

5    psychologist?

6    **A.**  Yes, you do.

7    **Q.**  And that's a decision that you make using your

8    professional judgment as to which tool to use?

9    **A.**  That's right.  Someone may disagree with me about that.

10           (Pause in proceedings.)

11   **Q.**  Now, you mentioned Depo-Provera in your direct

12   testimony; do you recall that?

13   **A.**  Yes.

14   **Q.**  And the context was that's a kind of modern management

15   technique for people with sex offense issues; right?

16   **A.**  Right, for people with pedophilia, intrusive fantasies

17   and urges.

18   **Q.**  And what Depo-Provera does is it takes out or interferes

19   with testosterone in some way; right?

20   **A.**  Yes, it lowers it to zero.

21   **Q.**  Lowers it to zero?

22   **A.**  Right.

23   **Q.**  And testosterone is a hormone which is involved in

24   libido in some way; right?

25   **A.**  Yes.

1  **Q.**  And so what it does is it takes away the libido?

2  **A.**  It does.

3  **Q.**  And that has been shown to be an effective treatment for

4  sex offenders with these intrusive thoughts and things like

5  that?

6  **A.**  For most, yes.

7  **Q.**  Now, a research finding, and, again, in this field is

8  that libido, testosterone decreases with age generally;

9  right?

10  **A.**  Yes, it does.

11  **Q.**  And that is a process that happens simply as the human

12  male matures; right?

13  **A.**  Yes, it starts right after puberty and continues

14  throughout the life of a male.

15  **Q.**  And it's sort of a natural Depo-Provera; right?

16  **A.**  Yes.  However, certainly the rates of testosterone would

17  never be that low in a male.

18  **Q.**  Well, it's very difficult for you to assess any

19  individual what their level of testosterone is; right?

20  **A.**  Right.  I am just referring to groups of males when they

21  have been measured at various ages.

22          (Whereupon, counsel conferred.)

23          **MR. GOLD:**  Just one moment, Judge.  I think I am

24  about ready to wrap up but I just want to flip over the rest

25  of my cards.

1              (Pause in proceedings.)

2    BY MR. GOLD

3    **Q.**  Dr. Phenix, I just want to talk briefly about your use

4    of the dynamic factors in this case.

5            In your report you talk about dynamic factors as a

6    method to either adjust the risk upward or downward.  And

7    this is the method that you have moved beyond because of

8    this research finding; right?

9    **A.**  Yes.

10   **Q.**  But you still use the same dynamic factors when you try

11   to determine whether someone is in a particular area of this

12   range or not?

13   **A.**  Right.

14   **Q.**  Now, you listed a number of these dynamic factors but

15   these factors were developed on men who were being

16   supervised in the community; right?

17   **A.**  Yes, that's what I explained.

18   **Q.**  Right.  And so they are essentially targeting people's

19   behavior in the community; right?

20   **A.**  Right.

21   **Q.**  And so -- and there -- now, you noted that in many, much

22   of the evidence that you marshaled for the dynamic factors

23   was inferential evidence from this behavior while he was in

24   the community; is that fair to say?

25   **A.**  Sure, I looked at his history.

1    **Q.**  And then what you have is an absence of information

2    because he has been incarcerated; right?

3    **A.**  Oh, right.  Right.

4    **Q.**  Now, you also mentioned the issue of undetected

5    recidivism.  Do you recall that?

6    **A.**  Yes.

7    **Q.**  And you suggested that that is a potential reason for us

8    to think that some of these percentages that we've been

9    talking about are underestimates; right?

10   **A.**  Right.

11   **Q.**  And that's because not all sex offenses are detected?

12   **A.**  Most are not, that's correct.

13   **Q.**  Most sex offenses are not detected?

14   **A.**  Yes.

15   **Q.**  Is that your testimony?

16   **A.**  Yes.

17   **Q.**  And often offenders commit sex offenses, and we also

18   know that offenders such as Mr. Hunt, you said even in this

19   case he has admitted now to offenses that he was never

20   convicted for; right?

21   **A.**  Right.

22   **Q.**  Either convicted of or that were never detected; right?

23   **A.**  Either one, right.

24   **Q.**  Right.

25          But the impact of that on assessments like this or

1    these percentages is not straightforward in the sense that

2    most sex offenses are not detected but most sex offenses are

3    not committed by convicted sex offenders; right?

4    **A.**   I guess I wouldn't be able to quote the statistics

5    between those that were committed by convicted sex offenders

6    and those that were not, particularly when they're

7    undetected.

8    **Q.**   Well, we know that most sex offenses that are committed

9    are not committed by sex offenders who have been released

10   from prison; right?

11              **THE COURT:**  How could she know that?

12              **MR. GOLD:**  Well, the department -- I can get into

13   the study.  I mean, maybe I should be more clear.  There is

14   a certain number of detected sex offenses and released sex

15   offenders -- this is the Department of Justice study, 2003.

16              **THE COURT:**  Well, ask her if she is familiar with

17   that.

18   BY MR. GOLD

19   **Q.**   Are you familiar with the Department of Justice study,

20   *"Prisoners Released In 1994"*?

21   **A.**   Yes.

22   **Q.**   2003 study?

23   **A.**   I'm sorry, yes.

24   **Q.**   And there is also, that's all prisoners and also all sex

25   offenders, two separate studies; right?

1   **A.**  Right.

2   **Q.**  And that shows that in fifteen states they have a sample

3   of basically all released prisoners in those fifteen states,

4   including California; right?

5   **A.**  Yes.

6   **Q.**  And in that sample there is some 300 or 30,000 -- well,

7   of that sample, there are 10,000 sex offenders that were

8   followed for three years; right?

9   **A.**  I don't recall exactly but --

10  **Q.**  But it's a large sample; right?

11  **A.**  Right.

12  **Q.**  And so we know that the number of sex offenses from that

13  sample was --

14      **MR. GOLD:**  Judge, I've waded into territory, maybe

15  I didn't -- let me --

16      **THE COURT:**  Well, I hope you have a point to you

17  asking those questions.

18      **MR. GOLD:**  I certainly do, Judge.  But I just

19  wanted to try -- I certainly do.  Let me try to get at it a

20  different way.

21  BY MR. GOLD

22  **Q.**  The issue that I am talking about is the impact of

23  undetected recidivism on these percentages that we're

24  applying to Mr. Hunt.  And you in your testimony suggested

25  that there are undetected offenses and that may mean these

1    percentages are underestimates; right?

2    **A.**  Right.

3    **Q.**  But what we, what we know is that -- and you said that

4    Mr. Hunt had undetected offenses as proof of this

5    phenomenon; right?

6    **A.**  Right, many offenders could, right.

7    **Q.**  Right.  But the thing about Mr. Hunt is that he was

8    caught; right?

9    **A.**  Oh, he's been caught many times.

10   **Q.**  Well, he was caught.  So in the sense that if he is in a

11   study, all his undetected offenses or for any offender,

12   their undetected offenses are caught when they are caught;

13   right?

14   **A.**  No, not always.  I mean, you would catch whatever is

15   charged but you may not know anything about other offending

16   that's occurred for that offender.

17   **Q.**  Well, let me take you back to your protocol.  And there

18   is the question that was posed in this Q and A part of the

19   protocol with Mr. Hanson.  And it says, "How do we consider

20   undetected offenses?"

21          "As in the past," the answer reads, "it's accurate

22   to say the Static-99 and Static-2002 underestimate a

23   person's risk for sexual reoffense because the rates are

24   based upon men who are officially detected of a new crime.

25   However, it must be acknowledged that persistent offenders

1    are typically caught whereas less frequent offenders may

2    survive longer without detection.

3            "The percentage of offenders who go undetected is

4    still unknown.  Those offenders who are most likely to be

5    caught are, A, high frequency, B, commit offenses against

6    unknown victims and, C, use force."

7            But what this passage is saying to me is what I

8    have been trying to get at, which that once someone in the

9    study is caught, in a sense all their offending is captured

10   in this statistic?  That's what is being expressed by this

11   passage, right, so that we can't know how much of an

12   underestimate these statistics are; right?

13           **THE COURT:**  You have a lot of questions you wrapped

14   up into one.  I don't know how she can answer that yes or

15   no.

16   BY MR. GOLD

17   **Q.**  This passage is saying that persistent offenders are

18   typically caught; right?

19   **A.**  That's what Dr. Hanson says.

20   **Q.**  And Dr. Hanson is a researcher with whom you consult;

21   right?

22   **A.**  Right, but he doesn't have data to demonstrate what

23   percentage of offenses go undetected, how much to adjust the

24   base rates for undetected offenses.  There are no guidelines

25   like that here.  He just says kind of logically that if a

1   person has offended quite a bit or they use force, it's more

2   likely to be reported.

3   **Q.**  Well, and he says here that the percent of offenders who

4   go undetected is still unknown; right?

5   **A.**  Oh, absolutely.

6   **Q.**  And the persistent offenders are typically caught;

7   right?

8   **A.**  Well, he believes that they are typically caught.  He

9   doesn't have any data to demonstrate that.

10          (Pause in proceedings.)

11          **MR. GOLD:**  Judge, I have nothing further.

12          **THE COURT:**  Anything else?

13          **MS. SERAFYN:**  Just a couple minutes, Your Honor.

14          **THE COURT:**  Well, you have about three.

15          **MS. SERAFYN:**  Okay.  Plenty of time.

16                      **REDIRECT EXAMINATION**

17  BY MS. SERAFYN

18  **Q.**  Dr. Phenix, I'd like to show you or just refer you to

19  the Hanson article that we've been talking about, *"Does*

20  *Static-99 Predict Recidivism Among Older Sexual Offenders."*

21  **A.**  Yes.

22  **Q.**  And that's the article that contains this chart that we

23  have been discussing; right?

24  **A.**  Right.

25  **Q.**  Okay.  Now, Attorney Gold asked you or focused your

1    attention on a passage on page 353 of that Hanson article

2    that's highlighted here that's says, "At the other end of

3    the age range, offenders over 60 appeared substantially

4    lower risk than expected.  There were very few offenders

5    over the age of 60.  And their recidivism risk was low even

6    when Static-99 scores were controlled."

7         Do you remember that?

8    **A.**  Yes.

9    **Q.**  Okay.  Now, I'd like to focus your attention on page 352

10   of this article, the paragraph right before that.

11        The last paragraph here (indicating) that starts

12   with, "Further."  And it says, "Further research is needed

13   to know how advanced age influences the recidivism risk of

14   offenders who grow old in prison."

15        Would you characterize Mr. Hunt as someone who has

16   grown old in prison?

17   **A.**  Yes.

18   **Q.**  Okay.  And the next sentence says, "The offenders deemed

19   most dangerous by the Criminal Justice System are likely to

20   serve very long sentences and would be underrepresented in

21   recidivism studies."

22        Do you agree with that statement?

23   **A.**  Yes, I think I said that Mr. Hunt was not represented in

24   that small sample of less than 11.

25   **Q.**  And then the next sentence says, "The current study did

1  not distinguish between offenders who were released after

2  serving very long sentences and those convicted at an

3  advanced age."

4        And is that your understanding about this study?

5  **A.**  Yes.

6  **Q.**  Okay.  Now, I'd like to just focus your attention down

7  on the last sentence here that says, "The overall finding

8  that age reduces the risk of most offenders does not

9  preclude the existence of a select few offenders whose risk

10  remains unacceptably high as long as they are physically

11  capable."

12        How, if at all, does that last sentence that I just

13  read apply to Mr. Hunt?

14  **A.**  I think that Mr. Hunt's risk of future sexual reoffense

15  is so high, that he's such a sexual specialist and that he

16  has suffered from a severe paraphilia of pedophilia

17  throughout his life and has had such poor volitional

18  controls over it that in my opinion he does rise above the

19  risk level of other offenders his age.

20        **MS. SERAFYN:**  Thank you.  Nothing further, Your

21  Honor.

22        **THE COURT:**  Okay.

23        Anything else?

24        **MR. GOLD:**  No, Your Honor.

25        **THE COURT:**  All right.  You are excused, Doctor.

1      Thank you.

2                  **THE WITNESS:**  Thank you, Your Honor.

3                  (The witness was excused.)

4                  (Whereupon, the Court and the Law Clerk conferred.)

5                  **THE COURT:**  Let me just check with Zita.

6                  (Pause in proceedings.)

7                  **THE COURT:**  Do you want me?

8           **MR. GOLD:**  I was just going to say, we discussed

9      with Zita this morning, we have a witness who is delayed in

10     the Superior Court in Dedham and he's coming at 11:30.

11                 **THE COURT:**  Okay.  Well, let me check this out.  We

12     are not going to start until 11:30?

13                 **MR. GOLD:**  Right.

14                 (Pause in proceedings.)

15                 (Whereupon, the Court and the Law Clerk conferred.)

16                 **THE COURT:**  Do you have another witness that you

17     want to put on before that?

18                 **MR. GRADY:**  Should the government -- we'd rest.

19                 **THE COURT:**  The government is going to rest when?

20                 **MS. SERAFYN:**  Now.

21                 **THE COURT:**  Oh, now.

22                 Well, who has got the witness tomorrow?

23                 **MR. GOLD:**  We do, Your Honor.

24                 **THE COURT:**  Okay.  So the government is resting, is

25     that what you are telling me?

1          **MS. SERAFYN:**  Yes, Your Honor.

2          **THE COURT:**  Okay.  So the first witness is tomorrow

3     and that is at 11:30?

4          **MR. GOLD:**  Right.  And, Your Honor, we take this

5     opportunity to make a motion under Rule 52 for a directed

6     verdict.

7          **THE COURT:**  Yes, denied.

8          **MR. GOLD:**  Okay.

9          **THE COURT:**  Anything else that we should take up

10     before we leave?

11          **MS. SERAFYN:**  One thing briefly, Your Honor, just

12     so that the record is clear.

13          Dr. Phenix had noticed a typographical error in her

14     Static-2002 Coding Sheet.  And the Static-2002 Coding Sheet

15     was originally admitted as Exhibit 27.  And I'd like to

16     simply substitute her corrected version as Exhibit 27.

17     That's the exhibit that I asked her about.

18          **THE COURT:**  Do you have any objection to that?

19          **MR. GOLD:**  No.

20          **THE COURT:**  Okay.  I will leave that up to counsel

21     to take care of that.

22          **MS. SERAFYN:**  Thank you.

23          **THE COURT:**  All right.  We will see you tomorrow.

24          11:30, you are sure it is 11:30 now?  I don't want

25     to have you people showing up at ten and I don't get here

1  until 11.

2          **MR. GOLD:**  Your Honor, we were just coordinating

3  with another case.  That's where Zita and I and the other

4  lawyer in the Superior Court in Dedham were this morning and

5  I don't anticipate there has been any change.  He has to go

6  on at nine and he said he would be here at 11:30.

7          **THE COURT:**  Okay.  We will hope that works out.

8          Thank you.

9

10          (WHEREUPON, the proceedings were recessed at 4:35

11          p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Carol Lynn Scott, Official Court Reporter for

the United States District Court for the District of

Massachusetts, do hereby certify that the foregoing pages

are a true and accurate transcription of my shorthand notes

taken in the aforementioned matter to the best of my skill

and ability.



                    /S/CAROL LYNN SCOTT


        _____

                    CAROL LYNN SCOTT
                  Official Court Reporter
                 John J. Moakley Courthouse
                1 Courthouse Way, Suite 7204
                 Boston, Massachusetts 02210
                      (617) 330-1377