```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2
       * * * * * * * * * * * * * * *
 3     UNITED STATES OF AMERICA      *
                                     *
 4                  Petitioner,      *
                 vs.                 *        CIVIL ACTION
 5                                   *        No. 07-12063-JLT
       WAYNE HUNT                    *
 6                  Respondent.      *
                                     *
 7     * * * * * * * * * * * * * * *

 8             BEFORE THE HONORABLE JOSEPH L. TAURO
                   UNITED STATES DISTRICT JUDGE
 9                 DAY FIVE OF NONJURY TRIAL

10     A P P E A R A N C E S

11             OFFICE OF THE UNITED STATES ATTORNEY
               1 Courthouse Way, Suite 9200
12             Boston, Massachusetts 02210
               for the United States
13             By:  Mark J. Grady, AUSA
                    Jennifer A. Serafyn, AUSA
14

15             FEDERAL DEFENDER OFFICE
               408 Atlantic Avenue
16             Boston, Massachusetts 02110
               for the Respondent
17             By:  Ian Gold, Esq.
                    Timothy Watkins, Esq.
18

19                                   Courtroom No. 22
                                     John J. Moakley Courthouse
20                                   1 Courthouse Way
                                     Boston, Massachusetts 02210
21                                   May 1, 2009
                                     10:10 a.m.
22

23
                       CAROL LYNN SCOTT, CSR, RMR
24                        Official Court Reporter
                      One Courthouse Way, Suite 7204
25                     Boston, Massachusetts 02210
                             (617) 330-1377
```

**I N D E X**

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|----------|--------|-------|----------|---------|

HOWARD ERROL BARBAREE

  By Mr. Gold        3                    107
  By Mr. Grady                 85

<u>**P R O C E E D I N G S**</u>

1

2          **THE COURT:**  Good morning, everybody.

3          **COUNSEL:**  Good morning, Judge.

4          **THE CLERK:**  We are just waiting for the witness to

5     come back up.

6          **THE COURT:**  All right.

7          (Pause in proceedings.)

8          **THE COURT:**  Good morning.

9          **THE WITNESS:**  Good morning.

10          **THE COURT:**  You can see I have little influence in

11    this building so you made it on your own.

12          (Laughter.)

13          **MR. GOLD:**  Your Honor, the respondent would call

14    Dr. Howard Barbaree to the stand.

15          **THE COURT:**  Okay.

16          **THE CLERK:**  Sir, could you raise your right hand,

17    please.

18               <u>**HOWARD ERROL BARBAREE, Sworn**</u>

19          **THE CLERK:**  Thank you.  You may be seated.

20                    <u>**DIRECT EXAMINATION**</u>

21    BY MR. GOLD

22    **Q.**  Good morning, Dr. Barbaree.

23    **A.**  Good morning.

24    **Q.**  Could you please state your name and spell it for the

25    record?

1    **A.**   Sure.  Howard Errol Barbaree, B-A-R-B-A-R-E-E.

2    **Q.**   Dr. Barbaree, what is your profession?

3    **A.**   I'm a psychologist.

4    **Q.**   Dr. Barbaree, I'd like to direct your attention to the

5    binder which is open in front of you on the witness stand.

6    **A.**   Yes, I have it.

7    **Q.**   And for the record, the binder is open to Exhibit No. 8.

8    **A.**   Correct.

9    **Q.**   Could you identify that document?

10   **A.**   This is a document I prepared at your request on

11   December 17, 2008 and essentially it outlines the evidence

12   that I'll be giving today about age at release.

13   **Q.**   And there is a, on the screen in front of you an image

14   up on the screen.  Is that the same document that's

15   Exhibit 8?

16   **A.**   That is.

17   **Q.**   Could you turn your attention to what has been marked

18   and entered into evidence as Exhibit 9, the next tab?

19   **A.**   Yes, I have that.

20   **Q.**   And what is that?

21   **A.**   This is my curriculum vitae prepared January 2008.

22   **Q.**   And there is an image up on the screen.  Is that the

23   same document?

24   **A.**   Yes, it is.

25   **Q.**   Now, Dr. Barbaree, could you please describe your

1    educational background starting with undergraduate?

2    **A.**   I did an undergraduate degree in psychology at the

3    University of British Columbia.  I graduated in 1968.

4            I did a master's degree in psychology at the

5    University of Newfoundland, Memorial University, St. John's,

6    Newfoundland.

7            I have a Ph.D in psychology at Queen's University

8    in Kingston, Ontario, graduating in 1974.

9    **Q.**   Did you have particular research areas in which you were

10   interested during your education?

11   **A.**   Yes, I did my Ph.D in the area of learning and I did a

12   postdoc, doctoral studies in the area of physiological

13   psychology.

14   **Q.**   Now, Dr. Barbaree, could you describe your professional

15   background starting with that postdoctorate?

16   **A.**   The postdoctoral studies was at the, were at the

17   McMaster University in Hamilton, Ontario.  And we were

18   looking at various aspects of hippocampal (ph.) functioning.

19           When I left the postdoc, I went to work at Kingston

20   Penitentiary.  This was in 1976 and began there as a

21   research associate attached to the Sex Offender Treatment

22   Program.

23           So I have been in this area of research since 1976.

24           At that time we were conducting research developing

25   methods of assessment of sex offenders.  We started working

1    at that time on the use of phallometry to measure --

2    **Q.**  Can you spell that word for the record?

3    **A.**  P-H-A-L-L-O-M-E-T-R-Y.

4    **Q.**  And what is "phallometry"?

5    **A.**  It's a method of assessing sexual preferences.  It

6    involves monitoring sexual arousal of the male directly in

7    response to stimuli that are presented to him in assessment

8    sessions.

9    **Q.**  And what was the next professional post that you had?

10   **A.**  I went, in 1980 -- I had been teaching part-time during

11   my time at the Kingston Penitentiary in the psychology

12   department at Queen's and then went there as an assistant

13   professor in 1980.

14        I was at the Queen's University Department of

15   Psychology till 1993.  Promoted to full professor in 1990.

16   Continued working during that time in the area of sexual

17   offenders, assessment and treatment.  And then in 1993 moved

18   to Toronto to the Clark Institute of Psychiatry.

19        I became the head of the, what was then called the

20   Forensic Psychiatry Programs at the University of Toronto

21   and clinical directer of the Law & Mental Health Program

22   which I have been in those roles for the last 16 years.

23        The Law & Mental Health Program, Centre for

24   Addiction and Mental Health cares for individuals who have

25   been found not guilty by reason of insanity.  We have about

 1    400 patients, most of them living in the community.

 2    **Q.**  Now, Dr. Barbaree, as a psychologist and an academic

 3    have you carried out research in the field of sex offender

 4    behavior?

 5    **A.**  Yes, I have.

 6    **Q.**  And directing your attention to Page 5 of your CV, there

 7    is a section entitled, "Research Grants."  Could you explain

 8    for the Court what that section of your resume is

 9    describing?

10    **A.**  Research is funded often through grants that are awarded

11    by external agencies.  Most often these are grants that are

12    awarded in response to proposals that are made to the

13    funding agency.  And the funding agency conducts a peer

14    review of the proposal and then awards the funding on that

15    basis.

16          So this is a list of the grants that I have been

17    awarded in the past, well, the most recent one in 2008 and

18    the earliest one 1996.

19    **Q.**  If you could, briefly summarize the areas of research in

20    which you have been conducting research over the course of

21    the last 16 years.

22    **A.**  Primarily working on the issue of risk prediction in sex

23    offenders.  During the period of time from 1989 to about

24    1996 I was director of a treatment program that was done in

25    the federal penitentiary near Kingston, Ontario.

1          During that time we treated about 800 sex

2     offenders, many of whom, of course, were released to the

3     community subsequent to their treatment.  And most of the

4     research that we have done since has been focused on the

5     issue of given certain information that you have available

6     while you're working with the individual in treatment, what

7     of that information is helpful in making predictions about

8     who recidivates and who does not.

9          So the research involves taking the files that we

10    had available to us while the individual is in treatment and

11    then we also seek information from the RCMP.  Canada's

12    Police Force maintains a database of all charges and

13    convictions that are registered in courts in Canada.  And so

14    we were able to get from them a record for all the men in

15    our program, records of recidivism for the period of time

16    after treatment while they're in the community.

17         So we have done a number of studies.  Many of them

18    were designed to provide what are called independent

19    cross-validation of the actuarial instruments that are

20    commonly used today.

21         We didn't go through the process of developing any

22    actuarial instruments ourselves.  What we did instead was to

23    take the instruments that had been developed and had been

24    published and coded those instruments with our sample and

25    then asked the question do those actuarial instruments help

1   us predict who will reoffend and who will not.

2   **Q.**   Dr. Barbaree, we've heard a bit about cross-validations.

3   Why are independent cross-validations important?

4   **A.**   If you look at the literature and divide it up into

5   those papers that are published by the developers

6   themselves, the people who do the cross-validation, the

7   statistics tend to be more favorable to the instruments when

8   it's done by the people who have developed the instrument.

9   Partly, because they have developed it, they know how to use

10   it better than others.

11       But the independent cross-validation is important

12   because for the practitioners in the field, they don't have

13   that advantage of having developed the instrument.  They

14   have to use it as a consumer in the sense of the instrument.

15   So we were acting like consumers of the instruments and

16   applying these instruments to a whole new sample.

17       The other reason independent cross-validation is

18   important is that though these instruments developed on the

19   samples that were used to develop the instrument, there is

20   no guarantee that these instruments will have the same

21   ability to predict recidivism when it's used on a whole new

22   sample.

23       So for the independent cross-validation to support

24   the idea that these instruments are predictive of recidivism

25   is very important because it supports the idea that

1    practitioners can use these instruments and give valuable

2    testimony at trial.

3    **Q.**  And are there, of the cross-validations that you have

4    done, which instruments have you cross-validated?

5    **A.**  We used the five instruments that have been identified

6    as the most commonly used in the literature:

7          The Violence Risk Appraisal Guide, and it's' often

8    shortened to the VRAG or V-R-A-G; the Sex Offender Risk

9    Appraisal Guide, shortened to SORAG, S-O-R-A-G; the RRASOR,

10   the Rapid Risk Assessment of Sex Offender Recidivism,

11   R-R-A-S-O-R; the Minnesota Screening Tool Revised,

12   M-n-S-O-S-T dash R; and the Static-99.

13         The Static-99 is, I think you have had a number of

14   people I think talk about the Static-99 here.  It contains

15   the four items from the RRASOR and adds some additional

16   items.

17         We also looked at an instrument that is not

18   technically speaking an actuarial instrument.  It's called a

19   Structured Professional Judgment instrument called the

20   Sexual Violence SVR-20, it's called the SVR-20.

21         And we have also done a very recent independent

22   cross-validation of the Static-2002.

23   **Q.**  And when was the independent validation of the

24   Static-2002 conducted?

25   **A.**  Well, we coded the 2002 several years ago.  The study

1    was published just this past year.

2    **Q.**   And is that -- how many independent cross-validations of

3    the Static-2002 have been conducted?

4    **A.**   I think we're the only one at the moment.

5    **Q.**   And when was the independent cross-validation of the

6    other instruments conducted?

7    **A.**   We published our first paper on that in 2001 and then we

8    published a subsequent paper about two years ago.

9    **Q.**   Dr. Barbaree, have you also conducted research in the

10   area of the effect of age on sex offender recidivism?

11   **A.**   Yes, I have.  We published our first paper on this issue

12   back in 2003.  We started looking at the age issue partly as

13   a consequence of my experience in conducting evaluations in

14   Washington State.  I had done an evaluation of someone who

15   coincidentally was born on my birthday.  And so it seemed to

16   me that the question of age was an important issue in his

17   case.

18           And when I gave evidence, I had to say essentially

19   that we knew very little about the effects of age on

20   recidivism.  So I went back and with my student Calvin

21   Langton took our sample and divided it up into different age

22   groups and started looking at age.

23           At the same time Carl Hanson published -- this was

24   in 2001 -- he published online and then published in the

25   literature in 2002 his first article on age.

1           So we have been working on this issue of the

2      effects of age on recidivism ever since.  It's a very

3      complex issue we found and it has taken some time to kind of

4      figure out how age is implicated in the actuarial

5      instruments.  And the relationship between actuarial risk

6      and age is a complex one.

7   **Q.**  Dr. Barbaree, have you made presentations about this

8      subject?

9   **A.**  Yes, numerous times.

10  **Q.**  And have you taught about this subject?

11  **A.**  I have.

12  **Q.**  Dr. Barbaree, could you describe in general terms the

13     findings that you have made since this period that you

14     described, for the early two thousands, on the effects of

15     aging on recidivism risk?

16  **A.**  We tried to look at this issue from a bit of a broader

17     perspective than just the effects of age on recidivism,

18     trying to see what basis there would be for arguing that age

19     is an important variable in recidivism risk.

20          It turns out that in our field, if you take the

21     field of sexual deviance, the people who study sex offenders

22     and related matters, the belief in the field is quite a

23     strong one that age doesn't have an important effect on

24     recidivism risk.

25          The reason I say that is that --

1          **THE COURT:**  Say that one again.  Repeat that for

2     me.

3          **THE WITNESS:**  When you just talk to the people who

4     are in our field, sex offender assessment and treatment, and

5     you ask them about the effects of age on recidivism, there

6     is a strong belief that age doesn't have an effect or --

7          **THE COURT:**  Does not?

8          **THE WITNESS:**  Doesn't have.

9          And I tried to figure out and understand why the

10    resistance is so strong to this idea.

11          Partly it is that when you look at these, the

12    empirical literature, the empirical literature in some ways

13    prior to 2003, 2002, the studies had never looked directly

14    at the issue of aging and recidivism.

15          But there are a number of empirical studies that

16    seem to provide evidence that went against the aging

17    hypothesis.  There had been what's called a meta-analysis

18    done of the recidivism literature.  A meta-analysis is

19    essentially a study of studies.  All of the published

20    literature and unpublished literature is brought together

21    and the conclusions are based on an analysis of the whole

22    literature.

23          These meta-analysis, the one that I'm identifying

24    here particularly was done, published by Carl Hanson in

25    1998.  It found a correlation, a negative correlation with

1    age which argues that age contributes to recidivism.

2            **THE COURT:**  What does that mean, "a negative

3    correlation"?

4            **THE WITNESS:**  It means that the older men in the

5    sample have a lower rate of recidivism.  So it supports the

6    idea that recidivism is affected by age but the correlation

7    is small.  So a correlation of minus .09 is not a very large

8    correlation.  So that I think encouraged people to think

9    that age wasn't that important.

10           There are a number of studies that have been done,

11   published that look at very long-term recidivism so over 20,

12   25 years.  And those studies indicate that even 25 years

13   after release individuals can still recidivate, seeming

14   again to support the idea that age may not have that much

15   import in this.

16           And then finally when you look at the actuarial

17   instruments themselves, these are instruments that have been

18   developed empirically and, so as to predict recidivism.  And

19   the items that are contained in the actuarial instruments

20   are there because they predict recidivism.

21           And when you look at the items, there are no items

22   in any of the actuarial instruments that capture what we

23   would call aging.  There is an age variable on a number of

24   them that essentially say is the individual older than 25 or

25   30 or younger than 25 or 30.  If they're younger, then

1    they're higher risk than if they're older.  But there is no

2    item that looks at the effects of aging beyond age thirty.

3         So when I think people in the field look at those

4    items, the age items, the conclusion is that aging isn't an

5    important contributor to recidivism risk.

6         Then the other thing is that when you look at the

7    theoretical accounts of sexual deviance, none of them have

8    aging as an important component to them.

9         So, for example, we know that psychopathy,

10   antisocial behavior is an important contributor to

11   recidivism.

12   **Q.**   Dr. Barbaree, could you define that term, "psychopathy"?

13   **A.**   "Psychopathy" is a term that describes individuals who

14   are manipulative, who exploit other people to their own

15   benefit, individuals who are impulsive.  They have

16   difficulties with anger control, have a history of behaviors

17   that we call antisocial, substance abuse, sexual

18   promiscuity.

19        And so the main individual who has studied this in

20   the last 30 or 40 years is a man by the name of Robert Hare

21   at the University of British Columbia.  And he has developed

22   a scale that allows us now to measure psychopathy.

23        Psychopathy has become a prominent feature in our

24   area because there was a subset of sex offenders who can be

25   described as psychopaths.  So the theoretical accounts of

1    sexual deviance that include psychopathy as a component talk

2    about psychopathy as what they call a stable enduring trait,

3    something that once somebody shows those traits, they tend

4    to show them through the lifespan.

5           So those I think are the reasons that our field

6    have a resistance to the idea that aging has an influence

7    over recidivism.

8           Now, there is a lot of reasons though, if you stand

9    back from the area and look at the area more broadly, there

10   is a lot of reasons why you would expect that aging would

11   have the effect of reducing recidivism risk.  Studies in the

12   biology of sexual behavior, studies looking at human

13   sexuality over the lifespan and so on.

14          We did a chapter in the book *Sexual Deviance* which

15   was just published in 2008 looking at trying to take a broad

16   view of the effects of age on sexual behavior of all sorts

17   but finally looking at the issue of sexual recidivism.

18   **Q.**  Now, Dr. Barbaree, could you please describe the

19   biological findings in this area?

20   **A.**  Sure.  This is a finding that has been known for a long

21   time.  Behavioral pathologists have studied the effects of

22   testosterone on male sexual behavior.  And the finding

23   essentially is that if you castrate males -- these are

24   studies obviously usually done with animals, but animals

25   from a variety of species -- if you castrate them, over a

1    period of time after castration their sexual behavior

2    reduces.   In many individuals the sexual behavior goes away

3    entirely.

4            Now, we know this for men, humans, males who have

5    been castrated show a very similar pattern of response.   And

6    we also know that for males who have been castrated and

7    whose behavior, sexual behavior has reduced, if you

8    introduce external testosterone, if you inject them with

9    testosterone, their sexual behavior comes back again.

10           So testosterone is obviously a very important

11   determinant of sexual behavior.

12   **Q.**   Is this finding regarding testosterone implicated in

13   recidivism risk?

14   **A.**   It is.   A number of studies that were conducted a number

15   of years ago in Europe where sex offenders were castrated as

16   a treatment and their recidivism rates dropped dramatically.

17           These studies have not been done in North America

18   but -- and they're aren't done in Europe anymore either but

19   they were done several years ago.

20   **Q.**   Dr. Barbaree, we've heard testimony about a medication

21   called Depo-Provera.

22   **A.**   Correct.

23   **Q.**   Is that an antiandrogen?

24   **A.**   Yes.   That's a drug that has the effect of reducing a

25   man's testosterone level, blood level of testosterone.   And

1    it's given to sex offenders specifically for the purpose of

2    reducing their risk for recidivism.

3         And there are a number of studies that support the

4    notion that those drugs do reduce recidivism risk.

5    **Q.**  What has your research disclosed regarding the effect of

6    aging on sexual behavior in men?

7    **A.**  Well, the first effect of aging that's important here is

8    that levels of blood -- blood levels of testosterone

9    decrease with age.

10        The studies involve the measurement of testosterone

11   in two different ways.  Testosterone has its effect on

12   behavior because as a molecule it has a particular shape and

13   it fits into the receptor cell because the receptor cell has

14   a shape that accepts the testosterone molecule.

15        When the molecule is on its own, it's known as

16   bioavailable or free testosterone.  There is something in

17   the blood called sex hormone binding globulin which has the

18   effect when it attaches itself to a testosterone molecule,

19   then the molecule is not in a shape that allows it to go

20   into the receptor cell.

21        So testosterone occurs in the blood in two forms,

22   the bound form and the free form.  So this figure here in

23   the top provides a measure of total testosterone in the

24   blood.  And the panel in the bottom provides a measure of

25   the free testosterone.

1          This study is one that is unique in a way because

2     it includes both the longitudinal and a cross-sectional

3     design.

4     **Q.**  Dr. Barbaree, could you for the record identify the

5     study by name that you're making reference to?

6     **A.**  This has been referred to as the *Baltimore Longitudinal*

7     *Study of Aging*.  It looked at a large number of measures of

8     hormones and sexual behavior.

9          This, if you look at the top figure for a moment

10    and the line that is labeled with the number 177, there are

11    177 individuals who were followed from just over the age of

12    30 to just less than the age of 50.

13         And then the next line over is 144 different

14    individuals who are followed from the age of about, what's

15    that, 46 to roughly 65 and so on.

16         So within that cohort, the 177 and the 144 and the

17    others, there is a single group of individuals who are

18    followed and given repeated measures over that period of

19    time.  And that line represents the change in their blood

20    level of testosterone over that period of time.

21         That's called, within each of these cohorts, the

22    design is called longitudinal because you're following the

23    same individual over a period of time.  It's also

24    cross-sectional because we've got different groups of

25    individuals at different ages.

1          And this distinction to be made between the

2     longitudinal studies and the cross-sectional studies is very

3     important in this area because we're trying to make

4     inferences about what happens to an individual over time.

5     But most of the research has been done using a

6     cross-sectional design where you're looking at different

7     groups of individuals who are different ages.  That's

8     because the researchers wanted to publish the study before

9     they age themselves.

10         That's the -- the literature was a very confusing

11    literature until they figured out a couple of things about

12    the research.  There is a diurnal rhythm in testosterone

13    such that blood levels of testosterone are higher in the

14    morning and then they reduce through the day.  Studies that

15    didn't take that into account and measure testosterone at

16    various times during the day were very confusing because

17    there was that influence on testosterone that wasn't taken

18    into account.

19         The other thing is that the studies tended to focus

20    on individuals who are hanging around hospitals.  They were

21    the available research subjects to use.  And, of course,

22    people who hang around hospitals tend to be ill in a variety

23    of different ways.

24         This research was cleaned up a lot when the studies

25    began to measure testosterone in the morning and used

1    individuals who were free of other medical disorders.

2          So that previous slide showing the decrease in

3    recidivism is I think the best representation of the

4    literature of the effects of age on testosterone.

5    **Q.**  And can you describe that effect in a phrase,

6    Dr. Barbaree?

7    **A.**  Yes.  Very simply the levels that we measured of

8    testosterone peak in the late teens, early twenties and then

9    gradually decrease over time.  We call this decline a linear

10   decline.  It can be represented quite faithfully by a single

11   straight line.

12   **Q.**  Dr. Barbaree, what is hypogonadism?

13   **A.**  Hypogonadism is a medical disorder or it's a symptom of

14   medical disorders in which the blood level of testosterone

15   gets down below a criterion level.

16         In this study, in the *Baltimore Longitudinal Study*

17   *of Aging*, they defined blood levels of testosterone less

18   than 300 nanograms per deciliter as hypogonadal.

19         This figure shows, if you look at the prevalence of

20   hypogonadism in the population that is aging, the prevalence

21   increases the older the sample is.

22         So, for example, in the 20- to 29-year olds here,

23   according to the free T index, there are no hypogonads where

24   as up at the upper end of the age range, in 80 plus, that's

25   about 90 percent of the sample are hypogonadal as measured

 1   by their free T index.

 2          And basically if you look at that slide, if you're

 3   looking at the free T index, then from age 40 on up the

 4   proportion of the samples that are hypogonadal just increase

 5   in a linear fashion.

 6   **Q.**  And does the prevalence of erectile dysfunction increase

 7   with age?

 8   **A.**  What we have looked at so far are indices of the

 9   physical condition of the individuals.

10          Here we are looking at function.  And testosterone

11   levels do have an influence on erectile performance.

12          This figure shows that the older an individual is,

13   the more likely individuals are to suffer from erectile

14   dysfunction so that by age, in the seventies more than half

15   or almost half have moderate to complete erectile

16   dysfunction.

17   **Q.**  Now, Dr. Barbaree, have you studied in particular the

18   effect of aging on sexual behaviors in men?

19   **A.**  When you look at sexual behavior, there is a large

20   number of studies on this, human sexuality, just looking at

21   the effects of age on sexual behavior.  What you find is

22   that sexual behaviors decrease in frequency with age.

23          And this study is an example of this literature.

24   In the study 39 individuals from age 21 to 82 were studied.

25   They were looked -- they were tested in the phallometric

1    laboratory in which erectile responses were measured and

2    sexual stimuli presented.

3         And there are two effects of age on the erectile

4    response.  The erectile response is not as large the older

5    the individual gets.  We can look at the next.

6         So the erectile response, it doesn't go down

7    dramatically but it does decrease with age.  And the other

8    effect is that the speed with which the erectile response

9    occurs to its maximum is much slower the older the

10   individuals get.

11        And this study also not only looked at the erectile

12   responses but also sexual behavior.  And basically the

13   sample of older men described decreased frequency of

14   intercourse, masturbation, sexual behaviors of all kind, all

15   kinds.

16        Interestingly when the individuals were asked at an

17   older age if they were satisfied with their sexual life,

18   there was no decrease in sexual satisfaction.  It's just

19   simply a decrease in frequency of behaviors.

20   **Q.**  Dr. Barbaree, what is andropause?

21   **A.**  If you're a male middle age and older and you go to your

22   doctor and you complain about reduced libido, muscle

23   weakness, tiredness, you complain that your erections are

24   not as strong as they used to be, the most likely diagnosis

25   you will get is called andropause.  It's the male equivalent

1    of female menopause.

2           Menopause occurs, of course, in women very

3    abruptly.  But with men andropause occurs gradually over

4    time.  And it is very likely if you go and are diagnosed

5    with andropause, one of the treatments that will be

6    considered will be testosterone replacement therapy.

7    **Q.**  Now, with respect to andropause, Dr. Barbaree, how is

8    that, how does that fit in the context of this research?

9    **A.**  Well, I think andropause in a way is diagnosed by the

10   medical practitioners as if it were a pathology.  So, in

11   other words, you're diagnosed with a medical disorder and

12   given treatment for it.

13          In actual fact when you look at the population

14   statistics, it's a naturally occurring phenomenon, is people

15   are given medical treatment to try to counteract it but the

16   fact is that aging and reduced sexual behavior is a very

17   natural occurrence.

18   **Q.**  And, Dr. Barbaree, are the medications targeted to

19   people with erectile dysfunction treating andropause?

20   **A.**  Yes.  I think it's important to say that erectile

21   dysfunction can occur quite independent of age and levels of

22   testosterone.

23          But typically when middle-aged men go to their

24   physician now complaining of these issues, they'll either

25   get hormonal replacement or they'll get one of these new

1    drugs that has the effect of increasing blood flow to the

2    genitals, or a combination of the two.  And these drugs can

3    be quite effective.

4           It's interesting when you see where these drugs are

5    advertised.  They're advertised in media outlets that are

6    more popular in the older age groups.

7    **Q.**  Dr. Barbaree, have you had occasion to study these same

8    issues in populations of sexual criminals or offenders?

9    **A.**  Yes.  We looked in our literature review at the effects

10   of age on sexual arousal.  There were very, very few

11   studies.  We found two previous to ours.

12          One was done by Gordon Hall.  He simply looked at

13   his sample of sex offenders after they had been through the

14   phallometric laboratory procedure and reported in a one-line

15   statement in the results that there was a correlation,

16   negative correlation between the strength of arousal and

17   age.

18          This study looked at a very restrictive age range.

19   These were individuals who were attending a clinic in New

20   York City for juvenile sex offenders.  The ages ranged from

21   13 to 17.  And these researchers reported a negative

22   correlation with age which I think is quite surprising.

23   Essentially the 13-year olds' arousal was stronger than the

24   17-year olds'.  So this decrease begins very, very early in

25   life.

1   **Q.** And so, Dr. Barbaree, again, did you yourself after this

2   literature review conduct research in this area?

3   **A.** One of the services that we provided at our hospital is

4   in what's called now the Kurt Freund Memorial Phallometric

5   Laboratory.  It's been in operation for 20, 25 years and has

6   a very, very large database, essentially looking at the

7   diagnosis of pedophilia with phallometric measures.

8        Up till this study was done we never looked at the

9   relationship between age and sexual, just the strength of

10  sexual arousal.

11  **Q.** And, Dr. Barbaree, when you just testified "this study,"

12  what study were you referring to?

13  **A.** This is the study that was published in 2005.  Ray

14  Blanchard is a colleague of mine at the Centre and he is the

15  one who runs the phallometric laboratory.

16  **Q.** Were the results of your study published?

17  **A.** Yes, in the *Journal of Sexual Abuse* in 2005.

18  **Q.** And what was the title of that study?

19  **A.** "The Strength of Sexual Arousal as a Function of Age of

20  the Sex Offender."  And we compared pedophiles with

21  hebephiles and teleiophiles.

22       Pedophiles are individuals whose sexual preference

23  is for children, prepubescent children.

24       Hebephiles are individuals whose sexual preference

25  are for pubescents.

1          Teleiophiles are individuals whose sexual

2     preference is for adults.

3          So we divided the sample up into those three groups

4     and then looked at the effects of age on sexual arousal.

5     **Q.**  And what were the results in your study?

6     **A.**  This figure shows essentially the average of the three

7     largest responses in the session for 1400 individuals who

8     had been tested in the laboratory.  And as you can see,

9     we've plotted this as a function of the age of the

10    individual as they were tested.

11         And you can see there that the highest level of

12    response is to, by the teenagers and then the strength of

13    arousal decreases thereafter.  That is a negative

14    accelerating decreasing curve.  It's' plotted there as a

15    reciprocal of age but it's, those actual data points are

16    very, very well represented by that curved linear line.

17    **Q.**  Now, are there arguments in the field that testosterone

18    alone is not the explanation for the decrease in sexual

19    behavior with age?

20    **A.**  I think the question arises as to whether there is a

21    decrease that we see in sexual behavior and sexual arousal

22    that is due to some psychological factors or whether it's a

23    biological function.

24         This is a study that was done, sleep studies,

25    studies that are done of individuals as they're sleeping in

1    a laboratory that can measure physiological responses often

2    record what's called nocturnal penile tumescence.  They just

3    simply record erectile responses that occur during sleep.

4         And in this study they plotted the frequency,

5    duration and rigidity of the nocturnal penile tumescence

6    response over age and they found that the peak was at age 13

7    and it decreased thereafter.

8    **Q.**  And so what does that -- what hypothesis does that study

9    support?

10   **A.**  I think it supports the idea that this is a biological

11   response.  This is a biological process.  That psychology

12   doesn't have much to do with the decrease in response.

13   **Q.**  Now, Dr. Barbaree, have you had occasion to study and

14   research the effects of the aging process on recidivism risk

15   in particular?

16   **A.**  Yes.  Now, one of the, when you stand back from the very

17   narrow area of recidivism risk with sex offenders, stand

18   back and look at the broader, the same issue in a broader

19   context, the question is what do we know about aging and

20   criminal behavior.

21        And outside of our field, in the field of

22   criminology, they have been saying for years that one of the

23   most prominent strongest predictors of criminal behavior is

24   age with criminal behavior being conducted mainly by

25   individuals who are younger.  And as these criminals age,

1        their likelihood of committing criminal acts goes down.

2                This is regarded in the field of criminology as one

3        of the first principles of predicting criminal behavior.

4                This figure (indicating) gives an example of the

5        data that informs that this is a risk per hundred thousand

6        population in the U.S. reported by the Federal Bureau of

7        Investigation for the years 1980, 1994 and 2001.

8                And you see then that when you plot the frequency

9        of arrest over age, peaks start prior to age 20 and then

10       decrease thereafter in a linear gradual fashion.

11               Now, I mentioned earlier that one of the

12       controversies in this area has to do with studying this from

13       a cross-sectional perspective or a longitudinal perspective.

14               And in the previous slide people have argued that

15       you're looking at different age cohorts.  These are

16       different people at different ages.  And inferring that that

17       is the way the pattern of criminal behavior in an individual

18       is is just faulty logic.

19               In this study Sampson and Laub looked at the same

20       groups of individuals from a very early age on until their

21       60s and just simply plot the frequency of criminal offenses

22       over age.

23               And as you can see there, the peak in this group is

24       in the late, well, yes, late teens, I guess middle to late

25       teens.  There is sort of an abrupt reduction around age 20

1    and then a gradual reduction for the rest of the lifespan.

2           So this would be regarded as a longitudinal study

3    because you're following the same group of individuals over

4    time.  And it addresses the issue of the confound with

5    different age cohorts.

6    Q.  Now, Dr. Barbaree, did this study involve the study of

7    persistent offenders in particular?

8    A.  Yes.

9    Q.  And what did it find with regard to persistent

10   offenders?

11   A.  This was the -- the persistent offenders showed the same

12   decrease in criminal activity over age as we see in our

13   populations.

14   Q.  Now, you stated at the beginning of your testimony,

15   Dr. Barbaree, that there is a strong belief in the field

16   that recidivism risk with sex offenders does not decline

17   with age?

18   A.  That's the current strong belief, yes.

19   Q.  And would that be the only index of sexual behavior in

20   the human male that does not?

21   A.  What they've reviewed is all aspects of the effects of

22   age on sexual behavior in the human male and in sex

23   offenders apart from recidivism.  And what we find is that

24   the frequency of sexual behavior just goes down with age.

25          So if recidivism does not go down with age in sex

1    offenders, then it's the only one we found so far that does

2    not.

3    **Q.**   And if recidivism in sexual offenders did not decrease

4    with age, would that be the only criminal behavior that did

5    not decrease with age?

6    **A.**   Yes, I think the criminologists would say that the

7    effects of age on criminal behavior goes across the broad

8    spectrum of criminal behaviors.

9    **Q.**   Now, this longitudinal study by Sampson and Laub, did

10   that include sexual offenders?

11   **A.**   It did.  We have been trying -- not we.  A colleague of

12   mine has been trying to get Sampson and Laub to simply take

13   the sex offenders out of that group and replot that.  And we

14   have not convinced them to do that yet.

15        When you look at the literature on sex offenders,

16   age comes up in a variety of different contexts.  Some

17   people it focused on the age at which these individuals have

18   been first criminally convicted.  And the idea is that the

19   earlier someone gets involved in a crime, the more likely

20   they are to be a persistent offender and to continue on into

21   old age.

22        We've looked at age at index offense.  Some of the

23   studies have recorded the age the individual is at the time

24   of the assessment.  What we want to look at here is the age

25   the individual is at the time that they're released from

1    custody and go out into the community.  And by looking at

2    that, you're able to then look at the effects of aging on

3    recidivism.

4    **Q.**  And has the effect of aging on recidivism in sex

5    offender populations been studied?

6    **A.**  It has.  The first published study was done by Carl

7    Hanson.  And what Carl did essentially was take the samples

8    that he had used to develop the Static-99 and the RRASOR and

9    simply plot their recidivism rates over age.

10         You can see there that the sample size is quite

11   large.  There is four thousand, more than four and a half

12   thousand sex offenders in this study.

13   **Q.**  What did that study find?

14   **A.**  There are two plots here.  The plot on the left is the

15   one that was in the published study.

16         What you can see there is that amongst the child

17   molesters, which is the curve at the top, the dotted line --

18   sorry -- the dashed line, it shows an increase in recidivism

19   first from ages 18 to 24 to 25 to 29 and then a reduction in

20   recidivism over the remainder of the lifespan.

21         The rapists show a reduction as well from the

22   youngest age group.  There are percolations (ph.) in this

23   slide.  As you can see, the 35- to 39-year olds seem to have

24   a lower recidivism than at the adjacent age groups.  I'll

25   talk about that in a minute.

1        And then the incest offenders in the youngest age

2   group have a very high risk for recidivism and thereafter

3   lower levels.  But I think you can see a decreasing trend

4   there as well.

5        **THE COURT:**  Let me ask you a question.  I hope this

6   doesn't come across as an impertinent one.

7        Is there any thought given to the fact that as

8   people get older, they get smarter too and they start to

9   realize that maybe it ain't worth the trouble to go in and

10  rob the bank, it is easier to get a job and stay out of jail

11  or they have been to jail and they don't like it?

12       **THE WITNESS:**  Right.

13       **THE COURT:**  Does that psychological --

14       **THE WITNESS:**  Yes, I think you've put that very

15  well.

16       One of the effects of aging is maturation.  And we

17  talk about people becoming more wise.  And that's probably a

18  very important component of the aging process.  We've talked

19  about testosterone as being the underlining component that

20  influences sexual behavior.  But that wouldn't explain all

21  of the effects on criminal behavior.

22       So if you are looking at nonsexual crimes, bank

23  robberies, physical assaults, you have to -- and when that

24  decreases over age, testosterone might account for the

25  violence because we know testosterone is related to levels

1      of violence.  But there is a component of it that is

2      reflected in increased wisdom I guess is the way best to

3      describe it.

4              **THE COURT:**  Thank you.

5      BY MR. GOLD

6      **Q.**  Dr. Barbaree, what is the graph next to the graph from

7      Dr. Hanson?

8      **A.**  When we looked at Dr. Hanson's graph, we complained

9      about it in a couple of ways.

10             First of all, what he had done, as you can see in

11     the figure, is he used a freehand pen to connect the dots

12     over the age groups.  And that assumes that we know what the

13     figures would be in between the dots.  So he is making an

14     inference about what the level of recidivism would be

15     between those age categories.

16             I guess what I'm saying is that if you organize the

17     age categories differently, that somehow the graph would

18     look the same.

19             And it also ignores in a way the error that's

20     associated with each of those points.  So, for example, in

21     the child molesters age 25 to 29, what we see there is a

22     recidivism rate that is just a bit more than 25 percent.

23             If we were to do the study in another sample, we

24     wouldn't get exactly 25 percent.  We would get something

25     perhaps near 25 percent.  But every study and every sample

1    that you use would have a different figure.  And you could

2    calculate the mean of the samples.  And you could calculate

3    the error that is associated with each of those data points.

4         From a statistical point of view the appropriate

5    way to represent these graphs is the way we have done it in

6    the right-hand side and calculate a regression line and then

7    ask whether or not the regression line is a good fit to the

8    actual data points.

9    **Q.**  Dr. Barbaree, could you briefly describe what you mean

10   by "regression"?

11   **A.**  Essentially what regression does is looks at each of the

12   points in that age graph and calculates a line of best fit

13   through them.  If you are going to use linear regression, it

14   has to be a straight line.

15        But what the statistical procedure does is it

16   places that line so as to minimize the error between the

17   actual points and the line estimate.  So any other line

18   placed in any other position you'd have increased error.

19        And so it's actually best thought of I think as a

20   line of best fit.  It's a line that best represents the

21   function of recidivism over age for that group.

22        And you can see there I think in that figure on the

23   right that most of the data points are quite close to the

24   regression line.

25        The other problem we had with the way this had been

1    plotted by Carl was that if you look at the age categories

2    on the left --

3    **Q.**   Dr. Barbaree, when you're saying "Carl," you're

4    making --

5    **A.**   Sorry.

6    **Q.**   -- reference to Dr. Hanson?

7    **A.**   Dr. Hanson.

8          On the left the age ranges are five years in

9    duration whereas up at the upper end of the graph the age

10   categories are ten years in duration.  And what that does is

11   takes that side of the graph and kind of compresses it,

12   making it appear as if there is, the reduction is more

13   towards the end of the lifespan than earlier on.

14         So what we did in our replotting was to plot the

15   regression line over age where the scale of age is

16   represented equally through the range.

17   **Q.**   So is the graph on the right a more accurate

18   representation of the data in your view?

19   **A.**   Yes.

20   **Q.**   Did you conduct your own study after Hanson did his

21   study?

22   **A.**   Yes, that replotting that you saw in the previous slide

23   was reported in this paper and it was done as sort of

24   preparation for our own study.  We used the sample that we

25   had from the work with the Sex Offender Treatment Program

1    and there were 477 individuals in this sample that we

2    reported.

3              And then what we did was we took the sample and

4    divided it up into four different age groups.  Those who had

5    been released in their twenties, in their thirties, in their

6    forties and above the age of fifty.  And the average age at

7    release in this sample is 40 years of age.  We have people

8    as young as 21 and people as old as 83.

9              And in the end 11 and a bit percent of them

10   committed a sexual reoffense within five years.

11             Here you see the numbers of the individuals in each

12   of those age groups.  And then this looked at their

13   recidivism using what's called a survival curve.  Survival

14   curves are used a lot to represent recidivism.

15             Basically at the point zero on the abscissa, the

16   individual -- that's the point in time where the individual

17   is released to the community.  And as you can see, a hundred

18   percent of them have been successful to that point.

19             And then as time goes on, as they have been

20   released to the community, an increasing proportion of them

21   recidivate or fail in the community.  So that if we take the

22   line that is represented by the orange and green figure, by

23   the time you get out to about ten years, that group has

24   recidivated with more than, by more than 20 percent.

25             The surviving group or the people who are still in

1    the community being successful, nonrecidivists, are almost

2    80 percent.

3         Now, when you look at these four graphs, those are

4    the four different age groups.  The bottom one is the

5    youngest age group.  They recidivated the most.  The next

6    one up are the group that were released in their thirties.

7    The next group up, the group that were released in their

8    forties, and the final group, the gray plot, I guess that

9    was intended, I don't think it was, that group recidivated

10   the least.  And their recidivism rate eventually is around

11   about 5 percent.

12   **Q.**  And the gray plot represents?

13   **A.**  The group who were released older than 51.

14        Now, what we did then was to calculate what is

15   referred to as a five-year failure rate.  The line that is

16   the vertical line represents the point in time when the

17   individuals have been out for five years.  If you go up that

18   line to where it crosses each of the survival curves and

19   then go over to the ordinate, the value on the ordinate is

20   essentially the rate at which the individuals have failed in

21   that sample in the five years.

22        And then if you plot that failure rate over age,

23   what you find, first of all, the regression line with the

24   predicted failure rate values are very, very close to the

25   actual observed failure rates.

1    **Q.**  Can you explain that again, observed and predicted

2    failure rates?

3    **A.**  Sure.  When you take a regression line, what you're

4    representing along that regression line is the estimate of

5    what recidivism would be for that age.  And then the actual

6    data that are plotted on the scatter plot, those are the

7    actual data points.

8         So what you're looking for is a line that

9    represents the actual data well.  And what I am saying here

10   is that it's amazing really how well this regression line

11   represents the actual data.

12        Now, the other thing that's amazing here is we

13   calculated the same thing for Dr. Hanson's sample.  And the

14   regression lines are essentially identical.  What that means

15   is that what we found in the relationship between age and

16   recidivism is almost exactly what Dr. Hanson had reported.

17   **Q.**  And just to summarize from this point, what do these two

18   studies together suggest?

19   **A.**  These studies quite clearly show that recidivism

20   decreases with age.

21   **Q.**  Were there subsequent studies?

22   **A.**  Yes.  Yes, there were.

23        Since we published in 2003 there have been an

24   additional six studies that -- now, all of these studies

25   have the same sort of theme and same sort of

1   characteristics.  They were all done specifically to study

2   the effects of age on recidivism.  They all used as their

3   sample a mixed group of offenders.  So there is child

4   molesters, rapists and the incest offenders.

5        They all followed their samples for a fairly long

6   period of time, five years and more.  They all divided their

7   sample up into different age groups.  Now, unfortunately not

8   everybody used the same age grouping so one difference among

9   them is that the age class intervals are different.

10       And the other difference is that the follow-up

11  period, ours was 5.1 years.  Others used different follow-up

12  periods.  So what we tried to do here is to calculate a

13  statistic from each of the studies that could represent the

14  relationship between age and recidivism in the same way.

15       So what I did was calculated it on the basis of the

16  data from the published reports, calculated a regression

17  line and then made an adjustment for the follow-up period.

18  And this represents the plots for those eight studies.

19  Q.  For the record, Dr. Barbaree, there is a chart on this

20  screen.  Could you simply describe what's in the chart?

21  A.  Sure.  These are the eight studies now published in the

22  literature.

23       Robert Prentky and his colleagues are the study

24  represented by the straight line that is the highest and

25  purple in color.  That actually is a sample of individuals

1    who were civilly committed here in Massachusetts a number of

2    years ago at the Massachusetts Treatment Center.

3          The next study down in the light blue dots with the

4    dark black line is Patrick Lussier's sample.  It's been very

5    recently published.

6          The dark blue line is a sample from Sweden reported

7    by Fazel and her colleagues.

8          The next line down is the yellow line which is our

9    sample reported in 2003.

10         The red one is Carl Hanson's sample.

11         David Thornton in orange, reported in 2006.

12         Then there is Hanson's study reported in 2006, a

13   different sample.  There is some common overlap in subjects

14   between the two samples but it's a different reported

15   function.

16   Q.  Different than the Hanson 2002 sample?

17   A.  Yes, different than the 2002 sample.  And then finally

18   Skelton and Vess, a New Zealand group, studied all of this.

19   Their N is almost 6,000 people.  And they had a database

20   that included all of the sex offenders who had been released

21   in New Zealand for several decades.  Their line is the dark

22   blue, black line at the bottom.

23   Q.  Now, Dr. Barbaree, next to each study you have a figure

24   in parentheses.  What is that figure?

25   A.  That figure is the correlation between the regression

1    line that is presented here and the actual data.  So it's a

2    correlation that represents the degree to which the

3    regression line is a good representation of the actual data.

4         Most of them are very high.  Most of them are in

5    the .9 and above.  And that means essentially that the

6    straight line is a very good fit to the actual data.  Even

7    the lowest though, Robert Prentky's study, the correlation

8    .74 is still a fairly high correlation.

9         We've represented the data here as a straight line

10   and a linear decrease over age.  And that certainly for many

11   of these samples is a very good representation of the actual

12   data.

13   **Q.**  Well, Dr. Barbaree, we've heard testimony in this case

14   that the line of decrease for child molesters has a

15   different shape than for rapists?

16   **A.**  Right.

17   **Q.**  Does that mean that decrease is not linear?

18   **A.**  No.  When you do an analysis of, what's called an

19   analysis of trend, you get different components out and they

20   are orthogonal.  And what that means is the two components

21   are entirely independent.

22        So in a trend analysis that could be done on these

23   data, for example, you get the linear component which would

24   tell you whether the figures on the left-hand side of the

25   graph are lower than the figures on the right -- sorry -- on

1    the right-hand side of the graph are lower than the figures

2    on the right-hand side -- left-hand side of the graph.

3         But the analysis could also quite independent of

4    what you found for the linear component find a nonlinear

5    component which means that there are some aspects of the

6    graph that go away from the straight line.

7         Now, there are two studies here where they found

8    what could be argued to be a nonlinear component:  The

9    Prentky study in 2007 and the Thornton study in 2006.  What

10   they report is that for subgroups in their sample the line

11   seems to have an extended plateau in the 30s to 40s and then

12   the reduction occurs later in life.

13        Now, in David Thornton's study he reported a

14   similar function for individuals who had more than three

15   appearances for sexual offense in their career.

16        Now, I think that this issue of whether we are

17   talking about a straight line or a curved or linear line is

18   an issue that remains to resolved in the literature.  And I

19   think there is some evidence that subgroups of particular

20   characteristics, with particular characteristics may have a

21   curve that is not best represented by a straight line.

22        But what is true I think and what is no doubt in my

23   mind and that is that when you look at the extremes, the

24   very young and the very old, the very old recidivism rate is

25   much lower than the younger samples.

1          So, in other words, there is a linear component

2     that I think all of the samples show.

3     Q.  And, Dr. Barbaree, why is it important to say that there

4     is a linear component?

5     A.  The linear component I think is the component that shows

6     that aging has the effect of reducing recidivism.  For the

7     older offender, their recidivism is significantly lower than

8     at earlier ages.

9     Q.  Now, Dr. Barbaree, are you familiar with the concept of

10    static and dynamic risk factors?

11    A.  Yes.

12    Q.  Could you briefly describe what is meant by those terms?

13    A.  Sure.  The risk instruments that are commonly used, what

14    we've recognized is that when you develop those instruments

15    empirically, what tends to be described in the items in the

16    instruments are characteristics of the individuals that

17    cannot change.

18         So let's take the, in the SORAG, for example, there

19    is nine of them that says lived with both biological parents

20    to age 16.  Now, once you code that for an individual, there

21    is no way that later on in their life that that situation is

22    going to change.

23         An item like failure on conditional release, once

24    you've got that in the history, an individual can't change

25    that later in life.  So much of the, many of the items in

1   the actuarial instruments describe what are called static

2   risk factors.

3          Now, dynamic risk factors would be things like,

4   well, let's say anger.  I think everyone recognizes that sex

5   offenders are more likely to reoffend if they're angry.  But

6   anger is a state that can change quickly.  You can become

7   angry very quickly.  If the issue is resolved, then anger

8   can go away.  So anger is an example of a dynamic risk

9   factor.

10          Aging though is, some people have referred to aging

11   as a dynamic factor because it changes.  Age at release can

12   change.  But I think there is a major difference between

13   aging and dynamic risk factors in the sense that

14   unfortunately once you've aged, you can't go back again.

15   It's not like anger where you can become unangry or other of

16   the dynamic risk factors.

17   **Q.**  Dr. Barbaree, what is demonstrated in this slide

18   (indicating)?

19   **A.**  If you look at all of the samples that are in the

20   literature that we've used to come to understand sex

21   offenders, particularly recidivism in sex offenders, what

22   these samples show is that rapists as a category of offender

23   are younger than child molesters.

24          And, in fact, if you divide the child molesters up

25   into those that offend against nonfamilial children, people

```
 1    they aren't related to, they're younger than incest

 2    offenders.  So these different ages in this, in these

 3    samples just seems to be a feature of the way these offenses

 4    occur through the lifespan.

 5           So rape is a behavior that occurs more likely in a

 6    younger man.  They're caught for it.  They're put in prison

 7    and, therefore, they're released at a younger age.

 8           Child molesters tend to get into molesting children

 9    at a time in their life when they have more access to

10    children, more authority, more children in the home, and

11    they tend to get caught later in life and released later in

12    life.  So this, the age --

13           THE COURT:  And the rape is sort of an impulsive --

14           THE WITNESS:  Correct.

15           THE COURT:  -- spontaneous act that reflects lack

16    of maturity?

17           THE WITNESS:  Correct.  Whereas child molestation

18    more likely the result of planning and grooming and

19    developing relationships and so on.

20           So this is very characteristic of this, this is

21    very, our sample looks very much like this as well.

22           What I also, if I can go back, one thing that is

23    also important to note in this slide (indicating) is the

24    relative absence of individuals in their fifties, sixties,

25    seventies and older.
```

1          So, in other words, if you look at the modal age of

2    rapists, it's in the mid twenties.

3    **Q.**  Dr. Barbaree, modal?

4    **A.**  Modal is the most frequently occurring age.  So if I am

5    pointing at the top of that curve where it changes from

6    upward going to downward going, that's the mode.  And so the

7    mode for rapists is younger than the mode for child

8    molesters which is younger than the mode for incest

9    offenders.

10         But the oldest mode is in the mid thirties.  And

11   then you get very, very large reductions in numbers.  So

12   that, for example, 60 years and older, there are just very

13   few men in the samples that are that age.

14   **Q.**  What's reflected in this slide, Dr. Barbaree?

15              **THE COURT:**  In this what?

16              **MR. GOLD:**  In this slide.

17              **THE COURT:**  Slide.

18   **A.**  These are, this is a list of the samples that were used

19   by Carl Hanson and his colleagues in the development of the

20   RRASOR and the Static-99.

21         And the various columns indicate whether the sample

22   was used in the development or validation of the RRASOR and

23   the Static-99 and whether or not the sample was used in Carl

24   Hanson's age study.

25         And then the final column provides the average age

1    of the sample upon release from custody.

2    **Q.**  And what can you tell us about those average ages?

3    **A.**  The average over the whole, all of the samples is less

4    than age 35.  It's about 34.88 or 66, something like that.

5    **Q.**  And why is that an important fact?

6    **A.**  Well, what this means is that the actuarial instruments

7    that are used and represented here, the RRASOR and the

8    Static-99, were developed on a set of, a group of

9    individuals who were released at a fairly young age, in

10   their mid thirties.

11        (Whereupon, the Court and the Clerk conferred.)

12        **THE COURT:**  Go ahead.

13   BY MR. GOLD

14   **Q.**  Now, Dr. Barbaree, does the fact that the modal

15   distribution is in the thirties play into this at all?

16   **A.**  What it means is that, if you go back for a moment, in

17   distributions that are skewed, these are distributions that

18   are positively skewed.

19   **Q.**  And positively --

20   **A.**  Skewed.

21   **Q.**  -- skewed means?

22   **A.**  Means simply that the distribution does not have

23   bilateral symmetry.  There is a tail that goes off for the

24   older group.  There are fewer of them going on to age 70

25   plus whereas the larger numbers of individuals are down at

1    the other end.

2    **Q.**   So what does that tell us about these averages here?

3    **A.**   In a skewed distribution the mode is always lower than

4    the mean.   And what that means is that what you have here in

5    the final column, the arithmetic average of the ages in the

6    sample.   The fact is that the bulk of individuals in the

7    sample are even younger than the arithmetic mean.   They're

8    more likely to be represented by the modes.

9         And if you go back, the modes are lower than the

10   average that we've talked about.

11   **Q.**   Now, Dr. Barbaree, does the research that we've

12   discussed so far lead you to any conclusions as to the use

13   of actuarial instruments with older subjects?

14   **A.**   When we as professionals, as psychologists and

15   psychiatrists use instruments that have been developed

16   empirically, there is an understanding that to use them

17   ethically and to use them properly, the individual that

18   you're testing has to be similar to the groups that the

19   instruments have been developed with.

20        So the argument here is very simply that when an

21   individual is as old as Mr. Hunt at age 60, is being tested

22   using an instrument that was developed on individuals who

23   were released primarily in the mid thirties or younger, then

24   an argument could be made that that use of the test is

25   improper and improper because it doesn't provide information

1    that is characteristic of the individual at that age.  That

2    individual is different from the group of subjects that

3    formed the developmental and validation samples.

4    **Q.**  Now, Dr. Barbaree, why do you say "as is" when you say

5    that the use of actuarial assessment as is with older sex

6    offenders may be discriminatory?

7    **A.**  When we talk about using the actuarial instruments as

8    is, what I mean is you take the instrument and then use the

9    estimates of recidivism risk that are provided for the

10   instrument.

11        Now, those recidivism risks as provided in the

12   tables are recidivism percentages that come from these

13   samples who are released in their mid thirties.

14        If recidivism goes down with age, then those

15   estimates will be an overestimate of recidivism risk for the

16   older offender.

17   **Q.**  Now, we'll return to this issue but have there been some

18   methods to adjust actuarials to account for the process of

19   advancing age?

20   **A.**  There are two methods that have been described in the

21   literature.  One is based on the use of the Static-99 where

22   the data is available for individuals of an older age.

23   Using base theorem as a mathematical way of adjusting the

24   percentages it accounts for age so it reduces the recidivism

25   risk for a particular individual with a particular actuarial

1    score and who has attained a particular age.

2           The other method -- now, that was a method that was

3    proposed initially by Dr. Wollert.  I've used and published

4    a method that is based on the Cox regression analysis that

5    we've done with our sample.

6    **Q.**  And Cox regression is?

7    **A.**  Cox regression is a way of evaluating the effects of

8    age.  It is a statistical procedure that is used where you

9    have got one of the variances in time.  And the analysis

10   that we've done using Cox regression indicate that on

11   average sex offenders reduced their recidivism risk by about

12   five percent on an annual basis.

13          So, in other words, if your recidivism risk at time

14   one, age one is let's say twenty percent, then your

15   recidivism risk the next year is five percent of 20 percent

16   reduced.  Does that make sense?

17          So it would be, I guess it would be 19 percent

18   then.  And these reductions occur on an annual basis so you

19   can calculate it.  If the actuarial instrument says that for

20   people in their thirties their recidivism risk is a certain

21   level, then you use this percentage decrease on an annual

22   basis out to the individual's age and that would give you an

23   estimate of their recidivism risk.

24   **Q.**  Well, now, Dr. Barbaree, this method that you have

25   proposed, has that been validated in any way?

1    **A.**   In a sense it's validated by the Cox regression that we

2    have done.   So what that Cox regression tells us is that in

3    our sample, that's what, that's the reduction that has

4    occurred.

5             Now, Carl Hanson conducted a Cox regression of the

6    same kind on his sample but he used the Static-99 to control

7    for actuarial risk first.   And he gets a two percent

8    reduction over age.

9             So a conservative way of approaching this would be

10   to say that you could calculate ranges of recidivism risk

11   using two percent on the one side and five percent on the

12   other.

13   **Q.**   And just to be clear, Dr. Barbaree, where do these

14   declines come from?   The research studies that we've been

15   discussing?

16   **A.**   Yes.

17   **Q.**   Now, what other methods are available for someone, a

18   practitioner in this field to perform an assessment and to

19   account for the effect of advancing age?

20   **A.**   I think for an evaluator who wants to take age into

21   account there are a number of approaches to this.

22            One would be, the first one would be to say because

23   of advanced age and because of what we know about age and

24   recidivism, I am not going to use the actuarial instruments

25   at all.   That I think -- and then you would be left I think

1    with the base rate for that age group as the best estimate

2    of risk.

3              So that's one approach to handling this.

4    **Q.**  And if you were an evaluator in that circumstance, where

5    would you go for the base rate?

6    **A.**  There are studies in the literature, some data that we

7    have shown here shows roughly what the recidivism rates are

8    for different age groups.  So if you go -- well, you

9    could -- yes.

10             So this (indicating) gives estimates for recidivism

11   risk for these eight different studies and shows what you

12   would be able to describe as an empirical base rate.  So if

13   you just go up from the abscissa at age 60, the majority of

14   those lines cross the age 60 at about five percent.  Maybe a

15   little bit lower than five percent.  And that would give you

16   roughly what the empirical studies have shown to be the base

17   rate for age 65.

18             Now, the line that is above in purple is a sample

19   of individuals who have been civilly committed and found to

20   be high risk in the first place.  So that sample is

21   different from the others who include individuals of low,

22   moderate and high risk.

23   **Q.**  What would be the base rate for that high risk sample?

24   **A.**  At age 60 it would be, is that about 25 percent I think,

25   20.

1    **Q.**  Now, what other method, and we've discussed two of them,

2    but what else could an evaluator do beyond looking at the

3    base rate to account for the --

4    **A.**  Effects of age?

5    **Q.**  -- the effects of age in an assessment such as this?

6    **A.**  So we have covered off not using the actuarials at all.

7    We have covered off using an empirical method of adjustment.

8    We have covered off using the base rate for that age group.

9    **Q.**  Well, we've heard testimony in this case that it has

10   been proposed in the literature using the tables that were

11   generated for the Static-99 in 2006 for this purpose.  Would

12   that be a defensible method of doing it?

13   **A.**  Yes, Carl Hanson's study that's listed here as Hanson

14   2006 provides a breakdown of recidivism rates for

15   individuals with different scores on the Static-99 and

16   different ages.

17         So, again, that would be equivalent I think to

18   using an empirical method of making an adjustment here.

19   It's really looking at the base rate that's provided for

20   that sample of a particular score level and a particular age

21   from one study.

22   **Q.**  Well, now, Dr. Barbaree, the base rates that you have

23   been discussing are undifferentiated?

24   **A.**  Right.

25   **Q.**  Now, what we have in Mr. Hunt's case is an extrafamilial

1    child molester who is scored as being high risk.  How do

2    these methods account for that?

3            **MR. GRADY:**  Your Honor, I have an objection to the

4    question but it's very, very limited.  I think that the

5    expert can answer hypothetical questions about Mr. Hunt but

6    his report does not purport to offer any opinions as to

7    Mr. Hunt.

8            And I realize that on this question it's a very

9    technical objection but I would expect that the defendant

10   may attempt to go more substantively on to the opinion of

11   Dr. Barbaree as to Mr. Hunt.  And that is not something

12   contained in his report.

13           **MR. GOLD:**  Well, that's right, Your Honor.

14   Dr. Barbaree is not --

15           **THE COURT:**  He was just called to talk about aging.

16           **MR. GOLD:**  That's right.  I may ask Dr. Barbaree

17   about what the implications for the assessment of an older

18   subject are, which I think is fair; but he has not evaluated

19   Mr. Hunt.

20           **MR. GRADY:**  Your Honor, again, with respect to this

21   question it's a very technical objection and I'm not making

22   it very strongly.  I just wish to make the record now or

23   make counsel aware that we would be objecting to that.

24           **THE COURT:**  Okay.  Thank you.

25   BY MR. GOLD

 1   **Q.**  Dr. Barbaree, are these methods designed to take --

 2           **THE COURT:**  Why don't we take a five-minute recess

 3   now anyway.

 4

 5           (Recess.)

 6

 7           **THE CLERK:**  All rise for the Honorable Court.

 8           **THE COURT:**  Good morning, everybody.  Sit down,

 9   please.

10           Go ahead.

11           **MR. GOLD:**  Thank you, Judge.

12                   **HOWARD ERROL BARBAREE, Resumed**

13                   **DIRECT EXAMINATION, (Cont'd.)**

14   BY MR. GOLD

15   **Q.**  Dr. Barbaree, we have heard testimony in this case that

16   a problem with relying on the age research in doing an

17   evaluation such as this is because there are so few subjects

18   in the older age groups.

19           Could you comment on that?

20   **A.**  Yes.  And this argument confuses me to some extent

21   because the -- it seems to beg the question.

22           If there are few subjects, it's because there are

23   few individuals at that age incarcerated to release.  So

24   when you look at the age at release data, what you see is

25   that by the time you get up to that age, there is nobody

1    being released meaning that they aren't -- people just don't

2    engage in sexual crimes at the older age but it seems to me

3    to prove the point.

4         When you look over all those studies that we had on

5    that earlier graph, you will see that the total unique

6    cases, there is almost 15,000 individuals, so the low end

7    that you're talking about are applicable to, if you're just

8    looking at one study and one sample, individuals at the

9    older ages, it's true the ends are relatively small.

10        When you look over the whole literature, the ends

11   are really quite large and large enough to be quite

12   confident that the recidivism rates are low for that group.

13        The other thing that the regression analysis helps

14   you do is to make estimates of, because those regression

15   lines are estimates, if you extend that line beyond the end

16   points, it's a reasonable estimate of what the recidivism

17   rates would be.

18        So, for example, we didn't plot it but the

19   regression analysis for these lower regression lines are

20   sort of indicating that by about age 80 the recidivism -- by

21   70 actually, 75, the recidivism rates are near zero.  Those

22   regression lines provide an estimate of what the recidivism

23   rates would be in the older age groups.

24        And those regression lines are based on the samples

25   that occur earlier in age.  And those samples are quite a

1   bit larger.

2   **Q.**  Now, Dr. Barbaree, does this research of the gross

3   population, does it include high risk offenders?

4   **A.**  Yes, it does.

5   **Q.**  Now, certainly, is it true that the high-risk offenders

6   are the ones of the very few who reoffended, that

7   reoffended?

8   **A.**  Yes, I think the actuarial instruments indicate that

9   individuals who score higher on the actuarial instruments

10  have a higher rate of recidivism obviously.  Otherwise the

11  instrument wouldn't be a good predictor of recidivism.

12       But the tabled values that are given are, represent

13  the percentage over the whole age range.

14  **Q.**  Now, Dr. Barbaree, is there a difference between --

15  well, you mentioned before the phrase "actuarial risk" as

16  opposed to actual risk posed.  Could you explain that?

17  **A.**  The actuarial risk is the risk that is provided by the

18  score on the actuarial instrument.  And I make a clear

19  distinction between actuarial risk and real risk.

20       Real risk is different because, we'll take an

21  example like Mr. Hunt.  At age 60 his actuarial risk is

22  determined by his scores on the Static actuarial items that

23  reflect behavior that he engaged in many years ago.  There

24  is nothing that he can do now to reduce those scores.  And

25  20, 25 years ago the score would be the same as it is today.

1          But since 25 years ago he has aged and so his real

2     risk is now different from his actuarial risk.  His

3     actuarial risk is high because his scores on the actuarial

4     instruments are high.  But as I say, those reflect behaviors

5     that occurred --

6          **THE COURT:**  When you talk about substituting a real

7     risk for the actuarial risk, you are really exercising

8     clinical, subjective clinical judgment; right?

9          **THE WITNESS:**  No.  With respect to the -- it's

10    based on the empirical data on aging and recidivism.  So I'm

11    making a distinction between the real risk that an older

12    man --

13         **THE COURT:**  But you can't -- there is no precise

14    number you are talking about at a certain stage in life it

15    is going to be less but you can't -- and I don't mean this

16    as a criticism, it is just my understanding of what you are

17    saying.

18         You can't pinpoint where he falls.  The actuarials,

19    whether they are valid or not or whether they are a great

20    idea or not, at least they purport to pinpoint with some

21    accuracy at least their concept of accuracy?

22         **THE WITNESS:**  I think we talked just before the

23    break about there are a couple of methods that have been

24    proposed to take the actuarial instruments estimates and

25    adjust them according to the age of the individual at

 1   release.

 2        So I really would make a clear distinction between

 3   clinical judgment and empirical adjustment of the risk.

 4        **THE COURT:**  But even the decision to do that would

 5   be a clinical judgment I suppose?

 6        **THE WITNESS:**  Well, I think --

 7        **THE COURT:**  I mean, to take it and try to blend the

 8   two sets of statistics.

 9        **THE WITNESS:**  It's a professional judgment.  And I

10   think it's based on knowing that the actuarials are making

11   an overestimate because of the data that we talked about

12   this morning and knowing that an adjustment of some kind is

13   required, if you want to make an estimate, you are going to

14   have to adjust the estimates that are given.  And those

15   adjustments should be based on the empirical literature.

16        So we talked this morning of various ways that you

17   could take the studies that have been done and make an

18   adjustment to the estimates.

19        **THE COURT:**  Okay.  Thank you.

20   BY MR. GOLD

21   **Q.**  And the resulting numbers from those adjustments, how

22   would we -- how do we consider those numbers?  Are those

23   real numbers in some sense?

24   **A.**  Well, they could be.  I think an appropriately

25   conservative evaluator would make the estimate, describe how

1    the estimate has been arrived at, describe the pitfalls in

2    doing that and add a comment that would say that these

3    adjustments are based on the literature that is currently in

4    the record.  And using these methods will be validated in

5    the future so they should be interpreted with some caution.

6         But I think that that evaluator who does make the

7    adjustment with those caveats is providing better

8    information than someone who just simply provides the

9    estimates based on the actuarials.

10   **Q.**  Now, Dr. Barbaree, we discussed a study done in 2006

11   looking at whether the Static-99 actually did a good job

12   predicting for the older people.

13   **A.**  Right.

14   **Q.**  What was the finding of that study?

15   **A.**  Basically what Dr. Hanson found was that if you look at

16   the use of the Static-99 at different ages, the instrument

17   does a pretty good job at all ages in rank ordering the

18   individuals in terms of risk but in the sense the base rates

19   of recidivism as you get older goes down.

20        So another way of saying that is that in the

21   individuals who are older using the Static-99 can still

22   identify the individuals who are highest risk in that whole

23   group but their risk for recidivism is lower than the tabled

24   values based on the younger offenders.

25   **Q.**  Now, Dr. Barbaree, an observation that has been made

1   about that study is that the actuarial scores, average

2   actuarial scores of the older offenders was low?

3   **A.**   Right.

4   **Q.**   And the suggestion was made that there is some

5   difference between those offenders and offenders who are

6   high risk and have high actuarial risk in old age?

7   **A.**   Right.

8   **Q.**   Could you comment on that?

9   **A.**   Sure.

10      This argument has been leveled against the papers

11   that have shown an aging effect and the argument goes

12   something like this.

13      If you look at the levels of actuarial risk in the

14   various age groupings, what you find according to this

15   argument is that the actuarial risk goes down with age.

16      And in a paper that was published by Grant Harris

17   and Marty Rice in 2006, they argue essentially that all of

18   the aging effect is due to this reduction in actuarial risk.

19      What they've identified is what is called a

20   confound between actuarial risk and aging as an explanatory

21   principle for recidivism risk.

22   **Q.**   And, Dr. Barbaree, what is a "confound"?

23   **A.**   A confound is simply in science a situation in which

24   you've got two variables that can be each equally well used

25   as explanations for a particular phenomenon.  And at the

1    present time there is no empirical data that would allow you

2    to decide between one or the other.

3            So for the anti-aging argument, if we can call it

4    that, they're saying that all of this decrease that we see

5    in recidivism in that earlier graph is due to the fact that

6    the older offenders have lower scores on the actuarial

7    instruments compared with the younger offender.

8            So the aging argument is, well, no, there is a real

9    effect of aging on the recidivism risk.

10   **Q.**  Well, Dr. Barbaree, have you very recently been studying

11   this confound issue?

12   **A.**  Yes.  This argument came up the first time we presented

13   these findings.  Grant Harris approached me afterwards and

14   made the argument about the confound.  And so this is --

15   **Q.**  When was that, Dr. Barbaree?

16   **A.**  In 2002.  And so we recognized for some time that this

17   is the argument that would be leveled against the aging

18   effect.  And we've been trying to analyze our data and think

19   about the relationship between actuarial risk and aging in a

20   way that kind of helps tease these two effects apart.

21   **Q.**  Now, we're going to be going into this in a little bit

22   more detail but has this research led to the publication of

23   papers in peer reviewed journals?

24   **A.**  We have published three papers over the past two years

25   on this effect.  And I think it provides an alternative.

1    What we have been able to do is to provide an alternative

2    explanation to the actuarial argument.

3         Basically what I think we are saying is that the

4    other argument, if they're saying that this reduction can be

5    explained by actuarial risk, they're saying the aging effect

6    can be explained by the actuarial phenomenon.  We are saying

7    that the actuarial phenomenon can be explained by aging.

8         So we have provided an account of how aging has

9    contributed to the development of the actuarial instruments

10   sort of item by item.  And we have shown that, in fact, when

11   you take the aging effect out of the actuarial scores

12   statistically, the ability of the actuarial instruments to

13   predict recidivism goes down significantly.

14   **Q.**  Now, Dr. Barbaree, you say when you take out the age

15   from the actuarial instruments, what does that mean?

16   **A.**  We use a statistical procedure called semi-partial

17   correlation.  And essentially what it does is takes the --

18   you've got a correlation between the actuarial score and age

19   at release.  The statistical procedure adjusts the scoring

20   on the actuarial instrument so as to take out that

21   correlation.

22        So that this confound that we've talked about

23   whereby the older individuals have a lower actuarial score,

24   it adjusts it so that there are no differences across the

25   age range in actuarial scores.  That has the effect of

1    taking the effects of age out of the actuarial scores.  And

2    then you ask the question do these scores that remain, do

3    they predict recidivism.  And the answer is they do but they

4    don't do as well as when the age factor is included in the

5    scores.

6    **Q.**  Dr. Barbaree, the conclusion from this -- and we'll get

7    into this in a little bit more detail -- but the conclusion

8    drawn from this finding that the items are not or the

9    actuarials are not as predictive when you subtract age is

10   what?

11   **A.**  Basically that recidivism risk is due to three separate

12   components that are entirely orthogonal, independent.

13          One is a component that is reflected in items that

14   have to do with antisocial behavior.  They're highly

15   correlated, these items, with one another.  They reflect

16   impulsivity, juvenile delinquency, conduct problems,

17   psychopathy, antisocial personality disorder, those kinds of

18   variables.

19          So antisocial behavior is the first component.  The

20   next component is what we refer to as sexual deviance.

21   These items describe individuals engaging in behaviors that

22   are illegal and nonnormative.  And they're items that a

23   number of previous sexual offenses, male victim, stranger

24   victim, sexual offenses in a public place and so on.

25          So those items reflect this aspect of these

1    individuals that contribute to risk.  But sexual deviance

2    has nothing whatsoever to do with antisocial behavior.  In

3    other words, we can measure those two factors entirely

4    independently so the two measures don't correlate at all.

5         And then the third factor is aging.  And those

6    three factors together, when we calculate each of those

7    three things together and add them up in a combination, we

8    predict recidivism as well as any of the actuarials.

9         So the actuarial instruments were developed

10   according to a methodology that was developed in the

11   insurance industry and it's an entirely empirical

12   methodology.  There is no theory.  There is no understanding

13   of the underlying factors that lead to sexual crime.

14        And I think from a scientific point of view that

15   has led to a situation in which we have these instruments

16   that have no foundation in theory.  And as a consequence the

17   items have their power to predict developed empirically but

18   we don't know where that power comes from.  We don't know --

19   we think we know.

20        For example, let's take the one item that's on all

21   of the instruments, which is failure on conditional release.

22   So you look in the file and you see whether anyone has been

23   released on their own recognizance or released on probation

24   or released on parole or did they violate the terms of the

25   probation or parole and were they brought back into custody.

1        You find that, you code that and you divide the

2   sample into those people who are, have that in their history

3   and those people who have been successful on release.

4        Now, we've always I think looked at that item and

5   said, well, that's reflecting antisocial behavior.  People

6   who are common criminals are more likely to fail on

7   conditional release than people who are more law abiding.

8   And so that item reflects antisocial behavior to that

9   extent.

10       But then when you look at the age of release of

11  those two groups, the individuals who have failed on release

12  are younger than the people who were successful on release.

13  So now this introduces the notion that part of the reason

14  that this item predicts recidivism is that it identifies a

15  younger subgroup.  And if age has the effects that we've

16  talked about, then aging contributes to that item's ability

17  to predict recidivism.

18  **Q.**  But, Dr. Barbaree, are you saying that to some extent

19  the individual items on these instruments are proxies for

20  the aging effect?

21  **A.**  Right.  That's exactly right, that they represent, part

22  of their ability to predict is due to their correlation with

23  age at release.

24       In other words, another way of saying this, that

25  the actuarial instruments when coded for a particular

1     individual can tell you within a rough age range how old

2     they are.  And then the final score reflects, predicts

3     recidivism partly because it's told you that this person is

4     younger.

5             Now, just to give you -- shall we go?

6     **Q.**  Well, yes.  Now, Dr. Barbaree, now going into a little

7     bit of detail about how, the mechanics of how you support

8     what you're saying right now.

9     **A.**  Well, first of all, when you look at the correlation

10    between the actuarial scores and age at release, everything

11    but the RRASOR is correlated with age at release negatively.

12    And what that means is people with higher scores on the

13    actuarial instruments are younger.  People who are lower in

14    the actuarial scores are older.  And that's true for the

15    VRAG, the SORAG, the Static-99 and the Mn-SOST-R.

16            Now, I don't think the VRAG has been described here

17    very much so I'll just, it's an instrument that was designed

18    initially to predict violent recidivism.  And it was

19    originally developed on a sample that included sex offenders

20    but also included violent offenders.  It's I think an

21    11-item scale, actuarial in nature.

22            And the results of the scoring puts an individual

23    into one of nine bins.  The ninth bin is the group who are

24    the highest risk for violent recidivism.  And the first bin

25    are the individuals who are the lowest risk.

1  **Q.**  Now, Dr. Barbaree, just to connect it to the testimony

2  that we've had in the case, do these bins correspond to, for

3  example, the risk categories of the Static-99?

4  **A.**  That's correct.  So whereas the Static-99 goes from one

5  to six plus, the VRAG goes from one to nine.

6       Now, this figure shows in orange the numbers of

7  individuals who are in each of those bins in this sample.

8  And it's like a normal curve.  Most people are in the

9  middle.  And then there are fewer and fewer people the

10  further out you go in the extreme high or extreme low risk.

11       The green figure indicates the proportion of the

12  bin, the group in the bin who violently recidivated.  So in

13  the individuals who are in bin nine, a hundred percent of

14  them reoffended.  The individuals in bin one, none of them

15  reoffended.

16       And then you can almost draw a straight line

17  between zero and one hundred.  And that represents the

18  recidivism rate in each of the bins.

19       Now, that I think when we first saw this figure is

20  very compelling evidence for the value of an actuarial

21  assessment.  It shows that you can take an instrument that

22  is very simple to administer.  You can get your

23  undergraduate students to go through the file and code these

24  very simple items, add up the score, put the individual in a

25  bin and it tells you roughly what the likelihood is that

1   they are going to reoffend.

2          Now, when this instrument was first presented,

3   nobody asked how old people were in these bins.  But the

4   next figure shows.

5          Now, we in our sample -- so we took the VRAG and

6   administered it to our sample, coded the VRAG and we didn't

7   end up with anyone in bin one.  So these are bins two to

8   nine.

9          And what we're plotting here is the age at release,

10  average age at release for each of these bins.  And you will

11  see there that the highest risk bin, these are the

12  individuals who the VRAG developers found to have

13  recidivated a hundred percent of the time.  They were

14  released in their mid twenties whereas --

15  **Q.**  Dr. Barbaree, you're pointing where, you can, I believe

16  you can point right on that screen.

17  **A.**  Down there (indicating).  Thank you, that's great.

18         So bin nine is down here (indicating).  And you

19  will see that their age at release is just a little bit more

20  than 25 whereas up here (indicating), bin two, their average

21  age at release is in the late fifties.

22         Now, here's where the argument goes one way or the

23  other.  Could we go back to the previous slide?

24         The argument from the actuarial side is that

25  actuarial risk predicts recidivism.

1          If we go to the next slide, the aging argument says

2     the actuarial risk can be accounted for at least in part by

3     age at release.

4          If aging influences recidivism as we've described,

5     then the aging process accounts for the actuarial risk to

6     some extent.  And in a way what the actuarial instruments

7     are doing is telling you how old somebody is.

8          So when you answer the question have you failed on

9     supervised release, yes, you're younger, then one.  Have you

10    got conduct disorder in your history, yes, you're younger,

11    then you get a one.  And you add those up for each of these

12    items, and at the end at that day the total score gives you

13    a good idea of how old the individuals were when they were

14    released.

15    **Q.**  So, Dr. Barbaree, in a case such as this then with an

16    older subject who has a high actuarial score, given what

17    you're saying, the score could be communicating that the

18    person is actually much younger than they actually are?

19    **A.**  Right.  Right.  So then, so that's -- this effect of

20    aging, of course, arises out of a situation in which we have

21    coded a group of individuals and then followed them over

22    time.

23         Nobody has considered the effects of aging in which

24    all of these individuals that we coded now have gone out

25    and, well, they've gone out but they've also aged.  So we'll

1    have in our sample, we could go out and perhaps in Ontario

2    and find them who have very high actuarial scores but

3    because they're now, it's now twenty years later, their risk

4    is much lower.

5    Q.   Now, the charts that we're looking at, is this research

6    that has been published in professional journals?

7    A.   Yes.  This was published in the *International Journal of*

8    *Forensic Mental Health* in 2007, I think it's 2007.

9    Q.   And this slide depicts the same relationship with

10   another actuarial?

11   A.   Yes, the Sex Offender Risk Appraisal Guide, the SORAG,

12   is the VRAG items with a number of other items that are

13   specially designed for sex offenders.  And, again, you see

14   here this relationship between age at release and bin

15   scores.  And that's the publication of this finding.

16           Here's the same plot but for the Static-99.  And,

17   again, you see here that the relationship between age at

18   release and actuarial category.

19   Q.   And, again, this shape is showing us what?

20   A.   That the individuals who scored higher on the Static-99

21   are older at release -- sorry -- younger at release than

22   individuals who scored lower on the Static-99.

23           Finally we've got the Mn-SOST-R here which shows

24   the same relationship.  People who attain higher scores on

25   the actuarial instrument are younger.

1    **Q.**  So is what you're saying, Dr. Barbaree, that one of the

2    reasons the higher scores are good detecting recidivists is

3    because they overwhelmingly pertain to younger people?

4    **A.**  I'd take the word "overwhelmingly" out; but otherwise I

5    agree with that statement, yes.  On average.

6    **Q.**  On average.

7    **A.**  The individuals who score high are younger.

8         And then we've recently, this is actually published

9    in May of 2009.

10   **Q.**  And what is this?

11   **A.**  This is the -- what we did was essentially the analysis

12   that I just described we reported for all five of the

13   actuarial instruments that are commonly used.  So all 38

14   static actuarial items were included in this analysis.

15   **Q.**  So of the five instruments there are 38 separate items

16   on each?

17   **A.**  Yes.

18   **Q.**  Now, what are we talking about here, you're separating

19   out the items of the instruments?

20   **A.**  What we looked at here was the correlation, what we've

21   talked about so far is the correlation between the total

22   actuarial score and age at release.

23        And what we're going to look at now is the

24   relationship between actuarial item scores, the separate

25   items themselves and their relationship with age at release.

1   **Q.**  Dr. Barbaree, could you just predict for us where we're

2   going to go with this?  What does this research into the

3   factors show us?

4   **A.**  This research is predicated on the notion that we

5   started to hypothesis --

6        **THE COURT:**  Excuse me.  How long are you going to

7   be with him on direct?

8        **MR. GOLD:**  About twenty more minutes, fifteen to

9   twenty.

10       **THE COURT:**  Go ahead.

11  **A.**  We started thinking about age at release as being

12  embedded in the actuarial scores.  And we started thinking

13  about that when we looked at the relationship between the

14  total scores and age at release.

15       And I guess we started this analysis thinking that

16  if the total scores were negatively correlated with age at

17  release, then the items should be as well.  Obviously if

18  those items composed the total score, they are what makes up

19  the total score, then it would be negatively correlated with

20  age at release as well.

21       What we found in contrast is that while many of

22  them did have a negative correlation with age at release, 20

23  of them did.  There were 11 of them who had significant

24  correlation in the opposite direction.

25       Now --

1   **Q.**  Well, Dr. Barbaree, I proposed before that the actuarial

2   scores were functioning at least in part as proxies for the

3   aging effect and you agreed with me.

4          Is this research demonstrating the same --

5   **A.**  Yes.

6   **Q.**  -- principle?

7   **A.**  Yes.  But what, we have now run into the complication

8   that some of the items are negatively correlated and some

9   are positively correlated so they're both, those are proxies

10   for age but the relationship is opposite.

11          Now, when we looked at the items that were

12   negatively correlated with age, what we noticed is if you

13   look at the content -- maybe we could go to the next.

14          These are items on various instruments that have a

15   negative correlation with age at release.  And the

16   correlations are the final column there.  And if you look at

17   the item content, what you see is they all relate to

18   antisocial behavior.  So scores on the psychopathy

19   checklist, history of alcohol problems, stranger victims,

20   disruption in employment, antisocial behavior as an

21   adolescent, behavior problems in school, under supervision

22   when they commit an offense and so on.

23   **Q.**  And what do these negative correlations tell us?

24   **A.**  That if you have that characteristic, you're younger

25   than if you don't.

1          Now, as I said, we found a number of items though

2     that were positively correlated with age at release.  And

3     maybe we could look.

4          These items all pertain to sexual deviance.  So a

5     number of different age groups victimized so that has to do

6     with the age preference.  Number of sexual related

7     convictions, male victims, prior sex offenses, deviant

8     sexual preferences measured in a laboratory.

9          And so these items reflect an entirely different

10    characteristic of the sex offender compared with the table

11    that we looked at before.

12    **Q.**  And why are these factors distributed differently over

13    age?

14    **A.**  You will remember back to the figure, maybe we should go

15    back to that, the figure that shows the different

16    distributions of ages in the samples.

17          That's it.  Thank you.

18          This is from Hanson's sample.  And as I said

19    earlier, the same as our sample, rapists tend to be younger

20    than child molesters and antisocial behavior risk factors

21    predominate in rapists compared with child molesters.  So

22    those items that we saw that reflected antisocial behavior

23    are more likely to be endorsed amongst rapists than child

24    molesters.

25          The sexual deviance items are more likely to be

1    endorsed for child molesters who are older.  So that is why

2    the antisocial behavior items identify younger offenders and

3    sexual deviance items identify older offenders.

4         Now, the reason that the correlations are negative

5    in the total scores is that these instruments are

6    predominated by the antisocial behavior items.  In other

7    words, there are more antisocial items on these actuarial

8    instruments than the sexual deviance ones.

9         So this relationship between aging and actuarial

10   risk just gets more complex as we look at it.

11        Now, the final thing that we have looked at here is

12   that this relationship of item scores to aging has an effect

13   on the item's ability to predict recidivism.  And I

14   mentioned earlier, we used a statistical procedure to remove

15   the effects of age from the actuarial score and then looked

16   at the ability of the data having the age taken out, its

17   ability to predict recidivism.  And what we found is that

18   for the antisocial items, when you take the effect of age

19   out of the scoring, its ability to predict recidivism goes

20   down whereas, conversely, when you take the effects of age

21   out of the sexual deviance items, their ability to predict

22   recidivism goes up.

23        Because this, let's think about an item from the

24   sexual deviance list:  Male victims.  Now, we always thought

25   that that item was predictive of recidivism because

1       individuals with male victims are more likely to recommit a

2       sexual offense and that's true.  But it also, male victim

3       identifies an older age group.

4               So here we have the aging effect and the sexual

5       deviance effect working against one another.  When you take

6       the effect of age out, then the sexual deviance item has a

7       chance to operate without that competing effect and it is

8       better at predicting recidivism.

9    **Q.**  Well, now, Dr. Barbaree, is an implication of your

10      testimony that someone with the sexual deviance class of

11      risk factors poses a higher risk as an older person?

12   **A.**  No.  Actuarial risk is, based on sexual deviance is most

13      often characteristics of individuals that they show quite

14      early in life.  And when we -- the opportunity to code for

15      these variables in the thirties, they probably would have

16      had the same scores they have now or nearly the same score.

17      But the actuarial risk is determined by the fixed

18      characteristics.

19              Aging, of course, occurs over the next twenty

20      years, has the effect of reducing recidivism risk.  And so

21      you have a situation where an individual at age 60 still has

22      the actuarial risk that could have been coded when they were

23      40 and, therefore, they seem to be high risk.  But at age 60

24      with the passage of time and aging their risk is much lower.

25              I hope that clarifies the distinction between

1    actuarial risk and real risk because the real risk is the

2    combination of both the antisocial behavior, sexual deviance

3    and aging.

4    **Q.**  Dr. Barbaree, you described this as, or is this an

5    unintended consequence, the development of the actuarials,

6    what you have been discussing?

7    **A.**  Well, I have called it an unintended consequence because

8    this, as the actuarial instruments were developed, the

9    developers and their consumers, the consumers of the

10   instruments were not attuned to the effects of age.  They

11   weren't controlling for age.  They weren't comparing

12   individuals with different scores on their age at release so

13   age didn't enter anyone's mind as they were developing the

14   actuarial instruments.

15         But aging as a risk factor has operated in the

16   development of these instruments to make antisocial items

17   better predictors of recidivism and they have impaired, the

18   aging effect impairs the sexual deviance items in their

19   ability to predict recidivism.

20   **Q.**  So did you develop a hypothesis about or how did you

21   attempt to test this hypothesis?

22   **A.**  Well, we used the statistical process that I described,

23   removed the effects of age from the actuarial scores --

24   perhaps I could show that, if you go back one more.

25         This is a scatter plot of scores on the VRAG.

1    These are VRAG bins.  And these are the VRAG scores from our

2    sample plotted as a function of age at release.  And we've

3    said before that there is a negative correlation there.

4    That's the regression line that reflects the relationship

5    between the VRAG score and age.

6         The semi-partial correlation process, the

7    procedure, has the effect of taking that regression line and

8    rotating it -- if you'd go to the next one -- to the

9    horizontal.

10        And what you have left there, now we have gotten

11   this distribution, no correlation with age at release at

12   all.  Age at release is no longer a factor in those scores.

13   What you have got left are scores that reflect actuarial

14   risk but absent the age effect.

15        So removing the effects of age at release reduces

16   the ability of the antisocial items to predict, increases

17   the ability of the sexual deviance items' ability to predict

18   recidivism.  And, therefore, we've argued then that age at

19   release, aging is embedded in the actuarial instrument

20   scores.

21        And that really to conduct a proper assessment of

22   recidivism risk you have to make an evaluation of sexual

23   deviance, antisocial behavior and it has to be done in a way

24   so that aging is not part of the assessment.

25        So, in other words, those scores have to be age

1    correct and then you add in the age as the third factor and

2    you get an assessment that is properly reflective of the

3    effects of aging with this way of doing it.  In an older

4    offender, as they age, their score on the instrument goes

5    progressively down.

6    **Q.**  And so, again, just to recap, Dr. Barbaree, you have

7    stated or what was your final conclusion based on this

8    research?

9    **A.**  We concluded that actuarial instruments have age

10   embedded in them.  That to conduct these assessments

11   appropriately you've got to take age and assess it

12   separately and that a proper assessment instrument would

13   evaluate those three components independently and -- but

14   that all three of them are important factors to consider in

15   evaluating risk.

16          In this way of conducting the assessment aging has

17   the effect of reducing the scores and appropriately

18   reflecting recidivism risk.

19   **Q.**  Now, Dr. Barbaree, you have occasion to keep abreast of

20   the research that is being done in this field?

21   **A.**  I do.

22   **Q.**  And are you familiar with what's been developing with

23   the Static-99 in particular?

24   **A.**  Yes.  I was at the presentation at the Association for

25   the Treatment of Sexual Abusers conference last October.

1    And Leslie Helmus and Carl Hanson and David Thornton made a

2    presentation of the new norms for the Static-99.

3    **Q.**   And to your knowledge, have those new norms been

4    validated or have been age corrected?

5    **A.**   No, they have not been age corrected, not yet.

6    **Q.**   Are you familiar with any ongoing research with regard

7    to the new norms and the impact of age on them?

8    **A.**   There is a presentation to be, that is being in the

9    process of being planned at the moment for the same

10   conference next October.  I have been invited by Dr. Hanson

11   to participate as a presenter.

12             Their plan as they have told me is to present age

13   related norms for the Static-99.

14   **Q.**   Now, to your knowledge are the norms that are presently

15   available, are they available in peer reviewed published

16   form?

17   **A.**   Not yet, no.

18   **Q.**   And there are now age adjusted norms which are available

19   in peer reviewed published forms?

20   **A.**   No.

21   **Q.**   Are you familiar with ongoing research in the field as

22   to age adjusted new norms for the Static-99?

23   **A.**   My understanding is that the participants in this

24   presentation in October are currently conducting analyses to

25   present age corrected norms for the Static-99.

1    **Q.**  And have you been apprised of any unpublished or

2    preliminary information that's being generated during the

3    course of this study?

4          **MR. GRADY:**  Objection.  If it's unpublished and

5    preliminary, it can't really be --

6          **MR. GOLD:**  Well, this is the same data that

7    other --

8          **THE COURT:**  I am going to let you have the

9    question.  Go ahead.

10   **A.**  Yes.  Well, I know that David Thornton has been, is one

11   of the people preparing to present in October.  And I have

12   been provided with a Power Point presentation that he has

13   sent to Dr. Rosell and Dr. Rosell has posted that on the

14   website.

15   **Q.**  And what was the finding in that?  The preliminary

16   finding?

17   **A.**  The preliminary finding that David Thornton provides in

18   a narrative in the presentation is that after 60 the

19   estimates should be halved compared with the estimates that

20   have been provided so far.

21   **Q.**  And, now, Dr. Barbaree, this is consistent with your

22   expectations based on your research?

23   **A.**  Entirely.

24   **Q.**  And that would be consistent with what was found in the

25   published 2006 article?

1    **A.**   Correct.

2    **Q.**   Now, Dr. Barbaree, you have reviewed the material which

3    has been generated in this case, the reports and depositions

4    showing different methods by the different evaluators?

5    **A.**   Yes, I have.

6    **Q.**   And could you comment on the methodology employed by

7    Dr. Phenix to adjust for age specifically and to actuarial

8    risk as a methodology, its weaknesses and strengths as it

9    appears to you?

10          **MR. GRADY:**   Your Honor, I'm just going to object as

11   being beyond the scope of the report.

12          **THE COURT:**   Yes, insofar as age is a factor.  But

13   he is not called as a general expert witness.

14          **MR. GRADY:**   Nor -- and his report was prepared

15   after Dr. Phenix -- does he comment on Dr. Phenix's report

16   so the government is --

17          **THE COURT:**   It is not in there?

18          **MR. GRADY:**   No.

19          **THE COURT:**   Then I will sustain the objection for

20   that reason alone.

21   BY MR. GOLD

22   **Q.**   Well, Dr. Barbaree, you proposed empirical methods to

23   adjust for age and contrasted those with clinical methods to

24   adjust for age.  Could you comment on the relative

25   weaknesses and strengths of those two contrasting methods?

 1          **THE COURT:**  Hasn't he pretty much covered this?  I

 2   mean, aren't you making him go over it again, just slicing

 3   it --

 4          **MR. GOLD:**  I may be, Your Honor.  Let me reflect.

 5   I'll withdraw that question and --

 6          **THE COURT:**  Why don't you pause for a second and

 7   reflect and see whether or not you are essentially done.

 8          (Pause in proceedings.)

 9          **MR. GOLD:**  I have nothing further, Judge.

10          **THE COURT:**  Okay.

11          **MR. GRADY:**  I think I can finish before one.

12          **THE COURT:**  You what?

13          **MR. GRADY:**  I think I can finish before one.

14          **THE COURT:**  Oh, really?  All right.

15          **MR. GRADY:**  Yes, absolutely.

16                        **CROSS-EXAMINATION**

17   BY MR. GRADY

18   **Q.**  Dr. Barbaree, I had a chance to briefly talk to you

19   during the break.  And I noted for you I'm the kind of

20   person who went to law school because there was no math

21   involved, or that was my understanding.

22          So you can imagine my chagrin at attempting to

23   cross-examine a researcher in the field of statistics.

24   **A.**  I'm trying to make this as clear as I possibly can.

25   **Q.**  You have not undertaken any evaluation of Wayne Hunt;

1  correct?

2  **A.**  Correct.

3  **Q.**  And in the past you have done so in individual cases;

4  correct?

5  **A.**  I have, yes.

6  **Q.**  Okay.  But you weren't asked by the defense to do that

7  for this defendant?

8  **A.**  I wasn't.

9  **Q.**  Now, there has actually been some testimony that you

10  have worked at various correctional facilities treating sex

11  offenders; correct?

12  **A.**  Correct.

13  **Q.**  Before we get into the statistics, I take it if you had

14  individuals incarcerated in those facilities that were in

15  for pedophilia, had between 25 and 30 victims between the

16  ages of seven and ten, you'd want to keep them away from

17  materials that might stir those deviant sexual interests;

18  correct?

19  **A.**  Correct.

20  **Q.**  And --

21       **MR. GOLD:**  Objection, Your Honor.  I think this --

22       **THE COURT:**  You may be making -- I think the

23  argument is going to be you may be making him a witness for

24  something he is not a witness for.

25       **MR. GRADY:**  Well, it's the defense's expert.  I

1    just wanted to see if there was some points in the

2    government's case not dealing with statistics with which he

3    might agree with the government's position.  It will be very

4    quick, Your Honor.

5           And it was, in fact, it will highlight an issue

6    that I think had been an issue of confusion for the Court

7    with respect to --

8           **THE COURT:**  All right.  Go ahead.

9    BY MR. GRADY

10   **Q.**  Just with respect to an individual who has been

11   incarcerated for --

12          **MR. GOLD:**  Objection, Your Honor.

13   **Q.**  -- pedophilia, if an individual is hiding these types of

14   pictures (indicating) while incarcerated, are these the type

15   of things that are going to cause concern that the

16   individual continues to harbor deviant sexual interests?

17   **A.**  You'd have to say yes.

18   **Q.**  Okay.  And so if the individual was found in possession

19   and hiding pictures of children such as these (indicating),

20   these are absolutely things that would cause concern that

21   they were continuing to have deviant sexual interests in

22   children; correct?

23   **A.**  I'd take out the word "absolutely" but, yes.

24   **Q.**  Well, it's certainly some evidence; correct?

25   **A.**  Correct.

1    **Q.**   Okay.  And any reasonable clinician would be concerned?

2    **A.**   Correct.

3    **Q.**   Now, again, you mentioned general views in the field of

4    the effect of age.  And I actually asked you would it cause

5    you some joy to learn that none of the experts in this case

6    have indicated that age is not a factor?

7    **A.**   Well, I think to be fair there, they're admitting or

8    agreeing with the proposition that age is an important risk

9    variable.

10   **Q.**   Certainly.

11   **A.**   I think they differ in whether they apply that age

12   effect to Mr. Hunt.

13   **Q.**   And but certainly it shows your research as having an

14   effect?

15   **A.**   Correct.

16   **Q.**   Okay.  And that it's beginning to gain acceptance and/or

17   if not becoming the majority opinion?

18   **A.**   Correct.

19   **Q.**   Okay.  And certainly an opinion that adjusts for age is

20   better than one that does not?

21   **A.**   Correct.

22   **Q.**   Absolutely especially with respect to a 60 plus

23   offender; correct?

24   **A.**   Correct.

25   **Q.**   Okay.  So certainly it has more validity than an

1    unadjusted opinion?

2    **A.**   Correct.

3    **Q.**   Okay.  Now, even among the field of researchers,

4    however, people much smarter than I and much better versed

5    in statistics disagree with you; correct?

6    **A.**   Correct.

7    **Q.**   And it is the subject of an ongoing dispute?

8    **A.**   Correct.

9    **Q.**   And these opinions can literally run the gambit.  There

10   are people, Doctors Harris and Rice, who believe that there

11   should be no adjustment for age; correct?

12   **A.**   Correct.

13   **Q.**   And they're not crackpots?

14   **A.**   No, certainly not.

15   **Q.**   Okay.  And even within the field of people who agree

16   there is a general decline in recidivism with age there is a

17   dispute as to the methodology to apply?

18   **A.**   Correct.

19   **Q.**   And then there is no one recognized methodology by which

20   to do so?

21   **A.**   Not yet, no.

22   **Q.**   Okay.  Now, just -- you would agree with me that as a

23   matter of statistical results that have been determined in

24   the past, the use of actuarials represents the best possible

25   method?

1    **A.**   The actuarial instruments are a significant advance over

2    what we were able to do prior to their development.   That's

3    certainly the case.

4    **Q.**   And you've written, in fact, and I may have misquoted a

5    little bit, "The worst actuarial is equal or better to the

6    best clinical judgment"?

7    **A.**   I'm not sure I said it exactly that way.

8    **Q.**   Okay.   Well, I told you I would probably do it, probably

9    butcher it wrong but I recall reading it.

10   **A.**   Actuarial instruments, for the general sex offender, the

11   use of actuarials is much preferred over clinical judgment,

12   yes.

13   **Q.**   Okay.   Well, I think it was, "The worst mechanical

14   instrument is equal to or better than --"

15   **A.**   I don't remember saying that but --

16   **Q.**   Okay.

17   **A.**   -- I wouldn't disagree with it strongly.

18   **Q.**   All right.   And you're certainly not advocating that we

19   abandon actuarial measures?

20   **A.**   No.

21   **Q.**   Okay.   And just briefly, your views on the actuarials

22   themselves, the Static-99, the RRASOR, the Mn-SOST-R, all of

23   these actuarials were developed using well established

24   principles of statistics; correct?

25   **A.**   Correct.

1    **Q.**  And to the best of your knowledge, for every actuarial

2    currently in common usage, the developers applied those

3    principles in a scientifically principled manner; correct?

4    **A.**  Correct.

5    **Q.**  And those instruments have been subjected to peer

6    review?

7    **A.**  Correct.

8    **Q.**  With the exception of the new 2008 norms to the

9    Static-99?

10   **A.**  Correct.

11   **Q.**  Okay.  But those, the Static-99 itself has been peer

12   reviewed?

13   **A.**  Right.

14   **Q.**  And what the new norms are seemly new percentages based

15   on a larger newer data set; correct?

16   **A.**  Correct.

17   **Q.**  And presumably just as they did in the original sample,

18   the developers of those norms have applied well recognized

19   statistical principles; correct?

20   **A.**  Correct.

21   **Q.**  That can be tested?

22   **A.**  Correct.

23   **Q.**  And they did so.  And you know these researchers so

24   certainly you would agree they properly did so or more

25   likely or even by clear and convincing evidence applied

1    those principles in a reasonable and principled scientific

2    manner?

3    **A.**   Correct.  And the fact that there is independent

4    cross-validation now means that other people have been able

5    to replicate what that have found.  And so all of that is

6    correct about actuarials.

7    **Q.**   Okay.  Now, they're very useful because they're based in

8    mathematics; correct?  I mean, yes?

9    **A.**   Correct.

10   **Q.**   And there is quite literally an elegance to mathematics;

11   correct?

12   **A.**   Correct.

13   **Q.**   Two and two is always four, four and four is always

14   eight; correct?

15   **A.**   Correct.

16   **Q.**   Humans and human behavior does not lend itself

17   particularly well to mathematical analysis; isn't that

18   correct?

19   **A.**   Well, I think that aspect of actuarials is reflective of

20   the fact that the estimates that are given provide a risk

21   for a group of individuals with particular characteristics.

22   But you always have the uncertainty in the end of whether

23   the individual you're assessing is in the recidivist

24   category or the nonrecidivist category.

25          So that's where I would say the uncertainty comes

1    into the equation that you're pointing to.

2    **Q.**   Okay.   Human behavior often does or it certainly can and

3    often does defy rational explanation?

4    **A.**   If we're able to come up with it at the time, yes.

5    **Q.**   Okay.   And, in fact, these actuarials really on their

6    best day are going to be of limited use in predicting the

7    future; correct?

8    **A.**   Yes.   I think the use, their use in predicting the

9    future is less compelling than their use in managing risk.

10   **Q.**   Okay.   Truthfully, I mean, if we could mathematically

11   predict the future, you wouldn't be wasting your time

12   testifying in court?   We have heard another witness say he'd

13   be cashing lottery checks.

14   **A.**   Right.

15   **Q.**   Now, many of the characteristics that are useful in

16   putting in the actuarials are characteristics or the only

17   really useful characteristics are ones that apply generally

18   to all sex offenders; correct?

19   **A.**   Correct.

20   **Q.**   And then for a given sex offender, however, there could

21   be very particularized and individualized reasons for sex

22   offending; correct?

23   **A.**   Correct.

24   **Q.**   An individual could offend against people with only red

25   hair; correct?

1   **A.**  I don't -- well, I'm not aware of that.

2   **Q.**  An individual sex offender could offend against

3   individuals wearing nurse's uniforms and that could be the

4   trigger; correct?

5   **A.**  Some offenders have some very particular preferences

6   but --

7   **Q.**  So, for instance, we would discover perhaps with an

8   individual who has an odd or compelling attraction to

9   individuals in a nurse's uniform a very strong but

10  individualized correlation between breaking his arm and

11  sexually offending because we would then learn he went to

12  the hospital and he encountered people with nurses' uniforms

13  on; correct?

14  **A.**  I have never run into a situation like that.  I suppose

15  it's a hypothetical that's possible.

16  **Q.**  Absolutely possible; correct?  And you'd discover

17  mathematically a very strong correlation between breaking

18  his arm and sexually offending; correct?

19  **A.**  In that circumstance, correct.

20  **Q.**  But that is not a finding that is generalizable to all

21  sex offenders?

22  **A.**  Correct.

23  **Q.**  And if we were to attempt to capture that finding for

24  all sex offenders, it wouldn't serve any purpose whatsoever?

25  **A.**  Correct.

1   **Q.**  But as to the one sex offender about whom we've

2   hypothesized, it would be an incredibly predictive factor;

3   would it not?  Well, it would be substantially predictive?

4   **A.**  Yes.  As you're describing it, it would be predictive.

5   **Q.**  When we talk about the individual on trial, we are

6   talking about an individual; correct?

7   **A.**  Correct.

8   **Q.**  We're not talking about all sex offenders?

9   **A.**  Right.

10  **Q.**  When we talk about the <u>United States versus Wayne Hunt</u>,

11  we're talking about Wayne Hunt; correct?

12  **A.**  Correct.

13  **Q.**  When you testified today, you are talking about rules

14  that are general, rules that are going to improve the

15  accuracy of these actuarial instruments as applied to all

16  sex offenders; correct?

17  **A.**  Correct.

18  **Q.**  And your statistical analysis, all of the research is

19  geared toward developing research that will help actuarial

20  instruments be more predictive across the board; correct?

21  **A.**  Correct.

22  **Q.**  It is not necessarily true for Wayne Hunt that

23  increasing actuarial accuracy generally will increase

24  actuarial accuracy for Wayne Hunt?

25  **A.**  Well, you can't really talk about I don't think

1    accurate --

2    **Q.**  You can't separate --

3    **A.**  -- with respect to an individual.

4    **Q.**  It is a bad question.

5         I'm going to try to move a little more quickly.

6         Now, you indicated on direct just a couple of

7    things I wanted to go over.

8         It remains to be resolved within the community of

9    sex offender research when there are subgroups of particular

10   offenders who do not exhibit linear decline; is that

11   correct?

12   **A.**  What I was arguing at that point I think is that the

13   linear component to a trend analysis is evident in all the

14   samples so that I don't think there is an argument to be

15   made about the linear component.  It's in the samples, it's

16   there.

17        The question is whether there are not subgroups who

18   might have a nonlinear component as well.  And then that's

19   in addition to the linear component.

20   **Q.**  Okay.  So that -- let me just see if I am clear.  If we

21   were to take out or break out actuarially scored high-risk

22   extrafamilial child molesters, we would still see a linear

23   decline; correct?

24   **A.**  Correct.

25   **Q.**  And there is to your mind adequate research of

```
 1   actuarially scored high-risk extrafamilial child molesters

 2   such that there really is no question in your mind that

 3   there is a linear decline in recidivism with age?

 4   A.  Correct.

 5   Q.  Okay.  But generally speaking, coming back just to the

 6   issue very quickly, the actuarials can capture generally

 7   applicable characteristics; correct?

 8   A.  Correct.

 9   Q.  But they're not necessarily going to capture all of the

10   characteristics that go into offending for an individual?

11   A.  Correct.

12   Q.  Okay.  So, again, on their best day they're only getting

13   part of the picture?

14   A.  Correct.

15   Q.  You've posited that a decline in libido could account

16   for decline in recidivism; correct?

17   A.  Correct.

18   Q.  And that trend you have shown has proven true generally;

19   correct?

20   A.  Correct.

21   Q.  For all types of offenders; correct?

22   A.  Correct.

23   Q.  But certainly it's possible to have an individual who

24   bucks the trend?

25   A.  There is certainly variability in the groups.  So
```

1    individuals don't always behave like the group does.

2    **Q.** An individual could begin offending at age 27 against

3    two children in a rather minimal touching type of fashion;

4    correct?

5    **A.** Correct.

6    **Q.** And then that individual's behavior could aggressively

7    increase both in frequency and in the severity of the sexual

8    assaults all the way to age 70?  That could happen; correct?

9    **A.** That could happen.  So you're talking about, you know,

10    someone who would be an extreme outlier.

11    **Q.** An individual who bucks the trend; correct?

12    **A.** Correct.

13    **Q.** And an individual could be less of an extreme outlier

14    and continue more aggressively and more frequently offend to

15    age 60?

16    **A.** Correct.

17    **Q.** And a little bit less of an outlier and could continue

18    to more frequently and more aggressively offend to age 50?

19    **A.** If you are talking about individuals who buck the trend,

20    yes, there are such individuals, that's correct.

21    **Q.** Okay.  Notwithstanding that their libido went down, as

22    they got older they could continue to offend more

23    aggressively and more frequently; correct?

24    **A.** Well, I guess if you are of the view that libido is an

25    important component of sexual offending, that would be

1    unlikely.  I suppose it's possible.

2    **Q.**  But there are offenders who continue to offend in their

3    sixties against children; correct?

4    **A.**  Yes.

5    **Q.**  There are offenders who continue to offend against

6    children in their seventies; correct?

7    **A.**  There have been reports of that, yes.

8    **Q.**  In the reports, it's in the Hanson study?

9    **A.**  Right.

10   **Q.**  There's a 72-year old individual released who offends

11   within a year; correct?

12   **A.**  Correct.

13   **Q.**  A very well respected and voluminous published

14   individual has made the statement, "We would be foolish to

15   argue that actuarial prediction is due entirely to age."  Do

16   you know who that was?

17   **A.**  That sounds like David Thornton.

18   **Q.**  No, that is Howard Barbaree:  We would be foolish to

19   argue that actuarial prediction is due -- is all due to age.

20   **A.**  I think to be fair that that is not what I said today.

21   I said, I've talked about the three components and the

22   importance of each.

23   **Q.**  Okay.  But certainly the components of the actuarials

24   that correlate to future risk are important?

25   **A.**  Right.

1   **Q.**  Even for an older offender; correct?

2   **A.**  As I said, the Static-99, for example, rank orders of

3   offenders even at the older age ranges.

4   **Q.**  Okay.  Very quickly I just want to run through some of

5   the methodologies you've advocated for adjusting for age.

6   In 2006 --

7   **THE COURT:**  Are you going to do this in one minute?

8   **MR. GRADY:**  It is five minutes, I have literally

9   three or four tops.

10   **THE COURT:**  Three or four what?

11   **MR. GRADY:**  Minutes.  I can really finish before

12   five past, Your Honor.  I'm pushing --

13   **THE COURT:**  No, we will come back.  I have people

14   coming in to see me and I have got other things to do too.

15   **MR. GRADY:**  I can do one and a half minutes then.

16   **MR. GOLD:**  Your Honor, I just have two questions on

17   redirect.

18   **MR. GRADY:**  Well, if we have redirect --

19   **THE COURT:**  We will see you at 2:15.

20   **MR. GRADY:**  Okay.

21

22   (Luncheon recess.)

23

24

25

1                    **AFTERNOON PROCEEDINGS**

2              **THE CLERK:**  All rise for the Honorable Court.

3              **THE COURT:**  Sit down, everybody.

4              (Whereupon, the Court and the Clerk conferred.)

5              **THE COURT:**  Okay.  Go ahead.

6              **MR. GRADY:**  Thank you.

7                 **HOWARD ERROL BARBAREE, Resumed**

8                 **CROSS-EXAMINATION, (Cont'd.)**

9    BY MR. GRADY

10   **Q.**  Very quickly, Dr. Barbaree, before we left I was

11   mentioning you had written an article in 2006.

12   **A.**  Yes.

13   **Q.**  Several other doctors, Dr. Prentky, and then Eric

14   Janus, Barbara Schwartz, Martin Kafka --

15   **A.**  Correct.

16   **Q.**  -- published in the *Psychology, Public Policy and the*

17   *Law*?

18   **A.**  Correct.

19   **Q.**  Is that a peer reviewed journal?

20   **A.**  Yes, it is.

21   **Q.**  And with respect to the problems created that you

22   perceived or that you and the coauthors perceived with

23   respect to applying actuarials proposed several solutions;

24   correct?

25   **A.**  We did.

1   **Q.**  And one of them would simply be to refrain from using

2   the actuarials at all; correct?

3   **A.**  Correct.

4   **Q.**  And that an expert could in this case, for example,

5   appropriately come in and opine I'm aware of the actuarials,

6   I'm aware of the research on the age, here's my clinical

7   opinion; correct?

8   **A.**  Correct.

9   **Q.**  And that would be appropriate?

10  **A.**  Right.

11  **Q.**  And you also mentioned that an expert could use

12  structured clinical judgment, the SVR-20 or other

13  empirically validated criteria, to come in and opine as to

14  whether Mr. Hunt presents a risk of recidivism; correct?

15  **A.**  As long as they include age as one of the factors they

16  consider, yes.

17  **Q.**  Okay.  And real quick, the instant charge that we've

18  seen several times, the purple line is a study by Prentky

19  and Lee; correct?

20  **A.**  Correct.

21  **Q.**  It's actually a republication of a study from 1997;

22  correct?

23  **A.**  Correct.

24  **Q.**  And that is a study that involved what we would deem by

25  virtue of having been civilly committed to be high risk;

1  correct?

2  **A.**  Yes.

3  **Q.**  And if we were looking for the sample that was most

4  likely to be analogous to another high-risk offender, that

5  would be the one that we would want to look to?

6  **A.**  Yes, I suppose that's true.  It does include the age

7  dimensions so you could take age into account by looking at

8  that.  That might give you some information about base rates

9  in the older high-risk offender.

10  **Q.**  Okay.  And you mentioned earlier Dr. Thornton with

11  respect to the new October 2008 Static-99 norms was in the

12  process of publishing information that the recidivism rates

13  would be half for individuals over 60?

14  **A.**  Correct.

15  **Q.**  Correct?

16      So in this case 59.9, 30 percent at the high risk

17  end, 50 percent, 25 percent the low risk end; correct?

18  **A.**  Correct.

19  **Q.**  And does that seem like an appropriate number to you?

20  **A.**  Yes, I think -- now, remember that the Static-99 does

21  contain age information embedded in the items as we

22  discussed this morning.

23  **Q.**  Right.  It may be capturing some of this already?

24  **A.**  Yes.  It wouldn't be my ideal optimal way of approaching

25  the risk assessment.  But if you've used the Static-99, then

1   I think those numbers would be about right.

2   **Q.**   Okay.   One other method you suggested was what's called

3   an empirically defensible method adjusting for age; correct?

4   **A.**   Correct.

5   **Q.**   And this is in the same 2006 article.   And you end up

6   with age adjusted risk will be equal to the actuarially

7   derived risk --

8   **A.**   Right.

9   **Q.**   -- times some hazard rate, 98 percent you used here?

10  **A.**   That's correct.

11  **Q.**   And then you multiply that to the power of whatever

12  number of years?

13  **A.**   Right.

14  **Q.**   Now, this is -- I warned you I attempted math.

15          If we were to take the Static-99 revised norms, now

16  you may not be able to do that in your head.   I certainly

17  couldn't.   But does that (indicating) seem correct?   Have I

18  applied that correctly?

19  **A.**   Yes, it looks reasonable to me.

20  **Q.**   Okay.   And using a 98 percent hazard rate, we end up

21  with percentages of 37 to 31?

22  **A.**   Yes.   Now, I did mention this morning that the hazard

23  ratio that we get is lower than that, 95.

24  **Q.**   But this was -- sorry.   You would use a bigger one;

25  correct?

1   **A.**   Yes.

2   **Q.**   But this is an empirically valid one based on

3   Dr. Hanson's research; correct?

4   **A.**   Correct.

5   **Q.**   Okay.  So --

6   **A.**   Now, I'll just hasten to say that, again, he used, in

7   doing that Cox regression he used the Static-99 as a control

8   variable.

9   **Q.**   Okay.

10  **A.**   Which by doing so takes age at release information,

11  enters it prior to the actual entry of the age at release.

12  **Q.**   Okay.  But --

13  **A.**   So I think frankly when all is said and done, when these

14  studies have, you know, ten years from now we'll have a

15  hazard ratio that is larger than .98.

16  **Q.**   Okay.

17  **A.**   Smaller than .98.

18  **Q.**   You believe that underestimates it.  But conservatively

19  that represents a valid empirically defensible adjustment

20  for age; correct?

21  **A.**   The upper range, yes.

22  **Q.**   Okay.  Last question.  The question -- now, you've

23  testified previously in Adam Walsh proceedings; correct?

24  **A.**   Yes.

25  **Q.**   In federal court, <u>United States v. Abregana</u> in the

```
1    District Court of Hawaii?
2    A.   Correct.
3    Q.   And you're familiar with the standard to be applied:
4    Past acts generally, a mental illness, serious disorder;
5    correct?
6    A.   Right.
7    Q.   And the question of whether an individual presents a
8    serious or will have serious difficulty in refraining from
9    further acts of sexually violent conduct or child
10   molestation; correct?
11   A.   Right.
12   Q.   And Congress in choosing that language did not use
13   language about percentages; correct?
14   A.   Correct.
15   Q.   And it did not use language that requires a finding of a
16   particular likelihood of recidivism; correct?
17        MR. GOLD:  Objection, Your Honor.  Beyond the scope
18   of his expertise.
19        THE COURT:  Are you all through?
20        MR. GRADY:  It is not beyond the scope of his
21   expertise.  He's an author --
22        THE COURT:  No, I don't think -- I am overruling
23   the objection.
24        MR. GRADY:  Thank you, Your Honor.  Nothing
25   further.
```

1          **THE COURT:**  Okay.  Anything else?

2          **MR. GOLD:**  Just two questions, Your Honor.

3                    **REDIRECT EXAMINATION**

4    BY MR. GOLD

5    **Q.**  The figures that the government just discussed with you

6    were 10-year rates.  Do you have any opinion as to the --

7    **A.**  Weren't they 15-year rates?

8    **Q.**  No --

9          **MR. GRADY:**  10-year.

10   **Q.**  -- 10-year rates.

11            Do you have any opinion as to the application of

12   the 10-year rate to a 63-year old?

13   **A.**  Well, it's a very long followup period for someone of

14   that age.  Yes, I think -- and during that period of time,

15   of course, the age effect continues to operate and so each,

16   with each successive year the risk level is lower.

17            So I think that percentage is based again on

18   individuals who are released on average in the mid thirties.

19   And ten years would be 35 to 45 years of age on average.

20   Highly different, very different from the situation that

21   Mr. Hunt is in.

22   **Q.**  Now, you were asked about whether the information that

23   you provided to the Court today is applicable to an

24   individual in a proceeding such as this.  And you mentioned

25   something about group data.

1          Could you just expand on that?

2  **A.**   Sure.  I think the distinction was being made in the

3  cross-examination between the assessment of Mr. Hunt as an

4  individual and the discussion that we had today about age in

5  the context of group norms and studies of groups of sex

6  offenders, as if the discussion we had today is somehow

7  different from the normal expertise that is given in

8  evidence in proceedings like this.

9          I think that is a bit of an exaggeration.  The

10  expertise that we come in with to substantiate the evidence

11  we give based on empirical studies are all studies of groups

12  of individuals.

13          So I think when the witnesses that you have seen

14  already have come in after having evaluated Mr. Hunt are

15  comparing Mr. Hunt with groups of subjects that have had

16  these actuarials coded, and these studies are in the

17  literature.

18          I think that the distinction is an important one to

19  make between the kind of evidence we can provide based on

20  the norms that we see in the studies in the literature

21  compared with the legal question which applies directly to

22  Mr. Hunt.

23          So the models are different but I think that the

24  evidence that we have covered today based on group data and

25  based on the scientific literature is of the same nature,

1   expertise and evidence as has been given about Mr. Hunt by

2   the experts who have actually evaluated Mr. Hunt.

3            **MR. GOLD:**  Nothing further.

4            **THE COURT:**  Okay.  Anything else?

5            **MR. GRADY:**  No, Your Honor.

6            **THE COURT:**  All right.  You are excused, Doctor.

7   Thank you.

8            **THE WITNESS:**  Thank you.

9            (The witness was excused.)

10           **THE COURT:**  Both parties rest now?

11           **MR. GOLD:**  Yes.  There is one housekeeping matter,

12  Your Honor.  We have --

13           **MR. WATKINS:**  Actually, if I may, there is just

14  some pages to be added to Exhibit G that the Court already

15  also.  I think it's going to be added without objection.

16           **MR. GRADY:**  No objection, Your Honor.  There

17  were --

18           **THE COURT:**  Okay.  Take care of that.  Make sure

19  Zita knows what you are talking about.

20           **MR. GOLD:**  We move again under Rule 52, Your Honor.

21           **THE COURT:**  Okay.  Denied.

22           Now, how did we leave this?  Are we having daily

23  copy transcript?

24           (Whereupon, the Court and the Clerk conferred.)

25           (Whereupon, the Court and the Court Reporter

1                conferred.)

2         **THE COURT:**  Do you want to order expedited copy?

3         What I want from you are proposed findings of fact

4  reference to the transcript.  No generalities.  John Jones

5  is ten years old, record page 3, line two.  No

6  editorializing, just proposed findings.

7         **MR. GRADY:**  No question about that, Your Honor.

8         As to the issue of expedited, I hate to sound like

9  a child but I would need to get permission literally.  So I

10  can get back to the Court today --

11         **THE COURT:**  Otherwise how long will it take for

12  them to get it?

13         **THE COURT REPORTER:**  Two to three weeks tops.  We

14  will still do it expedited.

15         **THE COURT:**  If it is expedited?

16         **THE COURT REPORTER:**  It is two weeks but we will

17  still try to do it within two weeks depending on how the

18  Court's schedule goes and where Brenda is assigned.

19         **THE COURT:**  All right.  Try to get it so that she

20  gets paid for expedited, okay.

21         **MR. GRADY:**  Okay.

22         **THE COURT:**  And then you will have it in two to

23  three weeks.  And then what I want from you would be

24  proposed findings of fact a month, within 30 days after you

25  have received the transcript.

1          Is that doable?

2          **MR. GRADY:**  It would be ideal.

3          **MR. GOLD:**  Yes, Judge.  And also should we -- well,

4     can we do a memorandum in addition?

5          **THE COURT:**  Sure.  Yes.  That is up to you.  If you

6     think that will be helpful for me, I would be very happy to

7     read it.  But don't clutter up the proposed findings of fact

8     with editorial.  I just want the proposed findings of fact

9     as a separate document.  Okay.

10          Is there anything else that we should take up?

11          All right.  I just want to commend both sides.  You

12    presented this difficult case in a very professional way.

13    And I am not patronizing you when I say that.  It was a

14    pleasure to preside, both sides, not just both counsel, all

15    three who asked the bulk of the questions here did a very,

16    very professional job.  It was a pleasure to preside.  Even

17    though sometimes I think you had too many questions but --

18          (Laughter.)

19          **MR. GRADY:**  Sometimes?

20          (Laughter.)

21          **THE COURT:**  All right.  Thank you.

22          **COUNSEL:**  Thank you, Your Honor.

23

24          (WHEREUPON, the proceedings were recessed at 2:40

25          p.m.)

C E R T I F I C A T E

 

I, Carol Lynn Scott, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

 

/S/CAROL LYNN SCOTT

_____

CAROL LYNN SCOTT
Official Court Reporter
John J. Moakley Courthouse
1 Courthouse Way, Suite 7204
Boston, Massachusetts 02210
(617) 330-1377