1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3    UNITED STATES OF AMERICA,          )
                                        )
4                        Petitioner,    )
                                        )
5    vs.                                )  CIVIL ACTION
                                        )  NO. 07-12063-JLT
6                                       )
     WAYNE HUNT,                        )
7                        Respondent.    )
                                        )
8

                    BEFORE THE HONORABLE JOSEPH L. TAURO
9                     UNITED STATES DISTRICT JUDGE
                       **DAY TWO OF NONJURY TRIAL**
10

11    A P P E A R A N C E S

12            OFFICE OF THE UNITED STATES ATTORNEY
              1 Courthouse Way, Suite 9200
13            Boston, Massachusetts 02210
              For the United States
14            By:  Mark J. Grady, AUSA
                   Jennifer A. Serafyn, AUSA
15

              FEDERAL DEFENDER OFFICE
16            408 Atlantic Avenue
              Boston, Massachusetts 02110
17            For the Respondent
              By:  Ian Gold, Esq.
18                 Timothy G. Watkins, Esq.

19

                                        Courtroom No. 22
20                                      John J. Moakley Courthouse
                                        1 Courthouse Way
21                                      Boston, Massachusetts 02210
                                        April 28, 2009
22                                      10:08 a.m.

23                    Brenda K. Hancock, RMR, CRR
                        Official Court Reporter
24                      One Courthouse Way
                        Boston, MA 02210
25                       (617)439-3214

I N D E X

| Testimony of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

DR. LUIS ROSELL
(CONTINUED)
| by Mr. Gold (Cont'd) | | 3 | | 77 |
| by Mr. Grady | | | 72 | |

DR. BERNARD KATZ
| By Ms. Serafyn | 82 | | | |
| By Mr. Gold | | 117 | | |

SGT. J. DONAGHY
| By Mr. Grady | 138 | | | |


E  X  H  I  B  I  T  S

(None marked this day)

1                    P R O C E E D I N G S:

2              THE CLERK:  All rise for the Honorable Court.

3              THE COURT:  Are we all set to go?  All right.  Let's

4    go ahead.

5              MR. GOLD:  There is just one preliminary issue, your

6    Honor.  I request the Court -- there is a witness, who's going

7    to be testifying as to some disciplinary report which occurred

8    in Mr. Hunt's career in prison, who's in the gallery.  I would

9    request that he be sequestered, since the facts of that

10   incident are going to be part of Dr. Rosell's testimony.

11             MR. GRADY:  Your Honor, I don't have a problem with

12   that.  I actually had asked counsel this morning if the witness

13   could stay, and counsel said, "Yes," at that point, but if

14   there is a problem now, he certainly has to stay outside.

15   That's fine.

16             THE COURT:  Okay.  If there is a request for

17   sequestration, then we have to honor that.

18             MR. GRADY:  Yes, absolutely.

19             THE COURT:  All right.  What is the date today,

20   anyway?

21             MS. SERAFYN:  28th.

22             MR. GOLD:  May I inquire?

23             THE COURT:  Please.

24                 DR. LUIS ROSELL, PREVIOUSLY SWORN

25                   CONTINUING CROSS-EXAMINATION

BY MR. GOLD:

Q.    Good morning, Dr. Rosell.

A.    Good morning.

Q.    Yesterday afternoon, I was wondering if I could get you to agree with me about whether some of the 10s in the development sample were scored with insufficient data.  Do you remember that?

A.    Yes.

Q.    And the idea there is that sometimes, when they didn't have data, for research purposes, they just scored someone a zero instead of scoring them a 1, when they didn't have the data, right?

A.    Yes.  I'm not sure how often that occurred, but I do know that in the developmental sample, the original developmental sample, for example, the RRASOR, had over 2,000 subjects, and then, when they did the Static, they had only about 1,000 because of probably insufficient data.  So, they did take into account at some point in that they did not have nearly -- you know, only half as many individuals in the Static as opposed to the RRASOR.  So, I'm not sure exactly how often it occurred that they would keep an individual in the sample, even though they did not have the amount of information.  That's something that the developers would have to answer.

Q.    Well, the government has brought up in this case that there are no 11s in the norms that we can find, right?

1    A.    Yes.

2    Q.    But there may be 10s or even 9s who were actually 11s, if

3    we had more information about them.  That's the point -- would

4    you agree with that point?

5    A.    Well, it would be possible speculation.  I'm not sure if

6    that, in that instance -- once again, I'm not sure how often

7    they included individuals where they were missing one -- maybe

8    one item or not.  I don't know.  I'd have to go back to the

9    coding rules and see if they indicated that in the coding

10   rules, or somebody else may be able to testify about that

11   information better than I have.

12   Q.    But the more important point in interpreting an 11 or a 10

13   on the Static-99 is whether, in fact, a 9, a 10 or 11 are

14   actually different from each other, right?

15   A.    Correct.

16   Q.    And there are confidence intervals now associated with the

17   upper-level scores, right?

18   A.    Yes.

19   Q.    And, in fact, those confidence intervals overlap for these

20   upper-level scores, right?

21   A.    Yes.

22   Q.    Now, I just want to back up.  We've been talking about the

23   development sample for the Static-99 and the new norms, and I

24   want to ask you a couple of questions about the new norms.  The

25   new norms are recently published, right?

1  A.    Um --

2  Q.    And by "published," I don't mean -- recently distributed

3  to people like yourself, right?

4  A.    Correct.

5  Q.    And, in fact, they haven't been published in any

6  peer-reviewed journal of any kind, right?

7  A.    No, they had not at this time.

8  Q.    Now, the original development sample of the Static-99 you

9  just said was 1,086 individuals, right?

10  A.    That's true.

11  Q.    And when people interpreted the Static-99 in courts, they

12  gave meaning to the scores by telling people what the

13  recidivism percentages associated from -- were from the

14  development sample, right?

15  A.    Yes.

16  Q.    And you, yourself, said it was part of your testimony in

17  many cases to critique the use of the Static-99 in this way,

18  right?

19  A.    Yes.

20  Q.    And the reason that you critiqued the Static-99 in this

21  way is that those associated percentages from the -- or one of

22  the reasons -- the associated percentages were overestimates

23  from the development sample, right?

24  A.    Yes, and the other side argue that they were

25  underestimates; so, both sides had a disagreement on the actual

1    numbers themselves.

2            THE COURT:  Try and keep your voice up.

3            THE WITNESS:  Oh, sorry, your Honor.

4    BY MR. GOLD:

5    Q.   Well, there was an important principle behind the

6    critique, which is that the overall base rate of reoffending

7    affected what those percentages would be.

8    A.   That's true.

9    Q.   Now, the overall base rate of sexual reoffending is just

10   the rate of all sexual offenders released to society in a given

11   population what we would expect the overall rate to be, right?

12   A.   Correct.

13   Q.   And the Static-99 base rate was relatively high for the

14   development sample, right?

15   A.   Twenty-five percent.

16   Q.   And that is higher than the overall base rate for sexual

17   reoffending that we find in contemporary samples; isn't that

18   right?

19   A.   Well, it depends on what contemporary sample you're

20   talking about.  There is 5-year rates, there's 10-year rates,

21   there's 15-year rates, there's rates for child molesters, for

22   rapists.  It's not an easy question to answer, what is the rate

23   of reoffense among sex offenders, because there's such a wide

24   variety.  But if you're looking at the meta-analysis, the rate

25   was 12.5 percent for child molesters over a 5-year period, 18

1   percent for rapists over a 5-year period.  This 25 percent

2   number was more of a 15-year rate.

3          So, those are just the facts; how people interpret

4   them is up to them.  So, it's difficult, when you say, What's

5   the contemporary base rate based on studies?  Every study has a

6   different type of rate based on the years and the followup and

7   the type of offender.

8   Q.   Well, but the principle is the same, which is that the

9   base rate of reoffending in a population has an effect on what

10  the Static-99 recidivism percentages will be.

11  A.   Correct.

12  Q.   Now, there used to be people in the field who argued that

13  the recidivism percentages associated with this development

14  sample were stable, regardless of the base rate in the

15  population in which it was tested.

16  A.   Yes.

17  Q.   And one of those researchers was this psychologist who

18  works at one of these facilities, the Sand Ridge facility,

19  named Dennis Doren, right?

20  A.   Correct.

21  Q.   And he argued that, regardless of what the base rate is,

22  high or low, your Static-99 recidivism percentages hold up.

23  A.   Correct.

24  Q.   And that is incorrect; is that fair to say?

25  A.   That's true.

1    Q.   And, in fact, the new-norm issue sort of put that argument

2    to rest, by which I mean the take-home message that the

3    developers of the Static-99 are saying is base rates matter.

4    A.   That's true.

5    Q.   Because, if the base rate is higher than the development

6    sample, you'll have higher Static-99 scores, right?

7    A.   Yes.

8    Q.   If the base rate is lower, you have lower Static-99

9    scores, right?

10   A.   Correct.

11          THE COURT:  Tell me, again, where do we get the base

12   rate?

13          THE WITNESS:  Your Honor, the base rate is just the

14   overall rate, regardless of the person's risk level, regardless

15   of what type of offense they committed.  In that 1,086

16   subjects, 25 percent of them reoffended at a 15-year time.  So,

17   that's all of them, it doesn't matter --

18          THE COURT:  How old they were.

19          THE WITNESS:  It doesn't matter how old they were,

20   what risk level --

21          THE COURT:  It's the gross figure.

22          THE WITNESS:  Correct, sir.

23          THE COURT:  All right.

24   BY MR. GOLD:

25   Q.   But, again, this gross figure is important when we go back

1   to the Static-99 and interpret what a particular score means,

2   right?

3   A.   Correct.

4   Q.   Now, experts like yourself critique the Static-99 because

5   they said that -- or could --

6          THE COURT:   When you say "critique," you mean

7   criticize?

8          MR. GOLD:   Criticize.

9   BY MR. GOLD:

10  Q.   Criticize the Static-99 or the use of it in a particular

11  case, because the respondent in some case was not similar to

12  the development sample.   Is that a fair statement?

13  A.   Correct.

14  Q.   And when you apply the results of any test to an

15  individual in this type of analysis, you need to compare the

16  person to the reference group that was used to develop the

17  instrument, right?

18  A.   Yes.

19  Q.   And, in fact, in the introduction to the instructions to

20  this instrument, it tells you, Don't use it on 18-year-olds or

21  on people who are under 18, because it wasn't normed on that

22  population, right?

23  A.   Correct.   It's not to be used with juvenile-only

24  offenders, unless -- there's very few exceptions, and they

25  delineate the exceptions, but, overall, it should not be used

1    with juvenile-only offenders.

2    Q.    And don't use it with women, for example, because it

3    wasn't normed on that population.

4    A.    Correct.  It should never be used with women.

5    Q.    Right.  Now, the average age of the development sample was

6    about 33 1/2 years old, right?

7    A.    That's right.

8    Q.    And, so, it was a frequent and valid criticism of the use

9    of the Static-99 that a particular individual was much older

10   than the development sample average age, right?

11   A.    That's true.

12   Q.    And the basis of that criticism was, in part, that the

13   base rate of offending for older individuals as a class, high,

14   low, medium risk, is low, right?

15   A.    Correct.

16   Q.    And that is, in fact, what the data showed.

17   A.    That's correct.

18   Q.    So, I guess, would you agree with the characterization

19   that a low base rate draws down the Static-99 scores --

20   A.    Yes.

21   Q.    -- or the recidivism percentages associated with them?

22   A.    Yes, it does.

23   Q.    Now, you testified that the Static-99 score that you

24   arrived at, when you scored Mr. Hunt, was important to your

25   assessment in this case.

1    A.    Yes.

2    Q.    And you hadn't seen an 11 before in your professional

3    experience, right?

4    A.    That's true.

5    Q.    Now, in the development sample for the Static-99, all

6    scores above 6 were grouped together for risk-analysis

7    purposes, right?

8    A.    Correct.

9    Q.    And one of the reasons for that is that they didn't have

10   sufficient numbers, right?

11   A.    That's true.

12   Q.    But the theory behind doing that is that they posed the

13   same amount of risk, right?

14   A.    Yes.

15   Q.    And Dr. Hanson said -- Dr. Hanson, one of the developers

16   of this instrument, said don't upwardly adjust the risk for a

17   higher number as you're just more confident that he's in the

18   high-risk category, right?

19   A.    Correct.

20   Q.    Now, Mr. Hunt scored what he scores on the Static-99 today

21   in 1986, right?

22   A.    That's true.

23   Q.    If you were to score him back in 1986, you would come into

24   a court like this, hypothetically, with an 11 and whatever

25   norms were associated with it, right?

1    A.    Yes.

2    Q.    And, so, that doesn't change at all for as long as he is

3    alive.

4    A.    Correct.

5    Q.    Now, you described your method of using the Static-99

6    yesterday in your direct testimony.  You said you used it as a

7    starting point, right?

8    A.    Correct.

9    Q.    And that the advantage to the Static-99 is that it's

10   empirically based, right?

11   A.    Yes.

12   Q.    Now, you discussed yesterday the Static-99, the accuracy

13   of the instrument, and you brought up a statistic called the

14   receiver operating characteristic.  Do you recall that?

15   A.    Yes.

16   Q.    And you testified that the research in the field shows

17   that the Static-99 is moderately accurate, according to this

18   ROC statistic.

19   A.    Correct.

20   Q.    Now, what the ROC measures is not what we were just

21   talking about, which is the absolute risk of recidivism, right?

22   A.    Right.

23   Q.    It rates or measures the ability of the instrument to

24   capture relative risk.

25   A.    That's true.

1    Q.    And it's only moderately accurate at that, right?

2    A.    Correct.

3    Q.    This is one of the acknowledged weaknesses of this

4    instrument, is that it's moderately accurate, right?

5    A.    Yes.

6    Q.    So that what that means is, sometimes it's sorting or

7    classifying moderate-risk people as high risk and high-risk

8    people as low risk, right?

9    A.    That can happen, yes.

10   Q.    But what we're talking about is the absolute recidivism

11   rates associated with each score, right?

12   A.    Right.

13   Q.    That's a different matter entirely.

14   A.    Correct.

15   Q.    Now, the developers of the Static-99, they looked at the

16   development sample, they did a large, new study, which is

17   underway right now, right?

18   A.    Correct.

19   Q.    And I say "underway," because they have issued recidivism

20   percentages but prior to releasing it in a published

21   peer-reviewed study, right?

22   A.    That's part of it, yes.

23   Q.    Now, they instruct -- there's now a website set up for the

24   Static-99, right?

25   A.    Yes, static99.org.

1   Q.   And they distribute material to practitioners in the

2   field, such as yourself, through that website.

3   A.   Correct, and attorneys can go on there, too.

4   Q.   Now, the recidivism percentages, a 16-page document which

5   was entered into evidence yesterday, those percentages are

6   simply the most current in the rolling process of releasing

7   normative data, right?

8   A.   That's true.

9   Q.   There have been several releases before it.

10  A.   Two that I can recall, November of '07 and then January of

11  '08 and then October of '08, and the latest I've heard is that

12  there's going to be another release at the end of the year.

13  Q.   Now, you're a member of an association called the

14  Association for Treatment of Sexual Abusers, right?

15  A.   Correct.

16  Q.   And you attend their conferences?

17  A.   Every year.

18  Q.   And one of the things that happened at the last

19  conference, which was in October of 2008, was the introduction

20  of the latest series of new norms, right?

21  A.   Correct.

22  Q.   And they come with instructions about how to use them,

23  right?

24  A.   Correct.

25  Q.   Now, so, it's fair to characterize this data that we're

1    talking about as a work in progress, isn't it?

2    A.    That's true.

3    Q.    But the basic finding, you testified in a deposition in

4    this matter, you felt confirmed the criticism that you had been

5    making of the Static-99 for years, which is that the Static-99

6    recidivism percentages were affected by base rates.

7    A.    That's true.

8    Q.    And, in fact, that's now what the developers are saying.

9    A.    Correct, because there have been other studies not done by

10   those developers but by other researchers that had found lower

11   probability estimates with corresponding risk scores.

12   Q.    You reported in your report in this matter a percentage

13   risk estimate associated with what you thought was Mr. Hunt's

14   score.  Do you recall that?

15   A.    Yes.

16   Q.    And you say in that report that the associated score with

17   a 10 on the Static-99 is 66 percent, right?

18   A.    Correct.

19   Q.    Then you note as a limitation that that's based on very

20   few subjects, right?

21   A.    Correct.

22   Q.    Twenty-two people.

23   A.    That's true.

24   Q.    Now, on the stand yesterday, you said that you would

25   report the recidivism percentage associated with a score on

1    the -- a 10 or 11 on the Static-99, 10 plus, with a risk range,

2    right?

3    A.    Correct.

4    Q.    And could you -- do you remember what that range is?

5    A.    49 percent to 59 percent.  I think that's what I said.

6    Q.    49 percent to 59 percent?

7    A.    Yes.

8    Q.    And why is there a range?

9    A.    Well, the first number that I included that was in my

10   report, that was the complete sample.  Since I wrote the

11   report, the developers have come out with a recommendation on

12   which norms to use, and, so, they are recommending using a

13   different table.

14         And then you have, as I mentioned yesterday, the lower

15   preselected group, lower risk group, and then there's the

16   higher risk group, and, so, there's been a recommendation to

17   look at the range, depending on the individual and some of the

18   factors that I was listing yesterday or, actually, reading,

19   because I didn't have those memorized.  Those are supposed to

20   assist the evaluator in determining where to place them within

21   that range.

22   Q.    Well, so, with the new norms, there's been one new

23   development, which is that you have a low-risk group and a

24   high-risk group, right?

25   A.    Correct, but it's misleading to say that the low-risk

1   group is a low-risk group based on the recidivism rate.  It's

2   based on other factors, because they still had individuals who

3   scored 8, 9 and 10 in the low-risk group.

4   Q.   But there's what's, basically, characterized as a low-risk

5   group and a high-risk group, right?

6   A.   Correct.

7   Q.   And there are five different samples in the high-risk

8   group, and there are five different samples in the low-risk

9   group, right?

10   A.   That's true.

11   Q.   And that's where the two numbers come from, right?

12   A.   That's true.

13   Q.   And an evaluator now is supposed to tell a court or

14   someone who's receiving the opinion which sample someone most

15   represents, right?

16   A.   Correct.

17   Q.   Did you make that determination for Mr. Hunt?

18   A.   I made the determination that he's probably somewhere in

19   between the two or maybe a little higher up, but I did not come

20   down -- I would have difficulty coming down with an exact

21   percentage, because I wouldn't be able to defend whatever

22   percentage I selected, because one of the critiques of the new

23   norms is that they haven't provided us enough information to

24   make that determination on how do we distinguish or identify

25   the factors, since they haven't identified the factors that

1    would distinguish the two different groups well enough for us

2    evaluators.  So, that's why the range -- where the range comes

3    in.

4    Q.   You've said that there is criticism now in the field of

5    the new norms, right?

6    A.   There's always criticisms, yes.

7    Q.   But I just want to get clear on what the developers are

8    saying.  So, they're saying there is a low-risk group and a

9    high-risk group, right?

10   A.   Yes.

11   Q.   And they give you some criteria but not much on where to

12   put someone in the high-risk group or the low-risk group,

13   right?

14   A.   That's true.

15   Q.   And then we can expect that the recidivism rate associated

16   with that group will correspond to the offender, right?

17   A.   Correct.

18   Q.   And the principle here is the same that we started out

19   talking about, which is that the overall base rate for the

20   low-risk group is lower, right?

21   A.   Correct.

22   Q.   And the overall base rate for the high-risk group is

23   higher, right?

24   A.   Yes.

25   Q.   And then that has an effect on the recidivism percentages.

1   A.   Correct.

2   Q.   Now, are you familiar with a Dr. Brian Abbott?

3   A.   Yes, I know him.

4   Q.   Are you familiar with critiques -- a critique authored by

5   Dr. Abbott about the current new norms?

6   A.   Yes.

7   Q.   And have you read a critique by Dr. Abbott about the new

8   norms?

9   A.   Yes.  I have it with me here.

10   Q.   So, you're looking at this document right now?

11   A.   Well, it's in my binder.

12   Q.   Now, for the record, I'm putting up on the screen a draft

13   of an article.  Do you know if this article has been accepted

14   for publication in a peer-reviewed journal?

15   A.   It has.

16         THE COURT:  It has?

17         THE WITNESS:  Yes, it has, your Honor.  And, actually,

18   yesterday he sent me -- I didn't have access to print it out --

19   but he sent me an updated, where he updated a couple of things,

20   but it has been accepted to publication in the journal of *Sex*

21   *Offender Treatment*.

22   BY MR. GOLD:

23   Q.   And, just for the record here, peer review in the

24   psychological community involves a process by which an article

25   is submitted and reviewed by anonymous experts in the field who

1    comment on it and either accept it or not for publication,

2    right?

3    A.   That's true.

4    Q.   And, so, this article, which we are looking at in draft

5    form, has, essentially, been through that process, right?

6    A.   Correct.  I have the in-press copy and then, as I said, he

7    updated it.  I don't know what updates he made or revisions, I

8    don't know what new he added, but I have the one from the one

9    that's been accepted for original publication.

10   Q.   And the issue that he's addressing is summed up in the

11   title of the article, which, for the record, is the

12   *Applicability of the New Static-99 Experience Tables in*

13   *Sexually Violent Predator Risk Assessments*, right?

14   A.   Yes.

15   Q.   Now, I brought up earlier, when we were talking about how

16   to interpret a high score on the Static-99, that the confidence

17   intervals overlap, right?

18   A.   Correct.

19   Q.   And one of the things that Dr. Abbott notes in this

20   article is that the obvious fact that these numbers, these

21   tables, the statistical analysis used to generate the numbers

22   has not been vetted in a peer-reviewed journal yet, right?

23   A.   Correct.

24   Q.   And one of the things we knew that happened with the old

25   norms is that the developers found that 6 and above should be

1    considered the same for risk-assessment purposes, correct --

2    A.    Right.

3    Q.    -- when they collapsed them?

4    A.    Yes.

5    Q.    In this draft form of the new norms, they have, for the

6    first time, broken out separate percentages based on different

7    numbers, right?

8    A.    Correct.

9    Q.    But that's with very small numbers of offender per score?

10   A.    Correct.

11   Q.    And that is based on statistical techniques that they

12   didn't use before, right?

13   A.    Correct.

14   Q.    Now, I have turned the display here to page 8 of the draft

15   article by Dr. Abbott, and what I'm showing here is a table,

16   and what that does is, it shows where the confidence intervals

17   for various scores overlap.  Do you see that table?

18   A.    Correct.

19             THE COURT:  That is at the bottom of the page?

20             MR. GOLD:  That's the table at the bottom of the page,

21   yes.

22   BY MR. GOLD:

23   Q.    And what this is essentially showing is that, for example,

24   with the high risk in the 10-year followup period or the 5-year

25   followup period for the complete sample, scores 9 -- 8 and 9

1    overlap?

2    A.    Correct.

3    Q.    Scores 9 and 10 overlap, right?

4    A.    Correct.

5    Q.    And, so, what Dr. Abbott states is that, for practical

6    purposes, those scores are, essentially, the same, right?

7    A.    Yes, that's what he says.

8    Q.    Now, the idea of developing a test like this is you want

9    to have risk bins where the confidence intervals don't overlap;

10   then you know that you're measuring discrete levels of

11   something, right?

12   A.    Correct.

13   Q.    And, again, for the 10-year followup period, there's even

14   more overlap.  For example, in the CSC category for 7 through

15   10, those all have overlapping confidence intervals, right?

16   A.    Correct.

17   Q.    And 8 through 10 in the high risk and 9 and 10 with the

18   complete sample.

19   A.    Correct.

20   Q.    Now, Dr. Abbott makes recommendations to evaluators, such

21   as yourself, performing risk assessments at the conclusion of

22   this article.  Are you familiar with those?

23   A.    Yes.

24   Q.    And turning your attention to the bottom of page 24, where

25   he lists some of the recommendations, first of all, the first

1    recommendation is, The risk information from October 2008

2    Static-99 experience tables should not be represented as

3    normative data.  Rather, evaluators should point out the lack

4    of information provided by the Static-99 test developers, such

5    as failure to provide empirically based interpretation rules

6    and lack of sample representativeness, all of which compromise

7    the confidence by which the risk data reflects an individual's

8    potential for sexual reoffense.

9            Do you agree with that recommendation by Dr. Abbott?

10   A.   Yes.  It's something that makes sense, and that's one of

11   the things that I mentioned earlier, that they haven't provided

12   us enough information to make a determination how to place the

13   individual in which group.

14   Q.   So, when you testified earlier that you sort of placed

15   Mr. Hunt in the middle, maybe a little to the high end of that

16   range, what was that based on?

17   A.   Well, it's based on the recommendation of the developers,

18   but, as I said, with the caveat that it's not clear exactly

19   where in that range to place them.  For example, since there's

20   been such little information regarding how to do it, most

21   recently, I think it was two or three months ago, Dr. Hanson

22   was asked that question, and he said that, if the individual

23   had been in a two-year treatment program, then you could maybe

24   put him more likely in the lower range.  That was just some

25   more information on what they meant by treatment, because

1    before they hadn't operationally defined what they considered

2    treatment.  But, as I said, it's one of the criticisms, and

3    Dr. Abbott is valid in bringing that up, that they haven't

4    provided us enough information on how to go about making that

5    determination of within which group to place them in.

6    Q.    Well, certainly Dr. Hanson, your recollection of

7    Dr. Hanson mentioning some advice about how to do this at a

8    conference is not the same as empirically validated criteria by

9    which you put someone in one group or another, right?

10   A.    That's true.

11   Q.    And, so, you made the decision based on these criteria,

12   which you criticize yourself as inadequate, right?

13   A.    Well, it's the best that we have, it's the only thing that

14   we have, so it gives some assistance, but it's just,

15   unfortunately, not the clearcut assistance that we would expect

16   in terms of a significant amount of criteria that's been found

17   that distinguishes these two groups.

18   Q.    But the principle -- getting back to the same principle,

19   again, that you compare someone to, you can use these

20   instruments to the extent that the person that you're

21   evaluating is similar to the reference group on which the

22   instrument is developed, right?

23   A.    Correct.

24   Q.    And these criteria that we're talking about is how to tell

25   whether someone should be in the high-risk group because

1   they're more similar to the high-risk group or in the low-risk

2   group because they're more similar to that group, right?

3   A.   Right.

4   Q.   That's the criteria that we're talking about right now,

5   right?

6   A.   Correct.

7   Q.   And, so, the second recommendation was anticipated by your

8   testimony just now.  It says, Second, clinician should provide

9   a sound justification for the selected reference group in which

10  to compare the individual being assessed.  Right?

11  A.   Correct.

12  Q.   Now, there has been research about the base rate of

13  reoffending for older offenders, right?

14  A.   Yes.

15  Q.   And I am talking now about this general base rate of

16  reoffending among older offenders in basic populations, right?

17  A.   Correct.

18  Q.   The first major study in this area or the first major

19  recent study was by this Dr. Karl Hanson in 2002, right?

20  A.   Correct.

21  Q.   Now, Dr. Hanson in that research broke up -- well, that's

22  published research, right?

23  A.   Yes, sir.  2002.

24  Q.   2002.  And in that research, he looked at the different

25  rates of offending, overall base rates for incest offenders,

1    rapists and extrafamilial child molesters, right?

2    A.    Correct.

3    Q.    And this isn't the base rate of offending; it's the base

4    rate of reoffending, right --

5    A.    Correct.

6    Q.    -- in a sexual way, right?

7    A.    Yes.

8    Q.    And I have put up on the screen, for the record, an

9    article by Dr. Karl Hanson from the *Journal of Interpersonal*

10   *Violence*, October 2002, called *Recidivism and Age:  Follow-Up*

11   *Data from 4,673 Sexual Offenders*, and you're familiar with this

12   article, you testified.

13   A.    Yes, sir.

14   Q.    And this is a representation of the data that Dr. Hanson

15   generated on page 1,054.  Figure 2 shows a graph with declining

16   recidivism rates, right?

17   A.    Yes, sir.

18   Q.    And what it shows is different rates of decline but

19   decline for those three separate groups that I mentioned,

20   right?

21   A.    Yes.

22   Q.    And there's a highlighted section there, where Dr. Hanson

23   states that he found that the older-than-60 recidivists --

24   well, first he states, There were very few recidivists among

25   the sexual offenders released after age 60, 5 out of 131 or 3.8

1    percent, right?

2    A.    Correct.

3    Q.    So, that, based on this sample of over 4,600 sex

4    offenders, can be characterized as the base rate for the

5    over-60 group, right?

6    A.    Correct.

7    Q.    And it says, The older-than-60 recidivists, of which there

8    were 5 out of that 131, included 2 extrafamilial child

9    molesters, 2 of 45, or 4.4 percent, and 3 unclassified

10   offenders, 3 of 37, or 8.1 percent, right?

11   A.    Correct.

12   Q.    So, that is a plausible base rate for over-60 sex

13   offenders, is it not?

14   A.    Yes.

15   Q.    And, in fact, in this field it's often represented by

16   different scholars as a good source of information if you're

17   looking for the base rate for older sex offenders, right?

18   A.    Correct.

19   Q.    And this, again, is the generalized base rate of all sex

20   offenders, right?

21   A.    Right.  The only thing about this study was that he didn't

22   break them down into risk categories.

23   Q.    That's right, but what we're talking about now is this

24   generalized base rate, which we've established has the effect

25   of drawing down the Static-99 scores, right?

1    A.    Correct.

2    Q.    Now, again, we spoke earlier about the average age of the

3    development sample of the Static-99, and that average age was

4    about 33 1/2, right?

5    A.    Correct.

6    Q.    Now, is the average age of the development samples for the

7    new norms known to you?

8    A.    37.1, I think.

9    Q.    And is that overall?

10   A.    Yes.

11   Q.    Do you have different figures for the low and the high?

12   A.    No.   I think the overall is 37 or 38, in that range.   I

13   know it's at least four years older than the other one, maybe

14   five, but it's in that range, 37, 38.

15   Q.    But it's still much younger than Mr. Hunt, right?

16   A.    Yes.

17   Q.    And, in fact, if we were to compare Mr. Hunt to the

18   average member of the new norms, the first thing we would

19   probably notice is that Mr. Hunt is 63, while the average

20   member of the new norms is 37 years old, right?

21   A.    Correct.

22   Q.    Now, we know that the base rate for any population has an

23   effect on these recidivism rates, right?

24   A.    Yes.

25   Q.    And we know that the base rate for 16-year-olds is low,

1   right?

2   A.   Yes.

3   Q.   And we know that it is lower than the base rates for

4   either the low-risk samples that we're talking about or the

5   high-risk samples, right?

6   A.   Correct.

7   Q.   Now, do you recall testifying about how you accounted for

8   age as an evaluator in these types of cases?

9   A.   I always take it into account.  I can't remember what else

10   I may have said.

11   Q.   Well, in your report that you submitted in this matter,

12   you made reference to, for example, the literature that I have

13   up here on the screen, the Hanson 2002 article, right?

14   A.   Correct.

15   Q.   And you made reference to other peer-reviewed articles,

16   even an unpublished dissertation, when it was relevant or you

17   thought it was relevant to consideration of your opinion,

18   right?

19   A.   Which unpublished dissertation?  Regarding age?  I don't

20   think I have an unpublished dissertation regarding age in my

21   report, but that's fine.  (Pause).  There aren't any in there,

22   but that's okay.

23   Q.   Well, I may be mistaken.  Are you familiar with a

24   dissertation by --  (Pause).

25   A.   You're talking about Calvin Langton?  That's when I was

1    referring to the Static norms or the cross-validation of the

2    Static-99, where the probability estimates were found to be

3    lower than --

4    Q.   I'm sorry, but you cited an unpublished dissertation when

5    it was important to the full consideration of your opinion,

6    right?

7    A.   Yes.  But, for the record, there's been about six

8    published studies from that dissertation.  Dr. Barbaree -- it

9    was Dr. Barbaree's research, and it published many articles

10   from that dissertation.

11   Q.   Well, regardless, I'm just sort of pointing out the

12   principle that, when you do these evaluations, you are putting

13   before the fact finder in these cases information which you

14   think is relevant to considering your opinion --

15   A.   Yes.

16   Q.   -- which include scholarly material which bears on your

17   opinion, right?

18   A.   Correct.

19   Q.   And, now, with respect to age, you reference the Hanson

20   2002 study.

21   A.   Yes.

22   Q.   And you reference a number of other studies, right?

23   A.   Correct.

24   Q.   But now you testified in a deposition in this matter --

25   well, first of all, your method is to look at the risk and then

1   decide whether age mitigates or not, right?

2   A.   Correct.

3   Q.   And that's a decision that you make based on your sense of

4   the case, basically.

5   A.   Correct.

6   Q.   Now, you said you've used these actuarial instruments,

7   which you did not used to use as a starting point, right?

8   A.   Correct.

9   Q.   And you used the Static-99 as the starting point in this

10   case, and you testified yesterday and during your deposition in

11   this matter that the score itself was influential on you,

12   right?

13   A.   Yes.

14   Q.   And you said that the fact that the developers in these

15   norms that they're rolling out had associated a percentage with

16   a high score was also important to your opinion, right?

17   A.   Correct.

18   Q.   Now, there's no question that Mr. Hunt, whose Static-99

19   score will not change or has remained the same for the last

20   quarter century, will always be high risk relative to other

21   offenders, right?

22   A.   That's true.

23   Q.   But it's certainly possible, looking at the base-rate data

24   from Hanson 2002, for example, that even the highest risk

25   offender is low risk in absolute terms, right?

1    A.    Yeah.  When you compare them to all the research out there

2    with 60-year-olds and over, the risk is lower than the younger

3    offenders.

4    Q.    So, in terms of absolute risk, a low-risk young offender

5    may pose the same or more than an old -- high-risk offender

6    grown old, right?

7    A.    It's possible.  It depends on the facts of the case.

8    Q.    Well, speaking in the abstract now, you start with the

9    Static-99, and you get information from that score, which you

10   apply in the case, right?

11   A.    Correct.

12   Q.    And that's a starting point for you, and it was an

13   important one in this case, by your own account.

14   A.    Yes.

15   Q.    Now, we talked about base rates and how they affect those

16   percentages, right?

17   A.    Correct.

18   Q.    And we know that Mr. Hunt is high risk relative to other

19   offenders and always will be, right?

20   A.    Correct.

21   Q.    But what we don't know is what his risk is in absolute

22   terms, right?

23   A.    Correct.

24   Q.    Now, I asked you how you accounted for age in your

25   assessments, and you basically said that you size up the case,

1    and you either apply it or not, that is, clear someone or not

2    based on age, right?

3    A.    Correct.

4    Q.    And I asked you if you were aware of any empirical or

5    empirically defensible ways to adjust an actuarial score based

6    on the available data.  Do you recall that?

7    A.    Correct.

8    Q.    And at the time during your deposition in this matter, do

9    you recall that I asked you, Now that you are using the

10   Static-99 with the new norms, how do you incorporate the age

11   data into your assessment?

12          And you testified, I list all the percentage, you

13   know, the percentages based on the individual's risk score, and

14   then I report what age data is out there as -- other than Dr.

15   Hanson's, we don't have a lot of research that looks at the

16   corresponding score with the age and a percentage other than

17   that one study.  All you can do is say that there appears to be

18   a trend, but we're not sure what the risk levels were to begin

19   with with those individuals, but it does seem to be a trend.

20          Do you recall that testimony?

21   A.    Yes.

22   Q.    Now, you testified on direct yesterday that you were aware

23   of two methods that are empirically based that have been put

24   forward to adjust a high actuarial score to account for

25   advancing age.  Do you recall that?

1    A.    Yes.

2    Q.    And one was a method proposed by Dr. Richard Wollert,

3    right?

4    A.    Correct.

5    Q.    And he uses a method based on what's called Bayes' Theorem

6    to adjust the --

7              THE COURT:   B-A-S-E?

8              MR. GOLD:   B-A-Y-E-S.   Bayes' Theorem.

9    BY MR. GOLD:

10   Q.    Which is, basically, a statistical method to look at the

11   accuracy of diagnostic tests of all types, right?

12   A.    Correct.

13   Q.    And he took the base rate data from Dr. Hanson's 2002

14   article that we discussed and proposed it as a base rate to

15   then adjust high actuarial scores, right?

16   A.    Correct, and you can do that -- it's, basically, a formula

17   of conditional probability in which you need to have the base

18   rate and the false positive and false -- true positive rates,

19   which are also used -- they're called specificity and

20   sensitivity of any test, and then there's this very obscure

21   formula, and then you plug in the numbers and then you can get

22   a rate that way.   That's what Dr. Wollert researched and

23   published in 2006.

24   Q.    And, if you know the formula, you can get a number, right?

25   A.    That's true.

1   Q.   Now, as an expert in this case, what you're doing with

2   respect to this initial -- your starting point, which is this

3   initial risk estimate that you then contribute to, you are

4   synthesizing the available data and applying it to this case,

5   right?

6   A.   Correct.

7   Q.   And part of the available data is this article that I have

8   on the screen that you just referred to, which is entitled, *Low

9   Base Rates Limit Expert Certainty When Current Actuarials Are

10  Used to Identify Sexually Violent Predators, An Application of

11  Bayes' Theorem.*   This is the Richard Wollert article, correct?

12  A.   Right.

13  Q.   And this was published in *Psychology, Public Policy, and

14  Law*, which is a peer-reviewed journal, right?

15  A.   Yes.

16  Q.   Now, he goes through the Bayesian analysis in his article.

17  Now, the Bayesian analysis is not just applied by Richard

18  Wollert, right?

19  A.   No.   It's used often in the medical field with, as you

20  mentioned, diagnostic testing.

21  Q.   And, so, it's a commonly accepted method of analyzing the

22  effectiveness of different tools in epidemiological research,

23  right?

24  A.   Correct.

25  Q.   Now, you're familiar with this article, and it was part of

1    the corpus of material which you relied on when you were

2    developing your opinion, right?

3    A.    Correct.

4    Q.    In the paragraph entitled -- or at the top of page 73, Dr.

5    Wollert writes, In the short run, three steps would seem to be

6    of potential value for addressing this issue, and this is the

7    issue of trying to improve the performance of actuarial

8    instruments, which he has abbreviated ATSRs, right?

9    A.    Correct.

10   Q.    By applying the Bayesian methods described above to both

11   low and high test scores, it would be possible to estimate the

12   sexual recidivism rate for each possible age and test-score

13   combination.  These combinations could then be sorted into new

14   risk groups that might, compared with their counterparts, offer

15   more in the way of efficiency, internal consistency and

16   coverage of the risk continuum.

17          And is it a fair characterization of what Dr. Wollert

18   finds in his analysis in this article that the accuracy of

19   these instruments degrade as individuals are older?

20   A.    Correct.

21   Q.    He then goes on to write, If these procedures were applied

22   to Static-99, for example, the highest risk group would include

23   offenders who were 18 to 24 years old with scores of 6, the

24   next highest group would include offenders who were 25 to 29

25   years old with scores of 6, and offenders who were 18 to 24

1    years old with scores of 5.  In contrast, offenders who are 60

2    to 69 but had scores of 6 would fall in a very low risk group.

3         That was his finding in this article, based on his

4    analysis, right?

5    A.   Correct.

6    Q.   Now, this analysis wouldn't complete the case, but it's --

7    well, to return to this article, the use of 6, Dr. Wollert is

8    referring to the development sample in this prior practice of

9    collapsing all scores above 6 into one high-risk group, right?

10   A.   Correct.

11   Q.   And the developers of the Static-99 and the new norms have

12   proposed separating out new risk groups, right?

13   A.   Yes.

14   Q.   But that is a process which has not been completed and has

15   not been peer-reviewed, right?

16   A.   Correct.

17   Q.   And the numbers are small, and the statistic that they use

18   to develop this is one that they haven't used before, right?

19   A.   Correct.

20   Q.   And, so, we don't know whether, when this is published or

21   fully vetted, we will have a high-risk group which contains,

22   for example, 7, 8, 9, 10 and 11, for example, right?

23   A.   Well, that's what they're attempting to accomplish, and,

24   given their track record of basically everything Dr. Hanson's

25   ever put on his website has become published, it would be out

1   of the ordinary if it didn't get published, just going by their

2   track record over the last 15 years.

3   Q.   Well, oftentimes certain calculations are changed in the

4   peer-review process, right?

5   A.   Correct.

6   Q.   Now, we just looked at an article by Dr. Abbott

7   criticizing the way these norms are presented, right?

8   A.   Correct.

9   Q.   And one of the things he shows is that the confidence

10  intervals, which is an important number -- first of all, he

11  says you should always report them, right?

12  A.   Yes.

13  Q.   And you didn't actually report the confidence intervals

14  when you reported your scores, right?

15  A.   No, I didn't.

16  Q.   Now, the confidence intervals overlap, right?

17  A.   Correct.

18  Q.   Now, that means, in practice, the risk level is the same,

19  right, or you could, certainly, argue that?

20  A.   You can argue that, yes.

21  Q.   Now, are you aware of a communication that Dr. Abbott's

22  article was sent for comment to the developers of the

23  Static-99?

24  A.   Yes.

25  Q.   And the developers of the Static-99 acknowledge the

1  validity of some of his criticisms; isn't that fair to say?

2  A.   Yes.

3  Q.   And then declined to respond until they were finished with

4  their analysis, right?

5  A.   Correct.

6  Q.   Now, Dr. Wollert's method for adjusting a high actuarial

7  risk score based on empirical data in an empirical way is not

8  the only way that's been proposed, right?

9  A.   Correct.

10  Q.   And you mentioned on your direct testimony yesterday that

11  you were familiar with a method using something called a hazard

12  ratio, right?

13  A.   Correct.

14  Q.   And that's been proposed by Dr. Howard Barbaree, among

15  others, right?

16  A.   Correct.

17  Q.   And that is, basically, looking at the available data and

18  coming up with a ratio by which you can say that the risk

19  declines year by year, right?

20  A.   Correct.

21  Q.   And there are different proposals as to what that

22  reduction would be, but it's a relatively simple formula, once

23  you make a decision, about what the rate of reduction is,

24  right?

25  A.   Yes.

1   Q.   For the record, I am putting on the display a scholarly

2   article entitled *Sexually Violent Predators in the Courtroom:*

3   *Science on Trial,* with five authors, Robert Prentky, Howard

4   Barbaree, Eric Janus, Barbara Schwartz and Martin Kafka, and

5   that's published in 2006 in the peer-reviewed journal of

6   *Psychology, Public Policy, and Law*.  Are you familiar with this

7   article?

8   A.   Yes.

9   Q.   And this article has been available for some time, right?

10  A.   Yes.

11  Q.   Now, this method that I just discussed is discussed in

12  this article, and I have turned to page 377.  A second approach

13  is to adjust -- and this is to account for the effect of

14  advancing age on these empirically based actuarial methods,

15  right?

16  A.   Correct.

17  Q.   A second approach is to adjust recidivism risk downward

18  after age 40 on the basis of empirically derived criteria.  If

19  we assume a linear decrease in recidivism rate after age 40,

20  most of the empirical studies would support such an assumption.

21  Adjustments to actuarially derived risk could be made,

22  depending on two additional factors: the number of years the

23  individual's age of release exceeds 40 and the rate of decline

24  and recidivism rates on an annual basis.

25              And what the authors of the article go on to propose

1   is a hazard rate derived from the empirical literature, or two

2   of them, right?

3   A.    Correct.

4   Q.    One is .95 and one is .98 or 5 percent reduction per year

5   or 2 percent reduction per year, and then they go on to show

6   how such a calculation would work with the more conservative

7   estimate of the 2 percent reduction per year, right?

8   A.    Yes.

9   Q.    And, so, an evaluator choosing to do this method would

10  have an empirically based method of accounting for a high-risk

11  percentage associated with an actuarial and advancing age,

12  right?

13  A.    Correct.

14  Q.    Now, your approach, in contrast to that, is to note the

15  percentages associated with the 37-year-old mean average age

16  sample and then to either adjust or not to account for

17  advancing age, right?

18  A.    Correct.

19                      (Pause)

20          MR. GOLD:  Just one moment, your Honor.  All my

21  pyrotechnics have had a little computer crash.

22                      (Pause)

23  BY MR. GOLD:

24  Q.    So, those are two methods that have been proposed to

25  account for age in a -- high risk and age in an empirically

1    justifiable way, right?

2    A.    Yes.  Without taking into account any of the facts of the

3    case, yes, other than that they're qualified as high risk.

4    Q.    Right.  But what we're talking about is the method that

5    you have used in this case, which was to start with the

6    actuarial instrument as a starting point, right?

7    A.    Yes.

8    Q.    And that starting point, you said in your -- or you wrote

9    in your report, was associated with a 66 percent recidivism

10   rate, right?

11   A.    According to the completed sample numbers that was one of

12   those 16-page charts.

13   Q.    And then you revised that testimony or your report, when

14   you testified yesterday, and you gave us a range, which I

15   believe was --

16   A.    49 to 59 percent.

17   Q.    -- 49 to 59 or 59.9, isn't it?

18   A.    Yes.

19   Q.    But we know that base rate affects the recidivism

20   percentages.

21   A.    Correct.

22   Q.    We know that base rate of old offenders is low, lower than

23   these samples, right?

24   A.    Correct.

25   Q.    So, we know that these recidivism percentages are

1    overestimates for Mr. Hunt, right, as a starting point?

2    A.    Possibly.

3    Q.    Now, Dr. Hanson -- well, going back to the article that we

4    were discussing earlier, which has been accepted for

5    publication but has not yet appeared in printed form by Dr.

6    Abbott, now, Dr. Abbott proposes that evaluators such as

7    yourself, in using the new norms, abandon the new norms

8    altogether for older offenders.  If I could turn your attention

9    to page --

10   A.    It's not on the screen.

11   Q.    -- to page 23 of that article, and this is Dr. Abbott,

12   who, as we discussed, is criticizing the applicability to

13   respondents such as Mr. Hunt of these new norms in general.  He

14   also states in this paragraph at the end of his list of

15   recommendations that we were discussing earlier, In the

16   interim, clinicians may want to use the age-adjusted risk

17   information released by Hanson in 2006 as corrected by

18   Waggoner, et al or employ the age-correction methods proposed

19   by Wollert when considering the effect of advancing age and

20   reducing the risk of sexual recidivism for SVPs.

21          Did I read that correctly?

22   A.    Yes.  That's what he recommends there, and then also in

23   his conclusions, he also recommends, Based on the arguments

24   presented in this paper, clinicians would be best advised to

25   report the risk information from the completed sample, as it

1   provides the most reliable risk data relative to the CSC

2   high-risk groups.

3           So, I'm not -- I mean, he's recommending a couple of

4   different things.

5   Q.   Well, but, again, in that same paragraph, if I could

6   direct your attention down to page 25, he repeats the

7   recommendation that we just discussed, which is, Finally, for

8   sexual offenders over the age of 40, clinicians may want to

9   use -- and this is a scientific paper.  He's discussing

10  reasonable conclusions based on the available data and his

11  criticisms, but, clinicians may want to use the age and

12  actuarial adjusted risk data as reported by Waggoner, et al.

13  Right?

14  A.   Correct.

15  Q.   Now, that is a set of information that we discussed

16  yesterday, which is a particular age study by Dr. Hanson from

17  2006, right?

18  A.   Correct.

19  Q.   And that study was entitled *Does Static-99 Predict*

20  *Recidivism Among Older Sexual Offenders?*  Right?

21  A.   Correct.

22  Q.   And the finding of that study was, in fact, that, with

23  respect to relative ranking, it did do a pretty good job,

24  right?

25  A.   Yes.

1    Q.    That's that moderate predictive accuracy that we've talked

2    about, right?

3    A.    Yes.

4    Q.    And that's an ROC statistic -- you testified on direct

5    yesterday, an ROC statistic of .5 would mean the instrument is

6    "drek."

7    A.    Correct.

8    Q.    .75 or .8 is moderately accurate, right?

9    A.    Correct.

10   Q.    And that's where this instrument falls, right?

11   A.    Yes.

12   Q.    And, in fact, it does a better job with this relative

13   ranking among older folks, according to this study, right?

14   A.    Yeah.   The ROC, I think, if I recall, was .82.   I might be

15   correct.   Sometimes I forget numbers.

16   Q.    So, this is the table that we looked at yesterday during

17   your direct testimony, and, in fact, it shows an ROC statistic,

18   which is down at the bottom, of .82, confidence interval of .68

19   to .95, right?

20   A.    Correct.

21   Q.    And that's a measure of the accuracy of this instrument in

22   sorting high from medium, medium from low, right?

23   A.    Yes.

24   Q.    But what this study found -- and, first of all, this was

25   not a one-of study; I mean, this was a big study with a large

1    population of over 3,000 offenders, right?

2    A.    Correct.

3    Q.    Now, what Dr. Hanson found is that, Offenders over 60, and

4    I'm reading from the article now on page 353, appeared

5    substantially lower risk than expected.  There very few

6    offenders over the age of 60, and their recidivism risk was

7    low, even when Static-99 scores were controlled, right?

8    A.    Yes.

9    Q.    And returning to the table, we have, based on this large

10   study now, a recidivism percentage associated with the 6-plus

11   category, the high-risk category, right?

12   A.    Yes.

13   Q.    And that's 9.1 percent with a confidence interval of 17

14   points either way, right?

15   A.    Yes.

16   Q.    So, we said yesterday that that would be a range of risk

17   of between zero and 26, right?

18   A.    Correct.

19   Q.    Now, Dr. Abbott proposes using this table when you're

20   employing the Static-99 with men such as Mr. Hunt.  This is a

21   third way of using the Static-99 with an older population,

22   right?

23   A.    Yes.

24   Q.    And he's not the only one who did that; he refers to

25   Waggoner in that article, which is another set of

1    researchers --

2    A.    It's Waggoner, Wollert and Cramer, who is a professor of

3    statistics in North Carolina, so it's Dr. Wollert's work also.

4    Q.    So, those three authors propose this table --

5    A.    Correct.

6    Q.    -- as an age-adjusted actuarial, right?

7    A.    Yes.

8    Q.    And, in fact, if this were used as an age-adjusted

9    actuarial, it would be the only one that actually accounts for

10   advancing age, right?

11   A.    Correct.

12   Q.    Now, you discussed starting with the Static-99 and then

13   doing other things as part of your assessment as a professional

14   in this case, right?

15   A.    Yes.

16   Q.    And one thing you did was you looked at dynamic factors,

17   right?

18   A.    Correct.

19   Q.    Now, in this field, there's dynamic factors and Static

20   factors, but what we're talking about is this body of research

21   which isolates risk factors which are associated with offense

22   or not reoffense, right?

23   A.    Correct.

24   Q.    And the dynamic factors that you use are ones that are

25   available in the literature, have been shown to have some sort

1    of validity for this purpose, right?

2    A.    Yes.  More so with community-based samples than with

3    correctional samples; but, yes, there is validity to it.

4    Q.    Right.  And, in fact, you stated in your deposition in

5    this matter that what influenced you the most was the high

6    actuarial score, right?

7    A.    Yes.

8    Q.    And, in fact, the dynamic factors, most of the ones that

9    would contribute to risk, applied to him 25 years ago, right?

10   A.    Well, as far as we know, we don't know what his -- we

11   can't definitively say what his deviant sexual arousal is,

12   because it hasn't been measured, so that's --

13            THE COURT:  Speak up.  I missed that last part.

14            THE WITNESS:  We can't measure -- we're not aware if

15   he has any deviant sexual arousal at this time, we can only go

16   by what his behavior was before he was arrested, but it was

17   definitely evident 23 -- 24 years ago, but the likelihood of

18   the attraction, as I mentioned yesterday, I doubt if that's

19   gone away.

20   BY MR. GOLD:

21   Q.    Well, but --

22   A.    If you're talking about the --

23   Q.    -- I'm referring back, Dr. Rosell, to your testimony,

24   where you testified during your direct testimony, if I am not

25   mistaken, that the majority of the dynamic factors that you

1    went through in your report that were risk or highly risk

2    relevant were historical, right?

3    A.   Yes, because a lot of it is based on historical factors.

4    Q.   Or it's based on assessments of people in the community,

5    and, so, it's not directly applicable to someone that you're

6    evaluating, like Mr. Hunt, right?

7    A.   Correct.

8    Q.   Now, you also mentioned research which has recently come

9    out, as recently as the last couple of months, which looked at

10   the combination of dynamic risk factors with these actuarial

11   instruments, right?

12   A.   Correct.

13   Q.   And Dr. Hanson performed that study as well, and it showed

14   that combining those two in various ways degraded the accuracy

15   of just using the actuarial, right?

16   A.   Correct.

17   Q.   But that doesn't matter too much here, because the dynamic

18   factors, in your own testimony, did not contribute much to the

19   overall opinion.

20   A.   Correct.

21   Q.   And you also testified that you used something called the

22   SVR-20, right?

23   A.   Yes.

24   Q.   And that is a different type of thing than an actuarial,

25   right?

1   A.   Correct.

2   Q.   It is a structured professional judgment instrument,

3   right?

4   A.   Correct.

5   Q.   And that did not contribute much to your overall opinion

6   in this case either, did it?

7   A.   It didn't mitigate, and it just confirmed some of the

8   factors which made him high risk to begin with, but I would say

9   it didn't help him in this case, because there have been cases

10  where I find that, based on the SVR-20, that there's some

11  mitigation, but in this case there wasn't any.

12  Q.   Now, some of the dynamic factors that we're talking about

13  you have positive evidence for, right?  One of the things you

14  look at is someone's adjustment while they're in prison, right?

15  A.   Well, under supervision, yes, you would --

16  Q.   Well, you would look for recent antisocial conduct, right?

17  A.   It's mostly under cooperation with supervision.  There's

18  not one that says antisocial conduct.  There's one about

19  impulsive acts but not specific antisocial conduct.  I guess

20  general self-regulation could go under that.

21  Q.   Right.  And, in fact, if you find someone who is

22  generating disciplinary reports while they're in prison, you

23  will find that they don't have adequate self-regulation, right?

24  A.   Correct.

25  Q.   That would be a dynamic factor that might contribute

1    information to the risk-assessment portion of your opinion,

2    right?

3    A.    Correct.

4    Q.    Now, in Mr. Hunt's case, what we have is a pretty

5    exemplary prison record for the last 25 years, right?

6    A.    Yes.  For the most part, yes.

7    Q.    And, in fact, he has been steadily employed and has taken

8    college courses, right?

9    A.    Correct.

10   Q.    And he has received glowing commendations from people that

11   he has worked for, right?

12   A.    That's true.

13   Q.    And these are all in the records, right?

14   A.    Correct.

15   Q.    Now, you testified that there was an incident from 1998

16   where certain contraband was -- or not contraband -- but images

17   were found on a computer that was used by Mr. Hunt, right?

18   A.    Yes.

19   Q.    Now, to you, this was diagnostic evidence of the continued

20   presence of pedophilia in Mr. Hunt, right?

21   A.    Yes.

22   Q.    And this evidence at this point is 11 years old, right?

23   A.    That's true.

24   Q.    Now, we've heard testimony during depositions in this case

25   and, I believe, on your direct testimony, that pedophilia is

1    like a sexual orientation.  Is that your opinion?

2    A.    I believe it is in this case.  It might not always be in

3    every case, but I believe it is in this case.

4    Q.    And, like any sexual orientation, that's an independent

5    thing from your sexual -- level of sexual arousal, right?

6    A.    I'm not sure I understand the question.

7    Q.    Well, your libido can wax and wane while your sexual

8    orientation remains the same, right?

9    A.    That's true.

10   Q.    And we have discussed, very briefly, research about how

11   libido declines, as a general matter, with age, right?

12   A.    Yes, it does.

13   Q.    Now, with Mr. Hunt, you don't expect his orientation to

14   change, right?

15   A.    Correct.

16   Q.    Now, Mr. Hunt has claimed to you that he feels he would be

17   attracted to adults presently, right?

18   A.    That's what he said.

19   Q.    But he also testified to you -- now, he's done a treatment

20   program, right?

21   A.    Correct.

22   Q.    And he did a treatment program -- this was a treatment

23   program at the Oneida Correctional Facility in New York, where

24   it's designed for people about to hit the street, right?

25   A.    Yes.

1    Q.    And, from the available records, it looks like it's an

2    intense program for the duration of the program, which is, as

3    we've discussed, not particularly long, right?

4    A.    Correct.

5    Q.    But it takes all day.

6    A.    Yes.

7    Q.    He generated dozens of pages of homework, right?

8    A.    Correct.

9    Q.    In fact, most of the information that you used to -- or a

10   great deal of the information that you used to form your

11   opinion in this case comes from these records, right?

12   A.    That was part of it, yes.

13   Q.    Well, there are details about these offenses which appear

14   in these records and nowhere else, right?

15   A.    Correct.

16   Q.    And they are part of -- and you have characterized, in

17   testimony, his participation in treatment so far as a good

18   start.

19   A.    Yes.

20   Q.    And you, actually, pay a lot of attention to his progress

21   and treatment in your report, right?

22   A.    Yes, because that's how I do all my reports.  If there's

23   treatment, I talk about the treatment, and then I felt it was

24   important to mention it because it's something that had

25   occurred.

1   Q.   Well, because it's relevant, right?

2   A.   Yes.

3   Q.   Right.  Now, his participation in the treatment program --

4   being a treatment dropout has been isolated as a risk factor

5   associated with reoffense, right?

6   A.   Yes.  In some research, that has shown that.

7   Q.   And that's not a risk factor that would apply to Mr. Hunt,

8   because he's completed a treatment program, right?

9   A.   Correct.

10  Q.   And, of course, you are at least passingly familiar with

11  the conditions of parole that Mr. Hunt faces, in the event that

12  he's released.

13  A.   Yes.  He has about three years, I believe.

14  Q.   Three years.  And have you reviewed the conditions under

15  which he would be -- that he would be required to comply with?

16  A.   I had reviewed them months ago, but I have not reviewed

17  them, so I couldn't tell you.

18  Q.   Well, do you recall if he's required to participate in sex

19  offender treatment?

20  A.   I assume that may be, but, as I mentioned, I can't

21  remember what the conditions were.

22  Q.   Well, now, you testified that he said his sexual

23  orientation had changed.  You're skeptical of that, because you

24  don't believe that it's likely, and also Mr. Hunt has every

25  incentive to say that as someone in his position, right?

1    A.    Yes.  I mean, I ask that question to every person I ever

2    evaluate, and, of course, it's always based on their

3    self-report, so I just have to go with what they're saying, but

4    based on, as I mentioned earlier, when he was offending, that

5    interest was pretty significant, and I doubt that would all of

6    a sudden just change dramatically.

7    Q.    Well, and, in fact, he told you, you said, two things

8    about his sexual attraction.  You said he was attracted or he

9    thought he would be attracted to adults currently, but that he

10   also said that, with respect to desire for kids, he could

11   control it, right?

12   A.    Correct.

13   Q.    And those were -- you picked up on that as significant

14   sort of comment, indicating that maybe he had a sense that

15   maybe there was this latent interest still present in him that

16   he would need to control, right?

17   A.    Correct.

18   Q.    And these treatment programs that provide treatment to

19   these folks, they're based on what's called a cognitive

20   behavioral model, right?

21   A.    Yes.

22   Q.    And they're also informed by what's called a relapse

23   prevention model, right?

24   A.    Correct.

25   Q.    And that's based on the whole substance-abuse field, where

1    you look at treatment as managing a lifelong condition, right?

2    A.    Correct.

3    Q.    And, in fact, that was the focus of his treatment at

4    Oneida in New York, right?

5    A.    Correct.

6    Q.    And that's, if he were to continue to be successful in

7    treatment, what you would expect him to do, is use these

8    techniques to manage his -- any sexual arousal he might have.

9    A.    Correct, but he had already had said that he didn't have

10   any attraction to children, and then later on, when I'm asking

11   him a different question, he says, Yeah, I can -- I have -- I

12   forget exactly how he said it, but he said that he has to know

13   how to manage his urges.  So, obviously, then, they're still

14   present or that attraction is still present.  If he would have

15   said, like many individuals say, I know what my problem is, I

16   know what I have to do, this problem is always going to be with

17   me, that would have been more forthcoming than the way he

18   presented it.

19   Q.    Well, making note of the fact that he could have been more

20   forthcoming in this situation, his second response is,

21   according to this view of him and the case, accurate; he's got

22   a latent or potentially latent desire that he will need to

23   manage and be aware of, using these techniques, right?

24   A.    Yes.   That part was good.

25   Q.    And you said that these techniques, in your opinion, are

1    effective or can be.

2    A.    What techniques?

3    Q.    Cognitive behavioral treatment.

4    A.    Oh, yes.

5    Q.    Relapse prevention programs.

6    A.    Yes.

7    Q.    I want to talk a little bit about the studies of treatment

8    that have been done.  The overall studies of treatment in this

9    area show a moderate benefit from treatment, right?

10   A.    Yes.

11   Q.    But these are meta-analyses, that is, studies of studies

12   which group a bunch of other studies and are kind of out

13   of removed from what they're talking about, right?

14   A.    Yes.

15   Q.    While there has been one major longitudinal study of these

16   treatment programs -- the California program, right?

17   A.    Yes.

18          THE COURT:  Why don't we take a break here, before you

19   get to that program, all right?  Five minutes.

20   (Recess taken from 11:40 a.m. to 11:55 a.m.)

21          THE CLERK:  All rise for the Honorable Court.

22          THE COURT:  Sit down, everybody.  Good morning, still.

23   We are ready to continue.

24   BY MR. GOLD:

25   Q.    Dr. Rosell, we were talking about the California SOTP

1    study, right?

2    A.    Yes.

3    Q.    And SOTP is the acronym for a Sex Offender Treatment

4    Program that they had in California, correct?

5    A.    Correct.

6    Q.    And there were a series of studies about it.  It was a

7    major study, right?

8    A.    Yes.

9    Q.    And it's the only -- some people have referred to it as

10   the gold standard in terms of study design, because it was

11   longitudinal and had control groups, right?

12   A.    It had randomization that's usually not found in these

13   kinds of studies.

14   Q.    And what that study found was that there was no difference

15   between the treated and the untreated groups.

16   A.    Correct.

17   Q.    And, in fact, although it was not statistically

18   significant, the untreated group reoffended at a lower rate

19   than the treated group, right?

20   A.    Correct.

21   Q.    But there was a finding in that study that people who had

22   got it reoffended at a lower rate, right?

23   A.    Correct.

24   Q.    And by "got it," they meant internalized the concepts that

25   they're supposed to be getting in the treatment, right?

1    A.    Correct.

2    Q.    And that is the point of treatment, to present these

3    concepts and to have them be internalized by the person, right?

4    A.    That's true.

5    Q.    It doesn't matter, essentially, how much they're exposed

6    to the concept; if they get it, that's what we're going for,

7    right?

8    A.    Correct.

9    Q.    And it's certainly possible that a younger person could

10   take longer to get it than an older person, while the converse

11   is also possible, right?

12   A.    Correct.

13   Q.    Now, that study also -- a point that can be drawn from

14   that study is that sex offenders are released from prison and

15   have other reasons not to reoffend besides exposure to

16   treatment, right?

17   A.    Correct.

18   Q.    Now, you've talked a bit about some uncertainty with

19   respect to age declines, recidivism risk decline with age,

20   because of the small numbers in the studies, right?

21   A.    Correct.

22   Q.    But part of statistical analysis is making predictions

23   based on the available numbers, right?

24   A.    Correct.

25   Q.    In fact, sampling, the point of sampling, is to be able to

1   make projections about a larger group by pulling a small group

2   from it, right?

3   A.    Correct.

4   Q.    Now, Dr. Barbaree is one of the preeminent researchers in

5   this field; is that fair to say?

6   A.    Correct.

7   Q.    And I have up on the screen here a chapter by Dr. Barbaree

8   entitled *Sexual Deviance Over the Lifespan:  Reductions in*

9   *Deviant Sexual Behavior in the Aging Sex Offender*, by Howard

10  Barbaree and coauthor Ray Blanchard.

11  A.    Correct.

12  Q.    Are you familiar with this article?

13  A.    Yes.  I have the book.

14  Q.    And it's part of a book?

15  A.    Yes.

16  Q.    Which is a recognized authority in this field?

17  A.    Yes.  The book is called *Sexual Deviance*, and its editors

18  are William O'Donohue and Richard Laws, and it's the second

19  edition.  The original came out in 1997.  This one is 2008.

20  Q.    And, so, this is a standard reference book in your field.

21  A.    Yes.  It has about 35 or 38 chapters on a variety of

22  issues regarding sexual deviance.

23  Q.    And is this a chapter with which you familiarized yourself

24  in the context of doing these assessments?

25  A.    Yes.  I've read the chapter at least once, if not twice.

1   Q.    Now, in this chapter, Dr. Barbaree summarizes the existing

2   research on the issue of age as it applies to sex offender

3   behavior; is that fair to say?

4   A.    Correct.

5   Q.    And we have talked about the decline in libido associated

6   with age.

7   A.    Correct.

8   Q.    And Dr. Barbaree talks about the hormone testosterone.

9   A.    Yes.

10  Q.    And testosterone is associated with libido.

11  A.    Correct.

12  Q.    And testosterone is something that can be measured and is

13  something that declines with age, right?

14  A.    Yes.

15  Q.    Now, Dr. Barbaree also looked at all the studies that had

16  been done to date on the issue of the reoffense rates of

17  convicted sex offenders, right?

18  A.    Correct.

19  Q.    And he lists them in this chart, which I've turned to on

20  page 49, figure 3.9, and in the box in the upper right-hand

21  corner are every study that had been done by the date of this

22  chapter on recidivism and sex offenders, right?

23  A.    Correct.

24  Q.    And what he did was he, using statistical methods,

25  analyzed them so that they could be compared to each other and

1   plotted on one graph, right?

2   A.   Yes.

3   Q.   And the point of what he's saying is that, in every

4   available study, when they are compared in a way that makes

5   them like-to-like, showed the same linear decline with age,

6   right?

7   A.   Yes.

8   Q.   And, again, we're talking about this overall base rate of

9   offending behavior in these studies, right?

10  A.   Yes.

11  Q.   And we've discussed why the base rate is an important

12  concept, right?

13  A.   Correct.

14  Q.   Now, the numbers in these studies overall are -- it's a

15  large amount of people, right?

16  A.   Yes.

17  Q.   And what you get from this large amount of people is a

18  line, right?

19  A.   Yes.

20  Q.   And this is a statistical concept called "the line of best

21  fit," right?

22  A.   Correct.

23  Q.   And the line of best fit allows us to take the data we

24  have and predict where the next values will be, right?

25  A.   Right.

1  Q.   And that is the point of presenting the information in

2  this graph, that we show this trend and it is hurtling

3  downward, right?

4  A.   Yes.

5  Q.   And, so, we don't expect that at the age of 60, for

6  example, it would change direction, right?

7  A.   Correct.

8  Q.   That would be almost impossible, right?

9  A.   Very, very unlikely.

10 Q.   You testified about a study by Prentky and Lee.  Do you

11 recall that --

12 A.   Yes.

13 Q.   -- yesterday?  Robert Prentky is also a prominent

14 researcher in this area?

15 A.   Yes.

16 Q.   And Dr. Lee or Austin Lee is a statistician?

17 A.   I'm not familiar with his job title or education, but, so,

18 if you say he is, then I'll agree.

19 Q.   Well, what that study looked at was pretty much the

20 highest risk group of sex offenders you can gather together,

21 right?

22 A.   Correct.

23 Q.   It was a group of men who had been committed as sexually

24 dangerous persons to the Massachusetts treatment center and

25 then released into the community, right?

1    A.    That's true.

2    Q.    And it showed a recidivism rate, and it postdates this

3    chapter here.

4    A.    I believe so.

5    Q.    Or, at least, they did not have it in time?

6    A.    It's right around the same time, but publication and

7    research, there's always a lag time.

8    Q.    Now, what that study showed and Mr. Grady showed you

9    yesterday was the recidivism rate for these high-risk

10   offenders, right?

11   A.    Correct.

12   Q.    And that showed a complete decline of recidivism at the

13   age of 60 for rapists in that group, right?

14   A.    Yes.

15   Q.    And it showed a different shape of the line for a child

16   molester, right?

17   A.    That's true.

18   Q.    But what it does show is that it shows a recidivism rate

19   of 16 percent, right?

20   A.    For those over-age-60 child molesters.

21   Q.    Right.  16 percent for this very high risk group, right?

22   A.    Correct.

23   Q.    Now, you have talked about the need for age-related data

24   on the new norms.  Do you remember that?

25   A.    Yes.

1    Q.    And, in fact, we discussed this at the deposition, and if

2    you recall the context, it was your testimony that, The

3    age-related data is needed desperately so that it will assist

4    in cases like this and in other types of cases of individuals

5    who are in their 40s and 50s, etc.  Yes, I would love to have

6    those numbers available.  They will probably be small, but they

7    would be -- it would be something.

8            So, that was your testimony talking about the need for

9    age-related information for these new norms, which we don't

10   have, right?

11   A.    Actually, there is some, but it's limited.

12   Q.    Well, I'll get to that, but at the time of your

13   deposition, you stated it's needed desperately, right?

14   A.    Yes.  At the time of my deposition and when I wrote my

15   report, correct.

16   Q.    And also during this deposition, you said, It's a shame

17   that they hadn't released the data, right?

18   A.    They didn't have it at the time, because I asked for it

19   specifically when I attended the training or the presentation

20   in Atlanta.

21   Q.    And you had asked for it, and they didn't have it, and you

22   said that was a shame.  Do you recall that?

23   A.    Did I say shame?  Sure, I guess I probably did.  I can't

24   recall what I said two hours ago, so I'll have to see what

25   happened in November, if I said that or not.

1    Q.    I would like to have those numbers --

2    A.    There it is.  It's a shame.

3    Q.    -- and they had access to that, and it's a shame that they

4    didn't.

5    A.    Right.

6    Q.    And now, since the time of your testimony, they have

7    developed, or you have received some information about that,

8    right?

9    A.    Yes.

10   Q.    Are you familiar with what I've just put up on the screen,

11   which is a document entitled *Static-99 Updated Norms Project:*

12   *Sexual Recidivism By Age Categories*, February 20, 2009?

13   A.    Yes.

14   Q.    What is it?

15   A.    I was talking to a colleague a couple of weeks ago, who

16   told me that there was some age data out for the new norms.

17   So, then I emailed Leslie Helmus, and she sent me this chart.

18   Q.    This chart that I have on the screen?

19   A.    And Leslie Helmus is the student who's doing a lot of the

20   research for Dr. Hanson in the new norms.

21   Q.    Now, again, this is part of this ongoing,

22   not-yet-published process of developing this data, right?

23   A.    Correct.

24   Q.    And she sent you what she had at this point because you

25   asked for it, right?

1    A.    Correct.

2    Q.    Now, this data shows for what looks like a substantial

3    part of this entire group age-related declines that we would

4    expect to see based on all the information that we're talking

5    about; is that right?

6    A.    Correct.

7    Q.    And it shows a base rate of sexual recidivism for 60- to

8    65-year-olds of all the offenders of 5.4 percent, right?

9    A.    Yes.

10   Q.    And then for 65 to 70, you had 135 men in that group, 5 of

11   them reoffended in some way, for a rate of 3.7 percent, right?

12   A.    Correct.

13   Q.    And then 70-plus you had 101 men, of whom three reoffended

14   in some way, right?

15   A.    Correct.

16   Q.    So, that leads to a sexual recidivism rate not of zero but

17   of 3 percent, based on these very small numbers, right?

18   A.    Yes.

19   Q.    And what that shows is the same thing that the government

20   pointed out yesterday, which is that sexual reoffense is

21   possible at these advanced ages in some form or another, but

22   that it's rare, right?

23   A.    Yes.

24   Q.    Now, the thing about rare events is that they're difficult

25   to predict, right?

1    A.    Correct.  What's important, to also look at this, is the

2    Static scores are very low on average, and the individuals are

3    recidivating, for what it's worth.  So, you've got guys who

4    have very low scores who have recidivated, granted it's a small

5    percentage.

6    Q.    Well, these are fairly large numbers, right?

7    A.    Right, but the numbers are broken down into medium -- the

8    mean Static-99 score based on the age ranges.

9    Q.    Right.  Now, child molesters.  We have separate rates for

10   that group, right?

11   A.    Correct.

12   Q.    Now, we also have, I'm putting up on the screen a document

13   entitled *Static-99 Updated Norms Project, Sexual Recidivism By*

14   *Age Categories,* dated February 25, 2009.  These tables are

15   restricted only to cases with Static-99 scores of 6 plus.  Are

16   you familiar with this document?

17   A.    Correct.

18   Q.    Do you have a copy of it?

19   A.    I didn't bring one with me.

20   Q.    But have you received a copy of it?

21   A.    Yes.  Leslie Helmus also sent me this with the other; she

22   sent me these two attachments.

23   Q.    And what this shows, and, again, this is data which is

24   coming out now being generated, is that all offenders in the

25   60-plus range with scores above 6, that is, the high risk, were

1   49, 4 of them reoffended, for a sexual recidivism rate of 8.2

2   percent, right?

3   A.   Correct.

4   Q.   And that's much lower than would be expected based on the

5   percentages associated with the 37-year-old mean age group,

6   right?

7   A.   Correct.

8   Q.   And then, under child molesters -- they break it out into

9   child molesters and rapists, and child molesters, the rate is

10   10.3 percent, right?

11   A.   Correct.

12   Q.   Which is, out of 29 people released and studied, 3

13   reoffended, right?

14   A.   Yes.

15   Q.   So, while not impossible, it's rare, right, sexual

16   reoffense among the high-risk group?

17   A.   Correct, and what's not included here, because she wasn't

18   able to provide me with an answer is, I asked her, Are these 5-

19   or 10-year followups, and she said they don't know.  So, she

20   couldn't tell me how long the followup was for all these

21   numbers, so that's just a no, that we don't know what these

22   followups are, because it's always nice to know what the

23   followup period is when numbers are being presented.

24   Q.   So, what we're saying about this Static-99, which is in

25   the process of being developed right now, is that it gives a

1    risk range, but we don't know exactly how to put someone in

2    that range, right?

3    A.    Correct.

4    Q.    There's no published or peer-reviewed or empirically

5    validated method to do that, right?

6    A.    As of now, yes.

7    Q.    And what we also have is this development of information

8    on how to apply this information to older offenders, right?

9    A.    We have some information, but how to specifically apply it

10   in terms of -- or how long the followup are, we cannot report

11   how long it is at this point.

12   Q.    It's unknown, right?

13   A.    Yes.

14   Q.    And this is the instrument that you start out a risk

15   assessment to give a fact finder an idea, starting out, of what

16   the absolute risk of an offender is before you do your other

17   stuff, right?

18   A.    Correct.

19            MR. GOLD:  No further questions, your Honor.

20            THE COURT:  Okay.  Redirect?

21            MR. GRADY:  15 minutes, tops, your Honor.

22            THE COURT:  I may have to take a break.  I have got a

23   visitor who is coming in to see me, Justice Garsh from the

24   Superior Court.  As I speak, I will bet that is her.  She is

25   bringing her two-year-old grandchild in to see me.

1              (Pause)

2          THE COURT:  She is here.  So, why don't we take

3     another short break, and then I will be back.

4          MR. GRADY:  Absolutely.  I can't think of a better

5     reason.

6     (Recess taken from 12:20 p.m. to 12:35 p.m.)

7          THE COURT:  Go ahead.

8                      REDIRECT EXAMINATION

9     BY MR. GRADY:

10    Q.   Very quickly, Dr. Rosell, if you had a question about

11    scoring or coding the new Static-99 norms, who would be the

12    people that you would talk to about that?

13    A.   Well, it's not really coding.  The test hasn't changed;

14    it's interpreting the norms.

15    Q.   Is Amy Phenix one of the people?

16    A.   Amy Phenix, Dr. Hanson, Dr. Thornton, and there's

17    Dr. Harris.  Those are the principal -- well, they created the

18    coding rules, if you had a question about coding, but the new

19    norms it would be Dr. Hanson and Leslie Helmus, and I think

20    Dr. David Thornton is also involved in that.

21    Q.   Have you attended any workshops on applying the new norms

22    that were given by Dr. Phenix?

23    A.   Not by Dr. Phenix, but I've got copies of her trainings.

24    I've attended a training by Dr. Thornton and Dr. Doren in

25    November of 2008 in Madison, Wisconsin.

1    Q.    Let's just very quickly come back to the numbers that

2    result from Mr. Hunt's score of an 11.  First of all, there is

3    no 11 on the scoring charts, correct?

4    A.    Correct.

5    Q.    Okay.  Now, with respect to the 10s, which is what Ian

6    just questioned you about, if we accept Dr. Abbott's criticisms

7    and we use the percentages from the general sample instead of

8    that risk range that you testified to, what does the risk range

9    -- or strike that.  What's the initial risk range you testified

10   to?

11   A.    The 10-year would be 66 percent, the 5-year would be 51

12   percent.

13   Q.    And the question I asked was what was the initial risk

14   range you testified to?

15   A.    Oh, that I testified to.  49 percent and 59.9 percent.

16   Q.    And if we accept Dr. Abbott's criticisms and we apply, as

17   he suggests, the general sample results, what does the risk

18   percentage become?

19   A.    The 5-year is 51 percent and the 10-year was 66 percent.

20   Q.    So, it actually goes up for Mr. Hunt, correct?

21   A.    Yes.

22   Q.    Okay.  Now, you've heard a great deal of questioning about

23   the effect of age and how low recidivism rates exist for

24   individuals over 60.  You were aware of this data before you

25   rendered your opinion, correct?

1    A.    Oh, yes.  I've been aware of Dr. Barbaree's,

2    Dr. Wollert's, Dr. Hanson's work before this, yes.

3    Q.    Ian mentioned -- excuse me -- Mr. Hunt's counsel mentioned

4    on cross-examination that there are suggestions of empirical

5    manners in which to adjust range, where one simply discounts by

6    a percentage each year over the age of 40, correct?

7    A.    Correct.

8    Q.    And have those been generally accepted?

9    A.    Well, they have been published in journals, and I've

10   considered them and used them in other cases, and other

11   evaluators do.  So, I think they have gotten -- they have

12   received general consensus.

13   Q.    And if you applied those factors in this -- excuse me --

14   in every case, what would be the risk percentage you generated

15   for anyone over 60 in every case?

16   A.    Assuming that they were high risk, then they'd probably be

17   between 8 and 10 percent range.  That's what the numbers have

18   shown.

19   Q.    Dr. Rosell, if you discounted 5 percent a year, as

20   suggested by Dr. Wollert, over age 40, what's 20 times 5?

21   A.    100.

22   Q.    And is there any risk percentile that is as high as 100?

23   A.    No.

24   Q.    So, if you used that system, by the time you got to age

25   60, what would be the percentage for any potential offender at

1    all?

2    A.    Zero.

3    Q.    So, in essence, that would require you to testify that any

4    offender, any individual, would have no risk of reoffending,

5    correct?

6    A.    Correct.

7    Q.    Now, do you believe that to be an appropriate manner of

8    adjusting for age?

9    A.    No, because it's not taken into account the individual

10   that you've been asked to evaluate.

11   Q.    Okay.  In light of this data, you, nonetheless, concluded

12   Mr. Hunt was dangerous, correct?

13   A.    Correct.

14   Q.    And why is it that you or -- strike that -- how do you do

15   that?

16   A.    Well, as I testified to yesterday, I've had a couple of

17   other occasions, basically two other times, that I've had

18   somebody who's over 60 where I felt that person was still

19   dangerous.  One was a pre-commitment trial, the other one was a

20   release case, and I just felt, as I said yesterday, that the

21   amount of offending that occurred, the way it occurred, for the

22   duration of the time it occurred, that I cannot say that

23   because he's older he is no longer a risk.

24   Q.    And with respect to these numerical percentages we have

25   discussed -- strike that.  Have you already or can you discuss

1   for me how it is you identify these numerical percentages --

2   strike that.  Are these numerical percentages solely the basis

3   upon which you make a conclusion of future dangerousness under

4   this statutory standard?

5   A.   Are you talking about the new norms, those --

6   Q.   No.  Strike that.  Your opinion as to Mr. Hunt's future

7   dangerousness in this case is based upon being asked whether

8   Mr. Hunt would have serious difficulty in refraining from

9   further acts of child molestation, correct?

10  A.   Correct.

11  Q.   Do the statistical analyses that we have discussed here

12  specifically answer that question?

13  A.   I believe they do assist in answering that question, but

14  even if I disregarded any of the analysis and the research,

15  just considering it from a different perspective, I would also

16  come up with the same conclusion.

17  Q.   But do the statistics tell us specifically about whether

18  Mr. Hunt would or would not have serious difficulty?

19  A.   The statistics can only tell you about how he compares to

20  other individuals, and when he does compare to other

21  individuals, he scores at a very, very high rate, one of the

22  highest scores, that he's basically off the chart, and that he

23  didn't even -- they didn't even say that he's in that zero to

24  10 or that 8 to 10 because of the confidence interval.  We

25  don't know what the confidence interval will be with 11, so

1    he's even beyond that.  So, with that respect, I think it does

2    provide information to make a decision.

3    Q.   One of the criticisms noted was that you had not testified

4    to the confidence intervals.  Those were in the exhibit that

5    have been admitted, correct, the confidence intervals?

6    A.   Correct, yes.

7         MR. GRADY:  I have nothing further.

8         MR. GOLD:  Just a short amount of followup.

9         THE COURT:  Go ahead.

10                      RECROSS EXAMINATION

11   BY MR. GOLD:

12   Q.   Dr. Rosell, again, you testified that you used the

13   actuarial as a starting point to give a sense of absolute risk,

14   right?

15   A.   Relative risk, not absolute risk.

16   Q.   Well, but you're also communicating information about

17   absolute risk, right?

18   A.   Correct.

19   Q.   Now, there are other actuarials that also communicate that

20   information, right?

21   A.   You mean the MnSOST-R or --

22   Q.   There is the Static-2002.  That's an actuarial, right?

23   A.   Oh, yes.

24   Q.   The MnSOST-R.  That's an actuarial, right?

25   A.   Yes.

1   Q.   The SORAG, correct?

2   A.   Correct.

3   Q.   The RRASOR, correct?

4   A.   Correct.

5   Q.   These are all actuarials that have different recidivism

6   rates associated with them, right?

7   A.   Correct.

8   Q.   In fact, there's one study that showed that the RRASOR was

9   the best out of that group, right?

10  A.   Yes.  I can't remember which study that was.

11  Q.   The study by Michael Seto, *Is more better*, right?

12  A.   Okay.  *Is more better*, correct.

13  Q.   Now, so, when you say that Mr. Hunt is off the chart, he's

14  off this one chart, among others that you could have chosen,

15  right?

16  A.   Correct.

17  Q.   And, again, we don't need an expert to come in here and

18  tell us that he's high risk in relation to other types of sex

19  offenders; a lay person could pretty much make that assessment,

20  based on his offending, right?

21  A.   Yes.

22  Q.   And, now, just with respect to the issue of the hazard

23  rates, the method of adjusting a high-risk actuarial number for

24  the progress of age, you stated you had done that in the past.

25  A.   That I've taken into account the person's age, especially

1    if they were over 60, yes.

2    Q.   But you had attempted to use the hazard rate as a measure

3    of quantifying that, based on the available data in the past?

4    A.   It comes up with a number, and the final number is

5    something under 10 percent.  So, yes.

6    Q.   Well, you would have to run the formula in each case,

7    right?

8    A.   With the hazard ratio, you take a number, and then you

9    multiply either .97 or .96, I can't remember the number, by

10   year based on what their original percentage was to begin with.

11   So, usually, it's going to be about the same.  Usually, it's

12   whatever that number was for that corresponding actuarial

13   score.

14   Q.   But I believe your testimony on redirect was that you very

15   quickly get to zero because you subtract 5 percent each year,

16   but that's not how it works, is it?

17   A.   Well, no.  It's -- I didn't want to argue, but it's not 5

18   percent each year, it's a little less --

19   Q.   Right.  It's a formula?

20   A.   -- but, eventually, it gets down to a number underneath 10

21   percent.

22   Q.   Well, but you could have taken any of the numbers in this

23   case and used a hazard ratio, and it would have given you a

24   number that was not zero for Mr. Hunt, right?

25   A.   Correct.  It gives you a number that's not zero.

1   Q.   And that would be a method that you could empirically

2   defend to say this is a plausible estimate of Mr. Hunt's

3   absolute recidivism risk.

4   A.   Right, but at the same time you're also saying that nobody

5   has any risk after age 60, and maybe you can say that about

6   rapists, because all the numbers seem to -- you know, even the

7   latest numbers of people over 60 who have committed rapes is

8   zero, but with child molesters, I just don't feel comfortable

9   saying that.  Just saying just because the person is 60 they're

10   no longer at risk, I think there needs to be -- you've got to

11   take into account the whole case.

12   Q.   Well, but no one is saying that Mr. Hunt or is suggesting

13   that Mr. Hunt is no risk.  We're trying to come up with a

14   method of quantifying what his absolute risk actually is.

15   A.   Correct.

16   Q.   And the number that you would get by applying this formula

17   that we discussed would not be zero for Mr. Hunt, would it?

18   A.   No.

19   Q.   Now, we discussed the high-risk sample, and, again, these

20   methods are not the end-all be-all; they are just empirically

21   based methods of adjusting for risk so that we can come up with

22   a good estimate, right?

23   A.   Correct.

24   Q.   So, I am returning your attention to the *Science on Trial*

25   article by Prentky, Barbaree and other authors.  They actually

1    put an example of the formula right here, and in that example,

2    they calculate as an example a 40 percent risk for a

3    52-year-old man, 12 years older what they choose as a base age

4    range, which is 40, right?

5    A.    Correct.

6    Q.    And then 12 years later they get 31.39 percent in that

7    example, right?

8    A.    Correct.

9    Q.    And, so, we would expect, if you were to choose a number,

10   for example, the 30 or 49 percent that Mr. Hunt posed when he

11   was sentenced 25 years ago, that you could adjust that for the

12   progress of age, based on this formula, which is based on the

13   data, right?

14   A.    Correct.

15   Q.    And you would get some number which is not zero at the age

16   of 63 but is not 49 percent, right?

17   A.    That's true.

18            MR. GOLD:  No further questions.

19            MR. GRADY:  Nothing further, your Honor.

20            THE COURT:  Okay.  You are excused, Doctor.  Thank

21   you.

22            THE WITNESS:  Thank you, your Honor.

23                     (Witness stepped down)

24            THE COURT:  All right.  Have you got another witness?

25            MS. SERAFYN:  Your Honor, the government calls the

1    Court-designated examiner, Dr. Bernard Katz.

2              THE COURT:  Okay.  He is where?

3              MS. SERAFYN:  Right here in the courtroom, your Honor.

4              THE COURT:  Okay.  Thank you.

5                    DR. BERNARD KATZ, SWORN

6                    DIRECT EXAMINATION

7    BY MS. SERAFYN:

8    Q.   Good afternoon, Dr. Katz.  Could you, please, state and

9    spell your full name, for the record.

10   A.   Yes.  It's Dr. Bernard Katz, K-A-T-Z.

11   Q.   And, Dr. Katz, how did you come to be involved in this

12   case?

13   A.   I was phoned a number of months ago by Attorney Syrie

14   Fried of the Federal Defenders Office, asking if I would be

15   interested in getting involved in this type of a case.

16   Q.   And did you have an understanding, at least initially,

17   about which party you would be doing an evaluation and report

18   for?

19   A.   Well, in as much as it was Ms. Fried that phoned me, I

20   thought I would be, essentially, retained by her to try and

21   assist with the defense in this case.  I, subsequently, got

22   communication from the Judge's office sort of appointing me

23   under the aegis of the Court to do this, and, so, I proceeded

24   along those lines.

25   Q.   And is it your understanding that it's the same office,

1    the Federal Defender Office, that represents Mr. Hunt now?

2    A.   Yes.

3    Q.   And, Dr. Katz, what's your occupation?

4    A.   I'm a physician specializing in psychiatry.

5    Q.   And did you have to go to medical school?

6    A.   Yes.

7    Q.   And when did you graduate medical school?

8    A.   1967.

9    Q.   And where did you go?

10   A.   University of Louisville.

11   Q.   Are you licensed in psychiatry?

12   A.   Well, I'm certified in psychiatry, licensed in

13   Massachusetts to practice medicine.

14   Q.   Okay.  When were you first licensed to practice medicine

15   in Massachusetts?

16   A.   1968.

17   Q.   And are you licensed in any other states?

18   A.   I was but no longer.

19   Q.   Now, you said that you're certified in psychiatry.  Is

20   that the same thing as being board certified?

21   A.   Yes.

22   Q.   And what does it mean to be board certified?

23   A.   First, you have to be eligible, by your training, in order

24   to sit for the examination.  First, there's an oral

25   examination.  When I took it, it was about two-thirds

1    psychiatry, one-third neurology, because it's the same board,

2    but I don't think we need to get into that, but you take the

3    written test, and then sometime after that, if you pass the

4    written test, you're able to sit for the oral examinations,

5    which have changed a little bit over the course of the past 35

6    years, but they are oral examinations, where you do

7    examinations of psychiatric patients and, in my day, also

8    neurology patients.

9    Q.   And what exactly are you board certified in?

10   A.   Psychiatry.

11   Q.   Anything else?

12   A.   I have subspecialty certification in forensic psychiatry.

13   Q.   Now, you have three binders on the stand there in front of

14   you.  I'd like you to turn to the first binder.  It should say

15   Exhibits 1 through 10 on the cover page.

16   A.   Okay.

17   Q.   And I'd like you to turn to tab 2.

18   A.   Okay.

19   Q.   And can you tell me what that document is?

20   A.   This is a copy of my curriculum vitae as of January 2007.

21   Q.   Now, this document that's Exhibit 2 has already been

22   admitted into evidence, so I don't want to go through it in

23   detail, but are you working now in some capacity that's not

24   reflected on this curriculum vitae?

25   A.   I am, yes.

1    Q.    Can you tell us what that work is?

2    A.    As of February, I took a position as Senior Psychiatrist

3    at the Worcester County Jail and House of Correction.

4    Q.    And what do you do as Senior Psychiatrist in Worcester?

5    A.    One thing I do is I treat inmates there psychiatrically.

6    The other thing I do is help improve their program.  As you may

7    note from my CV, most of my career has been in clinical

8    administration, program development, running units and so on.

9    So, I bring that experience to bear to try and improve the

10   quality of care rendered to the inmates at the jail and House

11   of Correction.

12   Q.    And are you doing evaluations of inmates in Worcester?

13   A.    Yes.

14   Q.    And other than acting as Senior Psychiatrist in the

15   Worcester County Jail, are you doing any other work currently?

16   A.    Yes.  My other paid work is I do medical-legal work, most

17   of which at this point in my career is civil medical

18   malpractice, primarily, but other forensic activities as well.

19        I also am a risk management consultant to two

20   nationwide hospital risk management chains that put together

21   teams and go around the country to various hospitals to help

22   them develop policies and procedures to reduce their risk, in

23   my case, on their psychiatric units.

24        And then I also do volunteer work, teaching at

25   Tufts-New England Medical Center.  I also do volunteer work

1   with the American Psychiatric Association.  And there may be

2   more; they're just not coming to my mind right now.

3   Q.   And this medical-legal work that you do, do you do that in

4   the context of a private practice?

5   A.   Yes.

6   Q.   And how long have you maintained a private practice?

7   A.   In forensic or in general psychiatry?

8   Q.   In general psychiatry.

9   A.   I would say since 1971.

10  Q.   And what about specifically forensic work?

11  A.   I did my first forensic evaluation, which happens to have

12  been a sexually dangerous person evaluation from someone, a

13  petitioner at the Treatment Center in 1979.

14  Q.   And can you give us some examples of the type of forensic

15  work that you've done in your private practice?

16  A.   Well, currently, as I mentioned, most of it is civil.

17  Medical malpractice is the bulk of it.  I also do some criminal

18  work.  I've got another case in Federal District Court,

19  sentencing for an inmate down in Wyatt.  I've also done some --

20  I've done many criminal responsibility competency to stand

21  trial evaluations, usually in superior court in Massachusetts.

22  Q.   Now, you mentioned earlier that Syrie Fried of the Federal

23  Defenders Office first contacted you about this case.  Have you

24  worked with Ms. Fried in the past?

25  A.   Yes, I have.

1    Q.   On what type of cases or what type of evaluations?

2    A.   If I remember correctly, I first started working with

3    Ms. Fried when she was with the State, Committee for Public

4    Counsel Services, although it may have been named something

5    else back then, and I've done a couple of cases for her in her

6    role as part of the Federal Defenders program, but this is my

7    first sexually dangerous person one in Federal Court.

8    Q.   Have you done sexually dangerous persons evaluations in

9    state court cases?

10   A.   Yes, many.

11   Q.   And, approximately, how many have you done?

12   A.   Over the course of the years, I would say maybe 40, 50,

13   60.  I'm not sure.  Quite a number.

14   Q.   And on whose behalf do you do those sexually dangerous

15   persons evaluations?

16   A.   Well, I haven't done one for the state in years, but,

17   historically, I would say 75, 80 percent for the petitioner,

18   someone petitioning Superior Court in order to -- I can't

19   remember the section, I think Section 13 or 14, I'm not sure,

20   in Massachusetts -- but the petitioner filing a yearly petition

21   to try and be released from treatment at the treatment center.

22   Q.   So, in the cases that you worked on, the individual was

23   already civilly committed?

24   A.   Almost all of them.  I may have had one or two at the

25   initial stage, but almost all of them they were petitioners

1    attempting to be released.

2    Q.   Is there a difference between doing an evaluation for

3    sexual dangerousness for someone at the initial commitment

4    phase versus someone who has already been committed and is

5    petitioning to get out?

6    A.   There are some differences.  The criteria are pretty much

7    the same, but the people who are petitioning have long records

8    of institutional behavior in the treatment center, treatment

9    records and the like, which you usually don't have in the

10   beginning phase of the original commitment.

11   Q.   And, now, have you testified in court about your

12   professional or medical opinions?

13   A.   In what regard?

14   Q.   Just in the context of any of the forensic evaluations

15   that you've done in your career.

16   A.   Yes.

17   Q.   And has that testimony included the diagnosis of mental

18   illnesses or disorders?

19   A.   Yes.

20   Q.   And has that testimony also included the risk of

21   recidivism that a person may pose if he got out of the

22   treatment center, for example?

23   A.   Yes.

24   Q.   In the cases in which you've testified, have you ever

25   failed to qualify as an expert when you've been proffered as an

1    expert?

2    A.    No.

3    Q.    And, now, just focusing solely on the sexually dangerous

4    persons cases that you've worked on, can you just sort of

5    remind me, in what percentage of those cases were you

6    testifying for the individual as opposed to testifying for the

7    government?

8    A.    This is a rough estimate.  I would say 80 to 85 percent on

9    behalf of the petitioner.  Let me try and clarify this, if I

10   may.  I'm not trying to nitpick, but it's important.  Most of

11   my being retained, I would say 80, 85 percent on the part of

12   the petitioner.  There were a number of cases that, even though

13   I was retained and asked by the petitioner, through his

14   attorney, I would not be able to offer a favorable opinion.

15   So, I wouldn't be asked to testify in those courses -- in those

16   cases -- but my retention was 80, 85 percent on the

17   petitioner's behalf.

18   Q.    And the other 15 to 20 percent would be for the

19   government?

20   A.    Correct.

21   Q.    Okay.  Now, in this case, Dr. Katz, you performed an

22   evaluation of Mr. Hunt; is that right?

23   A.    Correct.

24   Q.    And what was the purpose of that evaluation?

25   A.    The purpose of the evaluation was to comply with the

1    Court's instructions to see if I could render an opinion in

2    this matter regarding Mr. Hunt's sexual dangerousness, whether

3    he met, in my opinion -- to offer to the Court whether he met

4    the statutory definition of someone who is a sexually dangerous

5    person.

6    Q.   And did you render an opinion in this case as to whether

7    Mr. Hunt is a sexually dangerous person?

8    A.   As defined by the statutory language I was guided by, yes,

9    I did.

10   Q.   And what is that opinion?

11   A.   That, based on the language that I was guided by, that he

12   did meet that definition of a sexually dangerous person.

13   Q.   And is that opinion given to a reasonable degree of

14   medical certainty?

15   A.   Yes.

16   Q.   Now, did you write a report in this case?

17   A.   I did.

18   Q.   I'd like to turn your attention to the same binder, tab

19   number 1.  And this has already been admitted into evidence as

20   Exhibit No. 1, but can you identify this document?

21   A.   Yes.  This is a copy of my report, with a couple of typos,

22   because there was a fair amount of time pressure to get this

23   done.  My apologies to all.  There are some typos in here.

24   Q.   That's okay, Dr. Katz.  And what day did you submit this

25   report or did you write it?

1   A.   Well, it's dated July 2nd, 2008.

2   Q.   Now, did you review any materials before you wrote this

3   report on July 2nd, 2008?

4   A.   Yes, I did.

5   Q.   Okay.  And what types of materials did you review?

6   A.   I read a substantial number of materials related to Mr.

7   Hunt's prior criminal record, a lot of court transcripts,

8   appellate decisions.  There was a fair amount of material.

9        The reason I'm hesitating is, as you know, this

10  material came to me in a rolling fashion, and, as I sit here

11  today, I can't be entirely sure what I read before examining

12  him and what I read on an ongoing basis as the material rolled

13  in.

14  Q.   So, it sounds to me --

15       THE COURT:  Okay.  Why don't we take a break now.  Now

16  we are coming back -- we have a sentencing.  We will come back

17  with this at 2:30.  We have a sentencing at 2:15.  I should be

18  through by 2:30.

19       MR. GRADY:  Thank you, your Honor.

20       THE COURT:  Thank you.

21  (Lunch recess taken from 1:00 p.m. to 2:35 p.m.)

22       MS. SERAFYN:  May I, your Honor?

23       THE COURT:  Yes.  Please go ahead.

24  BY MS. SERAFYN:

25  Q.   Dr. Katz, before the break, we were talking about the

1    documents that you reviewed before you wrote your report, and I

2    think you were saying that you received documents on a rolling

3    basis in this case?

4    A.    That's correct.

5    Q.    So, did you receive documents after you submitted your

6    report or after you wrote your report on July 2nd, 2008?

7    A.    Yes, many.

8    Q.    And the totality of the documents that you reviewed in

9    this case, are those the records that are reasonably relied on

10   by experts in doing evaluations of sex offenders?

11   A.    Yes.

12   Q.    And did any of the documents that you received after you

13   wrote your report, did any of those documents change your

14   opinion at all?

15   A.    No, they did not.

16   Q.    Now, before writing your report, did you meet with Mr.

17   Hunt?

18   A.    I did.

19   Q.    And when did you meet with him?

20   A.    I met with him on June 30th, 2008.

21   Q.    And did Mr. Hunt consent to be interviewed?

22   A.    He did.

23   Q.    And how long did you meet with him?

24   A.    About one and three-quarters hours.

25   Q.    And was one and three-quarters hours sufficient for you to

1    do your evaluation in this case?

2    A.    I felt that it was.

3    Q.    Now, I presume, Dr. Katz, that you're familiar with the

4    Adam Walsh Act, which is 18 U.S.C. 4247 and 4248?

5    A.    Yes.

6    Q.    And is it your understanding that there are three

7    statutory criteria that Mr. Hunt needs to meet in order to be

8    considered a sexually dangerous person?

9    A.    In a general way I am, yes.

10   Q.    And is it your understanding that the first element or

11   statutory criterion asks whether Mr. Hunt has engaged or

12   attempted to engage in sexually violent conduct or child

13   molestation in the past?

14   A.    Correct.

15   Q.    And do you have an opinion to a reasonable degree of

16   medical certainty about whether he has committed that conduct

17   in the past?

18   A.    The child molestation, yes.

19   Q.    And what is your opinion?

20   A.    Yes, that he has.

21   Q.    So, can you just describe for us some of the child

22   molestation that Mr. Hunt has engaged in in the past?

23   A.    It's very, very numerous, starting back in the mid-'70s.

24   He had many, many episodes of child molestation in a variety of

25   circumstances over the course of the years.

1   Q.   I'd just like to direct you to in the binders in front of

2   you binder number 3.  It should have letter Exhibits A through

3   O.

4   A.   Okay.

5   Q.   It's the last exhibit in that binder, Exhibit O.  Now,

6   I'll just ask you if you've seen this document before.

7   A.   Yes, I have.

8   Q.   Okay.  But you didn't draft this document, right?

9   A.   No, I didn't.

10   Q.   But is it your understanding that this document contains a

11   chronology of Mr. Hunt's sex offenses?

12   A.   Yes.  I mean, I would have to go back and crosscheck every

13   one, but, at the very least, this is approximately correct.

14   Q.   And is it your understanding that this chronology is sort

15   of a summary of the voluminous documents that you reviewed in

16   this case?

17   A.   Yes.

18   Q.   And I believe in your report, which is Exhibit 1 in that

19   first binder, on page 3 of your report at the bottom of the

20   page, you list some of the sex offenses that Mr. Hunt has

21   engaged in, and I believe you note here that they start in

22   1973; is that right?

23   A.   Yes.

24   Q.   And what was the charge, if you recall, in 1973?

25   A.   I believe that was in California.  I believe he molested a

1   10- or 12-year-old boy or at least attempted to.  I don't

2   remember that particular one, specifically.

3   Q.   And then you note in your report in parentheses that this

4   charge or conviction was reduced to harassment, correct?

5   A.   That's my understanding, from reading the material.

6   Q.   Okay.  But it's your understanding that in 1973 he had a

7   conviction for something that you would consider a sex offense;

8   is that right?

9   A.   Yes, that's correct.

10  Q.   And then you list various other sex offenses here, but I

11  want to focus on the 1976 offense, because in your report you

12  note "1976 kidnapping," and then in parentheses it says "in

13  service of pedophilia."  What does that mean?

14  A.   Well, I'm not an attorney, and, so, when somebody reads or

15  hears the expression "kidnapping," the usual thought that gets

16  conjured up has to do with some sort of kidnapping for ransom

17  or sometimes, unfortunately, sexually violent behavior, murder,

18  rather heinous kinds of situations.  So, I felt, at least it

19  was important for me, for my own sense of balance, to

20  parenthetically note that, from what I read about the

21  situation, it was not one of those situations.  I'm sure it was

22  kidnapping in the eyes of the law, but it was not one of those

23  kinds of situations, and it seemed to me to be in the service

24  of promoting this ongoing pedophilic interest that he had.

25  Q.   And is there anything else significant about the 1976

1    kidnapping, in your view?

2    A.   Well, he was found with an unloaded Magnum weapon, I

3    think, at the time of his arrest.  It was also significant to

4    me or, at least, certainly it registered that he didn't have

5    sex with that particular kid, which I thought was interesting,

6    or it's not been noted in anything that I've read that there

7    was any actual sex going on with that kid, although that was a

8    part of Mr. Hunt's motivation, his hope to seduce this boy.

9    Q.   And also in your report you note some other sex offenses,

10   but you note another kidnapping in 1986, where you made the

11   same reference that it was in service of pedophilia.

12   A.   Right.

13   Q.   Is that the same situation as the 1976 kidnapping in terms

14   of then being in service of Mr. Hunt's pedophilia?

15   A.   Yes, that's right.

16   Q.   Now, in addition to the sexual offenses that you list on

17   page 3 of your report, you also describe some nonsexual

18   offenses that Mr. Hunt has committed.

19   A.   Right.

20   Q.   Can you just explain what those are for us?

21   A.   Well, the first one was his military situation, where he

22   has a general court-martial for desertion and did six months

23   hard labor at Portsmouth.  Then there were other arrests, 1966,

24   breaking and entering and larceny.  I'm not really that

25   familiar with the details of that at this point.  A fraudulent

1    check in 1967, where he served 30 days.  Then these two, quote,

2    kidnapping charges.  I don't have it in quotes, but I want to

3    reemphasize it was in the service of his pedophilia, '76 and

4    '86.

5            Then there was a grand larceny conviction or two

6    having to do with where he stole a generator and an ATV, I

7    suspect that's an all-terrain vehicle, in order, again, in my

8    opinion, in the service of his pedophilia.  Apparently, he was

9    living out in the woods in a trailer, and he had a bunch of

10   kids there, and he was engaging in a lot of pedophilic

11   activities, and these thefts, in my reading of it, again, were

12   in the service of the pedophilia so he could stay in the remote

13   area and continue his pedophilic activities.

14   Q.   Now, Dr. Katz, is it your understanding that the second

15   criterion for the Adam Walsh Act is that Mr. Hunt suffers from

16   a serious mental illness, abnormality or disorder, that that's

17   what the question asks?

18   A.   Yes.

19   Q.   And do you have an opinion, based on a reasonable degree

20   of medical certainty, as to whether Mr. Hunt does have a

21   serious mental illness, abnormality or disorder?

22   A.   I do.

23   Q.   And what is that opinion?

24   A.   My opinion is he suffers from the disorder of pedophilia.

25   Q.   And how do you go about making that diagnosis?

1    A.    You mean, what criteria do I use or what's the process?

2    Q.    Well, first, let's talk about the process.

3    A.    Well, you review whatever material one has, including

4    police reports, and just whatever material that you have

5    available so that you can be as well informed as possible.

6    Then you do a psychiatric evaluation, put it all together, and

7    you see if you come up with a diagnosis according to the

8    criterias listed in the *Diagnostic and Statistical Manual*.

9    Q.    Okay.  And is the *DSM* something that you used in this

10   case?

11   A.    Yes.

12   Q.    And is the *DSM* generally relied on in the field of

13   psychiatry?

14   A.    For diagnosis, yes.

15   Q.    And are you familiar with the diagnostic criteria for

16   pedophilia?

17   A.    I'm familiar with them.  Whether I can rattle them all off

18   or not, I'm not sure, but I'm familiar with them.

19   Q.    Well, the diagnostic criteria from the *DSM* have been

20   admitted into evidence at Exhibit I.

21   A.    In which book?

22   Q.    I think it's the one on top there.  It's Exhibit I.

23   A.    Yes, it is.

24   Q.    And could you just tell us, in your own words, what the

25   criteria are for pedophilia?

A.   Well, to make a diagnosis of disorder of pedophilia, the
individual has to engage over a period of time in pedophilic
acts, which are usually defined as sexual activity with
children of various ages, but minor children, and, at least
from my point of view, in order to make the diagnosis of
pedophilia, these sexual interests are not transient and
fleeting or under the influence of alcohol or something that
could lead to some disinhibition on a temporary or transient or
very infrequent basis.  We do see -- we see it psychiatrically.
I'm sure the Courts see this sort of thing as well.

For me, for pedophilia, the person's interest has to
be a paraphilic, an abnormal sexual interest in children, and
it has to be significant, and it has to be, at least in my
opinion, a part of their core sexual orientation.

There are heterosexual people who, under certain
circumstances, drunk, as I mentioned before, may engage in a
transient pedophilic act, still against the law, I'm not making
excuses for it, but that, in and of itself, at least if I'm
doing the diagnosis, does not warrant the diagnosis of
pedophilia.  It may warrant legal criminal sanction, but, from
my point of view, it might not -- probably might not warrant
that diagnosis.

Q.   So, in your opinion, does Mr. Hunt meet the diagnostic
criteria for pedophilia that are listed in Exhibit I?

A.   Yes.

1   Q.   And why is that?

2   A.   Well, because it's not transient.  This was a core part of

3   his sexual interest, his sexual interest in children,

4   manifested by the enumerable instances of pedophilic

5   experiences, I'm sure only a fraction of which he's been

6   charged with and found guilty of.  Usually, pedophiles have

7   many, many more instances of pedophilic behavior that does not

8   get reported, does not get charged, but even the ones that --

9   if you just stick with the ones where he's been charged and

10  convicted, they're quite numerous.

11  Q.   Now, does pedophilia ever remit?

12  A.   No.

13  Q.   And you note in your report that -- I believe it's on page

14  5 -- that the prognosis in most of these cases involving

15  pedophiles is fair.

16  A.   Right.

17  Q.   What does that mean?

18  A.   Well, it means that it's not excellent.  I mean, we're on

19  a continuum, again, so the prognosis is not excellent.

20  Somebody who is a pedophile does not have an excellent

21  prognosis, usually, of being able to resolve these conflicts

22  and to modify the aim or the object of his sexual interest.

23  So, it's not excellent.  It's difficult, at best.

24       It's also not hopeless.  There are pedophiles, who,

25  through treatment, through age and through, perhaps, other

1    circumstances, can, at the very least, control their pedophilic

2    interests.

3            So, it's on a continuum, like anything else.  So, I

4    would say that it is fair.  There are certain psychiatric

5    conditions where the prognosis is excellent, and there are

6    certain psychiatric conditions where the prognosis is extremely

7    poor.  For this type of paraphilia, I would say, at best, it's

8    fair.

9    Q.   Now, you reference this continuum.  Where do you place --

10   if you place him anywhere, where do you place Mr. Hunt on this

11   continuum of pedophilia?

12   A.   Well, I guess that's the question we have before us today.

13   Certainly, by history and by a vast amount of documentation, he

14   was certainly on the very severe end of the pedophilic

15   continuum.

16   Q.   And where do you believe Mr. Hunt is on the continuum

17   today?

18   A.   My guess is, because of some of the things that we have

19   mentioned, not the least of which has to do with the passage of

20   time and age, which I was sitting in the courtroom with the

21   prior witness, which we would all agree, everybody would agree,

22   that with age there is generally a diminution of libido and

23   concomitant steam behind sexual interest.  So, I would say that

24   he falls on the continuum in, I would say, the moderate range

25   at this point, given his age.

1    Q.    Now, it's your understanding that Mr. Hunt is incarcerated

2    today?

3    A.    Yes.

4    Q.    And the crimes for which he is currently incarcerated were

5    committed in the 1980s; is that right?

6    A.    Yes.

7    Q.    And what relationship, if any, did Mr. Hunt's pedophilia

8    have on his life in the 1980s before he was incarcerated?

9    A.    In my opinion, his life was completely dominated by his

10   pedophilic interests.  His life was out of control.  He seemed

11   to me -- and these are my words, not his -- he seemed to be

12   living for his pedophilic sexual interests.  He threw caution

13   to the wind, he violated supervision of probation or parole,

14   and he seemed to be tailoring his life almost exclusively to

15   pursue his pedophilic interests.  So, it had a severe impact on

16   his life.

17   Q.    Now, on this continuum of pedophilia that you referenced,

18   are there any factors or characteristics that might raise the

19   probability of reoffense for someone on this pedophilic

20   continuum?

21   A.    Well, maybe this will be a good point for me to say, as

22   you heard from a prior witness, and I'm sure you're going to

23   hear from other witnesses, there are individuals who make a

24   sub-subspecialty out of sexual offenders and their diagnosis,

25   the treatment, the development of scales and so forth and so

1    on.

2         I'm a general psychiatrist and a general forensic

3    psychiatrist, and I've had a fair amount of experience with the

4    diagnosis and treatment of some pedophiles, but I am not one of

5    those heavy-duty researchers.  So, I'm going to be able to give

6    you some general answers, based on my general review of the

7    literature, and I won't be able to quote you chapter and verse.

8         The usual things that people focus on are the passage

9    of time, age, what they call deviance, the selection.  When

10   we're talking about sex offenders, it's a big basket.  So, in

11   pedophiles, are there strangers that are victims, are there

12   victims of both sexes?  These are often felt to have some

13   prognostic -- multiplicity of charges and convictions and time

14   served -- all of these things go into the prognosis and into

15   the risk analysis.  Does the person violate his probation or

16   parole is a very big one, because that indicates that the

17   individual is so -- to me, is so under the sway of these

18   impulses and they're so out of control, that, even with massive

19   risks of incarceration and the rest of it, it all gets thrown

20   to the wind, they go off and they pursue this anyway.  These

21   are all generally considered prognostic indicators.

22   Q.   And, just to be clear, these are prognostic indicators of

23   what?

24   A.   Well, most of the time, these are considered prognostic

25   indicators for the probability of reoffending.

1    Q.   And does Mr. Hunt have any of these characteristics that

2    are prognosticators of reoffending?

3    A.   Yes, he does.

4    Q.   Which ones does he have?

5    A.   As I mentioned a number of times, he violated parole and

6    continued to reoffend while he was under -- it was either

7    parole or some sort of supervision.  I think he did that on

8    more than one occasion.  He had multiple victims, he had

9    multiple convictions.  Those are the big ones.

10   Q.   Can pedophilia amount to a serious mental illness,

11   abnormality or disorder as opposed to just a mental illness,

12   abnormality or disorder?

13   A.   Sure.  Everything is on a continuum, and that's -- yeah.

14   Q.   And, in your opinion, is Mr. Hunt's pedophilia a serious

15   mental illness, abnormality or disorder?

16   A.   In my opinion, it certainly was in the mid-1980s, and I

17   would say, as we sit here today, that it is probably a

18   moderately serious disorder.

19   Q.   And do you have an opinion as to whether Mr. Hunt can

20   control the pedophilia that you've diagnosed him with, if he

21   were released?

22   A.   I was following the language that I was provided by the

23   Court, and that operational language is would he have serious

24   difficulty in refraining from sexually molesting children, and,

25   yes, I do believe that he would have serious difficulty

1    refraining from sexual molestation of children.

2    Q.    Now, does Mr. Hunt have any history of heterosexual

3    activity?

4    A.    Licit or illicit?  Are you talking about with children, or

5    are you talking about with age-appropriate females?

6    Q.    Both, actually.

7    A.    Okay.  Well, the age-appropriate females, he has had

8    during his teenage years, apparently, he had a fair amount of

9    heterosexual activity, and he reported to me that he tried

10   being straight, heterosexual, tried to force himself to have

11   heterosexual activity, heterosexual fantasies.

12           He had a relationship with a woman named Kathy, which

13   I think went on for about 15 years.  It sounded to me and I

14   think he described it as being rather unstable.  She sounded,

15   at least through his description, to be unstable.  Their

16   relationship was unstable.  Their sex life was only fair; he

17   found it only moderately satisfying.  That's the extent of his

18   heterosexual life, as far as I know.

19   Q.    So, did you say that Mr. Hunt told you that he tried to,

20   essentially, change his sexual orientation from homosexual to

21   heterosexual?

22   A.    He told me he was trying to force himself to be straight,

23   to be heterosexual during his teenage years and into his 20s.

24   Q.    Now, you note in your report, I think it's on page 4, that

25   Mr. Hunt's historical pattern has been an almost exclusive

1    attraction to male youths between the ages of 11 and 13 years

2    old.

3    A.    Right.

4    Q.    Now, does Mr. Hunt have any history of sexual attraction

5    or relationships with adult males?

6    A.    Not that I'm aware of.

7    Q.    And you said earlier that you reviewed thousands, upwards

8    of 2,000 documents in this case; is that correct?

9    A.    I don't know the number.  Just, it's quite a stack, yes,

10   (indicating).

11   Q.    And were there any references in those documents to Mr.

12   Hunt's sexual attraction to young boys?

13   A.    Yes, many.

14   Q.    And were there references in those documents to Mr. Hunt's

15   relationship with this woman, Kathy?

16   A.    Yes, in some of them.

17   Q.    And were there any references in those documents to

18   Mr. Hunt having a relationship with or an attraction to an

19   adult male?

20   A.    Not that I'm aware of.

21   Q.    Now, did Mr. Hunt discuss with you at any time his

22   intended sexual attraction or interest, if he were to be

23   released?

24   A.    Yes, he did.

25   Q.    What did he say?

1  A.   He said that, if released, he would plan to live the life

2  of a consenting homosexual male.

3  Q.   And did you find that credible?

4  A.   I have to say, and this is not to cast any aspersion on

5  Mr. Hunt or anyone else, it is a frequent representation, in my

6  experience, with individuals facing these type of

7  adjudications; they will frequently say that.  Whether it's

8  true or not, the depth of the conviction, as I note in my

9  report, there's no way for me to know.

10 Q.   Now Dr. Katz, in your medical opinion would Mr. Hunt have

11 serious difficulty in resisting his pedophilic interests, if he

12 were released?

13 A.   In my opinion, he would, yes.

14 Q.   Now, I want to move on to the third element or criterion

15 in the Adam Walsh Act, and is it your understanding that that

16 question asks whether, as a result of that serious mental

17 illness, abnormality or disorder, which, in this case, you said

18 is pedophilia, that Mr. Hunt would have serious difficulty in

19 refraining from child molestation, if released?

20 A.   Yes.

21 Q.   And do you have an opinion to a reasonable degree of

22 medical certainty as to whether he would have serious

23 difficulty in refraining, if released?

24 A.   Yes.

25 Q.   And what is that opinion?

1    A.    That he would have serious difficulty refraining.

2    Q.    Okay.  And how did you reach that opinion?

3    A.    Just based on the totality of the material that I

4    reviewed, the severity of his pedophilia.  As I mentioned, it

5    was on a continuum, and he was in a very severe range of it,

6    and it was not going to be able to go away.

7            Plus, I do have to say I was a bit troubled by some of

8    the material in the record from the '90s, where there were

9    downloads of children that were downloaded I believe in a

10   folder on some computer.  Now, they were not pornographic, but

11   who downloads images of children in a folder?  I mean, I don't

12   know what the reason for it would be, other than some sort of

13   interest in children.

14   Q.    And I believe you're referencing a disciplinary incident

15   that happened in 1998 involving Mr. Hunt?

16   A.    Yes.

17   Q.    Did this disciplinary action for possessing these pictures

18   in prison, did it factor into your evaluation or your opinion

19   at all?

20   A.    It did somewhat, yes.

21   Q.    And how did it factor into or affect your opinion?

22   A.    Well, to me, it showed that there was a reasonable

23   probability that these fantasies were alive and ongoing in the

24   late 1990s.  Granted, it was 10 years ago, but that they seemed

25   to be there, because I couldn't come up with any other

1    plausible reason that someone would be downloading pictures of

2    children on a computer.

3    Q.    Now, Dr. Katz, we heard a lot from the last witness,

4    Dr. Rosell, about actuarial instruments.  Are you familiar with

5    actuarial instruments in the context of sex offender

6    evaluations?

7    A.    Not to the extent of Dr. Rosell, but I do have some

8    familiarity with them.

9    Q.    And can you just give us, generally, a sense of what

10    actuarial instruments are in this context of sex offender

11    evaluations?

12    A.    Well, look, everybody is trying to find a Holy Grail here,

13    because these determinations are so difficult to make.  They're

14    very important for both society and for the individual who is

15    facing, potentially, a lifetime in prison, so they're very,

16    very serious and very difficult.  Nobody likes to make them.

17    And, so, people are looking for ways to make these assessments

18    easier or, perhaps, a bit more valid.

19         So, I admire the people who develop these instruments,

20    because they're trying to do something that will be helpful to

21    the Courts in coming up with something fair, but they've got --

22    in my opinion, my reading of the material, they've got a long

23    way to go.  Their research is all over the place with these

24    instruments.  The almost obvious thing is it doesn't address an

25    individual, of course, it only addresses a certain population

1    of individuals, and, even at best, the correlation is moderate,

2    at best.  So, they've got a long way to go, but I admire the

3    efforts.

4    Q.   And did you score an actuarial instrument in this case?

5    A.   I looked at the one, the RRASOR, and I looked at the

6    Static-99 that was done by others, and I sort of re-scored them

7    in my own mind, particularly the Static-99.  I didn't write it

8    down; I just re-scored it in my own mind.

9    Q.   And why did you score the Static-99 in your own mind in

10   this case?

11   A.   Just to see what I came up with, and the numbers I came up

12   with were a little bit different from Ms. Beeshie (ph).

13   Q.   And who is Ms. Beeshie (ph)?

14   A.   I think she's a clinician at Devens, and that's where I

15   saw these actuarial instruments.

16   Q.   So, Ms. Beeshie (ph) at Devens scored a Static-99 for Mr.

17   Hunt and then you scored one yourself?

18   A.   Just in my own mind.

19   Q.   Do you know what score Ms. Beeshie (ph) came up with?

20   A.   I believe it was an 11.

21   Q.   And what score did you give Mr. Hunt on the Static-99?

22   A.   Either an 8 or a 9.

23   Q.   And can you account for the difference in score?  Why did

24   you give him an 8 or a 9, when Ms. Beeshie (ph) gave him an 11?

25   A.   Because I backed out those aspects, those antisocial

1    aspects, all of those aspects that I felt were in the service

2    of the pedophilia and not sort of freestanding items on their

3    own.  And it's a matter of opinion, it's arguable, but that's

4    what I did.

5    Q.   So, would it be a fair characterization to say that,

6    essentially, you gave Mr. Hunt the benefit of the doubt on some

7    of those questions?

8    A.   That would be fair, yes.

9    Q.   Now, what's the significance, if any, of a score of an 8

10   or a 9 on the Static-99?

11   A.   It's still a serious risk of reoffending.

12   Q.   We also spent a lot of time with the last witness talking

13   about age, and I think you referenced this a little bit earlier

14   in your testimony, but how old was Mr. Hunt when you met with

15   him last year?

16   A.   I think 62.

17   Q.   And did you consider Mr. Hunt's age as part of your

18   assessment of him in this case?

19   A.   I did.

20   Q.   And why did you consider his age?

21   A.   I felt it was clinically relevant and prognostically

22   relevant, and I think it needed to be taken into account.

23   Q.   So, why did you think that Mr. Hunt's age was clinically

24   and prognostically relevant in this case?

25   A.   Well, we've at least established a certain amount of

1    agreement that most people recognize that, for a large part of

2    the population, the libido tends to diminish with age, and

3    that, again, I, in my own way, was trying to be fair with Mr.

4    Hunt and to try and look at things that might be prognostically

5    favorable to him.  There were a few other things that were

6    prognostically favorable as well, so I wanted to try and have a

7    balanced, as best I could, a balanced approach to this man.

8    Q.    So, are you familiar with scientific research on age that

9    supports the proposition that libido decreases as age

10   increases?

11   A.    Yes.

12   Q.    Okay.  And what effect, if any, does Mr. Hunt's age have

13   on his risk of reoffense?

14   A.    I think that it, in all probability, lowers it, but where

15   it lowers it to is the question, and that's why, at least as I

16   tried to put this together, while I felt that he was a severe

17   risk, severe pedophile in the '80s, I was able to reduce that

18   in my report that he was a moderate risk, based on a number of

19   things:  his institutional adjustment overall, there were a few

20   blips, as we know, his good work record, he's got skills, and

21   the most important one is the advancing age that does tend, in

22   many cases, to reduce the pressure, the libido.

23   Q.    So, if we know, generally, that a person's sex drive

24   decreases as age increases, is there any way to determine

25   whether for Mr. Hunt, specifically, that that is true, that his

1   sex drive has decreased as his age is increasing?

2   A.   Not really.   I mean, we've got his self-report.   There is

3   not a one-to-one correlation with testosterone levels either,

4   to the best of my knowledge.   There may be a trend, but,

5   certainly, on an individual basis there is no one-to-one

6   testosterone level that can serve as a marker for libido that

7   anybody could have a great deal of confidence in.   So, mostly,

8   we've got his self-report and what we know about human

9   physiology in this regard, which has informed us in this

10  matter.

11  Q.   Has Mr. Hunt ever participated in sex offender treatment?

12  A.   Yes.

13  Q.   When did he participate in that treatment?

14  A.   I don't remember the exact -- I think it was in the '90s

15  at Oneida in Upstate New York.

16  Q.   And how long did he participate in that treatment?

17  A.   It was a six-month program.

18  Q.   Now, did you take Mr. Hunt's participation in sex offender

19  treatment into account in formulating your opinion in this

20  case?

21  A.   Yes.

22  Q.   And are you aware of any research on treatment, sex

23  offender treatment, specifically, and its relationship to

24  reoffense?

25  A.   Unlike some of your witnesses, I'm not going to be able to

1    quote you chapter and verse; however, my impression, from

2    reading the literature, is that there is a modest treatment

3    effect for sex offenders.

4              THE COURT:  What kind of effect?  A modest what?

5              THE WITNESS:  Modest treatment effect, your Honor.

6    BY MS. SERAFYN:

7    Q.   And are you aware of a school of thought among sex

8    offender treatment providers that the average course of

9    treatment for a sex offender should be between two and four

10   years?

11   A.   Yes.

12   Q.   And do you have an opinion in this case on whether six

13   months of sex offender treatment is enough for Mr. Hunt?

14   A.   I took it into account, and it was one of the factors --

15   I'm glad you reminded me, because you were asking me some of

16   the factors that I took into account prognostically that

17   enabled me to reduce my assessment from severe down to

18   moderate, and he did complete six months of sex offender

19   treatment.  Generally, that's not considered enough,

20   particularly with an individual whose case of pedophilia, whose

21   disorder, was as severe as Mr. Hunt's that we've established

22   or, at least, I've established in my mind.

23   Q.   So, just to be clear, it sounds like what you're saying to

24   me is that you considered Mr. Hunt's age, and you considered

25   his treatment participation, and both of those sort of mitigate

1    his risk of reoffense; is that right?

2    A.    Right.

3    Q.    But even though those mitigate his risk of reoffense or

4    reduce his risk of reoffense, you still find that he meets the

5    statutory criteria of a sexually dangerous person?

6    A.    Well, because the language I'm going with, really, unless

7    I'm misreading it or unless there's something else, it doesn't

8    even have anything to do with reoffense.  It says serious

9    difficulty in refraining.  That was the language that I used to

10   submit my report.

11   Q.    Now, I want to talk to you a little bit about Mr. Hunt's

12   release plan.  Did you talk to him at all about his plan for

13   what he would do if he were released from Devens?

14   A.    I did.

15   Q.    And what did he say?

16   A.    He said that he would hope to go to a sexual offender

17   halfway house or a halfway house and participate in outpatient

18   sex offender treatment.  He planned to go to gay bars and try

19   and establish a consenting-adult, homosexual relationship or

20   series of relationships.  He planned to get a job, and he does

21   have skills and -- I'm trying to remember.  He does have two

22   daughters in New York State, which I think has been

23   established.  I think he would try and re-establish some

24   contact with them.

25   Q.    Do you know if Mr. Hunt has had any contact with these

1    daughters while he's been in prison?

2    A.    I don't believe they've visited.  Whether he's had letters

3    or telephone calls, I'm not sure.

4    Q.    And are you aware that Mr. Hunt has three years of

5    probation left in New York State?

6    A.    Yes.

7    Q.    And did you factor that into your opinion in this case,

8    the fact that he would be on supervised release when and if he

9    is released?

10   A.    Did you say on supervised or unsupervised?

11   Q.    Oh.  That he would have supervised release, if he were to

12   be released from Devens.

13   A.    I factored it in somewhat.

14   Q.    And why somewhat?

15   A.    Well, he's already, through his behavior -- now, it was a

16   long time ago, I grant you -- has shown that at least he's had

17   a history of ignoring supervised release.  I believe that is

18   less likely now, given his age and the skills that he's

19   developed and the rest of it.  I doubt that he would be that

20   cavalier or foolish or reckless to ignore that, but he does

21   have a history of having ignored it in the past.

22   Q.    Now, did you factor Mr. Hunt's overall release plan into

23   your opinion in this case?

24   A.    Well, in my opinion, if he is released, that would be the

25   kind of plan I would recommend to the Court, but I don't know

1    how much close supervision is realistic these days or any other

2    days, but the closer the supervision, the tighter the

3    supervision, the better, the greater the likelihood of helping

4    him resist his impulses.

5    Q.    And do you think that going to a halfway house and,

6    perhaps, visiting with his adult daughters and getting a job

7    would help him to refrain from child molestation?

8    A.    I think it would help him, yes.  Whether it would be

9    successful or not is another story, but I think that it

10   would -- you know, it's all on a balance, and I think that that

11   would be useful in helping him attempt to restrain his

12   impulses.  Maybe that's a better way for me to put it.

13   Q.    But given everything that you know now, do you have an

14   opinion as to whether Mr. Hunt could restrain his impulses, if

15   he were released?

16   A.    I have an opinion that he would have serious difficulty

17   restraining his impulses toward child molestation.

18           MS. SERAFYN:  Just a moment, your Honor, please.

19                   (Pause)

20           MS. SERAFYN:  I don't have any further questions.

21           THE COURT:  Okay.  Cross?

22                CROSS-EXAMINATION

23   BY MR. GOLD:

24   Q.    Good afternoon, Dr. Katz.

25   A.    Mr. Gold.

1    Q.    Dr. Katz, you practice as a forensic psychiatrist?

2    A.    That's right.

3    Q.    In addition to -- you said most of your career was in

4    clinical management or administration?

5    A.    That's right.

6    Q.    And, so, this is a part of what you do?  I think you may

7    have testified at a deposition that it's about a third of what

8    you do, forensic work.

9    A.    When I gave my deposition -- I'm just trying to be as

10   honest as I can.  When I gave my deposition, that was before I

11   returned to work half time.  So, since I returned to work half

12   time, the forensic would be reduced to, maybe, 20 percent of

13   what I do now, whereas, it had been a third at the time of the

14   deposition.

15   Q.    Now, you've done sexually dangerous persons cases before.

16   A.    Yes.

17   Q.    But not for a long time.

18   A.    Right.

19   Q.    And you've done them here in the State of Massachusetts.

20   A.    Yes.

21   Q.    And the first forensic case you ever did was one of these

22   SDP cases.

23   A.    Correct.

24   Q.    Now, were you what's known as a qualified examiner at any

25   time?

1   A.   I'm not sure they had qualified examiners back then.

2   Q.   Now, you said you were retained by lawyers for people who

3   were trying to get out of the treatment center 85 percent of

4   the time, right?

5   A.   Yes.

6   Q.   And then the other 15 percent of the time you were

7   testifying for the Commonwealth of Massachusetts?

8   A.   In sexually dangerous persons cases.

9   Q.   In this type of case?

10  A.   Yes.

11  Q.   Those were called -- you mentioned a section -- I believe

12  they are Section 9 petitions?

13  A.   That's what it was, yes.  Thank you.

14  Q.   Right.  And those are a petition where someone has been

15  committed already to the treatment center and is trying to get

16  out, correct?

17  A.   Correct.

18  Q.   And what they are trying to do is demonstrate that they

19  have internalized some of the treatment that they're being

20  given at the treatment center, correct?

21  A.   Correct.

22  Q.   Now, when you testified about this experience during the

23  deposition, you called it the old days.  Do you recall using

24  that phrase?

25  A.   No, but it doesn't surprise me.  I probably did.

1    Q.   But are you aware that the Massachusetts statute was

2    partly repealed; that's part of the history that you're

3    familiar with?

4    A.   Are you referring to when it went from a bench trial to a

5    jury trial?

6    Q.   What I'm referring to, if you're familiar with -- you

7    stated on your direct testimony that they didn't used to come

8    after people at the end of their prison sentences --

9    A.   Oh, right.

10   Q.   -- but at the beginning, right?

11   A.   Oh, absolutely.  That's correct.

12   Q.   And that's when they would go to commit people in lieu of

13   a criminal sentence.

14   A.   Absolutely, yes.

15   Q.   And then the people would be committed for an

16   indeterminate sentence, one day to life.

17   A.   Correct.

18   Q.   And then they may at some -- they had an annual right of

19   petition, but that never worked out to be annual, every few

20   years, right?

21   A.   Right.

22   Q.   Now, are you aware, or if you recall, that the initial

23   commitment part of the statute was repealed in 1990?  Is that

24   something that you're aware of?

25   A.   I may have been aware at the time.  It doesn't come to

1    mind.

2    Q.    But you know that part of the statute was reenacted

3    relatively recently, in 1999?

4    A.    I have some awareness of it.

5    Q.    And that now they go after or they petition people at the

6    end of their prison sentences?

7    A.    Oh, yes.  I'm very familiar with that, yes.

8    Q.    Now, when you were doing these assessments, basically, you

9    would come in and evaluate the person, right?

10   A.    Yes, and review the records.

11   Q.    And you'd have a sense of how well they had absorbed these

12   concepts and give an opinion.

13   A.    Right.

14   Q.    Now, you're a member of the American Psychiatric

15   Association?

16   A.    Yes.

17   Q.    And they have sort of subgroups in forensic psychiatry?

18   A.    Yes.

19   Q.    And are you a member of those subgroups?

20   A.    Not at the current time, no.

21   Q.    But you have been in the past?

22   A.    Some of them, yes.

23   Q.    Now, this issue of predicting future dangerousness, which

24   we've been talking about in this case, is one which is of great

25   moment in the field of psychiatry, right?

1   A.    Yes, and it has been for many years, and not just sexually

2   dangerous, but dangerous -- general dangerousness.

3   Q.    Because psychiatrists are called upon to make

4   dangerousness-type of opinions in different contexts, not just

5   this one?

6   A.    That's right.

7   Q.    In the civil commitment context?

8   A.    Yes.

9   Q.    The straight civil commitment?

10  A.    Yes.

11  Q.    If someone's a danger to themselves or others?

12  A.    Right.

13  Q.    In the capital sentencing context?

14  A.    Correct.

15  Q.    Now, are you familiar with the name John Monahan?

16  A.    Of course.

17  Q.    And John Monahan is someone who's researched in this area

18  that we're talking about.

19  A.    Yes, he has.

20  Q.    And he came up with a finding some time ago now about

21  clinicians' or psychiatrists' ability to predict future

22  behavior in general.  Are you familiar with that finding?

23  A.    Correct.

24  Q.    And that finding, which is often repeated, is that

25  clinicians are wrong two times out of three, right, in

1   predicting this future outcome?

2   A.   Yes, but usually the prediction is an over-prediction, a

3   false positive, prediction of dangerousness that does not

4   occur, yes.

5   Q.   And these are studies of psychiatrists, psychologists as

6   well --

7   A.   Right.

8   Q.   -- predicting future dangerousness in a bunch of contexts,

9   right?

10  A.   Right.  Most of it is not in a sexual, sexually dangerous

11  context.  Most of it is just general assaultive-ness,

12  aggressiveness, but that's correct.

13  Q.   And in the field of psychiatry, generally, there's been a

14  move toward pumping in some empirical data into these types of

15  assessments; is that right?

16  A.   There's been an effort.

17  Q.   And there's been major research projects, like the

18  MacArthur Risk Project.

19  A.   Yes.

20  Q.   Big studies identifying risk factors and things like that?

21  A.   Right.

22  Q.   And, so, it's an area of central concern in the field,

23  right?

24  A.   Yes, because we recognize prediction as very difficult,

25  and we're trying to do what we can to improve our ability to

1    predict.

2    Q.    And you, Dr. Katz, have talked about this ethical dilemma

3    in your direct testimony, talking about the stakes on either

4    side, right?

5    A.    Right.

6    Q.    But you acknowledge that there's uncertainty inherit in

7    the task of predicting whether someone's going to reoffend or

8    not, right?

9    A.    Without question.

10   Q.    And what you used, when you did this assessment, is, you

11   used your clinical judgment to formulate the case, right?

12   A.    Right.

13   Q.    Now, when you looked at the statute, you separated out, it

14   seemed to me, from reading your report, the serious difficulty

15   refraining from child molestation component from the risk

16   assessment; is that right?

17   A.    I think they're connected.  I think they're related --

18        THE COURT:  I did not understand the question.

19   Rephrase it.

20        MR. GOLD:  Your Honor, let me turn to the point of the

21   report that I'm referring to.  I think that will make it clear.

22        THE COURT:  Go ahead.

23   BY MR. GOLD:

24   Q.    And, for the record, I have put up on the display what's

25   been marked, I believe, as Exhibit No. 1 an image of that which

1    is your signed report, and this is the last page, which is not

2    numbered here, and I've moved the mouse next to a paragraph

3    called "Risk Assessment."

4    A.    Yes.

5    Q.    And, so, it appears to me, from the way the report reads,

6    you answer consistently with what you just testified to about

7    the serious-difficulty question, but then you talked about risk

8    assessment in a separate paragraph.

9    A.    Right.

10   Q.    But did you see them as two, separate inquiries, or, as

11   you say, are they related?

12   A.    I think they're related.  I mean, the whole issue of

13   raising the question about serious difficulty resisting has got

14   to be under the aura of what is a risk assessment and what is

15   going to happen if this person is released.  I think it's

16   implied in these words.

17   Q.    And, yet, you made a -- when I say a dichotomous decision,

18   do you know what I mean?

19   A.    Yes.

20   Q.    And that's a yes-or-no decision?

21   A.    Yes.

22   Q.    And, so, you make a dichotomous decision as to serious

23   difficulty refraining.

24   A.    Right.

25   Q.    Which is a yes.

1    A.    Yes.

2    Q.    But then you make a continuous decision --

3    A.    Right.

4    Q.    -- as to risk.

5    A.    Correct.

6    Q.    And, so, based on your judgment in this case, the risk is

7    at a moderate level --

8    A.    Correct.

9    Q.    -- moderate to moderate high --

10   A.    Correct.

11   Q.    -- while he remains someone who will have serious

12   difficulty refraining.

13   A.    Correct.

14   Q.    Now, you stated you had treated some people who presented

15   with pedophilia during the course of your career.

16   A.    Right.

17   Q.    Now, during your deposition in this matter, you stated

18   that was about five or six individuals.

19   A.    Correct.

20   Q.    And these are individuals who would have come into your

21   practice when you were in an administrative capacity or a

22   treating physician?

23   A.    Well, it would be on an inpatient unit.  I don't recall

24   having anyone in my private practice on an out -- I might have

25   had one or two over the course of the years, but, certainly,

1     not a large number.  Most of these others were in an inpatient

2     facility under my care as attending physician while they were

3     in an inpatient facility.

4     Q.   Now, Dr. Katz, Mr. Hunt had told you he had done treatment

5     while you were doing your first evaluation of him.

6     A.   Right.

7     Q.   But you didn't have the records of his treatment, correct?

8     A.   Right.

9     Q.   So, you evaluated those afterwards, right?

10    A.   Right.

11    Q.   So, your moderate risk opinion was really not informed by

12    the records in the case, because they came afterwards, right?

13    A.   It was informed by the six months of the treatment.  If I

14    remember correctly, I think he did tell me it was six months of

15    treatment.  I just didn't have any proof of it until later,

16    when the Oneida records came.

17    Q.   So, the records came, and they were consistent with you

18    had credited him for participating in treatment?

19    A.   Correct.

20    Q.   Now, you talk about pedophilia being on a continuum for

21    Mr. Hunt, and he just hasn't come down far enough in the

22    continuum --

23    A.   Right.

24    Q.   -- for you to say that he is -- won't have difficulty

25    refraining, right?

1    A.    Correct.

2    Q.    But at the same time, you say that the risk he presents is

3    --

4    A.    Moderate.

5    Q.    -- moderate.

6    A.    Moderate to moderately high, yes.

7    Q.    To moderately high.  Now, is that --

8              THE COURT:  To moderately what?

9              THE WITNESS:  High.  Moderate to moderately high, your

10   Honor.

11   BY MR. GOLD:

12   Q.   But, now, we have been talking about a lot of research,

13   and you were in the courtroom when we were talking about it,

14   and you testified that you were a generalist, while a lot of

15   the testifying witnesses we're going to have are

16   sub-subspecialists in this area, right?

17   A.   Correct.

18   Q.   And, so, a lot of that research is not, necessarily,

19   research with which you would be familiar, right?

20   A.   I would suspect that's true, except in a general way.

21   Q.   Well, in preparing for this case -- you agreed to accept

22   this case after receiving a phone call from Syrie Fried, right?

23   A.   Right.

24   Q.   And you hadn't done one of these cases in a long time.

25   A.   Right.

1    Q.    But you remembered doing them.

2    A.    Oh, yeah.

3    Q.    Right.  And there has been a lot of water under the bridge

4    in terms of the research in this area since the time you last

5    did an evaluation of this kind, right?

6    A.    There's been a lot of water but nothing definitive.  We're

7    still pretty much back where we were, because nobody has, at

8    least in my review of the material, has been able to come up

9    with anything that even approaches a level that would be useful

10   to the evaluators and to the courts.  So, a lot of effort has

11   been put in with, in my view, modest results.  I'm not

12   denigrating their results, but they're modest results.

13   Q.    Now, that is based on your review of the literature prior

14   to doing this case, right?

15   A.    No.  Once I accepted the case, I went back and refreshed

16   my memory, and, while there is a lot of research that I'm not

17   familiar with, in a lot of the general overview articles a lot

18   of that research is referenced, even though I haven't gone back

19   to the primary sources.  I just didn't have the time to do all

20   of that.

21   Q.    And, just from your perspective, as a generalist coming in

22   to offer an opinion in this area, you wouldn't be expected to

23   become a sub-subspecialist for the purpose of one case, right?

24   A.    That's up to others.  I mean, I couldn't, in the amount of

25   time, become a sub-subspecialist in this field in the amount of

1   time, even if I devoted all my time to studying.

2   Q.   Now, you recall being deposed in this matter.

3   A.   Yes.

4   Q.   And do you recall being questioned by the government, when

5   the attorney for the government, Eve Stacey, I believe, asked

6   you, Is there a reason that you didn't list in your report a

7   bibliography or your sources?  I know you mentioned it would

8   take hours to list the records.  Is there any particular

9   research article or researcher that you relied upon?

10          And you responded:  I researched a couple of -- I

11  can't give you the chapter and verse -- a couple of articles.

12  Um, I researched a couple of articles.  I also looked at an APA

13  publication, I can't remember the name of it, psychiatric

14  treatments, I can't remember the name, but I just did a general

15  review to make sure that I wasn't missing anything important.

16  A.   Yes.

17  Q.   Is that a characterization of the review of the literature

18  that you did prior to doing this case?

19  A.   My answer there is a little bit more superficial than I

20  think is warranted.  I did more than a couple of articles, I

21  don't remember exactly how many, but I did do some research on

22  it.

23  Q.   And you looked at the Static-99, and I think it's very

24  interesting that you backed out the antisocial personality

25  traits when you scored it in your mind, and that's what -- I

1   think that's probably not an appropriate question, but you

2   testified on direct that you backed out the

3   antisocial-personality-type things.

4   A.   Right.

5   Q.   And you also testified that you didn't see an antisocial

6   personality diagnosis as appropriate.

7   A.   I think I said that it was arguable and reasonable -- I

8   could certainly understand why reasonable clinicians would

9   bring an antisocial personality disorder diagnosis to this

10   matter, but I didn't feel that he really met the criteria.

11   Q.   And when you're looking at a case like Mr. Hunt, you

12   talked a little bit about the difficulty making a decision like

13   this, right?

14   A.   You mean, these sexually dangerous decisions?

15   Q.   Yes.

16   A.   Yes, they're very difficult.

17   Q.   And why are they difficult?

18   A.   Well, as I alluded to earlier, the stakes are very high,

19   both for the individual and for society, and there is no clear,

20   bright line, and everyone seems to recognize there's no --

21   should recognize there's no clear, bright line, and we're

22   talking about probabilities and educated guesswork, and that's

23   what we're left with.  That's why people don't like doing them.

24   Q.   We were speaking during the break, and you mentioned to me

25   that Mr. Hunt was a likable person.  Do you recall that?

1    A.    Yes.

2    Q.    And that's one of the ironies of this case, right?

3    A.    Well, I just commented that he seemed like a likable

4    fellow when I interviewed him.  I'm not sure I would go as far

5    as saying it's an irony.

6    Q.    Well, he doesn't present as someone with antisocial

7    personality disorder --

8    A.    Oh, I see what you're saying.  No, I don't believe that he

9    does.  No.

10   Q.    And, in fact, the records outside of this pedophilia

11   indicate a good institutional adjustment, right?

12   A.    Yes.

13   Q.    And he's had glowing work reports and things of that

14   nature, gotten along with people.

15   A.    Yes.

16   Q.    In the risk assessment, you do mention that you would find

17   the risk of his reoffense to be moderate to moderate high,

18   depending on where he found himself, the conditions in which he

19   found himself.

20   A.    Let me just check my own words, if you don't mind.

21   (Pause).  Yes.

22   Q.    And, so, with appropriate conditions, the risk that he

23   poses in absolute terms would be less, right?

24   A.    No.  This was poorly written.  If he were released without

25   any supervision whatsoever, it would be my opinion that the

1   risk would at least be moderately high.  This moderate to

2   moderately high would be his being released under the terms of

3   a rational release plan.

4          MR. GOLD:  If I may just take one moment, your Honor.

5          THE COURT:  All right.  Let's just try to move it

6   along, though.

7          MR. GOLD:  Just one final set of questions, and we're

8   done.

9          THE COURT:  Well, make sure you need them.

10                 (Pause)

11  BY MR. GOLD:

12  Q.   For the record, I've put a document up on the screen here,

13  which is entitled "State of New York Executive Department,

14  Division of Parole, Special Conditions of Release to Parole

15  Supervision," and named in this document is Wayne Hunt.

16  A.   Yes.

17  Q.   And it's numbered Bates stamp 1873.  Is that part of the

18  statement -- part of the series of documents that you reviewed

19  in connection with preparation in this case?

20  A.   Yes.

21  Q.   And just reading out these conditions, the first is, I

22  will immediately register as a sex offender with the local law

23  enforcement agency.

24          2 is, I will remain in mental hygiene treatment at,

25  and then there is a blank, and remain in treatment until its

1    completion and will not leave without the knowledge and

2    permission of my parole officer.

3         I will enter and complete an alcohol therapy treatment

4    program.

5         The fourth is, I will abide by curfew.  I will not own

6    or operate a motor vehicle.

7         6 is, I will carry on my person at all times a log

8    truthfully detailing all of my daily events.

9         7, I will remain at my approved residence and have no

10   unauthorized visitations from others without prior approval of

11   the parole officer.

12        I will not have telephone blocks or answering

13   machines.

14        I will notify my parole officer when I establish a

15   relationship and then shall inform the other party of my prior

16   criminal history concerning sexual abuse.

17        I will submit applications for employment at three

18   sites daily.

19        Number 11, I will abstain from the use of all

20   alcoholic beverages.

21        I will not own or possess a beeper, scanner or cell

22   phone.  That's number 12.

23        Number 13, I will participate and fully cooperate with

24   any therapy or counseling, as directed by the Board of Parole

25   and/or my parole officer.

1          Number 14, I will not be in contact with any children

2     under the age of 18 unless I have prior approval from my parole

3     officer.

4          Number 15 is a provision stating he will not have

5     contact with certain individuals.

6          I will not enter or be within 300 yards of places

7     where children congregate, such as toy stores, parks, pet

8     stores, schools, and then there are other types of places,

9     playgrounds and video galleries.

10          Number 17, I will not have children's toys.

11          For the record, I'm summarizing, just reading the

12     beginnings of these.  And then there are a list of further

13     conditions, numbering 31 in total.

14          Now, assuming these are the conditions applicable to

15     Mr. Hunt, are these the type of conditions which you had in

16     mind as having a moderating or mitigating effect on Mr. Hunt's

17     risk?

18          MR. GRADY:  Objection, your Honor.  Before he answers

19     this, there are copies of this, conditions that are applicable

20     to Mr. Hunt that have been signed by Mr. Hunt contained in the

21     certified records of the New York Parole Department.  This is

22     an unsigned copy.  It may not very well represent the

23     conditions Mr. Hunt has.  There are certified copies with

24     copies signed by Mr. Hunt that are included in the government

25     exhibits which are in evidence, and I would suggest that, to

1    the extent we are talking about parole conditions, an unsigned

2    copy certainly shouldn't be deemed --

3            THE COURT:  Well, let us see your certified copy.

4    What is it?

5            MR. GRADY:  Sure, your Honor.

6            THE COURT:  Give those to Mr. Gold, and we can

7    substitute one for the other.

8            MR. GRADY:  Thank you.  Government Exhibit G, the

9    first page.  The second page after are two signed copies.

10   These are the certified records of the New York Parole

11   Commission.  Now, I'm not disputing that blank copy is also in

12   the certified records provided by New York, but we have

13   dated --

14           THE COURT:  Well, it makes more sense, if these

15   purport to be the agreement signed.  So, let's use these.

16           MR. GRADY:  These are the signed copies.  Sure.

17                         (Pause).

18           MR. WATKINS:  May I have just a moment, before we go

19   down there?

20           THE COURT:  Sure.

21              (Counsel conferring off the record)

22           MR. GRADY:  Well, if it's hypothetical, that's fine,

23   your Honor.  If these are hypothetical, the objection's

24   withdrawn.

25           MS. SERAFYN:  I don't remember the question being

1    asked in a hypothetical way.  I thought the question was asked

2    as --

3            MR. GRADY:  It is being modified, and if it's modified

4    to be a hypothetical question, the government withdraws the

5    objection.

6            THE COURT:  So, why don't we just wait, breathlessly,

7    for the question.

8            MR. GOLD:  Well, the question before Dr. Katz was were

9    these types of conditions the types of conditions which would

10   -- that Dr. Katz had in mind as the conditions which would

11   moderate or mitigate the risk that Mr. Hunt poses.

12           THE COURT:  Well, that is not what you asked him.  You

13   came close to that, but I think at the end he said something

14   about that he would be a moderate risk or something.

15           THE WITNESS:  What I believe, your Honor, and

16   Mr. Gold, and everyone else, that, yes, these are the kind of

17   conditions that would be -- if Mr. Hunt is going to be

18   released, it should be under terms and conditions similar to

19   this, would be my recommendation.  That, repeating myself,

20   would put him back -- would be in the moderate risk form for

21   reoffending rather than something below that.  But, yes, these

22   would be the kind of conditions that I would recommend.

23           MR. GOLD:  Nothing further.  If I might just address

24   the Court about this issue, and we'll revisit it later --

25           THE COURT:  About what issue?

1          MR. GOLD:  The issue of the signed conditions versus

2     the unsigned.

3          THE COURT:  I think we have gone beyond it.

4          MR. GOLD:  Fine.  I have no further questions for this

5     witness.

6          THE COURT:  Okay.  Does anybody else have any other

7     questions?

8          MS. SERAFYN:  Nothing further, your Honor.

9          THE COURT:  All right.  You're excused.  Thank you,

10    Doctor.

11         THE WITNESS:  Thank you, your Honor.

12              (Witness stepped down)

13         THE COURT:  Next witness.

14         MR. GRADY:  Thank you, your Honor.  The government

15    would call Sergeant James Donaghy.

16              <u>SGT. JAMES DONAGHY, SWORN</u>

17                 <u>DIRECT EXAMINATION</u>

18    BY MR. GRADY:

19    Q.   Can you, please, state your name and spell your last name,

20    for the record?

21    A.   James F. Donaghy, D-O-N-A-G-H-Y.

22    Q.   Okay.  Can you tell me your present employment?

23    A.   I'm currently retired from service for the New York State

24    Department of Corrections.

25    Q.   Okay.  Prior to your retirement, what was your employment?

1    A.   New York State Department of Corrections as a sergeant

2    for -- I had 26 years with the department, 6 years as an

3    officer and 20 years as a sergeant.

4    Q.   And just coming right to a head, in 1998, where were you

5    assigned?

6    A.   Woodbourne Correctional Facility.

7    Q.   And are you familiar with the defendant in this case,

8    Wayne Hunt?

9    A.   Yes, I am.

10   Q.   Can you describe for me -- or strike that.  I'm going to

11   show you --

12             MR. GRADY:  May I approach, your Honor?

13             THE COURT:  Yes.

14             MR. GRADY:  Thank you.

15   BY MR. GRADY:

16   Q.   I'm going to show you what's been marked for

17   identification as government Exhibit E, and in the binders in

18   front of you, you have Bates stamped copies here of the

19   originals.  Can you tell me what those documents are?  I'm

20   sorry.  It's in evidence as Exhibit E.  I apologize.

21   A.   All right.  The first document seems to be certifications

22   from Oneida Correctional Facility on the validity of these

23   other documents behind it.  The second page is a --

24   Q.   And then, generally, after that what are the documents?

25   A.   All right.  Generally, after that the next three or four

1    pages were the record from the Tier 3 disciplinary hearing

2    involving a search that I conducted, and after that is my

3    misbehavior report on the search that I conducted involving

4    Inmate Hunt in an area that he was working in, and then after

5    that are pictures as well as a form that's completed by an

6    assistant that's provided to an inmate when he's doing -- when

7    he's involved in a Tier 3 disciplinary hearing, since the

8    inmate is locked up at the time and he can't do his own

9    research.

10            And then after that are pictures that I had found

11   during a search of an area that Inmate Hunt was using as a work

12   area, and after that are scanned, like, of a CD case, scans of

13   a CD case that I had found or that had been found in his cell

14   and also a hand-drawn cartoon and then, again, finally, another

15   picture of Woodbourne Correctional Facility.

16   Q.    Thank you for describing the documents.  Just very

17   generally, can you just tell me the circumstances that led to

18   the Level 3 disciplinary proceedings that's depicted in those

19   documents?

20   A.    Okay.  What it was was, I was a sergeant at the time, and

21   I was asked to search an area of the facility, which happened

22   to be the school area that day, and the reason I was asked is

23   because I'm computer literate, and there are computers down in

24   that area.  There was a computer lab down in that area, where

25   the inmates were learning how to use computers.  And, so, in my

1    search of the computers, I found the machine that Inmate Hunt

2    used, and on that machine I found scanned pictures.

3    Q.   Let's just see if we can clarify, for the record.  Looking

4    at Exhibit E, the copy with the Bates stamp numbers, the

5    pictures found in the computer run from what Bates stamp page

6    to what Bates stamp page?

7    A.   Okay.  Should I be looking at this?

8    Q.   At the folder, the Exhibit E with the Bates stamp numbers.

9    A.   What are you asking?

10   Q.   The pictures that you located on the computer that you've

11   described, they run from what Bates stamp page to what Bates

12   stamp page, or, really to make it easier, do they run from 985

13   to 995?

14   A.   Yes.  That's seems to be -- there is one I can't -- 992 I

15   can't see, but, yes, that seems those are the scans.

16   Q.   Okay.  And then pages 996 and 997 is a copy of a CD found

17   in Mr. Hunt's cell?

18   A.   Correct.

19   Q.   And then, subsequently, at 998 and 999 are two cartoons

20   found in his cell as well?

21   A.   In his cell as well, yes.

22   Q.   Okay.  Can you describe for me the nature and purpose of

23   your search, what were you doing, why was it being done?

24   A.   Okay.  In the facility, you search common areas, and, so,

25   this is one area, especially being computers, that we searched

1    on an infrequent basis, meaning, we didn't let people know we

2    were coming to do it.  So, we would search just to see if we

3    could find some type of contraband, because that's how we

4    minimize the amount of contraband in the facility.

5            And, so, by me searching the computers, because I knew

6    what to look for and how to do that without damaging the

7    machine or corrupting any files, that's why I was picked for

8    this.  But it was a routine search.

9    Q.   Okay.  And Mr. Hunt became the individual accused of

10   possessing these pictures.  Why is that?

11   A.   Because I found these pictures on a file on a machine that

12   he used and that was -- he was a tutor in that area, so this

13   machine was more often used by him than anyone else that I was

14   aware of, and it was also found in a file that was a hidden

15   file; it was a file that was not readily visible on the

16   machine.

17   Q.   Can you explain what you mean by "hidden file" and how you

18   go about finding it?

19   A.   All right.  The attributes of the file were changed so

20   that, when you looked at the file structure on the hard drive,

21   you couldn't see it.  You had to know how to change the

22   attributes of the hard drive to make the file visible.  And

23   then you can also find out what's the whole hard drive and

24   what's contained.

25           And the way I found that was, the hard drive has a

1    size.  When you look at the size and the amount of files that

2    are on the hard drive, if that size doesn't match up to unused

3    space plus used space, then you know something's there that you

4    haven't seen yet.  So, then I knew to look to see if there were

5    any hidden files.

6    Q.   What, if any, hidden files did you find?

7    A.   I found a hidden file named -- it had a -- you can name

8    files, and I found a hidden file named "Wayne," and when I

9    opened it, I found the scanned pictures or -- yeah -- the scans

10   of the pictures in the file.

11   Q.   And if you could go through those photos and the

12   originals, what, if anything, do those photos depict?

13            THE COURT:  Well, we have done that.

14            MR. GRADY:  All right.  We've done that.  We'll skip

15   that question.  I withdraw it.

16            THE COURT:  The photos themselves are rather neutral;

17   I mean, there is nothing sexy about them, is there?

18            THE WITNESS:  No.  They're neutral photos, but the --

19            THE COURT:  It is the fact that they were hidden.

20            THE WITNESS:  It's the fact that they were hidden and

21   the fact that they were on a facility computer, not a

22   personal -- they weren't a personal item.  They were --

23            THE COURT:  And that is the offense that --

24            THE WITNESS:  Yes, that's one of the offenses in this

25   case.

1          THE COURT:  Well, those were the offenses.  I mean,

2     there was nothing else -- there was nothing else offensive

3     about the photographs themselves.

4          THE WITNESS:  Oh, you're talking about the

5     photographs.  They're not offensive.  It's just where their

6     location was that was the problem.

7          THE COURT:  Okay.

8          MR. GRADY:  Thank you, your Honor.  I have nothing

9     further.

10         THE COURT:  All right.  Thank you.

11         Anything?

12         MR. GOLD:  Just -- no.  No questions.

13         THE COURT:  Okay.  You are excused, sir.

14         THE WITNESS:  Thank you.

15                    (Witness stepped down)

16         THE COURT:  Next.

17         MR. GRADY:  Your Honor, the government's next witness

18    is not available till the first thing tomorrow morning.  It's

19    an expert flying in this afternoon.

20         THE COURT:  Okay.  I would rather have us ahead of the

21    game than behind.

22                    (Pause)

23         THE COURT:  Okay.  10:00, Zita tells us.  So, we will

24    see you then.  All right?

25         MR. GRADY:  Thank you.

1    (Whereupon, the proceedings adjourned for the day at 4:00 p.m.)

2

3

4                    C E R T I F I C A T E

5

6         I, Brenda K. Hancock, RMR, CRR and Official Reporter

7    of the United States District Court, do hereby certify that the

8    foregoing transcript, from Page 1 to Page 144, constitutes, to

9    the best of my skill and ability, a true and accurate

10   transcription of my stenotype notes taken in the matter of

11   *United States of America v. Wayne Hunt*, No. 07-cv-12063-JLT.

12

13

14

15                     /s/ *Brenda K. Hancock*

16                   Brenda K. Hancock, RMR, CRR

17                   Official Court Reporter

18

19

20

21

22

23

24

25