```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3    UNITED STATES OF AMERICA,        )
                                       )
 4                        Petitioner,  )
                                       )
 5    vs.                              )  CIVIL ACTION
                                       )  NO. 07-12063-JLT
 6                                     )
      WAYNE HUNT,                      )
 7                        Respondent.  )
                                       )
 8
                    BEFORE THE HONORABLE JOSEPH L. TAURO
 9                    UNITED STATES DISTRICT JUDGE
                        DAY FOUR OF NONJURY TRIAL
10

11    A P P E A R A N C E S

12            OFFICE OF THE UNITED STATES ATTORNEY
              1 Courthouse Way, Suite 9200
13            Boston, Massachusetts 02210
              For the United States
14            By:  Mark J. Grady, AUSA
                   Jennifer A. Serafyn, AUSA
15
              FEDERAL DEFENDER OFFICE
16            408 Atlantic Avenue
              Boston, Massachusetts 02110
17            For the Respondent
              By:  Ian Gold, Esq.
18                 Timothy G. Watkins, Esq.

19
                                        Courtroom No. 22
20                                      John J. Moakley Courthouse
                                        1 Courthouse Way
21                                      Boston, Massachusetts 02210
                                        April 30, 2009
22                                      11:50 a.m.

23                    Brenda K. Hancock, RMR, CRR
                         Official Court Reporter
24                         One Courthouse Way
                           Boston, MA 02210
25                          (617)439-3214
```

<u>I N D E X</u>

| Testimony of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| DR. JOSEPH J. PLAUD | | | | |
| By Mr. Gold | 3 | | 109 | |
| By Mr. Grady | | 56 | | |

<u>E   X   H   I   B   I   T   S</u>

(None marked this day)

```
1                   P  R  O  C  E  E  D  I  N  G  S:

2              THE CLERK:  All rise for the Honorable Court.

3              THE COURT:  Good morning, everyone.  So, the

4    government has rested.  We now have a witness proffered by the

5    defense, is that it?  Yes?

6              MR. GOLD:  Yes, Judge.

7      (Defendant entered the courtroom)

8              THE COURT:  Okay.  Any time you are ready.

9              MR. GOLD:  The respondent would call Dr. Joseph Plaud

10   to the stand.

11             THE COURT:  Spell it.

12             MR. GOLD:  P-L-A-U-D.

13                     DR. JOSEPH J. PLAUD, SWORN

14                        DIRECT EXAMINATION

15   BY MR. GOLD:

16   Q.    Good morning, Dr. Plaud.

17   A.    Good morning.

18   Q.    Could you please spell your name, for the record.

19   A.    Yes.  My name is Joseph J. Plaud, P-L-A-U-D.

20   Q.    Dr. Plaud, what is your profession?

21   A.    I'm a licensed psychologist.

22   Q.    And do you have any particular specialties in psychology?

23   A.    I do.  The area of my clinical focus and training from

24   graduate school onward has been in working with sex offenders,

25   evaluating and treating them.
```

1   Q.   Now, Dr. Plaud, I have in a binder open before you what's

2   been marked as Exhibit 10 in this case.  Do you recognize that

3   document?

4   A.   I do.

5   Q.   And what is it?

6   A.   It's a copy of my curriculum vitae.

7   Q.   And if you could turn that -- turn back to the previous

8   tab, number 9, in that same booklet.

9   A.   Yes.

10  Q.   And what is that document, which has been previously

11  entered as Exhibit No. 9?

12  A.   It is a copy of my psychological and psychosexual

13  evaluation report of Mr. Hunt.

14  Q.   Now, Dr. Plaud, I have up on the display here a copy of

15  your resume.  Is that the same document -- an image of the same

16  document that's been entered into evidence in this case?

17  A.   Yes.

18  Q.   Dr. Plaud, could you please describe your educational

19  background, starting with undergraduate?

20  A.   Yes.  I received my Bachelor's Degree in Psychology from

21  Clark University in Worcester, Massachusetts and a Ph.D. in

22  Clinical Psychology from the University of Maine.  I completed

23  my clinical internship at the University of Mississippi Medical

24  Center.

25  Q.   And during your time as a student, did you have a

1   particular research area in which you were mostly concentrated?

2   A.   Yes.

3   Q.   And what was that?

4   A.   Beginning in my first year of graduate school, I began

5   working with sex offenders, evaluating them, providing

6   treatment services to them, and that began in 1987 and has

7   continued to the present time.

8   Q.   Now, could you please describe your postgraduate career as

9   a psychologist?  Are you a licensed psychologist?

10  A.   Yes.

11  Q.   And when did you become licensed?

12  A.   Well, I was first licensed in 1994 in the State of North

13  Dakota, because I went to North Dakota post-matriculation to

14  serve as an Assistant Professor of Psychology at the

15  university.  I was there for about four and a half years.

16       I moved back to Massachusetts at the end of 1997.

17  Shortly after returning to Massachusetts, I was licensed as a

18  psychologist here in the Commonwealth.  Subsequently, I've also

19  been licensed as a psychologist in the State of New York.

20  Q.   Now, Dr. Plaud, could you please describe what you did

21  after completing your education, getting your Ph.D. at the

22  University of Maine?

23  A.   Yes.  I went into academia, as I said earlier, Assistant

24  Professor of Psychology at the University of North Dakota.  I

25  was on faculty there for about four and a half years.  While on

1  faculty, we had a doctoral training program in clinical

2  psychology at the university, and, so, I switched sides, I was

3  on the other side of the desk, and I had students, graduate

4  students, who I was training.

5          The focus of my work while a faculty member, a member

6  of the clinical faculty, was working with graduate students in

7  this particular area, meaning, working with sex offenders,

8  evaluating them, treating them, conducting research studies

9  relating to various topics on sex offending.  I opened up my

10  own clinic at the university that was dedicated to this issue,

11  coordinated with local human service centers in North Dakota

12  and Minnesota.

13          I was also approached by the State of North Dakota in

14  about 1995 to develop their statewide treatment program for sex

15  offenders who also had a history of developmental disabilities,

16  called the STOP Program or the Specialized Treatment of

17  Offenders Program, which was put into place in the state at the

18  Developmental Center and remains to this day as the program.  I

19  continued that work through 1997.

20          After the great Grand Forks flood of 1997, it made me

21  decide to come back to Massachusetts.  I became licensed here.

22  I started teaching courses, affiliating with universities in

23  this area, and I started my own private practice, again,

24  picking up where I had left off working with sex offenders.

25          Not long after that, the Commonwealth of Massachusetts

1    adopted its own sexual offender civil commitment statute, and I

2    began consulting in that area, and I've been doing that very

3    frequently for the better part of the last nine years.

4    Q.    Now, Dr. Plaud, this experience designing the STOP

5    Program, did that bring you into personal contact with

6    patients?

7    A.    Yes.

8    Q.    And what was the nature of your contact with that patient

9    population?

10   A.    Specific to the STOP Program?

11   Q.    Or during your postgraduate career in North Dakota.

12   A.    Well, I mean, I provided direct services.  When I was in

13   North Dakota, I was doing a lot more supervision, because I was

14   a faculty member.  I had students who were providing most of

15   the treatment services.  I was overseeing it, supervising it,

16   designing different types of programs, providing feedback to

17   the students and, occasionally, directly seeing the patients

18   myself in the context of providing mentorship models for the

19   students.

20   Q.    And, subsequently, at the STOP Program?

21   A.    Yes.

22   Q.    Now, Dr. Plaud, as part of your work, have you conducted

23   research in the area of psychology?

24   A.    Yes.

25   Q.    Now, turning your attention to page 5 of your CV, there is

1    a section entitled "Research Grant Activities."  Could you

2    please describe to the Court what that section of your CV is

3    describing?

4    A.    Yes.  Well, that's referring to, while I was on the

5    faculty at the University of North Dakota, I did apply for and

6    receive several grants, mostly through the National Science

7    Foundation, to support my research in the area of human

8    sexuality.

9    Q.    And this listing here are the lists of applications for

10   money for different research projects that you've applied for

11   and received?

12   A.    Yes.

13   Q.    Now, I've turned to a section on page 8 of your curriculum

14   vitae entitled "Publications."  Is this a list of your --

15   complete list of your publications in the field of psychology?

16   A.    Pretty complete, yes.

17   Q.    When you say "pretty complete," what do you mean?

18   A.    Well, there have been publications since the listing, the

19   last listing there on page 8.

20   Q.    Do you recall what those publications are?

21   A.    Well, I have several right now in press, but, most

22   notably, that one that's noted in press was published in the

23   *Handbook of Functional Analysis and Clinical Psychology*.  I've

24   also recently had published a paper in the *Archives of Sexual*

25   *Behavior* that has to do with the construct and the diagnosis of

1   hebephilia as a sexual disorder.

2   Q.    Now, Dr. Plaud, could you please describe for the Court

3   the nature and extent of your research and writing activity?

4   A.    Sure.  I was very busy at it some years ago, when I was

5   more focused on academia, and hope -- I've been actually

6   focusing more on it in the last six months.  So, I'm writing

7   more, collecting more data, analyzing much data that I have

8   collected in the past.

9        But I was, primarily, a clinical researcher while I

10  was at the University of North Dakota, working with students

11  and publishing a number of articles in several areas of

12  psychology, but most of it had to do with, essentially,

13  understanding human sexual arousal, what is it, how to measure

14  it, the relationship of human sexual arousal to human sexual

15  behavior, the conditioning of human sexual arousal, the short-

16  and long-term habituation of sexual arousal, different types of

17  assessment paradigms and protocols that are used in dealing

18  with sex offenders, different treatment modalities used with

19  sexual offenders.

20       So, I was publishing in a variety of different areas

21  relating to sexual offender assessment and treatment as well as

22  more generally in the assessment and evaluation of the human

23  sexual response.

24  Q.    And does that treatment or that, rather, research

25  experience inform your work today as a consultant on civil

1    commitment cases?

2    A.    It does.

3    Q.    And does your treatment experience also inform your work

4    today as a consultant on civil commitment cases?

5    A.    Correct.

6    Q.    Now, are you a member of any professional organizations in

7    the field of psychology?

8    A.    Yes.

9    Q.    What are those?

10   A.    I'm a member of a number of professional organizations in

11   psychology, I think it's on my vitae, but, most notably, the

12   American Psychological Association, of which I am a fellow.

13   I've also been associated with the Association for Treatment of

14   Sexual Abusers on and off, the Association for Behavior

15   Analysis, the Association for the Advancement of Cognitive

16   Behavioral Therapies.

17   Q.    So, you mentioned the Association for the Treatment of

18   Sexual Abusers or ATSA.

19   A.    Yes.

20   Q.    You are not currently a member of that organization?

21   A.    No.

22   Q.    And why is that?

23   A.    Well, I first joined ATSA many years ago.  I, actually,

24   was still in graduate school, I believe, as a student member,

25   and I would say I'd characterize it over about a 20-year period

1    as, at periods of times, having significant disagreements with

2    the advocacy that ATSA underscored and promoted through its

3    various activities.  I thought it should be more of a clinical

4    and research organization.  I took issues with several of their

5    practice standards.

6         You know, when I first joined it, they didn't have any

7    standards, but as they developed them, at one point I quit, I

8    stopped being a member for several years, rejoined again.  I

9    found just so many problems with these practice standards that

10   I could not remain a member.

11   Q.   Now, there was also a particular incident, wasn't there?

12   A.   Yes.  Well, this happens, actually, subsequently, but, you

13   know, I disagree very strongly with several of the

14   underpinnings of these practice standards, because I believe

15   they were geared towards a particular agenda that was not in

16   keeping with science.  One of them had to do with, essentially,

17   the practice standards that disallowed or -- I guess that's the

18   best word for it -- disallowed performing evaluations on those

19   who were not yet adjudicated, in other words, accused but not

20   yet adjudicated.  So, I thought that was wrong.  I was on

21   record for years opposing that.  Not that you could tell guilt

22   or innocence, but that you should be able to provide

23   information, psychological behavioral data, surrounding that

24   person.

25        And it came to a head with me when I was featured on

1    one of these late night shows with Diane Sawyer.  I call it

2    "The Diane Sawyer Affair," because it involved a man who had

3    been accused of perpetrating sexual violence, served prison

4    time for it, I believe four, four and a half years, and then

5    was released -- his conviction was overturned by the Virginia

6    Supreme Court, and it was followed by *ABC News* over a number of

7    years, and they contacted me about performing a comprehensive

8    battery of tests on him, physiological tests, psychological

9    tests, behavioral tests, which I did, and presented my findings

10   on that show.

11            Two people in the hierarchy of ATSA thought that was

12   inconsistent with their practice standards about performing

13   these types of evaluations, so they sought to cite me for a

14   violation of that practice standard about, specifically, I

15   think relating to the use of the penile plethysmograph, which

16   neither of them had any experience, but of which I had spent my

17   life working on.  So, that was the final nail in that coffin

18   for ATSA.

19   Q.   Now, what is the penile plethysmograph?

20   A.   The penile plethysmograph is a physiological measurement

21   device of male sexual arousal.

22   Q.   And is that something that is part of your area of

23   expertise?

24   A.   Yes.  I learned how to, first, administer it my first year

25   of graduate school.  It's been a component of every treatment

1    and assessment methodology generally that I have used over the

2    years, and I have used it extensively as a research tool in

3    publishing multiple peer-reviewed articles on the parameters of

4    male sexual arousal, some of which have actually won awards.

5    Q.   Now, Dr. Plaud, you said you've been a consultant or doing

6    civil commitment cases in Massachusetts, and is Massachusetts

7    the only place where you do that?

8    A.   No.

9    Q.   And where else have you done them?

10   A.   I've performed evaluations or testified in courts relating

11   specifically to civil commitment in the States of New

12   Hampshire, Massachusetts, New York, North Dakota, the State of

13   Washington, and I'm working on several cases in the State of

14   Iowa.  Oh, and Missouri.  Don't forget Missouri.

15   Q.   Have you ever failed to be qualified as an expert in a

16   case in which you've participated and testified?

17   A.   No.

18   Q.   Now, Dr. Plaud, how did you come to be involved in this

19   case?

20   A.   You contacted me and asked me if I was available to

21   perform an evaluation of Mr. Hunt relating to his pending

22   commitment as a sexually dangerous person.

23   Q.   And did you perform an evaluation in this case?

24   A.   Yes, I did.

25   Q.   And can you describe for the Court what that evaluation

1    consisted of?

2    A.   Yes.   I received documents, a large cache of records,

3    relating to Mr. Hunt's background, his history, his

4    psychosocial history, his criminal history, sexual offense

5    history, his institutional history, treatment history.   I

6    reviewed that material subsequent to organizing the data based

7    on my record review.   I traveled to the Federal Medical Center

8    in Devens to perform a clinical interview of Mr. Hunt.   I took

9    that information, along with my record review and my knowledge

10    in this area, my knowledge of the research that is specific to

11    the issues of this case with Mr. Hunt, and I made some

12    professional conclusions based on the totality of the

13    information available to me.

14    Q.   Well, now, are you familiar with the 18 United States Code

15    Sections 4247 and 4248?

16    A.   Yes.

17    Q.   And did you familiarize yourself with them in the context

18    of this case, or had you seen those sections before?

19    A.   I had seen them before.

20    Q.   And in what context was that?

21    A.   I was asked previously to perform an evaluation and make

22    determinations on sexual dangerousness in another federal case.

23    Q.   And in that case did you opine that the respondent met the

24    criteria under the statute?

25    A.   Well, ultimately I did, yes.

1   Q.   Now, have you arrived at an opinion in this case?

2   A.   Yes.

3   Q.   And what is that opinion?

4   A.   It's my professional opinion that Mr. Hunt today is not

5   sexually dangerous.  He's not a sexually dangerous person.

6   Q.   Now, are you familiar with the elements in the statutory

7   sections that we've mentioned?

8   A.   Yes, I am.

9   Q.   And is it your opinion that Mr. Hunt has committed acts

10   which are qualifying acts under the statute?

11   A.   He has.

12   Q.   Did you arrive at an opinion as to whether Mr. Hunt has a

13   qualifying mental disorder?

14   A.   Yes.

15   Q.   What is that opinion?

16   A.   It is my opinion that certainly Mr. Hunt could be

17   diagnosed with pedophilia, which is a sexual disorder, as

18   listed under the *Diagnostic and Statistical Manual of Mental*

19   *Disorders*.

20   Q.   Now, you drafted a report in this case.

21   A.   Yes.

22   Q.   Now, in your report, you write that the diagnosis is by

23   history.

24   A.   Correct.

25   Q.   Could you explain what you mean by that?

1   A.   Yes.  My conclusion, certainly, is that the diagnosis

2   could be made, and I would, certainly, be prepared to make it,

3   but the database upon which it rests is Mr. Hunt's history, as

4   contained most notably in the records that I reviewed.

5   Q.   And why is that important to point out in making that --

6   A.   Well, I don't have a current assessment of his sexual

7   preferences, his sexual interest pattern, which may or may not

8   be consistent with what has happened with him historically.

9   While pedophilia, as a disorder, a sexual disorder, is

10  oftentimes thought as a chronic condition, as it's mentioned in

11  the *DSM*, the *Diagnostic and Statistical Manual*, it's rarely

12  that straightforward, and I typically like to use some older

13  terms of clinical art to talk about different types of

14  pedophiles in my work.

15        But, insofar as the diagnosis is concerned, his

16  behavior over a period of time prior to his incarceration for

17  here, the governing offense, certainly is consistent with that

18  diagnosis, but I don't have any data in the last three to five

19  years, for example, that shows me that it's ongoing behavior,

20  that it's fixed in the sense that it's immutable to change.

21  I'm not assuming that it is, but I'm just noting, to be

22  specific, that the basis for that diagnosis would be by his

23  past behavior.

24  Q.   Well, now, Dr. Plaud, you mentioned terms of art in the

25  field.  Could you explain what you meant by that?

```
 1    A.    Yes.  Well, we use terms in psychology, as you might

 2    imagine, many terms, and some of them interface on the ways

 3    that we agree to diagnose mental conditions.  In sexual

 4    disorders there are many paraphilias, pedophilia being --

 5    Q.    Dr. Plaud, would you --

 6    A.    Paraphilias.

 7    Q.    Would you explain what paraphilia means?

 8    A.    A paraphilia is, essentially, a grouping of sexual

 9    disorders that refer to sexual behavior that generally is

10    considered to be beyond the bounds of normal human experiences

11    for which the person has over a period of time intense

12    thoughts, fantasies, urges or behaviors, and which, I said,

13    generally lie beyond the bounds of normal human experiences,

14    pedophilia being a prominent type of paraphilia, because it

15    refers to sexual attraction, interest, urges and behavior with

16    prepubescent children.

17          So, there are those terms, and they have associated

18    diagnostic classifications that go along with them, but a

19    person can meet the diagnostic criteria either by record or by

20    evidence of more current behavior, but it only gives us limited

21    information about that person.  For example, it doesn't tell us

22    a diagnosis of pedophilia, or any paraphilia does not speak one

23    syllable about a person's present-day volitional control over

24    that condition.  Furthermore, neither does any other type of

25    disorder, even nonsexual disorders.
```

1          I, myself, am not generally pleased to be in a

2    position of height.  I could easily be described as an

3    acrophobic, but, yet, I board airplanes all the time.  So,

4    while the condition might be diagnosable as a specific or

5    simple phobia, a fear of heights, for example, associated

6    physiological symptoms that go along with them, such as

7    vertigo, I am able to control that and go on airplanes all the

8    time.  So, it doesn't speak to the issue -- I'm using myself as

9    an example -- it doesn't speak to the issue, ultimately, of

10   whether a person has the capacity at present to engage in that

11   behavior or not; in other words, do they have volitional

12   control over that condition.

13   Q.   Is the authority for what you're talking about now the *DSM*

14   itself?

15   A.   Yes.

16   Q.   And what does the *DSM*, which is the *Diagnostic and*

17   *Statistical Manual of Mental Disorders*, say about this issue?

18   A.   Well, it speaks very specifically about that, saying that

19   a diagnosis in and of itself does not carry any implied

20   conclusion concerning a person's present level of volitional

21   control or impairment in that area.

22   Q.   Well, but, Dr. Plaud, we've heard a fair amount of

23   testimony in this case that pedophilia, in particular, is like

24   a sexual orientation but directed toward prepubescent children.

25   Do you agree with that?

1   A.   I do agree with it, to the extent that it captures some

2   pedophiles, yes.  For some pedophiles -- that's why I was

3   referring to older terms.  When I was training, we typically

4   talked -- when we talked about pedophiles, we used to use

5   different types of labels, which I think captures more of that.

6   In this case, the orientation issue, for example, fixated

7   pedophiles versus regressed pedophiles, is a prominent type of

8   differentiation, where fixated pedophiles were a subtype of men

9   who were, have been for a long time and probably would be for

10  the rest of their lives, the focus of their sexual experience,

11  interest, arousal, is towards prepubescent children.

12         So, to that extent, to the extent that a person could

13  be reliably described as a fixated pedophile in that manner of

14  speaking, I would ascribe validity to the notion that that

15  could be described as an orientation, yes.  For others, no.

16  Even though they may meet the diagnostic criteria of a

17  pedophilia, it does not, necessarily, mean that that is their

18  orientation, the way we understand sexual orientation, because

19  men abuse prepubescent children sexually for many reasons,

20  fixated sexual interest being only one of them.

21  Q.   Well, Dr. Plaud, you diagnosed -- or your diagnosis -- you

22  make diagnoses pursuant to this *DSM-IV*, right?

23  A.   Right.

24  Q.   And you mention in your report that pedophilia in this

25  case, if you were to diagnose it, would be nonexclusive.  Could

1   you explain what you mean by that?

2   A.    Yes.   That's just a simple way in the *DSM* to specify

3   whether or not the individual in question has had any evidence

4   of more normative sexual experiences in their past.   For

5   example, especially, again, for those fixated pedophiles, we

6   will oftentimes, not always, but oftentimes find that that, to

7   the extent that they have had any sexual behavior at all, it's

8   been illegal sexual behavior with prepubescents; any sexual

9   interests at all, as I've described, it's targeted specifically

10   towards prepubescents.

11          For many pedophiles, they have shown an ability to

12   have relations with adults or postpubescent adolescents.   So,

13   to the extent that there is any evidence that a person has

14   shown the ability to have sexual relations with postpubescents,

15   it's a nonexclusive type of diagnosis.

16   Q.   And is that an important piece of information in this

17   case?

18   A.    It can be.   I mean, it's a descriptive piece of

19   information, given Mr. Hunt's background, relationships, his

20   fathering of a child, but it could speak to the issue of is

21   that person fixated, is that the only way that they've been

22   able to experience their sexual function, their sexual arousal,

23   their sexual interest, historically, and to the extent that you

24   find no other data that would support any other type of sexual

25   interests, it might fall more in line with that fixated notion

1   and that orientation issue.

2   Q.   Now, Dr. Plaud, we've been discussing this concept of

3   libido and pedophilia as a sexual orientation.  Could you speak

4   to that?

5   A.   Well, I mean, libido is a term that is used in many

6   contexts from, you know, basic physiological types of

7   discussions to psychoanalytic issues.  Libido -- if you're

8   talking about an underlying drive, an underlying, physiological

9   drive, pedophilia would refer to a condition under which an

10  individual, for whatever reason, and figuring out reasons is

11  another issue, experiences primary sexual arousal towards

12  people who have not yet attained secondary sexual

13  characteristics.

14       What I mean by that is prepubescents.  There's

15  something about the fact that that individual that is the

16  sexual target has not yet attained secondary sexual

17  characteristics that is sexually exciting to that person and

18  leads to their engaging in sexual behavior, ultimately, with

19  prepubescents.

20       Now, libido, and it's a broad term, can refer to that

21  underlying sexual drive, arousal, and we measure that

22  physiologically.  There are certain things that go on in the

23  human male body that are associated with that libido, and

24  that's what we measure, for example.  We talked about the PPG

25  earlier.  That's what it measures.

1    Q.    Is there some relationship between a diagnosis and the

2    level of sexual drive, a necessary relationship there?

3    A.    Boy, I wish there was, but, no.  The answer is no, there

4    isn't.  There is no demonstration.  As a matter of fact, it can

5    be made just on behavior, it can be made just on thoughts.  It

6    doesn't even have to have behavior.  It's not, generally, made

7    by measuring any specific type of physical arousal, although

8    that can be consistent with it.  You would expect it, if you

9    did measure it, but you don't see the diagnostic criteria, the

10   requirement, for example, of PPG administration.  So, no, it's

11   not there.

12   Q.    But you agree that the diagnosis -- well, is the diagnosis

13   applicable to Mr. Hunt today?

14   A.    Yes.  Oh, I would diagnose him with pedophilia.  His

15   record certainly supports that.  If I was asked more

16   specifically, Well, what about today, well, you know, many, if

17   not most, pedophiles would have that label throughout their

18   lives, there's no doubt about that.  I can't, ultimately,

19   answer whether Mr. Hunt would validly have that diagnosis

20   today.  I would need to have more information than I have.

21   Q.    Did you consider any other diagnoses in this case?

22   A.    Well, I looked for the presence of other paraphilias,

23   which I really don't see any evidence of.  I look more

24   generally towards any other types of disorders, especially

25   disorders that have at least some relationship, however

1  tangential, with sexual reoffending.  I did look, for example,

2  for the presence of antisocial personality disorder, and I was

3  not prepared to make that diagnosis.

4  Q.   And what was your basis for declining to make that

5  diagnosis?

6  A.   Well, you know, there's a number of reasons.  First, when

7  a diagnosis of antisocial personality disorder is made, there

8  usually is not, necessarily, a formal diagnosis but there's

9  evidence of a conduct disorder with onset before age 15 years

10  old.

11       Now, I spent some time in this case with Mr. Hunt,

12  because, you know, there are records indicating that after the

13  death of his father he absconded and there was some mental

14  health issues and institutionalization for a period of time,

15  but you can't -- you have to put everything in context, and

16  given even the -- never mind what Mr. Hunt told me, but even

17  the records themselves indicated that prior to that, prior to

18  the father's death, I wouldn't have a basis for diagnosing a

19  conduct disorder.  Subsequent to his father's death, there is

20  indication, even in the records, and it's supported by Mr.

21  Hunt's own words in the interview, that his mother was a rather

22  abusive individual.

23       Now, when you have evidence of that, then behavioral

24  sequelae, things that happen behaviorally, acting out, running

25  away, these are not atypical, so you can't take it out of that

1    context.  When we're talking about conduct disorder, generally

2    we're talking about when you control for the socioeconomic

3    status, when you control for, you know, issues of how the

4    parents are raising their children, how the person is

5    functioning in society, they stand out from that, and they have

6    an inability to comport their behavior to even basic social

7    norms and rules, and I don't really see that with Mr. Hunt,

8    when you subjected the analysis to his own background at that

9    time.

10           I also note that, you know, when you look at his own

11   nonsexual criminal history, when you look at his institutional

12   history, when you look even, for example, over the past 5 to 10

13   years disciplinary-report-wise, you really don't see any real

14   evidence of any duration that would be suggestive of the

15   conclusion that Mr. Hunt is unable to comport his behavior to

16   social norms, that he acts recklessly or impulsively.  So, it

17   just isn't there.

18   Q.   Now, the next element of the statute is a determination as

19   to whether Mr. Hunt will have serious difficulty refraining

20   from child molestation in the event that he is in the

21   community.

22   A.   Yes.

23   Q.   Did you arrive at an opinion as to that element?

24   A.   I did.

25   Q.   And what is that opinion?

1    A.    Noting his history, noting the number of victims, the

2    types of victims and where he was and how he became an offender

3    and sustained his pattern of offending over a number of years,

4    understanding that, his lifestyle, contrasted with where we

5    find ourselves today, which is the critical issue, there are

6    two factors that lead me to say that I -- with no degree of any

7    precision to say if Mr. Hunt were released from a secure

8    facility today that he would be likely, very probable, highly

9    risky, whatever term you want to use, to reoffend in a sexual

10   manner.  That positive conclusion, that affirmative conclusion

11   about risk in the future is only affected so much by what we

12   know in the past, it reaches an asymptote.  But beyond that,

13   there are two issues that I believe today are in evidence that

14   make an affirmative-risk prediction just about impossible to

15   make for Mr. Hunt, the most primary issue being his current

16   age.

17   Q.    Now, in your view, Dr. Plaud, to answer this question that

18   the statute asks, for you it's necessary to do a risk

19   assessment?

20   A.    Yes.

21   Q.    Why?

22   A.    Well, to answer any question that's particular to judging

23   risk -- you know, look.  There are several things that I do in

24   risk assessment.  We've talked a bit about the diagnostic angle

25   of it.  There are certain diagnostic mental-condition issues

1    that I address in risk assessments, but beyond that,

2    conditions, even sexual conditions, sexual disorders, do not,

3    necessarily, bring with them the conclusion that a person will

4    act in a sexually aggressive, violent, illegal way in the

5    future.

6          So, what I have to pay attention to in my risk

7    assessment are data, research that has to do with what do we

8    know about the factors in that research that predict

9    individuals who have been adjudicated as sexual offenders,

10   served criminal sentences, are released, what factors can we

11   point to to say, well, if this is in evidence and that is in

12   evidence and this is in evidence, and we add them all together,

13   that pushes us over a threshold where there is a significant or

14   some type of likelihood that the individual will engage in that

15   behavior in the future.

16         So, the elements of risk analysis are trying to

17   understand what those factors are, taking them from the

18   research angle and applying them to the individual cases, and

19   when you do that in this case, I see there's lots of bumps in

20   the road with applying more traditional risk factors, and you

21   have to come up with something that is going to trump what is

22   the 800-pound gorilla in the room here, and that is, for men of

23   Mr. Hunt's age, he's 63 years old right now, men of his age,

24   even men who have committed multiple sexual offensive acts with

25   multiple victims over many years who are over age 60, so few of

1    them reoffend in the data as to make an affirmative risk

2    prediction the most purest guess in the universe.  That's the

3    bottom line.

4            I didn't make that data up.  If the data were

5    different, my conclusions might be different, but that's the

6    data.  The data are that there has to be something that is so

7    acute, something so powerful, so strong, that it would override

8    what I know about men over age 60 who are released from

9    confinement and the rates at which they reoffend.  No matter

10   how you want to slice it, dice it, measure it, it doesn't

11   matter.  Men who are in Mr. Hunt's age range, the vast, vast

12   majority of them do not reoffend.

13           So, if I'm going to make an affirmative prediction

14   that he will, I have to base that on something, and I don't

15   have anything to base that on.  So, I'm forced to conclude that

16   I can't say he will be likely to reoffend.

17   Q.   In your report, Dr. Plaud, you noticed -- you note that

18   there are four present-day issues which bear on the question

19   that we're talking about now --

20   A.   Yes.

21   Q.   -- whether he'll have serious difficulty refraining from

22   child molestation.

23   A.   Yes.

24   Q.   I have put up on the screen a copy or an image of your

25   report at page 9, where those four different issues are listed.

1   Could you describe the first, please?

2   A.   Yes.   Again, this is about today and tomorrow.   Yesterday

3   figures into the equation but only so far, because, while past

4   behavior is a predictor of future behavior, contrary to popular

5   wisdom, it is not the best predictor of future behavior, it is

6   a predictor of future behavior, and the research that has gone

7   into understanding past behavior, sexually offensive behavior,

8   and its ability to predict future sexual behavior, as I

9   suggested earlier, reaches an asymptote such that --

10   Q.   Could you define that word, Dr. Plaud?

11   A.   Yes.   Asymptote is just a limit, a line; it only goes so

12   far.   Our knowledge of an individual's past sexual offensive

13   behavior only has so much power in our ability to predict

14   future sexual behavior.   If it accounted for a lot of the

15   variants, this would be a lot easier to do; you would just

16   count things up over time, add them in, and your output would

17   be something very strong.   But it's not that way in this case.

18          So, I have to look at things that are closer in time,

19   because this is about today and tomorrow, where yesterday only

20   has so much explanatory power.   So, when I look over the last

21   decade or so with Mr. Hunt as he's a man in his mid-50s, going

22   over age 60 into his young 60s, I see evidence in the record,

23   without, basically, any issues that would tend to support a

24   different conclusion that he has been able, as I put here, in

25   his own behavior while incarcerated during this period of time,

1    that he's able to conform his behavior to appropriate

2    standards, that he has an awareness of himself in regard to his

3    institutional status.  There's no issues that he shows any

4    acute problems behaviorally with impulse control.  So, there is

5    evidence in his more proximal records that he's able to control

6    his impulses.

7    Q.   Could you please describe the second item that you have

8    there as one of the present-day issues that appear on the

9    question?

10   A.   Yes.  Yes.  The best available data I have, again, in the

11   last several years, is that Mr. Hunt, understanding he's been

12   institutionalized, but that he does have the ability to monitor

13   and control his sexual impulses.  I don't see any episodes of

14   sexual acting out, any sexually inappropriate behavior, any

15   disciplinary reports in a decade.  And he has participated, at

16   least somewhat, in treatment during this period of time, to the

17   extent that I don't really think treatment one way or the other

18   is a big factor in this case.  So, it is what it is, but I do

19   see no evidence in the past decade of any sexual impulse

20   control issues with Mr. Hunt.

21   Q.   Well, is that something that you might expect to see,

22   sexual misbehavior in a prison?

23   A.   Well, if a person is acutely symptomatic, meaning, that

24   they have a very strong evidence or an inability to control

25   their sexual impulses, yeah, I would tend to think there would

1    be evidence somewhere, disciplinary-report-wise, and I

2    certainly review this type of data with enough frequency in the

3    cases I work with, that there are ample opportunities for

4    individuals, even institutionalized individuals, to engage in

5    sexually inappropriate behavior that is documented, because

6    they are under observation at all times.

7    Q.   Now, you've listed as the third present-day issue which

8    bears on the question that all illegal and sexually offensive

9    behavior must be -- or all behavior, even illegal and sexually

10   offensive behavior, must be analyzed in the context of the

11   person's social and sexual functioning at the time the abuse

12   occurred, and you note, As a younger man, Mr. Hunt was involved

13   in a lifestyle that has a low probability of being duplicated

14   now that he is a man in his 60s.

15   A.   Right.

16   Q.   Could you expand on that?  What do you mean by that?

17   A.   You mean, I didn't say it perfectly right there in the

18   paragraph?

19        Yes.  Again, all behavior, even offensive illegal

20   behavior, has to be looked at in context.  I'm not here to make

21   a judgment as to whether Mr. Hunt should be re-punished for

22   behavior that occurred in the past; he served his sentences for

23   that behavior.  What I'm here to do is make some observations

24   and conclusions about the present day, the future.

25        All behavior is a function of the context in which it

1     occurs, its environmental antecedents that's influenced by a

2     person's -- obviously, there are biological issues and

3     diagnostic issues, but Mr. Hunt, I think it's clear, when he

4     was a younger man, was involved in a lifestyle that allowed him

5     maximal opportunity to be a sexual abuser.  He lived a

6     transient lifestyle, he lived a lifestyle where he was always

7     or frequently around children, in carnivals, most notably.

8     This type of daily lifestyle that he was engaged in over a

9     period of time really loaded the dice, so to speak, in terms of

10    him being a sexual abuser.

11          I do not see the probability that he will return to

12    that lifestyle being very strong right now.  First of all, he's

13    63 years old, he does have medical conditions, he's got even a

14    term that he owes the State of New York, I believe, still under

15    parole for a period of several years, which means he'll be even

16    later in his 60s if, in fact, New York doesn't petition against

17    him, now that they have a state law for civil commitment.

18          But I see the chances of him returning to this

19    carnival lifestyle as being so remote as, you know, as not to

20    be appropriate to put into the equation to try to figure out,

21    well, what are the risk factors, what are the precipitants, and

22    is he going to go return to that lifestyle in which he was an

23    active sexual abuser.  I just don't see that happening, given

24    those factors, so I think it's worth noting it.

25    Q.   And the fourth factor is the factor which we mentioned

1   first, which is age.

2   A.   Yes.

3   Q.   And we began to talk about how you go about answering or

4   doing a risk assessment.  Could you, please, describe how you,

5   as a professional, do a risk assessment in a case such as this?

6   A.   Well, doing a risk assessment particular to this area is

7   not an easy thing to do.  I mean, I'm making observations and

8   statements and conclusions about given what I know, about the

9   person, particularly, and given what I know about the research

10  more generally whether or not the final conclusion is that

11  person X is in a risk category that I might expect comports

12  itself with certain types of definitions of either conditions

13  or statutory language about sexual dangerousness.

14       I have to make conclusions about how risky individuals

15  are, given what I know.  The prediction of anything that

16  happens in the future is difficult, and it's not only related

17  to sexual behavior.  Long before civil commitment of sex

18  offenders became sort of a more pressing social issue across

19  the United States, psychologists, psychiatrists, statisticians

20  were involved in predicting more general violent behavior, and

21  we found out we're not very good at it.  I mean, if I was

22  really good at predicting future behavior, I wouldn't be here

23  on a beautiful Thursday afternoon, I'd be at the lottery

24  office; that's where I'd quickly achieve my goal and be on my

25  way.

1        So, there needs to be certain things in evidence, I

2   think, if people are going to make affirmative predictions

3   about risk, and it's a very dicey game to play, and that's why,

4   generally, when I do personally believe people are risky, I

5   don't tend to appear in court, because it's my opinion, and I

6   could be wrong because I'm talking about now affirmative

7   predictions, meaning someone is dangerous.  I could be wrong.

8        So, I look at the techniques that individuals,

9   professionals, have used to try to make these types of

10  predictions, the tools that they rely on to make these

11  predictions, and, certainly, within the last 10 to 12 years

12  statistical or actuarial techniques have been trumpeted as

13  being a way to predict risk of future reoffending that is

14  greater than chance and that outperforms clinical

15  methodologies, clinicians making decisions based upon their own

16  training and experience.

17       And, so, I've paid attention to this research, I have

18  used the research in trying to aid my own predictions, and I

19  have used, for example, actuarial tools, but when you have a

20  man who's 63 years old, there is no available actuarial

21  methodology that is valid to use.  If there's no valid

22  actuarial methodology to use, you can't use it, you shouldn't

23  use it, and, therefore, I do not use it in these cases.

24       So, as I stated earlier in my testimony, if you have a

25  man who's 63 years old with a noted record of sexual offenses

1       going back decades who now is in a certain age cohort, is there

2       anything, any information that I have that would tend to

3       override what I understand statistically about the base rates

4       of men over age 60 reoffending?  That's the key issue in this

5       case:  Is there anything you can point to, measure, define that

6       says, okay, this is what most of our, you know, the vast

7       majority of the research says about men 60 plus and their

8       reoffense rates, the base rates of their reoffending after age

9       60?

10              Put that there.  Here's other information that I have.

11      Is there anything in that other pile or piles that would trump

12      that basic statistical conclusion about reoffending in men age

13      60 and above?  And I submit to you, in this particular case,

14      the answer to that is no, there is not.

15              So, if there is not that information, and I know what

16      the base rates are, based on research of men age 60 and above,

17      how can I possibly conclude that Mr. Hunt is sexually

18      dangerous?  How can I conclude that it would be likely that he

19      would reoffend in the future in his 60s, if not confined to a

20      secure facility?  I may not like him, I may not feel good about

21      him, I don't know, but that's my own, personal opinion.  I

22      cannot scientifically, statistically, point to anything that

23      would support beyond any doubt, never mind a reasonable doubt,

24      that he would not be -- he would reoffend if not confined to a

25      secure facility at this point in time, and that is the basis

1   for my decision and why I'm here today.

2   Q.   Well, but, Dr. Plaud, we've heard a great deal of

3   testimony in this case that Mr. Hunt, when scored on these

4   actuarial instruments, is judged to be a very high risk of

5   reoffense, and you, yourself, score an actuarial in the context

6   of this case which says the same thing.  How do you jibe that

7   with the fact that the base rates that you're talking about are

8   undifferentiated groups of offenders?

9   A.   To answer your question, let's start, first, with the

10  first part of your question.  Let's say -- this is 2009.  Let's

11  say this is 2019, and, Mr. Hunt, I hope you live a long life,

12  but let's just say you don't make it to 2019, and I was

13  around -- maybe I won't make it to 2019 -- and I computed an

14  actuarial, a Static-99 or a RRASOR, which is R-R-A-S-O-R, on

15  Mr. Hunt.  He would score the same score that others have

16  scored him in this context.  Now, how risky is he as a dead man

17  to reoffend?  He's not going to reoffend; he's going to be

18  dead.

19       So, the scores on tests or tools don't tell you what

20  is the application of it, and if you're scoring him on tools

21  that have been validated with groups of sex offenders that are

22  in the order of 30 years younger than Mr. Hunt presently is, it

23  doesn't matter one bit what those scores are.  Those scores are

24  scores.  It's the meaning, it's the validity of the scores,

25  it's the implication of those scores that's significant for the

1    purposes of this proceeding, not the score itself, and, in my

2    judgment, these scores are meaningless today.  Now, if this was

3    1974, we may have a different discussion about that, but it's

4    not 1974, it's 2009, and Mr. Hunt is 63 years of age.

5         And for the second part of your question, yes, I put

6    the RRASOR, the Rapid Risk Assessment for Sexual Offense

7    Recidivism, in the body of my report.  He scores pretty high on

8    it, 5 out of 6 points, and, probably, I don't know, 10 or 11

9    points on the Static-99.  But that is meaningless information,

10   because, as I do in my report, I take that score, I take the

11   sensitivity and the specificity of that instrument at the score

12   that he achieved, but what I do is, I take that base rate

13   assumption that goes into the validation of the RRASOR which I

14   used, which, essentially, was a 5-year, 13.2 percent, and I

15   substitute base rates more applicable to Mr. Hunt's current age

16   range.  And what happens?  Well, the score stays the same,

17   nobody's changing scores, but the implication in terms of

18   recidivism numbers are vastly different than what you get from

19   the tables of the RRASOR and which you'll get in the tables on

20   the Static-99, if you do the same thing there.

21        That's the important issue, and when you do it as I

22   did and apply a very simple formula of conditional probability

23   called Bayes' Theorem to this issue with Mr. Hunt as a

24   63-year-old, what you get is a risk prediction.  It's not zero,

25   but it's certainly not in an area that I would call high or

1    even moderately high or in keeping with an urgent need to keep

2    him incarcerated for a day to life.  So, that's the implication

3    which is important.

4    Q.    Dr. Plaud, do you use actuarial methods in this work?

5    A.    I do use actuarial tools.  I, basically, I do it -- I only

6    use the RRASOR.

7    Q.    And why is that?

8    A.    Well, I had misgivings about the Static-99 dating back to

9    2005.  I was unhappy with certain issues with the Static-99,

10   and then I was also aware of research that came out, for

11   example, that addressed the issue of whether using multiple

12   actuarial tools was an appropriate methodology.

13   Q.    Dr. Plaud, we've heard a great deal about the RRASOR and

14   the Static-99, but could you, just briefly, describe what the

15   RRASOR is?

16   A.    Yes.  The RRASOR is one of the earliest actuarial and

17   statistical risk tools for use in this area.  It came out a few

18   years before the Static-99.  It measures at four areas of seven

19   validation samples, and it measures four areas:  Prior offenses

20   to the governing offense, the age at the time of release -- and

21   age is treated very dichotomously.  It's very simple.  If

22   you're over age 25, you don't score a point.  So, it's not

23   really a way to control or adjust for age.  Whether or not the

24   person has any male victims, whether or not the person has any

25   unrelated victims.

1          Those four items were combined, essentially, several

2     years later with another tool, a Structured Anchor and Clinical

3     Judgment Scale, to form what later became the Static-99.  It

4     was a ten-item test.  I'm sorry.  I shouldn't even refer to it

5     as a test.  It's not a test.  A tool, a ten-item instrument

6     that takes those four items in the RRASOR, and there are six

7     other items, many of which have to do with nonsexual criminal

8     history of a person, and the Static-99 was advanced to be the

9     tool of art to use in this area ever since.

10         So, as I started doing these types of evaluations, not

11    in a civil commitment perspective but in dealing with, for

12    example, departments of probation and parole about risk, I used

13    to use different tools prior to any of these actuarials, but

14    then the actuarials started coming on the scene.  So, I started

15    looking at them and utilizing them, and I reached a point where

16    in civil commitment contexts I was utilizing both the RRASOR

17    and the Static-99 together.

18         And, you know, there was discussion at some point

19    about multiple pathways to sexual reoffending, targeting the

20    sexual deviance and the antisocial lifestyle orientation and

21    that the RRASOR might have been a better tool to focus on the

22    sexual deviance, whereas, the Static-99, incorporating these

23    nonsexual items, was better for that more than the antisocial

24    lifestyle orientation, and this was a way to assess both areas,

25    especially if the scores were discrepant, if they went in the

1  same direction or if they went in opposite directions.

2          So, I looked at both, used both a number of times, and

3  then I abandoned the use of the Static-99 back in 2005.

4  Q.   Why was that?

5  A.   Well, for a number of reasons.  I had some misgivings

6  about it, particularly, but probably more prescient at the time

7  was the fact that the research showed that using multiple

8  actuarial tools did not produce a better prediction as a

9  baseline, and the RRASOR accounted for a little more

10 variability on sexual offense recidivism.

11 Q.   Well, you're talking about the results from a particular

12 study?

13 A.   I am.

14 Q.   And what was that study?

15 A.   The study entitled *Is more better*, and it was conducted by

16 Michael Seto, S-E-T-O.

17 Q.   And what did that study show?

18 A.   Well, the bottom line is that utilization of multiple

19 actuarial tools in tandem was not a better approach, it did not

20 produce better results, it did not produce a better predictive

21 model for future reoffending.

22 Q.   Better than what?

23 A.   Than just utilizing the RRASOR alone as an actuarial tool.

24 Q.   And, so, since that time, you've been using the RRASOR in

25 these types of investigation -- assessments?

1    A.    Yes.   And when I say I use the RRASOR, you have to

2    understand how I use the RRASOR as an actuarial tool.  I do not

3    make statements ultimately about risk based on any actuarial

4    tool.  It's a place in certain cases, this not being one, to

5    start the analysis, to give you just some baseline measure of

6    risk derived from the samples used, in this case, from the

7    RRASOR.  It's a place just to start the analysis.

8           I believe it is fundamentally illogical to base

9    high-risk estimates on any statement, conclusion from any

10   actuarial tool.  It's logically invalid to do that.  It does

11   not take into consideration dynamic factors that are

12   present-day factors, and it certainly doesn't take into

13   consideration what generally in this entire field or area is

14   called the broken-leg problem, and I alluded to that a little

15   earlier, when I prematurely killed off Mr. Hunt, saying that,

16   you know, there are certain factors that are not measured by

17   that tool that, if in evidence, makes whatever prediction or

18   whatever statement it makes about risk nonsensical.  If a

19   person is dead, it doesn't matter what they score.  If a person

20   has a seizure or is in a coma, they may score 11 on the

21   Static-99, but if they're not able to get out of bed, they're

22   not going to be very risky.

23          So, it's really very problematic to utilize any tool,

24   any actuarial tool, to opine high risk.  I think that the only

25   way to use actuarial tools appropriately as a baseline risk and

1    only as a rule-out instrument, in other words, to say, well,

2    this person doesn't line up on risk factors based on this tool,

3    to kind of weed out at the beginning the lower risk groups.

4            THE COURT:  Essentially, you rely on your clinical

5    judgment, is that the bottom line?

6            THE WITNESS:  I can't agree totally with that, because

7    clinical judgment is problematic too; but, yes, I do rely on my

8    clinical judgment, Judge.

9            THE COURT:  I am not suggesting there is anything

10   wrong with that.  I am just saying it seems to be where you are

11   coming from.

12           THE WITNESS:  Well, I guess I can say it best this

13   way.  To predict positively, affirmatively that someone will

14   reoffend in the future is a process so imbued with error that

15   it's almost impossible to do in any circumstance, and there's

16   one major reason for that:  base rates.  That's the 800-pound

17   gorilla in this room.  Base rates matter.

18           If most offenders, many or most offenders over

19   whatever period of time you want to talk about, let's just say

20   5 years, because we're talking about civil commit, people with

21   no control, I think a 5-year window can capture a lot of that.

22   If 90 percent of sex offenders, Judge, in that period of time

23   were released from confinement, knowing nothing else about them

24   other than they are adjudicated sexual offenders, reoffended in

25   some way, then I would have no problem coming to court every

1   time you need me.  If you bet the base rates and said yes,

2   they're going to reoffend, you're going to be right 90 percent

3   of the time; well, not 100 percent, but 90 percent is pretty

4   good.

5          The problem is the base rates are in the other

6   direction; generally, most offenders do not reoffend, and even

7   those who do reoffend, most of those, again, will not reoffend.

8   So, there's no real reliable way to pick out who the

9   reoffenders are, and when you get a man who's age 63 years old,

10  like Mr. Hunt, there's nothing there to show, other than if Mr.

11  Hunt says, I will reoffend.  Well, you might use that source of

12  information.  I would.  But short of something, some smoking

13  gun like that, there is no earthly, scientific way to predict

14  in the affirmative that someone is going to reoffend at this

15  time, even with his background, even with the number of victims

16  he has.  That's the bottom line, that's the research, and I can

17  have my own thoughts, my own prejudices, whatever you call

18  them, but they can't trump the data, the research, and that's

19  why I'm here to testify in this case the way I am.

20         THE COURT:  Okay.  How much longer are you going to be

21  on direct?

22         MR. GOLD:  Probably about half an hour.

23         THE COURT:  All right.  Let's recess.  We will return

24  at 2:15.

25         THE CLERK:  All rise for the Honorable Court.

 1   (Lunch recess taken from 1:00 p.m. to 2:15 p.m.)

 2         THE CLERK:  All rise for the Honorable Court.

 3         THE COURT:  Sit down, everybody, please.  Good

 4   afternoon.  All set to go?

 5         MR. GRADY:  Your Honor, just, I noticed that the

 6   defendant's second expert is present in the courtroom.  I ask

 7   that they be sequestered.

 8         THE COURT:  Yes.  We have a sequestration order, so if

 9   you would not mind going outside.  Would you identify your

10   expert and ask him to leave?

11         MR. GOLD:  It's Dr. Barbaree, your Honor.

12         THE COURT:  Explain to him what the sequestration

13   order is.  I do not want him to think I am being rude.

14         THE WITNESS:  I understand.

15             (Pause)

16         THE COURT:  Okay.  Are you ready to go?

17         MR. GOLD:  May I inquire?

18         THE COURT:  Go ahead.

19   CONTINUING EXAMINATION BY MR. GOLD:

20   Q.   Good afternoon, Dr. Plaud.

21   A.   Good afternoon.

22   Q.   When we broke for lunch, Dr. Plaud, the Court asked you

23   whether you were using your clinical judgment in this type of

24   assessment.

25   A.   Yes.

1    Q.    How do you use your clinical judgment?

2    A.    Well, in every case, no matter what the referral issue is,

3    I use clinical judgment.  So, that's one of those terms.  I

4    mean, I am a clinician, I was trained as a clinician.  I used

5    my clinical judgment in this particular case to inform my

6    judgment about Mr. Hunt and about reasons that I, going through

7    the records, account for the genesis of his sexual offending.

8    Maybe it's persistence over time.  I used my clinical judgment

9    in reviewing his treatment participation, but I think clinical

10   judgment, however, is a term, more specific term, that's used

11   to discuss a methodology in opining risk to reoffend.  I'm not

12   using it so much in that context, because I'm not opining in

13   that direction.

14         So, it's a little different in the sense that I'm not

15   using clinical judgment to say that he is likely to reoffend.

16   What I'm saying is I'm defaulting to the data that is very

17   suggestive that he is not likely to reoffend, and there's

18   nothing clinically or otherwise that I have in front of me

19   right now that would override that base rate data concerning

20   men who are in their 60s.

21   Q.    Well, let's talk about this issue of overriding the base

22   rate information that you have, Dr. Plaud.  You scored one of

23   the actuarials in this case.

24   A.    Right.

25   Q.    And why did you do that?

1    A.    I did it for illustrative purposes to show specifically

2    what I'm talking about in the research.  I scored the RRASOR.

3    The RRASOR is an actuarial tool that I do use with some

4    frequency in other cases, and if Mr. Hunt were 20 years

5    younger, I would be using it in this case with him in a

6    different sense.  What the RRASOR does, as the Static-99, as

7    every actuarial tool in coming up with those recidivism

8    statistics, there are certain assumptions, base rate

9    assumptions, that I -- what I've done in my report is I've gone

10    directly into the guts of the actuarial, and I've said, Okay,

11    here is the RRASOR, the Rapid Risk Assessment, here's what Mr.

12    Hunt would score.  On the surface, that's a high score.  Does

13    that mean he's very likely to reoffend?  Well, if you go to the

14    original tables and the recidivism tables in the RRASOR manual,

15    you'll see, yeah, well, that's in kind of a high range.

16          Well, then what I do is I show that those numbers are

17    based on an aggregate recidivism rate 5 years of 13.2 percent.

18    So, I take that base rate number, along with two other

19    parameters having to do with the RRASOR at score level 5.  One

20    is the sensitivity of the instrument.  All that means is how

21    good is the RRASOR, generally speaking in the research, at

22    score 5 to opine recidivism based on that score, and you follow

23    up with the samples, and you find the person did reoffend.

24    That's the sensitivity, true positives.

25          And then I looked at the specificity, which is the

1    opposite, which is true negatives, how good at score 5 is the

2    RRASOR to identifying true negatives; in other words, the

3    instrument said they won't reoffend, followup research they

4    don't reoffend.  I take those two sources of information in

5    context of research-derived base rates at age 60 plus.  You

6    feed them into the equation, into Bayes' Theorem, and what you

7    get as an output is simply this, that that risk level, even at

8    score 5 -- see, the score doesn't change, but the meaning

9    changes -- is much, much lower based on the base rate data for

10   age in Mr. Hunt's age range, such that it goes down into

11   approximately 24-or-so percent, which is dramatically different

12   than the unadjusted for age using the aggregate base rate

13   across all age spectrums.

14        That's why I did that.  I wanted to show, using

15   straightforward math this isn't -- this is Bayes' Theorem.

16   This is what Bayes' Theorem is.  This is how we measure, this

17   is how the actuarials all measure, but if you are using the

18   actuarials on a group that's different from that which the

19   underlying numbers come from, you're violating the most

20   sacrosanct principle of testing, and that is validity, does the

21   test measure what it purports to measure, and in this case

22   you're saying it measures recidivism, sexual offense

23   recidivism, but the underlying assumptions are violated.

24        So, it's not valid to use actuarial tools unless you

25   adjust them themselves for the target population insofar as age

1    is concerned, and that's what I have done.  That's why I put it

2    in there, to show that, even if he's super high on the RRASOR,

3    look at what the final estimates are of recidivism.  They're in

4    a range that would be medium to low for the other age groups.

5         I'm just trying to shine a little light on this issue,

6    because I really think it's very important to do that.  It's a

7    misuse of any actuarial tool, in my judgment, to use it on

8    people who are 60 and above if you don't adjust the base rates.

9    Q.   Well, we have heard testimony in this case where the

10   actuarials are scored and the risk-mitigating effect of age is

11   noted but is not applied.  What's wrong with that?

12        MR. GRADY:  Your Honor, I'm just going to object to

13   the question.  It's mischaracterizing other testimony.

14        THE COURT:  It is hard for me to follow that question.

15   Rephrase it.  Rephrase the question.

16   BY MR. GOLD:

17   Q.   We've heard testimony in this case that scoring the

18   actuarial and noting the risk-mitigating effect of age is an

19   appropriate methodology.  Can you comment on that methodology,

20   any weaknesses or strengths you see in it?

21   A.   Oh, yeah.  If you just note that age -- if you're not

22   noting specifically how age is affecting the output, then it

23   doesn't do much as a modifier.  What I'm doing -- what I did

24   was I actually put in the numbers so you can see the output,

25   the actual percentage.  You're not going to get that by noting

1     that age mitigates risk or however you want to word it.  It's

2     very vague, it's an obtuse way of doing it.  So, no, I don't

3     think that's appropriate at all.

4     Q.   Now, we've also heard testimony in this case that

5     Mr. Hunt's pedophilia, in particular the course of conduct that

6     he engaged in, would lead us to expect that he'd be an outlier,

7     that the age statistics wouldn't apply to him.  Do you have any

8     -- is that your view?

9     A.   No, it's not my view.

10     Q.   What is your view?

11     A.   Well, if you had proposed that Mr. Hunt is an outlier,

12     then you should give a rationale for that, and if you are using

13     the number of victims that he's had over the years, well, I

14     don't know who's saying that or what experience they've had,

15     but I've worked with many sex offenders over the years, and I

16     mean, yes, Mr. Hunt's had a number of victims, but it's lower

17     than the average number of victims for any group I would

18     consider to be high risk.  I've routinely dealt with sex

19     offenders who have had hundreds of victims, hundreds of victims

20     over much longer periods of time, evidence when they were in

21     adolescence, not as adults, where it happened in Mr. Hunt.

22         So, yes, Mr. Hunt has had a number of victims over a

23     period of time.  I said I'd diagnosis him with pedophilia, but

24     in no way is he an outlier than a good percentage of the

25     pedophiles or sex offenders that I have dealt with over the

1    years in evaluations and in treatment.  No, he's not an

2    outlier.  I mean, I don't know how else to say it but that he's

3    not.

4    Q.    Now, Dr. Plaud, isn't it possible that Mr. Hunt remains or

5    poses a high risk of reoffense today?

6    A.    Yes, it's possible.  Certainly, anything is possible.  The

7    question is what's probable, what is likely, and I'm making

8    judgments along that dimension.  Any man who has committed a

9    sexual offense, even if it's an incestuous sexual offense, is

10    at some risk for the remainder of their lives to reoffend.

11    Risk only totally abates with death, but that's not what I'm

12    judging.  I'm judging not if it's possible, is it probable, is

13    it likely, is it reasonable to expect that the person will

14    reoffend given what I know, and that, based on that type of

15    analysis, the answer, in my judgment, is no, it's not

16    reasonable to assume that.

17    Q.    Dr. Plaud, you testified that the fact that Mr. Hunt has

18    done some treatment did not contribute much to your overall

19    opinion.

20    A.    Right.

21    Q.    Are you familiar with the program that Mr. Hunt

22    participated in in Upstate New York?

23    A.    I am.

24    Q.    And can you tell us a little bit about that program?

25    A.    Yes.

1          MR. GRADY:  Your Honor, I'm just going to object on

2     relevance grounds.  If it didn't contribute to the opinion,

3     then why are we going to go through the details of the

4     treatment?

5          THE COURT:  I think he makes a point, don't you?  You

6     want to get out of here so we can finish with this witness so

7     we can do the others, and, so, I would confine my questions to

8     those things that you think are really pertinent to this case.

9          MR. GOLD:  I am, actually, just moving through the

10    last couple of points.  With regard to the relevance objection,

11    I do think the doctor's testimony is it didn't contribute, but

12    it also doesn't detract.  I just want to have him contextualize

13    that and move on.

14         MR. GRADY:  Fine.  I will withdraw the objection, your

15    Honor.

16         THE COURT:  All right.

17    A.   Well, briefly, the program that he undertook at Oneida is

18    in New York, it's at several institutions in New York, and I do

19    work in New York, so I have familiarity with the program.  It's

20    generally known as the Gowanda, G-O-W-A-N-D-A, Program, because

21    it's principally done at that institution, and it is a

22    six-month intensive treatment program that deals with many of

23    the major issues of what we call cognitive behavioral

24    treatment, that is, relapse-prevention focused, so I would

25    describe it as an intensive, approximately six-month program.

1    BY MR. GOLD:

2    Q.   Now, is it a positive fact that he completed that program?

3    A.   Yes.

4    Q.   And, so, why is it that it doesn't contribute much to your

5    overall opinion here?

6    A.   Because he's at the floor of the analysis of risk.  I

7    can't give treatment credit where, if you look at it -- if he

8    was, you know, a younger, much younger man, then I might think

9    of this a little differently, but we're at the floor of the

10   analysis right now.  Where is treatment going to go to bring it

11   lower risk?  He's there.  He's at zero almost now,

12   statistically.

13        So, I'm just being realistic and honest about this.

14   Treatment is not going to add as a protective factor to that

15   notion of lowering risk, because what we know about people like

16   Mr. Hunt, based on age 63, is that he is at very low risk to

17   reoffend, period.

18   Q.   Now, you testified that you no longer use the Static-99

19   and that you abandoned its use some time ago.

20   A.   2005.

21   Q.   Now, are you familiar with what's happening in the field

22   with respect to the Static-99 today?

23   A.   I am.

24   Q.   And have you considered, given the developments in the

25   field, reincorporating the Static-99 into your work?

A.    Quite to the contrary.  I'm like Nostradamus for having

abandoned it in 2005.  The reasons, the problems that I had

with it back then are starting to bear more fruit as we collect

more data now.

Q.    And what were those problems then?

A.    Well, I had trouble, originally, with the variability with

some of the sampling in the Static-99 as well as the

unreliability of its scoring, given some of the items on the

Static-99.

        I abandoned its use in 2005.  In 2008, in October, new

norms were published for the Static-99 by the original research

group led by Karl Hanson and David Thornton, with the addition

of a researcher named Leslie Helmus, H-E-L-M-U-S, and they

followed -- they have a new set, and it's still not determined

exactly how many data sets they have, but they published some

preliminary data that suggests precipitous declines in the

rates of recidivism generally in all age ranges, but, more

importantly, that the original norms of the Static-99 that are

still used are over-predicting recidivism.

        In my judgment, you know, I don't think you should

scrap it, you should still do research, but it should be

labeled a purely experimental instrument at this point.  Who

knows what the norms are?  The researchers who developed the

tool don't know what the norms are.  We still don't have final

answers.  So, it's completely experimental at this point, and

1    this is the issue.

2    Q.   Well, and what about the RRASOR, then, in that context?

3    A.   Well, the RRASOR, actually, over the years has generally

4    had much more stability of findings.  I'm not saying it itself

5    isn't but the followup data on the RRASOR has been more solid,

6    in my judgment, than any other actuarial tool over time.  I'm

7    not saying it's a perfect tool, it's certainly not, and it

8    itself could be affected by some of the same issues.

9    Unfortunately, this research isn't going on too much more with

10   the RRASOR, because the people who developed the RRASOR also

11   developed the Static-99, and once they developed the Static-99,

12   they threw the RRASOR overboard, which was unfortunate, because

13   research data coming out 5, 10 -- excuse me -- 5, 6, 7 years

14   later showed the RRASOR outperforming the Static-99.

15         So, that's what I'm telling you.  I mean, here we are

16   in court, it's a different context, but this is an area in the

17   science and the use of actuarials that is in flux right now,

18   and it's very difficult to say if someone scores high on

19   actuarials -- even before the Hanson and Helmus data started

20   coming out in October of last year, it's so difficult to say,

21   well, based on this, this person is high risk.  See, again,

22   there is a difference between opining high risk and using the

23   instrument as a screen-out device.  That's a very important

24   distinction, unfortunately, that's not made.

25   Q.   And, Dr. Plaud, there is this incident in 1998, where

1    pictures are recovered from the computer connected to Mr. Hunt.

2    A.   Yes.

3    Q.   Is that part of the data that you reviewed in arriving at

4    your opinion?

5    A.   Yes.

6    Q.   Well, how does that contribute to your opinion?

7    A.   Well, assuming that, you know, and I understand --

8         THE COURT:  I thought that his opinion was that there

9    was no antisocial behavior here.

10        Isn't that your opinion, or did I mishear you?

11        THE WITNESS:  No, Judge.  You heard correctly.

12        MR. GOLD:  But this is the issue that goes to -- these

13   are the pictures that were recovered.

14        THE COURT:  I know, but that was offered on the theory

15   of antisocial behavior.

16        MR. GOLD:  Oh, I believe the government's offering

17   that as evidence of continued sex drive and deviance.

18        THE COURT:  That was not my understanding.

19        MR. GOLD:  Well, I'll withdraw that.

20        MR. GRADY:  I think the government will attempt to

21   clarify that, your Honor.

22        THE COURT:  All right.  Well, I am pressing that, so I

23   think that he is trying to tell me that he is going to go

24   contrary to what I think the testimony was.  So, why don't you

25   go ahead with your cross-examination.

1          MR. GOLD:  All right.

2     BY MR. GOLD:

3     Q.   Could you tell me how this contributed to your opinion,

4     Dr. Plaud?

5     A.   Well, yes.  I mean, a little over 10 years ago there was

6     contraband on a computer that depicted -- you know, they were,

7     to just look at them, fairly neutral stimuli, but, certainly,

8     for a person with a diagnosis of pedophilia could be consistent

9     with a finding that a person continues to have interest in --

10    although there was such a mixed group, it looked like there

11    were some postpubescents in there and as well as some

12    prepubescents.

13         So, it's very difficult to make any conclusion one way

14    or the other based upon that.  I, certainly, in my practice am

15    consistently seeing stimuli much worse, I'll put it to you that

16    way, and it happened a decade ago.  So, my judgment is more

17    influenced by more recent behavior than it is behavior going

18    back into what we can describe as decades.

19    Q.   And just one final question, Dr. Plaud.  Could you,

20    simply, explain to the Court this concept of screen out or rule

21    out, the use of the actuarials as a rule-out and not a rule-in?

22    A.   Yes.  It's very simple, and all I mean is, using actuarial

23    tools for those who score in the lower ranges of the tool, to

24    say that this person is not evidencing these features that are

25    consistent with higher risk known groups of recidivists.  So,

1    based on some actuarial baseline data say, Well, if they don't

2    match that, then it's more unlikely they're going to be high

3    risk.  So, you screen them out based on the actuarial.  To take

4    a high actuarial score and then say based on that say they are

5    high risk is not, I think, an appropriate application of any of

6    these actuarial tools because of the broken-leg problem that I

7    described before.  It does not consider dynamic factors that

8    are -- could be and probably are more predictive of current and

9    future risk than these static factors that measure historical

10   variables.

11   Q.    In this case you ruled out with the actuarial?

12   A.    To the extent that you want to use the actuarial in a

13   meaningful way in the risk.  That's why I use them, when

14   they're appropriate to use, for that possibility, but if

15   someone scores high on one or more actuarial tools, I'm not

16   concluding based on that data alone that they're high risk.

17   I've written something about it called *Affirming the*

18   *Consequent*.  It's really a poor -- it's an illogical way of

19   dealing with that tool.

20              MR. GOLD:  No further questions.

21              THE COURT:  Okay.  Cross?

22              MR. GRADY:  Thank you, your Honor.

23                        CROSS-EXAMINATION

24   BY MR. GRADY:

25   Q.    Dr. Plaud.

1   A.   Yes.

2   Q.   Good afternoon.

3   A.   Good afternoon.

4   Q.   It's a little bit more comfortable for you than last time

5   you were in court, correct?

6   A.   I would say so.

7   Q.   Last time, the government called you as a witness.

8   A.   Correct.

9   Q.   In this particular case, however, you were appointed at

10   the request of Mr. Hunt.

11   A.   Yes.

12   Q.   Correct?

13   A.   Correct.

14   Q.   Are you the first expert that was appointed at the request

15   of Mr. Hunt?

16   A.   Well, if I've got the chronology right, I think I was --

17   at the request of Mr. Hunt?

18   Q.   Yes.

19   A.   I'm not sure who appointed what.

20   Q.   Sure.  Let me see if I can help with you this.  Initially

21   in this case, there was a little bit of dispute between the

22   parties about who should be appointed.

23   A.   Okay.

24   Q.   And you can see here counsel for the United States, if we

25   look right here, submitted three potential examiners.  Defense

1   counsel and counsel -- excuse me -- counsel for respondent Hunt

2   submitted an additional three, correct?

3   A.   Yes.  That's what it looks like.

4   Q.   Defense counsel and counsel for the United States are not

5   in agreement as to the list, right?

6   A.   Right.

7   Q.   Okay.  And then there are three individuals listed there.

8   You're not on that list.

9   A.   No.

10  Q.   And Dr. Katz is.

11  A.   He is.

12  Q.   Okay.  And this is the respondent -- Counsel for the

13  respondent Hunt submits the following professionals for the

14  Court's consideration, correct?

15  A.   Yes.

16  Q.   So, Dr. Katz would be the first suggested by the

17  respondent, right?

18  A.   Right.

19  Q.   And Dr. Katz concluded that Mr. Hunt was sexually

20  dangerous under the Adam Walsh Act, correct?

21  A.   Yes.

22  Q.   There is, in fact, yet another filing by Mr. Hunt.

23  Respondent Wayne Hunt, pursuant to 18 U.S.C. 4247(b) hereby

24  designates Luis Rosell as his choice as mental health examiner

25  for purposes of 18 U.S.C. 4248, correct?

1    A.    Yes.

2    Q.    So, you would acknowledge that's the second expert

3    appointed at the request of Mr. Hunt in this case, correct?

4    A.    Correct.

5    Q.    And Dr. Rosell opined how?

6    A.    In the affirmative, that he was dangerous.

7    Q.    Dr. Rosell concluded that Mr. Hunt met the standards of

8    the Adam Walsh Act, correct?

9    A.    Yes.

10   Q.    So, you are the third expert appointed at the request of

11   Mr. Hunt, correct?

12   A.    Third time is a charm.   Yes.

13   Q.    Do you feel slighted that you weren't the first choice?

14   A.    No, I wasn't, because I think I expressed to you directly

15   in the last case that I wasn't amenable to being appointed by

16   the Court as an expert, because if my opinion is a person is

17   dangerous, I do not elect to testify.   That is my opinion.   I

18   only testify when my opinion is that the person is not

19   dangerous.   I find plenty of people to be dangerous, but in

20   those cases I do not testify.

21   Q.    That was not an option in the Shields case, because you

22   were appointed by the Court, correct?

23   A.    Well, that was not my understanding going in, but when I

24   found that out and I had made my opinion that he was dangerous,

25   I ended up testifying for the government, that is correct, and

1    I did.

2    Q.   I'm going to just try to go through some things we can

3    agree on and get through this very quickly.  Can you just take

4    a quick look at Exhibit O in the third binder in front of you?

5    It will be three of three.

6    A.   Yes.

7    Q.   Do you recognize that?

8    A.   The chronology.

9    Q.   Okay.  We had a chance to review this at your deposition,

10   correct?

11   A.   We did.

12   Q.   And you agree that this is an accurate summary of the

13   sexual offense history of Mr. Hunt upon which your opinion is

14   based, correct?

15   A.   I did.

16   Q.   Moving right along, we can certainly agree Mr. Hunt's

17   history depicts an individual who is sexually attracted to

18   prepubescent children, correct?

19   A.   Yes.

20   Q.   And, in fact, the overwhelming majority of Mr. Hunt's

21   nearly -- in fact, the overwhelming majority of Mr. Hunt's over

22   30 victims are prepubescents age 12 or under, correct?

23   A.   That's correct.

24   Q.   You've previously testified in connection with the

25   Static-99.  I just want to see if you would continue to agree.

1    The recidivism numbers portrayed by the Static-99 are

2    underrepresentations of the actual recidivism risks for sex

3    offenders, because the Static-99 and other actuarials, in

4    general, they're based on reported incidents, correct?

5    A.    Yes.

6    Q.    You've previously testified to that effect?

7    A.    Yes.

8    Q.    And do you continue to believe that actuarials can only

9    capture some of the sex offender recidivism out there?

10   A.    I do, as a general statement, agree with that.  However,

11   again, aging enters into that equation such that even

12   Dr. Hanson has been in his publication stating that for older

13   people it may be an over-representative.  So, it's not as easy,

14   but, as a general statement, yes, I will agree with what you

15   just said.

16   Q.    When we are talking about the issue of the actuarials

17   capturing the entire universe of recidivism --

18   A.    Yes.

19   Q.    -- the actuarials underestimate the risks of recidivism,

20   because, by definition, unreported and undetected crimes can't

21   be part of that, correct?

22   A.    True.

23   Q.    And you've previously testified, am I correct, that

24   supervision in the community cannot be a significant factor of

25   adjustment because there is no good data on that point,

1   correct?

2   A.   There is some data now, more than the last time I

3   testified, but I wouldn't say it's overwhelming data.   But

4   Hanson, et al. did have a community supervision project that

5   they published on, which did lend support to the conclusion

6   that successful supervision post-release, if it was at least, I

7   believe, over a 3-year period, could have the recidivism scores

8   of the original Static-99.

9   Q.   Successful completion of supervision, which would mean not

10  reoffending during supervision?

11  A.   Meaning, successful participation, complying with the

12  terms of probation, yes.

13  Q.   One of the terms of probation would be not to reoffend,

14  correct?

15  A.   I would assume that would be the case.

16  Q.   Well, if you successfully comply with probation, then

17  haven't you cut the recidivism rate to zero?

18  A.   Oh, for that period of time, but this is talking about

19  future recidivism always.

20  Q.   Well, but we don't have evidence of any successful

21  completion of probation on behalf of Mr. Hunt at any time,

22  correct?

23  A.   Correct.

24  Q.   Now, we had an opportunity to discuss at your deposition

25  Mr. Hunt's medical conditions, correct?

1   A.   Yes.

2   Q.   And, in general, you would agree Mr. Hunt's medical

3   conditions do not contribute to your opinion here.

4   A.    No, they do not.  The acute one that he was experiencing

5   at the time left me concerned that he would even survive,

6   ultimately, the episode.

7   Q.   Just very briefly, Mr. Hunt has angina, coronary artery

8   disease, correct?

9   A.   He does.

10  Q.   And that is not a significant protective factor, in your

11  opinion?

12  A.   I didn't use it, no.

13  Q.   And Mr. Hunt has hypertension?

14  A.   Correct.

15  Q.   And that is not a significant protective factor, in your

16  opinion, correct?

17  A.   Correct.

18                       (Pause)

19       MR. GRADY:  I apologize for the pause in between, your

20  Honor, but I'm skipping questions, so I hope that --

21       THE COURT:  That is good.

22  BY MR. GRADY:

23  Q.   Very quickly, there is no doubt whatsoever that Mr. Hunt

24  meets the diagnostic criteria for pedophilia, correct?

25  A.   Correct.

1    Q.   And that pedophilia is a serious mental disorder.

2    A.   It is.

3    Q.   It is a serious mental disorder as that term is defined in

4    the Adam Walsh Act, correct?

5    A.   Correct.

6    Q.   And you have previously testified to that effect.

7    A.   Correct.

8    Q.   Now, just to clarify this, you indicate that the data is

9    historical, correct, on which a diagnosis is based?

10   A.   Yes.

11   Q.   And that is because you had an opportunity to interview

12   Mr. Hunt, and he indicated he's no longer attracted to

13   children, correct?

14   A.   Yes.

15   Q.   And that if he had told you he continues to be, that would

16   not be historical information, correct?

17   A.   Right.  I would need some current source.  It could be

18   self-report, it could be physiological assessment, it could be

19   very proximal collateral data gathered from where he is.  There

20   are other sources of information, but you're right.

21   Q.   Okay.  Well, it moves quicker if you just say yes or no to

22   yes-or-no questions.

23   A.   Yes.

24   Q.   You would agree with me, however, that if Mr. Hunt

25   continues to have sexual interest in children, he has a fairly

1  substantial reason not to disclose that to you, correct?

2  A.   That's true.

3  Q.   You indicated at the outset of the interview that the

4  information he relayed to you would be relayed to the Court,

5  correct?

6  A.   Correct.

7  Q.   And it would be used in a proceeding to determine whether

8  Mr. Hunt would be released, correct?

9  A.   Correct.

10 Q.   You note in your report, and my brother put it up on the

11 screen, the computer, not nearly as intrepid, four factors

12 which you indicate in the present day suggest that Mr. Hunt is

13 at a lower risk to reoffend, correct?

14 A.   Correct.

15 Q.   And the first of those factors, Mr. Hunt has demonstrated

16 ability over the last 10 years to conform his behavior to

17 prison rules and regulations, correct?

18 A.   Correct.

19 Q.   Now, the question in this case is whether Mr. Hunt would

20 have serious difficulty in refraining from further acts of

21 child molestation if he were released, correct?

22 A.   Or any sexual aggression, but yes.

23 Q.   Well, we're not particularly concerned about violent

24 sexual acts by Mr. Hunt, are we?

25 A.   I'm not, no.

1  Q.   Now, the question is, then, whether Mr. Hunt would have

2  serious difficulty in refraining from further acts of child

3  molestation or sexually violent conduct if released, correct?

4  A.   Right.

5  Q.   The question is not whether over the next 10 years Mr.

6  Hunt would have a serious problem complying with prison rules

7  over the next 10 years.

8  A.   True.

9  Q.   And to the extent that we believe the issue of Mr. Hunt's

10  compliance with prison rules over the last 10 years to be

11  relevant, that's because we're assuming that Mr. Hunt's

12  behavior in prison will carry over upon his release.

13  A.   I mean, that is an implication, I suppose, but that's not

14  really what I meant there.

15  Q.   Okay.  Well, Mr. Hunt's behavior in prison is not direct

16  evidence of how he's going to behave upon release, correct?

17  A.   No.

18  Q.   And in order to use information derived from his behavior

19  in prison, you have to make an assumption that his behavior in

20  prison will carry over to behavior upon release, correct?

21  A.   Yes.

22  Q.   Okay.  Now, we have rather substantial and extensive

23  evidence, all be it from the past, that when Mr. Hunt has been

24  released from prison in the past, he has gone out and molested

25  dozens of children, correct?

A.   Yes.

Q.   He was released from prison in 1981, after serving
approximately 5 years of incarceration, correct?

A.   Right.

Q.   And he went on to molest dozens of children, correct?

A.   He did.

Q.   And during that 5-years' period of federal incarceration
between 1976 and 1981, he didn't have any disciplinary problems
then, either?

A.   True.

Q.   And in that occasion, the fact that Mr. Hunt experienced
no difficulty whatsoever abiding by prison rules was no
indication whatsoever about the likelihood that he would go out
and reoffend against children, correct?

A.   Correct.

Q.   And you would agree with me that one possible inference
from the fact -- strike that.  You would agree with me, at
least with respect to the past behavior, that one potential
inference, rather than the one you draw about good behavior,
that we could look back at his past release from prison and
that we could draw -- excuse me.  Withdrawn.  Terrible
question, your Honor.  I apologize.

     You note in your second point that Mr. Hunt -- or,
actually, your risk evaluation points to the conclusion that
Mr. Hunt has an ability to control his sexual impulses,

1    correct?

2    A.    Yes.

3    Q.    And you note that treatment may have been beneficial.

4    A.    I do note that, yes.

5    Q.    Okay.  Now, you mentioned earlier in your direct the

6    treatment wasn't that important because of Mr. Hunt's age,

7    among other reasons, correct?

8    A.    Right.

9    Q.    Now, you were actually asked about this during your

10   deposition, specifically treatment.  Treatment was your

11   statement, and my question was, As to his sexual dangerousness.

12   Answer:  In no age range would -- not only in this particular

13   case, but in general, unless certain other factors are

14   involved, I would not use it as a significant factor and did

15   not in this case.

16           Have I read that correctly?

17   A.    Yes.

18   Q.    And that is your testimony from the deposition?

19   A.    Yes.

20   Q.    Okay.  Going down to line 13:  Treatment was not a

21   significant protective factor for Mr. Hunt.  Answer:  Yeah, and

22   that's why I don't think you see me discussing it with -- other

23   than reflecting it as a factual statement in my report.

24           Have I read that correctly?

25   A.    You have.

1   Q.   And that was your deposition testimony in this matter?

2   A.   Yes.

3   Q.   And that deposition was what, a week and a half ago?

4   A.   Approximately.

5   Q.   And this is the portion of your report, and I actually ask

6   you specifically about this portion of the report.

7       Now, you indicate that treatment may have been

8   beneficial.  Answer:  Yes.

9       Have I read that correctly?

10  A.   Yes.

11  Q.   And I go on to ask, And then we've discussed that, and

12  it's been acknowledged, you would agree, that treatment here is

13  not a significant protective factor.  And your answer is:

14  Correct.

15  A.   Right.

16  Q.   And I've read that correctly?

17  A.   Yes.

18  Q.   Returning back to the note that the risk evaluation points

19  to the conclusion that Mr. Hunt does have an ability to control

20  his sexual impulses -- sorry.  You know what?  Coming back to

21  that note, Mr. Hunt has the ability to control his sexual

22  impulses, correct?  And you pointed to evidence that in 1976,

23  when he kidnapped a 12-year-old boy, that the record reflects

24  that Mr. Hunt did not molest the boy, correct?

25  A.   True.

1    Q.   And you have relied upon that -- Well, first of all, I

2    asked you whether or not there were any bases in the evidence

3    before you, based on your experience with child molesters,

4    based on your experience with the victimization of children,

5    whether there might be some reason to believe that that claim

6    that Mr. Hunt did not sexually abuse the 12-year-old boy was

7    untrue.

8    A.   Right.

9    Q.   And you indicated, Well, that is certainly plausible.

10   A.   Well, yes.  That's possible.

11   Q.   And there are many reasons why a 12-year-old boy in 1976

12   in Louisiana might deny having had homosexual contact with an

13   adult male, correct?

14   A.   It's certainly possible.

15   Q.   Not the least of which would be embarrassment?

16   A.   Sure.

17   Q.   And certainly in this case Mr. Hunt was dead to rights in

18   kidnapping, correct?

19   A.   Correct.

20   Q.   And it really wouldn't have served any additional law

21   enforcement purpose to attempt to prove that Mr. Hunt had

22   sexually abused the child, correct?

23   A.   That I don't know.

24   Q.   Well, fair enough.  Now, while you point to this 1976

25   evidence as suggesting that Mr. Hunt has the ability to control

1   his sexual impulses, we have evidence closer in time from the

2   past that suggests he does not have that ability, correct?

3   A.   Correct.

4          THE COURT:   Excuse me.   You have to be with Judge

5   Zobel at 3:00?

6          MR. GOLD:   At 3:00, yes.   I was going to ask at two

7   minutes of.

8          THE COURT:   Well, it is three minutes of now.   I would

9   like you to be on time for her.   But you don't have to be here

10  for the rest of this.   Can't Mr. Watkins --

11         MR. GOLD:   If Mr. Watkins is here, I can certainly go

12  right over.

13         THE COURT:   Yes.   Mr. Watkins will earn his money now.

14  Go ahead.

15         MR. WATKINS:   I will try my best, your Honor.

16  BY MR. GRADY:

17  Q.   For instance, in 1973, he's put on probation in California

18  after being involved with sexually assaulting two 11-year-old

19  boys, correct?

20  A.   Yes.

21  Q.   And within two weeks he's failed to report and left the

22  State of California, correct?

23  A.   Correct.

24  Q.   And we know that between 1973 -- or strike that.   One of

25  the specific conditions of that probation was that he not have

1    contact with individuals under the age of 14, correct?

2    A.    Right.

3    Q.    And we know from both the records and Mr. Hunt's own

4    admissions that he neither complied -- he didn't comply with

5    his probation, he didn't comply with the order to stay away

6    from children under 14, correct?

7    A.    Correct.

8    Q.    Between 1973 and 1976.

9    A.    Yes.

10   Q.    We, in fact, know he molested somewhere between 15 and 20

11   boys, by his own admission, during that time period.

12   A.    Yes.

13   Q.    So, certainly in the past, probation has been no

14   impediment to recidivism for Mr. Hunt, correct?

15   A.    That's correct.

16   Q.    And we know he's been on federal parole.

17   A.    Yes.

18   Q.    And we know that he has gone out and molested dozens of

19   children while on parole, correct?

20   A.    Correct.

21   Q.    And we know, in fact, pending charges haven't even stopped

22   Mr. Hunt, correct?

23   A.    Correct.

24   Q.    We know in April of 1985 Mr. Hunt, while on federal parole

25   and having been molesting dozens of children between the ages

1  of 7 and 10 between the summer of 1982 and April 1985, he's

2  arrested, correct?

3  A.    Yes.

4  Q.    He's arrested and charged with two counts of sodomy in

5  April of 1985.

6  A.    Correct.

7  Q.    And he makes bail in May of 1985, correct?

8  A.    Correct.

9  Q.    And he immediately absconds from his federal parole,

10  correct?

11  A.    Yes.

12  Q.    He jumps bail, correct?

13  A.    Yes.

14  Q.    He goes out and he steals a power generator and an

15  all-terrain vehicle, and he sets up a campsite on an Indian

16  reservation in a remote part of northern New York, correct --

17  A.    That's right.

18  Q.    -- both to evade capture and to continue to sexually

19  offend against two boys he was later found there with, ages 12

20  and 14, correct?

21  A.    Correct.

22  Q.    Boys whom he sexually molested not only between May of

23  1985 and August, when he's finally caught, but the records

24  reflect that Mr. Hunt had been sexually abusing for years.

25  A.    That's right.

1    Q.    And, indeed, the records would support that Mr. Hunt, in

2    virtually every aspect of his life, formed and shaped his life

3    around his sexual offending for the entire period from 1973

4    until his eventual arrest in 1985; is that correct?

5    A.    I concur completely, and that's part of my analysis, is

6    exactly that, yes.

7    Q.    He picked professions that provided him access to

8    children, correct?

9    A.    That's right.

10   Q.    He worked as a karate instructor, he worked on carnivals.

11   A.    That's right.

12   Q.    And he chose those professions for the purpose of

13   furthering his pedophilic interests.

14   A.    That's certainly -- I would agree with that conclusion,

15   yes.

16   Q.    And he even committed nonsexual crimes, stealing the power

17   generator, stealing the ATV, for the purpose of furthering his

18   pedophilic interests, correct?

19   A.    For the purposes of evading detection, yes.

20   Q.    During the time between May of 1985 and August of 1985, he

21   set up a campsite in a remote part of New York, correct?

22   A.    Right.

23   Q.    And there he continued to sexually abuse a 12- and a

24   14-year-old boy, correct?

25   A.    True.

1    Q.   And he used that campsite to continue his offending,

2    correct?

3    A.   Correct.

4    Q.   And he used the power generator to set up away from law

5    enforcement, who would have prevented him, I presume, from

6    reoffending against those children, correct?

7    A.   Correct.

8    Q.   So, he stole those power generators and that equipment for

9    the purpose of furthering his sexual offending, did he not?

10   A.   You could reach that conclusion.  I'm not disagreeing.

11   Q.   And, essentially, for the last 35 years, since 1973, Mr.

12   Hunt has either been actively molesting children, working

13   towards molesting children, or he's been incarcerated and

14   unable to do so; is that correct?

15   A.   True.

16   Q.   Now, we are also aware that in prison Mr. Hunt --

17           MR. GRADY:  May I approach the witness, your Honor?

18           THE COURT:  Yes.

19   BY MR. GRADY:

20   Q.   In one of the most restrictive environments imaginable,

21   Mr. Hunt continues to attempt to gratify his sexual interest in

22   children; isn't that correct?

23   A.   Referring to the '98 --

24   Q.   The pictures.

25   A.   Yes.

1      (Court confers with clerk)

2          THE COURT:  You can go at 3:15, but we are going to

3    keep going.

4          MR. GOLD:  Okay.

5    BY MR. GRADY:

6    Q.   Now, this is a situation in which the external controls

7    are as great as they can be, correct, prison?

8    A.   Yes.

9    Q.   And even in this situation, where someone's virtually

10   looking over his shoulder every moment of every day, he chose

11   to secret away and hide on the computer pictures of children.

12   A.   Yes.

13   Q.   And there are pictures of young boys, whether they be pre-

14   or postpubescent, in small bathing suits, correct --

15   A.   Yes.

16   Q.   -- among the pictures?

17   A.   Yes.

18   Q.   And, certainly, for an individual with a sexual interest

19   in children, those are very troubling pictures.

20   A.   I would agree.

21   Q.   And, by the way, you had a chance to interview Mr. Hunt in

22   this case, correct?

23   A.   I did.

24   Q.   And Mr. Hunt has never offered you some explanation for

25   his possession of those photographs other than for furthering

1   his sexual interest in children, correct?

2   A.   That's right, and that's probably more my fault than --

3   Q.   Well, let's be clear.  Mr. Hunt has not offered you an

4   explanation for those pictures that did not involve furthering

5   his sexual interest in children, correct?

6   A.   Correct.

7   Q.   Now, the next point you discuss is that Mr. Hunt's sexual

8   offending must be analyzed in the context of the person's

9   social and sexual functioning at the time of the abuse,

10   correct?

11   A.   That's right.

12   Q.   And you noted his jobs, working at a carnival, working as

13   a karate instructor.  Those are the types of things that,

14   because of Mr. Hunt's age, he will not be able to replicate,

15   correct?

16   A.   I think that's highly unlikely, correct.

17   Q.   And, as a result, since his offending arose from those

18   behaviors, it's less likely that he would go out and reoffend,

19   correct?

20   A.   I think that entire contextual basis for his offending is

21   completely undermined at this point in time, that's right.

22   Q.   But there are certainly aspects of his prior offending

23   that his age is not going to preclude him from repeating,

24   correct?

25   A.   I'm not quite sure how to answer that.

1    Q.   Sure.  Let me see if I can give you some examples.

2    A.   Thank you.

3    Q.   We'll just start with an easy one.  He identifies having

4    met several victims at the mall, correct?

5    A.   Right.

6    Q.   And, certainly, his age isn't going to prevent him from

7    going to the mall.

8    A.   I would doubt that.

9    Q.   And, now, you recall in the state police records you

10   reviewed, among the 2,000 pages, there were statements from

11   victims of Mr. Hunt, correct, and the victims relayed certain

12   manners by which they met Mr. Hunt and certain activities that

13   Mr. Hunt took them to --

14   A.   Yes.

15   Q.   -- before the sexual abuse?  So, in addition to the

16   carnival-type rides, one of the things that Mr. Hunt also did

17   was attempt to locate children at the movies.  I'm just going

18   to refer you to page 16 and 17 of the materials you reviewed,

19   and I'm going to ask, is this among, Bates stamp number 16 and

20   17, the materials you reviewed?

21   A.   Yes, it is.

22   Q.   Okay.  And this is a statement from AA from 1986.  AA was

23   born in November of 1974, so we're talking in 1985 about 11

24   years old, correct?  Actually less, because it's November, and

25   Mr. Hunt was arrested in August.  So, it would be 10 years old

1    at the oldest, correct?

2    A.    Correct.

3    Q.    And he states -- I've highlighted a portion.  Can you read

4    that for us?

5    A.    Aloud you want me to read it?

6    Q.    Yes, please.

7    A.    I remember Wayne used to take us to the movies at Colonie

8    Center and he would look for little kids dressed in rags and

9    looked poor.  He would then give the kids money or buy them

10   candy or give them tickets to the carnival by his house.

11   Q.    So, at least in that regard, Mr. Hunt would go to the

12   movies, look for poor children, correct, and then he would

13   attempt to garner at least their interest by giving them candy

14   and other items, correct?

15   A.    That's what it says.

16   Q.    Certainly, that's something -- Mr. Hunt wouldn't be

17   physically unable to go to the movies, correct?

18   A.    Correct.

19   Q.    Now, there are, in fact, other victims who relate that Mr.

20   Hunt would offend in connection with the movies and attending

21   movies.  I show you a statement from JHS.  This is page 1606 of

22   the Bates stamped materials, and JHS was born in August of

23   1970.

24        Can you tell me -- can you read aloud the portion of

25   that report that's highlighted?

1    A.    Yes.  We would, Wayne and me, go to the movies, and Wayne

2    would play with me all the way to the movies at Colonie Cinema.

3    I can't remember what we saw, but this happened during 1982,

4    1983 and 1984, and we went to at least 15 movies.

5    Q.    Okay.  And in 1982, 1983 and 1984 for an individual born

6    in August of 1970 would represent ages 12, 13 and 14?

7    A.    Yes.

8    Q.    There is a statement from another individual, JR.  Now,

9    this is Bates stamped page 1605.  Is that among the materials

10   you reviewed?

11   A.    It is.

12   Q.    And JR was born in December of 1976.  This is in evidence.

13   It's Exhibit K.

14   A.    Yes.

15   Q.    Can you read the highlighted portion of this record?

16   A.    I first met Wayne Hunt during the summer of 1984.  Wayne

17   had a carnival behind my house in Waterford.  I remember the

18   first time we went over to Wayne's trailer in Troy, New York.

19   It was after me and Wayne went to see *Beverly Hills Cop* at the

20   Clifton County Mall or Country Mall.  That was a good movie.

21   Well, anyway he showed us around and gave me and blank a cork

22   gun, which we played with for a while.  Then he showed us lots

23   of pictures of people with their clothes off from magazines.

24   Then Wayne and blank played with each other's weenies.  Then

25   they sucked each other's weenies.  Then Wayne played with

1    blank's weenie and then sucked his too.  Then Wayne played with

2    my weenie, and I wouldn't let Wayne suck it, though.

3    Q.    Thank you.  Now, again, this is another victim who

4    Mr. Hunt victimized in connection with the movies, correct?

5    A.    Right.

6    Q.    And Mr. Hunt, certainly, by virtue of his age, is not

7    precluded from attending movies.

8    A.    That's right.

9    Q.    And not that I ask you to suggest any here, Mr. Hunt could

10   devise several other manners in which he could come in contact

11   with children that are not precluded by his age, correct?

12   A.    Sure.

13   Q.    Let's just move on very quickly.  On the point of the

14   actuarials, if we put aside the issue of age, Mr. Hunt scores

15   -- is going to score in the high-risk to extremely high-risk

16   range on every, single actuarial, correct?

17   A.    Yes.

18   Q.    Because he has every, single characteristic that the

19   actuarials have measured that correlate to a risk of

20   recidivism, correct, putting aside age?

21   A.    Yes.

22   Q.    Okay.  I actually asked you this, and you said, As the

23   Cole Porter song goes, he's the top peanut.

24   A.    Right.

25   Q.    Mr. Hunt is the top of the actuarial scale, correct?

1    A.   Correct.

2    Q.   Now, let's just move right to his age.  You indicate that

3    the risk of recidivism for Mr. Hunt -- he's in an age cohort

4    over 60 years in which sexual offense is as low as can be

5    measured, correct?

6    A.   That's right.

7    Q.   And Mr. Hunt's age is far and away the most significant

8    factor, in your opinion.

9    A.   I would agree with you.  It is the most important issue in

10   this case, even given all those terrible things I've just read

11   aloud, because those have only -- as awful as they are, they

12   only have so much power to predict future behavior, especially

13   in older people.

14   Q.   Remember what I said about yes-or-no questions and this

15   going more quickly?

16   A.   I'm sorry.  Okay.

17   Q.   Thank you.  Now, you recall at your deposition that was

18   your testimony as well, correct?

19   A.   Yes.

20   Q.   And I asked you, Well, what if Mr. Hunt were 53, correct?

21   A.   You did.

22   Q.   And you didn't answer me.  You couldn't answer the

23   question, correct?

24   A.   Well, I think I have to think about some issues.  It

25   wasn't on the spot, Give me an answer.

1   Q.   At your deposition you couldn't answer, correct?

2   A.   I'm sorry.  I don't understand.

3   Q.   You couldn't answer the question of what would you opine

4   if Mr. Hunt were 53, correct?

5   A.   Right.

6   Q.   Okay.  And I asked 43.  Same thing, correct?

7   A.   Well, I don't recall specifically, but --

8   Q.   Well, let's take a look at it.

9   A.   Thank you.

10  Q.   We'll start at page 108.  And if Mr. Hunt were 53 instead

11  of 63 and we were confronted with exactly the same offense

12  history -- Yes -- we would be talking about a different

13  conclusion on your part.

14         Answer:  That's a very good question, that's a clever

15  question, and I would say that, certainly, it would involve my

16  thinking along some different lines.  What my ultimate

17  conclusion would be, I would have to defer the answer, because

18  I have not considered it in that particular context.

19  A.   Right.

20  Q.   And I would say that, yes, even into his late 50s, it

21  would cause me to pause significantly longer in my judgment.

22  Correct?

23  A.   That's right.

24  Q.   And I told you you could not answer the question at your

25  deposition; isn't that correct?

1    A.    Well, I told you I had to think about it a little more

2    than just sitting there answering yes or no.

3    Q.    Did you answer the question yes or no at your deposition?

4    A.    No.

5    Q.    And, so, you couldn't answer the question at that time,

6    correct?

7    A.    Well, I gave the context for why, so I addressed the

8    question, but I didn't answer it yes or no, that's right.

9    Q.    You did not answer the question yes or no at the

10   deposition, correct?

11   A.    Right.

12   Q.    And the same answer, when I asked if Mr. Hunt were 43,

13   correct?

14   A.    Yes.

15   Q.    And I asked if you considered Mr. Hunt's age of being 60

16   or over to be determinative, and you indicated that for Mr.

17   Hunt it was, correct?

18   A.    Yes.

19   Q.    So that, essentially, as soon as someone reaches the age

20   of 60, bang, no longer dangerous, correct?

21   A.    Well, it's not quite that simple, but that is a very -- I

22   think in my direct testimony I laid it out as best I can, that

23   the data with men who have more victims than Mr. Hunt, we know

24   about this, but now they're in this age range more -- the most

25   -- the data indicate that those individuals do not reoffend as

1    a group.  If there's something else I can point to with any

2    reliability that would trump that data, then I'm all for it.

3    In this case, I'm not able to do that, and that is the

4    important issue.

5    Q.    So, Mr. Hunt is, effectively, a typical sex offender --

6    A.    I'm sorry?

7    Q.    -- over 60.  He's typical; he's just like everyone else.

8    A.    I don't like to use those terms, typical or atypical.  I'm

9    saying is there something that stands out that would

10   countermand what we know about his age and recidivism rates.

11   Q.    Among the group of offenders over 60, nothing about

12   Mr. Hunt stands out, correct?

13   A.    Plenty of things stand out.

14   Q.    Now, you indicated that for men who have more victims than

15   Mr. Hunt, their reoffense rate is so low that it makes opining

16   that any of them are dangerous an impossible task, correct?

17   A.    Yes, it does make that basically an impossible task.

18   That's correct.

19   Q.    Doctor, now, can you tell me what or which of the

20   age-related empirically validated studies have indicated or

21   were based upon individuals with more victims than Mr. Hunt?

22   A.    Well, I can tell you the demographics of average victims

23   in samples of sex offenders.  Most of that data is not

24   presented in the tables of the studies.

25   Q.    So, this information that you get that individuals with

1    more victims than Mr. Hunt recidivate at a lower rate isn't

2    available in any of the peer-reviewed articles on age, correct?

3    A.    It's not in the table.   It doesn't show the number of

4    victims, that's correct.

5    Q.    So, this data is not in the peer-reviewed articles on age,

6    correct?

7    A.    In the articles, right.

8    Q.    So, you're basing this on your personal experience.

9    A.    True, I'm basing it on my personal experience.   I'm also

10   basing it on epidemiological research on numbers of victims of

11   pedophiles.   I'm also basing it on other data that I have that

12   had even looked at the higher risk groups of older offenders.

13   Q.    Well, I'm going to come back to this again, but,

14   Dr. Plaud, what published and peer-reviewed study on the issue

15   of age and recidivism indicates that the members of the group

16   over 60, like Mr. Hunt, had any particular number of victims?

17            MR. WATKINS:   It's been asked and answered at this

18   point, your Honor.

19            THE COURT:   It is cross.   Go ahead.

20   BY MR. GRADY:

21   Q.    It's overruled.   Answer the question.

22   A.    They don't, as I said.

23   Q.    Thank you.   It's a bit of hyperbole on your part?

24   A.    No, it's not hyperbole.   I'm just -- I'm telling you --

25            THE COURT:   Don't argue with him.   Let's keep it

1    going.

2    BY MR. GRADY:

3    Q.    Now, you would acknowledge there's no age at which

4    extrafamilial child molesters cease offending, all of them?

5    A.    True.

6    Q.    And you indicated at your deposition that you've found

7    individuals over the age of 70 to be dangerous, correct?

8    A.    I have.

9    Q.    And, certainly, you would acknowledge that, even if we

10   credit the general notion that age declines on a line -- would

11   it be proper use of the term assimode (ph), declines on an

12   assimode (ph)?

13   A.    Asymptote.

14   Q.    Oh, asymptote.  Sorry.  Declines on a line with age, that

15   there may be individuals who are still dangerous after the age

16   of 60, correct?

17   A.    That's very true.  That's an empirical question in all

18   cases, true.

19   Q.    Now, I've mentioned extrafamilial child molesters.  Just

20   very quickly, what's the difference between extrafamilial and

21   intrafamilial child molesters, for purposes of recidivism?

22   A.    Well, it's a grouping factor that divides, subdivides

23   pedophiles into -- or molesters into groups in which the

24   victims were within the context of the family versus those who

25   were outside the context of the family.

1  Q.    What does the data generally show about the recidivism

2  rates of incest offenders versus those who offend against

3  outside --

4  A.    The general finding is that, through the lifecycle prior

5  to age 50, incest offenders are the lowest recidivists compared

6  to the other groups.

7  Q.    And that extrafamilial child molesters recidivate at much

8  higher rates, correct?

9  A.    Yes.

10  Q.    So, for purposes in analyzing recidivism, you want to

11  separate the two out, correct?

12  A.    True.  That's right.

13  Q.    Mr. Hunt is an extrafamilial child molester, correct?

14  A.    True.

15  Q.    I want to talk very, very quickly, in deference to the

16  Court, about some of the published findings.

17          THE COURT:  Well, it is in deference to your own

18  schedule.  Do not say it is in deference to the Court.

19          MR. GRADY:  All right.

20  BY MR. GRADY:

21  Q.    You rely upon several published peer-reviewed studies on

22  age, correct?

23  A.    I do.

24  Q.    And one of them is the 2002 study by Dr. Hanson?

25  A.    Yes.

1    Q.    And you've referenced several other studies, a 2006 study

2    by Dr. Hanson?

3    A.    Correct.

4    Q.    The work of Dr. Howard Barbaree, who I made sit in the

5    hall, correct?

6    A.    Yes.

7    Q.    And Dr. Wollert.  You're familiar with the work of

8    Dr. Fazel in Sweden --

9    A.    Yes.

10   Q.    -- and the published article in 2006?

11   A.    Yes.

12   Q.    You're familiar with the work of Dr. Thornton --

13   A.    Yes.

14   Q.    -- and his published article in 2006?  Okay.  Now, I

15   think, right off the bat, we can agree that, when we attempt to

16   study older sex offenders, there are much more limited numbers

17   than when we talk about the general pool of sex offenders?

18   A.    There are more limited numbers.

19   Q.    Okay.  And, as a result, in some respect we can question

20   the strength of the findings as to individuals over the age of

21   60 because of the limited number of individuals in the data.

22   A.    Well, you could, but the fact that there are smaller

23   numbers in and of itself is telling.

24   Q.    I asked a similar question at deposition.  With respect to

25   this specific study and this specific chart, referring to the

1    2002 Hanson data, we can question the strength of the finding

2    because of the limited number of people that were in that

3    60-to-69 group, like Mr. Hunt.

4    A.   Yes.

5    Q.   Answer:  You can.

6    A.   Sure.

7    Q.   Now, it's certainly possible among 60-plus offenders to

8    have different actuarial scores, correct?

9    A.   I'm sorry?

10   Q.   You can have a 60-plus offender that gets a zero, you can

11   have a 60-plus offender, all be it rare, that gets an 11.

12   A.   Yes, you can.

13   Q.   Okay.  And all in between.

14   A.   Sure.

15   Q.   Okay.  And, certainly, one potential attempt to determine

16   the best fit, the best pool of comparison for Mr. Hunt, would

17   be to attempt to look at older sex offenders who scored 11 on

18   the Static-99, similar to Mr. Hunt, correct?

19   A.   You could do that.

20   Q.   Well, actually, that's a theory.  Can we do that?  Can we

21   look at individuals who have scored an 11, like Mr. Hunt?

22   A.   Can you?

23   Q.   Yeah.  Is there any data available?

24   A.   There's data for the 6 pluses.

25   Q.   But not for 11.

1    A.    There's no data for any specific number.  It's grouped in

2    6 plus.

3    Q.    So, for anything 6 and above, the best data we have is a

4    pool of offenders scoring 6 or higher, correct?

5    A.    That's right.

6    Q.    But there's no independent pool of individuals that score

7    11.

8    A.    Or 10 or 9 or 8 or 7.

9    Q.    Okay.  Now, with respect to that 2002 Hanson study, there

10   were 45 sex offenders over the age of 60, correct?

11   A.    Right.

12   Q.    And two of them, two extrafamilial child molesters,

13   reoffended, correct?

14   A.    That's right.

15   Q.    And that's about a 4 1/2, 5 percent rate.

16   A.    Right.  It's an under 5 percent rate, correct.

17   Q.    And one reasonable theory with respect to the data in the

18   2002 article would be that higher-risk offenders are

19   disproportionately represented in that two that recidivated,

20   correct?

21   A.    Right.

22   Q.    But we can't determine anything about that theory from the

23   data, correct?

24   A.    That's true.

25   Q.    Because we don't know the ranks of the offenders on the

1    2002 data, correct?

2    A.    The way it's presented, that's correct.

3    Q.    Okay.  Now, Dr. Hanson notes in his 2002 article a

4    limitation on the data, which I don't see reflected in your

5    report, and you can let me know, after I show you it, whether

6    or not you've reflected it in your report.  Dr. Hanson -- now,

7    I take it you're familiar with his 2002 age article we

8    discussed earlier --

9    A.    Yes.

10   Q.    -- entitled *Recidivism and Age* --

11   A.    Correct.

12   Q.    -- published in the journal of *Interpersonal Violence,*

13   published in a peer-reviewed journal, correct?

14   A.    Right.

15   Q.    Dr. Hanson notes -- well, why don't you just read the

16   highlighted section and let me know is that a limitation Dr.

17   Hanson noted on his data?

18   A.    Medical records were not available for any of the samples

19   analyzed in this study.  Consequently, research has yet to exam

20   the extent to which reductions in sexual recidivism risk should

21   be expected for older offenders who remain in good health.

22   Q.    So, Dr. Hanson noted that, for the population of 60 plus

23   there, we don't know how many were still healthy and capable of

24   reoffending, correct?

25   A.    That's true.

1   Q.   And, so, it's possible that this 4.4 is artificially low,

2   because, statistically speaking, we should remove people who

3   are physically incapable of reoffending from the pool, correct?

4   A.   Well, it's arguable.  I would not say yes or no.

5   Q.   Well, that's true.  If, in applying the data, we were able

6   to determine health --

7   A.   Yes.

8   Q.   -- we would want to then go back and similarly identify

9   health issues in the subset that we're comparing.

10  A.   Yes.  I would use it as a covariant.

11  Q.   Okay.  Now, certainly, we've identified a potential theory

12  of exploration, that individuals 60 plus could recidivate at a

13  higher rate than other individuals -- excuse me -- 60 plus who

14  score high in the actuarials could recidivate at a higher rate

15  than other 60-plus offenders, correct?

16  A.   Yes.

17  Q.   Okay.  And Dr. Hanson actually attempted to examine that

18  very theory, among others, in 2006, correct --

19  A.   That's right.

20  Q.   -- in an article entitled *Does the Static-99 Predict*

21  *Sexual Recidivism for Older Offenders?*

22  A.   Right.

23  Q.   And, again, that article was published in a peer-reviewed

24  journal, correct?

25  A.   Correct.

1    Q.   And he came up with a chart, and we've been through it,

2    and I'm not going to go through the numbers very much.  When we

3    talk about the group in this -- strike that.  When we try to

4    look at 60-and-older offenders who scored 6 or higher, how many

5    people are we talking about?

6    A.   That scored 6 or higher?

7    Q.   Yes.  11?

8    A.   11.

9    Q.   Okay.  And, now, when we talk about questioning the

10    strength of findings based on small samples, what we try to do

11    or what Dr. Hanson tries to do with this 11, group of 11 plus 6

12    over-60 offenders is say, I would like to take the general

13    trends I observe here and extrapolate out to the entire

14    population of sex offenders who share these characteristics,

15    correct?

16    A.   Sure.

17    Q.   And, in doing so, when you're going from 11 to the whole

18    population, you're going to end up with a margin of error,

19    correct?

20    A.   That's right.

21    Q.   And next to that number -- now, we know of those 11, one

22    person recidivated, for a rate of 9.1 percent, correct?

23    A.   Yes.

24    Q.   But, given the small sample, we end up with a margin of

25    error or a plus or minus of 17 percent, correct?

1   A.   That's the confidence interval, which does reflect

2   standard error of measurement --

3   Q.   And what the confidence interval here is, and let me see

4   if I can state it correctly, and I apologize if I mangle it, We

5   are 95 percent certain that the recidivism rate for individuals

6   who score a 6 or higher who are 60 and older fall somewhere

7   between zero and 26 percent, correct?

8   A.   I would say that's an excellent way to state that.

9   Q.   Okay.  So, the recidivism rate for individuals 60 and

10  older who score a 6 plus is somewhere between zero and 26.

11  A.   Right, and if you'll notice, that fits right in with my

12  analysis.

13  Q.   Okay.  And you indicate somewhere in the range of 24

14  percent.

15  A.   Right.

16  Q.   Okay.  Now, that's just for 6 plus, not for individuals

17  scoring 11, right?

18  A.   Right.  That's people who score high on the Static-99.

19  Q.   So, presumably, if we tried to narrow this group, I think

20  he started out with 3,500 or just shy of 3,500 offenders?

21  A.   Just shy of it.

22  Q.   Okay.  Just shy of 3,500 offenders.  When you try to even

23  just get 6 plus who are 60, you end up with 11, correct?

24  A.   Right.

25  Q.   If you had attempted to parse out -- first of all, we have

1    no idea anyone even scored as high as an 11, correct?

2    A.    I don't know what they scored other than 6 plus.

3    Q.    But if we tried to narrow down that 11 to -- the 11 --

4    excuse me -- the 11 members of that group into individuals or

5    we tried to parse out of that 11 people who scored an 11 -- you

6    see why I'm having a tough time with this question -- we would

7    be talking about a very small group, one or two, possibly,

8    possibly zero.

9    A.    I have no idea.

10   Q.    Okay.  It's certainly more likely to be one or two than

11   ten.

12   A.    Well, if I had to guess, I would agree with you.

13   Q.    Okay.  Now, at the end of the day, Dr. Hanson, as you

14   indicate, concluded that the Static-99 may over-predict

15   recidivism rates for over-60 offenders, correct?

16   A.    Correct.

17   Q.    But, unlike you, he did not conclude that you cannot use

18   the Static-99 for over-60 offenders, correct?

19   A.    I would say he did not conclude it.  It's his instrument,

20   he's vested in it, but I think his data says otherwise.

21   Q.    So, you disagree with the conclusions reached by

22   Dr. Hanson in his study?

23   A.    They're very tentative conclusions based on -- I mean, he

24   puts the data in there, and you see that if you're talking and

25   even putting in the confidence interval, you're at a high, and

1    for the high-risk group of 26 percent, at the high end, well,

2    confronted with that data, my conclusion is you shouldn't use

3    it.

4    Q.    Okay.   Dr. Hanson noted some limitations in addition to

5    what we would agree is a very small sample, and, again, I'm

6    just going to show you -- this is *Sex Abuse Journal* 2006 --

7    A.    Yes.

8    Q.    -- Dr. Hanson's 2006 article.   Certainly, one question for

9    further research is the extent to which the observed declines

10   in recidivism potential are mediated by poor health.   Again, it

11   is quite plausible, for example, that a vigorous 50-year-old

12   offender may maintain the same recidivism rate or risk as he

13   did when he was 35.   Correct?

14   A.    Right.

15   Q.    Certainly, you don't take issue with that being an

16   unresolved finding.

17   A.    Well, it's an unknown, is what it is.   I mean, every

18   research article ever written, you have to put limitations, and

19   that's a potential limitation in terms of explaining certain

20   factors about what causes the recidivism rates to decline with

21   advanced aging.

22   Q.    Sure.   And, Although shortened life expectancy effectively

23   lowers long-term recidivism risk, it would have been useful for

24   evaluators to have been able to separate the influences of

25   shorter life expectancies from other personal characteristics

1    that could mitigate recidivism risk in older offenders.  Death

2    records weren't available in the current study, and that's

3    included, because we don't know how many of those 11 offenders,

4    one of whom reoffended, were actually still alive.

5    A.   That's very true, but that also applies to Mr. Hunt.

6    Q.   Well, we know he's alive.

7    A.   He could die next week.  We don't know.

8    Q.   We know he's alive today.

9    A.   He's alive today.

10   Q.   And another question remaining from Dr. Hanson's study is

11   whether the crimes of the elderly are perceived as seriously as

12   the crimes of the young.  It is possible that the same sexual

13   misbehavior that could be treated as criminal when committed by

14   a strong, young man but be treated as inappropriate or pathetic

15   when the perpetrator is himself frail and vulnerable.

16        So, another potential explanation for the lower

17   recidivism rates.

18   A.   Sure.

19   Q.   Other studies looking at high risk --

20        THE COURT:  How much longer are you going to be?

21        MR. GRADY:  I will finish by 4:00, certainly.

22        THE COURT:  You do not want this doctor outside to

23   testify?

24        MR. GRADY:  Sure.  If you ask me, no.

25        THE COURT:  My intention was to put him on, confine

1   you both to about a half hour and try to finish with him this

2   afternoon so he can go about his way and the case can be over.

3           MR. GRADY:  I think there are some points that I have

4   to make with respect to this witness that I have yet to make,

5   your Honor.  I will try to expedite it as much as I can.

6           THE COURT:  Okay.  Well, we will forget about the

7   doctor, then.

8           MR. GOLD:  Your Honor, he's available tomorrow

9   morning.

10          THE COURT:  There are other people I was thinking

11  about too.  I was thinking about the doctor.  I assume that he

12  would like to be finished with today, if he could.

13          MR. GOLD:  No.  He had always anticipated testifying

14  tomorrow.

15          THE COURT:  Well, all right.  Just because you have

16  the time, do not feel as though you have to think of how many

17  questions you can ask.

18          MR. GRADY:  I'm not trying to fill it; I'm trying to

19  make points I think are important for the Court in this matter.

20          THE COURT:  Okay.

21          MR. WATKINS:  Your Honor, having said that, should I

22  tell the doctor that he need not stay around today, or does the

23  Court want him here in case we do begin?

24          THE COURT:  How long can you possibly be with him?

25          MR. GRADY:  I think 30 minutes at this point would be

1   at the outside of where I would complete, your Honor.

2          THE COURT:  I am not talking about this witness, I am

3   talking about the next witness, Barbaree.

4          MR. GOLD:  Are you asking the respondent?  I

5   anticipate his direct testimony -- we have a little bit that we

6   want to do.  He's the person doing the original research which

7   backs up what's been discussed and kind of out of removed

8   during the case.  So, I'm looking at about an hour, Judge.

9          THE COURT:  Okay.  All right.  You can tell him to go,

10  if he wants.  He does not have to stay.  Go ahead.

11         MR. WATKINS:  Then, will we be starting at 9:30

12  tomorrow, should I tell him?

13         THE COURT:  No.  10:00.  I have not even gotten to

14  that yet.  I will think about that one.  I do not know when we

15  are going to come in.

16         MR. WATKINS:  All right.  Thank you.

17  BY MR. GRADY:

18  Q.   All right.  Dr. Plaud, there have been other studies that

19  looked at arguably high-risk offenders, correct --

20  A.   Yes.

21  Q.   -- not measured actuarially?  Drs. Prentky and Lee

22  published a 2007 study looking at about 250 offenders who had

23  been released from the Massachusetts Treatment Center, correct?

24  A.   Right.  There is one data sample of pre-identified

25  high-risk offenders, and that is the Prentky data set, correct.

1    Q.    It's, actually, a reanalysis of data from 1997?

2    A.    '97, correct.

3    Q.    You pointed that out to me at your deposition, correct?

4    A.    Yes.

5    Q.    And there was a followup of this group for 25 years,

6    correct?

7    A.    Correct.

8    Q.    And this is a group that is presumed by the authors to be

9    effectively prescreened for being high risk by virtue of having

10   been civilly committed.

11   A.    Yes.  They were all adjudicated as sexually dangerous.

12   Q.    And in that study you still only end up with about 12

13   high-risk offenders, correct --

14   A.    Correct.

15   Q.    -- over the age of 60 --

16   A.    Over the age of 60.

17   Q.    -- that are extrafamilial child molesters?

18   A.    That's right.

19   Q.    And we have a recidivism rate there of almost 17 percent,

20   correct?

21   A.    Correct.

22   Q.    But within the 2 to 26 percent, 95 percent confidence

23   interval established by Dr. Hanson?

24   A.    You got it.

25   Q.    But, certainly, that range could have been somewhat higher

1    if Dr. Hanson had started with the 2 out of 12 instead of 1 out

2    of 11 number.

3    A.   Well, any data would be different if the results were

4    different, yes.

5    Q.   And there are even findings and peer-reviewed studies

6    showing an increase in recidivism as offenders get older,

7    correct?

8    A.   Well, I --

9    Q.   Well, there's a study published by Drs. Fazel, et al,

10   correct?

11   A.   Right.

12   Q.   In *Sex Abuse:  A Journal of Research and Treatment*,

13   correct?

14   A.   Yes.

15   Q.   And that's a published peer-reviewed journal.

16   A.   It is.

17   Q.   And they studied 1,300, approximately, offenders, 42

18   percent rapists and 42 percent child molesters, correct?

19   A.   Right.

20   Q.   And in their published article they summarize their

21   findings as showing, if we just look at sexual reconviction

22   rates for those 1,300 offenders, which they didn't screen for

23   any particular high risk, low risk --

24   A.   That's right.

25   Q.   -- that between the ages of 40 and 50 you have a 5.6

1  recidivism rate, correct?

2  A.    Correct.

3  Q.    And between the ages of 55 plus the recidivism rate

4  actually goes up to 6.1 percent, correct?

5  A.    Yes.  Very minor, still low and with a younger group

6  beginning with 55, not 60 plus.  So, that's what I was

7  intimating earlier.

8  Q.    That's fine, but the recidivism rate between 40 to 54 is

9  lower than the recidivism rate of the 55-plus group, correct?

10  A.    It is lower, but they're both low numbers.

11  Q.    But that, certainly, is an odd finding in light of the

12  general observed trend that there would be an uptake?

13  A.    I can't say that it is not typical, but then, when you

14  look at the actual recidivism rates, they're so low that the

15  bottom line is who cares if it's a little high because they're

16  both so low.

17  Q.    You're familiar with the work of Dr. Barbaree?

18  A.    I am very familiar with the work of Dr. Barbaree.

19  Q.    Okay.  And one of Dr. Barbaree's theories is that declines

20  in libido associated with age could be one explanation for

21  declines in sexual recidivism, correct?

22  A.    Could be.

23  Q.    But there are studies suggesting, and I quote, The

24  assumption of a uniform decline in sexual recidivism with

25  increasing age is theoretically suspect.

1    A.   What are you reading out of there?

2    Q.   I'm asking if there are studies that have posited that

3    Dr. Barbaree's theory is theoretically suspect.

4    A.   Yes.  There have been comments about it, yes.

5    Q.   Okay.  Now, you're familiar with a 2006 article by

6    Dr. Thornton.

7    A.   I am.

8    Q.   And Dr. Thorton, again, is another respected researcher in

9    the field, correct?

10   A.   He is.

11   Q.   And in 2006 he published an article in *Sexual Abuse:  A*

12   *Journal of Research and Treatment* --

13   A.   Yes.

14   Q.   -- entitled *Age and Sexual Recidivism:  A Variable*

15   *Connection*, correct?

16   A.   Yes.

17   Q.   And he looked at a group of about 750 sexual offenders,

18   correct?

19   A.   Correct.

20   Q.   And he found that, when he parsed out that group by the

21   number of prior sentencing occasions, that the individuals with

22   two or more prior sentencing occasions continued to vigorously

23   offend right up until age 60 at almost a 50 percent rate,

24   correct?

25   A.   That's what he found.

1   Q.   Okay.  And, in his view, that data, and in his published

2   article he opined that that data was inconsistent with the

3   decline in age for that particular subset of offenders,

4   correct?

5   A.   Prior to age 60 --

6   Q.   Yes.

7   A.   -- which is a big issue in this case.

8   Q.   Sure.

9   A.   But, yes.

10  Q.   Okay.  And, indeed, he posited that a possible explanation

11  for this lack of change during the middle years might be that

12  for the group of repeat offenders, that is, sort of sexually

13  dedicated offenders, sex had come to serve as the primary means

14  of gratifying a diverse range of motives, expression of anger,

15  reduction in stress or other negative emotions, gratification

16  of needs for intimacy or excitement, etc.  Thus, reduction in

17  one motivational force, the sex drive, would still leave the

18  behavior supported by another -- a range of other forces.

19  A.   Yes.

20  Q.   Okay.  Finally, offenders whose crimes are deemed most

21  significant by the criminal justice system you would agree are

22  underrepresented in criminal -- in recidivism studies, correct?

23  A.   I would.

24  Q.   That, basically, gentlemen who have served 10-, 20-,

25  30-year sentences are going to be underrepresented in

1    recidivism studies, because recidivism studies look at people

2    that are on the street, correct?

3    A.    It does.

4    Q.    In order to be eligible to be in a study about whether you

5    will reoffend on the street, you have to be on the street,

6    correct?

7    A.    Correct.

8    Q.    So, individuals who are serving 20 to 30 years have less

9    time on the street to be in the studies at all, correct?

10   A.    On the surface, that's true, but it also certainly depends

11   on when the study is being done and --

12   Q.    Well, I went through this at your deposition with you.   If

13   we posit a study that looked at people released over a ten-year

14   period --

15   A.    Yes.

16   Q.    -- how many people serving a 20-year sentence would be

17   eligible to be in that study?

18   A.    All the ones whose 20-year sentence expired during that

19   10-year period.

20   Q.    They would have had to have been sentenced at least 10

21   years before, correct?

22   A.    Sure.

23   Q.    How many people serving a 4-year sentence would be

24   eligible for the study?

25   A.    All of them.

1    Q.    Every, single one.  So, I asked:  Conversely, individuals

2    serving much shorter sentences are more likely to appear in

3    recidivism studies by virtue of the simple fact that they're

4    more often eligible to be in the studies for greater periods of

5    time, correct?

6    A.    That's right.

7    Q.    So that, just as a matter of probabilities, individuals

8    serving longer sentences are likely to be underrepresented,

9    correct?

10   A.    In certain studies, yes.  If they're like the Prentky

11   study, no.  But, yes.

12   Q.    And Dr. Hanson himself noted this limitation, again

13   looking at the 2006 article.  Can you read the highlighted

14   section?

15   A.    Further research is needed to know how advanced age

16   influences the recidivism risk of offenders who grow old in

17   prison.  The offenders deemed most dangerous by the criminal

18   justice system are likely to serve very long sentences and

19   would be underrepresented in recidivism studies.  The current

20   study did not distinguish between offenders who were released

21   after serving a very long time and those convicted at an

22   advanced age.  Based on typical sentences in the jurisdictions

23   involved, most of the offenders would have served relatively

24   short sentences, in parens, less than 4 years, and

25   approximately one-third were not incarcerated at all for their

1    indexed offense.

2    Q.    I have one last question, Doctor.

3    A.    Yes.

4    Q.    Dr. Hanson has posited that lower offending in older

5    offenders may be the result of a learning effect, correct?

6    A.    He has.

7    Q.    Much of the age decline -- I'm just going to read -- this

8    is the 2002 article, correct?

9    A.    Yes, it is.

10   Q.    And we've referred to that as a published peer-reviewed

11   article?

12   A.    Yes.

13   Q.    Much of the age decline in sexual offending could also be

14   attributed to a simple learning effect, right?

15   A.    Correct.

16   Q.    With experience, men can learn that sex offending is not

17   an effective route to happiness, or, more disturbingly, they

18   can learn new and better ways to avoid detection.  Is that

19   correct?

20   A.    That's what it says.

21   Q.    Okay.  And, certainly, those statements are both true.

22   A.    They could be.  They're just positing reasons.

23            MR. GRADY:  Just a moment, your Honor.

24                       (Pause)

25            MR. GRADY:  Nothing further, your Honor.

1          MR. WATKINS:  If we may just have a moment, your

2     Honor.

3                         (Pause)

4                    REDIRECT EXAMINATION

5     BY MR. GOLD:

6     Q.    Dr. Plaud, did you ask Mr. Hunt about the pictures?

7     A.    My recollection is that I had intended to, but I did not.

8     I was aware of it.  There was something going on during the

9     interview that caused me to curtail some of the interview.

10    Q.    And what was going on during the interview?

11    A.    And it wasn't his fault; that's what I said, it was mine.

12    He was in great distress and great pain at the time.

13    Q.    And why was that?

14    A.    Because of the reaction he had had to a course of

15    antibiotics for a staph infection that he had contracted whilst

16    in the institution.

17    Q.    And is this the issue that he had which you thought might

18    be -- or you referred to as theoretically potentially

19    life-threatening?

20    A.    Resistance to antibiotics for staph infection is generally

21    not a good thing, so, yes.

22    Q.    Are you familiar with the fact that -- well, you mentioned

23    that you're aware that Mr. Hunt owes the State of New York

24    parole.

25              MR. GRADY:  Objection.  Beyond the scope of cross.

1        MR. GOLD:  That's fair.

2        THE COURT:  It is, but go ahead, ask the question.

3   Just try to see if you can shave it down just a little bit.

4   BY MR. GOLD:

5   Q.   Are you familiar with Mr. Hunt's parole condition?

6   A.   Yes.

7   Q.   You testified during cross-examination that parole

8   conditions are not a protective factor; is that right?

9   A.   Generally, I do not consider them to be, that's correct.

10  Q.   What impact do the parole conditions, if any, have on your

11  opinion in this case?

12  A.   They don't.

13  Q.   You testified that the context of Mr. Hunt's offending was

14  unlikely to be repeated, and the government presented you with

15  certain examples of behavior which he could potentially repeat.

16  Could you explain what your analysis is with respect to that

17  point?

18  A.   Well, my point is, is that, and I believe in

19  cross-examination it was brought up, he had a lifestyle and it

20  was an offense-based lifestyle that, as a consequence, among

21  other things, produced a number of victims.  I'm fully aware of

22  that; I've spent hours reading about it.

23        I do not believe that scenario, that lifestyle

24  orientation that formed the basis for his offending conduct

25  over a significant period of time when he was younger, is

1    likely to be reenacted, is likely to be regenerated at this

2    time with his current health condition, his current age, his

3    current conditions, especially when you tack on at least three

4    years of supervision and parole.  It's just not going to --

5    it's very unlikely that he's going to return to that lifestyle

6    that formed the basis for his offending conduct.

7    Q.   Are you familiar with the research on the testosterone

8    issue and age and sexual behavior?

9    A.   I'm familiar with it.  I've published myself in that area.

10   Q.   Well, what is the connection between testosterone and

11   sexual behavior?

12   A.   Well, as a function of age, including beginning in one's

13   mid-30s, testosterone production starts to decline as well as

14   several other hormones and neurotransmitters that are

15   associated with the male sexual response cycle.

16   Q.   Well, is the idea that testosterone is related to sexual

17   behavior theoretically suspect, in your opinion?

18   A.   No, not at all.  It's the key male hormone.  No

19   testosterone, no sex drive.  It's as simple as that.

20   Q.   And this idea that it's theoretically suspect was

21   attributed to Dr. David Thornton.  Are you familiar with Dr.

22   Thornton?

23   A.   Yes.

24   Q.   And who is Dr. Thornton?

25   A.   Dr. Thornton is the co-director of the Sand Ridge Center

1    in Minnesota, and he is a coauthor of the Static-99.

2    Q.   And what is the Sand Ridge Facility?

3    A.   It's a secure treatment facility for sex offenders, risky

4    sex offenders.

5    Q.   And are there aging sex offenders in that facility?

6    A.   Yes.

7         MR. GOLD:  No further questions, Judge.

8         THE COURT:  Okay.

9         MR. GRADY:  Nothing further.

10        THE COURT:  All right.  You are excused, Doctor.

11   Thank you.

12        THE WITNESS:  Thank you, Judge.

13                    (Witness stepped down)

14        THE COURT:  Now, what do you have left in the case?

15        MR. GOLD:  We have --

16        THE COURT:  I am thinking of both of you.

17        MR. GRADY:  The government has nothing additional.

18        THE COURT:  You are not planning any rebuttal

19   testimony, then?

20        MR. GRADY:  At this point, no, your Honor.

21        THE COURT:  Okay.  And all you have is this doctor

22   that we just excused?

23        MR. GOLD:  Dr. Barbaree, yes.

24        THE COURT:  Is he still out there?  Maybe we could --

25        MR. GOLD:  Start with him?

1          THE COURT:  Well, we have got some time.

2          MR. GRADY:  I'm sorry, your Honor.  I was better with

3   complying with the Court's order to speed up than I thought I

4   would be.

5          THE COURT:  You did well.

6          He left?

7          THE COURT SECURITY OFFICER:  He left the building.

8          THE COURT:  Like Elvis.  So, we will see you tomorrow

9   at 10:00.  But we just have that one witness and then the case

10  is over?

11         MR. GOLD:  That's it.

12         THE COURT:  Okay.

13  (Whereupon, the proceedings adjourned for the day at 3:50 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

4            I, Brenda K. Hancock, RMR, CRR and Official Reporter

5    of the United States District Court, do hereby certify that the

6    foregoing transcript, from Page 1 to Page 113, constitutes, to

7    the best of my skill and ability, a true and accurate

8    transcription of my stenotype notes taken in the matter of

9    *United States of America v. Wayne Hunt*, No. 07-cv-12063-JLT.

10

11

12

13

14

15                         /s/ *Brenda K. Hancock*

16                      Brenda K. Hancock, RMR, CRR

17                      Official Court Reporter

18

19

20

21

22

23

24

25