# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 07-12063-JLT |
| | ) | |
| WAYNE HUNT, | ) | |
| | ) | |
| Respondent. | ) | |

_____)

## GOVERNMENT'S PROPOSED FINDINGS OF FACT

The United States respectfully requests that the Court enter the following findings of fact and conclusions of law in this matter, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## INTRODUCTION

On March 7, 2007, Petitioner, United States of America initiated this proceeding, seeking to have Respondent Wayne Hunt ("Hunt") civilly committed as a "sexually dangerous person" under the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, Title 111, § 302(4), 120 Stat. 620 (July 27, 2006), codified at 18 U.S.C. §§ 4247-4248 (the "Adam Walsh Act"). To order such commitment, the Court must conclude, after an evidentiary hearing at which the government bears the burden of proof, that an individual is a sexually dangerous person as defined by the Adam Walsh Act. If the Court finds that the government has satisfied its burden, the individual must be committed to a suitable facility for mental health treatment until he is determined to no longer be sexually

dangerous to others. 18 U.S.C. § 4248(d).

Pursuant to 18 U.S.C. § 4247(d), the Court conducted a trial in this matter from April 27, 2009 through May 1, 2009.  The Court heard the testimony of six witnesses: (1) Bernard Katz, the court-designated examiner; (2) Luis Rosell, Psy.D., an expert designated by this Court at the request of Hunt; (3) Amy Phenix, Ph.D., a government retained expert; (4) Joseph Plaud, Ph.D., an expert retained by the defense; (5) Dr. Howard Barbaree, Ph.D., an expert retained by the defense; and (6) James Donaghy, a retired New York corrections officer.  The Court also received various exhibits into evidence, Joint Exhibits 1-28 and Government Exhibits A-C, E-K, and N-Q, including the experts' reports and curriculum vitae, various records concerning Hunt's past criminal conduct, and records of Hunt's treatment while incarcerated.

## <u>FINDINGS OF FACT</u>

### I.   <u>Background</u>

#### A.   **Personal History**

1.     Hunt was born in Albany, NY and raised in Troy, NY.  Joint Ex. 3, p. 2; Joint Ex. 9, p. 3. Hunt reported that he was adopted at the age of 18 months and grew up as an only child.  Joint Ex. 1, p. 1; Joint Ex. 3, p. 2; Joint Ex. 9, p.3.

2.     Hunt reported a history of physical abuse at the hands of his adoptive mother, which began when Hunt's father passed away when Hunt was 14 or 15 years-old.  Joint Ex. 1, p. 1; Joint Ex. 3, p. 2; Joint Ex. 9, p. 3-4.

3.     Hunt reported that after his father's death he began running away, performing poorly

at school and had a juvenile conviction for breaking and entering.  Joint Ex. 1, p. 2;
Joint Ex. 3, p. 2; Joint Ex. 9, p. 3-4.

4.      Hunt had at least one (and possibly up to three) period(s) of inpatient psychiatric
commitment during this time period.  Joint Ex. 1, p. 2; Joint Ex. 3, p. 2, 4; Joint Ex.
5, p. 9, 15; Joint Ex. 9, p. 3-4.

5.      Hunt did not graduate high school but later obtained a GED while incarcerated.  Joint
Ex. 3, p. 2; Joint Ex. 9, p. 3.

6.      Hunt reports that he was sexually abused as a child beginning at age 7, and continuing
until he was 10 or 11,  by an "uncle" in his thirties who lived next door.  Joint Ex 1,
p. 2; Joint Ex. 3, p. 2; Joint Ex. 9, p. 4.

7.      Hunt further reports sexual assault at the hands of a Baptist preacher between ages 12
and 14.  Joint Ex. 1, p. 2; Joint Ex. 3, p. 2; Joint Ex. 9, p. 4.

8.      Hunt also reported to some of the interviewing psychologists, but not others, a history
of sexual assault by members of a nearby yacht club between the ages of 10-14.  Joint
Ex. 3, p. 2; Joint Ex. 9, p. 4.

9.      Hunt reports that he had his first heterosexual experience at age "14," which he
described as "all right," and reports that for many years  he "tried being straight," but
by his twenties, his sexual fantasies changed to reflect his pedophilic interests.  Joint
Ex. 1, p. 2.

10.     Hunt reports that he had a fifteen year, on and off, relationship with a woman named
"Kathy" with whom he has two daughters.  Joint Ex. 1, p. 2; Joint Ex. 3, p. 3; Joint

Ex. 5, p. 10.

11.     Hunt joined the Navy at age 18 and appears to have been honorably discharged in 1965.  Joint Ex. 1, p. 2; Joint Ex. 3, p. 2; Joint Ex. 5, p. 9; Joint Ex. 9, p. 4; Joint Ex. 14.

### B.     Pertinent Occupational History

12.     Hunt has worked in the past primarily in the carnival business, though he has also worked as a karate instructor for young boys, as an electrician, and running tugboats. Joint Ex. 1, p. 3; Joint Ex. 3, p. 3; Joint Ex. 5, p. 9; Joint Ex. 9, p. 4.

13.     While incarcerated, has obtained considerable experience with computers.  Joint Ex. 1, p. 3; Joint Ex. 3, p. 3.

### C.     Non-Sexual Criminal Offending

14.     Hunt was disciplined while in the Navy for going AWOL and for failure to obey a lawful order.  Joint Ex. 1, p. 2; Joint Ex. 3, p. 2-3; Joint Ex. 5, p. 9, 11; Joint Ex. 9, p. 4.

15.     In March of 1966, Hunt was charged with breaking and entering in Hartford Connecticut, but those charges were dismissed.  Joint Ex. 3, p. 4; Joint Ex. 5, p. 11; Joint Ex. 9, p. 5.

16.     In December of 1966, Hunt was charged with Burglary, though no disposition is recorded for that charge.  Joint Ex. 3, p. 4; Joint Ex. 5, p. 12; Joint Ex. 9, p. 5.

17.      In August of 1967, Hunt spent thirty days in jail for writing a fraudulent check.  Joint Ex. 3, p. 4; Joint Ex. 5, p. 12; Joint Ex. 9, p. 5.

18. In August of 1970 Hunt was charged with being a fugitive, though no disposition is reflected for that charge.  Joint Ex. 3, p. 4; Joint Ex. 5, p. 12; Joint Ex. 9, p. 5.

19. In September of 1970, Hunt was convicted of grand larceny and received a conditional discharge.  Joint Ex. 4, p. 4; Joint Ex. 5, p. 12;  Joint Ex. 9, p. 5.

## II.   Hunt Has Engaged In Prior Acts of Child Molestation

20. A summary of the extensive documentation of Hunt's past sexual offending was admitted into evidence without objection.   Government Exhibit O; Tr. D. 1, p. 48.[1]

21. The accuracy of the summary was affirmed by each of the four experts who evaluated Hunt for the purpose of offering an opinion as to Hunt's sexual dangerousness.  Tr. D. 1, p. 46-48; Tr. D. 2, p. 94; Tr. D. 3, p. 12; Tr. D. 4, p. 60 .

### A.   Sexual Offenses Prior to Hunt's First Arrest

22. Prior to his first arrest for a sexual offense in June of 1973, at age 27, Hunt engaged in mutual oral sex with an eleven to twelve year old boy that he met at a mall in California.   Tr. D. 1, p. 48-49; Joint Exhibit 3, p. 10; and Gov. Exhibit O, p. 1.

23. Also prior to his first arrest for a sexual offense in June of 1973, on two or three occasions, Hunt engaged in mutual masturbation with a young male approximately 14 years of age whom he had met at a carnival.  Tr. D. 1, p. 49; Joint Exhibit 3, p. 10; and Gov. Exhibit O, p. 1.

### B.   *California v. Hunt*, California Superior Court Action 42920 (1973)

24. On June 4, 1973, Hunt was arrested and charged in California Superior Court with

---

[1]"Tr. D." refers to the transcript of the proceedings by day of trial, 1-5.

two felony counts of committing a lewd and lascivious act upon a child under the age of fourteen in violation of Section 288 of the California Penal Code.  Tr. D. 1, p. 49-50; Joint Exhibit 25; Gov. Ex. O, p. 1.

25.   The two victims, D.W.[2] (age 11) and J.C. (age 11), testified at a probable cause hearing on June 22, 1973, at which Hunt was represented by counsel.  Tr. D. 1, p. 49-50; Joint Ex. 25, p. HU1632-1673;[3] Gov. Ex. O.

26.   Both testified that on June 3, 1973, Hunt had approached them at a carnival.  Tr. D. 1, p. 49-50; Joint Ex. 25, p. HU1638, ln. 10-31; HU1654, ln. 18-32, HU1655, ln. 1-2; Gov. Ex. O.

27.   Neither knew Hunt before that day.  Joint Ex. 25, p. HU1638 ln. 10-26; HU1655 ln.20 - HU1656 ln. 2.

28.   J.C. testified that Hunt had tickled him, kissed him, and attempted to put his hand in J.C.'s pants.  Tr. D. 1, p. 49-50; Joint Ex. 25, p. HU1639, ln. 21-23, 27-32; HU1640, ln. 1-16; and HU1647, ln. 9-17; Gov. Ex. O.

29.   W.C. testified that Hunt had tickled him, kissed him, lowered his pants and fondled his penis, and asked W.C. to fondle Hunt's penis.  Tr. D. 1, p. 49-50; Joint Ex. 25, p. HU1656, ln. 13- HU1659; Gov. Ex. O.

30.   On August 3, 1973, Hunt entered a plea of guilty to a single count of a lesser included

---

[2]Minor victims are identified by their initials pursuant to Local Rule 5.3(A)(2).

[3]The Exhibits were previously bates stamped during the course of discovery.  For ease of reference, when referring to particular pages within the Exhibits that have been bates stamped, the bates stamped page numbers will be referenced.

offense, a misdemeanor violation of California Penal Code 647a (annoying or molesting a child under 18) and the second charge was dismissed.  Tr. D. 1, p. 50-51; Joint Ex. 25, p. HU1674, 1677; Gov. Ex. O.

31.   Though Hunt only pled guilty to one charge, Hunt acknowledges having oral sex with one of the boys and touching the other child (with clothes on).  Joint Ex. 3, p. 10; Gov. Ex. O.

32.   On September 7, 1973, Hunt was sentenced to three years of probation.  As a condition of that probation, Hunt was specifically prohibited from having unsupervised contact with any minor under the age of 14. Tr. D. 1, p. 50-51; Joint Ex. 25, p. HU1676-77; Gov. Ex. O.

33.   On September 18, 1973, Hunt failed to report as required by the terms of his probation, and, on November 21, 1973, probation sought a warrant for Hunt's arrest.  A bench warrant was issued.  Tr. D. 1, p. 51-52; Joint Ex. 25, p, HU1687-1689, 1684; Gov. Ex. O.

34.   On or about March 7, 1977, the bench warrant was recalled and Hunt was sentenced to time served, in absentia, because Hunt was serving a federal kidnapping sentence.  Tr. D. 1, p. 51-52; Joint Ex. 25, p. HU1680-1682; Gov. Ex. O.

**C.    Hunt's Sexual Offending Between September 1973 and August 1976**

35.   At some point after being placed on probation in California, Hunt moved back to Louisiana.  Tr. D. 1, p. 53-59; Joint Ex.  3, p. 11; Gov. Ex. O, p. 2.

36.   Hunt reported in an interview with Dr. Rosell that at age 29 (between 1975-1976) he

had four victims between the ages of 12-16 on whom he performed oral sex.  Tr. D. 1, p. 54; Joint Ex. 3, p. 11; Gov. Ex. O.

37.   Hunt has acknowledged to Dr. Rosell that prior to his arrest on federal kidnapping charges in September of 1976, Hunt worked as a karate instructor for young boys between the ages of 12 and 16 in Louisiana.  "[Hunt] stated they were allegations and he was never charged and they were dropped.  He also indicated that he did victimize some of the boys while teaching karate."  Joint Ex. 3, p. 8-9, 11.  See Tr. D. 1, p. 54, 57-58; Joint Ex. 24, p. 1449; Gov. Ex. F, p. HU1010; Gov. Ex. O, p. 2.

38.   Hunt further stated in treatment as to this period, "I ended up downtown Sacramento and started picking up young male prostitutes[4] (which I will call previously abused children).  After a few times I was caught by police trying to solicit and was arrested and pled to harassment a non-sex charge.  After this I went to Louisiana . . . I bought a boat and lived on it, and would go to New Orleans to find male prostitutes.  Of course I was looking for underage previously abused children and I found them."  Joint Ex. 23, p. 1368.

39.   Hunt also reported to BOP psychiatrists on March 15, 1977, the following offense history:

> [F]or the past 20 years he [Hunt]  has been involved in pedophillic activity, such as masturbatory practices with boys between the ages of 8 years old to 15 years old, but he prefers boys who are 12 years old,

---

[4]It should be noted that Hunt's description of the two 1973 Sacramento, California victims, D.W. and J.C., as "prostitutes" is contradicted by the children's testimony in that matter.  See Joint Ex. 25, p. HU1632-1673.

thin, medium height and neatly dressed.  Most frequently Mr. Hunt masturbates the boys, but at times the boy will masturbate him and he will sleep with the boy, but he denies kissing or hugging with the boy while in bed.  As an example, Mr. Hunt indicates that from January 1976 until his arrest in September 1976, he has had masturbatory practices with about 15-20 different boys and up to 25 times with the same boy.

Tr. D. 1, p. 56-57; Gov. Ex. C; Gov. Ex. O, p. 2-3.

> **D.     Hunt's 1976 Federal Kidnapping Conviction:** *United States v. Wayne Hunt* **Criminal Action No. 76-738 (W.D. La.)**

40.    On September 13, 1976, Hunt was indicted on charges that on or about August 4, 1976, he kidnapped a 12 year old boy, K.J.T, in violation of 18 U.S.C. §1201.  Tr. D. 1, p. 59-61; Joint Ex. 24, p. HU1389, 1436, 1415; Gov. Ex. O, p. 3.

41.    Hunt acknowledges that his motivation in committing that crime was an interest in having sex with K.J.T., but denies having molested K.J.T.  Tr. D. 1, p. 59-61; Tr. D. 2, p. 95-96; Joint Ex. 3, p. 11; Gov. Ex. A, p. HU97; Gov. Ex. O, p. 3.

42.    Hunt possessed a firearm during the course of this offense but claims that the weapon was not loaded and was not displayed to K.J.T.  Tr. D. 1, p. 58-59; Gov. Ex. A, p. HU97; Gov. Ex. O, p. 3.

43.    Hunt was arrested on September 16, 1976, and, on February 14, 1977, entered a plea of guilty.  Hunt was initially given a life sentence but on May 15, 1977, that sentence was reduced to ten years imprisonment.  Tr. D. 1, p. 60; Joint Ex. 24, p. HU1391; Gov. Ex. O, p. 3.

44.    Hunt was paroled and released from federal prison on September 11, 1981.  Tr. D.

1, p. 61; Gov. Ex. F, p. HU1017-1018; Gov. Ex. O, p. 3.

E.     *New York v. Wayne Hunt*, **Indictments W-6131, W-7031 Rensselaer County, New York**

45.    Hunt returned to New York after his release from federal custody, and, in and around the summer of 1982, Hunt began sexually victimizing a group of new minor victims and that sexual abuse continued until his arrest in 1985.  Tr. D. 1, p. 65; Tr. D. 4, p. 72; Joint Ex. 3, p. 11; Gov. Ex. O, p. 3-6.

46.    Ultimately, Hunt sexually abused well over a dozen children between 1982 and 1985 whose ages ranged from 7 to 14.  Tr. D. 1, p. 75, 80-81; Joint Ex. 3, p. 11; Joint Ex. 23, p. HU1291-1299 and 1315-1381; Gov. Ex. O.

47.    On or about April 6, 1985, Hunt was indicted in Rensselaer County New York and arrested on charges that he had engaged in sodomy with a thirteen year old boy and had engaged in sexual abuse of a twelve year old boy.  Tr. D. 1, p. 75-76, 81; Joint Ex. 19; Joint Ex. 20; Gov Ex. K, p. 1570, ¶ 5; Gov. Ex. O, p. 4.

48.    After his release on bail for these charges, on May 25 1985, Hunt failed to report to his  federal parole officer and failed to report his change in address.  Tr. D. 1, p. 76-77, 82; Tr. D. 4, p. 72-73; Gov. Ex. F, p. HU1067, 1104; Gov. Ex. O, p. 4; Hunt v. U.S Parole Cmm'n, 2006 WL 2051069, *3 (S.D.N.Y. July 21, 2006).[5]

49.    Hunt also failed to appear for a July 1, 1985, hearing in the state criminal proceedings.

_____

[5]The Court did not allow into evidence the New York district court's opinion but took judicial notice of it and indicated it could be cited by the government.  Tr. D. 1, p. 77-78.

Tr. D. 1, p. 76-77; Gov. Ex. F, p. HU1020, 1067, 1104; Gov. Ex. K, p. HU1570, 1586; Gov. Ex. O, p. 4.

50.    Both a state warrant and federal parole warrant were issued for Hunt's arrest.  Tr. D. 1, p. 77; Gov. Ex. F, p. HU1020; Gov. Ex. K, p. 1570, 1576-1577; Gov. Ex. O, p. 4; Hunt v. U.S Parole Cmm'n, 2006 WL 2051069, *1-3.

51.    During this same period, in April and May of 1985, Hunt rented a generator and ATV from local businesses and failed to return them and ceased making payments on a Ford pick up truck that he had purchased in May of 1984.  Tr. D. 1, p. 82; Tr. D. 4, p. 73; Gov. Ex. K., p. HU1562, 1570-1571; Gov. Ex. O, p. 4.

52.    Hunt stole the generator and ATV so that he could set up a campsite in a remote part of New York both to evade capture and to allow him to continue sexually offending against H.D. and L.A., twelve and fourteen year old boys that Hunt took with him when he fled authorities.[6]  Tr. D. 1, p. 82-83; Tr. D. 2, p. 97; Tr. D. 4, p. 73-75.

53.    Several months latter, on August 8, 1985, New York State Police investigating an area in which Hunt's pick up truck had been located found the two juveniles, L.A., a male age twelve, and H.D., a male age fourteen, at a campsite near Hunt's vehicle.  Tr. D. 1, p. 82-84; Gov. Ex. K, p. HU1571; Gov. Ex. O, p. 4-5.

54.    Hunt was arrested later that day at a nearby truck stop.  Tr. D. 1, p. 83-84; Gov. Ex. F, p. HU1067; Gov. Ex. K, p. 1571-1572, 1576-1577; Gov. Ex. O, p. 5.

55.    At the time of Hunt's arrest in August 1985, among the items located in Hunt's trailer

---

[6]Hunt was later convicted of kidnapping the two juveniles.  See infra.

(along with the stolen ATV and generator) were numerous photographs of children engaged in sexual acts with Hunt and with each other.  Tr. D. 1, p. 84, Gov. Ex. K, p. HU1569, 1582, 1589, 1591; Gov. Ex. O, p. 5.

56.   With respect to the generator and ATV that Hunt stole in April or May of 1985, on October 28, 1985, Hunt pled guilty to charges of grand larceny in Albany County Court and was sentenced to two to four years of incarceration.  Tr. D. 1, p. 82; Gov. Ex. F, p. HU1028, 1030, 1104; Gov. Ex. O, p. 5; Hunt v. U.S. Parole Com'n, 2006 WL 2051069, *3.

57.   On November 18, 1985, Hunt entered a plea of guilty to one count of the April 1985, initial, sodomy  indictment, Joint Exs. 19-20, and on December 5, 1985, Hunt was sentenced to two to four years of incarceration for that offense.  Tr. D. 1, p. 85; Joint Ex. 19; Gov. Ex. O, p. 5.

58.   Further investigations of the photos seized at the time of Hunt's August 1985 arrest led to the identification of numerous child victims and the filing of a further sixty count indictment charging Hunt with, *inter alia*, kidnapping, use of children in a sexual performance, promoting the sexual performance of children, and sodomy in the first and second degrees.   Tr. D. 1, p. 84; Joint Ex. 22; Gov. Ex. K, p. HU1591-1625; Gov. Ex. O, p. 5.

59.   Two years later, on October 15, 1987, Hunt entered a plea of guilty to eighteen counts of the sixty count indictment. Tr. D. 1, p. 85; Joint Ex. 16, p. HU1143-1163; Joint Ex. 21; Joint Ex. 22; Gov. Ex. O, p. 5.

60.     As to Counts 1 and 2, charging the crime of kidnapping in the first degree (reduced
        to charges of kidnapping in the second degree as part of the plea), Hunt pled guilty
        to, in May of 1985, kidnapping a twelve year old boy, L.A., and a fourteen year old
        boy, H.D.  Tr. D. 1, p. 85; Joint Ex. 16, p. HU1147-1150, 1157; Joint Ex. 21; Gov.
        Ex. O, p. 5.

61.     Hunt's offending against L.A. and H.D. was far more extensive than the conduct for
        which Hunt was convicted.  Hunt began sexually abusing the two boys, L.A., at the
        age of 8-9, and H.D., at the age of 11, approximately four years prior to his arrest in
        August 1985.  Hunt has acknowledged that over this period he photographed these
        children engaged in sexual acts, and that he engaged in oral and anal sex with both
        L.A. and H.D.  Tr. D. 1, p. 73-74.  Joint Ex. 3, p. 11; Joint Ex. 23, p. HU1318, 1320,
        1352-1353; Gov. Ex. K, p. HU1594-1595 Gov. Ex. O, p. 4. As to the kidnapping,
        Hunt stated, "L.A. and H.D. went with me when I jumped bail and went to Macina.
        The taking of them with me for sexual gratification led to the kidnap charges."  Joint
        Ex. 23, p. HU1353.

62.     As to Counts 3-6, charging the crime of using a child in a sexual performance, Hunt
        pled guilty to, between June and August 1984, authorizing or inducing a nine year old
        boy, G.D., a nine year old boy, H.R., a thirteen or fourteen year old boy, J.S.#1, and
        an eleven year old boy, J.Z., to engage in a sexual performances which consisted of

taking photographs of G.D., H.R., J.S.#1[7] and J.Z. while they engaged in sexual conduct, a class C felony.  Tr. D. 1, p. 85-86; Joint Ex. 16, p. HU1150-1151, 1157-1158; Joint Ex. 21; Gov. Ex. O, p. 5.

63.   Hunt acknowledged that the scope of his offending against G.D, J.Z. and H.R. was much greater than that for which he was convicted.  For example, Hunt began abusing G.D. when he was seven, in the Summer of 1982.  Tr. D. 1, p. 66-68; Gov. Ex. K, p. HU1592; Gov. Ex. O, p. 3.  According to Hunt, "there is no telling how many times we had sex.  In [G.D.]'s case at least some type of abuse daily."  Tr. D. 1, p. 66-68; Joint Ex. 3, p. 11; Joint Ex. 23, p. HU1338, 1352; Gov. Ex. K, p. HU1592; Gov. Ex. O, p. 3.   Similarly, Hunt began abusing J.Z. in October 1982, when he was a nine, and that abuse was ongoing until Hunt's arrest in 1985.  Tr. D. 1, p. 68-70; Joint Ex. 3, p. 11; Joint Ex. 23, p, HU1317, 1327, 1333, 1348, 1349-1350; Gov. Ex. K, p. HU1595; Gov Ex. O, p. 3-4.  Hunt began abusing H.R. in 1982 when he was nine, and that abuse continued until Hunt's arrest in 1985.  Hunt also directed H.R. to have sex with his seven year old younger brother, J.R.  Tr. D. 1, p. 72-73; Joint Ex. 3, p. 11; Joint Ex. 23, p. HU1353;  Gov. Ex. K, p. HU1593; Gov. Ex. O, p. 4.

64.   As to Counts 7-9, charging the crime of promoting the sexual performance of a child, Hunt pled guilty to, between May and July 1984, offering or agreeing to promote photographs depicting  a twelve year old boy, J.S.#2, a twelve to thirteen year old girl,

---

[7]J.S.#1 and J.S.#2 are brothers.  Joint Ex. 23, p. HU1319, 1341.  J.S. #1 was thirteen or fourteen and J.S. #2 was twelve.  Joint Ex 16, p. HU1151, 1155.

L.W., and an eleven year old boy, J.Z., engaged in sexual conduct.  Tr. D. 1, p. 86; Joint Ex. 16, p. HU1151-1152, 1158-1159; Joint Ex. 21; Gov. Ex. O, p. 5-6.

65.    As to Count 11, charging the crime of sodomy in the first degree, Hunt pled guilty to, between December 1984 and January 1985, engaging in deviant sexual intercourse with a ten year old boy, G.D., such conduct involving Hunt performing oral and/or anal sex upon G.D. Tr. D. 1, p. 86; Joint Ex. 16, p. HU1152-1153, 1159; Joint Ex. 21; Joint Ex 22, p. 1231; Gov. Ex. O, p. 6.

66.    As to Counts 13-16, charging the crime of sodomy in the first degree, Hunt pled guilty to, between June and August 1984, engaging in deviant sexual intercourse with a ten year old boy, J.F., a seven year old boy, J.R., a nine year old boy, H.R.,  and an eight year old boy, A.W., such conduct involving  Hunt performing oral and/or anal sex upon J.F., J.R., H.R. and A.W.  Tr. D. 1, p. 86; Joint Ex. 16, p. HU1153-1154, 1160; Joint Ex. 21; Joint Ex. 22, p. 1232-1234; Gov. Ex. O, p. 6.

67.    As to Count 19, charging the crime of sodomy in the first degree, Hunt pled guilty to, in August of 1984, engaging in deviant sexual intercourse with a ten year old boy, P.W., such conduct involving  Hunt performing oral sex upon P.W.  Tr. D. 1, p. 86; Joint Ex. 16, p. HU1154, 1160; Joint Ex. 21; Joint Ex. 22, p. 1235; Gov. Ex. O, p. 6.

68.    As to Count 22, charging sodomy in the second degree, Hunt pled guilty to, between May and July 1984, engaging in deviant sexual intercourse with a thirteen year old male, J.S.#1, such conduct involving  Hunt performing oral sex upon J.S.  Tr. D. 1, p. 86-87; Joint Ex. 16, p. HU1154-55, 1160; Joint Ex. 21; Joint Ex. 22, p. 1237; Gov.

Ex. O, p. 6.

69.    As to Count 25, charging sodomy in the second degree, Hunt pled guilty to, between June and August 1984, engaging in deviant sexual intercourse with a twelve or thirteen year old male, J.S.#2, such conduct involving Hunt performing oral sex upon J.S.  Tr. D. 1, p. 87; Joint Ex. 16, p. HU1154-55, 1161; Joint Ex. 21; Joint Ex. 22, p. HU1238-1239; Gov. Ex. O, p. 6.

70.    As to Count 26, charging sodomy in the second degree, Hunt pled guilty to, between November and December 1984, engaging in deviant sexual intercourse with an eleven year old male, P.S., such conduct involving Hunt performing oral and/or anal sex upon P.S.  Tr. D. 1, p. 87; Joint Ex. 16, p. HU1154-55, 1161; Joint Ex. 21; Joint Ex. 22, p. HU1239; Gov. Ex. O, p. 6.

71.    Hunt acknowledged that his sexual offending against P.S. was more expansive than the conduct alleged in the indictment and occurred "over a four year period . . ." Joint Ex. 23, p. HU1333.

72.    On November 24, 1987, Hunt was sentenced to: 12 and 1/2 years to 25 years incarceration on Counts 1-2 (Kidapping 2nd degree) and Counts 11, 13-16, and 19 (Sodomy 1st degree); 7 and 1/2 to 15 years incarceration on Counts 3-6 (use of a child in a sexual performance); and  3 and 1/2 to 7 years incarceration on Counts 7-9 (promoting sexual performance of a child) and Counts 22, 25 and 26 (Sodomy 2nd degree).  All sentences were ordered to be served concurrently.  Tr. D. 1, p. 87; Joint Ex. 17, p. HU1167-1170; Joint Ex. 21; Gov. Ex. O, p. 6.

73.     That sentence was vacated on appeal, and on August 30, 1989, the sentence was

        reimposed.  Tr. D. 1, p. 87-88; Joint Ex. 18, p. HU1174-1175, 1203-1204; Joint Ex.

        21; Gov. Ex. O, p. 6; see also, People v. Hunt, 162 A.D.2d 782, 557 N.Y.S.2d 694

        (N.Y. 1990) (upholding the re-imposed sentence).

74.     Hunt is on parole from that sentence through July 11, 2012.  Tr. D. 1, p. 88-89; Gov.

        Ex. G, p. HU1731; Gov. Ex. O, p. 6.

### F.      Disciplinary Proceedings at Oneida Correctional Facility, New York

75.     On April 7, 1998, while serving his sentence at the Woodbourne Correctional

        Facility in New York, Hunt was found by correctional officers to be in possession

        of several photographs depicting young children including young boys in

        swimsuits.  Tr. D. 1, p. 90-94; Tr. D. 2, p. 139-144; Gov. Ex. E, p. HU981; Gov.

        Ex. G, p., HU1792-1793; Gov. Ex. O, p. 7.

76.     The photographs were located in a hidden directory on a computer used

        exclusively by Hunt.  Tr. D. 2, p. 140-143.

77.     Hunt was disciplined for possession of unauthorized literature and possession of

        property (the photographs) in an unauthorized area.  Tr. D. 1, p. 92-94; Tr. D. 2, p.

        139-144; Gov. Ex. E, p. HU978-979; Gov. Ex. O, p. 7.

78.     Despite the fact that none of the photos were explicitly pornographic, Hunt's

        possession of these photographs of young children while incarcerated was, in the

        opinion of *every* expert to testify, evidence of Hunt's ongoing pedophilic interests

and certainly "troubling" in light of his history of sexual offending against children.  Tr. D. 2, p. 52; Tr. D. 2, p. 108-109; Tr. D. 3, p. 69; Tr. D. 4, p. 76-77; Tr. D. 5, p. 86-88.

### G.      Federal Parole Proceedings

79.    At the time of his release in 1981 from federal custody, Hunt remained on federal parole for the 1977 kidnapping conviction.  Gov. Ex. O, p. 7; Hunt v. U.S. Parole Com'n, 2006 WL 2051069 (S.D.N.Y. July 21, 2006).

80.    In July of 1985, Hunt's parole officer notified the United States Parole Commission that Hunt had been charged with new sexual offenses in New York, that as of May 1985, Hunt had failed to report to his parole officer and had failed to keep his parole officer apprised of his address.  A parole violation warrant was issued. That warrant was amended twice, and ultimately included charges that Hunt had pled guilty to Grand Larceny and Sodomy while on parole.   Gov. Ex. F, p. HU1020-1021, 1023-1025; Gov. Ex. O, p. 7;  Hunt v. U.S Parole Cmm'n, 2006 WL 2051069, *1.

81.    At a dispositional hearing in 1990, Hunt acknowledged that he had been convicted of sodomy and grand larceny while on parole and admitted that after he was arrested in April 1985, "he left the area because of the indictment for the sexual crimes to avoid prosecution" and, as a consequence, that he had failed to comply with reporting requirements of federal parole.  Gov. Ex. F, p. HU1067; Gov. Ex. O, p. 7.

82. Hunt was detained by the U.S. Marshal in March of 2004, upon the completion of his state sentence in New York.  Gov. Ex. O, p. 7; <u>Hunt v. U.S Parole Cmm'n</u>, 2006 WL 2051069, *2.

83. "[Hunt's] final revocation hearing was held on June 30, 2004.  Mr. Hunt, represented by counsel, admitted that he had committed sexual abuse in the second degree and sodomy in the second degree and had failed to appear in court as directed; he admitted that he had failed to report to the parole officer; he admitted that he had failed to report a change in residence; and he admitted that he had committed grand larceny in the third degree."  <u>Hunt v. U.S Parole Cmm'n</u>, 2006 WL 2051069, *3.

84. After a final revocation hearing, the Parole Commission issued a final determination on March 4, 2005, requiring that Hunt serve out the entire balance of his federal sentence for the 1977 kidnapping conviction.  Gov. Ex. F, p. HU 1128-1129; Gov. Ex. O, p. 7;  <u>Hunt v. U.S Parole Cmm'n</u>, 2006 WL 2051069, *3.

85. Hunt completed his federal sentence on March 18, 2007.  Gov. Ex. O, p. 8.

86. Pursuant to the provisions of the Adam Walsh Act, 18 U.S.C. § 4247-4248, on March 7, 2007, the United States filed the instant action seeking to commit Hunt as a sexually dangerous persons and his release was stayed pending the outcome of these proceedings [D. 1].

87. All four experts to have evaluated Hunt agreed that Hunt had engaged in past acts of child molestation.  Tr. D. 1, p. 43. 94-95; Tr. D. 2, p. 93; Tr. D. 3, p. 11-12; Tr.

D. 4, p. 15; Joint Ex. 1, p. 4; Joint Ex. 3, p. 26-27; Joint Ex 5, p. 2; Joint Ex. 9, p. 7.

88.   Accordingly, having considered the forgoing evidence, this Court finds that Hunt has engaged in or attempted to engage in child molestation.

## III.   Hunt Suffers From A Serious Mental Illness, Abnormality, Or Disorder

### A.   Experts and Experts' Qualifications

89.   Pursuant to 18 U.S.C. § 4247(b), the Court designated, Bernard Katz, M.D., a licensed psychiatrist, as the court-designated examiner at the request of Hunt. [D. 15, 20]; Tr. D. 2, p. 82-83; Tr. D. 4, p. 58.

90.   Pursuant to 18 U.S.C. § 4247(b), the Court designated, Luis Rosell, Psy.D., a licensed psychiatrist, as the Respondent's designated examiner at the request of Hunt. [D. 36, 38] Tr. D.2, p. 43-44.

91.   The Court also heard testimony from an expert retained by the government, Dr. Amy Phenix, and two experts retained by Hunt, Joseph Plaud, Ph.D., and Howard Barbaree, Ph.D.  Tr. D. 3, p  1-178; D. 4, p. 1-112; D. 5, p. 1-109.

92.   Bernard Katz is a physician specializing in psychiatry.  Tr. D. 2, p. 83.  He is a graduate of the University of Louisville Medical School, has been licensed to practice medicine in Massachusetts since 1968, and has been board certified in psychiatry and neurology since 1974.  Tr. D. 2, p. 83-84; and Exhibit 2, p. 4.  He is presently employed as a senior psychologist for the Worcester County Jail and House of Correction, Tr. D. 2, p. 85, and has maintained a private practice in

general psychiatry since 1971.  Tr. D. 2. p., 85-86.  Dr. Katz is frequently called

upon to testify as an expert as to mental health issues generally, and, relevant to

the instant proceeding, has performed between 50-60 sex offender risk assessments

in the past.  Tr. D. 2, p. 86-87.   He has never failed to be qualified by any court as

an expert.   Tr. D. 2, p. 88-89.   His curriculum vitae, listing his relevant education,

professional experience, teaching positions and publications was admitted into

evidence as Exhibit 2.  Tr. D. 1, p. 39; Tr. D. 2, p. 84.

93.    Dr. Luis Rosell is a psychologist licensed in the states of Iowa, since June 2000,

and Missouri, since January 2003.  Tr. D. 1, p. 39; Ex. 4.  He has been working

professionally with sex offenders since 1989.  Tr. D. 1, p. 40.  In 1998, Dr. Rosell

became the Sex Offender Treatment Director for the Iowa Department of

Corrections where he served until 2002 when he left to pursue private practice.  Tr.

D. 1, p. 41.   Since 2002, Dr. Rosell has worked in private practice providing

treatment and has conducted numerous evaluations and testified as an expert in

both civil and criminal matters on issues such as competency and diminished

capacity.  Tr. D. 1, p. ; Ex. 4, p. 1.   He works primarily on behalf of defendants.

Tr. D. 1, p. 165.  He has performed over 200 sex offender risk assessments, has

testified on over 80 occasions, and has been qualified as an expert in the U.S.

District Court for Hawaii, ten states, and the Commonwealth of Puerto Rico.  Tr.

D. 1, p. 41-42; Ex. 4, p. 1.   His curriculum vitae, listing his relevant education and

professional experience was admitted into evidence as Exhibit 4. Tr. D. 1, p. 39-

40.

94.    Dr. Phenix holds psychology licenses from California (since 1992), Florida (since

        approximately 2005) and Washington (since approximately 2006).  Tr. D. 3, p. 4;

        Exhibit  6.   She has been evaluating sex offenders since 1995.   Tr. D. 3, p. 5.

        She has published peer-reviewed articles on the topic of sex offenders and has

        written a chapter in Innovations in Clinical Practice: A Source Book  pertaining to

        the risk assessment of sex offenders.  Tr. D. 3, p. 5; Exhibit 6, p. 4.  Of particular

        note, she is a co-author of the Coding Rules for the Static-99 – the manual for the

        most-widely used actuarial instrument that assesses the risk of sexual recidivism.

        Exhibit 6, p. 4.  She has presented at 20 - 30 conferences.  Tr. D. 3, p. 6-7; Exhibit

        6, p. 4-7.  She has provided numerous training sessions on actuarial instruments,

        the Static-99, and sex offender risk assessment.  Id.  She has testified on

        approximately 170 occasions concerning sex offender risk assessment, testifying

        on behalf of both the government and defendants, though the majority of her

        testimony has been on behalf of the government.  Tr. D. 3, p. 6-7.  Her curriculum

        vitae, listing her relevant education, professional experience, publications and

        presentations was admitted into evidence as Exhibit 6.  Tr. D. 1, p. 39; Tr. D. 3, p.

        5.

95.    Dr. Plaud is a licensed psychologist in Massachusetts and has been licensed since

        1998.  Tr. D. 1, p. 39; Tr. D. 4, p. 4-5; Exhibit 10.   He is also licensed in New

        York and was previously licensed in North Dakota from 1994 to 1997.  Tr. D. 4, p.

-22-

5; Exhibit 10. Dr. Plaud has conducted numerous sex offender risk assessments and has testified as an expert in Massachusetts and the courts of several other states.  Tr. D. 4, p. 7, 13.  Dr. Plaud has published several articles on sexual behavior and sexual offending.  Tr. D. 4, p. 8-10; Exhibit 10, p. 8-18.  His curriculum vitae, listing his relevant education, professional experience, and publications was admitted into evidence as Exhibit 10.  Tr. D. 1, p. 39; Tr. D. 4, p. 4; Exhibit 10.  But for one instance, Dr. Plaud has testified exclusively on behalf of respondents.  Tr. D. 4, p. 59-60.  Dr. Plaud testified in this matter that he would never again testify that an individual was sexually dangerous.  Tr. D. 4, p. 59.

96.   Dr. Howard Barbaree is a psychologist licensed in Canada and has been so licensed since 1979.  Tr. D. 5, p. 4; Ex. 8, p. 24.  Dr. Barbaree has worked within in the field of sex offender treatment and research since 1976.  Tr. D. 5, p. 5.  Dr. Barbaree has published four books, thirty-three book chapters and sixty-seven articles in the field of sex offender treatment and research.  Exhibit 8, p. 7.  His curriculum vitae, listing his relevant education, professional experience, and publications was admitted into evidence as Exhibit 8.  Tr. D. 1, p. 39; Tr. D. 5, p. 4; Exhibit 8.  Dr. Barbaree was not asked by Hunt to conduct any evaluation or risk assessment, though he has offered such opinions in the past, and Dr. Barbaree testified solely as to his research on the issue of the effect of age upon sex offender recidivism.  Tr. D. 5, p. 85-86.

### B.     Materials reviewed

97.   Dr. Katz, Dr. Rosell, Dr. Plaud and Dr. Phenix were provided with over two

thousand pages of records of Hunt's background, including records of criminal

charges, convictions, probation, parole, police reports, records of Hunt's

incarceration federally and in the State of New York, and records of Hunt's

treatment while incarcerated.  Tr. D. 1, p. 46; Tr. D. 2. p. 91-92, 106; Tr. D. 3, p.

8-9; Tr. D. 4, p. 14; Exhibit 9. p. 4; Exhibits 11-14, Exhibits 16-25; Gov. Exhibits

A-C, E-G and K.

98.   Dr. Katz conducted a clinical interview of Hunt on June 30, 2008.  Tr. D. 2, p. 92.

99.   Dr. Plaud conducted a clinical interview of Hunt on March 27, 2009.  Exhibit 9, p.

1.

100.   Dr. Rosell conducted a clinical interview of Hunt on November 20, 2008.  Tr. D.

1, p. 44.

101.   Dr. Phenix was precluded from interviewing Hunt.  Tr. D. 3, p. 10; [D. 22].

### C.     Hunt Suffers From Pedophilia, A Serious Mental Disorder

102.   In light of Hunt's prolific sexually offending against young boys under the age of

13, all four of the experts who evaluated Hunt diagnosed him as suffering from

pedophilia.  Tr. D. 1, p. 95, 98, 178; Tr. D. 2, p. 97, 99; Tr. D. 3, p. 12-15; Tr. D. 4,

p. 15-16; Joint Ex. 1, p. 5; Joint Ex. 3, p. 27; Joint Ex. 5, p. 8.[8]

---

[8]Dr. Plaud's testimony on this issue was, at best, muddled.  He repeatedly testified
that he would diagnose Hunt with pedophilia, Tr. D. 2, p. 15-16, 22, 63, but seeks to
cabin, or limit, this diagnosis, stating that the diagnosis was based upon historical factors

103.    In making that diagnosis, each relied upon the Diagnostic and Statistical Manual of

Mental Disorders, Fourth Edition, Text Revision ("DSM-IV") which is generally

relied upon in the fields of psychology and psychiatry to diagnose and classify

mental disorders.  Tr. D. 1, p. 95-97; Tr. D. 2, p. 98; Tr. D. 3, p. 18; Tr. D. 4, p. 15.

104.    Pedophilia is a serious mental disorder.  Tr. D. 1, p. 109; Tr. D. 2, p. 104; Tr. D. 3,

p. 12-13; Tr. D. 4, p. 64; <u>Kansas v. Hendricks</u>, 521 U.S. 346, 360 (1997).

105.    Under the DSM-IV, the diagnostic criteria for pedophilia are:

> A.      Over a period of at least 6 months, recurrent, intense sexually
> arousing fantasies, sexual urges, or behaviors involving sexual activity with
> a prepubescent child or children (generally age 13 or younger);
> B.      The person has acted on these sexual urges, or the sexual urges or
> fantasies cause marked distress or interpersonal difficulty;
> C.      The person is at least age 16 years and at least 5 years older than the
> child or children in Criterion A.

Tr. D. 1, p. 97-98; Tr. D. 2, p. 99; Tr. D. 3, p. 18; Gov. Ex. I.

106.    In making a pedophilia diagnosis, the DSM also asks psychiatrists and

psychologists to specify if the individual is sexually attracted to males, females, or

both, and if the attraction to children is "exclusive," in that the individual is

sexually attracted only to children, or "non exclusive."  Gov. Ex. I.

107.    Drs. Rosell and Plaud found that Hunt was a pedophile attracted to male non-

familial victims and this attraction was "non-exclusive."  Tr. D. 1, p. 98-99; Tr. D.

4, p. 19-20.  Dr. Katz and Phenix found that Hunt was a pedophile attracted to

---

(Hunt's prolific offending against prepubescent boys) only, Tr. D. 4, p. 15, and he
testified, "I can't ultimately, answer whether Mr. Hunt would validly have that diagnosis
today."  Tr. D. 4, p. 22.

males and that this attraction was essentially "exclusive."  Tr. D. 2, p. 97, 99; Tr.

D. 3, p. 12-14; Joint Ex. 1, p. 5.

108.  That Hunt is attracted to male pre-pubescent children is significant because the

DSM-IV provides, "[t]he course [of pedophilia] is usually chronic, especially in

those attracted to males.  The recidivism rate for individuals with pedophilia

involving a preference for males is roughly twice that for those who prefer

females. "  Gov. Ex. I; Tr. D. 1, p. 99; Tr. D. 3, p. 18.

109.  Hunt's pedophilia is severe and extreme.  Hunt's life, prior to his incarceration,

was completely and thoroughly dominated by his pedophilic interests.  Tr. D. 1, p.

101-102; Tr. D. 2, p. 101-102; Tr. D. 3, p. 24-25; Tr. D. 4, p. 74.

110.  Prior to his incarceration, Hunt exhibited no ability whatsoever to control his

pedophilic urges.  Tr. D. 1, p. 179; Tr. D. 3, p. 24-25.

111.  The evidence in this matter demonstrates that between the Summer of 1982 and his

arrest in August of 1985, Hunt sexually offended against pre-pubescent boys, and

often multiple boys, on a daily basis.  Tr. D. 3, p. 25; Gov. Ex. O, p. 3-4; Joint Ex.

3, p. 11; Joint Ex. 23, p. HU1317-1320, 1327, 1333, 1338, 1348-50, 1352-1353.

112.  Hunt, himself, states, "It started with one victim and I was not satisfied with

control over just one, it escalated and cascaded into the 16 victims and I was

*totally out of control*."  Joint Ex. 23, p. HU1369 (emphasis added).

113.  Hunt also prepared a four page statement in treatment regarding his personal

history in which he related his personal history including sexual abuse as a child.

-26-

(HU1303-1306).  In that description of his history Hunt relayed that "[he] didn't

really get *out of control* until [his] 30's.  [He] had several deviant experiences in

[his] mid 20's but *kept it under control* until [his] mid 30's.  *[He] should have been*

*able to control it but [he] didn't have the tools or knowledge at that time* and acted

out with disastrous results for [him]." Joint Ex. 23, p. HU1306 (emphasis added).

114.   Virtually every aspect of Hunt's life was directed to molesting pre-pubescent boys.
       Tr. D. 4, p. 71-75.

115.   Hunt chose work that afforded him access to children, such as working in carnivals
       or as a karate instructor.  Tr. D. 1, p. 101-102; Tr. D. 2, p. 101-102; Tr. D. 4, p. 4.

116.   Hunt cultivated relationships with young boys' parents so that he would be trusted
       to take custody of the children for long periods.  Joint Ex. 23, p. HU1328, 1332,
       1336.

117.   Hunt committed non-sexual crimes, such as larceny, to further his sexual
       offending.  Tr. D. 2, p. 97; Tr. D. 4, p. 75.

118.   Hunt is unusual in that he kidnapped multiple sexual victims.  Most child sex
       offenders do not kidnap their victims, let alone do so multiple times.  Tr. D. 1, p.
       107.

119.   Since 1973, Hunt was never in the community for longer than a year without
       sexually offending against a prepubescent boy.  See Joint Exs. 16-25; Gov. Ex. A,
       C, K, and O; and *supra, ¶¶* 20-71.

120.   Hunt sexually offended against prepubescent boys while on probation, while on

parole, and even while on release on bail on child molestation charges.  *See supra*, ¶¶ 20-71; Tr. D. 2, p. 24-25; Tr. D. 4, p. 71-75.

121.  As agreed by the Respondent's own expert, Dr. Plaud, between 1973 and 1985 Hunt shaped virtually every aspect of his life around his sexual offending and, over the past 35 years, Hunt has either been actively molesting children, working towards molesting children, or incarcerated, and unable to do so.  Tr. D. 4, p. 74-75.

122.  Each of the experts who evaluated Hunt concluded that the diagnosis of pedophilia remained appropriate today.  Tr. D. 1, p. 98-99; Tr. D. 2, p. 99-100; Tr. D. 3, p. 15; Tr. D. 4, p. 15-16, 22, 63.  But see, supra note 8.

123.  Hunt's sexual attraction to prepubescent children will not change over his lifetime.  Tr. D. 1, p. 99, 102-103; Tr. D. 2, p. 52-53, 100; Tr. D. 3, p. 15-16, 24-25.

124.  Dr. Rosell testified that Hunt's pedophilia is "ingrained" based upon the nature, extent and duration of Hunt's offending.  Tr. D. 1, p. 101-103.

125.  Hunt's prognosis, the possibility that he could alter his sexual interest in prepubescent children, is at best, fair.  Tr. D. 2, p. 100.

126.  Hunt's 1998 possession of photographs of young children while incarcerated at Woodbourne Correctional Facility was, in the opinion of every expert to testify, objective evidence of Hunt's ongoing pedophilic interests even while incarcerated.  Tr. D. 2, p. 52; Tr. D. 2, p. 108-109; Tr. D. 3, p. 69; D. 4, p. 76-77; D. 5, p. 86-88.

127.  Hunt has never offered any explanation for possessing the photos other than sexual

gratification.  Tr. D. 2, p. 108; Tr. D. 4, p. 76-77.

128.   Accordingly, based upon the foregoing this Court finds that Hunt suffers from

pedophilia and that pedophilia is a serious mental disorder.

### D.   Hunt Suffers From Anti-Social Personality Disorder, A Serious Mental Disorder

129.   According to the DSM-IV, antisocial personality disorder is a "pervasive pattern of

disregard for, and violation of, the rights of others that begins in childhood or early

adolescence and continues into adulthood."  Gov. Ex. H.

130.   The DSM-IV lists the following diagnostic criteria for ASPD:

A.   There is a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years, as indicated by three (or more) of the following:

1.   failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest;

2.   deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure;

3.   impulsivity or failure to plan ahead;

4.   irritability and aggressiveness, as indicated by repeated physical fights or assaults;

5.   reckless disregard for safety of self or others;

6.   consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations;

7.   lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.

B.      The individual is at least age 18 years.

C.      There is evidence of a Conduct Disorder with onset before age 15 years.

131.   ASPD is a serious mental illness abnormality or disorder.  Tr. D. 3, p. 12-13.

132.   Unlike Hunt's pedophilia, the DSM-IV recognizes that ASPD may moderate as offenders age.  Tr. D. 1, p. 108.

133.   Drs. Rosell and Phenix both concluded that Hunt met the diagnostic criteria for ASPD.  Tr. D. 1, p. 95, 106-108; Tr. D. 3, p. 21-22.

134.   Dr. Phenix testified that Hunt had been previously diagnosed with Conduct Disorder by age 15.  Tr. D. 3, p. 22.  By age 15, Hunt had been convicted of breaking and entering, had run away several times, and was suspected of setting several fires in his home.  Tr. D. 3, p. 22.

135.   Dr. Phenix testified that Hunt meets the other required criteria because he has a substantial history of criminal activity (especially for sexual abuse of children), and also for property crimes, an exhibited history of aggression, a history of impulsivity, and Hunt has exhibited little remorse for his crimes.  Tr. D. 3, p. 23.

136.   Dr. Phenix opined that Hunt's ASPD contributed to her finding that Hunt would have serious difficulty in refraining from further acts of child molestation.  Tr. D. 3, p. 24.

137.   In Dr. Katz's view many of the criminal activities which could be attributable to ASPD were motivated by Hunt's desire to molest children.  Tr. D. 2, p. 95-97.  Dr. Katz concluded that Hunt did not meet the criteria for ASPD, but nonetheless felt

it was a reasonable diagnosis for Hunt.  Tr. D. 2, p. 131.

138.   Dr. Plaud concluded that Hunt did not meet the criteria for ASPD.  Tr. D. 4, p. 22-

23.

139.   Dr. Rosell, who did diagnose ASPD, did not feel that Hunt's ASPD, as opposed to

the pedophilia diagnosis, contributed significantly to his future risk of sexual

reoffense.  Tr. D. 1, p. 108-109.

140.   Accordingly, this Court finds that Hunt suffers from ASPD, and that ASPD is a

serious mental illness, abnormality or disorder.[9]

## IV.    As A Result Of A Serious Mental Illness, Abnormality Or Disorder Hunt Would Have Serious Difficulty In Refraining From Further Acts of Child Molestation If Released

141.   Drs. Katz, Rosell, Phenix and Plaud conducted an assessment of whether Hunt's

pedophilia would cause him to have "serious difficulty in refraining from sexually

violent conduct or child molestation if released."  18 U.S.C. § 4247(a)(6).

142.   Drs. Katz, Rosell, and Phenix all concluded that Hunt would have serious

difficulty as a result of his pedophilia in refraining from further acts of child

molestation, while Dr. Plaud opined that Hunt's age, 63, precluded any finding that

Hunt would have serious difficulty in refraining from further acts of child

---

[9] If the Court concludes that Hunt's suffers from pedophilia, and, as a result of his pedophilia would have serious difficulty in refraining from further acts of child molestation, it need not reach the issue of Hunt's ASPD.  Though, it should be noted, ASPD can qualify as a serious illness abnormality or disorder sufficient to warrant civil commitment under sexually dangerous person laws.  See, e.g., Young v. Murphy, 2009 WL 1211041 (D. Mass. May 05, 2009) (upholding civil commitment under Massachusetts' sexual predator law based upon a diagnosis of ASPD).

molestation.  Tr. D. 1, p. 165-166; Tr. D. 2, p. 93, 97-98, 107; Tr. D. 3, p. 85-86,

178; Tr. D. 4, p. 25-27, 42, 44.

### A.    Hunt's Risk of Re-Offending

143.    As part of their assessment of whether Hunt would have serious difficulty in

refraining from further acts of child molestation, each of the experts relied, in

varying degrees, upon actuarial tools which have been developed to assess the risk

that a sex offender will recidivate.  Tr. D. 1, p. 109; Tr. D. 2, p. 110-111; Tr. D. 3,

p. 26; Tr. D. 4, p. 35.

144.    In practical terms, on just over seven out of ten occasions, these instruments will

correctly identify an individual as being at higher risk to reoffend than another sex

offender.  Tr. D. 1, p. 116-118; Tr, D. 3, p. 33-35.[10]

145.    It is unlikely, however, that actuarial instruments will ever achieve perfect, or even

near perfect, prediction.  As observed by the Defendant's own expert, Dr.

---

[10]"Actuarial tools are, at best, 'moderate predictor[s] of risk,' and do not enable
even experts in the field . . . to predict the future (i.e., whether Mr. [Hunt] will or will not
re-offend. . . ).  The tools, however, do provide a 'greater than chance prediction,' and
thus allow evaluators to initiate an analysis by placing an individual in a range (e.g., high,
moderate, or low risk)."  United States v. Shields, 597 F.Supp.2d 224, 236 (D. Mass.
2009).  It is not required, however, that this Court rely upon the actuarials in reaching its
conclusion.  As noted by Judge Saris, "while I have considered [the Respondent's] scores
on the actuarial instruments, these scores are not the primary basis upon which I rest my
conclusion of sexual dangerousness.  In fact, I afforded them little weight in my final
analysis.  Rather, as detailed above, I focused on [the Respondent's] past conduct, lack of
successful sex offender treatment to date, and the testimony of the experts *as a whole* (not
simply their predictions on the actuarial instruments)."  Id. at 236 n. 18 (emphasis in
original).

Barbaree, characteristics useful to actuarial measures are those that apply

universally to all sex offenders.  Tr. D. 5, p. 93.  They cannot capture all of the

individual motivations that may contribute to sexual offending.  Tr. D. 5, p. 93-95,

97.[11]

146.  Drs. Rosell and Phenix, though relying upon the actuarial instruments to establish

a baseline of risk and to inform their conclusions, did not testify that the statute in

required them to predict the future, *i.e.*, to conclude that Hunt presented any

specific risk of re-offense.  Tr. D. 1, p. 166-167; Tr. D. 2, p. 182-183, 191-192; Tr.

---

[11]It is noteworthy that Congress specifically chose language that did not require
proof of any specific likelihood of re-offense.  See 18 U.S.C. § 4247(a)(6).  And, though
such language is not present in the Adam Walsh Act, even SVP statutes which
specifically include language concerning whether an individual is "likely" to reoffend
have not been construed as requiring proof an any particular statistical likelihood.  See
M.G.L. c. 123A § 1 (defining a sexually dangerous person as a person "convicted of . . .a
sexual offense and who suffers from a mental abnormality or personality disorder which
makes the person likely to engage in sexual offenses if not confined to a secure facility").
As noted by Massachusetts Supreme Judicial Court:

> While "likely" indicates more than a mere propensity or possibility, it is not
> bound to the statistical probability inherent in a definition such as "more
> likely than not," and the terms are not interchangeable.  To conclude that
> "likely" amounts to a quantifiable probability, absent a more specific
> statutory expression of such a quantity, is to require mathematical precision
> from a term that, by its plain meaning, demands contextual, not statistical,
> analysis. . . . "More likely than not" is most familiar as a standard of proof
> equivalent to fifty per cent plus one.  As used in the statute, however, the
> term "likely" is not intended as a standard or burden of proof.  Rather, it is
> descriptive of one characteristic ("likely to engage in sexual offenses") of a
> sexually dangerous person.  While the Commonwealth is required to prove
> beyond a reasonable doubt that a person is sexually dangerous, that is, has
> all the characteristics of such a person as defined in G.L. c. 123A, § 1, *it is
> not required to prove to any particular mathematical quantum the
> likelihood of his committing another sexual offense*.

Commonwealth  v. Boucher,  438 Mass. 274, 277 (2002)(emphasis added).

D. 3, p. 24-25.

147.   Dr. Katz did not rely upon actuarial instruments in reaching his conclusion, and agreed that the statute did not require any finding that Hunt would, or would not, re-offend in the future.  Tr. D. 2, p. 115, 124-126.

148.   Only Dr. Plaud appeared to believe that the statute required statistical proof that it was more likely than not that Hunt would re-offend.

### B.   Actuarial Instruments

149.   The Court heard testimony concerning Hunt's scoring on four such actuarial tools, the Rapid Risk Assessment for Sexual Offense Recidivism ("RRASOR"), the Static-99, the Static-2002, and the Minnesota Sex Offender Screening Tool – Revised ("MnSOST-R").

150.   The RRASOR has been subjected to peer review and cross-validated.  Tr. D. 4, p. 39, 53.

151.   The Static-99 has known error rates and has been cross-validated in over sixty studies in multiple countries, and, over thirty of these studies have been published in peer reviewed journals.  Tr. D. 1, p. 113; Tr D. 3, p. 31.  It has gained general acceptance in the field of experts performing sex offender risk assessments.  Tr. D. 1, p. 115; Tr. D. 3, p. 32, 47.

152.   The Static-2002 is a new test.  Tr. D. 3, p. 56.  It has been cross validated, has gained general acceptance, and is beginning to be widely used.  Tr. D. 3, p. 56; Tr. D. 5, p. 10-11.

153.   The Mn-SOST-R is well established in the field, has known error rates, has been cross validated, and is generally accepted within the field.   Tr. D. 1, p. 112; Tr. D. 3, p. 59-60.

154.   Cross-validation is used to test the actuarial instrument on different types and groups of sex offenders in different jurisdictions and countries to ensure that it performs accurately when applied to different groups of sex offenders.  Tr. D. 1, p. 114-115; Tr. D. 3, p. 31-32.   More cross-validation leads to more confidence that the instrument works.  Tr. D. 3, p. 32.

155.   The defendant's own expert, Dr. Barbaree, acknowledges that:  these actuarial instruments were developed using well established principles of statistics, Tr. D. 5, p. 90; for every actuarial in current usage, the developers applied those principles in a scientifically principled manner, Tr. D. 5, p. 91, and, these instruments have been subject to peer review and cross validated.  Tr. D. 5, p. 91-92.

### 1.   RRASOR

*156.*   The RRASOR was developed in 1997 by Dr. Hanson and consists of four items, each of which was later incorporated into the Static-99. Tr. D. 1, p. 111-112. Scores on the RRASOR range from zero to six, with zero representing a lower risk of recidivism than a six.  Joint Ex 9, p. 12.

157.   The RRASOR is scored based upon the number of prior sex offenses, age at release (greater or less than 25), whether the offender has male victims, and whether the offender has unrelated victims.  Joint Ex. 9, p.12.

158.   Dr. Plaud scored Hunt as a "5" on the RRASOR, but for illustrative purposes only, Tr. D. 4, p. 45, because in his view no actuarial can be used to assess the risk of a 63 year old sex offender.  Tr. D. 4, p. 33.

159.   A "5" signifies an individual at high risk to reoffend.  Joint Ex. 9, p. 12-13.

160.   The estimated recidivism rates for an individual scoring a "5" on the RRASOR are 49.8% over a five year period and 73.1% over a ten year period.  Joint Ex. 9, p. 13.

161.   Dr. Plaud views this score as "meaningless" and "meaningless information." Tr D. 4, p. 36.[12]

162.   Nevertheless, Dr. Plaud testified that if the data were adjusted for age according to Bayes' Theorem,[13] Hunt's risk of recidivism is approximately 24%.  Tr. D. 4, p. 45-46.

### 2.   Static-99

163.   The Static-99 is an actuarial instrument developed by R. Karl Hanson, Ph.D., and David Thornton, Ph.D., to estimate the probability of sexual and violent re-conviction for adult males who have been charged with or convicted of at least one

---

[12]The opinion that actuarial instruments do not provide useful information stands in conflict with much of the testimony of the defense's second expert. Dr. Barbaree.  As discussed more fully below, Dr. Barbaree testified, *inter alia*, that the actuarial instruments remain effective as discriminating between low risk older offenders and high risk older offenders and that actuarial instruments provide useful information if empirically adjusted for aging.

[13]According to Dr. Plaud, Bayes' Theorem "essentially states that the probability of sexual offense recidivism, given a particular score on the RRASOR, is a function of two factors: the base rate of sexual offense recidivism and the RRASOR's discriminative properties. . . " Joint Ex. 9, p. 14.

sexual offense against a child or non-consenting adult.  Tr. D. 3, p. 29.

164.    It is the most widely used actuarial tool and was utilized by two (and to a limited

degree by a third) of the four experts who evaluated Hunt.  Tr. D. 1, p. 111-112;

Tr. D. 2, p. 110-110; Tr. D. 3, p. 28.

165.    The Static-99 consists of ten items, each of which has been shown through

empirical study to correlate to a higher risk of sexual reoffending.  Tr. D. 1, p. 123;

Tr. D. 3, p. 37-44; Joint Ex. 26.

166.    A Coding Manual for the Static-99, for which Dr. Phenix is one of the authors,

provides instructions for scoring each item.  Tr. D. 3, p. 32.

167.    Scores on the Static-99 range from zero to twelve.  Tr. D. 1, p. 127; Tr. D. 3, p. 35.

168.    A score of zero places an individual in the Low Risk category for reoffense, while

a score of six or above places an individual in the High Risk category. Tr. D. 3, p.

50-51.

169.    Hunt's total score is 11.[14]  Tr. D. 1, p. 126; Tr. D. 3, p. 44; Joint Ex. 26.

170.    That means, but for being over the age of 25, Hunt possesses every single

characteristic which the developers of the Static-99 found to correlate to a higher

risk of sexually re-offending.  Tr. D. 1, p. 122-123; 133-134; Tr. D. 3, p. 30-31,

37-44; Joint Ex. 26.  For an individual Hunt's age, an eleven is the maximum

possible score.

_____

[14]Dr. Katz testified that, in his head, he did a "rough" scoring of the Static-99
granting Hunt significant benefit of the doubt, and came up with an 8 or 9 which is also
High Risk.  Tr. D. 2, p. 110-111.

171. The average Static-99 score is around 2.  Tr. D. 3, p. 35.

172. The score of 11 places Hunt in the High Risk category.  Tr. D. 1, p. 127; Tr. D. 3, p. 50-51.

173. Dr. Phenix testified that such a high score is very rare, Tr. D. 3, p. 50, 55, and Dr. Rosell testified that he had never encountered a score as high as an eleven in his career.  Tr. D. 1, p. 127; Tr. D. 2, p. 12.

174. Among a recent study of over 6,406 sex offenders which was used to generate estimated re-offense probabilities for the Static-99, no offender scored as high as an 11.  Tr. D. 1, p. 127-128.

175. Among that group of 6,406 sex offenders, only 22, one third of one percent (.0034%), even scored as high as a ten.  Tr. D. 2, p. 16; Gov. Ex. L, p. 1.

176. The developers of the Static-99 recently completed a recidivism study of over 6,000 Canadian, European, and American sex offenders who were released within the last fifteen years.  Tr. D. 1, p. 121, 124; Tr. D. 3, p. 28-29; 46.

177. This research appears to have been in response to criticisms of the Static-99's original probability estimates because those estimates were based upon sex offenders who were released between 1958 and 1983, and, thus, arguably were not reflective of the recidivism rates of present day sex offenders.  Tr. D. 1, p. 119-121; Tr. D. 3, p. 28-29.

178. Based upon this study, the developers have recently, in October 2008, made available to practitioners in the field newly revised estimates of the probabilities

that an individual who receives a particular score will re-offend.  Tr. D. 1, p. 121, 124; Tr. D. 2, p. 15; Tr. D. 3, p. 46-47; Gov. Ex. L, P.

179.    The new probability estimates are provided for the sample generally and the authors of the instrument have also generated a range of re-offense probabilities based upon the reoffense rates of two classes of offenders within the study group, a low risk group, all of whom had undergone two years of treatment, and a high risk group, who had exhibited anti-social behavior in prison, been expelled from treatment or had dropped out, who resisted rehabilitation and who, as groups, exhibited very high recidivism rates.  Tr. D. 1, p. 125; Tr. D. 3, p. 48-50; Gov. Ex. L, P.

180.    These new estimates have been cross validated and have rapidly gained general acceptance.  Tr. D. 3, p. 47, 116.

181.    The authors of the study suggest that experts testifying on these probabilities provide the estimated percentages for both the high risk and low risk groups.  Tr. D. 1, p. 131; Tr. D. 3. p. 50.

182.    The new probability estimates provide risk percentages for individuals scoring as high as ten.  Tr. D. 1, p. 124, 129; Tr. D. 3, p. 47-48; Gov Ex. L, P.

183.    Because Hunt scores an eleven, the recidivism rates for the group scoring ten are used for Hunt.  Tr. D. 2, p. 16; Tr. D. 3, p. 51, 165.

184.    Based upon the complete sample, individuals who scored a ten will sexually recidivate at a rate of 51% over a five year period and will sexually recidivate at a

rate of 66% over a ten year period.  Tr. D. 1, p. 130, Tr. D. 2, p. 73; Gov. Ex. L, P.

185.  Using the data derived from the high risk and low risk samples, Hunt's estimated

risk of re-offending over five years is between 34.9%-50%, and over ten years is

between 49.7-59.9%.  Tr. D. 1, p. 131; Tr. D. 2, p. 17-18; Tr. D. 3, p. 51; Gov. Ex.

L, P.

186.  Where an individual falls within that range depends upon the expert's opinion as to

whether the individual is more like the high or low risk group.  Tr. D. 1, p. 132; Tr.

D. 2, p. 17-18.

187.  These risk estimates are under-representations of risk because researchers cannot

capture sex offenses that go unreported or which do not come to the attention of

the police.  Tr. D. 3, p. 51-52, 171.  This was acknowledged by Hunt's own expert

Dr. Plaud. Tr. D. 4, p. 60-61.

### 3.   MnSOST-R

188.  The MnSOST-R is another actuarial instrument that measures static factors found

to be related to sex offender recidivism, but it also includes dynamic factors related

to treatment, behavior while incarcerated, and age.   Tr. D. 1, p. 112; Tr. D. 3, p.

60.

189.  Dr. Phenix scored Hunt as a 14 on the Mn-SOST-R.  Tr. D. 3, p. 61; Joint Ex. 28.

190.  That score falls within a range called "refer."  Tr. D. 3, p. 61.  An "8" or above is

deemed "high risk" and "refer" signifies that the individual must be referred for

potential civil commitment under the Minnesota's sexual predator law.  Tr. D. 3, p.

61.

191.  The Mn-SOST-R has older risk estimates based upon groups of sex offenders who had not been subject to community supervision.  Under those numbers, the estimate recidivism risk for Hunt would be 72% within six years.  Tr. D. 3, p. 62.

192.  Based upon more contemporary samples measuring recidivism of sex offenders under community supervision, the estimated probability of re-offense is 40% over six years.  Tr. D. 3, p. 62.

### 4.  Static-2002

193.  The Static-2002 is another actuarial developed by Dr. Karl Hanson.  Tr. D. 1, p. 112.

194.  The Static-2002 scores an offender on 13 items which correlate to the risk of sexual reoffending and it attempts to better identify the source of risk and to better account for changes accompanying an offender's age.  Tr. D. 1, p. 113; Tr. D. 3, p. 55-56.

195.  Scores range from 0-14. Tr. D. 3., p. 56; Joint Ex. 27.  A score of: "0-2" is "low risk;" "3-4" is "low-moderate risk;" "5-6" is "moderate risk;" "7-8" is "moderate high risk;" and "9+" is "high risk."  Tr. D. 3, p. 58; Joint Ex. 27.

196.  Dr. Phenix scored Hunt as a ten on the Static-2002.  Tr. D. 3, p. 56.

197.  The Static-2002 generates estimated risk probabilities utilizing a scoring method similar to the Static-99.  It generates a range based upon risk percentages derived from a high and low risk comparison group.  Tr. D. 3, p. 58; Gov. Ex. Q.

198.    The recidivism rates associated with Hunt's score of ten are 25.4%-37.8% over

five years and 30.5%-45.5% over ten years.  Tr. D. 3, p. 59; Gov. Ex. Q.

**C.    Non-Actuarial Risk Assessment Tools**

**1.    SVR-20**

199.    In addition to the Static-99, Dr. Rosell scored Hunt on the Sexual Violence Risk-

20 ("SVR-20") a guided clinical measure of sexual dangerousness based upon 20

factors that have been shown to have a relationship to sexual recidivism.  Tr. D. 1,

p. 138; Tr. D. 2, p. 51; Joint Ex. 3, p. 23-24.

200.    The SVR-20 has been studied and cross validated as a predictor of sexual

recidivism and has been found to have moderate predictive validity.  Tr. D. 1, p.

139; Tr. D. 5, p. 10.

201.    Unlike an actuarial instrument, there are no estimated risk probabilities.  Tr. D. 1,

p. 139; Tr. D. 2, p. 51.

202.    In Dr. Rosell's view, Hunt's scoring on the SVR-20 served to confirm the actuarial

findings, namely that Hunt was high risk to sexually reoffend.  Tr. D. 2, p. 51;

Joint Ex. 3, p. 22-23.

**D.    Dr. Katz Did Not Rely Upon Actuarial Instruments**

203.    Unlike the other three experts, *see infra*, Dr. Katz did not significantly rely upon

the actuarial tools.  Dr. Katz testified that he respected the work done by the

developers of these instruments to improve the accuracy of predictions but felt that

they were of limited use because they were only moderately accurate.  Tr. D. 2, p.

-42-

109-110; 129.

204.    Dr. Katz's consideration of the actuarial tools was limited and merely confirmed

his opinion that Hunt was high risk and that Hunt would have serious difficulty in

refraining from further acts of child molestation because of his pedophilia.  Tr. D.

2, p. 107-108, 110-111.  Dr. Katz scored both the RRASOR and Static-99 in his

head but did not offer any estimated risk percentages based upon his scoring.   Tr.

D. 2, p. 109-111.

205.    Dr. Katz viewed the statute's language as requiring an assessment of the extent to

which Hunt's pedophilia would cause Hunt to have serious difficulty in refraining

from further acts of child molestation.  Tr. D. 2, p. 115.  He did not view the

statute as requiring any specific finding about whether Hunt would sexually

reoffend. Tr. D. 2, p. 115, 124-125.

206.    Dr. Katz concluded that Hunt's pedophilia was severe, and that, prior to his

incarceration, Hunt's life was dominated by his pedophilic interests and that Hunt

was completely out of control.  Tr. D. 2, p. 101-102.

207.    Dr. Katz's conclusion that Hunt would have serious difficulty refraining was based

upon Hunt's prolific history of offending and characteristics of Hunt which have

been empirically demonstrated to correlate to a higher risk of sexual reoffending,

such as: deviance, multiple convictions, multiple victims, stranger victims, male

victims and violations of probation and parole. Tr. D. 2, p. 103-104; Joint Ex. 1.

208.    Dr. Katz was further troubled by Hunt's possession of pictures of children while

incarcerated in 1998, which Dr. Katz viewed as demonstrating ongoing sexual interest in children.  Tr. D. 2, p. 107-108.

209. Dr. Katz, nevertheless, like the other evaluators also considered factors which he thought could be prognostically favorable to Hunt.  Tr. D. 2, p. 112.

### E.    Dynamic or Individual Factors Considered

210. After concluding that Hunt scored in the high risk category,[15] Drs. Phenix, Rosell and Plaud all looked to aggravating and mitigating dynamic risk factors to determine whether, and how, to adjust Hunt's baseline level of risk as established by the actuarial instruments.   Tr. D. 1, p. 135-170, Tr. D. 2, p. 32; Joint Ex. 3, p. 21-26; Tr. D. 2, p. 112-128; Tr. D. 3, p. 63-88; Tr. D. 4, p. 35-36, 40, 45-47.

211. Dr. Rosell and Plaud considered all of these dynamic factors, including age, as factors apart from the actuarial measures while Dr. Phenix viewed the dynamic factors as providing a basis upon which to estimate Hunt's risk of re-offending within the range of estimated probabilities derived from the actuarial instruments.  Tr. D. 1, p. 135-170; Tr. D. 3, p. 63; Tr. D. 4, p. 40, 45-47.

212. Though Dr. Katz did not utilize actuarial instruments, he similarly looked to dynamic, or individualized, factors which may have been prognostically relevant.

### 1.    Treatment

213. Treatment can be considered as a factor that may reduce the risk of sex offender

---

[15]It was acknowledged, even by Dr. Plaud, that Hunt will score in the high risk range on every actuarial tool currently in use in the field.  Tr. D. 4, p. 81.

recidivism.  While incarcerated in New York State, Hunt underwent a six month sex offender treatment program.  Tr. D. 1, p. 141; Tr. D. 2, p. 114; Tr. D. 3, p. 62, 87; Joint Ex. 23.

214.   The six months of sex offender treatment received by Hunt in 2003 was not viewed by any expert in this matter as a significant protective factor in their assessment of whether Hunt would have serious difficulty in refraining from further acts of child molestation.  Tr. D. 1, p. 141-142; Tr. D. 2, p. 113-115; Tr. D. 3, p. 87; Tr. D. 4, p. 29, 68-69.

215.   Sex offender treatment is generally between two and four years long, and for an offender whose pedophilia is as severe as Hunt's, six months of treatment was viewed by Dr. Katz, Dr. Rosell and Dr. Phenix as inadequate.  Tr. D. 1, p. 141-142; Tr. D. 2, p. 113-115; Tr. D. 3, p. 87 .

216.   Dr. Plaud testified that treatment is rarely a significant protective factor and it was not a protective factor for Hunt at all.  Tr. D. 4, p. 68-69.

### 2.   Conditions of Release

217.   Community supervision and conditions of release can be considered as potentially reducing a sex offender's risk of recidivism.  Tr. D. 2, p. 116-117; Tr. D. 3, p. 88-89.

218.   Hunt will be on parole in New York State until July 2012.  Tr. D. 1, p. 88-89; Gov. Ex. G, p. HU1731; Gov. Ex. O, p. 6.

219.   Dr. Katz felt that Hunt's conditions of supervision served to reduce the risk Hunt

would re-offend, they simply did not reduce that risk enough, and, they did not, alone or in combination without other factors, change Dr. Katz conclusion that Hunt would have serious difficulty in refraining from further acts of child molestation.  Tr. D. 2, p. 116-117; 132-133.

220.  Dr. Phenix did not consider Hunt's supervision to significantly reduce his risk because of his past failures on parole and probation and because it was not long enough.  Tr. D. 3, p. 88-89.

221.  Dr. Plaud testified that Hunt's conditions of release were not a significant factor. Tr. D. 4, p. 61-62, 110.

### 3.      STABLE 2000 and STABLE 2007

222.  Drs. Phenix and Rosell considered several additional dynamic factors which past research had shown bore some correlation to sex offender recidivism.  Tr. D. 1, p. 135-136; Tr. D. 3, p. 63; Joint Ex. 3, p. 21-23; Joint Ex. 5, p. 25-28.

223.  Dr. Rosell acknowledged that recent research has called into question whether these factors add any predictive validity to actuarial assessment.  Tr. D. 1, p. 135; 135-138; Joint Ex. 3, p. 21-23.

224.  The factors considered included: (1) significant social influences; (2) capacity for relationships; (3) hostility toward women; (4) social rejection and loneliness; (5) lack of concern for others; (6) general self regulation; (7) impulsivity; (8) poor cognition and problem solving; (9) negative emotionality and hostility; (10) sexual self regulation; and (11) cooperation with supervision.  Tr. D. 1, p. 135-138; Tr. D.

2, p. 50; Tr. D. 3, p. 63-71; Joint Ex. 3, p. 21-23; Joint Ex. 5, p. 25-26.

225.   Dr. Rosell testified that while he reviewed these factors, none was substantially significant, in his opinion, in mitigating or aggravating Hunt's risk.  Tr. D. 1, p. 135-138; Tr. D. 2, p. 50.

### 4.   Hunt's Medical Conditions

226.   Hunt's medical conditions were noted by Dr. Plaud in his report.  Tr. D. 4, p. 63; Joint Ex. 9, p. 4.

227.   Dr. Plaud acknowledged that he did not consider Hunt's medical conditions relevant to his opinion as to whether Hunt was sexually dangerous.  Tr. D. 4, p. 63.

228.   No other expert testified that any medical condition of Hunt contributed to their opinion.

### 5.   Hunt's Age

229.   Hunt's age was viewed by all of the experts as a substantial and significant factor to consider in assessing whether Hunt would have serious difficulty in refraining from further acts of child molestation.  Tr. D. 1, p. 141-165; Tr. D. 2, p. 111-113; Tr. D. 3, p. 53-54, 72-86; Tr. D. 4, p. 26-27, 44, 82, 84.

230.   Each of the experts who evaluated Hunt were aware of published research demonstrating that recidivism declines with age and that the recidivism rates for sexual offenders over the age of sixty, even high risk older offenders, were substantially lower than the recidivism rates for high risk younger offenders.  Tr. D. 1, p. 142-143, 146; Tr. D. 2, p. 27-28, 33, 73-74, 111-113; Tr. D.3, p. 53, 73-80;

Tr. D. 4, p. 26-27, 44, 82, 84.

231. Further, each expert utilizing the actuarial instruments[16] felt that the actuarial risk estimates may overestimate risk for an offender over 60.  Tr. D. 2, p. 29; Tr. D. 3, p. 83-84, 140-141, 157, 162; Tr. D. 4, p. 26-27, 44, 82, 84.

(a). Testimony of Dr. Howard Barbaree

232. Hunt called an expert, Dr. Barbaree to testify specifically on the effect of aging upon sex offender recidivism.  Tr. D. 5, p. 11, 12-85.

233. Dr. Barbaree testified that a decline in sexual recidivism as male sex offenders age is consistent with what scientists know about biology.  Tr. D. 5, p. 16-17, 27. Testosterone levels decrease with age, and testosterone plays a significant role in male libido.  Tt. D. 5, p. 16-18.  Tr. D. 2, p. 62.  Strength of sexual response to stimuli decreases from the teens onward. Tr. D. 5, p. 27.

234. Dr. Barbaree further testified that, generally, overall criminality is observed to decline with age, Tr. D. 5, p. 28-29, and, if sexual criminal behavior did not similarly decline, it would be the only criminal behavior that did not.  Tr. D. 5, p. 31.

235. Dr. Barbaree also testified about his review of the data and results of eight studies of aging and sex offender recidivism, one of which he performed, see Joint Ex. 7, p. 9, and how the data reflected linear declines in sexual recidivism as sexual offenders age.  Tr. D. 5, p. 31-32, 36-37, 40-41.   The data, as he has compiled it,

[16]As previously noted, Dr. Katz did not rely upon actuarial instruments.

reflects a straight line downward decline in recidivism as sex offender grow older.

236.   Dr. Barbaree acknowledges, however, that whether all types of offenders exhibit

such decline remains open in the scientific literature, and further acknowledges

that some subgroups of offenders may have characteristics that are not best

represented by a straight line.  Tr. D. 5, p. 43.

237.   Dr. Barbaree testified that recidivism for older offenders is significantly lower than

for younger offenders.   Tr. D. 5, p. 43-44.  As a result, Dr. Barbaree believes that

actuarial risk assessments should not be directly applied to offenders as old as

Hunt.   Tr. p. 49-50.  Because the developmental samples involved sex offenders

primarily in their late thirties, in his opinion, the risk projections represent over

estimations of the recidivism risk for individuals over age 60.  Tr. D. 5, p. 49-50,

78.[17]

238.   Dr. Barbaree testified as to appropriate methodologies by which experts could

offer opinions as to an individual's sexual dangerousness in light of the decline in

recidivism that accompanies aging.  Tr. D. 5, p. 50-52; 102-103.

   (1)   An expert could offer an opinion as to sexual dangerousness without
         using actuarial instruments at all;
   (2)   An expert could offer an opinion as to sexual dangerousness using

---

[17]As previously noted, there is no requirement of any particular quantum of statistical proof of the likelihood that Hunt would re-offend.  See supra notes 10-11; and Defendant's Memorandum of Law, filed herewith.  Nevertheless, even adjusted for age, by the admissions of Hunt's own experts, the actuarially derived statistical risk of Hunt's re-offending is substantial. Dr. Barbaree acknowledges that it would be appropriate to conclude that Hunt's age adjusted risk of recidivism ranged anywhere from 20% to as high as 37%.  Tr. D. 5, p. 53, 102-104, and Dr. Plaud acknowledges that it is approximately 25%.  Tr. D. 4, p. 45-46.

empirically guided judgment;

(3)    An expert could opine on sexual dangerousness using recidivism base rates for each age group as reflected in published studies; and

(4)    An expert could adjust the actuarial risk estimates using mathematical analysis.

Tr. p. 50-53, 102.

239.  Dr. Barbaree acknowledges that his suggested methodologies are not universally, or even generally, accepted in the field, and that respected researchers disagree with his findings and proposed methodologies.  Tr. D. 5, p. 89.

240.  Further, he acknowledges that even among researchers who would adjust actuarial risk scores for age, there is no generally accepted methodology for doing so.  Tr. D. 5, p. 89.

241.  Dr. Barbaree agreed that Dr. Katz utilized an appropriate methodology.  Tr. D. 5, p. 102.

242.  Similarly, Dr. Barbaree acknowledges that Dr. Rosell's testimony that Hunt is at high risk to reoffend sexually based upon the SVR-20 is an appropriate methodology.  Tr. D. 5, p. 102.

243.  Finally, Dr. Barbaree acknowledged that even assuming a straight linear, downward decline in recidivism, there are unquestionably outliers who will not follow the general trend and there are child molesters who have continued to offend well into their sixties and seventies.  Tr. D. 5, p. 99.

244.  Dr. Barabaree also acknowledged that actuarials remain very good at discriminating between low and high risk offenders, even for older offenders, and

that published studies support the ability of the Static-99 to discriminate between low risk and high risk offenders over 60.  Tr. D. 5, p. 61.

      **6.**    **The Effect of Age On The Opinions of Drs. Rosell, Phenix, and Katz As to Whether Hunt Would Have Serious Difficulty Refraining From Further Acts Of Child Molestation**

        (a).   <u>Dr. Katz</u>

245.   Dr. Katz, who was selected as an expert by Hunt, concluded that Hunt's pedophilia was severe in the 1980's, but felt that several factors mitigated the risk presented by Hunt.  Specifically, Dr. Katz considered Hunt's treatment, conditions of release, Hunt's institutional adjustment, and most substantially, Hunt's age.  Despite all of those factors, because Hunt's pedophilia was so severe, Hunt's pedophilia remained a moderately serious disorder and Hunt remained at moderate to moderate high risk.  Tr. D. 2, p. 101, 104, 111-115, 127-128.

246.   Accordingly, despite any mitigation that may accompany these protective factors, including Hunt's age, because Hunt's pedophilia was so severe, Dr. Katz concluded that Hunt would have serious difficulty refraining from further acts of child molestation.  Tr. D. 2, p. 104-105, 107-108.

        (b).   <u>Dr. Rosell</u>

247.   Dr. Rosell credits the research showing a decline in recidivism for sex offenders as they age, including the research and publications of Dr. Barbaree.  Tr. D. 1, p. 148-149, 152; Tr. D. 2, p. 61-62, 73-74.  Though he also notes one such study that showed no decline in recidivism for individuals aged 40-59 who had multiple prior

convictions for a sex offense.  Tr. D. 1, p. 148.

248.   Dr. Rosell agrees that the research on age suggests that actuarial risk estimate may over estimate the risk of older offenders and he would adjust any risk estimates downward for older offenders.  Tr. D. 1, p. 149; Tr. D. 2, p. 43-44.

249.   However, there is been no general consensus on how to adjust for age.  Tr. D. 1, p. 149.  Dr. Rosell would not, as Dr. Barbaree suggests, undertake a mathematically based adjustment of the risk profiles because that does not allow consideration of the individual.  Tr. D. 1, p. 149-150.

250.   Dr. Rosell testified that the research on aging has, in the past, led him to conclude that the overwhelming majority of offenders over sixty should not be civilly committed.  Tr. D. 1, p. 164.

251.   In Hunt's case, however, Hunt's past offending was so prolific, of such duration and frequency, and Hunt's pedophilia so severe, that Hunt's age alone cannot justify a finding that he is not sexually dangerous.  Tr. D. 1, p. 164-165, Tr. D. 2, p. 75, 80.

252.   Dr. Rosell's opinion that Hunt would have serious difficulty refraining from further acts child molestation was informed by, but not controlled by, the percentages he derived from actuarial instruments.  Tr. D. 2, p. 76.

253.   And, even if Dr. Rosell disregarded the statistics, he would reach the same conclusion.  Tr. D. 2, p. 76.

254.   Ultimately, Dr. Rosell concluded that as a result of his pedophilia, Hunt would

have serious difficulty refraining from further acts of child molestation despite his age.  Tr. D. 1, p. 165-166.

      (c).    <u>Dr. Phenix</u>

255.   Dr. Phenix is aware of research, including that of Dr. Barbaree, showing that older offenders are at lower risk to recidivate.  Tr. D. 3, p. 53, 73-80.

256.   Dr. Phenix also acknowledges that the risk estimates derived from actuarial instruments may be over representative of Hunt's risk because of his age.  Tr. D.3, p. 83-84, 140-141, 157, 162.  Like Dr. Rosell, she would not adjust the risk estimates for age based solely upon a mathematical formula as that adjustment would not allow consideration of Hunt's unique characteristics and behavior and further, such a methodology does not allow her to take into account other studies which offer results conflicting with those of Dr. Barbaree.  Tr. D. 3, p. 84-85, 156.

257.   She notes that at least one study has shown no decline in recidivism for sex offenders age 40-60 who had three or more prior convictions for a sex offense.  Tr. D. 3, p. 75-78.

258.   Dr. Phenix also considered that despite the severity of Hunt's pedophilia, his libido may have declined with age.  Tr. D. 3, p. 68.

259.   She also noted, but does not credit, studies by respected researchers concluding that age has no effect whatsoever on sex offender recidivism.  Tr. D. 3, p. 76-77.

260.   Dr. Phenix testified that Hunt's age is a "protective" factor because the research establishes that for an older offender the risk of recidivism may be reduced.  Tr. D.

3, p. 73.

261. Notwithstanding such research, Dr. Phenix concluded that Hunt would have serious difficulty refraining from further acts of child molestation.  Tr. D. 3, p. 85-86.  While age reduces Hunt's risk, it certainly does not eliminate it.  Tr. D. 3, p. 86.  In Dr. Phenix's opinion Hunt remains a very high risk offender who has had inadequate treatment while incarcerated.  Tr. D. 3, p. 86, 178.

262. Accordingly, this Court concludes that Hunt would, as a result of a serious mental illness abnormality or disorder, pedophilia, have serious difficulty in refraining from further acts of child molestation.[18]

---

[18]The government has explained why this court should not credit the opinion of Dr. Plaud in the government's accompanying memorandum of law.

**Conclusion**

For all of these reasons, the Court finds that Hunt is a sexually dangerous person as defined in the Adam Walsh Act, and further orders that Hunt be committed to the custody of the Attorney General for care and treatment in accordance with the provisions of 18 U.S.C. § 4248(d) and (f).

Respectfully submitted,

MICHAEL K. LOUCKS
Acting United States Attorney

By:  /s/ Mark J. Grady
Mark J. Grady
Jennifer Serafyn
Assistant U.S. Attorneys
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

Dated: June 24, 2009

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on June 24, 2009.

 /s/ Mark. J. Grady
Mark J. Grady
Assistant United States
