UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Petitioner, | ) |
| | )   CIVIL ACTION NO. 07-12063-JLT |
| v. | ) |
| | ) |
| WAYNE HUNT, | ) |
| | ) |
| Respondent. | ) |

## RESPONDENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Respondent Wayne Hunt respectfully requests that the Court enter the following findings of fact and conclusions of law in this matter, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  For the reasons that follow, the Court should enter judgment in this matter that Wayne Hunt is not a "sexually dangerous person" and order his release from the custody of the federal Bureau of Prisons.

Respectfully submitted,
WAYNE HUNT
By his attorney:


/s/ Ian Gold
Ian Gold
Assistant Federal Defender
Federal Defender Office
408 Atlantic Ave.
Boston, MA 02110

Dated: June 29, 2009

**TABLE OF CONTENTS**

I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

II.  FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-
    A.  Personal History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
    B.  Criminal and Sexual Offense History. . . . . . . . . . . . . . . . . . . . . . . . . . -7-
        1.  Uncharged Sexual Offenses in 1975-1976. . . . . . . . . . . . . . . -8-
        2.  The Louisiana Federal Conviction . . . . . . . . . . . . . . . . . . . . . -8-
        3.  New York v. Wayne Hunt. . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
        4.  Disciplinary History.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-
        5.  Sex Offender Treatment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-
        6.  Federal Parole Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . -16-
    C.  Current Status. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-

III.  EXPERT'S QUALIFICATIONS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

IV.  LEGAL PRINCIPLES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-
    A.  Standard of Proof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-
    B.  "Sexually Dangerous Person". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

V.  FINDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-
    A.  Child Molestation in the Past. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-
    B.  Suffers from a Serious Mental Illness, Abnormality or Disorder. . . . . . -22-
        1.  Pedophilia. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-
        2.  Antisocial Personality Disorder.. . . . . . . . . . . . . . . . . . . . . . . -29-
    C.  Serious Difficulty Refraining from Child Molestation. . . . . . . . . . . . . -32-

V.  DANGEROUSNESS / RISK ASSESSMENT. . . . . . . . . . . . . . . . . . . . . . . -32-
    A.  Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -33-
    B.  The Development of Actuarial Instruments for Sexual Recidivism. . . . . -35-
    C.  Measuring the Accuracy of Actuarial Instruments. . . . . . . . . . . . . . . . -39-
        1.  Relative Risk. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-
        2.  Absolute Risk.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-
    D.  The Effect of Age on Sexual Recidivism. . . . . . . . . . . . . . . . . . . . . . . -45-
        1.  The Impact of Age on the Biology of Sexual Behavior . . . . . . . . . . -48-
        2.  The Impact of Age on Sex Offender Recidivism.. . . . . . . . . . . . . . . -51-

VI.  RISK ASSESSMENTS CONDUCTED IN THIS CASE. . . . . . . . . . . . . . . . -59-
    A.  Dr. Bernard Katz' Risk Assessment. . . . . . . . . . . . . . . . . . . . . . . . . . -59-
    B.  Dr. Luis Rosell's Risk Assessment. . . . . . . . . . . . . . . . . . . . . . . . . . -62-
        1.  Dr. Rosell's Assessment of Mr. Hunt's Risk Within the Actuarial Range of the Static-99. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -66-
        2.  Dr. Rosell's Consideration of Mr. Hunt's Age. . . . . . . . . . . . . . -67-

C.     Dr. Amy Phenix's Risk Assessment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -72-
       1.     Methodology. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -72-
       2.     Dr. Phenix's Scoring on the Actuarial Instruments. . . . . . . . . . . . . . . -74-
       3.     Dr. Phenix's Assessment of Mr. Hunt's Risk Within the Actuarial Ranges
              Given by the Static-99 and Static-2002. . . . . . . . . . . . . . . . . . . . . . . . . . -75-
       4.     Dr. Phenix's Accounting for Age. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -78-
       5.     Dr. Phenix Did Not Adjust to Account for the Lower Base Rate for Older
              Offenders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -79-
       6.     Dr. Phenix's Continued Emphasis on Relative Risk Level. . . . . . . . . . -83-
D.     Dr. Joseph Plaud's Risk Assessment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -84-

VII.   CONCLUSIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -88-

## I.     INTRODUCTION

Petitioner, the United States of America ("the Government"), instituted this civil action

on

March 9, 2007, seeking to commit Wayne Hunt ("Mr. Hunt" or "Respondent") as a sexually

dangerous person pursuant to the Adam Walsh Child Protection and Safety Act of 2006 ("the

Act").[1]  The Government's petition states that mental health personnel for the Federal Bureau of

Prisons ("BOP") have examined Respondent and have issued a preliminary determination that he

is sexually dangerous.  Upon receipt of the petition, the Act required this Court to stay

Respondent's release from federal custody pending a hearing to determine whether Respondent

qualifies for commitment as a sexually dangerous person.

The Court held a five-day bench trial in this matter beginning on April 27, 2009.  At the

conclusion of trial, the parties were allowed to submit proposed findings of fact and conclusions

of law.  After considering the testimony at trial, the evidentiary record, and the parties'

submissions, this Court concludes that the Government has failed to establish by clear and

convincing evidence that Respondent is sexually dangerous to others as required by the Act and

the Constitution.

## II.    FACTS

1.      Wayne Hunt was born in 1946 and was 63 years of age at the time of the

evidentiary hearing.

2.      At the time of the hearing Mr. Hunt had been incarcerated for approximately 24

years.

---

[1]18 U.S.C. § 4248 (West 2009).

-4-

A.    **Personal History**

3.    Mr. Hunt was adopted at the age of 18 months by Wilbur and Lora Hunt and raised as an only child.[2]  Mr. Hunt reported that his mother was manic-depressive and physically abused him.[3]  His relationship with his father was much warmer, but his father died when he was 14.  Subsequently Mr. Hunt began engaging in runaway behaviors, performed poorly in school, and had one juvenile charge of breaking and entering when he was 15.[4]

4.    Beginning at the age of seven, Mr. Hunt was sexually abused by an uncle who lived next door.  The abuse consisted of repeated anal and oral sex until he was approximately ten to twelve  years old and he estimated that it occurred more than 100 times.  The abuse ended when the uncle was incarcerated for arson.[5]  Mr. Hunt attempted to tell his mother about the abuse but she did not believe him.  He did not tell his father because he feared what his father might do.[6]  In addition, he reported that a minister sexually abused him at age twelve and again at age fourteen prompting him to run away.[7]  Mr. Hunt also reported suffering other sexual abuse from men at a yacht club between the ages of 10-14.  At that time, he felt it enjoyable, as he went on trips.[8]

---

[2]Exh. 3 at 2.

[3]Exh. 3 at 2.

[4]Exh. 1 at 2.

[5]Exh. 1 at 2; Exh. 3 at 2.

[6]Exh. 1 at 2; Exh. 3 at 2.

[7]Exh. 1 at 2; Exh. 3 at 2.

[8]Exh. 3 at 2.  During his sex offender treatment Mr. Hunt wrote about the abuse that he suffered as a child and its relationship to how he viewed the children that he abused: "When I

5.      Mr. Hunt was admitted to the Hudson River State Hospital in Poughkeepsie, NY in 1962 at the age of 15.   He was diagnosed with "Disorders of Psychogenic Origin, Primary Behavior Disorder in Children, and Conduct Disturbance."  Records described him as "emotionally flat, unconcerned youngster of a schizoid type of personality" and with "bland affect, autistic and ambivalent."[9]  Later in life Mr. Hunt admitted to several suicide attempts after the death of his father around age 14.[10]

6.      Mr. Hunt did not continue in school after tenth  grade.  When he was 18 years old he enlisted in the Navy.[11]  Military records indicate that he was discharged following a sentence of six months hard labor for "desertion," breaking restriction, and refusal to follow a lawful order.  Although some records indicate he received a "bad conduct" discharge, his discharge paperwork describes a discharge "under honorable conditions."[12]

7.      At the age of 19 Mr. Hunt began a 15-year "off and on" relationship with Kathy Taylor.   They lived together intermittently and had two daughters, who are now in their 30s. Mr. Hunt reported to Dr. Rosell that he was in love with Kathy and the relationship was "stable

---

was a child I was controlling adults into taking me with them on their boats in exchange for sex and the association with those in power. I knew they were in control, but did not want to admit it. I needed to feel I was in control, as illogical as that was, I accepted it. This distorted logic stayed with me through adulthood and entered into my offenses. I started off with objectifying previously abused youth who I thought of as hustlers. My distorted logic here was anything I might do with them is all right. They are male prostitutes and I'll pay them for their services. Paying them will make it all right." Exh. 3 at 17 citing Exh. 23 at HU01370.

[9]Exh. 3 at 4.

[10]Exh. 3 at 4.

[11]Exh. 3 at 2.

[12]Exh. 1 at 3.

and went beyond sex."[13]   Mr. Hunt also reported having about a dozen female sexual partners, however he characterized his relationships with women other than Kathy as "one night stands" and he did not consider them serious.[14]   Mr. Hunt's offending behavior includes the time that he was with Kathy.[15]

8.       Mr. Hunt reported that while he was in the community he had a few sexual encounters with adult males.  He denied having, however, any sexual encounters while in prison because he did not want to get caught.[16]

**B.       Criminal and Sexual Offense History**

9.       Records documenting Mr. Hunt's sexual offenses were entered into evidence.  In addition, a chronology drafted by the parties summarizing Mr. Hunt's sexual offenses and convictions was entered into evidence as Exhibit O.

10.      Mr. Hunt's first sexual arrest was in June 1973 at the age of 27.   Prior to this first arrest he molested two additional victims:  He engaged in mutual oral sex with an eleven to twelve-year-old boys that he met in a mall in California and he engaged in mutual masturbation with a young male approximately fourteen years old that he met at a carnival.[17]

11.      In June 1973 he was charged in California Superior Court with two felony counts of committing lewd and lascivious acts on a child under 14.  The victims were two boys (both

---

[13]Exh. 3 at 3.

[14]Exh. 3 at 3.

[15]Exh. 3 at 3.

[16]Exh. 3 at 3.

[17]Exh. O at 1; Exh. 3 at 10.

age eleven) that Hunt met at a carnival.  In August 1973 Hunt pled guilty to one count of a

lesser-included misdemeanor (a violation of California Penal Code 647a for annoying or

molesting a child under 18).  Although he only pled guilty to one charge, he acknowledged

having oral sex with one of the boys and touching the other boy with clothes on.[18]

12.     On September 7, 1973, Hunt was sentenced to three years probation.  On

September 18, 1973, Hunt failed to report as required by the terms of his probation.  An arrest

warrant was issued.[19]

### 1.     Uncharged Sexual Offenses in 1975-1976

13.     After being placed on probation in California, Hunt moved to Louisiana.

14.     He reported in an interview with Dr. Rosell that at age 29 (1975-76) he had four

victims between the ages of 12-16 on whom he performed oral sex.  He was never charged for

these offenses.  He also reported that prior to his arrest on federal kidnaping charges in

September of 1976 he worked as a karate instructor for young boys between the ages of 12-16 in

Louisiana.  Although he was never charged, he acknowledges victimizing some of the boys.[20]

15.     On March 15, 1977, Mr. Hunt reported to BOP psychiatrists that from January

1976 until his arrest in September 1976 he has had masturbatory practices with about 15-20

different boys and up to 25 times with the same boy.[21]

### 2.     The Louisiana Federal Conviction

---

[18]Exh. O at 1; Exh. 3 at 10.

[19] Exh. O at 1-2.

[20]Exh O at 2; Exh. 3 at 9, 11.

[21]Exh. O at 2.

16.     On September 13, 1976 Hunt was indicted on charges that on August 4, 1976 he kidnapped a twelve-year-old boy, K.J.T.,. in violation of 18 U.S.C. 1201.[22]

17.     Hunt was arrested in September 1976 and entered a plea of guilty on February 14, 1977.  He was initially given a life sentence, but on May 15, 1977 the sentence was reduced to ten years imprisonment.[23]

18.     Hunt acknowledges that his motivation in committing the crime was an interest in having sex with K.J.T., but denies having molested K.J.T. [24]   He possessed a firearm during the course of this offense but claims that the weapon was not loaded and was not displayed before the juvenile.[25]

19.     Hunt was paroled and released from federal prison on September 11, 1981.

### 3.     New York v. Wayne Hunt

20.     Hunt returned to New York after his release from federal custody and in the summer of 1982, began sexually victimizing a new group of minor victims.  This conduct continued until his arrest in 1985.[26]

21.     Hunt began abusing G.D., a 7-year-old male, in the summer of 1982.  Hunt's abuse of G.D. involved oral and anal sex, and Hunt photographing the conduct.  According to Hunt's self-report from his sex offender treatment records:  "There is no telling how many times

---

[22]Exh. O at 2.

[23]Exh. O at 2-3.

[24]Exh. O at 2; Exh. 3 at 11.

[25]Exh. O at 2.

[26]Exh. O at 3; Exh 3. at 11.

we had sex.  In. [G.D.'s] case at least some type of abuse daily."[27]

22.     Hunt began abusing J.Z., an 11- year old male, in October 1982 and that abuse was ongoing until Hunt's arrest in 1985.  Hunt would further direct J.Z. to bring other boys for Hunt to sexually abuse.[28]

23.     Hunt began abusing H.R., a nine-year-old male, approximately three years prior to his arrest in 1985 and that abuse continued until Hunt's arrest in 1985.  Hunt also directed H.R. to have sex with his seven-year-old younger brother, J.R., and to also directed H.R. to photograph sexual acts[29]

24.     Hunt began abusing L.A. a  twelve-year-old male, and H.D., a fourteen-year-old male, approximately four years prior to his arrest in 1985.  Hunt has acknowledged that he photographed these children engaged in sexual acts and that he engaged in oral and anal sex with both L.A. and H.D.[30]

25.     Ultimately, Hunt sexually abused well over a dozen children between 1982 and 1985 whose ages ranged from 7-14.[31]

26.     In April 1985 Hunt was indicted and arrested on charges that he had engaged in sodomy with a 13-year-old boy and had engaged in sexual abuse of a 12-year-old boy.[32]

---

[27]Exh. O at 3.

[28]Exh. O at 3.

[29]Exh. O at 3; Exh 3 at 11.

[30]Exh. O at 3; Exh 3. at 11.

[31]Exh. O at 3; Exh. 3. at 11.

[32]Exh. O at 3; Exhs. 19-20.

27.     After his release on bail for these charges in May 1985, Hunt failed to report to his federal parole officer and failed to report his change in address.  Hunt also failed to appear for a July 1985 hearing in the state criminal proceedings.  Both a state warrant and a federal parole warrant were issued for Hunt's arrest.[33]

28.     During this same period, in April and May of 1985, Hunt rented a generator and an ATV from local businesses and failed to return them and ceased making payments on a Ford pickup truck that he had previously purchased.[34]

29.     In August 1985, New York State Police investigating an area in which Hunt's pick up truck had been located found two juveniles, L.A. a 12-year-old male and H.D., a fourteen-year-old male, at a campsite near Hunt's vehicle.   Hunt was arrested later that day at a nearby truck stop.

30.     When the police arrested Hunt in August 1985 they found numerous photographs of children engaged in sexual acts with Hunt and with each other inside his trailer.

31.     On October 28, 1985, Hunt pled guilty and was convicted of grand larceny in Albany County Court and was sentenced to two to four years of incarceration.[35]

32.     On November 18, 1985, Hunt entered a plea of guilty to one count of the initial sodomy indictment, *supra* para. 26, and on December 5, 1985 he was sentenced to two to four years of incarceration for that offense.

33.     Further investigation of the photos led to the filing of a sixty count indictment

---

[33]Exh. O at 4.

[34]Exh. O at 4.

[35]Exh. O at 4.

involving numerous child victims charging Hunt with *inter alia*, kidnaping, use of children in a sexual performance, promoting the sexual performance of children, and sodomy in the first and second degrees.

34.    Two years later, on October 15, 1987, Hunt entered a plea of guilty to eighteen counts of the sixty count indictment.[36]

> a.    Counts 1-2: Hunt pled guilty to kidnaping in the second degree (L.A., a 12-year-old boy and H.D., a 14-year-old boy);
>
> b.    Counts 3-6: Hunt pled guilty to authorizing or inducing a 9-year-old boy, G.D., a 9-year-old boy, H.R., a thirteen or fourteen-year-old boy, J.S. #1, and an 11-year-old boy, J.Z., to engage in performances which consisted of taking photographs of G.D., H.R., J.S.#1, and J.Z. while they engaged in sexual conduct.
>
> c.    Counts 7-9: Hunt pled guilty to, between May and July 1984, offering or agreeing to promote photographs depicting a 12-year-old boy, J.S. #2, a 12 to 13-year-old girl, L.W., and an 11-year-old boy J.Z., engaged in sexual conduct.
>
> d.    Count 11: Hunt pled guilty to, between December 1984 and January 1985, engaging in deviant sexual intercourse with a 10-year-old male, such conduct involved Hunt performing oral and/or anal sex upon G.D.
>
> e.    Counts 13-16: Hunt pled guilty to, between June and August 1984, engaging in deviant sexual intercourse with a 10-year-old male, J.F., a 7-year-old male, J.R., a 9-year-old male, H.R,. and an eight-year-old male, A.W., such conduct involved Hunt performing oral and/or anal sex upon J.F., J.R., H.R., and A.W.
>
> f.    Count 19: Hunt pled guilty to, in August 1984, engaging in deviant sexual intercourse with a 10-year-old male, P.W., such conduct involved Hunt performing oral sex upon P.W.
>
> g.    Count 22: Hunt pled guilty to, between May and July 1984, engaging in deviant sexual intercourse with a 13-year-old male, J.S. #1, such conduct involved Hunt performing oral sex upon J.S.#1.

---

[36]Exh. O at 4.

     h.     Count 25: Hunt pled guilty to, between June and August 1984, engaging in deviant sexual intercourse with a 12 or 13-year-old male, J.S.#2, such conduct involving Hunt performing oral sex upon J.S.#2.

     i.     Count 26: Hunt pled guilty to, between November and December 1984, engaging in deviant sexual intercourse with an 11-year-old male, P.S., such conduct involved Hunt performing oral and/or anal sex upon P.S.

35.     On November 24, 1987, Hunt was sentenced to 12 ½ to 25 years incarceration on Counts 1-2 (Kidnaping, 2d degree) and Counts 11, 13-16 and 19 (Sodomy, 1st Degree); 7 ½ to 15 years incarceration on Counts 3-6 (use of a child in a sexual performance); and 3½ to 7 years incarceration on Counts 7-9 (promoting sexual performance of a child) and Counts 22, 25, and 26 (Sodomy 2d degree).  All sentences were ordered to be served concurrently.[37]

36.     Hunt is on parole from that sentence through July 11, 2012.[38]

**4.     Disciplinary History**

37.     While incarcerated Mr. Hunt has been steadily employed and has taken college courses.  He has received glowing recommendations from people he has worked for.[39]   Mr. Hunt's educational and occupational records were entered into evidence as Exhibit 11.

38.     Mr. Hunt's only significant disciplinary violation while incarcerated occurred at Woodborne Correctional Facility in New York in April 1998.  During a routine search of a computer used by Mr. Hunt, pictures of boys, including one in a bathing suit, were found in a hidden file labeled "Wayne."  Copies of these pictures were entered into evidence.[40]  A

---

[37]Exh. O at 6.

[38]Exh. O at 6; Exh. G at HU1731; Apr. 27 Tr. at 89.

[39]Apr. 28 Tr. at 52.

[40]Exh. E at 985-995.

subsequent search of his cell found additional material, copies of which were also entered into evidence.[41]  Mr. Hunt was found guilty of "unauthorized literature" and "property in an unauthorized area."  He was found not guilty of possession of contraband.[42]

### 5.    Sex Offender Treatment

39.    Mr. Hunt attended sex offender treatment at Oneida Correctional Facility in New York from June 2003 to December 2003.[43]   The sex offender treatment program was an intensive six month cognitive behavioral treatment program.[44]  Records from the program were submitted into evidence as Exhibit 23.   Mr. Hunt's homework in treatment "included answering questions about why he engaged in the behavior, how distorted his thinking was, how he planned his crimes, his acting out phase, his reward phase, his minimizing, blaming, denial, and covering up."[45]  As part of his therapy he wrote about his offenses, including a 60+ page narrative detailing how he met, groomed, and offended against each of his victims:[46]

> I will describe their vulnerabilities:  I see their basic vulnerability as having no anchor at home to be attached to.  These victims were adrift in a river full of predators, including myself.  They would believe anything I told them, and basically some of them attached themselves to me as their anchor.  You can see this with the length of time of my abuse to them.  I offered them the only home life most of them had, this was their basic vulnerability, as no one was there for

---

[41]Exh. E at 996-999.  This included a cartoon of a naked man and woman with the caption "Love is helping each other get up in the morning."

[42]Exh. E at Hunt0978.

[43]Exh. 23 at HU01212.

[44]Apr. 30 Tr. at 50; See also Apr. 28 Tr. at 54 (characterizing program as "intensive" day long treatment, a cognitive-behavioral model focused on relapse prevention).

[45]Exh. 3 at 17.

[46]Exh. 23 at HU1291-HU1299; HU1303-1308 and HU1315-HU1381.

them except people that wanted them to abuse.  I include myself in this category.

How I isolated these victims

Their Environment: I really created a new environment for them with the excitement of the carnival. Their environment was already shaped by their hustling, so it was very easy to offer them some fun and a speratic [sic] home type life.

Their family and friends:  They were already isolated by their families, so the families I got to know looked on me as a white knight.  The person that could help with their child's problems or in some cases someone to dump their kid on and get him out of their hair.  This was very easy to do because most street children have a bad home life.  Their friends were mainly people they were working the streets with and reinforced this distorted sexual view.  The only ones they could find acceptance with. Friends and family were easily manuplited [sic] by me into doing what I wanted them to do.

How I groomed these victims

Physical Grooming: I would take them with me when I went places, and all boys like to drive so they would sit on my lap and steer while I fondled and touched them.  I would hug them, they would sit close so I could put my arm around them. They were totally desensitized to touch.  They were looking for some type of love and I took full advantage of this in my distorted thinking.

Psychological Grooming: I would tell them how much I loved and enjoyed their company.  I would listen to them open up about the horrors of street life and pretend to be empathetic.  I really used this as my form of fantasies and porno.  I gained their trust, and I never really worried about them telling anyone.  I felt I would be the last one they would tell on.  I became their mentor, serquart [sic] parent, friend, someone they thought they could turn to.  I even self-groomed myself through my distorted thinking telling myself I was helping them.

Social Environment: I was a highly respected business man running a multi-million dollar business.  The money I made was power.  I did business with cities and top officials through New York and other states.  With the carnival it would be natural to see kids hanging around.  Nothing to cause someone to be suspicious even if someone saw me talking to one of them.  I would usually under contract from a fair board hire off duty police officers for fair security, again I was the paymaster and no one looked my way.  I was above reproach.  Power and control

-15-

that it what its all boils down to and my distorted way I was approaching life.[47]

40.     Mr. Hunt completed the program in December 2003.  His evaluations and
discharge report were entered into evidence.[48]

### 6.     Federal Parole Proceedings

41.     At the time of his release in 1981 from federal custody, Hunt had remained on
federal parole for the 1977 kidnaping conviction.  See *supra*, paras. 16-19.

42.     When he completed his state sentence in New York in March 2004, Hunt was
detained by the U.S. Marshall.   The Parole Commission required Hunt to serve the balance of
his federal sentence for the 1977 kidnaping conviction.

43.     Hunt completed his federal sentence on March 18, 2007.

### C.     Current Status

44.     On March 7, 2007, the United States filed the instant action seeking to commit
Hunt as a sexually dangerous person under the Adam Walsh Act, 18 U.S.C. § 4248.    Pursuant
to the statute, the filing of this action stayed his release pending the outcome of the proceedings.


45.     Mr. Hunt's medical records from the Bureau of Prisons were entered into
evidence as Exhibit 13.  Mr. Hunt suffers from hypertension and angina and takes medication for
these conditions.[49]

46.     If released, Mr. Hunt would be on parole in New York until July 11, 2012, at

---

[47]Exh. 23 at HU01345-1347.

[48]Exh 23 at HU01272, 1277, 1312, 1314.

[49]Exh. 9 at 4; Exh. 1 at 4; Exh. 13.

which time he will be 66 years old. His conditions of parole include, among others,

participating in any sex offender therapy, mental health therapy and/or substance abuse treatment

as directed by the parole officer, no contact with anyone under the age of 18, abiding by curfew

and boundary restrictions of the parole officer, not possessing any computer equipment with

internet access without permission, not possessing or using a car without permission, reporting to

his parole officer as required, and registering as a sex offender.[50]

## III.   EXPERT'S QUALIFICATIONS

47.     Pursuant to 18 U.S.C. § 4247(b), the Court designated Dr. Bernard Katz as the

court-appointed examiner in this case. He was authorized to review Mr. Hunt's records

including his Bureau of Prisons file and to interview Mr. Hunt. Dr. Katz interviewed Mr. Hunt

on June 30, 2008.

48.     The government retained Dr. Amy Phenix as an expert in the case. Dr. Phenix

was authorized to review Mr. Hunt's records including his Bureau of Prisons file. She was not

authorized to interview Mr. Hunt.

49.     At Respondent's request the Court appointed Dr. Louis Rosell. Dr. Rosell was

authorized to review Mr. Hunt's records and interview Mr. Hunt. Dr. Rosell interviewed Mr.

Hunt on November 20, 2008.

50.     Respondent retained Dr. Joseph Plaud. Dr. Plaud reviewed Mr. Hunt's records

and interviewed Mr. Hunt on March 27, 2009.

51.     Respondent also retained Dr. Howard Barbaree to provide expert testimony

regarding the effect of aging on the risk of recidivism in sex offenders.

_____

[50]Exh. G; Apr. 28 Tr. at 133-136

-17-

52.     The parties did not challenge the qualifications of any of the above experts.  The

Court having reviewed the curriculum vitaes of the experts, and having heard their testimony,

finds that each individual is qualified by education and experience to offer expert testimony in

this matter.

## IV.    LEGAL PRINCIPLES

### A.    <u>Standard of Proof</u>

53.     The government has the burden of proving each element by clear and convincing

evidence.  18 U.S.C. § 4248(d).  "[T]he individual's interest in the outcome of a civil

commitment proceeding is of such weight and gravity" that this standard is required not only by

the Act, but by the Due Process clause of the Constitution." <u>Addington v. Texas</u>, 441 U.S. 418,

427 (1979).  The clear and convincing evidence standard is an "intermediate standard," lying

somewhere "between preponderance of the evidence and proof beyond a reasonable doubt." <u>Id</u>.

at 425.  "In other contexts, the First Circuit has described the standard variously as 'stiff,'

'stringent,' 'rigorous,' a 'high threshold,' a 'heavy burden' and a 'high hurdle.'" <u>United States</u>

<u>v. Carta,</u> 2009 WL 1560199 at *9 (D. Mass. June 4, 2009) (internal citations omitted).   The

government must produce "[e]vidence indicating that the thing to be proved is highly probable or

reasonably certain." <u>Id</u>. <u>citing</u> Blacks Law Dictionary, 596 (8th ed. 2004).

### B.    <u>"Sexually Dangerous Person"</u>

54.     To commit Respondent, the Government must prove by clear and convincing

evidence that Respondent is a "sexually dangerous person," which the Act defines as "a person

who has engaged or attempted to engage in sexually violent conduct or child molestation and

who is sexually dangerous to others."[51]  An individual is "sexually dangerous to others" under

the Act if he "suffers from a serious mental illness, abnormality, or disorder as a result of which

he would have serious difficulty in refraining from sexually violent conduct or child molestation

if released."[52]

55.     This phrase has not been defined by the statute. The legislative history indicates

that it is a direct legislative enactment of the principle of volitional impairment enunciated in

Kansas v. Hendricks, 521 U.S. 346 (1997) and Kansas v. Crane, 534 U.S. 407 (2002).  See H.R.

Rep. No. 109-218(I) Section-by-Section Analysis and Discussion §511.  In Crane, the Supreme

Court stated that the "serious difficulty" requirement  is intended to distinguish the "dangerous

sexual offender whose mental illness, mental abnormality or mental disorder subjects him to

civil commitment, from the dangerous, but typical, recidivist convicted in an ordinary criminal

case who, having been convicted and punished for one crime, proceeds through his own free

choice to commit another." Crane, 413.

56.     A finding of dangerousness is also constitutionally required.   Kansas v. Crane,

534 U.S. 407-409-10 (stating "we have consistently upheld involuntary commitment statutes . . .

[when] (1) the confinement takes place pursuant to proper procedures and evidentiary standards;

(2) there is a finding of 'dangerousness either to one's self or others,' and (3) proof of

dangerousness is "coupled . . . with the proof of some additional factor, such as a 'mental illness'

or 'mental abnormality' (citing Kansas v. Hendricks, 521 U.S. 346 357-358; quotations omitted,

---

[51]Id. §4247(a)(5).

[52]Id. §4247(a)(6).

emphasis added)).  See also Foucha v. Louisiana, 504 U.S. 71, 82-83 (1992).

57.    The government has suggested at various points during the trial that the risk

analysis testimony offered in this case is unnecessary to its case, and in some sense superfluous

to the Court's determination of whether the Respondent is a sexually dangerous person.[53]  They

did so despite the apparent centrality of this type of evidence to the experts who testified on the

Government's behalf.   The Court notes that the statute does not explicitly require a finding that

the risk of re-offense [meet a certain numerical threshold] be likely or highly-likely.[54]  The

---

[53]See e.g. May 1 Tr. at 106.

[54]The Court notes that all state civil commitment statutes require an explicit finding that
Respondent is either "likely" or "highly likely" to reoffend.  While the statute does not contain
an express likelihood requirement, one can be inferred from the "serious difficulty refraining"
clause of the statute.  See e.g. In re Commitment of W.Z., 801 A.2d 205 (N.J. 2002) (finding "no
basis for separating the court's determination of a person's likelihood to engage in acts of sexual
violence from the court's assessment of the person's loss of control over his or her harmful
behavior specifically," and that "the State must prove [the requisite] threat by demonstrating that
the individual has serious difficulty in controlling sexually harmful behavior such that it is *highly
likely* that he … will not control his or her sexually violent behavior and will reoffend.")   Every
state civil commitment statute contains an explicit requirement of some level of probability of
re-offense to justify commitment.  See George Woodworth and Robert Kadane, Expert
Testimony Supporting Post-sentence Civil Incarceration of Violent Sexual Offenders, 3 Law,
Probability and Risk 221, 222 (2004).  The Kansas statute upheld by the Supreme Court in the
Hendricks case, for example has a likelihood requirement.  See Hendricks, 521 U.S. at 357
(describing statute as one which "requires evidence of past sexually violent behavior and a
present mental condition that creates a likelihood of such conduct in the future if the person is
not incapacitated."); Kan. Stat. Ann. § 59-29a02 (a) (2009) ("'[l]ikely to engage in repeat acts of
sexual violence' means the person's propensity to commit acts of sexual violence is of such a
degree as to pose a menace to the health and safety of others") Indeed, certain states have
expressly adopted, either through statute or case law, requirements that risk of re-offense be
demonstrated to be over fifty percent.  See e.g. Wash. Rev. Code Ann. § 71.09.020(7) (2009)
("likely" statutorily defined as "more probably than not.")  Wis. Stat. Ann. § 980.01(1m) (2009)
("'likely' means more likely than not.")  State v. Ward, 720 N.E.2d 603, 609 (Ohio Ct. App.
1999) (Ohio sexual predator statute "requires the court to find by clear and convincing evidence
that an offender is 'likely to' commit a sexually oriented offense in the future…[s]tated
differently, the standard is whether there exists proof that produces a firm belief or conviction
that an offender will more likely than not commit another sex offense in the future.")

operational language of the statute was imported directly from Kansas v. Crane and was

language which the Supreme Court articulated not in the context of discussing the level of risk

sufficient to justify commitment, but in the context of a discussion about the types of mental

conditions which would adequately distinguish those subject to involuntary commitment from

those who are not.

58.     Respondent argues that if no separate showing of likelihood of re-offense is called

for by the "serious difficulty refraining" language of the statute, then some showing of likelihood

is required by the phrase "sexually dangerous to others," which is also in the statute.   The Court

agrees and holds that the statute and due process considerations require that, in addition to a

volitional impairment, the government must prove by clear and convincing evidence that the

Respondent poses a  risk of re-offense that is significant enough to justify a finding Respondent

is sexually dangerous and therefore can be preventively detained.

---

Several states require a "high" likelihood to justify commitment.  See e.g. IMO Commitment of
W.Z., 173 N.J. 109 (2002) ("[t]o be committed under the SVPA an individual must be proven to
be a threat to the health and safety of others because of the likelihood of his or her engaging in
sexually violent acts … the State must prove that threat by demonstrating that the individual has
serious difficulty in controlling sexually harmful behavior such that it is highly likely that he or
she will not control his or her sexually violent behavior and will reoffend.)  And other state
courts have rejected a more likely than not standard in favor of even higher burdens.  The
Supreme Judicial Court in Massachusetts, for example, eschewed the more likely than not
standard for a contextual standard in Commonwealth v. Boucher,   780 N.E.2d 47 (Mass. 2003).
The California Supreme Court rejected more likely than not as well, formulating the likelihood
requirement in this way: "a substantial danger, that is, a serious and well-founded risk, that he or
she will commit such crimes if free in the community." People vs. Superior Court (Ghilotti)
(2002) 44 P.3d 949 (Cal. 2002) (emphasis in original).  Both of these states require proof of
dangerousness beyond a reasonable doubt.  See Boucher, 780 N.E.2d at 48; Ghilotti, 44 P. 3d at
973, n. 15; see also Id. at 979 (Wedergar, J., Concurring).  See also in United States v. Abregana,
574 F.Supp.2d 1145, 1147 (D. Hawai'i 2008)(holding that the serious difficulty finding included
a requirement that the probability of future reconviction be "more likely than not.").

59.     In this case the Government has proven neither.  The evidence in this case does not demonstrate that Respondent currently suffers from a volitional impairment.  The evidence also demonstrates that the recidivism rates proposed by the Government's experts are likely overestimates.  Furthermore, even if this Court were to credit the Government's experts regarding Respondent's likelihood of recidivism, the statistical evidence they presented does not rise to the level of clear and convincing evidence of dangerousness sufficient to justify commitment.

V.      **FINDINGS**

   A.      **Child Molestation in the Past**

60.     Mr. Hunt does not contest that he has engaged in child molestation in the past.  .[55] This Court finds that the government has demonstrated this element by clear and convincing evidence.

   B.      **Suffers from a Serious Mental Illness, Abnormality or Disorder**

61.     The government must prove that Mr. Hunt currently "suffers from" a "serious mental illness, abnormality, or disorder."  Neither the terms "suffers from," or "serious mental illness, abnormality, or disorder" have been defined by the statute.  Nor has the qualifier "serious" been defined or quantified in its own right.  18 U.S.C. §§ 4247; 4248.

62.     Each expert used the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR") to diagnose Mr. Hunt.[56]   The DSM-IV-TR is

---

[55]See Respondent's Pretrial Memorandum (Docket Entry 63) at 4.

[56]Apr. 27 Tr. at 95; Apr. 28 Tr. at 98; Apr. 29 Tr. at 18, 22; Apr. 30 Tr. at 19.

generally relied on in the field of psychiatry and psychology.[57]

### 1.    Pedophilia

63.    Drs. Rosell, Katz, and Phenix diagnosed Mr. Hunt with pedophilia.   Pedophilia is defined in the DSM-IV-TR as:

> A.    Over a period of at least six months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or younger).
>
> B.    The person has acted on these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty.
>
> C.    The person is at least age 16 years and at least five years older than the child or children in Criterion A.[58]

64.    Dr. Plaud testified that Mr. Hunt's behavior prior to incarceration was consistent with a diagnosis of pedophilia.[59]   However, he noted that because there was no indication that Mr. Hunt has had any sexually arousing fantasies, urges, or behaviors with prepubescent children within the last ten years, the diagnosis could be made "by record" only.[60]

65.    The DSM-IV-TR states that "the course of pedophilia is usually chronic, especially in those attracted to males."[61]   Each expert was questioned about the meaning of this phrase and the "chronic" nature of pedophilia.

66.    Dr. Phenix testified that "the course of pedophilia is lifelong.  It's just like a

---

[57]Apr. 27 Tr. at 176; Apr. 28 Tr. at 98.

[58]Exh. I.

[59]Apr. 30 Tr. at 16.

[60]Exh. 9 at 8; Apr. 30 Tr. at 15-16.  See also Apr. 30 Tr. at 64 (contrasting with current sources of information: Self-report, physiological assessment, or other proximal data).

[61]Exh. I.

sexual orientation that any person has."[62]  She stated that Mr. Hunt "will be aroused to children throughout his life until he dies, that will be the course of pedophilia for him."[63]  When asked if pedophilia can ever remit, she said "[i]n some offenders it can -- I would never say it's in remission because, like I said, it's very difficult to know internally in someone's mind what's going on."[64]  However, she testified that some offenders tend to offend when they're overwhelmed or stressed and don't tend to experience constant fantasies and urges of children, while other offenders struggle constantly with sexual fantasies and urges about children."  She opined that Mr. Hunt was one of these types of offenders.[65]  About those types of offenders she said that "[w]e see improvement with medications that reduce libido such as Depo-Provera, antiandrogen medications; but other than that it's very difficult to get those fantasies and urges to remit."[66]

67.      Dr. Katz testified that pedophilia did not remit.[67]  He testified that the prognosis

---

[62]Apr. 29 Tr. at 15.

[63]Apr. 29 Tr. at 16.

[64]Apr. 29 Tr. at 17.  Although Dr. Phenix testified that it was difficult to know what was going on in a person's mind, she also testified that "when offenders are sexually aroused to children, it's not unusual to see them go into custody, come out of custody as has happened in this case and immediately start offending again. So, for example, if someone is in custody for four and a half years, they don't have to even have pictures of children to be reinforcing pedophilic fantasies and urges which characterize the disorder. So what they will do is to think back about past victims, past offending. They will fantasize about those victims. They'll masturbate to those and then for many years just continue to reinforce their pedophilic fantasies and urges or visualizing children on television with no one knowing that while they're in prison or in custody and then masturbating to those fantasies." Apr. 29 Tr. at 17-18.

[65]Apr. 29 Tr. at 17.

[66]Apr. 29 Tr. at 18.

[67]Apr. 28 Tr. at 100.

of pedophilia was "fair."  When asked to elaborate he stated:  "Well, it means that it's not

excellent.  I mean, we're on a continuum, again, so the prognosis is not excellent.  Someone who

is a pedophile does not have an excellent prognosis, usually, of being able to resolve these

conflicts and to modify the aim or the object of his sexual interest.  So it's not excellent.  It's

difficult, at best.  It's also not hopeless.  There are pedophiles who, through treatment, through

age, and through, perhaps, other circumstances can, at the very least, control their pedophilic

interests." [68]

68.      Dr. Rosell testified that Mr. Hunt had "one of the more extreme cases of

pedophilia" that he had seen.[69]  Thus, he found it "questionable" that Mr. Hunt's significant

interest in children could dissipate over time.[70]  During his interview Dr. Rosell asked Mr. Hunt

about his current fantasies and arousal level.  Mr. Hunt told Dr. Rosell that he currently

masturbates about once every three months and he currently fantasizes about adult males and

females.[71]  Dr. Rosell found Mr. Hunt's statement about fantasizing about adults "somewhat

difficult to believe" given his strong prior interest in children.[72]  Dr. Rosell also believed this

statement was inconsistent with Mr. Hunt's claim that he knew how to handle his urges.[73]

---

[68]Apr. 28 Tr. at 100.

[69]Apr. 27 Tr. at 101.

[70]Apr. 27 Tr. at 100.

[71]Apr. 27 Tr. at 99-100.

[72]Apr. 27 Tr. at 100.

[73]Apr. 27 Tr. at 100-101 ("Then when I asked him if he were released how he would
handle it and he basically said that he knows how to handle his – at one point he was saying that
he doesn't have the attraction and then at another point he says I know how to handle my urges.
So either, that means that you, either you have it or you don't possibly, it's not likely going to

dissipate while I still have it but I know how to handle it, which could be the case.  And there are individuals who still have that attraction and that's why I believe he still does have that attraction.  And then maybe he feels he can handle it.  But to say that he doesn't have the attraction anymore, I find that unlikely.")

In his report, Dr. Rosell detailed the following conversation with Mr. Hunt:  "When asked about his current masturbation practice, Mr. Hunt reported masturbating once every three months, while fantasizing about women and some men. He stated five years ago, he would masturbate once a month. When asked what feelings or moods would put him most at risk to reoffend, Mr. Hunt said he could not think about any. When asked about what thoughts (including sexual thoughts or fantasies) would place him at risk, he could not think of any thoughts or fantasies, saying, 'I have these under control, I don't look at pictures of children. I watch what I read and see on TV.'  He said, 'I can't avoid seeing them, but I deal with it and I have not had any urges.' He denied there were any events that would be of concern to him. When asked about place or situations that he would need to avoid, he reports parks, malls, or anywhere children would go. He added, 'I would conduct my business and leave.' He said if he saw kids he would not approach them, not objectify them, and leave the first chance he could. He would avoid any situation that could be construed that he was looking at them.

When asked about setting up situations to offend, Mr. Hunt reported, 'I started arguments with Kathy so I could reoffend.'  He stated 'these are SUDs – seemingly unimportant decisions that lead to bad choices. With the kids there was some grooming, but the kids were already groomed and into sex and by getting them involved in carnivals and money it made it even easier. I set up the environment for more abuse.' When asked how he could have avoided that in the future, he said he could not get into the wrong occupation or getting into the wrong relationships that could lead to being destabilized. He would not be involved with anyone with grandchildren. He has told his daughters not to see him with their children, as he has six grandchildren. Only one is a boy and he is sixteen years-old. He would want his PO with him also to make everything is above board.

Mr. Hunt was asked what individual would be most at risk to him. He replied, 'to be safe I could not be with anyone under the age of twenty-one. I have addressed the problem and think I have no business with 10-12 year old boys any more.' He said if he came across someone underage, he would not approach them and would leave the area. When asked about whom he has told about his past and what would keep him safe in the future, Mr. Hunt said he would be on parole and on the registry and would be attending programming. When asked how people would know he was increasing his risks, he stated by not communicating with others and doing things with no plans such as driving aimlessly. Mr. Hunt also spoke of 3-4 other sex offenders he knows who have been out of prison since 2000.  They are doing well and continue in treatment. He plans on getting help from them if needed.

When asked what excuses or justifications he gave himself to offend, he said, 'I did not hurt

Dr. Rosell admitted that an individual could have the diagnosis of pedophilia by history and not presently have intrusive thoughts.[74]   He also admitted that having a diagnosis of pedophilia does not answer the question of whether that person can control their behavior.[75]  Dr. Rosell agreed with the characterization that pedophilia is "like a sexual orientation."[76] He also agreed, however, that, an individual's libido can wax and wane while sexual orientation remains the same.  He agreed that, as a general matter, libido declines with age.[77]

69.    Dr. Plaud  noted that there is no relationship between a diagnosis of pedophilia and the level of sex drive.[78]   Although pedophilia is mentioned in the DSM as a chronic condition "it is rarely that straightforward."  Without a current assessment of Mr. Hunt's sexual preferences and sexual interest pattern, the diagnosis can be made only by record.[79]

70.    All of the experts noted that Mr. Hunt's 1998 disciplinary violation for having

them, they would do it anyway, I paid them, they won't tell, I am a client, and it happened to me.' When asked how he would intervene in those thoughts if they occurred in the future, he said, 'I know they are disturbed thinking, keeps the cycle of abuse in my mind.  I've been able to address pre-abuse triggers, maladaptive program responses, acting out phase, and shame and guilt.' These are some of the factors he said he would use as intervention. Finally, when asked to score himself on a scale of 0-10 (0 meaning never and 10 being most likely) on the likelihood of committing a future sex offense, Mr. Hunt scored himself a zero, saying he did not want to do any more damage and did not want to come back to prison. Mr. Hunt stated he has three years of parole with intensive level 3, which includes treatment, a curfew, and sex offender registry. He admitted he is not cured, but feels he is 'in remission.' See Exh. 3 at 12-13.

[74]Apr. 27 Tr. at 179-180.

[75]Apr. 27 Tr. at 178.

[76]Apr. 28 Tr. at 53.

[77]Apr. 28 Tr. at 53.

[78]Apr. 30 Tr. at 22.

[79]Apr. 30 Tr. at 22.

pictures of children could be taken as evidence of continued sexual interest in prepubescent children.[80]  Dr. Plaud noted that the pictures were of a mixed group of prepubescents and postpubescent and that they were "fairly neutral stimuli."[81]  He said that it could be consistent with the finding that the person continues to have an interest [in children].[82]  However, because the information was eleven years old, he believed it was difficult to make a conclusion one way or the other.[83]  He testified that his judgment was more influenced by recent behavior.

71.    The experts also differed on whether Mr. Hunt's pedophilia was classified as "exclusive" or "non-exclusive" type.  Dr. Phenix classified it as "exclusive" type.[84]  Dr. Katz classified it as "essentially" exclusive type.[85]  Drs. Plaud and Rosell classified it as "nonexclusive" type.[86]

72.    Dr. Plaud explained that the distinction in the DSM between exclusive and nonexclusive pedophilia was simply a way to specify whether the individual has had any more normative sexual experiences in their past.[87]  Dr. Plaud couched his classifications in terms of "fixated" and "regressed."  Dr. Plaud described fixated pedophiles as men "who were, have been

---

[80]Apr. 28 Tr. at 42; Apr. 28 Tr. at 108-109; Apr. 29 Tr. at 69-70; Apr. 30 Tr. at 55.

[81]Apr. 30 Tr. at 55.

[82]Apr. 30 Tr. at 55.

[83]Apr. 30 Tr. at 55.

[84]Apr. 29 Tr. at 13; Exh. 5 at 5.

[85]Apr. 28 Tr. at 102; 105-106.

[86] Apr. 27 Tr. at 95, 98-99; Apr. 30 Tr. at 19-20.

[87]Apr. 30 Tr. at 20.

for a long time and probably would be for the rest of their lives, the focus of their sexual experience, interest, arousal is toward prepubescent children."[88] In Dr. Plaud's view, Mr. Hunt's relationship with an adult woman and fathering a child could speak to the issue of whether Mr. Hunt's pedophilia is "fixated" because "to the extent you have no other data that would support any other type of sexual interests, it might fall more in line with that 'fixated' characterization."

73.     All of the experts agreed  that pedophilia was a "serious mental illness, abnormality, or disorder" with the exception of Dr. Katz.[89]   Dr. Katz testified that Mr. Hunt's pedophilia was certainly a "serious" mental illness, abnormality, or disorder in the mid-1980s. He testified that it was "probably a moderately serious disorder" today.[90]

### 2.     Antisocial Personality Disorder

74.     Dr. Rosell and Dr. Phenix also diagnosed Mr. Hunt with Antisocial Personality Disorder.[91]  The DSM-IV-TR criteria for Antisocial Personality Disorder are:

A.     There is a pervasive pattern of disregard for and violation of the rights of others

occurring since age 15 years, and indicated by three (or more) of the following:

(1)     failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts which are grounds for arrest.

(2)     deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure;

(3)     impulsivity or failure to plan ahead;

(4)     irritability and aggressiveness, as indicated by repeated physical fights or assaults;

---

[88]Apr. 30 Tr. at 19.

[89]Apr. 27 Tr. at 95; Apr. 29 Tr. at 13; Apr. 30 Tr. at 64.

[90]Apr. 28 Tr. at 104.

[91]Apr. 27 Tr. at 95-96; Apr. 29 Tr. at 13.

(5)     reckless disregard for safety of self or others;

(6)     consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations;

(7)     lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.

B.     The individual is at least 18 years old.

C.     There is evidence of Conduct Disorder with onset before age 15 years.

D.     The occurrence of antisocial behavior is not exclusively during the course of

Schizophrenia or Manic Episode.[92]

75.     Although the DSM-IV-TR indicates that a personality disorder is by definition "enduring" and "relatively stable over time," the criteria also indicate that antisocial personality disorder "may become less evident or remit as the individual grows older, particularly by the fourth decade of life.  Although this remission tends to be particularly evident with respect to engaging in criminal behavior, there is likely to be a decrease in the full spectrum of antisocial behaviors and substance abuse."[93]

76.     Dr. Phenix testified that her diagnosis of antisocial personality disorder was a "current diagnosis"[94]   The examples she cited to support the diagnosis of antisocial personality disorder were Respondent's 1) history of "conduct disorder" as an adolescent; 2) history of property crimes as an adult; 3) work in jobs like the carnival that entailed traveling and "molesting in most of the jurisdictions, in several jurisdictions along the way, exhibiting

_____

[92]Exh. H.

[93]Id.

[94]Apr. 29 Tr. at 23-24.

significantly impulsive behavior."[95]   She also testified that Mr. Hunt had not shown any

significant remorse over the years for his offending:  "He would get into trouble molesting time

and time again. And individuals who are remorseful or feel badly for the behavior stop doing

that. And in his case there wasn't anything that really stopped him. As a matter of fact, his

offending escalated significantly and he violated the rights of so many children by the time he

was arrested in 1985 indicating just really a striking lack of remorse for the hurt and harm he

perpetrated upon children."[96]   Dr. Phenix did not discuss Mr. Hunt's progress in sex offender

treatment or whether that influenced her conclusion that Mr. Hunt's Antisocial Personality

Disorder was a current diagnosis.  She did note, however, that Mr. Hunt had not exhibited any

signs of impulsivity while in prison.[97]

    77.    Dr. Phenix testified that in her opinion Antisocial Personality Disorder, standing

alone, would not be sufficient for commitment.[98]  She has co-authored an article to that effect.[99]

    78.    Although Dr. Rosell diagnosed Mr. Hunt with Antisocial Personality Disorder, he

testified that Antisocial Personality Disorder did not play much of a role in his assessment of Mr.

Hunt's dangerousness.[100]   He testified that because Antisocial Personality Disorder has been

---

[95]Apr. 29 Tr. at 23.

[96]Id.

[97]Apr. 29 Tr. at 70.

[98]Apr. 29 Tr. at 103-104.

[99]Apr. 29 Tr. 103-104;  Exh. 6 citing J. Vognsen & A. Phenix, Antisocial Personality
Disorder is not enough: A reply to Sreenivasan, Weinberger, and Garrick, 32 J. Amer. Acad.
Psy. & Law, 440-442 (2004).

[100]Apr. 27 Tr. at 96.

known to remit as people get older, he did not feel that it was that big of an issue.[101]  He also testified that Mr. Hunt's compliant behavior while in prison made the ASPD diagnosis of limited value to the assessment of whether Hunt is sexually dangerous.

79.     Neither Dr. Katz nor Dr. Plaud believed that Mr. Hunt met the criteria for Antisocial Personality Disorder.[102]

### C.     Serious Difficulty Refraining from Child Molestation

80.     In order to commit Mr. Hunt, the government must prove that the disorder results in "serious difficulty refraining from sexually violent conduct or child molestation."  As discussed above, this term implies a volitional impairment.

81.     The DSM-IV-TR is clear that the fact that someone has been diagnosed with a mental illness or disorder does not answer the question of whether that person's volition is impaired.[103]   The manual states:

> It is precisely because impairments, abilities and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability.  The fact that an individual's presentation meets the criteria for DSM diagnosis does not carry any necessary implication regarding the individual's degree of control over the behaviors that may be associated with the disorder.  Even when diminished control over one's behavior is a feature of the disorder, having the diagnosis in itself does not demonstrate that a particular individual is or was unable to control his or her behavior at a particular time."[104]

82.     This Court finds that the Government has not shown by clear and convincing

---

[101]Apr. 27 Tr. at 108.

[102]Apr. 28 Tr. at 131-132; Apr. 30 Tr. at  23-24.

[103]Apr. 30 Tr. at 18.

[104]Apr. 27 Tr. at 177.

evidence that Respondent currently remains at a level of volitional impairment sufficient to justify his commitment.

## V.     DANGEROUSNESS / RISK ASSESSMENT

### A.     <u>Introduction</u>

83.     With the exception of Dr. Katz, who used his "clinical judgment" to assess Mr. Hunt, all experts in this case employed empirical tools and viewed this statistical risk analysis as the central component of their dangerousness determination.[105]

84.     The actuarial instruments used by Dr. Rosell and Dr. Phenix do not provide this Court with relevant information regarding the 63-year-old Respondent's risk of recidivism if released.   Moreover, even if this Court were to credit *all* of Dr. Rosell and Dr. Phenix's testimony, Respondent's risk of recidivism is not sufficient for a finding of dangerousness.

85.     Both Dr. Phenix and Dr. Rosell used actuarial instruments that are generally used in the field to predict sexual recidivism.   Using these instruments, they each determined that Respondent was "high" risk relative to other sex offenders.   They also provided the court with recidivism estimates for Respondent based on his scores on the actuarial instruments.   Relying on this information, they opined that Respondent met the criteria for commitment.

86.     Dr. Howard Barbaree, a renowned expert in risk analysis, testified in great detail regarding the available research on aging and its effects on testosterone levels in the blood,

---

[105] Apr. 27 Tr. at 182-183 (Dr. Rosell testified that he conducted a risk assessment in this case "to try to answer the question of the individual's difficulty refraining from a way of looking at his history and the, therefore, the likelihood of the behavior occurring again in the future."); Apr. 29 Tr. at 26 (Dr. Phenix testified that "I did a risk assessment in this case to determine his overall level of risk to go on to commit another sex offense in the future.");  Apr. 30 Tr. at 25 (Dr. Plaud testified that it was necessary for him to do a risk assessment in order to answer the question the statute asks.).

sexual behavior, and sexual arousal as measured by phallometry.  He also testified about the

statistical research regarding aging and sexual recidivism in sex offenders and discussed why the

recidivism percentages derived from the actuarial instruments were *overestimates* for a 63-year-

old man.  In Dr. Barbaree's opinion using these instruments "as-is" to assess a 63-year-old man

would be improper because it would not provide information that is accurate for the individuals

at that age.   Dr. Barbaree then discussed several empirically-validated statistical methods than

an evaluator could use in a risk assessment which would take into account the effect of

advancing age and provide recidivism estimates more appropriate for a 63-year-old man.   All

these methods provide recidivism estimates substantially lower than those provided by Drs.

Phenix and Rosell.  .

87.     Dr. Joseph Plaud examined Respondent and concluded that he did not meet the

criteria for commitment.   In accordance with Dr. Barbaree's statistical analysis, Dr. Plaud

opined  that Mr. Hunt did not qualify for commitment in part because  his risk of reoffense was

low due to his age.  Dr. Plaud testified that the base rate of re-offense among older offenders is

so low, it made it difficult to opine that any given individual in that age range would likely re-

offend.   He testified that the actuarial instruments typically used in the field should not be used

on older offenders unless some adjustment was made to take into account the lower base rate of

offending in the older population.  Failure to do so, according to Dr. Plaud, would result in an

overestimate of recidivism.

88.     To illustrate this principle, Dr. Plaud took one of the actuarial instruments used, the

RRASOR, and subjected the underlying data to a statistical formula known as "Bayes'

Theorem," to account for the lower base rate of recidivism in the 60+ age group.  The Bayesian

analysis resulted in an adjusted recidivism estimate from 49.8% to 24%.2, less than half of the

original risk estimate.[106]  Dr. Plaud opined that this level of risk was insufficiently discriminatory

to meet the criteria for commitment.  Dr. Plaud's methodology, including the results of the

application of Bayes' Theorem, was one which Dr. Barbaree confirmed as an empirically

validated way to account for age.

        89.     The government has not proven dangerousness by clear and convincing evidence.

Unlike Dr. Plaud,  neither Drs. Katz, Phenix, nor Rosell provided an empirically defensible

method to account for Mr. Hunt's age in their risk assessments.  Dr. Katz, who relied exclusively

on  his clinical judgment, attempted to apply the risk mitigating effect of age by opining that Mr.

Hunt's risk of recidivism was "high" when incarcerated in 1985 but "moderate to moderately

high" today.  However, his adjustment for age, like his entire assessment, was based purely upon

his clinical judgment and was not grounded in any empirical data regarding the risk of

recidivism.  Dr. Rosell and Dr. Phenix simply used the common actuarial instruments that were

developed on men in their mid-30s, mentioned that age *might* be a factor that reduces recidivism,

but did not attempt to quantify or apply that factor in any way.   Dr. Rosell testified explicitly

that he decides whether or not to "adjust" for age on a case-by-case basis, while Dr. Phenix, who

purported to rely on a "pure" actuarial method as a best practice, acknowledged the general

principle that lower base rates result in lower recidivism percentages, but declined to apply any

of the empirically-validated methods to adjust the recidivism percentages for age and continued

to apply a base rate that was not applicable to an older offender.

        90.     The Court further finds that even if it were to credit the Government's estimates

---

[106]Exh. 9 at 14-15.

of recidivism, they are not sufficient to justify a finding of dangerousness.

### B.      The Development of Actuarial Instruments for Sexual Recidivism

91.      A main thrust of Respondent's argument is that the actuarial instruments, specifically as used by Drs. Rosell and Phenix, do not account for the effect of aging and that it is inappropriate to use those instruments "as-is" to assess his risk of reoffense because he is so much older than the development populations.[107]  Respondent argues that the appropriate group to compare him to when assessing his risk of recidivism is individuals of a similar age and he provides several methods to do so statistically.  In order to understand these arguments it is necessary to review how actuarial instruments were developed, how they function, and what information they impart.

92.      Prior to the development of actuarial instruments for risk assessment experts used "clinical judgment."  Clinical judgment is simply calling upon the clinician's experience to make a judgment about the persons's risk.   Clinical judgment considers the past records to come to some conclusion based on the clinician's experience.[108]  Research studying the accuracy of clinical judgment in predictions of future dangerousness has demonstrated that clinical judgment is wrong two out of every three times in their predictions of future dangerousness.  Usually these errors are false positives.  In other words, a clinician predicts dangerousness where empirical evidence demonstrates no danger.[109]  Clinical judgment is now generally considered only as

---

[107]May 1 Tr. at 48 ("The actuarial instruments that are used and represented here, the RRASOR and the Static-99, were developed on a set of, a group of individuals who were released at a fairly young age, in their mid-30s.").

[108] Apr. 29 Tr. at 27.

[109]Apr. 28 Tr. at 122-123. See also Apr. 27 Tr. at 184 (agreeing that clinical assessments of dangerous have been shown to be less accurate than mechanical methods); Apr. 29 Tr. at 128

accurate as flipping a coin.[110]

93.     The inaccuracy of clinical judgment spurred a move toward greater use of

empiricism in risk prediction.[111]  This move has been spearheaded by  Dr. Karl Hanson, a

statistical researcher with the Canadian Office of Public Safety,

94.     After publishing the meta-analysis of existing studies, Dr. Hanson isolated  four

factors which he found had a statistical correlation with recidivism and combined them into an

actuarial instrument, the Rapid Risk Assessment for Sex Offender Recidivism (RRASOR).  The

RRASOR is comprised of four "static" factors.[112]   The RRASOR scores the offender on a scale

from 0 to 6.  Each score is associated with a risk level (i.e. high, medium, low).  Each score is

also associated with a percentage of recidivism.  Dr. Hanson derived the recidivism percentages

associated with each score by retrospectively scoring the instrument on a group of 2,592

offenders who were released from secure incarceration in and who had known 5 and 10 year

recidivism rates after release.[113]  The average age of these 2,592 individuals was approximately

---

(agreeing that research has found that clinicians tend to over-predict dangerousness).

[110]Apr. 29 Tr.  at 35, 112-113.

[111]Apr. 30 Tr. at 33 ("[W]ithin the last 10 to 12 years statistical or actuarial techniques have been trumpeted as being a way to predict risk of future reoffending that is greater than chance and outperforms clinical methodologies, clinicians making decisions based upon their own training and experience.")

[112]A "static" risk factor is one which cannot change. The RRASOR consists of 4 static factors:  Prior sexual offenses, whether the offender is younger than 25 years old, whether the offender had an extrafamilial victim, and whether the offender had a male victim.  See Exh. 9 at 11.

[113]Apr. 27 Tr. at 187; Exh. 9 at 11.

34 years old.[114]

95.     In 1999 Dr. Hanson developed the Static-99, an actuarial instrument consisting of

ten factors.[115]  The Static-99 scores the offender on a scale from 0 to 12.  Each score is associated

with a risk level (i.e. high, medium, low).  Each score was also associated with a percentage of

recidivism over 5 years, 10 years, and 15 years.[116]  Dr. Hanson derived the original recidivism

percentages associated with each score on the Static-99 by retrospectively scoring the instrument

on a group of 1,086 offenders released from incarceration in Canada and the United Kingdom

between 1958 and 1993 with known 5, 10, and 15 year recidivism rates after release.[117]  The

average age of these 1,086 individuals was 33.5 years old.[118]

96.     Other actuarial instruments are also sometimes used in the field of sex offender

risk prediction.  Dr. Phenix used two additional instruments used in this case, a new instrument

developed by Karl Hanson, the Static-2002,[119] and the Minnesota Sex Offender Screening Tool -

---

[114]Exh. 9 at 11.

[115]The Static-99 consists of 10 static factors:  Whether the offender is younger than 25 years old, whether the offender ever lived with a lover for at least two years; index non-sexual violence, prior non-sexual violence, number of prior sentencing dates, any unrelated victims, any stranger victims, and any male victims. See Exh. 26.

[116]As will be discussed, the new Static-99 recidivism percentages released in October, 2008 contain only 5 year and 10 year rates.  See Exh. P.

[117]Apr. 27 Tr. at 188-189; Apr. 28 Tr. at 6; Apr. 27 Tr. at 120.

[118]Apr. 28 Tr. at 11; Apr. 29 Tr. at 123.

[119]The Static-2002 consists of 14 static factors: Age at release, prior sentencing occasions for sexual offenses, juvenile arrest, rate of sexual offending, non-contact sex offenses, any male victims, young unrelated victim, any unrelated victims, any stranger victim, any prior involvement with the criminal justice system, prior sentencing occasions for anything, any community supervision violation, years free prior to index sex offense, and any prior non-sexual violence sentencing occasions.  Each score is associated with a risk level.  Each score is also

Revised (MnSOST-R).[120]   The Static-2002 is comprised of fourteen static factors, while the

MnSOST-R is comprised of twelve static factors and four dynamic factors.[121]

### C.   Measuring the Accuracy of Actuarial Instruments

97.    Actuarial instruments import two distinct pieces of information: A relative risk

level (i.e. "high," "medium," "low") and a recidivism estimate.  Relative risk ranks offenders

relative to each other while the recidivism estimate associated with each score (sometimes

referred to during the testimony as "absolute risk") reflects the recidivism rate of the individuals

in the development sample who received the same score as the offender.

### 1.    Relative Risk

98.    Relative risk is something that cannot change.  Because the instrument is based on

static factors, once an individual has a factor in his history he will continue to have that factor

regardless of age or life circumstance.[122]  For example, Mr. Hunt, who scored an 11 on the

Static-99 when he was first incarcerated in 1985, will continue to score an 11 for the remainder

of his life.

99.    The actuarial instruments used in this case has been "cross-validated" and each is

_____

associated with a percentage of recidivism over 5 years and 10 years. See Exh. Q.

[120]The MnSOST-R is a sixteen question instrument comprised of twelve static factors and four dynamic factors.  Apr. 29 Tr. at 60; Apr. 27 Tr. at 112.  The score ranges from -16 to 31. See Exh. 28. Each score is associated with likelihood of re-arrest over a period of six years. See Exh. 4 at 25.

[121]These two instruments will be discussed in connection with Dr. Phenix's risk assessment of Respondent.

[122]Apr. 29 Tr. at 139; Apr. 30 Tr. at 35; May 1 Tr. at 58.  This is sometimes referred to as the "broken leg problem." See Apr. 30 Tr. at 40 (Dr. Plaud explained the broken leg problem by noting that "[i]f a person has a seizure or is in a coma, they may score an 11 on the Static-99, but if they're not able to get out of bed, they're not going to be very risky.").

reported to have "moderate predictive accuracy."[123]   Predictive accuracy is a measure of how well the instrument can discriminate between high risk offenders and low risk offenders,[124] in other words, it is a  measure of how frequently the instrument can correctly identify a recidivist as higher risk than a non-recidivist.[125]

### 2.     Absolute Risk

100.     The labels of high, moderate, and low risk are not meaningful without an understanding of what the risk of recidivism is in numeric terms.  An offender may be in a "high" risk category relative to other offenders, but is actually a low risk statistically to recidivate.   The cross-validation studies do not address absolute risk.[126]

101.     Moreover, there are difficult questions as to whether any general assessment of risk can be accurately translated  to different groups of offenders.  Difficultly arises when an

---

[123] The Static-99 has been "cross-validated" in numerous published and unpublished studies. Apr. 27 Tr. at 113-114; Apr. 29 Tr. at 31.

[124]Apr. 29 Tr. at 34.

[125]Apr. 27 at 117.  Predictive accuracy is measured by a statistic called the "receiver operator  characteristic" or "ROC".  An ROC of .5 is the equivalent of chance or flipping a coin, while an ROC of 1.0 is the equivalent of perfect accuracy. Apr. 27 at 117.   Dr. Phenix testified that the Static-99's ROC is generally reported as being between .68 to .75.  Apr. 29 Tr. at 33. She explained that "[i]f the predictive accuracy is .70 that "means that about 70% of the time the instrument will be able to say that a high risk offender has a high score and that a low risk offender has a low score, it will be able to separate out offenders.  However, about 30% of the time the instrument will be inaccurate in doing that.  So it says it's a high risk but he may be moderate or low risk." Apr. 29 Tr. at 34.

The other actuarial instruments used in this case also had "moderate predictive accuracy." Apr. 29 Tr. at 34 ("Well, actually, the Static-99, the MnSOST-R and the Static-2002 all have moderate predictive accuracy, they're all the same."); Exh. 9 at 11 ("The ROC of the RRASOR was reported to be .71.").

[126]Apr. 28 Tr. at 13-14; Apr. 29 Tr. at 137.

individual is not similar to the individuals that made up the development sample of the instrument.[127]   Similarly, the "base rate" of the population that the individual belongs to is the same, lower, or higher than the base rate of the development sample.   The "base rate" is the overall rate of sexual offending in a given population.[128]

102.   The base rate of the Static-99 development sample of 1,086 people was relatively high, approximately 25% of the individuals in the sample had recidivated by 15 years after release.[129]   For many years experts in the field debated whether the recidivism percentages associated with the Static-99 scores generated from the original development sample could be accurately applied to other populations.[130]   This debate occurred most frequently in the context of applying the percentages to contemporary sex offenders or to older sex offenders, both of whom were thought to have a lower rate of recidivism.

103.   Some psychologists in the field argued that the recidivism percentages obtained for the different scores were stable, regardless of the base rate in the population in which it was tested.[131]   Other researchers argued that if the instrument was applied to a population with a

_____

[127]For example, the Static-99 should not be used with women because there were no women in the samples.   It should not be used with juveniles because there were not enough juveniles in the samples.   Apr. 29 Tr. at 125.   In order to use the Static-99 with a juvenile, one would have to make an adjustment.   See Apr. 29 Tr. at 125 (Q: And so if you were going to try to use it or make sense of it for someone who is eighteen you would have to make some adjustment.   You would have to do something or you couldn't use it at all; right?   A: If they were under 18?   Q: Under 18; right.   A: Right.").

[128]Apr. 28 Tr. at 7.   See also Exh. 9 at 14 ("The base rate refers to the naturally occurring rate or prior probability at which something occurs.")

[129]Apr. 28 Tr. at 7, 9.

[130]Apr. 28 Tr. at 9.

[131]Apr. 28 Tr. at 8.

lower base rate than the development sample the recidivism percentages for the scores would be lower.[132]  That group posited that the original Static-99 recidivism percentages would be *overestimates* if applied to groups with lower base rates, such as contemporary sex offenders or older offenders.

104.    Just recently, in the fall of 2008, the developers of the Static-99 issued new recidivism percentages associated with the different scores on the instrument.  These were referred to during testimony as the new norms.[133]   While the prior recidivism percentages associated with the original Static-99 were derived from sex offenders released from 1958 to 1993, these newer recidivism percentages are based on contemporary samples of sex offenders who were released from incarceration in the 90s and after.[134]

105.    The new recidivism percentages associated with the different scores on the Static-99 are substantially lower than the old recidivism percentages.[135]

106.    Issuance of these new, lower, recidivism percentages demonstrated the underlying principle, expressed by both Drs. Plaud and Barbaree, that the base rate must be considered in the assessment of risk.[136]  If the base rate is higher than the development sample, the recidivism

---

[132]Apr. 28 Tr. at 7 ("Q: There was an important principle behind the critique, which is that the overall base rate of reoffending affected what those percentages would be.  A: That's true.").

[133]Apr. 29 Tr. at 46; Exh. P.  The "new norms" provided in Exhibit P were first introduced at a conference in the fall of 2008.  Dr. Phenix testified that the data has been peer reviewed and is waiting for publication. Apr. 29 Tr. at 116.  She also agreed that preliminary age data about the new norms is being released by the developers.  Apr. 29 Tr. at 163-165.

[134] Apr. 29 Tr. at 29, 46; Apr. 27 Tr. at 121.

[135]Exh P.; Apr. 27 Tr. at 21.

[136] Apr. 28 Tr. at 9.

percentages will be higher.  If the base rate is lower, the recidivism percentages will be lower.[137]

Thus, the hypothesis that the original Static-99 recidivism percentages would be stable

regardless of the base rate of the population it is used on has proven to be incorrect.[138]

107.    The new norms themselves are also, in themselves, an illustration of the principle

that "base rate matters."   The new norms are structured differently than the old norms:  While

the prior norms reported a single recidivism percentage associated with each score on the Static-

99, the new norms have a lower number and an upper number which form a range.[139]   These two

numbers are developed from two different populations of offenders.  The lower number is the

recidivism percentage derived from five different samples of offenders in the "Routine CSC

Samples."  The higher number is derived from five different "Preselected High Risk" samples.[140]

 The two types of samples are distinguished by the different characteristics of the offender:  The

routine CSC samples are made up of individuals who were in prison in Canada and subject to

approximately two years of intensive all-day programming including anger management,

criminal behavior, and sex offender therapy.  The individuals in these samples generally did not

violate rules and when released from incarceration had services to help them reintegrate into the

community.[141]  The routine CSC samples have a lower base rate, in other words, a lower general

---

[137] Id.

[138] Id.

[139] Exh. P.

[140]Apr. 29 Tr. at 48.  During the testimony sometimes these two different samples in the new Static-99 norms were referred to as the "low risk" sample and the "high risk" sample. However, Dr. Rosell clarified that the "low risk" may be misleading because the "routine CSC" group still had individuals who scored 8, 9 and 10 on the instrument.  See Apr. 28 Tr. at 17-18.

[141] Apr. 29 Tr. at 48-49.

rate of recidivism.  In contrast, the "preselected high risk" samples have characteristics such as psychiatric problems, developmental disabilities, rule violations in prison, being kept to their maximum dates and not receiving good time.[142]   The preselected high-risk samples have a higher base rate, a higher general rate of recidivism.

108.     The developers of the Static-99 recommend that evaluators report the Static-99 recidivism percentages under these new norms as a range, rather than the single number formerly used:  For each given Static-99 score the recidivism percentages are anchored by the "routine CSC sample" number as the lower end of the range and the "pre-selected high risk" number as the high end of the range.[143]  Evaluators are directed  to try to assess which sample the person they are evaluating most represents in order to determine where in the range to place them.[144]

109.     Thus, the new Static-99 norms illustrate the principle that a lower general base rate draws down the recidivism percentages associated with the scores on the instrument.[145]

110.     Both Dr. Phenix and Dr. Rosell used these new norms in their evaluation of

---

[142] Apr. 29 Tr. at 50.  See also Apr. 27 Tr. at 125 (Dr. Rosell testified that the information given by the developers about the Preselected High Risk group was "resistance to sustained rehabilitative effort, treatment dropout, antisocial behavior during current sentence."  He said the information given about the Routine CSC samples was "treatment participation and limited programming, cooperative but proportionate, programming not provided.")

[143] Apr. 29 Tr. at 50; Apr. 28 Tr. at 17; Apr. 27 Tr. at 131.

[144] Apr. 28 Tr. at 18; 25-26.  However, one of the criticisms of the new norms is that the developers have not provided enough information about the two different groups to enable an evaluator to meaningfully compare an individual they are evaluating, or provided guidance about how to place an individual within the range. Apr. 28 Tr. at 24-25.  A peer reviewed article by Dr. Brian Abbott entitled Applicability of the New Static-99 Experience Tables in Sexually Violent Predator Risk Assessments has been accepted for publication in the Journal of Sex Offender Treatment which addresses this and other criticisms of the new Static-99 norms. Apr. 28 Tr. at 21, 24.

[145] Apr. 29 Tr. at 136.

Respondent.[146]

111.    The average age of the individuals in the samples that make up the "new norms" is approximately 37-38 years old.[147]   Respondent argues that because the individuals that make up these two groups of samples are substantially younger than he, and because data indicates that offenders over 60 have lower base rates than even the *lower* of these two samples (i.e. the Routine CSC group) using the Static-99 when assessing Respondent will produce an overestimate of his potential recidivism rate.  Instead, Respondent argues that to provide meaningful statistical information to the Court, evaluators must use a method that accounts for the low base rate for older offenders.

**D.**    **The Effect of Age on Sexual Recidivism**

112.    The Respondent presented the testimony of Dr. Howard Barbaree.  While Dr. Barbaree was the last witness to testify, the Court discusses his testimony first, as he was called not as an expert who had evaluated the Respondent, but as an expert on the impact of aging on sex offense recidivism, the key issue in this case.[148]

113.    Dr. Barbaree is the Clinical Director of the Law & Mental Health Program at the Centre for Addition and Mental Health in Toronto, a professor at the University of Toronto and the Editor-in-Chief of *Sexual Abuse: A Journal of Research and Treatment*.

---

[146]Apr. 27 Tr. at 131-132; Apr. 28 Tr. at 17; Apr. 29 Tr. at 51.

[147]Apr. 28 Tr. at 29 (Dr. Rosell testified that the average age is approximately 37-38 years old) Apr. 29 Tr. at 123-124 (Dr. Phenix did not recall the exact ages of either the routine CSC or preselected high risk samples but testified that both were "slightly older" that the original Static-99 development sample, whose average age was 33.5).

[148]Dr. Barbaree's report was entered into evidence as Exhibit 7.  His curriculum vitae was entered into evidence as Exhibit 8.

114.    Dr. Barbaree has been working in the field of sex offender risk prediction for approximately 16 years.[149]  He has been deeply involved in the research into sex offender recidivism risk.  He and his colleagues at the University of Toronto have performed a number of the independent cross-validation studies of actuarial instruments used in the field of sex offender risk prediction, including the RRASOR, Static-99, and MnSOST-R, among others.[150]  He has also conducted the only independent cross-validation of the Static-2002 to date.[151]

115.    Dr. Barbaree began studying the effect of age on sex offender recidivism specifically in 2001.[152]  He published his first paper on the subject in 2003.[153]  In 2005 he published another paper examining the effect of age on sexual arousal and recidivism among sex offenders.[154]  Finally, in 2008 Dr. Barbaree and coauthor Ray Blanchard published a chapter in a book entitled *Sexual Deviance over the Lifespan*, which synthesized the existing research regarding the impact of aging on sex offender behavior, and presented arguments about the

---

[149]May 1 Tr. at 7.

[150] May 1 Tr. at 8-9; Exh. 8.

[151]May 1 Tr. at 11; Exh. 8.

[152] May 1 Tr. at 11-12.

[153]May 1 Tr. at 11; Exh. 8 at 10 citing Barbaree, H.E., Blanchard, R. & Langton, C.M. (2003) The development of sexual aggression through the lifespan: The effect of age on sexual arousal and recidivism among sex offenders.  In R.A. Prentky, E.S. Janus & M.C. Seto (Eds.), Sexually coercive behavior: Understanding and management (pp. 59-71).  New York: Annals of the New York Academy of Science (Vol. 989).

[154]Exh 8 at 10 citing R. Blanchard  & H.E. Barbaree, *The strength of sexual arousal as a function of age of the sex offender: Comparisons among pedophiles, hebephiles, and teleiophiles*.  17 Sexual Abuse: A Journal of Research and Treatment, 441-456 (2005).

implications of that research for applied evaluations.[155]

116.    The upshot of Dr. Barbaree's research is that, in line with the criminological

literature on general recidivism, age is a powerful determinant of recidivism risk among sex

offenders.  Dr. Barbaree testified, however, that in the field of sex offender assessment there has

historically been resistance to the idea that age has an important effect on sex offender

recidivism.[156]   He theorized that this resistance might stem from several sources: First, prior to

2002, few studies had been done on the issue; second, that while Karl Hanson's influential 1998

meta-analysis of the sex offender recidivism literature did find a negative correlation between

advanced age and recidivism, the correlation was smaller than might have been expected;[157] third,

that the actuarial instruments which were developed did not contain any items that captured

aging; and finally, that certain long-term follow up studies had shown that re-offense still

occurred well into the long follow-up periods, suggesting that re-offense was still possible at

older ages.[158]

117.    Despite resistance to the notion that sex offense recidivism risk declines with age

within the narrow field of sex offender research, Dr. Barbaree testified that there are compelling

reasons to expect that aging would have the effect of reducing sex offender recidivism.  He

---

[155]Exh. 8 at 7 citing H.E. Barbaree & R. Blanchard, *Sexual Deviance over the lifespan: Reductions in deviant sexual behavior in the aging sex offender*.  In D.R. Laws & W. O'Donohue (Eds.). Sexual deviance: Theory, Assessment and Treatment, 2nd Edition, New York: Guilford. (pp. 37-60) (2008). The book in which the chapter appears was referred to elsewhere in testimony as a "standard reference" in the field.  Apr. 28 Tr. at 61.

[156]May 1 Tr. at 12-13.

[157] May 1 Tr. at 13-14.

[158] May 1 Tr. at 14.

referred specifically to his published chapter, which synthesized the existing research, including his own.  Dr. Barbaree testified that known facts about the biology of sexual behavior, and studies that examine the impact of age on sexual behavior, suggest that sex offense risk, like other expressions of human sexual behavior, declined with age.  He testified that studies that have directly examined sex offender recidivism demonstrate that age has a profound mitigating effect on recidivism risk.[159]

### 1.    The Impact of Age on the Biology of Sexual Behavior

118.    Dr. Barbaree testified that biological studies have demonstrated that the hormone testosterone is an important determinant of sexual behavior.[160]

119.    First, both animal and human studies have found that when males are castrated, over a period of time after castration their sexual behavior reduces or in many instances abates entirely.  If external testosterone is then introduced, sexual behavior returns.[161]  In addition, a number of European studies of sex offenders who were castrated for the purpose of treatment have found that recidivism rates dropped dramatically after castration.[162]  Similarly, a number of studies support the notion that antiandrogen drugs such as Depo-Provera, which have the effect of reducing the blood level of testosterone, also reduce recidivism risk.[163]

120.    Second, studies which measure testosterone levels in the blood have demonstrated

---

[159]May 1 Tr. at 16.

[160]May 1 Tr. at 17.

[161]May 1 Tr. at 16-17; Exh. 9 at 2.

[162]May 1 Tr. at 17; Exh. 9 at 3.

[163]May 1 Tr. at 17-18; Exh. 9 at 3.

that these levels peak in the late teens and early twenties and then gradually decrease over time in a linear fashion.[164]  Similarly, hypogonadism (a medical disorder in which the blood level of testosterone is below criterion level) increases in a linear fashion after age 40.[165]  Testosterone levels also influence erectile performance:  Studies have demonstrated that the older an individual is the more likely he is to suffer from an erectile dysfunction, so that for individuals in their 70s almost half of those studied have moderate to complete erectile dysfunction.[166]

121.   Third, studies which examine the effects of aging on sexual behavior have found that sexual behaviors decrease in frequency with age.  In addition, both the erectile response and the speed at which the erectile response occurs decrease with age.[167]

122.   Dr. Barbaree testified that these studies demonstrate that andropause, which is the male equivalent of female menopause, is a naturally occurring phenomenon.  Unlike menopause, which occurs in women very abruptly, andropause occurs gradually over time.[168]

123.   In 2005 Dr. Barbaree published a study entitled "The Strength of Sexual Arousal as a Function of Age of the Sex Offender."[169]  This study examined the effect of age on sexual

---

[164]May 1 Tr. at 21.  Dr. Barbaree cited the Baltimore Longitudinal Study on Aging as a key study in this area because it examined a large number of measures of hormones and sexual behavior and had both a longitudinal and cross-sectional design. May 1 Tr. at 19-20; See also Exh. 9 at 3-4.

[165]May 1 Tr. at 21-22; Exh. 9 at 4.

[166]May 1 Tr. at 22.

[167]May 1 Tr. at 23.

[168]May 1 Tr. at 23-25.

[169]Exh 8 at 10, *supra* note 163.

arousal using phallometry.[170]  Prior to Dr. Barbaree's study, there had only been two previous

studies of the effects of age on sexual arousal of sex offenders.  Both found a negative correlation

between the strength of sexual arousal and age.[171]  Dr. Barbaree's study of fourteen hundred

individuals also found a negative correlation between arousal and age.  The highest level of

sexual arousal was seen in teenagers and the strength of arousal decreased thereafter.[172]

124.    In his research Dr. Barbaree also reviewed the literature regarding age and general

criminal behavior.  He testified that in the field on criminology one of the strongest predictors of

criminal behavior is age.  Criminal behavior is conducted mainly by individuals who are young.

As criminals age, their likelihood of committing criminal acts goes down. This is regarded in the

field of criminology as one of the "first principles of predicting criminal behavior."[173]

125.    Dr. Barbaree's review of the literature and his own phallometric study has led him

to conclude that all indices of sexual behavior in both the human male generally and in sex

offenders specifically decrease with age.  So, if sex offender recidivism does *not* decrease with

age it would be the only index of male sexual behavior that does not.  It would also be the only

_____

[170]May 1 Tr. at 26.

[171]May 1 Tr. at 25.

[172]May 1 Tr. at 27; Exh. 9 at 6.

[173] May 1 Tr. at 28- 9.  Dr. Barbaree presented data compiled by the Federal Bureau of
Investigation in 1980, 1994, and 2001 which showed that the frequency of arrests peaks prior to
age 20 and then decreases thereafter in a gradual linear fashion.  May 1 Tr. at 29.  He also
presented data from a longitudinal study by Sampson and Laub which looked at a group of
individuals from an early age through their sixties which showed a peak in criminal offenses in
the middle to late teens, an abrupt reduction around age 20, and a gradual reduction for the rest
of the lifespan. May 1 Tr. at 29-30.  This study also involved "persistent" offenders, and sex
offenders, and showed that they had the same decrease in criminal over age as in the population.
Id.

type of criminal behavior which does not.[174]

### 2.      The Impact of Age on Sex Offender Recidivism

126.      The first major study of the effect of aging on sex offender recidivism was a 2002 study by Karl Hanson, based on the data he had used to develop the RRASOR and the Static-99 (4,673 people).  Hanson divided the individuals into three different groups — incest offenders, rapists, and child molesters — and then plotted recidivism rates for these three different groups across various age categories.[175]  Recidivism rates declined for all three types of offenders.  For extra-familial child molesters, the data showed an increase in recidivism from the 18-24 age group to the 25-29 age group, and then a reduction in recidivism over the remainder of the lifespan.[176]

127.      The next major research study on the effect of aging on sex offender recidivism was conducted by Dr. Barbaree and his colleagues.  Dr. Barbaree re-analyzed Dr. Hanson's data and did an independent study of 477 individuals.  During his testimony Dr. Barbaree discussed the graph in which Hanson presented the 2002 data:   He testified that he and his colleagues found flaws in the organization and presentation of the data, and re-plotted the data using a regression analysis.   The result of this operation was to reveal that the data from Hanson's study was in fact

---

[174]May 1 Tr. at 30-31.

[175] R. Karl Hanson, *Recidivism and age: Follow-up data on 4,673 sexual offenders*, 17 Journal of Interpersonal Violence, 1046-1062 (2002).

[176]May 1 Tr. at 32; Exh. 9 at 6 ("In non-familial child molesters, the rate of recidivism peaks when offenders are released at ages 25-29, then gradually declines to release at age 50, at which time the rate of decline increases markedly to release at age 70).

best represented not by a curvilinear line, but as a linear decline, or a "line of best fit."[177]   Dr.

Barbaree and colleagues then plotted their own data, derived from a study of 477 individuals.[178]

This study showed a decline in recidivism risk as individuals aged.  Using a statistical method

called survival analysis, Dr. Barbaree and colleagues calculated a 5-year recidivism rate for the

individuals in different age groups.[179]  Dr. Barbaree calculated a line of best fit for the smaller

sample which fit the observed recidivism data very well.  The regression line which captured the

recidivism data was, importantly, "essentially identical" to the line of best fit they had calculated

for the Hanson 2002 study.[180]

128.    Since this 2003 paper was published there have been six additional studies of the

effect of aging and recidivism risk.[181]   The studies shared similar features and he was able to

---

[177]Exh. 9 at 7 ("A number of aspects of these data became very clear from this re-plotting
. . . (1) recidivism in sex offenders declined from the late twenties; (2) the decline can best be
characterized as a linear decline over age-at-release in all offender sub-groups, (3) the decline
ended at age 70, and at that age the estimated recidivism rate is zero for all subgroups, and (4) in
their youth sex offender subgroups differed at the rate at which they recidivated, with child
molesters showing the highest rate and incest offenders showing the lowest rate.")

[178]  Barbaree, H. E., Blanchard, R., & Langton, C. M. (2003).  The development of sexual
aggression through the life span: The effect of age on sexual arousal and recidivism among sex
offenders. In  R. A. Prentky, E. S. Janus, & M. C. Seto (Eds.), Sexually coercive behavior:
Understanding and management (pp. 59-71). New York: Annals of the New York Academy of
Sciences (Vol. 989).

[179]May 1 Tr. at 38.

[180]May 1 Tr. at 39.

[181]  The studies are: R. Karl Hanson, *Does Static-99 Predict Recidivism Among Older
Sexual Offenders?* 18 Sexual Abuse: A Journal of Research and Treatment, 343-355 (2006); D.
Thornton, *Age and sexual recidivism: A variable connection*. 18 Sexual Abuse: A Journal of
Research and Treatment, 123-135 (2006);. Seena Fazel, et. al., *Risk factors for criminal
recidivism in older sexual offenders*. 18 Sexual Abuse: A Journal of Research and Treatment,
159-167 (2006); Robert Prentky &  Austin Lee, *Effect of age-at-release on long term sexual
re-offense rates in civilly committed sexual offenders*, 19 Sexual Abuse: A Journal of Research

calculate a statistic from each study which would allow them to be plotted on the same graph.[182]

Dr. Barbaree testified that every study showed the expected linear decline in recidivism rates.  In

all but one study (Prentky & Lee), the recidivism rate for offenders in their sixties was in the 5%

range.[183]

129.    Dr. Barbaree summarized the results of the research in this way:

Based on the above, it would be reasonable to conclude that when sex offenders
are released from custody at different ages, they show age-related decreases in
recidivism.  The best description of the age function is a gradual linear decrease
in recidivism rates from age 25 to age 70, at which point the estimated recidivism
rate is near zero.  This age function is similar to that described earlier in this
chapter for blood levels of testosterone, for sexual arousal in normal men, and for
sexual arousal in sex offenders.  Additionally, these reductions in sexual
recidivism are very similar to reductions in non-sexual recidivism (both violent
and nonviolent) among non-sexual criminals.[184]

130.    The next portion of Dr. Barbaree's testimony addressed the implications of the

research on actuarial instruments.  Dr. Barbaree testified that:

when ... professionals, as psychologists and psychiatrists use instruments that have
been developed empirically, there is an understanding that to use them ethically
and to use them properly, the individual that you're testing has to be similar to the

---

and Treatment, 43-59 (2007); Alex Skelton & James Vess, *Risk of sexual recidivism as a
function of age and actuarial risk*, 14 Journal of Sexual Aggression, 199-209 (2008); Patrick
Lussier & Jay Healey, *Rediscovering Quetelet, Again: The 'aging' offender and the prediction of
reoffending in a sample of adult sex offenders*. Justice Quarterly (in press).

[182] May 1 Tr. at 40. Exh. 9 at 8. ("In order to compare the results of these eight studies
and to highlight similarities among the findings contained in these studies, we plotted their
results in a comparable format on one graph.")

[183]The Prentky & Lee study followed a group of 136 rapists and 115 child molesters who
were civilly committed to a prison in Massachusetts for 25 years post-release.  The recidivism
rate for child molesters over 60 was 16.7%.

[184]  Ex. 7 at 8 (citing studies by Hirschi & Gottfredson, 1983, and  Sampson & Laub,
2003).

groups that the instruments have been developed with.[185]

131.    According to Dr. Barbaree, the implication of this research is:

very simply ... when an individual is as old as Mr. Hunt at age 60, is being tested
using an instrument that was developed on individuals who were released
primarily in the mid thirties or younger, then an argument could be made that that
use of the test is improper and improper *because it doesn't provide information
that is characteristic of the individual at that age.* That individual is different from
the group of subjects that formed the developmental and validation samples.[186]

132.    Dr. Barbaree testified that "if recidivism goes down with age," which is what he

claimed, then actuarial recidivism estimates "will be an overestimate of recidivism risk for the

older offender."[187]

133.    Dr. Barbaree several discussed methods that an evaluator, confronted with this

problem of the inapplicability of the actuarial instruments to older offenders, *could* use to provide

accurate information regarding actual risk an individual offender posed.[188]

134.    First, an evaluator could decline to use actuarial instruments at all, and instead

simply report the most relevant generalized "base rate" data available.  In terms of what would

constitute relevant base rate data, Dr. Barbaree testified that seven of the eight studies showed a

---

[185]May 1 Tr. at 49.

[186]  May 1. Tr. at 49-50.

[187]  May 1. Tr. at 50

[188]At the conclusion of Dr. Barbaree's testimony about empirical methods to adjust the
risk instruments to account for age, the Court asked Dr. Barbaree if the decision to do so was, in
effect, an exercise of "clinical judgment."  Dr. Barbaree responded that he believed it was a
"professional judgment." May 1 Tr. at 60 ("It's a professional judgment. And I think it's based on
knowing that the actuarials are making an overestimate because of the data that we talked about
this morning and knowing that an adjustment of some kind is  required...".).

base rate for individuals 60+ age range of approximately 5%.[189]  The only exception was the

Prentky & Lee study, a "high risk" sample which, Dr. Barbaree testified, showed a recidivism rate

of 20 or 25%, but which was actually a recidivism rate of 16.7%[190]

135.    An alternative approach would be to utilize "empirical methods" of adjusting the

actuarial risk estimates to account for the effect of age-at-release.[191]  Dr. Barbaree testified that

the literature has described two methods to take an actuarial instrument and adjust it so that the

risk estimates account for the effect of age at release.

136.    The first is to use a method of statistical extrapolation known as "Bayes'

Theorem" to adjust the actuarial percentages using generalized base rate data for older

populations of sex offenders.  This method was first proposed by Richard Wollert.[192]   It was used

---

[189]May 1 Tr. at 53.

[190]   May 1 Tr. at 52.  Dr. Barbaree was mistaken about this number during his testimony.
While Dr. Barbaree reported this estimated recidivism rate while looking at the display of the
study on a graph, in fact, the Prentky & Lee study found a recidivism rate of 16.7% for child
molesters over 60, a fact that the Government correctly represented during its questioning of Dr.
Plaud. See Apr. 30 Tr. at 101.  Because this study consisted of individuals who had already been
civilly committed, the Government suggested that an evaluator could point to it as giving valid
information about base rates for aging "high risk" sex offenders, to which Dr. Barbaree agreed:
"Yes, I suppose that's true. It does include the age dimensions so you could take age into account
by looking at that.  That might give you some information about base rates in the older high-risk
offender." May 1 Tr. at 103.  Despite the Government's suggestion in cross-examination,
neither Dr. Phenix nor Dr. Rosell abandoned the actuarial in favor of the Prentky and Lee base
rate.  In addition, Dr. Plaud's cross examination made clear that the Prentky & Lee study was
consistent with Dr. Hanson's 2006 article *Does Static-99 Predict Recidivism?*, which found a
recidivism rate for child molesters over 60 of 9.1% with a confidence interval of plus or minus
17%. Apr. 30 Tr. at 101 (Q: And we have a recidivism rate there of almost 17%, correct?  A:
Correct.  Q: But within the 2 to 26 percent, 95 percent confidence interval established by Dr.
Hanson?  A: You got it.").

[191]   May 1 Tr. at 50.

[192]May 1 Tr. at 50-51; Exh. 7 at 23 <u>citing</u> Richard Wollert, *Low Base Rates Limit Expert
Certainty When Current Actuarials Are Used To Identify Sexually Violent Predators*, 12 Psy.

in this case by Dr. Plaud.

137.   The second method is to multiply the number of years by which an offender is older than the average age of a developmental sample by an expected percentage of recidivism decline.[193]   Doing this calculation, sometimes referred to in the testimony as performing a "hazard ratio," will lead to an empirically validated estimate of the offender's recidivism risk. This method was proposed by Dr. Barbaree and his coauthors in the article *Sexually Violent Predators in the Courtroom: Science on Trial.*[194]   Dr. Barbaree testified that there are currently two empirically-derived estimates in the literature for an appropriate percentage of recidivism decline.   Dr. Barbaree proposed a decline of 5% per year, while Dr. Hanson proposed a decline of 2% per year.[195]   Although Dr. Barbaree believed that Dr. Hanson's percentage underestimates the rate of decline,[196] he posited that "a conservative way of approaching this [age adjustment of actuarial risk] would be to say that you could calculate ranges of recidivism risk using two percent on the one side and five percent on the other."[197]

138.   Finally, Dr. Barbaree testified that an evaluator could also use the tables reported

---

Pub. Pol. & Law 56-85 (2006).

[193]May 1 at 51-52.

[194]Apr. 28 Tr. at 41; Exh. 8 at 10 <u>citing</u> Robert Prentky, et. al., *Sexually Violent Predators In The Courtroom: Science on Trial*, 12 Psy. Pub. Pol & Law, 357, 364 (2006).

[195]Drs. Barbaree and Hanson derived these estimates by performing a "Cox regression analysis"on their own data and reporting the rate of recidivism decline from their data sets.  May 1 Tr. at 51-52, 105.

[196]May 1 Tr. at 105.

[197]May 1 Tr. at 52.

in Dr. Hanson's 2006 age study, *Does Static-99 Predict Recidivism Among Older Offenders?*[198]

139.   Dr. Barbaree was asked questions relating to the new "norms" for the Static-99. He testified that the new norms were released at a presentation for the Association for the Treatment of Sexual Abusers in October 2008.  The norms are presently available but are not yet available in peer-reviewed, published form.[199]  The developers are currently conducting analyses to present age-corrected norms for the Static-99 at their upcoming conference in October 2009. Dr. Barbaree testified that he received some preliminary information generated by Dr. David Thornton regarding this presentation: "The preliminary finding that David Thornton provides in a narrative is that after 60 the estimates should be halved compared with the estimates that have been provided so far."[200]  Dr. Barbaree testified that this decline would be consistent with his research.  It would also be consistent with Hanson's 2006 age study on the prior Static-99 norms, *Does Static-99 Predict Recidivism in Older Offenders?*[201]

140.   During its cross-examination, the Government questioned Dr. Barbaree about the possibility that any given individual would "buck the trend" of a decline in recidivism shown in

---

[198]May 1 Tr. at 54.  (Using the data from this article an example of "using an empirical method of making an adjustment here.  It's really looking at the base rate that's provided for that sample of a particular score level and a particular age from one study.").

[199]May 1 Tr. at 81-82.

[200]May 1 Tr. at 83.

[201]May 1 Tr. at 83-84.  See R. Karl Hanson, *Does Static-99 Predict Recidivism Among Older Sexual Offenders?* 18 Sexual Abuse: A Journal of Research and Treatment, 343-355 (2006).  Under the prior Static-99 norms the five-year recidivism estimate for a score of 6+ (the highest score for which recidivism percentages were given at the time) was 39%.  Exh. 5 at 22. In his 2006 article Karl Hanson reported a five-year recidivism estimate for offenders 60 and over scoring a 6+ as 9.1% with a confidence interval of +/- 17%. Apr. 29 Tr. at 142-143.

the data.[202]   This questioning was consistent with the Government's suggestion that Mr. Hunt was an "outlier" and that the age related declines in recidivism would not apply to him, and with Dr. Rosell and Dr. Phenix's suggestion that they did not attribute more of an age-related decline in recidivism to Respondent because they were assessing him as an "individual."[203]  Dr. Barbaree testified that it was certainly possible for an individual to "buck the trend."[204]  However, he clarified that all of the actuarials used in this matter are based on group data, and thus the expert opinions which are based on the actuarials are also based on group data:

> I think the distinction was being made in the cross-examination between the assessment of Mr. Hunt as an individual and the discussion that we had today about age in the context of group norms and studies of groups of sex offenders, *as if the discussion we had today is somehow different from the normal expertise that is given in evidence in proceedings like this*.  I think that is a bit of an exaggeration. *The expertise that we come in with to substantiate the evidence we give based on empirical studies are all studies of groups of individuals.*
>
> So I think when the witnesses that you have seen already have come in after having evaluated Mr. Hunt *are comparing Mr. Hunt with groups of subjects . . ..*[205]

141.   Thus, Respondent argues that it would be inconsistent to apply an actuarial instrument – which is based on group data – to assess Respondent's likelihood of recidivism, but decline to rely on age-related group data on the theory that it does not apply to the individual in the case.

## VI.   RISK ASSESSMENTS CONDUCTED IN THIS CASE

### A.   Dr. Bernard Katz' Risk Assessment

---

[202]May 1 Tr. at 97-98.

[203]Apr. 27 Tr. at 150; Apr. 28 Tr. at 75; Apr. 29 Tr. at 156.

[204]May 1 Tr. at 97-99.

[205]May 1 Tr. at 108.

142.    Dr. Katz is a physician specializing in psychiatry.[206]  He is currently Senior
Psychiatrist at the Worcester County Jail and House of Corrections.[207]  Most of his career has
been in clinical administration, program development, and managing units. [208]  He has done
approximately 40-60 evaluations in sexually dangerous person Massachusetts state court
cases.[209] However, Dr. Katz had not done a sexually dangerous person evaluation in years.[210]

143.    Dr. Katz described himself as a "general psychiatrist and a general forensic
psychiatrist."  He testified that he had a fair amount of experience with the diagnosis and
treatment of some pedophiles, "but I am not one of those heavy duty researchers."[211]  Dr. Katz
agreed that there had been a lot of research in this area since the time he last did such an
evaluation.[212]  After accepting the case he went back and did a "general review" of the literature
in the area.[213]   He reviewed a number of articles but he did not remember how many or their
titles.[214]   Dr. Katz testified that he could not become a sub-specialist in this field in the amount
of time even if he devoted all of his time to studying.[215]

---

[206]Apr. 28 Tr. at 83.

[207]Apr. 28 Tr. at 85.

[208]Apr. 28 Tr. at 85; Exh. 2.

[209]Apr. 28 Tr. at 87.

[210]Apr. 28 Tr. at 87, 118.

[211]Apr. 28 Tr. at 103.

[212]Apr. 28 Tr. at 129.

[213] Apr. 28 Tr. at 130.

[214] Apr. 28 Tr. at 130.

[215] Apr. 28 Tr. at 129-130.

144.     Dr. Katz used his clinical judgment to assess Mr. Hunt's sexual dangerousness.[216]

145.     Dr. Katz saw the question of "serious difficulty refraining" and likelihood of risk of reoffense as two separate questions.[217]  In his report he stated that the operational phrase serious difficulty in refraining from child molestation if released "makes such a conclusion as a sexually dangerous person difficult to avoid given Mr. Hunt's long-standing paraphilic disorder and his past history including serious re-offending behavior while on parole and ostensibly under supervision."[218]  Dr. Katz testified that Mr. Hunt would have serious difficulty refraining from child molestation if released "just based on the totality of the material that I reviewed, the severity of his pedophilia.  As I mentioned, it was on a continuum, and he was in a very severe range of it, and it was not going to be able to go away."[219] Thus, he opined that Mr. Hunt's pedophilia has not come down far enough in the continuum for him to opine that he would not have serious difficulty refraining.[220]

146.     Dr. Katz then assessed Mr. Hunt's risk to reoffend.[221]   Dr. Katz did not score any actuarial instruments in the case.  However, he looked at the RRASOR and Static-99 scoring that was done by others.  He re-scored the Static-99 in his mind.  When doing so he "backed out those aspects, those antisocial aspects, all of those aspects that I felt were in the service of the

---

[216]Apr. 28 Tr. at 124.

[217]Apr. 28 Tr. at 115.

[218]Exh 1 at 5.

[219]Apr. 28 Tr. at 108.

[220]Apr. 28 Tr. at 127.

[221]Apr. 28 Tr. a 125-126.

pedophilia and not sort of freestanding items on their own."[222]   Thus, Dr. Katz scored Mr. Hunt

either an eight or a nine on the Static-99.[223]

147.    Dr. Katz testified that Mr. Hunt's age and his participation in treatment mitigated

his risk of reoffense.[224] He testified that, "my impression, from reading the literature, is that there

is a modest treatment effect for sex offenders."[225]   He also testified that "with age there is

generally a diminution of libido and concomitant steam behind sexual interest."[226]

148.    He  testified that Mr. Hunt's risk of reoffense was "moderate to moderately high"

under a rational release plan with conditions similar to those Mr. Hunt would be facing on

parole.[227]   If Mr. Hunt were released without any conditions of supervision whatsoever, the risk

would "at least be moderately high."[228]

149.    Dr. Katz did not define or quantify his use of the terms "high," "moderate," or

"moderately-high."

**B.**    **Dr. Luis Rosell's Risk Assessment**

150.    Dr. Rosell testified that when conducting a risk assessment he reviews the

material, interviews the respondent, and writes a report.  In terms of methodology he stated: "I

---

[222] Apr. 28 Tr. at 110-111.

[223] Apr. 28 Tr. at 110.

[224]Apr. 28 Tr. at 114-115.

[225]Apr. 28 Tr. at  114-115.

[226]Apr. 28 Tr. at 101.

[227] Apr. 28 Tr. at 133, 137.

[228]Apr. 28 Tr. at 132-33.

look at the actuarial issue.  I look at the, using the Static-99 [sic], and then I look at some

dynamic factors.  I look at treatment.  I look at the issue of age.  And then I come to my

decision."[229]

151.    Dr. Rosell wrote in his report that one of the issues in this case was "how to

reconcile a very high actuarial score with the issue of age and treatment."[230] In the report he

indicated that he considered dynamic factors "to assist in making this determination."[231]

However, at trial Dr. Rosell testified that in Mr. Hunt's case most of the dynamic factors were

historical.[232]   Ultimately he concluded that the dynamic factors did not contribute much to his

overall opinion.[233]

152.    Dr. Rosell scored Mr. Hunt an 11 on the Static-99.[234]   This score was important

to his assessment in this case.[235]   He had not seen an 11 before in his professional experience.[236]

In fact, the thing that influenced him most was Mr. Hunt's high actuarial score.[237]   Dr. Rosell

acknowledged that Mr. Hunt would have received a Static-99 score of 11 in 1986 and that this

---

[229]Apr. 27 Tr. at 109.

[230]Exh. 3 at 26.

[231] Id.

[232] Id.

[233]Apr. 28 at 50.

[234] Apr. 27 Tr. at 126.

[235] Apr. 28 Tr. at 11.

[236] Apr. 28 Tr. at 12.

[237] Apr. 28 Tr. at 49.

score would not change for as long as he is alive.[238]

153.     Dr. Rosell also admitted that recidivism percentages on the Static-99 are associated with confidence intervals.  He agreed that for the upper-level scores the confidence intervals overlap.[239]  He agreed that some researchers have suggested that the overlap suggests that for practical purposes there may not be a difference between two consecutive upper-level scores (i.e. and eight may mean essentially the same as a nine, a nine may mean the same as a 10).[240]

154.     Dr. Rosell reported the new Static-99 norms associated with Mr. Hunt's Static-99 score.  He testified that a score of 10 or above on the Static-99 translated into a recidivism range of between 34% to 50% for 5 years and 49% to 59% for 10 years.[241]

155.     Although Dr. Rosell testified that he was influenced primarily by Mr. Hunt's score on the Static-99, he also testified that the instrument had limitations.[242]  Dr. Rosell began using the Static-99 within the past year.  Prior to that he did not use it.[243]  He described himself

---

[238]Apr. 28 Tr. at 12-13.

[239]Apr. 28 Tr. at 5.

[240]Apr. 28 Tr. at 22-23.

[241]Apr. 27 Tr. at 131-132; Exh. P; Apr. 28 Tr. at 17.  Dr. Rosell originally reported that the recidivism percentage associated with a score of 10+ under the new Static-99 norms was 51% over 5 years and 66% over 10 years, which he termed the "complete sample."  Exh. 3 at 21. However, he testified that the developers recommended using a different table and reporting the range between the routine CSC samples and the preselected high risk samples. See Apr. 27 Tr. at 130-132.

[242]Apr. 27 Tr. at 116.

[243]Apr. 27 Tr. at 110.

as a "detractor" of the instrument for many years.[244]  Even though he has begun to use the Static-

99, he agreed that there were still problems and that he was still aware of its limitations.[245]

> Q.    And what you say you do now with the actuarial is that you use it as a
>        starting point; right?
>
> A.    Correct.
>
> Q.    So your position now is that it's providing good information to the Court
>        within its limitations; right?
>
> A.    Yes.
>
> Q.    And so when the Court looks at or the Court wants to decide what the risk
>        posed by an individual is, you as a professional coming into this court are
>        saying the Static-99, for example, is providing good information; right?
>
> A.    It's not the best but it's providing some information. As I have said, it's not
>        -- it's the best we have. It's not the best thing there is because it's
>        impossible to have that 1.0 predictability of any instrument. So it's going
>        to have its limitations.[246]

156.    Dr. Rosell agreed that one of his criticisms of the Static-99 had been that while

studies had continued to show "moderate predictive validity" in the instrument's ability to

discriminate between recidivists and non-recidivists, the studies also showed lower recidivism

estimates than those in the development sample.[247]

157.    Dr. Rosell acknowledged that there was important principle behind that criticism,

which is that "base rates matter,"[248] and the overall base rate of reoffending in a population has

---

[244]Apr. 27 Tr. at 115.

[245]Apr. 27 Tr. at 116, 191.

[246]Apr. 27 Tr. at 191-192.

[247]Apr. 27 Tr. at 120.

[248]Apr. 28 Tr. at 9.

an effect on what the Static-99 recidivism percentages will be.[249]  He agreed that a low base rate

draws down the Static-99 recidivism percentages.[250]

161.     Dr. Rosell also agreed that the new Static-99 norms confirmed the criticism he

had been making of the Static-99, that the recidivism percentages were affected by base rates.

He also noted that this has been confirmed by the Static-99 developers.[251]

### 1.     Dr. Rosell's Assessment of Mr. Hunt's Risk Within the Actuarial Range of the Static-99

159.     Dr. Rosell was asked a series of questions about how he assessed whether Mr.

Hunt was more like the Routine CSC samples or the Preselected High Risk samples provided by

the new Static-99 norms.

160.     In his report Dr. Rosell stated that "[b]ased on his treatment participation and

benefit, he may appear to belong more to the routine CSC samples than the preselected high risk

samples.  However, his extensive sexual offending and *very high score on the Static*-99 place

him in the high end of the high risk group."[252]

161.     During his direct examination Dr. Rosell reiterated the concept that he believed

that Mr. Hunt's actuarial score may make him more like the Preselected High Risk sample:

Q.     Okay. And similarly the developers of the study have told you what with
        respect to placing an individual within that spectrum?

A.     You have to then look at the individual and try to figure out based on the
        information that they've provided you on how they discriminated these

---

[249]Apr. 28 Tr. at 8.

[250]Apr. 28 Tr. at 11.

[251]Apr. 28 Tr. at 16.

[252]Exh. 3 at 21 (emphasis added).

two groups of samples, how this individual falls into that group.

Q.      Okay. What is the information in the sense of how does the Static-99 data that we've just discussed inform your opinion as to Mr. Hunt's sexual dangerousness?

A.      Well, it's what's commonly looked at as the starting point. If the instrument does not tell you about the individual's absolute risk, it definitely tells you about the relative risk when compared to other individuals. *And so when you compare them to other individuals, he scores higher than pretty much everyone else.*[253]

162.    However, in cross-examination he admitted that actuarial score was *not* one of the characteristics that the developers had put forth for distinguishing the Routine CSC and Preselected High Risk samples, stating:  "[I]t's misleading to say that the low risk group is a low risk group based on the recidivism estimate.  It's based on other factors, *because they still had individuals who scored 8, 9, and 10 in the low-risk group.*"[254]

163.    He then revised his assessment of where Mr. Hunt was within the recidivism range given by the Static-99, stating: " I made the determination that he's probably somewhere in between the two or maybe a little higher up, but I did not come down -- I would have difficulty coming down with an exact percentage, because I wouldn't be able to defend whatever percentage I selected . . .."[255]

## 2.      Dr. Rosell's Consideration of Mr. Hunt's Age

164.    Dr. Rosell testified that "generally speaking" he considers age to be an issue in

---

[253]Apr. 27 Tr. at 132.

[254]Apr. 28 Tr. at 17-18.

[255]Apr. 28 Tr. at 18.

risk assessment.[256]  He testified that in any case where the offender is over 50 "I always talk

about age."[257]   When questioned further about his methodology for evaluating the risk of

recidivism for older offenders he agreed that his method for incorporating age into his risk

assessment was simply to look at the risk and then decide whether age mitigates or not.[258]  He

agreed that he makes this decision based on his sense of the case.[259]

165.    Dr. Rosell admitted that as a general matter libido in most people declines with

age.[260]  Therefore, without knowing anything else we would expect someone's libido to decline

with age.[261]

166.    Dr.  Rosell testified that he was familiar with the work of Dr. Barbaree and agreed

with his conclusion that "in general that the recidivism rates goes down [for older sex

offenders.]".[262]

167.    Dr. Rosell also agreed that the data shows that the base rate of offending for older

---

[256]Apr. 28 Tr. at 149.

[257]Apr. 28 Tr. at 141, 142.

[258]Apr. 28 Tr. at 32.

[259]Apr. 28 Tr. at 32.

[260]Apr. 27 Tr. at 181.

[261]Apr. 28 Tr. at 181-182.

[262]Apr. 28 Tr. at 148.   Dr. Rosell testified that there was one researcher that did not agree that age reduces risk.  Dr. Thornton's study looked at 40-59 year olds and showed "that there was not a decline."  However, he noted that the Thornton study didn't further break out the age group 40-59 so "we don't know if the one's who recidivated were more in the first decade or the second."  Id.

individuals is low.[263]  In fact, he agreed that the base rate for older individuals is lower than the

base rate for either the "Routine CSC" or "Preselected High Risk" samples of the Static-99,

which generated his estimate of  34% to 50% for 5 years and 49% to 59% for 10 years.[264]

168.    In addition to his agreement that the general base rate for older offenders was low

and that low base rates would draw down the Static-99 scores, Dr. Rosell was also aware of a

specific study of "high risk" offenders who had been civilly committed and later released.  This

study indicated that the rate of recidivism of these "high risk" offenders over 60 years old was

approximately 16%.[265]

169.    Dr. Rosell was aware that at least one researcher has recommended that

evaluators  abandon the new norms entirely for older offenders.[266]

170.    Dr. Rosell testified that he was aware of two empirically based methods that have

---

[263]Apr. 28 Tr. at 11.  Dr. Rosell agreed that in 2002 Karl Hanson studied a sample of over 4,600 offenders.  There were very few offenders released after age 60 (131).  Of those, 5 offenders, or 3.8% recidivated.  Those 5 people included 2 extrafamilial child molesters (2 out of 45 or 4.4%) and 3 unclassified offenders (3 out of 37 or 8.1%). Dr. Rosell agreed that this study provided a plausible base rate for offenders over 60 and one that was often represented in the field by different scholars as a good source of information for the base rate for older offenders. Apr. 28 Tr. at 48.

[264]Apr. 28 Tr. at 30.

[265]Apr. 28 Tr. at 64-65.  Dr. Rosell testified that a recent study by Robert Prentky and Austin Lee looked at the recidivism rate of sex offenders who had been civilly committed at the Massachusetts Treatment Center and then released into the community. He agreed that this was a study of "high risk" sex offenders, by virtue of the fact that they had been civilly committed. This study showed that these "high risk" child molesters who were 60 and older had a reoffense rate of 16%.

[266] Apr. 28 Tr. at 44-45.  Dr. Rosell was aware that Dr. Brian Abbot recommends abandoning the new norms for older offenders.   Instead, Dr. Abbott recommends using the age adjusted risk information released by Hanson in 2006 or employ the age correction methods proposed by Wollert.

been suggested in the literature to adjust an actuarial score to account for advancing age.[267]

171.    He was aware of a method proposed by Dr. Richard Wollert to adjust for age using Bayes Theorem.[268]  He was also aware of the method proposed by Dr. Howard Barbaree to adjust for age using a "Hazard Ratio."[269]

172.    On direct examination Dr. Rosell testified that the recommendations of Dr. Barbaree and Dr. Wollert regarding how to adjust the actuarial to account age have not been accepted by everybody).[270]   However, on redirect examination he testified that these methods had received general consensus and that he had used them in other cases.[271]

173.    At his deposition Dr. Rosell testified that he would like to have the age-related

---

[267]Apr. 28 Tr. at 34-35.  Despite his testimony at trial that he was aware of two methods for adjusting the recidivism estimate, during a deposition in this matter Dr. Rosell testified that all an evaluator can do is report the existing data and conclude that "there appears be a trend." Apr. 28 Tr. at 34 ("I list all the percentage, you know, the percentages based on the individual's risk score, and then I report what age data is out there as -- other than Dr. Hanson's, we don't have a lot of research that looks at the corresponding score with the age and a percentage other than that one study. All you can do is say that there appears to be a trend, but we're not sure what the risk levels were to begin with with those individuals, but it does seem to be a trend.").

[268]Apr. 28 Tr. at 35-37.

[269]Apr. 28 Tr. at 40.  Dr. Rosell was also aware that other researchers have recommended

[270]Apr. 27 Tr. at 150.

[271]Apr. 28 Tr. at 74 ("Q: " . . .Mr. Hunt's counsel mentioned on cross-examination that there are suggestions of empirical manners in which to adjust range, where one simply discounts by a percentage each year over the age of 40, correct? A:  Correct.  Q:  And have those been generally accepted?  A:  Well, they have been published in journals, and I've considered them and used them in other cases, and other evaluators do.  So, I think they have gotten – I think they have received general consensus.").  Dr. Rosell also agreed that an evaluator choosing to do a hazard ratio would have an empirically based method of accounting for a high-risk percentage associated with an actuarial in advancing age. Apr. 28 Tr. at 42.

data for the samples that make up the new Static-99 norms.[272]  He stated that "this age related data is needed desperately so it will assist in cases like this . . .."  He also said  "Yes, I would love to have those numbers available.  They will probably be small, but they would be – it would be something."[273]

174.     However, since the time of his deposition Dr. Rosell asked for and received information from the Static-99 developers regarding the age data.[274]

175.     Dr. Rosell received a document that showed a general base rate of sexual recidivism for all offenders 60-65 years old of 5.4% and a base rate of sexual recidivism for all offenders 66-70 years old of 3.7%.[275]  He also received a document which isolated offenders whose Static-99 scores were six or higher.  Of those 49 people, four of them reoffended for a recidivism rate of 8.2%.  The researchers then broke out the child molesters from that group. There were 29 child molesters in the 60+ age range with a score of 6 and over.  Of those 29 people, three reoffended for a recidivism rate of 10.3%.[276]

176.     Ultimately, Dr. Rosell's explanation for why he did not use an empirically adjusted method to account for Mr. Hunt's age was that if he did so, he would not be assessing Mr. Hunt "as an individual."  He testified that Dr. Wollert's Bayesian analysis could be performed "[b]ut when you're doing it that way, you're basically, you're disregarding everything

---

[272]Apr. 28 Tr. at 65-66.

[273]Apr. 28 Tr. at 66.

[274]Apr. 28 Tr. at 67.  Dr. Rosell testified that the information he received was part of the developing data on the new norms.  Id.

[275]Apr. 28 Tr. at 68.

[276]Apr. 28 Tr. at 70.

else about the individual.  You're not really taking into account who the person is.[277]   He also

testified that he believed the Hazard ratio would not be an appropriate manner to adjust for age

(despite the fact that he admitted to using it in the past) "because it's not taken into account the

individual that you've been asked to evaluate."[278]

177.    Dr. Rosell's testimony makes clear that he based his conclusion primarily, if not

solely, on Mr. Hunt's high Static-99 score:

> [I]n most cases of this type I usually find that an individual, especially if they're
> this old, there has been just two other cases where I came up with the same
> conclusion based – there was always some other reason.  And in this case I
> believe it's based mostly on his sex offending history, the extent of it, the pattern
> of offending and his actuarial score which in my opinion makes him different than
> almost most sex offenders who are out there.  And so that was the final decision
> because this was a difficult decision for me to make because in most cases when
> someone is over 60, there has to be something else that is going to convince me
> because I do believe in the age issue.[279]

178.    Dr. Rosell employs no consistent methodology and could offer no empirically

based justification for why, despite having done so in the past, he chose not to incorporate age

data in Mr. Hunt's risk assessment.

## C.    Dr. Amy Phenix's Risk Assessment

### 1.    Methodology

179.    Dr. Phenix testified that she uses a "pure" actuarial method of risk prediction.

She testified that "currently pure actuarial is the preferred method [of sex offender evaluation].[280]

---

[277]Apr. 27 Tr. at 150.

[278]Apr. 28 Tr. at 75.

[279]Apr. 27 Tr. at 164 (emphasis added).

[280]Apr. 29 Tr. at 28.  Although Dr. Phenix testified on direct examination that pure
actuarial was the appropriate method of risk assessment, on cross examination she admitted that

Under this method the primary overall risk level comes from scoring actuarial instruments.[281]

She testified that she uses this method because the recidivism percentages generated by the

instruments are "the most plausible base rates."[282]

180.    Using the pure actuarial approach, Dr. Phenix stated she only gives risk estimates

"within the range" of risk estimates the instruments afford.  She previously relied on dynamic

factors to support opinions that a particular respondent's risk was either greater or lesser than the

percentage range yielded by the actuarial tool; she now relies on these same dynamic factors

only to assist in placing a subject within a given range, but she would not opine that the level of

risk either exceeded or was less than the given range.[283]

181.    Dr. Phenix scored three actuarial instruments in this case: The Static-99, the

Static-2002, and the Minnesota Sex Offender Screening Tool -Revised. ("MnSOST-R").[284]  She

testified that she uses three instruments because she is looking for "converging" evidence of risk

---

it was one which she had only adopted within the past year.  Apr. 28 Tr. at 111. Dr. Phenix
drafted a report evaluation of Mr. Hunt which assessed his risk of recidivism based on an
"adjusted actuarial" method of risk assessment.  This report was submitted into evidence as
Exhibit 5.  She testified that she did not draft an updated report reflecting this change because
she did not have time to do so, and because the change in method did not result in a change in
her ultimate opinion. Apr. 28 Tr. at 118-119.

[281]Apr. 29 Tr. at 28.

[282]Apr. 29 Tr. at 128.

[283]  Apr. 29 Tr. at 72. ("Q. So based on the dynamic factors that you just described, are
you adjusting Mr. Hunt's risk outside of these numbers or within the range?  A. No, I would not
adjust them outside. It's definitely within the range that I would adjust them in.")

[284]Apr. 29 Tr. at 10.

level.[285]

182.    Although all three instruments show "moderate predictive accuracy," there have

not been any studies or data on whether using all three together increases accuracy. [286]

### 2.    Dr. Phenix's Scoring on the Actuarial Instruments

183.    Dr. Phenix scored Mr. Hunt at 11 on the Static-99.[287]   She has rarely seen a score

of 11.[288]  A score of 6 or above is considered "high" for the instrument.  The Static-99 recidivism

percentages released in October 2008 indicate that a score of 10 or above is associated with

reoffense rates of 34.9% to 50% within 5 years and 49.7% to 59.9% within 10 years.[289]

184.    Dr. Phenix scored Mr. Hunt at 10 on the Static-2002.[290] A score of nine or above

is designated in the "high" risk range for the instrument.[291]   The Static-2002 recidivism

percentages indicate that a score of 10 is associated with reoffense rates of 25.4% to 37.8%

---

[285]Apr. 29 Tr. at 55; 60.  See also Apr. 29 Tr. at 26 ([T]he way that I go about it is to score a multitude, a number of actuarial instruments that have all been tested or validated.  In other words, they help me to know if this person is low, medium, or high risk to reoffend.").

[286]Apr. 29 at 127; 140.

[287]Apr. 29 at 35.

[288]Apr. 29 at 55.

[289] Exh. P; Apr. 29 Tr. at 51.  The collection of samples called the "Routine CSC samples" showed (rounded) recidivism rates associated with this score of 35% after 5 years, and 50% over 10 years.  The collection of samples referred to as the "Preselected High Risk Samples" showed recidivism rates associated with this score of 50% after 5 years, and 60% after 10 years.

[290] Apr. 29 Tr. at 56; Exh. 27.

[291]Apr. 29 Tr. at 58.

within 5 years and 30.5% to 45.5% within ten years.[292]  The Static-2002 percentages estimates

are based on the same "Routine CSC sample" and a "Preselected High Risk" sample.[293]

185.    Dr. Phenix scored Mr. Hunt a 14 on the MnSOST-R.[294]  She testified that a score

of eight or above is labeled "high" risk.   Individuals with a score of 13 or above are

automatically referred for civil commitment screening in Minnesota.[295]  Dr. Phenix testified that

the recidivism percentages associated with the scores have changed.   The older percentages

associated with a score of 14 were "a 72% probability of sexual arrest within 6 years."[296]  The

"more contemporary samples measure a six-year period of time the offender is on community

supervision to have a lower probability of about 40%."  She testified that once an individual's

community supervision ends, "you would consider the true risk to be the original probability, the

72%."  Dr. Phenix did not explain why she opined that once supervision ended the "true risk"

would revert back to the prior norms which consisted of older samples, with presumably higher

base rates of recidivism.[297]

---

[292]Exh. Q; Apr. 29 Tr. at 59.  This recidivism data, like the new norms data for the Static
99, was released in November of 2008.  However, Dr. Phenix testified that the data in the form
in which it was entered into evidence was being made available on the internet on the very day
of her testimony.  Id. at 115.

[293]Apr. 29 Tr. at 58.

[294]Exh. 28.

[295]Apr. 29 Tr. at 61.

[296]Apr. 29 Tr. at 62.

[297]Id.  Dr. Phenix essentially deflected a question about whether the old MnSOST-R
norms were still applicable.  When asked if the 72% would still be good information about Mr.
Hunt, she stated: "The 72 percent would be the study sample.  And I reported that not for Mr.
Hunt but for the study sample that there was a recidivism rate of 72% for a score of 13 and above
essentially." Apr. 29 Tr. at 161.  The norms for the MnSOST-R were not entered into evidence

### 3.     Dr. Phenix's Assessment of Mr. Hunt's Risk Within the Actuarial Ranges Given by the Static-99 and Static-2002

186.    As described above, Dr. Phenix testified that she uses dynamic risk factors to help make the determination where in the range of risk given by the Static-99 and Static-2002 the offender falls.[298]

187.    She considered the following dynamic risk factors: Social support in the community;[299] intimacy defects;[300] sexual self-regulation;[301] cooperation with supervision;[302] general self regulation;[303] and treatment.[304]

188.    Dr. Phenix testified that Mr. Hunt had a number of dynamic risk factors that were

---

as an exhibit. Dr. Phenix said that the norms had been presented at a presentation and would be published in a book chapter next year. Apr. 29 Tr. at 162.

[298]Apr. 29 Tr. at 63; 170.

[299]Apr. 29 Tr. at 64.

[300]Apr. 29 Tr. at 66-67.

[301]Apr. 29 Tr. at 67-69.

[302]Apr. 29 Tr. at 69.  Dr. Phenix testified that supervised release or probation was a factor which she considering when opining on dangerousness, but that it did not affect her opinion in this case.  Apr. 29 Tr. at 88-89 ("In the past it hasn't happened to protect Mr. Hunt from reoffending because, of course, he has had supervision in the past but that hasn't stopped him from reoffending. ... So while I think that that is a positive thing, I think that his particular risk, while it may be reduced on community supervision, it's hard to say because it hasn't in the past but perhaps he is less impulsive now, has better judgment and can better maintain community supervision. Nonetheless, his risk will persist after he is off of supervision. It's not lengthy enough in my opinion.")

[303]Apr. 29 Tr. at 70.

[304]Apr. 29 Tr. at 71; 86-87.  Dr. Phenix testified that sex offender treatment was effective in reducing risk of re-offense, but that Mr. Hunt's exposure to treatment was not sufficient to reduce his risk adequately.

similar to the high risk sample.  However, he also had characteristics which were similar to the low risk sample.[305]

189.    Dr. Phenix also testified that she considered Mr. Hunt's age as a potentially protective (risk lowering) factor *within* this analysis.[306]  In other words, she used age as a factor to determine where Mr. Hunt fell within the range of recidivism percentages on the Static-99 and Static-2002 given by the "routine CSC" or "preselected high risk" samples.  She did this despite the fact that she was aware that age was *not* one of the factors that distinguished the low risk and high risk samples from each other.[307]

190.    Ultimately, she concluded that, due to Mr. Hunt's age, she would consider the lower range probabilities to be applicable.[308]

191.    Thus, Dr. Phenix presented the Court with the following information regarding the rate of recidivism for individuals (whose average age was in the mid-late 30s) who have scored similarly to Respondent on the actuarial instruments:

| Years | STATIC-99 | STATIC-2002 | MnSOST-R |
|-------|-----------|-------------|----------|
| 5 | **34.9%** to 50% | **25%** to 37% | -- |
| 6 | | | 40% (new norms) |
| 6 | | | 72% (old norms) (after supervision) |

---

[305]Apr. 29 Tr. at 71.

[306]Apr. 29 Tr. at 73.

[307]Apr. 29 Tr. at 124.

[308]Apr. 29 Tr. at 86.  See also Apr. 29 Tr. at 151 ("I see him as closer to the low risk sample rather than the high risk sample because of his age.  And I base that on the fact that he is older and he would be closer to a lower base rate sample, not a higher base rate sample.").

| 10 | **49.7%** to 59.9% | **30.5%** to 45.5% | -- |

192.    Dr. Phenix did not discuss how the Court should consider the different risk estimates yielded by these instruments, or whether the Court should privilege one actuarial range over the other (e.g. more like 35% or 25%?).    Although the Static-99 actuarial instrument was the subject of most of Dr. Phenix's testimony, the Static-2002 was, according to Dr. Phenix, "[t]he only instrument that considers aging offenders," in that an offender's score decreases to some extent as the offender ages.   As Dr. Phenix testified the lower end of the range was appropriate, this results in a risk estimate of 25%.[309]

### 4.    Dr. Phenix's Accounting for Age

193.    Dr. Phenix testified that experts in the field "consider 60 and over in terms of this research" as being "advanced age."[310]  Dr. Phenix acknowledged that she considered age to be a risk mitigating factor in her assessment of Mr. Hunt.   However, she opined that the reduction in risk which resulted was insufficient to find he was not a sexually dangerous person.

194.    To support her contention, Dr. Phenix relied on a study by Dr. David Thornton. This study examined the effect of aging on a population of 750 British sex offenders.  According to Dr. Phenix, this study showed an overall decline, but also demonstrated a plateau of risk from the age of 40 to 59 among those members of the study who had two or more prior sex offenses. She testified this study suggested that there may have been no, or little, decline of risk with age

---

[309]Respondent notes that this estimate was similar to the results of the estimate Dr. Plaud testified could be derived from adjusting a high RRASOR score for age through a process called Bayesian analysis.

[310]Apr. 29 Tr. at 76.

in a high risk sex offender.[311]   However, she agreed that the study did not differentiate the

individuals in the 40-49 year old age group from those in the 50-59 year old age group.  She also

agreed that there were no individuals 60 and over with two prior sex offenses, and stated that

"there is just too small a sample to make any conclusions after 60."[312]

195.   Despite this, Dr. Phenix relied on this study to support her position that Mr. Hunt

continued to be dangerous because age did not "erase his risk."

> Q.    So if you considered Mr. Hunt's age a mitigating factor in this case, why
> is it or how is it that you have opined that he would have serious difficulty
> in refraining from sexually violent conduct or child molestation if
> released?
>
> A.    Well, because his age does not erase his risk.

### 5.    Dr. Phenix Did Not Adjust to Account for the Lower Base Rate for Older Offenders

196.   Due to her opinion that age would have some affect but would not "erase his

risk," Dr. Phenix ascribed the percentages at the low end of the Static-99 range to Mr. Hunt due

to his age:

> Before I said he has a number of traits similar to the high-risk samples; but given
> his age I would consider the lower range in his cutoff score, the probabilities for
> his cutoff score to be applicable but not completely override overwhelming
> evidence telling me that this is a high-risk sex offender when there's been very,
> very little intervention for him in the time he's been in custody.[313]

---

[311]   Apr. 29. Tr. at 77. ("If you look at large groups of sex offenders, most of them are low to moderate risk. Most of them have low to moderate scores on actuarial instruments. And most of them are one-time sex offenders.)

[312]Apr. 29 Tr. at 158.

[313]Apr. 29 Tr. at 86.  In this passage Dr. Phenix appears to suggest that only some kind of 0% risk showing, rather than a low-risk finding, would allow her to support a non-commitment decision.  Dr. Rosell testified similarly, stating in his trial testimony that "I cannot say that because he's older he is no longer a risk."  Apr. 28 Tr. at 75.  See also Apr. 28 Tr. at 80 (A.

197.    Dr. Phenix did not adjust the percentages outside of the actuarial range to account for the lower base rate of offending in older populations. Dr. Phenix agreed that the underlying base rate would affect the Static-99 recidivism percentages:  She agreed that if the overall base rate was high, the percentages would go up.  If the overall base rate was low, the percentages would go down.[314]

198.    Dr. Phenix also agreed that the new Static-99 and Static-2002 norms are based on this principle:  The high risk (preselected high risk) samples have a higher base rate than the low risk (routine CSC) samples.[315]

199.    Dr. Phenix was also aware that the average age of both the routine CSC and preselected high risk samples was in the mid-30s.[316]

200.    Given her agreement that base rates affect the recidivism percentages, Dr. Phenix was asked a series of questions about why she did not use a method of risk analysis which takes into account the lower base rates for older offenders.

201.    One methodology that has been advanced is to use the material published by Dr. Hanson in his age analysis on the prior Static-99 norms, entitled *Does Static-99 Predict*

---

Right, but at the same time you're also saying that nobody has any risk after age 60, and maybe you can say that about rapists, because all the numbers seem to -- you know, even the latest numbers of people over 60 who have committed rapes is zero, but with child molesters, I just don't feel comfortable saying that. Just saying just because the person is 60 they're no longer at risk, I think there needs to be -- you've got to take into account the whole case. Q. Well, but no one is saying that Mr. Hunt or is suggesting that Mr. Hunt is no risk. We're trying to come up with a method of quantifying what his absolute risk actually is. A. Correct.")

[314]Apr. 29 Tr. at 122.

[315]Apr. 29 Tr. at 122.

[316]Apr. 29 Tr. at 124.

*Recidivism in Older Offenders?*  Dr. Phenix acknowledged that the finding in this article was the then-current norms were "substantial overestimates" of risk for older offenders.[317]  She also acknowledged that the article found that individuals who were "high risk" under the prior norms (those who scored a 6 or above on the Static-99) had a recidivism rate of 9.1% over 5 years with a confidence interval of +/-17%, thus a 0% to 26% recidivism rate.[318]  Despite this, Dr. Phenix discounted the idea of using the chart in that article to provide information regarding the risk posed by high risk offenders over 60.   She testified that Hanson's sample of people was much smaller than the current norms.   Thus she believed that the data "is not as informative as it would be if we had larger samples."[319]  Although Dr. Phenix emphasized that small sample size was one of the reasons she declined to use this method, she agreed that the samples comprising this study consisted of over 3,425 people in total, while the "routine CSC" and "pre-selected high risk" samples on which she based her opinion consisted of only 1,000 individuals each.[320]

202.    Dr. Phenix was also aware that, similar to the study Hanson did for the old norms discussed above, the new norms are currently in the process of undergoing an age analysis.  Dr. Phenix testified that she would like to have that data, and agreed that it would improve the quality of her assessment.[321]

203.    At one point in her testimony she agreed that it was *possible* that the new norms

---

[317]Apr. 29 Tr. at 139.

[318] Apr. 29 Tr. at 143-144.

[319]  Apr. 29 Tr. at 54.

[320]Apr. 29 Tr. at 151-152.

[321]Apr. 29 Tr. at 140.

would be overestimates as a result of age.[322]  At another point in her testimony she indicated that

this would be not just possible, but *likely*:

> What will be reduce likely - and I think we'll see this in the new data when it comes out - is that the probabilities associated with reoffense are going to be lower than those probabilities that you see listed . . .[323]

204.    However, when presented with preliminary data released by the Static-99

developers after she conducted her evaluation which showed that sex offenders over 60 who

were classified as "high risk" on the Static-99 recidivated at a rate of 8.3%; the child molester

sub-population had recidivated at a rate of 10.3%, Dr. Phenix discounted this data, stating that

the number of subjects was small and that it was unclear whether there were individuals who

scored an 11 in the group**.**[324]  She also testified that she could not apply those numbers to an

*individual* case:

> A.    Well, I don't know that there was anyone with a score of 11 in this sample. Again, it's a very small sample. 49 for all offenders which I wouldn't use, I wouldn't use those values. I'd use those for those with child molest as offenses. And there were only 29 subjects. Three of them reoffended.  So clearly there is a reduction in recidivism with age just like I've been talking about. *I just can't apply these numbers to an individual case. That's not the purpose of this.* So clearly there is a reduction in recidivism with age just like I've been talking about. I just can't apply these numbers to an individual case. That's not the purpose of this.

> Q.    But you applied the numbers which apply to 37-year olds or people in their mid 30s in this case?

> A.     I said that those values clearly were the recidivism rates for the study

---

[322]Apr. 29 Tr. at 141.

[323]Apr. 29 Tr. at 83-84.

[324]Apr. 29 Tr. at 165.

sample and for the study sample with that score.[325]

205.     Dr. Phenix also discounted Dr. Barbaree's proposal of using a hazard ratio to

come up with an empirically justified number that reflected recidivism risk for an older offender.

She testified that "what he is doing is applying a formula to an individual that may be relevant

for groups of individuals but may not tell the whole story in terms of what contributes to the risk

for an individual."[326]

### 6.     Dr. Phenix's Continued Emphasis on Relative Risk Level

206.     Ultimately, Dr. Phenix opined that actuarial instruments can be used reliably to

assess sexual recidivism for men over age 60 "because relative risk is accurate."[327]  She also

emphasized the fact that more than one actuarial instrument indicated that Mr. Hunt had a "high"

level of risk.[328]

207.     Although Dr. Phenix emphasized the relative risk level, she conceded that this

relative risk level will not change.  Someone who is high risk remains high risk once they've

scored high risk on the instrument:[329]

> So, in other words, for no matter what the age of the offender, the cutoff score is
> accurate and the risk level is accurate.  So an offender who is 70 and has a high
> risk on the Static-99 is truly high risk compared to an offender who is 70 but has a

---

[325]  Apr. 28 Tr. 162-163

[326] Apr. 29 Tr. at 156.

[327] Apr. 29 Tr. at 84.

[328] Apr. 29 Tr. at 58 ("[Hunt's score on the Static-2002] is consistent with the Static-99 in terms of now two instruments saying he's high risk for sexual re-arrest."); Apr. 29 Tr. at 62 ("Q . . . What do all of these three different actuarial instruments tell us in this case about, Mr. Hunt? A: That he's a high risk sex offender if released.").

[329] Apr. 29 Tr. at 139.

<u>low risk on the Static-*99*.  So the relative risk ranking is going to be accurate for any older age offender.  What will be reduced likely – and I think we'll see this in the new data when it comes out – is that the probabilities associated with reoffense are going to be lower than those probabilities that you see listed.</u>[330]

208.     Thus, Dr. Phenix conceded that the relative risk level indicates that Mr. Hunt would remain "high" risk relative to *other offenders his age*, but that new data would likely reveal that the probabilities associated with risk of reoffense would be lower than the data that she testified to using her "pure" actuarial method.

### D.     Dr. Joseph Plaud's Risk Assessment

209.     Dr. Plaud reviewed the records in the case and interviewed Mr. Hunt.   He opined that Mr. Hunt did not meet the criteria for commitment.

210.     Dr. Plaud testified that statistically Mr. Hunt's risk of reoffense was extremely low.   He testified that the base rate for offenders in Mr. Hunt's age range is low.[331]   Due to this statistical data, it was difficult to affirmatively opine that Mr. Hunt would reoffend: "[F]or men of Mr. Hunt's age, he's 63 years old right now, men of his age, even men who have committed multiple sexual offenses acts with multiple victims over many years who are over age 60, so few of them reoffend in the data as to make an affirmative risk prediction the most purest guess in the universe."[332]

211.     Dr. Plaud typically uses actuarial tools as part of his methodology for risk

---

[330]Apr. 29 Tr. at 83 (emphasis added).

[331]Apr. 30 Tr. at 34, 42.   In his calculations Dr. Plaud used a base rate of 4.8% which was generated from Dr. Hanson's data.  Exh. 9 at 10-11, 14.

[332]Apr. 30 Tr. at 26-27.

assessment.[333]   Although he typically uses these tools, he does not use them for individuals in Mr. Hunt's age group.  He testified that for a man who is 63 years old "there is no available actuarial methodology that is valid to use.  If there's no valid actuarial methodology to use, you can't use it, you shouldn't use it, and therefore I do not use it in these cases."[334]

212.    Dr. Plaud testified that it would be a misuse of any actuarial tool to use it on individuals who are 60 and above without making a calculation to reflect the lower base rate for that age group.[335]   In order to demonstrate the difference between the recidivism percentage generated by the actuarial tool when used "as-is" and the recidivism percentage generated when the applicable base rate for older offenders is taken into account, Dr. Plaud performed a calculation to adjust the actuarial:  He took the instrument he typically uses, the RRASOR, and subjected the underlying data to a statistical analysis, Bayes Theorem.   He substituted the base rate on which the RRASOR was founded with the base rate for offenders over 60 which was reported by researchers as 4.8%[336]  Applying this formula to account for the lower base rate

---

[333]Apr. 30 Tr. at 37.   Currently Dr. Plaud uses the RRASOR, although in the past he has used both the RRASOR and the Static-99. Apr. 30 Tr. at 37-38.  Dr. Plaud testified that he changed his methodology based on the results from a paper by Michael Seto found that using multiple actuarial tools did not produce a better baseline prediction than using the RRASOR alone. He believes the RRASOR is a better tool to use to focus on sexual deviance because the Static-99 incorporates both sexual deviance items and antisocial items.  Id. at 37-39

[334]Apr. 30 Tr. at 33.

[335]Apr. 30 Tr. at 47.  See also Id. at 46-47 ("If you're using the actuarials on a group that's different from that which the underlying numbers come from, you're violating the most sacrosanct principle of testing, and that is validity, does the test measure what it purports to measure, and in this case you're saying it measures recidivism, sexual offense recidivism, but the underlying assumptions are violated.  So, it's not valid to use actuarial tools unless you adjust them themselves for the target population insofar as age is concerned.")

[336]Exh. 9 at 14.

reduced the five-year recidivism estimate associated with Mr. Hunt's RRASOR score of 5 from 49.8% to 24.2%.[337]  Dr. Plaud opined that this was not sufficient for commitment.[338]

213.     Dr. Plaud was asked to comment on the methodology of scoring an actuarial instrument and noting that age was a risk-mitigating factor, but not applying that factor.[339] Dr. Plaud testified that "[i]f you're not noting specifically how age is affecting the output, then it doesn't do much as a modifier.  What I'm doing – what I did was I actually put in the numbers so you can see the output, the actual percentage.  You're not going to get that by noting that age mitigates risk or however you want to word it.  It's very vague, it's an obtuse way of doing it. So no, I don't think that's appropriate at all."[340]

214.     Dr. Plaud disagreed with the argument that Mr. Hunt was an "outlier" due to the number of his victims and his course of conduct and therefore that the age statistics that show a decline in recidivism would not apply to him.[341]  Dr. Plaud testified that he would not characterize Mr. Hunt as an "outlier."  He testified that although Mr. Hunt has had a number of victims "it's lower than the average number of victims for any group I would consider to be high

---

[337]Dr. Plaud's calculation was detailed in Exh. 9 at 13-14.

[338]Apr. 30 Tr. at 35. ("[W]hen you do it as I did and apply a very simple formula of conditional probability called Bayes' Theorem to this issue with Mr. Hunt as a 63 year old, what you get is a risk prediction.  It's not zero, but it's certainly not in an area that I would call high or even moderately high or in keeping with an urgent need to keep him incarcerated for a day to life.").

[339]Apr. 30 Tr. at 47.

[340]Apr. 30 Tr. at 48.

[341]Apr. 30 Tr. at 48-49.

risk." [342]

215.    Dr. Plaud believed that Mr. Hunt's behavior while incarcerated evidenced general behavioral impulse control; that he does have the ability to monitor and control his sexual impulses, which may have been helped by treatment; and that there was a low probability of his prior lifestyle being duplicated if he is released.[343]

216.    Dr. Plaud acknowledged that there may be individuals who are still dangerous after age 60.[344]   In fact, in the past Dr. Plaud has found individuals over the age of 70 to be dangerous.[345]   However, in this case he believed that there was no information, clinical or otherwise, that would override the base-rate data concerning men who are in their 60s:

> If the data were different, my conclusions might be different, but that's the data. The data are that there has to be something that is so acute, something so powerful, so strong, that it would override what I know about men over age 60 who are released from confinement and the rates at which they reoffend. No matter how you want to slice it, dice it, measure it, it doesn't matter. Men who are in Mr. Hunt's age range, the vast, vast majority of them do not reoffend. So, if I'm going to make an affirmative prediction that he will, I have to base that on something, and I don't have anything to base that on. So, I'm forced to conclude that I can't say he will be likely to reoffend.[346]

---

[342]Apr. 30 Tr. at 48-49.  On cross examination Dr. Plaud was asked to name age-related *recidivism* studies which had individuals who had more victims than Mr. Hunt.  Dr. Plaud testified that this type of data is not reported in the recidivism studies specifically.  He testified that he based his opinion that Mr. Hunt is not an outlier in terms of number of victims on 1) his clinical experience and 2) epidemiological research on numbers of victims of pedophiles. Apr. 30 Tr. at 85-86.

[343]Exh. 9 at 9.

[344]Apr. 30 Tr. at 87.

[345]Apr. 30 Tr. at 87.

[346]Apr. 30 Tr. at 27; Apr. 30 Tr. at 47 ("There is nothing clinically or otherwise that I have in front of me right now that would override that base rate data concerning men who are in their 60s.").  Dr. Plaud gave statements made by an offender as an example of clinical

217.    Dr. Plaud testified that it was certainly *possible* that Mr. Hunt remains or poses a high risk of reoffense today.  However, he testified that the question was not whether it was "possible," but "is it *probable, is it likely, is it reasonable* to expect that the person with reoffend . . .."[347]  For the reasons stated above, he answered this question in the negative.

## VII.   CONCLUSIONS

218.    The Court finds that Respondent has committed acts of child molestation in the past.

219.    The Court finds that, although Respondent meets the diagnostic criteria for pedophilia, there is insufficient evidence that Respondent *currently* suffers from sexually arousing fantasies or urges about prepubescent children.

220.    The Court also finds that the Government's evidence is inadequate to prove a current level of volitional impairment which would amount to "serious difficulty in refraining from . . . child molestation."

221.    The government's evidence on this point rested primarily on Mr. Hunt's past offenses, which are now twenty-five years old.   In the past twenty-five years Mr. Hunt has been an almost model inmate.  Mr. Hunt's only disciplinary violation occurred over ten years ago,

---

information that could override the base rate data. Apr. 30 Tr. at 42.  This type of evidence was present in one of the seminal cases on sex offender civil commitment.  See e.g. Hendricks 521 U.S. at 355 ("Hendricks admitted that he had repeatedly abused children whenever he was not confined. He explained that when he 'get[s] stressed out,' he 'can't control the urge' to molest children. Although Hendricks recognized that his behavior harms children, and he hoped he would not sexually molest children again, he stated that the only sure way he could keep from sexually abusing children in the future was 'to die.'  Hendricks readily agreed with the state physician's diagnosis that he suffers from pedophilia and that he is not cured of the condition. Indeed, he told the physician that 'treatment is bull...' .") (internal citations omitted).

[347]Apr. 30 Tr. at 49 (emphasis added).

when Mr. Hunt was disciplined for having in his possession (non-pornographic) pictures of boys. Even assuming this incident could be taken as continued evidence of his interest in prepubescents children, it does not suffice to prove his current volitional impairment.  In addition, since that time Mr. Hunt has completed an intensive sex offender treatment program. Although the program was only six months in duration, his voluminous work in the program which was submitted for the Court's review demonstrated that Mr. Hunt was amenable to, and in fact internalized, the cognitive behavioral and relapse-prevention techniques offered to him.  The Court notes that Mr. Hunt will be released to a three-year term of parole in New York where he will be monitored and required to undergo additional treatment.

222.    The Court has been presented with conflicting opinions about Respondent's risk of reoffense in the event he is released, and has been presented with statistical information derived from studies of released offenders.  The Court has considered the information and finds this information relevant to its determination of Respondent's sexual dangerousness.  For the following reasons the Court finds that the Government has not proven dangerousness by clear and convincing evidence sufficient to justify commitment.

223.    Dr. Katz testified that Respondent currently poses a "moderate" to "moderately-high" risk of reoffense, due to the passage of time, and to Mr. Hunt's positive behavior while an inmate.  Dr. Katz relied purely on his clinical judgment in making this opinion.  Unlike the other opinions offered in this case it was not grounded in any data which would help the Court understand the meaning behind the labels "moderate" or "moderately-high."  Therefore, the Court does not credit this opinion.  Even if the Court were to credit this opinion, the Court finds that a "moderate" or "moderately-high" risk is insufficient to justify commitment.

224.    Dr. Rosell testified that Respondent's risk of reoffense was "high." He testified that Respondent's Static-99 score corresponded to a 34.9% to 50% recidivism rate five years[348] after release and that Respondent would fall within the midpoint or slightly higher. This Court does not credit Dr. Rosell's opinion because it did not sufficiently account for Respondent's age. Dr. Rosell based his opinion almost totally on Mr. Hunt's high actuarial score, despite the fact that the score will not change for the remainder of his life. Dr. Rosell was aware that the base rate in Mr. Hunt's age group was lower than the base rate associated with the current Static-99 norms, upon which his opinion was grounded. Dr. Rosell was also aware that a low base rate in a given population affects the actuarial recidivism rates in that population, and that the recidivism rates of older offenders are lower than the "low risk" Static-99 sample. Dr. Rosell was also aware of various methods to adjust the recidivism percentages associated to account for this lower base rate, and in fact, had used one of these methods in a prior case. Dr. Rosell had even received some preliminary information from the Static-99's developers confirming that recidivism percentages for the new norms were substantially lower for child molesters in the 60+ age group. Despite this, Dr. Rosell declined to adjust the recidivism percentages in any way to account for Respondent's advanced age. Dr. Rosell's only explanation for not doing so was that if he took age into account he would not be assessing Mr. Hunt "as an individual." Since all the actuarial instruments are based on group data, the Court finds this explanation unpersuasive. The Court concludes that Dr. Rosell's risk estimate is a substantial overestimate. In addition, even if this Court were to credit Dr. Rosell's opinion, a risk of recidivism of 34.9% to 50% in five years is not sufficient for commitment.

---

[348]  The Court discusses the five year percentages for convenience, and also because it is arguably inappropriate to discuss ten year recidivism percentages for older offenders.

225.    Dr. Phenix testified to the same percentages for Respondent's Static-99 score, but stated that Respondent's age would lead her to place him within the lower end of that range.  Dr. Phenix also reported the scores for two other instruments: The Static-2002 which yielded a lower recidivism estimate of 25.4% to 37.8% within 5 years; and the MnSOST-R, which yielded a higher estimate of 40% after 6 years.  Other than to say that all three instruments ranked Respondent as "high" risk relative to other sex offenders in his age group, which they will continue to do for the remainder of his life, Dr. Phenix did not provide the Court with any meaningful way to interpret the relationship between the three different estimates she gave. Relying in large part on these instruments, she opined that the risk was sufficient for commitment. The Court concludes that Dr. Phenix's risk estimate is a substantial overestimate. In addition, even if this Court were to credit Dr. Phenix's opinion, a risk of recidivism of 34.9% or 25.4% in five years is not sufficient for commitment.

226.    Drs. Rosell and Phenix both agreed with the principle that lower base rates of general recidivism would draw down the actuarial scores associated with the actuarial instruments.  They agreed that the general base rate of sex offender recidivism for individuals over 60 years old is low.   They also agreed that it was likely that lower recidivism estimates for offenders over age 60 will be released in the fall of 2009.   Dr. Phenix herself acknowledged that age-adjusted norms for the Static 99 will almost certainly yield lower estimates.  However, until that time they declined to adjust their risk assessments to account for Mr. Hunt's age, despite having the empirical tools to do so.  Simply noting the probable impact of age without attempting to quantify it in this context is inadequate.

227.    Dr. Plaud, in contrast, stated he relied primarily on the overall base rates of

offending among older offenders to state that it would be difficult to predict with any level of

certainty that an offender in the age group would be recidivist.  He justified this claim by

reference to the empirical literature.  Dr. Plaud attempted to estimate what the recidivism risk for

a high scoring individual would be estimated to be when adjusted for age using Bayes' Theorem,

and arrived at an adjusted figure of 24%.  While noting Mr. Hunt's treatment participation, he

stated it did not affect his opinion as to risk of reoffense, because Mr. Hunt's risk level was

already low, that it could not have a discernable impact on the risk Mr. Hunt posed.

228.    The Court was also presented with the testimony of Dr. Howard Barbaree, and the

results of various studies on sex offender recidivism.  Dr. Barbaree's research noted a decline in

recidivism risk as offender populations aged.  He described the decline as linear.  Two studies in

particular were discussed which combined findings of high actuarial risk and age.  Dr. Hanson's

2006 study "Does Static-99 Predict Recidivism in Older Offenders?" reported a recidivism rate

for high-risk offenders over 60 years old of 9.1% with a 95% confidence interval of +/- 17%.  (1

of 11 high risk sex offenders re-offended).  Dr. Brian Abbot, who published a peer-reviewed

article criticizing the use of the new Static 99 norms in SDP proceedings, suggested evaluators

use this table to communicate information to Courts about the risk posed by older high-risk sex

offenders, while the new norms remain under development.  Dr. Barbaree endorsed this

recommendation as an empirically defensible method to estimate risk for older offenders scoring

high risk on actuarials.

229.    A study by Robert Prentky and Austin Lee of high risk sex offenders released

from the Massachusetts Treatment Center for the Sexually Dangerous  suggested a recidivism

rate for child molesters of 20% for all offenders over 50, of 23% in the 50 to 60 age bracket (3 of

13) and approximately 16% (2 of 12) in the over 60 age bracket.  Dr. Barbaree endorsed the view, proposed by the government, that this figure could plausibly be used to begin a risk estimate of high risk offenders over 60 years of age, while Dr. Plaud agreed that  it fell within the confidence interval set out by Dr. Hanson.  None of the government's experts, however, adopted this estimate.

230.    It was further revealed that preliminary, draft data generated by the S99 developers and provided to the evaluators in this case by Leslie Helmus showed that high risk child molesters (S99 scores above 6) recidivated at 32.2% (10 of 31) in the 50 to 60-age bracket, and 10.3% (3 of 29) in the over 60 bracket. Finally, a method was discussed during trial which involved the combination of an empirically derived risk estimate, and a numerical estimate of the decline in recidivism risk posed in general per year (a "hazard ratio"), to arrive at reasonable estimate of risk which combined actuarial risk information with the probable impact of age.

231.    Accordingly, the Court finds that Mr. Hunt's risk of re-offense is low in absolute terms due to his age. The Court is persuaded that Dr. Plaud's method of synthesizing the available data and applying it to the case has given the Court the most accurate sense of what Mr. Hunt's true risk of re-offense is.   The Court finds that the evidence suggests that Mr. Hunt's risk of re-offense is, consistent with Dr. Plaud's testimony, between 5% and 24%, and that this is consistent with the available data on formerly high risk offenders who have aged into their 60s. This level of risk, without more, is insufficient to warrant his commitment under the Adam Walsh Act.

Respectfully submitted,

WAYNE HUNT

By his attorney:


/s/ Ian Gold

Ian Gold

Assistant Federal Defender

Federal Defender Office

408 Atlantic Ave.

Boston, MA 02110


Dated: June 29, 2009


CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 29, 2009.


/s/ Ian Gold

Ian Gold