```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2
       * * * * * * * * * * * * * * *
 3     UNITED STATES OF AMERICA      *
                                     *
 4                    Petitioner,    *
                   vs.               *        CIVIL ACTION
 5                                   *        No. 07-12063-JLT
       WAYNE HUNT                     *
 6                    Respondent.    *
                                     *
 7     * * * * * * * * * * * * * * *
```

```
 8              BEFORE THE HONORABLE JOSEPH L. TAURO
                   UNITED STATES DISTRICT JUDGE
 9                       STATUS CONFERENCE
```

```
10     A P P E A R A N C E S

11            OFFICE OF THE UNITED STATES ATTORNEY
              1 Courthouse Way, Suite 9200
12            Boston, Massachusetts 02210
              for the United States
13            By:  Mark J. Grady, AUSA
                   Eve A. Piemonte-Stacey, AUSA
14

15            FEDERAL DEFENDER OFFICE
              408 Atlantic Avenue
16            Boston, Massachusetts 02110
              for the Respondent
17            By:  Ian Gold, Esq.

18
                                    Courtroom No. 22
19                                  John J. Moakley Courthouse
                                    1 Courthouse Way
20                                  Boston, Massachusetts 02210
                                    October 25, 2011
21                                  12:00 p.m.

22

23                    CAROL LYNN SCOTT, CSR, RMR
                         Official Court Reporter
24                    One Courthouse Way, Suite 7204
                       Boston, Massachusetts 02210
25                          (617) 330-1377
```

1                       **P R O C E E D I N G S**

2                  **THE CLERK:**  Civil action No. 07-12063, United

3   States of America versus Wayne Hunt.

4          Counsel please identify themselves for the record.

5                  **MR. GRADY:**  Good afternoon, Your Honor.  Mark

6   Grady on behalf of the United States.  With me is Assistant

7   U.S. Attorney Eve Stacey.

8                  **THE COURT:**  Good morning -- good afternoon I

9   should say.

10                 **MR. GOLD:**  Good afternoon, Your Honor.  Ian

11  Gold on behalf of, I guess the petitioner now, Wayne Hunt.

12                 **THE COURT:**  All right.  Now, walk me through

13  this.  What are we going to do here?

14                 **MR. GOLD:**  Your Honor, if I could start, I

15  wanted to say I requested a status conference but mostly

16  this is to report that Your Honor committed Mr. Hunt to the

17  care of the Attorney General back in 2009 to participate in

18  this treatment program and he's done extremely well in the

19  program.

20          I was just looking over the discharge report that

21  Dr. Andres Hernandez who runs the program down there wrote

22  about him.  They talk about how he helped in establishing

23  this therapeutic community working with the men down there.

24  He's passed all phases.  He had setbacks and then kind of

25  overcame barriers and so forth.

1            And as of July they say that he is finished with

2    the program, the commitment treatment program that they have

3    and they proposed this set of conditions for his release

4    so --

5            **THE COURT:**  And I have a proposed order?

6            **MR. GOLD:**  Well, no, there is no proposed

7    order yet because the conditions aren't concrete.  They're

8    all abstract because there is no actual release plan in

9    place.

10           One of the things I guess from our perspective is

11   the Adam Walsh Act that Congress passed in 2006 is a little

12   unfinished.  There is no part of this commitment and

13   treatment program that actually deals with the integration

14   of people back into the community once they've finished the

15   treatment program and they're kind of putting it on the

16   court to have a release hearing or to actually craft these

17   conditions of release.

18           I will say that there is one other case, I think

19   four men now have been committed, maybe five altogether.

20   Judge Saris committed a man named Jeffrey Shields and he is,

21   both of these two men I think were in classes and the

22   program together and benefited from a very high

23   faculty-to-student ratio I guess you could say and both of

24   them did very well.

25           And Mr. Shields is out, he was released under some

1    conditions here in Boston, went to Maine and I believe is

2    trying to come back to Boston now.

3            I understand from Mr. Grady --

4               THE COURT:  Did I have another one of these

5    cases?

6               MR. GOLD:  You had three I think altogether,

7    Your Honor.  Two of them you found the respondent was not

8    sexually dangerous so this is the only case for this Court

9    where this release issue is coming up.

10              THE COURT:  All right.

11              MR. GOLD:  And so the other person was in

12   front of Judge Saris and is released.  That's our only

13   precedent for release.  And it was a kind of catch as catch

14   can or -- I don't want to say it that way -- but an ad hoc

15   kind of back and forth between what the commitment program

16   was proposing and what the government's response was.

17          Now, in my communications with my client, I went

18   down there in September, I spoke with Dr. Hernandez.  I

19   looked at the program that they have.  They've got this

20   special area just for men who are not committed or committed

21   because they're not criminal or inmates any more, they are

22   civil committees so they try within their constraints to

23   keep them separate.

24          What I get from him is he would like to be released

25   and would like to be released to -- by Your Honor after a

1     hearing or by order to this area.  And the reason is --

2               **THE COURT:**  Released still under custody?

3               **MR. GOLD:**  Well, the only way he can get out

4     is by an order by this Court either discharging him

5     completely or discharging him conditionally.  And that's

6     what the program proposes and I don't think there is any

7     proposal right now that we're coming forward that he be

8     proposed without some sort of supervision.

9          And the question is --

10              **THE COURT:**  So it seems to me what you are

11    saying to me -- I don't mean to jump ahead of you --

12             **MR. GOLD:**  Please.

13             **THE COURT:**  And perhaps I am incorrectly

14    anticipating what you are going to say:

15          The parties are in agreement as to what ought to

16    happen here and there is no reason why you couldn't put

17    together a proposed order for me that stood the test of

18    expert examination here instead of having a battle over

19    minutiae.

20             **MR. GOLD:**  I think that's right except that

21    there is one area where we might not be able to resolve and

22    I want to be very clear.  I'm, you know, I communicated with

23    my client in North Carolina and maybe we can work something

24    out.

25          But Mr. Hunt, as the Court will recall, is 63 or 64

1   now.  He has some serious physical infirmities.  He has no

2   connection to where he used to live beyond the fact that his

3   crimes occurred there, which is upstate New York, and he

4   desires to be released here.  I think we agree on all

5   particular --

6           THE COURT:  His parole obligation though is in

7   New York; isn't it?

8           MR. GOLD:  Well, there is no more federal hold

9   on him.  There is a federal -- there is a New York state

10  parole which is due to expire in 2012, I think March, but

11  please don't quote me on that.

12          But what I understand from New York State Parole

13  authorities is that New York doesn't have any interest in

14  him being there so long as if he is released he is

15  supervised.  So there is no from our perspective reason for

16  him to go to New York.

17          THE COURT:  As long as he provides some

18  demonstration that he is going to be supervised here?

19          MR. GOLD:  Correct.

20          THE COURT:  We do that often in other contexts

21  and have jurisdiction over someone switched from one

22  district to another.  It is not -- there is some precedent

23  for that certainly.

24          MR. GOLD:  We certainly think there is.  And

25  we would also point out that my office is familiar and

 1    becoming more familiar with the support services that are

 2    available here in terms of treatment and housing for people

 3    with the type of offenses that Mr. Hunt has, sex offenses.

 4    And for that reason we had proposed that he be released to

 5    the Boston area.

 6            I understand there that the government has, I'm not

 7    sure exactly where the resistance is coming from but there

 8    is resistance to the notion of him being released in the

 9    Boston area.  And so I think that's where all conflict might

10    be.  I think we agree on almost all of the other

11    particulars.

12            MR. GRADY:  Thank you, Your Honor.

13            THE COURT:  Why don't you start with the tough

14    part first.  If you agree on everything else, why don't you

15    concentrate on what he says you don't agree on.

16            MR. GRADY:  I'm not certain that "agreement"

17    is an appropriate characterization.  I think that an

18    agreement could be reached but I think that might overstate

19    the current situation, Your Honor.  And it might be best if

20    I -- I'll happily address the issue --

21            THE COURT:  Take your time.  Do the whole

22    thing.

23            MR. GRADY:  As the Court is aware, in July

24    BOP's treatment providers came to the Court and said that

25    Mr. Hunt could be released on what they described as

1      aspirational terms of release in that they believe that

2      Mr. Hunt could, if those aspirational terms could be met,

3      could be safely released to the community on that prescribed

4      regimen of care.

5                Since that time I, BOP and Probation from the

6      Northern District of New York -- and I'll explain why as I

7      go along, Your Honor -- had been attempting to find a way to

8      operationalize these sort of proposed conditions that the

9      treatment providers have come up with as the prescribed

10     regimen of care under which he could be safely released.

11               The fundamental sticking point or the primary

12     sticking point at this point is where Mr. Hunt will reside

13     not only geographically but in what type of facility.  And

14     it is currently the hope of BOP and Probation and myself

15     that Mr. Hunt, having served I believe in the Navy, will be

16     capable of availing himself of Veterans Administration

17     Services.  That may allow us to find somehow a nursing home

18     placement which would allow him a structured environment

19     which is one of the requirements that the doctors thought

20     would need to be in place in order for him to be released.

21               And, in fact, the prescribed regimen of care is

22     fairly stringent.  It involves a great deal of supervision

23     and oversight by the Probation Department.  And those

24     portions the Probation Department in the Northern District

25     of New York believes it can implement and so the current

1    sticking --

2              **THE COURT:**  Will be able to, they can?

3              **MR. GRADY:**  They can.  And so that there is

4    certainly agreement with respect to that.

5              And currently what we're simply trying to do is

6    operationalize where he will be living in a facility that

7    will meet the standards that the treatment providers have

8    set forth in terms of it being structured and allow the

9    implementation of the other conditions.

10             It does not appear that a residential reentry

11   center or halfway house would be available to Mr. Hunt.  I

12   don't believe there is any way for that to be paid for but

13   we're hopeful that between a combination of Social Security

14   Disability and Veterans Administration Services that a

15   placement in a nursing home can be made.

16             From the perspective of the government, in terms of

17   geographically where he will be placed, it is the

18   government's view, I understand that both Probation in the

19   Northern District of New York and Probation here, we have

20   representatives from the Probation Department in the

21   District of Massachusetts in the courtroom, both the Chief

22   Probation Officer and the Deputy Probation Officer Hurtig

23   are here to discuss this.

24             Generally speaking, Your Honor, it's Probation's

25   view that Mr. Hunt is most appropriately placed back in New

1   York where he was convicted, that he has no ties to

2   Massachusetts.  There is no reason for him to be transferred

3   here.

4          And generally speaking, in the absence of some

5   reason for a transfer, there is no reason for him to go to

6   anywhere other than the district from which he was

7   originally brought into the custody of the BOP.

8          I am happy to have the Court talk to Probation

9   further if they want but generally speaking, Your Honor, it

10   is the position of the government that Mr. Hunt should be

11   released in Albany and that services and conditions of

12   release should be applicable there, not in the District of

13   Massachusetts.

14          **THE COURT:**  Now, is there a facility in Albany

15   that would take care of the concerns that everybody has for

16   him?

17          **MR. GRADY:**  We're attempting to locate

18   something through the Veterans Administration and through

19   BOP that would be able to be a structured living environment

20   in which Mr. Hunt could be released.

21          **THE COURT:**  Now, his view is contrary, right,

22   the plaintiff himself?

23          **MR. GOLD:**  Well, Your Honor --

24          **THE COURT:**  Why does he want to come back here

25   if, as counsel suggests, his ties are all in New York?

1     **MR. GOLD:**  Well, because I don't think that's

2     correct.  As I stated earlier, the only connection Mr. Hunt

3     has to New York is that his crimes occurred there.  He used

4     to live there but he doesn't have any other connection

5     there.

6          This is --

7          **THE COURT:**  So what connection does he have

8     here?

9          **MR. GOLD:**  Well, he was committed here.  We're

10    here, we are his counsel.  We are familiar with the services

11    that are here.  You know, those are the types of connections

12    that we have.

13         Now, I will say Albany, this is the first I'm

14    hearing about Albany today, and maybe -- and that's why I

15    wanted to say I'll talk to my client and I don't think we

16    want to -- we do want to do this with a minimum of delay and

17    conflict if we can.

18         On the other hand, the first proposal that they

19    were saying was upstate New York for Mr. Hunt but Mr. Hunt

20    is infirm.  The notion of him driving long distances to get

21    to his, whatever is required for him, these classes over

22    here, a lot of these men are released to these demanding

23    regimes.  Boston is an urban setting.

24         **THE COURT:**  Where would the classes be?

25         **MR. GOLD:**  Well, they have to do sex offender

1    therapy, for example, and that's a place where you have to

2    get to.

3           The benefit of an urban environment is that these

4    places, we -- Boston is, a lot of it is simply that he was

5    committed here.  We're his attorneys, we know the services

6    and so we have a sense of what's available in the community.

7           But the basic thing for him is an urban environment

8    is one in which he is more likely to succeed and able to

9    negotiate things --

10           **THE COURT:**  Well, Albany is certainly urban

11   enough; isn't it?

12           **MR. GOLD:**  It possibly is, although one thing

13   I wanted to say which is emerging here is I think that there

14   is some sort of hot potato going on with respect to who pays

15   for Mr. Hunt.

16           He was committed under the Adam Walsh Act.  I'm

17   learning from the government now that a Residential Reentry

18   Center, these centers that are BOP and Probation areas of or

19   places of re-transition is not available to Mr. Hunt because

20   he cannot pay for it.

21           It seems to me in the 4246 situation it is common

22   that we have people supervised by Probation, the money for

23   that comes from somewhere; but what I'm getting from the

24   government here is that Mr. Hunt has been recommended for a

25   release regime which is a continuation of his treatment

 1    protocol that they developed for him but he is going to have

 2    to pay for it himself.  And to the extent that that's part

 3    of the background here, I'd like to flush that out.

 4         I don't --

 5              **THE COURT:**  Well, is that your position?

 6              **MR. GRADY:**  I think he's confusing a number of

 7    issues, Your Honor.

 8         The Probation Department will supervise Mr. Hunt

 9    and it will supervise him under the very stringent

10    conditions that the treatment providers have recommended.

11         What counsel appears to be suggesting is that we

12    should pay for his house.  That's a very different question.

13         Essentially when we release someone on supervised

14    release, Probation doesn't fund their apartment or where

15    they live.  They have to find a place to live on their own.

16    That is not something that the U.S. Government pays for as a

17    result of your being convicted of a crime.  You don't then

18    get the right to have the government give you a house for

19    the rest of your life.

20         The problem with respect to Mr. Hunt's placement is

21    it's not enough for Mr. Hunt to walk out the door and be put

22    in a homeless shelter because the treatment providers would

23    tell you that's not going to ensure his safe release to the

24    community.

25         And what becomes an issue then is not whether the

1      government is refusing to supervise Mr. Hunt, what becomes

2      an issue is is Mr. Hunt requires something more than going

3      to the homeless shelter so that he can be safely released so

4      that he doesn't present a danger to children in the

5      community, then who is going to pay for it.  And that's a

6      very different question than the manner in which it was

7      portrayed by defense counsel, Your Honor.

8                **MR. GOLD:**  Your Honor, I have to say I didn't

9      quite understand that.  I mean, I understand based on my

10     personal experience that some people are committed and

11     they're released.  And sometimes they're released to a

12     Residential Reentry Center.  So, I mean, I'm not suggesting

13     anything unusual I don't think when, you know, the notion is

14     that if that's appropriate for him, he should do it.

15          So, again, I'm not really sure what the nature of

16     the conflict is here.  I'd like to speak with Mr. Hunt, see

17     if Albany is all right.  I mean, Mr. Hunt is not a criminal

18     defendant anymore.  He is someone who is civilly committed.

19          My position is the federal government broke it,

20     they bought it.  They should now provide for his aftercare.

21     I think we can put in front of the Court the reasons why we

22     choose Boston.  They may not be overwhelming but he is

23     someone who doesn't have roots anywhere and this seems as

24     good a place and maybe better than others.

25          The government has just informed me that in order

1    to implement this supervision regime they're going not to be

2    paying for it out of any requisition from the Adam Walsh Act

3    but from Mr. Hunt's military benefits.  And one thing I know

4    based on recent experience is that Massachusetts has the

5    most generous Veterans Benefit Program in the nation.  So

6    that would be another reason where it might make sense to

7    put him in Massachusetts if that's the nature of what's

8    going on.

9         But my sense of what would happen with an Adam

10   Walsh commitment when we got into this was that they would

11   treat him and then they would fund or have some kind of

12   aftercare which is part of the treatment program because he

13   then --

14        **THE COURT:**  Don't you two, as familiar as you

15   are with -- when I say "you two," I am focusing on the

16   bodies rather than the entity (ph.).

17        With all your experience generally speaking but

18   particularly with respect to this plaintiff, couldn't you

19   come up with -- that is wrong -- why can't you come up with

20   a plan that you think is appropriate and try to agree to it?

21   And if for some reason or other you can't agree, show me

22   where the disagreement is and I will resolve the

23   disagreement if I possibly can.

24        If I can't, then tell me where we go from there.

25   In other words, are we going to just keep him there with no

1    treatment or do I let him out with no supervision?  There is

2    some stark possibilities down the line if you don't agree.

3    And it seems to me that this is the kind of case that just

4    cries out for some innovative thinking by counsel because I

5    certainly don't know what you know.  I am not as experienced

6    as you people are.  I can pass judgment on something if I

7    think it makes sense or if it doesn't.

8            MR. GOLD:  Judge, I think that's a great idea.

9    I'd like to go back to the drawing board with the government

10   and see if we can work something out.

11           I do, I want to say --

12           THE COURT:  Including the details about who

13   pays.  I mean, that is a reality, you know, and just about

14   everything that we do here in this building, there is always

15   the cost component, not because we put cost above treatment

16   but that is the reality of it.  We have to justify what we

17   spend.

18           MR. GOLD:  I wanted to point out to the Court,

19   I think that's great.  I mean, there's a lot about this and

20   the conflicts that we're having that I just want to frankly

21   say I don't quite understand.  Like I don't understand what

22   the resistance to Boston is, why there is this push to do it

23   in New York when he doesn't want to be there.  I don't

24   understand that.  And I'd like to understand more so I'll

25   get together with Mr. Grady and see if --

1          **THE COURT:**  I will give you an offhand remark

2     that is not intended to push the situation one way or the

3     other but intuitively, which is always dangerous, it seems

4     to me that if he wants to be someplace as opposed to

5     someplace else, and that place that he wants to be is a

6     sophisticated venue which has available the necessary tools

7     to treat him properly and get him to the point perhaps where

8     he is released totally, then that is better than sending him

9     someplace where he doesn't want to be.

10          And I just think that my intuitive reaction, and,

11    again, dangerous, is that you learn quicker and better if

12    you are in an environment where you are happy and that is

13    where you want to be as opposed to being dragged there and

14    you have to knock down all the resistance.

15          Does that make any sense at all?

16          **MR. GRADY:**  Of course there is some value to

17    that, Your Honor.

18          I think that, however, institutionally there are

19    some problems from the government's perspective with

20    allowing the sexually committed individuals to choose where

21    they go or to rely upon the place of commitment as a

22    justification for release.

23          I will tell the Court that there are only two

24    districts in which these sexual offender commitments have

25    gone forward:  This district and the Northern -- excuse

 1    me -- and North Carolina.

 2              **THE COURT:**  That was Judge Saris's case?

 3              **MR. GRADY:**  There were three or four

 4    individuals committed out of this district.  There are about

 5    ten cases total.

 6              In North Carolina there are about a hundred cases

 7    waiting to go, Your Honor.  And one of the government's

 8    concerns with respect to allowing the committing court to be

 9    sort of the locus for where an individual would be released

10    is that what is going to happen is Massachusetts and North

11    Carolina are going to end up with a disproportionate number

12    of the most overwhelmingly dangerous sex offenders that are

13    currently held by the Bureau of Prisons.

14              Recall that the individuals that are civilly

15    committed here are not merely sex offenders.  These are the

16    most dangerous of the sex offenders that are incapable of

17    being released on any conditions.

18              And if the Court entertains the notion that

19    these -- first of all, I think there is some danger in

20    allowing those individuals to pick where they go.

21              Second, there is also an issue with respect to if

22    those individuals are then placed where they're committed

23    out of, there are going to be an overwhelming

24    disproportionately large amount of sex offenders, very

25    dangerous sex offenders released in Massachusetts and North

1    Carolina.

2              Again, and with that concern, the government has

3    adopted the Probation's presumption, which is the

4    presumption that applies in criminal cases that individuals

5    are released to the districts from which there are confined.

6    And that's what the government proposes here.  And that

7    would ameliorate much of the concern with respect to

8    Massachusetts and North Carolina getting a very large number

9    of very dangerous sex offenders.

10              THE COURT:  And that district is where in this

11   case?

12              MR. GRADY:  Massachusetts would be one

13   district and North Carolina is the other.  There are about

14   ninety more cases --

15              THE COURT:  No, you --

16              MR. GRADY:  Northern District of New York,

17   Albany, Your Honor.

18              THE COURT:  That is where he was sentenced

19   from?

20              MR. GRADY:  That's where his supervised

21   release was revoked and that's where he was committed to the

22   custody of BOP from.

23              THE COURT:  Okay.

24              MR. GOLD:  Actually, just a point of

25   clarification, Your Honor, with all due respect.  I think

1   there is a little bit of bureaucratic or rhetorical language

2   in there, the typical argument that being afraid of opening

3   the floodgates, and I think that's the reason why the

4   resistance so I have a little bit of a better understanding

5   of why they're resisting placing him here, it's because of

6   these other concerns and not so much about Mr. Hunt it would

7   appear.

8          But I will say the most dangerous, I mean, right

9   now, dealing with Mr. Hunt, if you read this discharge

10  report, as his counsel as I was getting this material, I

11  felt like a proud parent.  He is doing very well.  He gets

12  good reports and they say he's supervisable.  He's

13  treatable.  He did very well in their program.

14         And now, I think as he's entitled to do, he's

15  looking for release and he's looking for a little bit of

16  give, you know.  The reasons that he wants to be here are to

17  be away from old haunts, to be in a new place where he knows

18  that his services are a known quantity because we know about

19  them and because Mr. Shields, this other person -- there are

20  only four individuals who were committed in Massachusetts,

21  four.  There will be no more.  Mr. Grady knows that.

22         Everyone else is now, they have centralized these

23  things down in North Carolina.  And I suppose Probation has

24  this notion that if they allow Mr. Hunt to be released in

25  Boston, somehow this is going to cause this problem in North

 1    Carolina.  I'm not sure how good that argument is, how based

 2    in empirical fact it is.  But this is the sort of thing that

 3    makes me a little worried that we won't be able to agree

 4    because we keep running into these conflicts about this

 5    central point.

 6           The other thing I wanted to mention is I found out

 7    from my client that Mr. Grady along with the Bureau of

 8    Prisons, maybe other people in the Attorney General's Office

 9    and Probation, have been having meetings all along with

10    Mr. Hunt's therapist about placement but that the client has

11    not been invited to give his input or to participate in

12    those meetings.

13           I tried to invite myself and Mr. Grady had some

14    good reasons why I wouldn't -- that the communications were

15    privileged or something like that.  But that is the

16    character of what's going on in terms of his release, that

17    there is this planning going on without contribution from me

18    or contribution from my client through me.

19           So what I'd like to do is propose that we go to

20    the, back to the drawing board and see if we can cobble

21    together an agreement in 30 days or something like that, but

22    I would like to be part of the process or at least be able

23    to give Mr. Hunt -- articulate Mr. Hunt's point of view by

24    participating in the planning process in a way that we

25    haven't been allowed to so far.

1          **MR. GRADY:**  I think, Your Honor, again, that

2     skews to some degree what is actually happening.

3          First and foremost, with respect to communication

4     between myself, Probation and the Bureau of Prisons, those

5     are attorney/client communications.

6          In addition, in the context of this particular

7     situation where the United States Government is working

8     through what would be the second release of an individual

9     under the Adam Walsh Act, there are a lot of potential ways

10    in which the government could handle it.  The government is

11    working through how to best do it.  And the free exchange of

12    ideas would be chilled if ideas were thrown out in the

13    context of that process and made available to the defense

14    because they were a part of it.  Essentially, Your Honor,

15    these are deliberative process, privileged material as well

16    in addition to being attorney/client.

17         And the way in which the government is going to

18    ultimately deal with these releases is a work in progress.

19    There have been no final decisions about how this is going

20    to be implemented and in many cases --

21         **THE COURT:**  I can understand that.  Everybody

22    is entitled to have the benefit of their own counsel, just

23    as you would be with your client.  I mean, you wouldn't

24    expect Mr. Grady to attend your client conferences.

25         **MR. GOLD:**  I suppose that's --

1          **THE COURT:**  But at some point all this

2     snowball packing comes to an end and you have to throw the

3     snowball.  You pack and pack and pack and pack, you plan,

4     you meet, but at some point it is time to -- fish or cut

5     bait is a more polite way than another way I could have said

6     it.

7          (Laughter.)

8          **MR. GRADY:**  That is true, Your Honor.

9          **THE COURT:**  So why don't we look for you

10    people -- if you think this is practical -- without me

11    putting you on a short leash, you know, not appointing some

12    tiger of a master to stand over you and take a bite every

13    time you seem to be going a little slower than he or she

14    might want, why don't I adopt the suggestion that you return

15    to me with a plug number, you tell me what the number ought

16    to be because you have to do the work, and what you are

17    going to try to put together is a plan that will work.

18          Don't come back and tell me all the problems

19    because if you are going to do that, then there is no sense

20    in you coming back.  We will just keep him where he is.  If

21    that is what you want, that is what you will probably end up

22    getting.

23          **MR. GRADY:**  Okay, Your Honor.  I'm happy to do

24    that.  That's what we've been trying to do, is

25    operationalize these conditions.  And I'm happy to have

```
 1    input from counsel on the way in which he would like to see

 2    that happen.

 3              THE COURT:  Yes.  And you have to understand

 4    that maybe your client can't get everything -- he makes a

 5    very good argument.  It doesn't seem that the government has

 6    an obligation to give him something that I don't even get

 7    from the government and that is free housing.

 8              MR. GOLD:  Well, Your Honor, Mr. Grady put it

 9    that way.

10              THE COURT:  Well, I thought it was -- and I

11    think I said it that way, if I didn't -- I thought his

12    argument was well cushioned.  I paid attention to it anyway.

13              MR. GOLD:  I mean, I'd say if you break it,

14    you buy it.  I mean, here his therapists are saying that

15    we've got treatment for him.  He's now non-dangerous.  He

16    should be in the community under certain conditions.  And

17    it's typical that they're in some sort of supporting

18    environment like a Residential Reentry Center.  And all, you

19    know, I mean, we don't think about it in terms of --

20              THE COURT:  But you are taking on a big load

21    when you do that.  I don't think breaking and not buying it,

22    whatever it was, I don't think that is particularly apt.  I

23    am not saying that it isn't but it doesn't ring out to me.

24    It is not like "999."

25         (Laughter.)
```

1          **THE COURT:**  I say that with good humor.

2          **MR. GOLD:**  My background here is, you know,

3     looking at the treatment program over in Massachusetts for

4     the same type of thing, you know, there is these sexually

5     dangerous persons commitments in Massachusetts and there

6     they had these men committed and they would never let them

7     go.  And in the '90s the Federal Court came in and came up

8     with a consent decree that in order to be a real treatment

9     program reintegration has to be part of the treatment

10    program.

11          And they, under this consent decree they created

12    this Community Access Board which really, or, you know,

13    something like that which hadn't existed before.  So in that

14    sense it does seem like they have gotten Mr. Hunt to the

15    point where he is now non-dangerous, enough to be released

16    under conditions.  It's not a good alternative to say, well,

17    if we can't work something out, he just sits there.  He has

18    actually I think got some kind of --

19          **THE COURT:**  But that is -- I agree with you,

20    that is certainly not where we want to be.  We want to

21    complete the circle.  But if you don't sharpen your

22    negotiated skills with each other and put aside some

23    preconceived notions that both of you probably have and try

24    to work toward the end of benefiting the client by getting

25    him the best sort of venue as possible, then you have the

1    burden of telling me what else can I do?  What would you

2    have you me do that I haven't already tried?

3                    **MR. GOLD:**  Well --

4                    **THE COURT:**  You know me, I am willing to try

5    anything.

6                    **MR. GOLD:**  Right.

7                    **THE COURT:**  But if you people aren't going to

8    agree to it, then it is not going to happen.  I can't force

9    you to do certain things, not in this area.

10                   **MR. GOLD:**  Well, we might have to have a

11   hearing about it and have Your Honor make a choice, you

12   know, if we're going --

13                   **THE COURT:**  I said I would do that.  I said

14   that quite a while ago, that you people get together and

15   try -- I see no reason why you can't agree on everything and

16   give me a complete document that is absolutely perfect, even

17   with respect to the spacing of the commas.  I don't see that

18   that is so hard here.

19        You know what you are doing in this area.  You know

20   where the give and the take has to be.  And instead of

21   smacking your head against the wall that you know isn't

22   going to come down, go a different route and try to come up

23   with a plan that will work and that we can all sign off on

24   and be very proud of and have it be a precedent someplace

25   else.  That is what I urge you.

 1              If you don't do that, then you come back here if

 2      there is an issue that lends itself to resolution, then I

 3      will resolve it one way or the other.  And then you can sit

 4      and wait and see what the Court of Appeals does with it,

 5      which is what the procedure is if you don't agree with what

 6      my resolution is.

 7              So, now come back to the, when -- how long is it

 8      going to take you to come up with a plan that we can all be

 9      proud of?

10              **MR. GRADY:**  I think 30 days was not an

11      unreasonable suggestion, Your Honor.

12              **MR. GOLD:**  Okay.

13              **THE COURT:**  All right.  So why don't you give

14      them a date sometime 30 days after to come back and see me.

15              **THE CLERK:**  Thirty days out?

16              **THE COURT:**  It doesn't have to be 30 days.  It

17      could be 40 days, just that general area.

18              **THE CLERK:**  December 12th, 11:30.

19              **MR. GRADY:**  That's good for the government,

20      Your Honor.

21              **MR. GOLD:**  Okay.

22              **THE COURT:**  Is that okay?

23              **MR. GOLD:**  Yes.

24              **THE COURT:**  We will assume that is going to be

25      a report of progress, okay.

```
 1              MR. GRADY:  We will file something in advance,
 2    Your Honor.
 3              THE COURT:  Yes.  As the saying goes:  Make it
 4    happen.
 5              MR. GOLD:  Well, what we'll do, Your Honor, is
 6    we will either have an agreement or we will have narrowed
 7    the issue for the Court so should we file something a week
 8    ahead?  Should we plan on that?
 9              THE COURT:  Well, you said you needed 30 days.
10    I want to make sure that you get that.  Today is what,
11    the --
12              MR. GOLD:  No, December 12th is just more than
13    30 days, that's --
14              THE COURT:  Well, it is more than 30 days,
15    that is the meeting.
16              (Whereupon, the Court and the Clerk conferred.)
17              THE COURT:  What about the medical report that
18    you are relying on?
19              MR. GRADY:  Those are on file with the Court.
20    There should be reports under seal concerning the treatment
21    providers' annual reports --
22              THE COURT:  Yes, I think they are under seal.
23    I think --
24              THE CLERK:  Oh, it is the annual one?
25              MR. GRADY:  Yes, it should be the annual
```

1    report.

2              **THE CLERK:**  We do have that.

3              **MR. GOLD:**  Yes, it is all in that document.

4              **THE COURT:**  The thing I have resisting is I

5    don't want to hear from you about we are this close and we

6    failed, because then you haven't done anything in the next

7    30 days.  That is where you are now.  So what I want is, I

8    don't want anything other than a complete plan that you are

9    willing to sign, both sides.  That is what I am looking for.

10             And if you don't do that, that is why I don't want

11   to see it ahead of time, I don't want to see a draft that it

12   would work if only thus and so, I want the draft that you

13   are going to sign.  If you are not going if sign it, if you

14   are going to represent to me that you cannot agree, in other

15   words, you cannot agree, then I will ask you what is it that

16   is available to me to do, if anything.  I am not going to

17   chase you all around the block.  If you can't agree, you

18   can't agree.

19             **MR. GOLD:**  But, Your Honor, I just, I wanted

20   to say this because we were -- but it seems like, I think

21   either my client agrees to Albany or we don't agree.  Then

22   I'd like, if Boston is a better choice and we've got good

23   reasons, I'd like to bring those to the Court because what

24   is happening is --

25             **THE COURT:**  Well, you know that is where you

1    are right now.  Why don't you just try to get together and

2    see if you can agree on Boston or Albany?  You think that is

3    the problem, Boston or Albany?  You are only talking about a

4    four-hour drive.

5             MR. GRADY:  I think, Your Honor, that we are

6    still attempting to implement the possibility of finding

7    somewhere that would amount to a structured living

8    environment for Mr. Hunt.

9             THE COURT:  Where?

10             MR. GRADY:  In Albany.  I don't think there

11    has been any suggestion from Mr. Gold that he's found

12    somewhere that Mr. Hunt can go in Boston, which is truly

13    where I think that the rubber hits the road, is the

14    government is working towards finding a place in Albany --

15             THE COURT:  Well, maybe that is what you ought

16    to concentrate on this next 30 days, coming up with a place,

17    either, A, in Albany, or, B, in Boston and have some

18    specificity to it.  496 Jewlet Street, Chelsea, whatever the

19    address is, this is where it is and this is the deal you can

20    get there.

21             MR. GOLD:  Right, no, but we have all these

22    moving pieces like a social worker finally on the task with

23    BOP trying to get some of this stuff in order and where we

24    can do it, we devote resources to it too but why are they

25    devoting the resources to Albany when he wants to be in

1   Boston?  That's our question.  I mean, they are I guess

2   trying to put together a fait accompli that we're going to

3   have to live with when, you know, I can do, I can on a

4   parallel track going back to litigation propose an

5   alternative to the Court; but what we'd like to do is say

6   okay, you've got good reasons, we're going to let you go to

7   Boston.  We're not worried about the precedent or whatever.

8                   **THE COURT:**  I think what you ought to do is to

9   come up with alternative plans for me, one saying -- I mean

10  you, when I say "alternative" --

11                  **MR. GRADY:**  I understand, Your Honor.

12                  **THE COURT:**  -- I don't mean you have one and

13  he has one.  I mean the two of you have an Albany plan and

14  the two of you have a Boston plan.  In other words, agree as

15  to what it would be like -- if my call is Boston or Albany,

16  and that is all I have to do is flip a coin and have it come

17  out Boston or Albany, then the details of the commitment

18  ought to have been spelled out by you two.  That is where

19  your expertise comes in handy.

20                  **MR. GRADY:**  Your Honor, I will undertake

21  everything the Court has ordered inasmuch as it is

22  consistent with the opinions of the treatment providers and

23  it is consistent with, of course, the statutory discretion

24  granted to the U.S. Attorney's Office.

25                  **THE COURT:**  Exactly.

1          **MR. GOLD:**  That's great.

2          **THE COURT:**  I am not going to ever try to ask

3   you to do anything more.  But let's not start from a point

4   where you can't win.  In other words, sometimes you have to

5   take a premise that you don't like and work from that

6   premise.  So you are going to have two premises here, one

7   Boston, one Albany.  It seems to me that that is where the

8   hitch -- once we resolve that hitch, then the rest might be

9   a little smoother sailing.

10          **MR. GRADY:**  Your Honor, if it is possible to

11   do both things, I will.  If it is not possible, I will let

12   the Court know why but --

13          **THE COURT:**  "Why" would be very interesting to

14   me.

15          **MR. GRADY:**  I understand, Your Honor, but I

16   can't --

17          **THE COURT:**  I don't understand "impossible."

18          **MR. GRADY:**  I can't envision --

19          **THE COURT:**  It is a great song but --

20          **MR. GRADY:**  I don't envision problems but I

21   don't want to be committed to something that becomes

22   impossible.

23          **THE COURT:**  No, you are not committed to

24   anything; but I do think that if you were working for me and

25   you were my law clerk and I told you to give me a draft of

1    an opinion that goes like this in that the plaintiff wins

2    and defendant loses, you may go home at night and start to

3    cry thinking what a terrible clerkship you got, the guy is a

4    Communist, he is not even an American, but you do what I

5    told you to do.

6              **MR. GRADY:**  That is always true when the Court

7    tells me to do something.

8              **THE COURT:**  So that is the same thing here.

9    What I am looking for is your expertise.

10             Okay.  So we will see you December?

11             **THE CLERK:**  12th.

12             **THE COURT:**  December 12th.

13             **MR. GOLD:**  Thank you, Your Honor.

14             **THE COURT:**  I am very confident you are going

15   to get it done.  Just don't be too tough with each other.

16             (Laughter.)

17             **MR. GRADY:**  No, we've never been tough.

18             **MR. GOLD:**  Thank you, Judge.

19             **MR. GRADY:**  Thank you, Your Honor.

20             **THE CLERK:**  Court is in recess.

21             **THE COURT:**  I will say no more except just

22   don't be tough with each other.

23             (Laughter.)

24             (Pause in proceedings.)

25             **THE COURT:**  I want to make sure you

1     understand, I want two plans that you both agree to.  If it

2     has to be Albany, this is what you would need, even though

3     you want it to be Boston.

4                     **MR. GRADY:**  Yes.

5                     **MR. GOLD:**  Yes, Your Honor.

6                     **THE COURT:**  Or vice versa.  Two people are

7     going to sign up for each plan.

8                     **MR. GRADY:**  Consistent with the statute, yes,

9     Your Honor.

10                    **THE COURT:**  Yes, whatever the statutes say.

11              All right.  Thank you.

12

13              (WHEREUPON, the proceedings were recessed at 12:45

14              p.m.)

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

       I, Carol Lynn Scott, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

       /S/CAROL LYNN SCOTT

_____

CAROL LYNN SCOTT
Official Court Reporter
John J. Moakley Courthouse
1 Courthouse Way, Suite 7204
Boston, Massachusetts 02210
(617) 330-1377

**DATE: July 31, 2012**