```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3      - - - - - - - - - - - - - - - - - - x

 4      UNITED STATES OF AMERICA,               :

 5            Petitioner,                        :    Civil Action No.
                                                      1:07-cv-12063-LTS
 6         v.                                    :

 7      WAYNE HUNT,                              :

 8            Respondent.                        :

 9      - - - - - - - - - - - - - - - - - - x

10

11          BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12
                                  BENCH TRIAL
13                                   DAY 1

14

15                        Friday, October 18, 2019
                                 9:02 a.m.
16

17

18

19

20      John J. Moakley United States Courthouse
        Courtroom No. 13
21      One Courthouse Way
        Boston, Massachusetts
22

23      Rachel M. Lopez, CRR
        Official Court Reporter
24      raeufp@gmail.com

25
```

1                    **A P P E A R A N C E S**

2

   On behalf of the Petitioner:

3

4       UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
        BY:  JENNIFER A. SERAFYN
        John Joseph Moakley Courthouse

5       One Courthouse Way, Suite 9200
        Boston, Massachusetts  02210

6       (617) 748-3969
        jennifer.serafyn@usdoj.gov

7

8

   On behalf of the Respondent:

9

10      LAW OFFICES OF IAN GOLD
        BY:  IAN GOLD
        185 Devonshire Street

11      Suite 302
        Boston, Massachusetts  02110

12      (617) 297-7686
        ian.gold@iangoldlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

**TABLE OF CONTENTS**

**TRIAL WITNESSES**

On behalf of the Respondent:                              Page

JOSEPH J. PLAUD, PH.D.

         By Mr. Gold                                      22

         By Ms. Serafyn                                   69

WAYNE HUNT

         By Mr. Gold                                      80

         By Ms. Serafyn                                   96

         By Mr. Gold                                      99

         By Ms. Serafyn                                  100

**EXHIBITS**

                                                   Admitted

Number 1 and 2                                          10

Number 3                                                28

```
 1                    P R O C E E D I N G S
 2              (In open court.)
 3              THE DEPUTY CLERK:  The United States District Court
 4       for the District of Massachusetts is now in session, the
 5       Honorable Leo T. Sorokin presiding.
 6              Today is October 18th, the case of United States
 7       vs. Hunt, civil action 07-12063 will now appear before this
 8       court.
 9              Counsel, please identify themselves for the record.
10              MS. SERAFYN:  Good morning, Your Honor.  Jennifer
11       Serafyn for the United States.
12              THE COURT:  Good morning.
13              MR. FOSTER:  Good morning, Your Honor, Chris Foster
14       from US probation.
15              THE COURT:  Good morning.
16              MR. GOLD:  Good morning, Your Honor.  Ian Gold on
17       behalf of the petitioner here, Wayne Hunt.
18              THE COURT:  Good morning.  And good morning,
19       Mr. Hunt.
20              All right.  So I've read the trial briefs.  And
21       just so you know, I read his background.  The notice the US
22       Attorney's Office filed in 2007, that essentially the
23       precondition to the sexually dangerousness proceeding.  I
24       read Judge Tauro's decision, the Circuit's decision
25       affirming, and I have a status report from Mr. Winguard from
```

1    US probation, dated October 24, 2017.

2              I don't know if you've ever seen that, Mr. Gold.

3              MR. GOLD:  I don't know that I have, Your Honor.

4              THE COURT:  I'm happy to provide it to you, if you

5    want.  It's an annual status update.  It's more -- I don't

6    think there will be anything in there you don't know, but if

7    you want to look at it, you're welcome to.  And then the

8    motion -- just what's proceeded since we've had the

9    proceedings here in front of me.

10             All right.  So I'm ready to -- and you have two

11   exhibits.  One is the -- oh, summary from Mr. Foster.  All

12   right.  I'll look at that.

13             MR. GOLD:  And a report by Dr. Plaud.

14             THE COURT:  Okay.  And the report by Dr. Plaud.

15   Okay.  Give me one minute just to --

16             So the issue -- you have the burden, right,

17   Mr. Gold?

18             MR. GOLD:  According to the First Circuit, yes.  I

19   do have a couple of comments about that, but for the purposes

20   of this proceedings, I have the burden to prove by a

21   preponderance of the evidence that Mr. Hunt is no longer

22   sexually dangerous.

23             THE COURT:  And that really reduces to a three-part

24   question, of which really only potentially two parts would be

25   in play here.  Right?  In other words, a sexually dangerous

1    person is a person who is engaged or attempting to engage in

2    sexually violent conduct.  There's really no dispute that

3    he's done that.

4              MR. GOLD:  No dispute about that element.

5              THE COURT:  He's done that.  So then really, the

6    question is, does he suffer from a serious mental illness,

7    abnormality, or disorder, and if so, as a result of that,

8    would he have a serious difficulty in refraining from

9    sexually violent conduct.

10             Do you agree that those are the two elements?

11             MR. GOLD:  Those are the other two elements.

12             THE COURT:  You agree with that, right,

13   Ms. Serafyn?

14             MS. SERAFYN:  Yes, Your Honor.

15             THE COURT:  All right.  So it looks like from

16   Mr. Plaud's report, but I haven't read it all yet, but just

17   taking a quick look, what he's saying essentially is, that he

18   has such a serious mental illness, but he, as a result of

19   that mental illness, he does not have a serious -- the third

20   prong is not met.

21             MR. GOLD:  Your Honor, that's not quite right.

22             THE COURT:  Okay.

23             MR. GOLD:  If I might just --

24             THE COURT:  Yes, that's why I'm asking.

25             MR. GOLD:  If I might just give a gloss on that.

1    There's no dispute that he suffered from pedophilia and that

2    that qualified as a mental abnormality at the time of his

3    commitment.  And I think Mr. Plaud agrees with that

4    wholeheartedly.

5            The mental abnormality question is a little

6    different.  It is one of whether the condition has remitted.

7            THE COURT:  So one argument is that, given what you

8    say are the strides in treatment that Dr. Plaud refers to,

9    and that no longer, today, does he suffer from the

10   abnormality.

11           MR. GOLD:  That's -- that's right.  I mean, we can

12   talk about it.  I do think this is a serious difficulty case,

13   if we're going to talk about it like lawyers.  I think the

14   serious difficulty issue resolves the case, but we definitely

15   think there is a contest on both elements and the dividing

16   line is not entirely sharp.

17           THE COURT:  Fine.  I understand -- in testing both,

18   you don't have to agree with me on this or not, but your

19   strongest argument is the serious difficulty.

20           MR. GOLD:  I think that's right.

21           THE COURT:  Okay.  Fine.

22           And you disagree on both points, right,

23   Ms. Serafyn?

24           MS. SERAFYN:  Yes, Your Honor.

25           THE COURT:  Okay.  Fine.  So you have the burden of

1    proof, Mr. Gold.  Go ahead and call your --

2              MR. GOLD:  Your Honor, if I could just be heard on

3    the burden of proof.

4              THE COURT:  Yes.

5              MR. GOLD:  So in 2016, in a case called *United*

6    *States vs. Whitmore*.  The First Circuit held, as a matter of

7    first impression, I think, anywhere, that the statute -- that

8    the burden is on the respondent, or the petitioner now, but

9    the statute is silent on that question, and so we're bound by

10   the First Circuit here.

11             I object to the burden being on the respondent.  I

12   just want to say that and very quickly why, which is that

13   it's acknowledged that this quality of being a sexually

14   dangerous person is a moving target.  It's not something

15   that's static in time.  It's a finding at a particular time.

16   The burden is on the Government to prove by clear and

17   convincing evidence that these contested claims, at a moment

18   which is now in the distant past, putting the -- someone like

19   Mr. Hunt to the burden of producing it, at some point,

20   becomes unfair.  I think it's a matter of a sliding scale, I

21   would say, where at this point, we have evidence, the

22   Government has none, and yet we have to go forward.  So I'm

23   just objecting --

24             THE COURT:  Fine.  So let me -- the Circuit has

25   said that the burden of proof is on you.  I think I'm bound

1   by the Circuit decision.

2           MR. GOLD:  Yes.

3           THE COURT:  And you do, too, in the absence of a

4   Supreme Court decision that's contrary.  So I'm going to,

5   obviously, impose and require and apply the burden in that

6   fashion.  That is, that he's a sexually dangerous person and

7   he remains on supervision, unless you establish by

8   preponderance of the evidence that he's not.  But I note, and

9   it's preserved for the record, your objection that the burden

10  of proof should not be on -- by preponderance of the

11  evidence, should not be on your client, and if you wish to do

12  more in writing to preserve the record, you can do that.  But

13  your objection to me applying the Circuit standard, that you

14  concede applies, although you don't concede it's correct, is

15  preserved.  And to the extent you feel it's appropriate, or

16  you wish to augment the record in some way, I suggest you do

17  it in writing, and that's fine.

18          And if he does, Ms. Serafyn, for my purposes, in

19  rendering my decision, you need not respond.  I'm not -- like

20  it's hard for me to imagine how he would be giving me

21  anything that would cause me to rethink the ruling that I

22  just rendered.  You would be free, if you wished, if you

23  wanted to say something, for your own reasons, for whatever

24  reason, then you could, but otherwise I would view it as just

25  like an offer of proof.  He's just stating his reasons to put

1    on the record.

2              MS. SERAFYN:  Thank you, Your Honor.

3              MR. GOLD:  Thank you, Judge.  And before I call

4    Dr. Plaud, I had intended to make a couple of opening

5    remarks.

6              THE COURT:  Fine.

7              MR. GOLD:  But I also don't have to.  It depends

8    on -- what I was going to say is talk a little bit about what

9    I know about the precedent for this type of proceeding.

10             THE COURT:  Sure.  Go ahead.  I don't know anything

11   about it.

12             MR. GOLD:  And just also discuss what I intend to

13   introduce, which, as you've seen, are the two exhibits.  I

14   think those, if we could enter those ahead of time.

15             THE COURT:  Sure.  No objection to Exhibit 1 or 2

16   in evidence?

17             MS. SERAFYN:  No objection.

18             THE COURT:  Fine.  One, which is the memo April 8,

19   2019 from Senior US Probation Officer Chris Foster is

20   admitted.  As is number 2, which is the May 31, 2019 letter

21   to Mr. Gold from Dr. Plaud, consisting of 14 pages.

22             (Exhibit No. 1 and 2 admitted into evidence.)

23             MR. GOLD:  So the two elements are mental

24   abnormality, serious difficulty controlling behavior.

25   Basically, I think Mr. Foster's memo is, in and of itself, an

1    evidentiary basis to say that Mr. Hunt has no longer the

2    serious difficulty controlling behavior that's required to

3    maintain the classification under the statute.  And I'll

4    get -- we'll get into that with Dr. Plaud.

5         I, and Ms. Serafyn, were present at the creation --

6    the *Adam Walsh Act* was passed in 2006.  There were, I'm going

7    to say, about 15 cases where the Bureau of Prisons moved very

8    quickly to implement the statute in 2006/2007.  About 10 or

9    12 were here in Devens before bureaucratic decisions were

10   made to site the program in Butner, North Carolina.  And from

11   that moment on, every sexually dangerous person's case

12   originates there.  This is a legacy case from that initial

13   period of 10 to 12 cases.

14        Ironically, I often call it a tale of two

15   districts, we -- I don't have any evidence for this, but it

16   was thought, among folks who worked in the area, that the

17   Bureau of Prisons might have thought North Carolina would be

18   a more favorable --

19        THE COURT:  Jurisdiction.

20        MR. GOLD:  -- jurisdiction for these types of

21   cases, with the higher rate of commitment.  It's not clear

22   that that's the case.  I think the way I read what's happened

23   down there and I've been in touch with the federal defenders

24   down there over the years, is there's a -- maybe a

25   libertarian streak, but the cases have been hard fought and

1    the win/loss rate is about 50/50 down there for cases the

2    that have --

3            THE COURT:  Initial commitment cases in the posture

4    that Mr. Hunt's case was in back in -- before Judge Tauro.

5            MR. GOLD:  Before Judge Tauro, in that posture.

6    Correct.  Interestingly, the statute was first found --

7            THE COURT:  It only reaffirms the principle that

8    the third branch is the branch that seems uniformly, over

9    history, committed to the principle of law, and it doesn't

10   matter who you're before.

11           MR. GOLD:  Agreed.  Agreed, Your Honor.

12           THE COURT:  It does seem like it's evidence of

13   that, that it doesn't matter what district you're in, or what

14   judge you're before.

15           MR. GOLD:  Well, it certainly is an interesting

16   story, from my vantage point, but what we've --

17           THE COURT:  Unsurprising result to me.

18           MR. GOLD:  But the narrative -- there's a case

19   called *Comstock*, I think it's 2009, it's decided.  But the

20   district court judge in the Eastern District of North

21   Carolina, similar to Judge O'Toole up here, found the statute

22   an unconstitutional exercise of Congress's power under the

23   commerce clause.  That wended it's way up to the Supreme

24   Court, where it was decided in favor of the Government.  But

25   during that time, there was a stay of all the cases in North

1    Carolina, while the cases here in Massachusetts, except for

2    Judge O'Toole's case, moved forward.  Mr. Hunt's case was one

3    of those, as you know and as you read, it was a five-day

4    trial, in front of Judge Tauro, where the focus of the

5    defense was whether you could say to someone in the age

6    cohort that Mr. Hunt was at that time, was a sexually

7    dangerous person or had serious difficulty controlling his

8    behavior.

9           Also, with a evidentiary record which showed

10   behavioral control while incarcerated for a long period of

11   time.  And so that was an important factor and it's an

12   important factor in these cases.  The common law of these

13   cases is developing in the Eastern District of North

14   Carolina.  There's -- they do thoughtful, long decisions, on

15   the initial commitments down there, and that is a factor

16   which is --

17          First of all, it's a problem, in a surprising

18   portion of the cases, a behavioral discontrol in a sexual way

19   in prison.  It's not uncommon.  And when the Government finds

20   it, they use it.  And when there's an absence of it, the

21   courts down there find it salient and important.

22          So when Mr. Hunt was committed, one other

23   individual had been committed at that time, Jeffrey Shields,

24   by Judge Saris.  There had -- there were a couple of

25   victories that we had at that time, but those were the main

```
 1    two.  There were a couple drawn to Judge Wolf, a few to Judge
 2    Tauro, three to Judge Tauro, one to Judge O'Toole, and two
 3    to -- I think two to Judge Saris, or maybe just the Shields
 4    case at that time.
 5               THE COURT:  Have the two of you done all those
 6    cases?
 7               MR. GOLD:  I think so.
 8               MS. SERAFYN:  The vast majority, Your Honor.
 9               MR. GOLD:  The majority.
10               I continue to represent Mr. Hunt and also one man
11    who remains committed, whose name is Volungus, who was tried
12    in front of Judge O'Toole.
13               Since -- at the time that Mr. Hunt was committed
14    and we'll hear testimony about this, but he and Mr. Shields
15    were the only two patients in the commitment and treatment
16    program, which was designed to implement this portion of the
17    Adam Walsh Act.  And they were the only two patients for --
18               THE COURT:  At Devens?
19               MR. GOLD:  At Butner.  So once they were initially
20    committed up here, they were transferred to Butner for this
21    program, which is the implementation of the sexually
22    dangerous person.
23               THE COURT:  They weren't the only two people in it.
24    They were the only two people from this district in it.
25               MR. GOLD:  No, they were the only two people in the
```

1    program for 18 months approximately.

2            THE COURT:  When to when.

3            MR. GOLD:  Because everyone else -- no one else --

4            THE COURT:  Oh, they were all stayed.

5            MR. GOLD:  Everyone was stayed and stewing and just

6    not much happening over there.  So it was an interesting time

7    in the institution.  But during that time, Mr. Hunt and the

8    other inmate, the other patient, were -- had a kind of the

9    run of the place, in terms of, you know, a teacher/student --

10   teacher pupil ratio of 12 to 2, or something along those

11   lines.  So it was a very intense period of programming for

12   both of them.  And I think they both -- well, I'm not going

13   to speak for Mr. Shields --

14           THE COURT:  Shields doesn't matter.

15           MR. GOLD:  But Mr. Hunt benefitted from that period

16   to an extraordinary degree.  It's also not relevant, but the

17   story has changed, as the flood gates opened, and now the

18   program has a different teacher/pupil ratio.  And the other

19   inmate that I represent, just for comparison purposes, is

20   just languishing, I would say.  That's my impression.

21           So I just -- there was another individual

22   committed.  So Mr. Shields was released, like Mr. Hunt.

23   Mr. Shields has been unconditionally discharged, after being

24   conditionally discharged.  He was out for just over four

25   years, before that unconditional discharge.  And I will say

1    that the position, as I read the docket, the public record in

2    that case, Mr. Shields was committed here, but his case, he

3    was supervised in Maine.  Maine Federal Probation took no

4    position on the discharge.  They had nothing negative to say

5    and the Government did not opposed and so he was

6    unconditionally discharged by Judge Saris.

7            THE COURT:  Without a written opinion?

8            MR. GOLD:  Without a written opinion.

9            THE COURT:  Or without a trial?

10           MR. GOLD:  Without a trial like this.

11           Now -- and I will say about Mr. Shield's

12   trajectory, that he was released, he had some behavioral

13   issues, and was actually reincarcerated.  So he was released

14   before Mr. Hunt, got in trouble, I'm not sure of the details,

15   was taken back into custody, tuned up at Butner, released

16   again.  And that period was a four-year period.

17           THE COURT:  The second release.

18           MR. GOLD:  The second one, of clean sailing.  The

19   other individual is another individual I represented, Todd

20   Carta, who was also tried in front of Judge Tauro, and then

21   tried a second time, he won -- we won in front of Judge

22   Tauro, that was reversed by the First Circuit.  We retried

23   the case in front of Judge Saris, who committed him.  He was

24   released and, again, he was supervised in another district,

25   in Connecticut, which is where he was from.  And from his

1    conditional release, on conditions like Mr. Hunt, to

2    unconditional release, where I believe Ms. Serafyn for the

3    Government did not object, and probation took no position, he

4    was out for a total of two years.

5            There's one other individual, Joel Whitmore, who

6    has only just recently been released by Judge Saris, on

7    conditions in situations similar to Mr. Hunt.  And then,

8    based on my interactions with the -- the vast majority of

9    these cases are handled by the federal defender's office down

10   in the Eastern District of North Carolina.  No one has sought

11   to do -- and it could just be an issue of timing, but there

12   have been no -- there have been conditional releases.  There

13   have been no requests for unconditional discharge from a

14   conditional release as of yet.

15           THE COURT:  In the Eastern District.

16           MR. GOLD:  In the Eastern District of North

17   Carolina.  So that's the universe of precedent that I know.

18           In comparison, Mr. Hunt, since his release in

19   August of 2012, is --

20           THE COURT:  Seven-plus years.

21           MR. GOLD:  Seven-plus years of evidence, we argue.

22           So with that, I'll call --

23           THE COURT:  Just before you do, I don't know if

24   Ms. Serafyn wants the opportunity to say anything.

25           You don't have to, but if you wish, since he gave

what was a form of an opening statement, in a way.  You don't
have to say anything, but I just want to give you the chance
if you do want to say something.

MS. SERAFYN:  Thank you, Your Honor.  I think it
makes sense for me to try to frame the Government's position
here.  The Government has a tough road to hoe here, no
question.  I'd like to bring the Court to the practical,
though.

THE COURT:  Uh-huh.

MS. SERAFYN:  So I understand that Your Honor has
read many of the documents that detail Mr. Hunt's history.
So he does have quite a history of horrific sexual assault --

THE COURT:  Yes.

MS. SERAFYN:  -- on mostly boys, over 60 victims,
as young as seven.

THE COURT:  Do they have any right to notice of or
participation in this proceeding?

MS. SERAFYN:  I don't think in this proceeding,
Your Honor.  We -- they did, I think, at the sort of initial
commitment, and then maybe that initial release period.  And
I think in all of these cases, we had significant difficulty
locating victims.  So I can't remember, actually, any
specific ones that we were able to find, except in one case
that is not this one.

So that is significant, obviously.  But as we

1    acknowledge in our trial brief, it appears that the last

2    hands-on offense, that we know of, occurred in 1985.

3              THE COURT:  That was after release from -- on

4    parole, he's released on federal parole, that's the New York

5    incident -- the New York hands-on offenses at the camp sight.

6              MS. SERAFYN:  That's right.

7              THE COURT:  Among other things.  That led to the

8    conviction in New York?

9              MS. SERAFYN:  Yes.

10             THE COURT:  He served his sentence in New York,

11   came out, didn't come out, but was released from New York

12   custody and then parole revocation in federal proceedings,

13   served the remainder of his federal sentence and that's when

14   the civil -- civil commitment proceedings began.

15             MS. SERAFYN:  That's right, Your Honor.  That's

16   right.  And in addition to the horrific hands-on sexual

17   offenses, there was also one kidnapping.  During that

18   kidnapping, I think Mr. Hunt was in possession of a firearm,

19   though it's not --

20             THE COURT:  That's the federal offense?

21             MS. SERAFYN:  That's right.  That's right.

22             THE COURT:  That's not the New York offense,

23   though, was not a kidnapping conviction?  It appeared from my

24   reading of it to have qualities of kidnapping.

25             MS. SERAFYN:  Yes.  And I think there was a -- I

1    think there was an initial charge of kidnapping that may have

2    been reduced or changed at some point.

3              At one point, he received a life sentence that was

4    reduced to, I think, ten years.  So obviously significant

5    sexual offenses.

6              But the last hands-on offense that we know of

7    occurred in 1985.  Mr. Hunt is 73.  Obviously, age plays a

8    role and I think you'll hear that from Dr. Plaud, in terms

9    of, you know, sexual libido and the link between age and

10   rates of recidivism, I think is something that you'll hear

11   about.

12             Another thing, obviously Mr. Hunt has been living

13   in the community, essentially, for seven years.  Those

14   certainly are facts that, you know, work against the

15   Government in this case, and we certainly acknowledge that,

16   which is why I think it's important to focus on the practical

17   here, and that is the role of probation in this case and the

18   role that probation has played in Mr. Hunt's success over

19   those seven years, because I think everything that you're

20   going to hear today is going to show that by and large, he

21   had been successful in the community in those seven years.

22             He now has some stable housing, which probation

23   helped him to get.  He's been seeing a -- doing treatment,

24   sex offender treatment with a doctor, who probation connected

25   him to.  So probation has been playing an important role in

1      Mr. Hunt's treatment and in Mr. Hunt's success.  And just

2      focusing on the practical, it seems like if that's working,

3      and it's not an onerous part of his life, which I don't think

4      it is, probation has contact with him approximately once a

5      month.  Probation has contact with his treatment provider,

6      Dr. Cusack, again, approximately once a month.  It's a good

7      way to check in, to see if there are any problems percolating

8      to see if there were any trigger, and to work with Mr. Hunt

9      and to work with his doctor to ensure that that success

10     continues.

11            So essentially, I think, for lack of a better

12     phrase, the Government's position is if this is working, why

13     mess with it, why mess with a good thing?  And you know, I

14     was not going to have Mr. Foster testify, but I think it

15     certainly makes sense for the Court to hear from him, because

16     he's the one who's had that direct contact and perhaps we can

17     do that after Dr. Plaud testifies.

18            THE COURT:  Sure.

19            MS. SERAFYN:  But I just wanted to frame for the

20     Court that we're taking a sort of practical view of the very

21     prosocial supportive role that probation plays in Mr. Hunt's

22     life at this point and the need for that to continue.

23            THE COURT:  Fine.

24            All right.  Mr. Gold.

25            MR. GOLD:  Thank you.  All right.  Mr. Hunt calls

1  Dr. Plaud.

2          THE COURT:  All right.  Dr. Plaud, if you take the

3  witness box there.

4          (The witness was duly sworn.)

5          THE COURT:  Please be seated.

6          Go ahead.

7                    **JOSEPH J. PLAUD, PH.D.**

8       having been duly sworn, testified as follows:

9         **DIRECT EXAMINATION BY COUNSEL FOR RESPONDENT**

10  BY MR. GOLD:

11  **Q.**  Good morning, Dr. Plaud.

12  **A.**  Good morning.

13  **Q.**  Could you please state your full name for the record?

14  **A.**  Yes, it's Joseph J. Plaud, P-l-a-u-d.

15  **Q.**  And Dr. Plaud, you're testifying as an expert witness

16  here today.  Could you please describe your background and

17  credentials for the Court?

18  **A.**  Sure.  I received my bachelor's degree in psychology from

19  Clark University in Worcester, and a Ph.D. in clinical

20  psychology from the University of Maine.  I completed my

21  clinical internship at the University of Mississippi Medical

22  Center in Jackson, Mississippi.

23  **Q.**  And did you study with anyone in particular as a graduate

24  student?

25  **A.**  Well, my first major professor, who's on faculty at the

1   University of Maine, his name was William O'Donahue, and

2   that's how I became involved in evaluating and treating sex

3   offenders, way back 32 years ago now, 1987.  We had a

4   traditional doctoral program at the university, it was a

5   mentorship model training, so basically what meant that is

6   whoever our advisor, our major professor was, the area that

7   he or she concentrated in, and research and their clinical

8   work tended to be a focus in our training, and so it was with

9   me.

10          THE COURT:  Did you -- did he pick you, or were you

11  assigned to him?

12          THE WITNESS:  Well, Judge, it was just a match made

13  in heaven.  I guess we both gravitated towards each other.

14  He was new to the faculty then, he had just graduated,

15  himself, and he was a very prolific researcher coming out of

16  graduate school.  And so he was setting up his clinic, his

17  sex offender assessment and treatment clinic.  He got a

18  contract with the Maine Department of Probation and Parole.

19  And we did a lot of physiological testing, as well, and I

20  was -- again, this is the '80s.  There was a lot more -- a

21  lot less portability in our equipment than we use today, a

22  lot of solid state equipment back then.  So I really was

23  drawn to the technical aspects as well of essentially putting

24  the lab together.  So that led into what became basically my

25  focus of clinical concentration and my professional work

1    subsequent.

2    BY MR. GOLD:

3    **Q.**   And so can you describe, briefly, where your career went

4    right after graduate school?

5    **A.**   Sure.  After graduate school and after internship, I went

6    into academia.  I was in a relationship at the time, and so

7    we -- she, who became my wife, we wanted joint academic

8    appointments, so we arranged it at a -- in North Dakota at

9    the University of North Dakota, she went into the medical

10   school, I went into the Department of Psychology.  I was

11   there for about four and a half years, on a tenure track

12   position, as an assistant professor of psychology.

13          We had, at the university, a fully accredited

14   doctoral training program in clinical psychology, so I was on

15   the other side of the desk and trained graduate students,

16   undergraduate students, again, in this area, evaluating and

17   treating sex offenders.  I set up my own clinic at the

18   university in our psychological services center.  I made

19   arrangements with local human services agencies, both in

20   North Dakota as well as Northwestern Minnesota.  The

21   University is on the borderline between Minnesota and North

22   Dakota, on the Red River.

23          And at one point, I was asked to design the

24   statewide treatment program in North Dakota for sex offenders

25   who also had a history of developmental disabilities, autism,

1    special needs, where the typical cognitive behavioral

2    treatment modality that we used, it was more difficult, so we

3    had to reengineer some of the basic treatment concepts.  A

4    program I created called the STOP program, which stood for

5    the Specialized Treatment of Offenders Program.

6              So I was there as faculty, I guess about four and a

7    half years, until the end of 1997.  We had a big flood in

8    North Dakota back then.  My marriage decided to take a left

9    turn at that point.  So I came home to Massachusetts, I took

10   a position as director of research for Cambridge Center for

11   Behavioral Studies.  And I founded my own private practice

12   around that period of time called the Plaud Behavioral

13   Consultants, which I still work under the umbrella of.  And I

14   taught courses, went back and became affiliated with several

15   universities and colleges in Boston and Providence, at Brown

16   University, and have continued doing this work for the

17   present time.

18   **Q.**  Did your return to Massachusetts coincide with a legal

19   change until Massachusetts?

20   **A.**  Yes, well, when I came back to Massachusetts and I became

21   licensed as a clinical psychologist here, Massachusetts, like

22   all states, by the late '80s, the old civil commitment of sex

23   offender statutes, typically, we call the MDSO laws, you know

24   the Mentally Disordered Sex Officers.  The sexual psychopath

25   laws, they were all repealed.  Massachusetts civil

1    commitment, sexual offender commitment law was repealed back

2    in the 1980s, when I was training up in Maine.  So

3    Massachusetts did not have a civil commitment statute when I

4    moved back.

5         In 1999, however, they readopted the new so-called,

6    second wave or new wave of civil commitment, which began in

7    1990, in the state of Washington.  So Massachusetts, about a

8    decade later, adopted their own, using some different legal

9    terminology, in contrast with the old law.

10        And so now, there's about -- I think there's 20

11   states, as well as the federal Government, in the Adam *Walsh*

12   *Act*, in the 4248 cases, as you said, now in the Eastern

13   District of North Carolina, that have civil commitment.  So

14   when the Massachusetts law, the new law came on board,

15   suddenly I -- my phone rang a lot, because this was my area

16   of clinical focus and doing risk assessments.  And so

17   around -- it took a while to go through constitutional muster

18   up to the SJC here in Massachusetts, but in late 2000, I

19   started doing evaluations in Massachusetts for those

20   petitioned against under the 123(a) Mass. General laws

21   Sexually Dangerous Person Act.  So yes, I've been very active

22   in almost 20 years now.  Not only in Massachusetts, but in

23   other jurisdictions.  I've been very active in the federal

24   system.  There's not many a case that I don't know about down

25   there in the federal system.

1  **Q.**  But so is it fair, Dr. Plaud, to say that that, in a

2  nutshell, is how you became to be involved as an expert

3  witness in this type of case?

4  **A.**  Yes, I was trained as a researcher and clinician, just

5  dealing with both evaluating and treating sex offenders, as

6  well as conducting research on recidivism, on sexual arousal,

7  the measurement of sexual arousal, the relationship between

8  sexual arousal and sexual behavior, all those kinds of

9  issues.  So, yeah, this kind of came at me.

10            MR. GOLD:  And Your Honor, if I might address the

11  Court for one moment, I have a -- Dr. Plaud's CV was attached

12  to my motion for funds for Dr. Plaud way back when.  So I

13  haven't admitted it as an exhibit here, but it's available to

14  the Court in that way.

15            And also, Dr. Plaud has a synopsis as an addendum

16  in the report that is Exhibit 2 of these credentials.

17            THE COURT:  I don't recall whether your motion for

18  funds was ex parte or not.

19            MR. GOLD:  It almost certainly was, but I'm happy

20  to have it --

21            THE COURT:  I think that it would be -- I don't

22  know if there's a dispute about his qualifications, but it

23  would seem unfair to -- for me to rely on his CV to the

24  extent it's in an ex parte filing.  So I think why don't

25  you -- after -- this afternoon or Monday, just provide a copy

1      to Ms. Simeone and Ms. Serafyn, and just formally, even if

2      she's seen it before.

3              And then you don't object to admitting it as an

4      exhibit, his CV, do you, Ms. Serafyn?

5              MS. SERAFYN:  No, Your Honor.  Dr. Plaud has also

6      been on these *Adam Walsh Act* cases since Mr. Gold and I have,

7      so we know each other well and the Government has no

8      objection to his qualifications or him testifying.

9              THE COURT:  Fine.  I accept his qualifications.  I

10     think, for the record, you should file the CV and not admit

11     it as an exhibit, just provide it to Ms. Simeone, so it's in

12     the record, because I think I should rely upon the one in the

13     public record, even though effectively Ms. Serafyn knows

14     what's in the ex parte filing.

15             THE WITNESS:  I do have a copy here.

16             THE COURT:  Fine.  We'll take that.  All right,

17     we'll admit that.  It short-circuits it.  Exhibit 3 admitted,

18     the CV of Dr. Plaud.

19             (Exhibit No. 3 admitted into evidence.)

20             THE COURT:  Okay.  Go ahead.

21             You can go right to the merits.

22             MR. GOLD:  Thank you.

23     BY MR. GOLD:

24     **Q.**  Dr. Plaud, did you have the opportunity to --

25             THE COURT:  I'm sorry, I do have one or two

1    questions, because I'm not as familiar with you as the

2    lawyers.

3              So roughly, over the years, how many forensic

4    evaluations do you think you've performed on people who are

5    or are alleged to be or might be sexually dangerous?  People

6    who there's a question about their sexual impulses with

7    respect to criminal behavior?

8              THE WITNESS:  Judge, I would say, in all

9    jurisdictions, over 1,000 evaluations.

10             THE COURT:  And are those -- roughly -- how do

11   those divide in terms of defense attorney retained,

12   prosecutor retained, or neutral -- so-called neutral expert

13   for the Court, or maybe for an -- like maybe you did

14   evaluations for Bridgewater Treatment Center, where they

15   called you in, and I wouldn't put that in the defense

16   attorney box, the prosecutor box, or the court box.  That

17   would be the fourth box.

18             THE WITNESS:  Judge, my entire career, I've sought

19   to be independent.  In other words, I don't -- and it depends

20   on the jurisdiction, obviously.  So for example, in

21   Massachusetts, the SDP cases, it follows -- the procedure

22   that it follows are -- if you read the news, you see there's

23   a lot of controversy about it lately, but there are qualified

24   examiners, the commissioner of the department of correction

25   appoints professionals that are basically contracted through

```
 1    the service provider that runs the treatment program at the
 2    Massachusetts treatment center.  And each case, there are two
 3    qualified examiners that are chosen.  I have not never sought
 4    to be a qualified examiner, because there are certain rules.
 5            THE COURT:  So you haven't sought to be and you're
 6    not?
 7            THE WITNESS:  Correct.  So that means that I would
 8    not not ever be called by the State now.  That doesn't mean
 9    that I don't find people sexually dangerous, I do.
10            THE COURT:  Sure.
11            THE WITNESS:  But in Massachusetts, when that
12    happens, I send my report and my conclusion to the defense
13    attorney and, under attorney-client work product, that goes
14    away.
15            THE COURT:  So in Massachusetts, on the SDP cases,
16    essentially, the department of corrections has a list of
17    people, you haven't sought to be on the list.
18            THE WITNESS:  Correct.
19            THE COURT:  If that -- if those people evaluate the
20    person as sexually dangerous, that's what leads to the
21    proceedings in court and those are the experts who the
22    Commonwealth would call.
23            THE WITNESS:  Correct.
24            THE COURT:  And rather than retaining, still,
25    another expert.
```

1              THE WITNESS:  That's right.

2              THE COURT:  And then the defense would retain

3     someone and you're retained by the defense, and you say

4     whatever you say.

5              Okay.  That answers that question.

6              Second, do you ever engage in treatment, or is your

7     practice entirely forensic?

8              THE WITNESS:  I would say the trajectory of my

9     practice has gone from heavy treatment oriented, like the

10    time we were talking about earlier.

11             THE COURT:  When you were in North Dakota?

12             THE WITNESS:  Yeah, North Dakota, and even when I

13    moved back to Massachusetts, and in -- I was doing treatment,

14    actually, even in New Hampshire.  I was contracted with an

15    agency up there, working with sex offenders in Laconia, New

16    Hampshire.  But as the evaluations proliferated and,

17    especially in other states, keeping standard appointments for

18    treatment has become extremely difficult, so I've winnowed

19    them down considerably.  I have no active cases of treatment

20    right now.  I did have a couple up until awhile ago, but not

21    at this time.

22             THE COURT:  So it would be fair to say, the last

23    ten years, the bulk of your professional focus has been

24    forensic evaluation?

25             THE WITNESS:  That's correct.

1           THE COURT:  Okay.  Fine.

2           Go ahead, Mr. Gold.

3           I should tell you both one thing, I don't think

4    this is really an issue at all, but Dr. Plaud's recent

5    testimony has reminded me of something.  And so I just in the

6    interest of full disclosure, I tell you, if you think it's an

7    issue, then you can raise it and tell me, which is that a

8    long time ago, before I was in the federal defender's office,

9    I worked at the Attorney General's Office of Massachusetts,

10   and at that time, the Bridgewater Treatment Center for

11   Sexually Dangerous Persons was under a long running 20 plus

12   year, I think, consent decree, that was issued out of this

13   court, that at the time -- I was at the attorney general's

14   office was being overseen by Judge Mazzone.

15           And at some point in time in my service in the

16   attorney's office, I represented the department of

17   corrections in that ongoing proceeding, which had both

18   contempt proceedings and general oversight.  And during

19   the -- about a year that I did that, there were motions made,

20   and part of a process that was aimed at lifting the consent

21   decree.

22           So anyway, as a result of that, I don't think I

23   have any -- I don't think Mr. Hunt was ever there, but I did

24   meet with the people at DOC, I represented them, I was

25   familiar with the treatment and legal framework governing the

1    program at that time, which would have been, I think, 1996 to

2    1997, thereabouts.  And so nothing of what I did involved or

3    in that case at the time that I was involved in, really

4    turned on the forensic evaluation of any individual person.

5    It turned on more the larger questions related to whether the

6    federal court should be overseeing the program or not.  But

7    there were certainly questions about treatment programs, and

8    truth be told, it's a long time ago, and I'm not sure how

9    much of that I remember.  But since this is about that, I

10   thought I would at least tell you all that, so you know.  If

11   you think about that, if you think it's an issue, you can

12   raise it.

13            MR. GOLD:  Thank you.

14            THE COURT:  Go ahead.

15   BY MR. GOLD:

16   **Q.**  Just one data point about your testimony in prior cases,

17   Dr. Plaud.  Did you testify in a trial in this building in

18   the matter of Jeffrey Shields?

19   **A.**  Yes.

20   **Q.**  And in what capacity did you testify in that case?

21   **A.**  I initially testified in his initial commitment trial.

22   And I did testify for the Government in that case.

23   **Q.**  And so you were an independent examiner who testified for

24   the Government?

25   **A.**  Yes.  You know, in the federal -- whether I'm independent

1    or not, I get appointed, court appointed.  I'm not quite sure

2    as to what my position would be.  Like in the standing orders

3    now in North Carolina, in the Eastern District, the way it

4    works now is I'm almost always court appointed in the cases,

5    but sometimes that comes as kind of a neutral court appointed

6    expert.  But the respondent gets to, through their attorney,

7    gets to select an expert, but then that expert can be court

8    appointed, and it's my experience that in the commitment

9    cases, I've always basically been court appointed.

10          So my report goes to the Court regardless of my

11   opinion.  So if I find a person dangerous, you know, I have

12   testified to that finding in federal court in the Eastern

13   District, as I did here in the Shields case.  So it's -- I'm

14   not the legal scholar, so I'm not sure how to answer your

15   question the way I think it was phrased.

16   **Q.**  But you did testify for the Government in the Shields

17   cases and in cases in the Eastern District of North Carolina?

18   **A.**  Yes.

19          MR. GOLD:  And if I might address the court.  Your

20   Honor, Dr. Plaud referred to there's a detailed standing

21   order now governing how these cases are processed.

22          THE COURT:  Sure.  I figured that.  In the Eastern

23   District.

24          MR. GOLD:  In the Eastern District of North

25   Carolina, yeah.

1    BY MR. GOLD:

2    **Q.**  And Dr. Plaud, just to complete this chapter, do you

3    publish?

4    **A.**  Yes.

5    **Q.**  In peer-reviewed journals?

6    **A.**  Yes.

7             THE COURT:  I see that in this list.

8    BY MR. GOLD:

9    **Q.**  And what is the nature of your research, just in layman's

10   terms?

11   **A.**  Well, the focus, earlier on, in my earlier research,

12   which is certainly much more prolific than it is now, but my

13   early research focused on sexual arousal, the measurement of

14   sexual arousal, the relationship between sexual arousal, and

15   sexually offending behavior, the efficacy of various

16   cognitive behavioral treatment methodologies for sex

17   offenders.

18            The focus, more lately, of my work, has been in

19   recidivism and publishing about the issues relating more to

20   civil commitment, because that's really the focus of my work

21   now, with the past decade and a half to two decades.  So --

22   and most recently, my research now is turning towards

23   Massachusetts recidivism, so I'm participating in a --

24   following men who have been released from the Massachusetts

25   Treatment Center, who were once deemed sexually dangerous,

1    then released either by a trial, what we call a Section 9

2    proceeding, under 123(a), Massachusetts, or found by two

3    qualified examiners like the *Chapman* case that's garnering

4    all the news headlines and our release because of qualified

5    examiners, both of them find him not dangerous.

6           So I'm following those cases, I've got data now,

7    about three years' worth of data that I've presented and I'm

8    going to be publishing on.  I've presented it both nationally

9    and at an international conference this summer.  So that's

10   been the focus of my most recent research.

11   **Q.**  And this is a basic point, but recidivism is the

12   reoffense of previously convicted persons who have been

13   released from confinement.

14   **A.**  Right.  But sexual recidivism is sexual reoffending, but

15   it can be measured differently.  So it depends upon the level

16   of detection that we use as the criterion for pronouncing

17   recidivism.  So they can be a technical probation or parole

18   violation, right?  It could be a rearrest for another crime,

19   sexual crime.  It could be a reconviction, you know, so an

20   arrest is made, but the person is found not guilty, or the

21   charges are dropped, et cetera.  So there are different

22   definitions of recidivism, but basically some type of

23   detection at some level for reoffending sexually over a

24   period of time, yes.

25   **Q.**  Dr. Plaud, I'm going to move on to the merits.  You had

1    an opportunity, at my request, to evaluate Mr. Hunt?

2    **A.**  I did.  I interviewed Mr. Hunt on May 24th of this year.

3    **Q.**  And could you describe, briefly, the other steps or

4    activities that you did as part of the evaluation of

5    Mr. Hunt?

6    **A.**  Yes, well, in all these cases, the first step is to

7    review records.  When I say that, the person's history, their

8    background, their criminal history, their developmental

9    history, their sexual history, their substance abuse history,

10   their institutional history, treatment history --

11            THE COURT:  Just the sort of -- to be efficient, I

12   would -- unless somebody disagrees, in which case it's

13   different, I would draw the conclusion, based on the fact

14   that Dr. Plaud testified in the commitment proceeding, that

15   Judge Tauro held, that he reviewed and appeared all of the

16   records of Mr. Hunt's background, or relatively comprehensive

17   subject, to cross-examination, that is sufficient for that

18   and this is essentially --

19            MR. GOLD:  An update.

20            THE COURT:  In other words, that I assume he would

21   have rereviewed that to some degree, because I wouldn't

22   imagine Dr. Plaud had a vivid memory of each and every detail

23   of Mr. Hunt's background, five or seven years after that --

24   more than seven years after that trial, more like nine years

25   after that trial.

1          But would it be fair to say, that in the first time

2    around, you reviewed all the background records?

3          THE WITNESS:  Correct.

4          THE COURT:  And you rereviewed them to refresh your

5    recollection at this time?

6          THE WITNESS:  I rereviewed them and, obviously,

7    there was additional records.

8          THE COURT:  Additional records.

9          THE WITNESS:  Correct.  That's right.

10         THE COURT:  Did you review the additional records

11   with respect to his time in prison, post the hearing with

12   Judge Tauro, which you testified prior to his release?

13         THE WITNESS:  Yes.

14         THE COURT:  And did you review the probation and

15   other treatment records related to his time from his

16   conditional release through the date of your report?

17         THE WITNESS:  I did.

18         THE COURT:  All right.

19   BY MR. GOLD:

20   **Q.**  And in addition to the records that the Court mentioned,

21   did you review medical records pertaining to Mr. Hunt?

22   **A.**  Yes.

23   **Q.**  And did you perform any physiological testing, or did you

24   find that necessary in this case?

25   **A.**  I did not perform psychophysiological testing.  I did not

1    deem it necessary in this case.

2    **Q.**   And did you, after interviewing Mr. Hunt, reviewing the

3    records, arrive at an opinion as to Mr. Hunt's sexual

4    dangerousness?

5    **A.**   Yes.

6    **Q.**   And what was that opinion?

7    **A.**   It's my professional judgment that Mr. Hunt is not a

8    sexually dangerous person.  He is -- no matter how I approach

9    this analytically, whether we're talking diagnostically,

10   whether we're talking basic issues in recidivism, static and

11   dynamic risk factor analysis, he's as low a risk as a person

12   who has a heartbeat, in terms of sexual recidivism at this

13   point.  That he is, in no measurable way, as far as I'm

14   concerned as a professional, likely to engage in further acts

15   of sexual violence or child molestation.  It is my

16   professional judgment, as the federal statute is worded, that

17   he does not have serious difficulty in refraining from

18   further acts, irrespective of his level of supervision at

19   this time.

20              So from a clinical, psychological empirical risk

21   analysis perspective, that is what I bring to this equation,

22   Wayne Hunt, as he sits here today, is as low a risk to

23   reoffend sexually as I can possibly describe.  And certainly

24   comparative speaking at the evaluations that I've done, he's

25   probably one of the top two low risk evaluations that I have

1    conducted.  And so other issues, if it ain't broke don't fix

2    it kind of thing and keep it going, that's not in my

3    bailiwick, right?  That's legal, constitutional issues.  But

4    from a risk perspective, he is not likely to engage in

5    further acts of sexual molestation going forward.

6    **Q.**   Dr. Plaud, there are two elements that you may have heard

7    we were discussing before we began, under the statute, mental

8    abnormality and serious difficulty refraining from further

9    child molestation or sexually violent conduct in this case?

10   **A.**   Yes.

11   **Q.**   I'd like to just talk about those two separately for a

12   moment.

13   **A.**   Okay.  Sure.

14   **Q.**   So the first, mental abnormality?

15   **A.**   Yes.

16   **Q.**   Do you diagnose Mr. Hunt with pedophilia today?

17   **A.**   I do.  I diagnose him with pedophilic disorder,

18   nonexclusive, because the manner in which paraphilia,

19   sexually based disorders are clinically diagnosed is using

20   the *Diagnostic and Statistical Manual of Mental Disorders,*

21   currently in its fifth edition.  Although, psychologists and

22   I, myself, to varying degrees have been involved in this --

23   as a psychologist, it's published by the American Psychiatric

24   Association.

25            It's premised on essentially what is a medical

1    model, a disease model.  And so issues of when a person is

2    clinically diagnosed with a disorder, the course of that

3    disorder, being based on a medical model, gives changes in

4    the diagnostic structure.  It fits us into boxes that are

5    hard to get out of, I guess is the way to say it.  Pedophilic

6    disorder, as a paraphilia, is one of those.  There's no

7    provision for a remission of that condition.

8           In other words, there's no way that we can say

9    that, like, a cancer diagnosis, right?  It's presently in

10   remission.  There are certain pedophilias now, in the *DSM-V*,

11   where that term is starting to come into use, it's basically

12   noncontact-based disorders.  But not pedophilic disorder.

13   And the *DSM* and verbiage carrying from the *DSM-IV-TR*, says

14   that Pedophilia is oftentimes considered to be a chronic

15   condition, which is not really based on research, and I think

16   it's coming out.  As a matter of fact, we have been heavily

17   debating that issue and I think that verbiage, finally, is

18   coming out of the *DSM*, and when the *DSM-VR*, or whatever

19   they're going to call it, comes out.

20          But so if you get the diagnosis, you get the

21   diagnosis, but what I will point to is the fact that the

22   diagnosis is based upon, most strongly, the following words:

23          "Recurrent and intense sexually arousing fantasies,

24   urges or behavior involving sexual activity with a

25   prepubescent child or children."

1          Recurrent and intense.  So to the extent that we

2     have data, evidence, clinical or otherwise, to substantiate a

3     finding that a person, over a six-month period, is not

4     engaged in either recurrent or intense sexually arousing

5     fantasies urges or behavior, involving sexual activity with

6     prepubescent children, then logically, the deduction is that

7     that diagnosis probably really doesn't apply to that person

8     in the current tense.

9          But like I said, I'm constrained, I have to follow

10    the rules, so I can point that out and I think I do in my

11    report.  He would get the diagnosis, but the strength of the

12    diagnosis, is such, in Mr. Hunt's case today, that it's

13    negligible.

14    **Q.**  And so you mention a phrase, I believe, it's "by

15    history"?

16    **A.**  Yes.

17    **Q.**  In your report.  Could you explain or expound on that

18    phrase?

19    **A.**  Well, "by history" means that at one point, the diagnosis

20    would have been credibly made and it would have been

21    reflective of Mr. Hunt's underlying sexual deviance.  So that

22    just doesn't evaporate, as I said, because there are

23    constraints diagnostically in the way that the diagnostic

24    criteria, even today, in that paraphilia are worded, are

25    constructed.  So "by history," what I'm saying is the

1  diagnosis is there, I don't say does or doesn't meet the

2  diagnostic criteria, but I'm trying to put it in it's -- what

3  I consider to be its proper context and that is by history

4  going back now decades.

5        I do not see, find, conclude, in the current and

6  present tense, that Mr. Hunt has the features that would

7  define pedophilia or pedophilic disorder.  One of the changes

8  from *DSM-IVTR* to *DSM-V* has to do with the differentiation

9  between pedophilia as a condition and pedophilic disorder,

10  which is more related to it being problematic in one or

11  another, either distressing to the person.

12        THE COURT:  So is your point -- I'm sorry to

13  interrupt, but let's see if I understand.

14        THE WITNESS:  It's okay.  You're the judge.

15        THE COURT:  No doubt he qualified for the

16  diagnosis.

17        THE WITNESS:  Correct.

18        THE COURT:  Because at least his behavior was

19  recurrent -- what was the two words?  Recurrent.

20        THE WITNESS:  And intense.

21        THE COURT:  Pedophilic behavior in the form of the

22  abuse of so many boys.

23        THE WITNESS:  Correct.

24        THE COURT:  And maybe also he -- maybe that's,

25  itself, evidence of urges and fantasies, or there may be

1    independent evidence of that, but in any event.  But what

2    you're saying is that's enough, since it's essentially here

3    undisputed that he had that, to give the diagnosis, and the

4    *DSM* doesn't provide any basis for remission or -- remission,

5    or, quote, cure.  Therefore, he has the diagnosis, but what

6    would you say, since there's no current evidence, in -- of

7    behavior, there's nothing before me that -- of documented or

8    even alleged instances of pedophilic behavior and the time

9    he's been on conditional release the last seven years.  That

10   that's one factor you would say, it's just weaker?

11          THE WITNESS:  Correct, Judge.  That's right.

12          THE COURT:  What, if any, evidence is there with

13   respect to urges or fantasies.

14          THE WITNESS:  Currently.

15          THE COURT:  In the last seven years, since he's

16   been on conditional discharge.

17          THE WITNESS:  None that I'm aware of.  None.

18          THE COURT:  And how would one determine, from your

19   perspective, how would one determine whether a person who you

20   were evaluating had such urges or fantasies?

21          THE WITNESS:  Well, there's a number of different

22   ways that that can be -- it's certainly not a perfect system,

23   but obviously the simplest is a self-report, which there is

24   none.  But that's, generally speaking, in my experience,

25   against one's penal interest, so you don't see a lot of that

1    happening.  Although it does.

2              So self-report would be one.  Treatment notes,

3    where issues are discussed, and therapists who know what

4    they're doing ask the right questions and elicit answers that

5    maybe the individual didn't realize what they were admitting

6    to, that happens a lot.  I don't see any evidence of that.

7    Behavior --

8              THE COURT:  We talked about behavior.

9              THE WITNESS:  Yup, but I'm just saying behavior

10   that maybe not would go towards an offense, but might be in

11   a -- what we would call cycle behavior, would be in a chain

12   of events, but the behavior itself didn't end in an offense,

13   but might -- the behavior that we can measure might be

14   evidence of underlying fantasies or urges, so you can use

15   behavior that way, as well.  So those would be the main ways,

16   as well as as if we did some physiological testing.

17             THE COURT:  So self-report, treatment notes,

18   psychological testing.

19             THE WITNESS:  Right.

20             THE COURT:  And reports of behavior that wasn't, in

21   and of itself, criminal or otherwise misconduct behavior, but

22   might be behavior that was a red flag, if you will, or a flag

23   of concern with respect to maybe that suggests the person is

24   having thoughts or fantasies about this, though they haven't

25   necessarily acted upon it.

1          THE WITNESS:  Right.  I would generally refer to

2     that as precursive behavior, yes.

3          THE COURT:  Okay.  Go ahead, Mr. Gold.

4          I'm sorry, so just to close up, so it's basically,

5     the absence -- what you believe to be the absence of those

6     things that gives rise to your view that, yes, he has the

7     diagnosis, but in the scheme of things, it's a relatively

8     weak diagnosis because of these seven years, during which

9     there is no evidence of those fantasies, urges and behaviors.

10         THE WITNESS:  Yes, if there was a provision for

11    remission, I would have found it most definitely in this

12    case.  Yes, Judge.

13         THE COURT:  I see.  Okay.  Go ahead.

14         Was that also the reason, back at the time of the

15    trial with Judge Tauro, the absence of current data, that --

16    if you recall, that you said, well, the diagnosis could be

17    made, but you weren't so comfortable making it?

18         THE WITNESS:  Right.  Even back then, there was

19    certainly cracks in the wall diagnostically, but we have a

20    lot more data since then.  And I think, you know, without

21    trumpeting a horn there, I think my statements back then have

22    been borne out by actual in the community behavior, not over

23    six months, or a year, or a year and a half, but now over

24    seven years of duration, I think finds -- you know, my

25    prediction back then would have been you would not have seen

1   this and we certainly haven't.

2           And although I'm certainly aware of the old

3   statement that evidence -- what is it?  Absence of evidence

4   is not evidence of absence, that in my experience, in sexual

5   behavior, that bridge is a lot shorter to cross.  And even if

6   you look at the fourth circuit decisions in the SDP cases

7   down there, the *Wooden* decision, W-o-o-d-e-n, that's been a

8   big appellate decision down in the Fourth Circuit, that

9   focuses on a lot of the institutional behavior that they see

10  at Butner, in making professional judgments about whether the

11  person still experiences, or has intense or recurrent

12  fantasies or urges.

13          MR. GOLD:  Thank you, Dr. Plaud.  That's a 2012

14  case.  I appreciate your legal expertise, as well as

15  clinical.

16  BY MR. GOLD:

17  **Q.**  But Dr. Plaud, would viewing materials having to do with

18  kids be a diagnostic -- a data point in a diagnosis that

19  would support an active diagnosis?

20  **A.**  Oh, yes.

21  **Q.**  And in this case, were there -- was Mr. Hunt's computer

22  monitored?

23  **A.**  Yes.

24  **Q.**  And was he subjected to regular polygraphs?

25  **A.**  Yes.

1    **Q.**  And did you find evidence, according to a diagnosis, in

2    either of those two sets of data?

3    **A.**  No.

4    **Q.**  And was there evidence from the monitoring of his

5    computer of looking at videos?

6    **A.**  Well, I think he looked at -- you mean child videos?

7    **Q.**  No, any videos.  ^ Fix speaker?

8    **A.**  Yeah, I think that he did watch videos, yes.

9    **Q.**  Right.  And that was of -- did you have occasion to look

10   at what that video --

11   **A.**  Yes.

12   **Q.**  -- was?

13   **A.**  Yes.  I would not consider it to be risk relevant.

14   **Q.**  Right.  And there was a video kind of -- with kind of a

15   sexual theme, but involving adults?

16   **A.**  Adults, correct.

17          THE COURT:  What was the video?

18          MR. GOLD:  It's in the report, Your Honor, the

19   title, maybe "Crazy Hot Summer," or something along those

20   lines.  It's easily Googleable and --

21          THE PROBATION OFFICER:  Your Honor, the report

22   reflects that it's "Slutty Summer," I believe.

23          MR. GOLD:  Slutty Summer.

24          THE COURT:  Your report or his report?

25          THE PROBATION OFFICER:  My report.

1          MS. SERAFYN:  So it's page 2 of Exhibit 1.  It's in
2    the second to last paragraph.
3          THE COURT:  I see.
4    BY MR. GOLD:
5    Q.  And is data or information like that -- oh, not your
6    report, Dr. Plaud, the --
7    A.  No, I know.  I did reference the issues on page 9 of my
8    report, though.
9          MR. GOLD:  Right.  It's also page 9 of Dr. Plaud's
10   report.
11         THE COURT:  Okay.
12   BY MR. GOLD:
13   Q.  So how does that figure into your -- the diagnostic
14   conclusion, if at all?
15   A.  It is consistent with what my conclusion is in this case
16   and that is his sexual interests are not pedophilic in nature
17   at this time.
18   Q.  And in your opinion, the diagnosis that you do make, does
19   that rise to the level of mental abnormality under the
20   statute, as you understand?
21   A.  Well, you know -- and again, I've been involved in dozens
22   and dozens of these federal cases.  And the way it's
23   described, the second tier or second prong of the 4248 is
24   refers to a person having a serious mental illness,
25   abnormality, or disorder.  That's a different wording than

1    they find in just about every state definition.

2            So, for example, in Massachusetts, it talks about a

3    person having either a mental abnormality or a personality

4    disorder.  And those terms are defined rather precisely in

5    the law, in the relevant section of the law.  So in

6    Massachusetts, a mental abnormality refers to a congenital or

7    required condition of a person that results in that person

8    having a general lack of ability to control the sexually

9    impulses and behavior that makes that person a menace to

10   public safety, et cetera.  It's not really defined here in

11   *Adam Walsh*, right?  Child molestation and sexually violent

12   conduct are, but not prong 2.

13           So it enlarges it, so it's not just a mental

14   abnormality, you see.  It's a serious mental illness,

15   abnormality, or disorder.  So in this case, there is a

16   disorder that's diagnosed and that is pedophilic.  So in my

17   experience -- again, I'm not a legal scholar and I'm not

18   aware of any appellate law on this issue in the federal

19   system, that instructs experts what they really should be

20   looking for.  It's a very broad issue in the federal one, the

21   way it's defined in comparison to state laws that I deal in.

22           So I would say he meets that prong and, to the

23   extent, that he has a diagnosable pedophilic sexual

24   condition.  So again, how serious it is is the question, not

25   that is the diagnosis made.  So I would temper -- I'd give

1  him half a point for two, for tier two.

2  **Q.**  Now, Dr. Plaud, I think now is the time to move to the

3  third element, but it's a serious mental illness condition or

4  disorder, which makes or causes a person to have serious

5  difficulty --

6  **A.**  Right.

7  **Q.**  -- refraining from sexually violent conduct or child

8  molestation?

9  **A.**  Right.

10  **Q.**  Do you have an opinion as to the third prong?

11  **A.**  It's absent.  The diagnosis is made of pedophilic

12  disorder by history, but he does -- Mr. Hunt, here, today,

13  does not have serious difficulty in controlling his sexual

14  impulses or behavior that would involve him being -- engaging

15  in further acts of any type of sexual exploitation of

16  children or sexually violent conduct.  No, I would say, most

17  definitely my judgment, the third element is not met.

18  **Q.**  Now, in the course of your review, including speaking

19  with Mr. Hunt and reviewing the document since his release,

20  did you find evidence of behavioral stability in the

21  community?

22  **A.**  Yes.  I found evidence of great behavioral stability, of

23  forward thinking, of release planning that he put into

24  action, continuing with treatment, doing well, not engaging

25  in behavior that in any way would put him in a cycle, or to

1    be risky in that sense.  I mean, I'm an expert, I guess, but

2    don't take my word for it.  Take Mr. Hunt's own behavior in

3    the community.  It's not many cases that you get, you know,

4    initial commitments, these guys are all coming out of prison.

5    That's where they've been, so we have to try to infer they

6    said from institutional behavior a lot.  It's very rare that

7    we get seven-plus years of actual in the community behavior

8    to use as our touchstone that we have here.  And I mean, if

9    you need a smoking gun, that's your smoking gun in this case.

10   He --

11        You know, he is monitoring his behavior, he's not

12   engaging in risk relevant behavior and -- generally speaking.

13   I mean, he is engaging in a lifestyle that is stable and

14   lawful.  So again, this is what I would expect of him, and

15   this is what he's doing.

16   Q.  Now, is there research in the area of sex offender

17   recidivism, specifically homing in on the issue of the risk

18   relevance of time free in the community?

19   A.  Yes.

20   Q.  Can you tell us a little bit about that research and

21   whether it informs your opinion here today?

22   A.  Yes.  Well, dynamic risk factors, generally, refer to

23   factors that can change, that are present and future focused,

24   and can be measured in realtime, rather than just historical

25   or static.  So in other words, Mr. Hunt --

1          THE COURT:  You can skip that.  I understand the
2     difference between dynamic and static.
3          THE WITNESS:  And there are two of them that I
4     think are particularly powerful in our analysis.  The first
5     is age, current age.  He's got both of them going for him
6     now.  And the second is time offense-free in the community.
7     And if you look at the available research that is focused on
8     that, if you can demonstrate or have a data set that an
9     individual is in the community for greater than five years,
10    that seems to be a magic number, that basically wipes out
11    risk.
12         Now, I'm not saying that there's never offending
13    after five years, but to be able to predict it affirmatively,
14    basically goes away after five years.  So here we have
15    seven-plus years, right?  A little over seven years.  So he's
16    not only past that, he's greatly surpassed that mark, added
17    an additional two-plus years on to it, again, with no
18    reoffending.  So that basically, in and of itself, would zero
19    out the possibility of an affirmative risk prediction.
20         That's why, in my report, I don't even do a static
21    99, an actuarial, because given his age and given the time
22    offense-free in the community, it makes no sense to do it.
23    So yes, that, to me, is the smoking gun in this case, other
24    than his age, his current age.
25         MR. GOLD:  And Your Honor, Dr. Plaud just made

1   reference to an actuarial instrument called the "static 99"

2   or the "static 99-R" today, which is often the focus and may

3   have been, I think, a big focus in the trial in front of

4   Judge Tauro.  But what Dr. Plaud, I believe, has testified is

5   that it -- they're not indicated to be used with someone of

6   Mr. Hunt's advanced age.

7   BY MR. GOLD:

8   **Q.**  Is that fair?

9   **A.**  Oh, yes.  If you combine age and time offense-free in a

10  community and the level of treatment.  That's the third fact,

11  if you want to bring that in.  These issues would make him

12  completely unrepresentative of the developmental samples in

13  the Static-99R.  So you cannot compare him to that group.

14          And even the developer of Static-99 now are

15  discussing and it's in the most updated coding rules, the

16  coding manual of the static-99 are to basically significantly

17  reduce the risk estimates, if you have any information of the

18  person being offense-free in the community for at least a

19  five-year period of time.

20  **Q.**  So Dr. Plaud, I've saved the best for last, but you

21  mentioned it.  Can you talk to the issue of, in your opinion,

22  the degree -- well, first of all, in your opinion, can you

23  comment on the treatment that Mr. Hunt has received and is

24  receiving and also his level of internalization of those

25  treatment concepts?

1    **A.**   Right.  Well, you know, Mr. Hunt was one of the first two

2    graduates of the CTP.  That's the commitment and treatment

3    program, that's what was founded at Butner.  When I

4    originally saw Mr. Hunt, I saw him in a place I can't see him

5    anymore.  There were only two people there when I went,

6    originally, so we got to go right into the unit itself and do

7    the evaluation, rather than in the visiting room.

8         But you know, the way that treatment is delivered

9    in the federal system, they have what's called SOMPs, okay?

10   Those are the sex offender management programs and they have

11   residential and non-residential programs.  So for example, at

12   here, at Devens, they have a SOMP program.

13        What Dr. Hernandez did, down in Butner, was create

14   a special program that focused on those who were in Butner,

15   either as a temporary commit, going through the *Adam Walsh*

16   *Act*, or post commitment, and he labeled that program the

17   Commitment and Treatment Program, or CTP for short.  So

18   Mr. Hunt and Mr. Shields both were there and participated

19   over about a 18 -- about a two-year period, in the program,

20   where they had, basically, the full attention of the

21   treatment staff, because everybody else was moved out at that

22   time.

23        So he participated.  He did well in the program.

24   He graduated the program.  He's probably one of only -- still

25   to this day, single the digits that have graduated from the

1    CTP program.  In my experience, most of them aren't even

2    involved in the program down there these days.  So he did

3    that, he graduated from it.  He got a lot of attention, since

4    he was one of two.  He certainly, reading the treatment notes

5    generated at that time in CTP, going back to -- I think he

6    graduated in July of 2011.  If my memory serves, Judge.  So

7    again, we're talking a number of years ago.  The treatment

8    notes, CTP treatment notes were very positive.

9         He gets out in the community, under supervised

10   conditions of release, he's with a treatment provider,

11   Dr. John Cusack, who I know, very good treatment provider.

12   The records of his outpatient base, the sex offender

13   treatment continue in the positive domain.  So there's

14   nothing --

15        He's not a treatment drop out.  He's not someone

16   who's in and out of treatment.  He's not someone who you can

17   describe in any way, shape, or form as not internalizing the

18   principles of treatment.  He's aware of what the terms are of

19   the treatment.  He knows what relapse planning means.  He

20   knows what cycles are, he knows about deviancies and chains.

21   So I consider Mr. Hunt to be an overtreated.  I mean, what

22   more treatment is he going to get?  That's what --

23        If he wants to do it, fine.  A lot of times

24   individuals, in my experience, continue, if not specifically

25   on sex offender treatment, but just in their ongoing

1    adjustment, to talk to somebody in a formal, structured way.

2    Which is fine, I recommend it, if that's what they want.  But

3    in so far as him continuing to benefit from treatment at this

4    stage, given his institutionally based treatment and he had

5    some contact with treatment even before the CTP.  And in the

6    last seven years as an outpatient, there's nothing that he's

7    going to learn, any more than what he's already learned and

8    internalized.  So he is a treatment success of the first

9    order and any benefit that treatment can be thought of as

10   being a risk reduction factor, what we call a protective

11   factor, would apply in this case.

12   **Q.**   You had occasion to review some of Mr. Hunt's medical

13   records and talk to him about how he's doing medically.

14   **A.**   Yes.

15   **Q.**   Does his physical condition, is it part of your opinion?

16   **A.**   It is, to the extent that it certainly would be -- it

17   would be consistent with being a major factor relating to

18   what age and recidivism bring to the table.  In other words,

19   in some cases, 73 years old, especially in today's world, you

20   know, people can be very spry and active, people of 73.  So

21   sometimes I see it argued, at least, that people who are very

22   physically fit and spry at the age of 73 may be an exception,

23   or I hear as an outlier to the age recidivism research.  Even

24   though there's really no shred of evidence to support that,

25   but I can see the logic of where it goes.

1              In this case, he's 73, he's got a lot of issues.

2      He looks older.  If you had to judge his age just by looking

3      at him, I think you probably think he may be older than 73,

4      just visually.  I'm sorry to say that, Mr. Hunt, but

5      that's -- and he suffers from a number of conditions that

6      limit his mobility, limit his ability to function in a way

7      that I think is very supportive of the aging research in

8      recidivism.

9              And I do summarize, a lot of those points beginning

10     on page 4 of my report, into page 5.

11             MR. GOLD:  I am content.  I don't know if the Court

12     has --

13             THE COURT:  Only one question.

14             So one purpose, you're saying, of sex offender

15     treatment is to learn.

16             THE WITNESS:  Yes.

17             THE COURT:  So that the offender can learn about

18     his or her behavior, what leads to it, what internal triggers

19     he has and the like, so that he can control it.

20             MR. GOLD:  Correct.

21             THE COURT:  And that, you say, based on the

22     evidence you have reviewed, is a function that's completed,

23     in your opinion?

24             THE WITNESS:  Yes.

25             THE COURT:  Is there, in your view, any other

1    function to the treatment, with respect to sex offenders?

2          THE WITNESS:  Not related, Judge, directly to

3    sexual risk.  As I said earlier in my testimony, even under

4    the umbrella of sex offender treatment, sometimes individuals

5    who really derive nothing more, tend to look at it as an

6    opportunity for them to do counseling, more general life

7    skills adaptive, emotional cognitive counseling, as someone

8    who they feel comfortable with already, given the treatment

9    liaison they have with that individual.  So that's not

10    atypical.  But you should label it for what it is.  So in

11    other words, if you're saying he should continue to do sex

12    offender treatment, because it will help him to still manage

13    his risk level, that's very different than saying you should

14    do it because it makes him feel better.

15          THE COURT:  Are you saying that, as a general

16    proposition, sex offenders don't need treatment in order to

17    manage their risk levels.  The purpose of treatment is sort

18    of a learning purpose?

19          THE WITNESS:  Yes.

20          THE COURT:  And once they've accomplished the

21    learning purpose, the treatment has no more risk control.

22          THE WITNESS:  That's exactly it.  There are

23    different names for the treatment modalities.  Now, we tend

24    to use this term called "good lives," but that's just a

25    recasting of what's basically an underpinning of what we call

1     cognitive behavioral treatment.  In other words, to learn the
2     skills, right, and to manage your behavior, your emotions,
3     your thoughts, to understand what cognitive distortions are
4     and what they lead to.

5              And generally speaking, there's some capstone
6     document, in the older system, it was always called a relapse
7     prevention plan, good lives model tends to use other terms.
8     Although the CTP does have its own relapse plan, good lives
9     relapse.  They have their own unique title for it.  But the
10    bottom line is it's a living document.

11             In other words, you teach a person the skills to
12    ultimately create that document, to make it a realistic
13    document, and to be able to change that document as
14    circumstances permit.  So in other words, if the person is in
15    a different economic circumstance, if they're living in a
16    different place, if they have a different set of friends, if
17    their employment situation changes, if they have a medical
18    issue that comes about, they lose somebody important, that
19    would tend to trigger certain things.

20             They're supposed to learn in treatment and
21    recognize this and to modify it on their own, their relapse
22    plan, and that's what we have here.  So to the extent that
23    this is -- and I will just say, honestly, it's not that the
24    perfectly treated person, like cuts their relapse -- excuse
25    me -- their reoffense rates in half, research-wise.  It

```
 1   doesn't.  Is it in cases associated with decreases in
 2   recidivism?  Yes.  But not more than -- it reaches an assent,
 3   in most of the studies, if you look, at about 7 percent risk
 4   reduction, not 70 percent, 7.
 5            So I recommend treatment, I do treatment, I was
 6   trained as a treating provider.  I think, you know, it is a
 7   structured thing, but we have to put the brakes on a little
 8   bit, when you're saying okay --
 9            THE COURT:  So your view is fundamentally that
10   treatment is helpful, but it's really not that big a deal.
11            THE WITNESS:  Correct.
12            THE COURT:  So what accomplishes reductions in
13   recidivism?
14            THE WITNESS:  What accomplishes it, in my judgment,
15   given the research, age, aging, and consequences.  Aging and
16   consequences.  The reason that sexual recidivism rates of all
17   major criminal categories are the lowest, right, if you look
18   at DOJ statistics.  I'm following 120 guys now, many of them
19   for three years, there's almost no recidivism.  Under 2
20   percent recidivism in that period of time.
21            THE COURT:  So the two things you think are most
22   significant, with respect to control, are age and
23   consequences?
24            THE WITNESS:  Right.
25            THE COURT:  Not treatment.
```

```
 1              THE WITNESS:  No, treatment is a way to formalize
 2     some of that and to teach skills.  I'm not throwing it out
 3     the window.
 4              THE COURT:  But like the two biggest things.
 5              THE WITNESS:  Yes.
 6              THE COURT:  Are age and consequences?
 7              THE WITNESS:  Yes.  Because with aging, not only
 8     does --
 9              THE COURT:  So is consequences, one aspect of
10     consequences is consequences received in the past?
11              THE WITNESS:  Yes.
12              THE COURT:  Is that what you -- is that only what
13     you mean by consequences, or do you mean more than that?
14              THE WITNESS:  No, well, consequences continue,
15     because certainly institutionally, there are a number of
16     consequences over a number of years for individuals who are
17     put in prison.  And if you're a sex offender in prison,
18     generally speaking, your consequences, which you have to look
19     out for, and how -- are a magnitude or two greater than what
20     typical --
21              THE COURT:  But in terms of consequences, looking
22     at Mr. Hunt, you would say one consequence, one set of
23     consequences is the criminal punishments that have been
24     imposed on him.
25              THE WITNESS:  Yes.
```

1      THE COURT:  And the second set of consequences is

2  the smaller sort of behavioral management consequences that

3  were imposed while he was incarcerated.

4      THE WITNESS:  Correct.

5      THE COURT:  And both in terms of if you do this,

6  then that happens; if you don't do this, then this happens?

7      THE WITNESS:  Yes.

8      THE COURT:  All right.  So then another level of

9  consequences is once released in the community, the oversight

10  of probation.

11      THE WITNESS:  True.

12      THE COURT:  So in this -- Ms. Serafyn, in the

13  status in which Mr. Hunt is in today, his discharge to the

14  community is conditional, correct?

15      MS. SERAFYN:  Yes, Your Honor.

16      THE COURT:  And so if -- I understand you haven't

17  made this motion and probation hasn't made this motion, but

18  if, in somebody in Mr. Hunt's legal status, the probation or

19  the Government thought the discharge should be revoked, you

20  would file a petition with the Court, right?

21      MS. SERAFYN:  That's right.

22      THE COURT:  And then there would presumably be a

23  hearing and a proceeding.  And then -- but that would be

24  before the Judge.

25      MS. SERAFYN:  Yes.

```
 1              THE COURT:  And much like a revocation of
 2    supervised release, essentially.
 3              MS. SERAFYN:  That's correct.
 4              THE COURT:  Okay.  You agree with that, generally,
 5    Mr. Gold?
 6              MR. GOLD:  Yes.
 7              THE COURT:  So then my question to you, Dr. Plaud,
 8    is what, if any, significance, do you -- you understand --
 9    strike that.  You understand now Mr. Hunt is on conditional
10    discharge?
11              THE WITNESS:  Yes.
12              THE COURT:  And supervised by probation.
13              THE WITNESS:  Yes.
14              THE COURT:  And you understand that there are
15    potential consequences to Mr. Hunt for behavior that's well
16    short of committing a new hands-on offense, or committing any
17    crime?
18              THE WITNESS:  Yes.
19              THE COURT:  Both in terms of increased oversight by
20    probation, right?
21              THE WITNESS:  Right.
22              THE COURT:  Additional monitoring tools imposed,
23    home confinement, more frequent visits by probation, more --
24    different kinds of requirements, and ultimately the
25    possibility of return to prison without a jury trial.
```

1                 THE WITNESS:  Correct.

2                 THE COURT:  What, if any significance -- so in that

3       sense, those are all akin, in a way, to the kinds of

4       consequences that are, in a different form, available to when

5       you're in the Bureau of Prisons, even when you have a

6       determinate sentence that, on a given day, you will be

7       released no matter what?

8                 THE WITNESS:  Right.

9                 THE COURT:  At least from the criminal sentence.

10      What, if any, significance do you ascribe to the presence of

11      those potential consequences/oversight to Mr. Hunt?

12                THE WITNESS:  Well, Judge, in this case, we have to

13      evaluate it in realtime.

14                THE COURT:  Yes.

15                THE WITNESS:  Based -- and I'll use a metaphor,

16      while I think it may be abrupt, is appropriate in the sense

17      of beating a dead horse here.  We can only supervise

18      everybody all the time forever, I guess.  The question is,

19      when you reach a point when you are unable, statistically,

20      empirically, clinically to assess a risk level that has any

21      meaning, then, you know --

22                THE COURT:  But that's not the question that I'm

23      asking you exactly.  The question that I'm asking you is

24      this:  You've told me that there are two significant factors

25      in reducing recidivism.  And recidivism is a form of

1    measuring a difficulty in controlling your behavior.  It

2    doesn't establish that the difficulty -- it's a general

3    statistical measure, it's not an individual piece of

4    evidence.

5            THE WITNESS:  Uh-uh.

6            THE COURT:  And it's not necessarily evidence of

7    causation and here we have to have not only a serious

8    difficulty, but a serious difficulty caused by a specific

9    reason.

10           Age is one thing.  There isn't any dispute about

11   how old Mr. Hunt is, so I understand.  And he's -- and I

12   understand your point is well taken, that there's -- people

13   at -- he's 73?  That at 73, there's a range of people, there

14   are people at 73, who are doing iron man triathlons and there

15   are people on 73 who are on death's door, and a range in

16   between.  And he's somewhere in between, but he's not, what

17   you're saying, on the spry side, and all of those medical

18   things, conditions that he suffers that you describe, you're

19   saying further reduce his risk of recidivism, right?

20           THE WITNESS:  Yes.

21           THE COURT:  And that's one of the two big things

22   that the research says reduces recidivism, age?

23           THE WITNESS:  Yes.

24           THE COURT:  The second is consequences, so what I'm

25   wondering about is whether the presence of the possibility --

1  of the oversight, and those consequences, itself, is

2  contributing to his present success, if you know.

3  　　　　　THE WITNESS:  Well, my answer is, is when you get

4  to the point where you have conditional release, your access

5  to potential pools of victims goes through the roof.  Okay?

6  So when I'm talking about consequences mostly, I'm talking

7  about the criminal justice system and the

8  institutionalization of the individual.  That's where, in my

9  judgement, most of the variance is captured in that term

10  under consequence.

11  　　　　　When you're in the community, yes, if you have

12  probation, federal probation or state probation, they are

13  conditions, could involve polygraphs, certainly mandated

14  treatment, you know, GPS monitoring, in many cases.  There's

15  a wealth of different -- a range of supervision requirements.

16  And if you violate them, a range of consequences from

17  extending the ranges of supervision, to adding conditions, to

18  returning the person to incarceration.  So I'm well aware of

19  that.

20  　　　　　But the point is, if you have data that says that

21  even under conditions, in environments where it would be

22  rather easy to have potential victims, and you see no

23  evidence of that, over a prolonged period of time, then

24  you've answered the question.  What is the -- what do you

25  supervising at the end of the day.  You got years of data,

```
 1    right, and you can say, well, okay, maybe, but if I did this,
 2    I might get violated, well, maybe.  But this is somewhat --
 3    the definition is of a sexually dangerous person, who by
 4    definition has serious difficulty controlling his sexual
 5    behavior.  So the mere thought of --
 6              THE COURT:  So your view is, really, that if
 7    someone is complying with their conditions over an extended
 8    period of time, which conditions are more extensive than
 9    merely prohibiting violent, sexual behavior, then their
10    ability to comply with those conditions, even in the face of
11    consequences, notwithstanding the fact that there are
12    consequences there that may contribute to their behavior,
13    then that's addressed the absence of a serious difficulty.
14              THE WITNESS:  Correct.  That's exactly right.
15              THE COURT:  I don't have any other questions.
16              Anything else, Mr. Gold?
17              MR. GOLD:  No, thank you.
18              THE COURT:  Ms. Serafyn.
19              MS. SERAFYN:  Thank you, Your Honor.
20              Before I start, though, Your Honor, Mr. Hunt's
21    conditions of release are Document 101 on the docket.
22              THE COURT:  101?
23              MS. SERAFYN:  101.  And the procedure that Your
24    Honor referred to in terms of a violation of a condition of
25    supervised release and a revocation happened in the Shields
```

1    case that Mr. Gold mentioned, so we, in this district, have

2    gone through that once in that case.

3              THE COURT:  Maria, would you just print out 101.

4              MS. SERAFYN:  Dr. Plaud, in the --

5              THE COURT:  And in that sense, it's just a

6    petition, a hearing, potentially, and a full-blown

7    proceeding, that was contested and the like.  An evidentiary

8    hearing before the Judge, with the burden on -- I will assume

9    for the moment the burden on the Government to prove by

10   preponderance of the evidence that there was a violation of

11   the conditions of conditional discharge that had been

12   established by the Court and then a discretionary decision by

13   the Court, under the totality of the circumstances, is what

14   the appropriate remedy for that would be, whether it would be

15   a revocation of conditional discharge, or whether it would be

16   some increase in conditions, or the like.

17             MS. SERAFYN:  That's right, Your Honor.

18             THE COURT:  Okay.  Go ahead.

19             **CROSS-EXAMINATION BY COUNSEL FOR PETITIONER**

20   BY MS. SERAFYN:

21   **Q.**  Dr. Plaud, Mr. Hunt told you that he has no current

22   sexual interest in prepubescent boys, right?

23   **A.**  Correct.

24   **Q.**  And you believe him, right?

25   **A.**  Do I believe him?  In this case, I would tend to believe

1    him.  Generally speaking -- I always ask in every case and I

2    put it for what it is.  Generally, my practice is, if the

3    person says something that is against their penal interest, I

4    pay more attention to it, than if they say I have none.  But

5    in this case, it is my conclusion that that is an accurate

6    statement.

7    **Q.**  Did you do any tests or assessments to verify if that was

8    true?

9    **A.**  I did not.

10   **Q.**  So you didn't administer a PPG?

11   **A.**  No, given the medical issues and his age, and my

12   experience over the years of PPGs, I would think it would

13   have been flatlined, at best.

14   **Q.**  But a PPG is a penile plethysmograph?

15   **A.**  Very good, yes.

16   **Q.**  And that is a way to measure one's sexual arousal,

17   correct?

18   **A.**  It's a direct way to measure a man's relative pattern of

19   sexual arousal based up on exposing that person to audio and

20   visual stimuli while they wear a device around their penis

21   that measures change in the circumference.  In other words,

22   the engorgement of the penis.  Yes.

23   **Q.**  But doing that could tell you, for example, if Mr. Hunt

24   was aroused by pictures of prepubescent boys, correct?

25   **A.**  It could.

1   **Q.**   And you also didn't do any psychological testing, right?

2   **A.**   Correct.

3   **Q.**   You didn't administer the Static-99R, correct?

4   **A.**   I decided not to as I explained in my report.  I think it

5   would be inappropriate in this case.  That's correct.

6   **Q.**   But there are psychological tests and actuarial

7   instruments that help determine whether someone is likely to

8   reoffend if released?

9   **A.**   Well, there's not merely psychological tests, per se.

10  Psychological tests help diagnostically, right?

11  Psychological tests help to look at other issues of

12  personality and mental functioning, but they're not directly

13  to assess sexual risk.  But I will agree, actuarial tests,

14  comparatively speaking, they're not really tests.  They're

15  tools.  And the most widely used is the Static-99R, are

16  designed at least to put a person in a rank order,

17  essentially, of risk, but that presupposes certain things

18  that are different in this case, right, under three mayor

19  areas.  Treatment, age, and time offense-free in the

20  community.  It just makes it, it would be invalid, the number

21  would be meaningless of a Static-99 in this case at this

22  time.

23  **Q.**   Is there anything in the instructions or the coding

24  manual of the Static-99R that says that you can't administer

25  this actuarial instrument on someone who is 73 years old?

1    **A.**   Well, there certainly would be -- there are cautionary,

2    like if you look at the time offense-free in the community,

3    it would be cautionary.  I don't have the coding manual in

4    front of me, but at least half, the risk estimate, number

5    one, so that tells you something.

6    **Q.**   But, to your knowledge, is there an explicit prohibition

7    against using the Static-99R on someone who is 73 years old.

8    **A.**   No, for any test or measurement, look at the personality

9    tests, right?  Someone could be -- not be able to read or

10   write.  If you look at a personality test and they say, well,

11   can you not give this person a personality test, do you have

12   to do something different?  Read it to them and take their

13   answers, which would be in violation of the protocol in many,

14   the way it was developed.  Yes, it doesn't say you can't do

15   it, but the question is why do it, right?  What value does it

16   have?

17   **Q.**   So you could have administered the Static-99R, but you

18   chose not to; is that fair?

19   **A.**   Right, because it would not give me a finding that would

20   be any reliable.  It would not speak to the issue that I'm

21   trying to evaluate.

22   **Q.**   And the research shows that men in their 70s have

23   reoffended, correct?

24   **A.**   Yes.  Death is the only thing that brings recidivism down

25   to zero, right?  But having said that, men over the age of 70

1    and 60, really, is the touchstone, never mind 70, is such a

2    low group -- in other words, comparatively speaking, after

3    the age of 60, less than five percent of offenders reoffend.

4    After the age of 70, it's about as close statistically to

5    zero as possible.  Does that mean it can't happen?  No.  But

6    it's really an outlier at that point.

7    **Q.**  And at least some of the research shows that there have

8    been men in their 80s who have reoffended.

9    **A.**  Right.  Death is the only thing that brings recidivism

10   truly to zero.

11   **Q.**  Now, in your report, you said that Mr. Hunt is taking

12   gabapentin for severe nerve pain; is that right?

13   **A.**  Yes.

14   **Q.**  And Mr. Hunt said that, since taking this medication, his

15   sexual functioning has decreased, correct?

16   **A.**  Yes.

17   **Q.**  And you believe him?

18   **A.**  I don't know, I didn't do a PPG on him.  So I'm just

19   reporting what he's reporting.  I'm not making conclusions or

20   risk evaluations based on that self-report.

21   **Q.**  And you're not -- you don't know what's going to happen

22   if Mr. Hunt stops taking this medication that he says reduces

23   his sexual functioning; is that right?

24            THE COURT:  Is that a known effect of gabapentin?

25            THE WITNESS:  Yes.

BY MS. SERAFYN:

**Q.**  So it's possible that Mr. Hunt's sexual functioning could actually increase if he were to stop taking this medication?

**A.**  Well, it's certainly possible, but again, we're dealing with a person who has a number of issues medically and who is in his -- he's now approaching his mid 70s, so even if that were the case, the question is how far can it possibly go at this point.

**Q.**  I understand.  I'm just asking if it's possible.

**A.**  Yeah.

**Q.**  Okay.  Now, you testified that Mr. Hunt has participated in sex offender treatment, right?

**A.**  Yes.

**Q.**  And you also testified that he, in your view, has been successful in that treatment with Dr. Cusack, correct?

**A.**  Yes.

**Q.**  And Mr. Hunt recognize that his treatment with Dr. Cusack has been beneficial to him, correct?

**A.**  I think the therapeutic alliance has been a very strong one between them, yes.  I'm glad to see it, because it isn't in a lot of cases, cases that we've had.

**Q.**  For sure.  And Mr. Hunt has enjoyed this therapeutic alliance with Dr. Cusack so much that he has said that he will continue to meet with Dr. Cusack, even if he's not required to.  Is that's right?

1    **A.**  Right, which I think is terrific, but just keep --

2           THE COURT:  You answered the question.  Next

3    question.

4    BY MS. SERAFYN:

5    **Q.**  And you believe that Mr. Hunt will continue with

6    treatment with Dr. Cusack, even if he's not required to?

7    **A.**  I do.  Correct.

8    **Q.**  But again, you can't be sure, right?

9    **A.**  I can't be sure and even if he quit the minute after he

10    was released, I don't think it would make a bit of difference

11    risk-wise.

12    **Q.**  Now, Mr. Hunt has been supervised by US probation since

13    he was released in 2012; correct?

14    **A.**  That's correct.

15    **Q.**  And probation is the one who connected Mr. Hunt with

16    Dr. Cusack?

17    **A.**  Good job.  Yeah, they did.

18    **Q.**  And as you testified, that's worked out well for

19    Mr. Hunt, right?

20    **A.**  Correct.

21    **Q.**  Over the past seven years?

22    **A.**  Correct.

23    **Q.**  Now, as part of his supervised release conditions,

24    Mr. Hunt has periodic polygraphs, right?

25    **A.**  Correct.

1  **Q.**  And he's had one in 2013?

2  **A.**  I don't remember exactly the date, but I'll take that to

3  be true, yes.

4  **Q.**  Okay.  And I don't know if you remember one that he had

5  in 2015.  In that one, I'll represent to you that the post

6  test report showed that Mr. Hunt had a problem with the test

7  that seemed to center around being alone with children.  Do

8  you remember that?  It's on page nine of your report.

9  **A.**  Thank you.  I do remember it.  Yes.

10  **Q.**  And his conditions of supervised release weren't revoked

11  at that point, right?

12  **A.**  Correct.

13  **Q.**  Okay.  Now, probation gets this information from the

14  polygraph, right?

15  **A.**  Yes.

16  **Q.**  And Dr. Cusack gets this information from the polygraph,

17  as well, correct?

18  **A.**  Yes.

19  **Q.**  And based on this information, they're then able to work

20  with Mr. Hunt.  Isn't that right?

21  **A.**  Sure.

22  **Q.**  So if he expresses something in the polygraph that

23  raises, you know, a red flag or a yellow flag, that can be

24  discussed in his treatment, correct?

25  **A.**  It can.

1    **Q.**  Now, in 2016, he had another polygraph that showed that

2    he had been looking at sex toys online.  Do you remember

3    that?

4    **A.**  Yeah, I think I talk about that on page nine in my

5    report, yes.

6    **Q.**  And you said that he had an explanation for this, which

7    is that he was using a -- had a catheter at the time,

8    correct?

9    **A.**  Yes, we did discuss that during the clinical interview.

10    He told me that he was searching for lubricant for medical

11    reasons for the catheter and he noted to me, I think he put

12    in quotes that he was naive when he was directed to the

13    search page, not knowing such devices existed.

14    **Q.**  And again, his conditional or supervised release wasn't

15    revoked at this time, right?

16    **A.**  Correct.

17    **Q.**  But probation got this information, right?

18    **A.**  Right.

19    **Q.**  And Dr. Cusack got this information, correct?

20    **A.**  Yeah.

21    **Q.**  And they were all able to sort of talk to Mr. Hunt about

22    it and work through that through his treatment, right?

23    **A.**  Yes and no.  I mean, yes, you're right about coming to

24    the attention, but if it became a major clinical issue of

25    risk relevancy, then that would have been a -- I would have

1    treated it differently in my analysis.  I am of no awareness

2    that any of that led to any issue of any concern about his

3    risk at that time.

4    **Q.**  And a polygraph in 2017 showed that Mr. Hunt reported

5    physical contact with his grandchildren, through handshakes

6    and hugs, right?

7    **A.**  Yes.

8    **Q.**  Okay.  And again, this information was relayed to

9    probation and Dr. Cusack, correct?

10   **A.**  Yes.

11   **Q.**  Okay.  And his conditions weren't revoked at that time,

12   either, right?

13   **A.**  Correct.

14   **Q.**  Now, probation has been a support to Mr. Hunt over these

15   past seven years, right?

16   **A.**  Yeah, I mean, I have nothing to say about good things to

17   say about probation in this case.  I think treatment and

18   outpatient treatment of probation, I think they've done an

19   outstanding job with him.  Yes, I agree.

20           MS. SERAFYN:  Can I just have a moment, Your Honor?

21           THE COURT:  Yes.

22           (Counsel confers.)

23           MS. SERAFYN:  No further questions, Your Honor.

24           THE COURT:  Any redirect?

25           MR. GOLD:  No, Judge.

```
1              THE COURT:  Thank you very much, Dr. Plaud, you're
2    excused.
3              THE WITNESS:  Thank you, Your Honor.
4              THE COURT:  Next?
5              MR. GOLD:  Your Honor, I call Mr. Hunt.
6              THE COURT:  All right.  Is he confined?  What is
7    his status in the wheelchair?
8              MR. GOLD:  He has great difficulty moving.  He can
9    kind of go like this (demonstrating).
10             THE COURT:  Why don't you just have him go over
11   next to the witness box.
12             MR. GOLD:  What was the Court's direction?
13             THE COURT:  That he can move his wheelchair over
14   sort of between the witness box and the table, in that open
15   area, sort of in the well.  Right around.  Yes, then, maybe
16   have him come forward --
17             A little bit more, Mr. Hunt, right about there, but
18   turn.
19             Yes.  I don't think -- nobody needs.
20             MR. HUNT:  What about my talking?
21             THE COURT:  Ms. Serafyn, are you able to see
22   Mr. Hunt from there?
23             MS. SERAFYN:  Yes, Your Honor, thank you.
24             THE COURT:  Fine.  Okay.  That's perfect.
25             (The witness was duly sworn.)
```

1          THE COURT:  Go ahead.

2          MR. GOLD:  Your Honor, I'm just going to jump right

3    in.

4                          **WAYNE HUNT**

5          having been duly sworn, testified as follows:

6          **DIRECT EXAMINATION BY COUNSEL FOR RESPONDENT**

7    BY MR. GOLD:

8    **Q.**  Mr. Hunt, do you recall when you were involved with the

9    commitment and treatment program in Butner, North Carolina?

10   **A.**  Yes, I do.

11   **Q.**  And before I go any further, is it difficult for you to

12   talk?

13   **A.**  Yes, part of my throat is paralyzed with the partial -- I

14   could talk in short sentences.

15          THE COURT:  Move the microphone, so he doesn't have

16   to lean forward.

17          MR. HUNT:  I can answer in short sentences.  My

18   diaphragm is paralyzed and my chest muscles took over.  So

19   the air is a little rough, but I can talk.

20          THE COURT:  I can understand you fine.

21   BY MR. GOLD:

22   **Q.**  Can you just describe for the Court what -- what that

23   program consisted of?

24   **A.**  Yes.  It was solitary to start with.  There was probably

25   50 people in the dorm area, but most of them were not

1    program.  They were just against it.  Jeffrey Shields and I,

2    we didn't want to spend the rest of our life in prison, so we

3    knew we had to change.  So we took the program, which was --

4    a lot of people didn't like that and they didn't like us,

5    because they didn't want anybody to take the program.

6           But we had about four psychologists and three or

7    four staff that would work with us every day, for eight

8    hours, and we had things to do on the weekend to bring in on

9    Monday morning.  It was very intensive and one thing

10   Dr. Hernandez said to me one time was -- it was very

11   profound, I thought.  You've done this for your way 60 years,

12   you've lived your life, the way I did, offending, and she

13   said now it's time to try my way.

14          And that was pretty profound, because living your

15   life in criminality and then the transfer over to a

16   productive -- becoming a productive citizen in the community

17   was not easy.  Our whole thought process had to change.  When

18   you do something for so long, it's not easy to stop, and then

19   take another type of behavior.  But if I -- I didn't want to

20   spend the rest of my life in prison, I had to change.  There

21   was no ifs, ands, or buts about that.  I wanted to see my

22   daughter, I wanted to see my grand kids, I wanted to live a

23   good life, and I think I've lived up to their program.

24          I have done everything that I could, and not just

25   for them, but for the victims I had.  I regret every one of

1  them.  Everything that I did before 1985 is I guess you would
2  call it static.  I can't change that.  I regret it, but
3  there's nothing right at this point I could do about it,
4  except try to show that I can live a better life.  I can make
5  better choices.
6         I wish I had this program way earlier.  You know,
7  it would save victims.  I don't want any more victims.  I do
8  not want to reoffend and I have no intentions of it.  It's
9  a -- it's a life change for me that I had to make, if I want
10  to stay free and not just that, but victimless.  I'm going to
11  have to do it their way, basically, and I did.  I don't know
12  what I can add to that.
13  **Q.**  No, thank you, Mr. Hunt.  Can I just ask you, were there
14  classes that you took?
15  **A.**  Yes.  We had a regimen.  Every day we were with, four
16  hours in the morning, with psychologists.  And then the
17  afternoon, sometimes we're with staff, because they had what
18  they call the good life model, they just didn't focus in on
19  sex, but our whole life, what brought us to this.  I
20  isolated.  That was one of my triggers, isolation.  So now,
21  I'm at the veterans center, I have plenty of people to talk
22  to, and plus Dr. Cusack.
23         Now, my own insurance is paying for Dr. Cusack.  I
24  made that choice, I'm going to stay with him and I do like
25  the groups, because my input, I think, helps other people in

1    the same position that I'm in.  You know, the first thing

2    that you got to do is know that there's no cure.  You've got

3    to manage.  You've got to be aware of every morning waking up

4    and basically saying to yourself I'm going to live a good

5    life, no more victims.  And you don't put yourself in

6    situations that are high risk.  Now, I don't do this for

7    probation, I do this for myself.

8    **Q.**  Mr. Hunt, you're doing a wonderful job.  Let me just

9    bring you back to the Butner treatment program for one

10   moment.

11          Would you agree that it culminated, your work in

12   the program, culminated or ended with a relapsed prevention

13   plan?

14   **A.**  Yes, we took about eight months of the second year to

15   formulate this.  I found it very hard to write so much,

16   because I didn't realize what it entailed, until I got

17   writing it.  And then you look at it and you start changing

18   things.  Even today, like probation doesn't give me a curfew,

19   I had one.  They've basically taken that away.  It didn't

20   bother me a bit even beyond a curfew, because I'm in bed

21   early anyway.  But like of the 4th of July, I do like to go

22   to the Esplanade, watch the fireworks, and listen to the

23   music.  I love the Boston Pops, but that's about the only

24   place I go and I usually take somebody with me, somebody that

25   knows my past.  I don't have to, but I do.

1          When I'm with my daughter, probation even --

2   Mr. Foster has talked to my daughter.  My grand kids are well

3   aware of my past.  I do hug them, I do shake the hand of the

4   one over 22, but I still act natural around them, I don't --

5   and my daughter is always there.  I'm never alone with

6   anybody, I don't want to be.  And this is part of the

7   conditioning of that program, part of my relapse plan and I

8   have to live up to that.

9   **Q.**  Mr. Hunt, is it something that you carry around in your

10  back pocket, the relapse prevention plan, or is it something

11  that you have internalized to some extent?

12  **A.**  Oh, it has to be internalized.  You can't just talk,

13  because talk is cheap.  You have to show that you have

14  internalized this.  I think I have, because at seven years,

15  well, my offending is 40 years old.  I haven't had a criminal

16  case in 40 years.

17          THE COURT:  35.

18          MR. HUNT:  Pardon me?

19          THE COURT:  35.  1985.

20          MR. HUNT:  Okay.  35 years, actually.

21          THE COURT:  34.

22          MR. HUNT:  34.  And I've been out in the community

23  over seven years now.  I've had no problems.  I don't -- and

24  it's not because I'm watched all the time.  I mean, I can go

25  out, around, unchaperoned, and there's never been a problem.

BY MR. GOLD:

**Q.**  Mr. Hunt, can you describe for the Court what your support network has been like and is today?

**A.**  Sure.  I talk to my daughter at least once a week.  I talk to Dr. Cusack.  I did talk to him every week, now it's every -- once a month for mental health and then I go to the group.  And I'm pretty vocal in groups, because I think it helps other people, knowing my situation.  I don't judge anybody in these groups, but if I hear something, I speak up about it.

THE COURT:  How often do you go to group?

MR. HUNT:  I go once a month.

THE COURT:  So Cusack once a month, group once a month.

MR. HUNT:  Yes.

THE COURT:  Those are separate.  Those are separate things.

MR. HUNT:  Yes, they are.

BY MR. GOLD:

**Q.**  And group is facilitated by Dr. Cusack?

**A.**  Yes, it is.

**Q.**  Any other aspects of your support network as it has been or as it is today, that you care to mention?

**A.**  Well, probation is good.  I've never had a problem with probation.  Mr. Foster has been great with me.  I had

1    Mr. Smith at first, when I first come out.  And you know,

2    when I first got out, probation didn't want me in

3    Massachusetts, I don't know if that was ever brought up.

4    They wanted me to go back to New York, but I couldn't get

5    around in New York and there was no support group there.  But

6    they finally realized that I should come here to Boston,

7    where I could get around, have the services I needed.  And

8    Mr. Smith was great.  I had Mr. Laudate, and then I had --

9    oh, I can't think of her name now -- I had these two women

10   that I can't remember their names.  But they were good to me.

11         And Mr. Foster has always been -- he's straight up

12   with me.  I'm straight up for him, no secrets.  That was one

13   of my things, too, in relapse, be transparent.  And I have to

14   be transparent if I'm -- if I'm going to stay free.

15   **Q.**   Mr. Hunt, you live at the home for veterans?

16   **A.**   Yes.  New England Center and Home for Veterans.  They

17   have SROs and they have apartments.  Now, I can't get an

18   apartment with my level yet and of course, probation, I have

19   got to be free of everything to have an apartment, because

20   that's through HUD.  And that would be nice, because then I'd

21   have my own bathroom.  I'm on an SRO.  There's 15 men in a

22   floor, we have a communal area, we have a clean area, and I

23   have a lot of interaction, but more downstairs in the open

24   spaces where everybody congregates.

25         THE COURT:  The apartment would be in the same

1  building?

2          MR. HUNT:  Yes, they're in the same building, yes.

3  BY MR. GOLD:

4  **Q.**  And were you a part of a veteran's group, support group?

5  **A.**  I guess you could say that.  There's plenty of support

6  there.  We have coffee hours, we have all the people's stuff

7  that goes on, bingo, they take us places.  So I -- I look at

8  them as a part of my network, yes.

9  **Q.**  Now, can you describe for the Court, in your own terms,

10 your medical condition today?

11 **A.**  Okay.  I have what they call Parsonage Turner Syndrome.

12         MR. GOLD:  That's a name, Parsonage Turner

13 Syndrome.

14         MR. HUNT:  What that is is all the nerves in my

15 body -- usually it goes away, but mine didn't.  I was

16 completely paralyzed at one time.  I got about 40 percent

17 back.  I can't bend my fingers and make a fist, that's about

18 all I can do.  My arms, I can move this up a little up

19 higher, this one I can't move as high.  Part of my throat is

20 paralyzed.  My diaphragm is paralyzed.  I can walk maybe ten

21 feet, at the most.  I've fallen a couple of times, but

22 luckily I haven't hurt anything.  I got -- I still got

23 partially collapsed lung, there's water in it.  I had an

24 infection around the heart, myocardial ste- -- something like

25 that.  I'm just falling apart.  I guess that's all I can say.

1   **Q.**  Now, do you go to medical appointments from the New

2   England Home for Veterans?

3   **A.**  I have services at both the VA.  As a matter of fact,

4   I've got to pick up hearing aids next Thursday.  That's why I

5   can't hear that well.  I use MGH.  I got a thoracic surgeon.

6   I have a podiatrist, I have a lungologist, what he does is

7   stick a thing up in my nose and look at the paralysis.  I

8   have Dr. Colon, which is she?  A rheumatoid -- I have

9   osteoarthritis, she's a rheumatologist.  I don't think I can

10  name all the doctors that I have, but I make all my

11  appointments, and I try to keep my health up.  I eat right.

12  I do a little cooking.  You wouldn't want to eat it, but I

13  try.  That's about my life.

14          THE COURT:  How do you support yourself?

15          MR. HUNT:  I get SS retirement, Social Security

16  retirement, which isn't much, I live on about -- from them

17  800 and then I get 800 from SSP, which is a state supplement

18  program.  I also have a voucher that pays part of my rent

19  from HomeStart.

20          THE COURT:  What's that?  What's HomeStart?

21          MR. HUNT:  It's a place that helps pay your rent.

22          THE COURT:  I see.

23          MR. HUNT:  It's like a HUD program.

24          THE COURT:  I see.

25          MR. HUNT:  But I can't get HUD at this venture,

1   because I'm both on probation and my level hasn't changed

2   yet, which I'm trying to address after this, which you can't

3   have them two factors and get a voucher from HUD, you know.

4   So I had to go through HomeStart, and the center was really

5   good at helping me get that.  I pay $266 out of my stipend to

6   HomeStart.

7   BY MR. GOLD:

8   **Q.**  Mr. Hunt, I'm going to switch topics here, back to some

9   of the core areas of interest in the case.  Are you

10  interested in sex today?

11  **A.**  No.  I went to a group.  They call it a meet-up group at

12  Club Cafe and this was -- this was once a month on a Sunday,

13  we went there for brunch, and it was over 50 people.  Now, I

14  didn't go there looking for sex.  I went there looking just

15  for friendship and talk.  Sex just don't appeal to me

16  anymore.  They talked about gabapentin and I'll address that

17  with you.

18          If I didn't take gabapentin, I would be in pain,

19  like you wouldn't believe.  I take 300 -- 600 milligrams,

20  three times a day, which is almost the most you can take, I

21  got one more dose I can go to.  Now, they've offered me

22  narcotics.  I don't want that.  I want to be clear thinking.

23  So I take the gabapentin and I'm always in some kind of pain,

24  but the gabapentin reduces it so much, without a lot of the

25  side effects of the other drugs.  That's why I always stick

1    with gabapentin and I can't go off of it.

2    **Q.**   Mr. Hunt, do you have intense sexual fantasies?

3    **A.**   No.  No.

4    **Q.**   Of any kind?

5    **A.**   You know, I'll say not really fantasies, I've had them,

6    yes, but they just go in and I don't have to acknowledge

7    them.  In other words, you can have fantasies, but it's the

8    acting on it that's important.  I just wouldn't act on it.

9    **Q.**   But Mr. Hunt, I think you've advanced a couple of

10   questions in my mind about treatment, I want to go back to

11   that, but just as a physical matter, do you have intense

12   sexual fantasies on a daily or any basis as part of your

13   present, day-to-day --

14   **A.**   No, I don't, no.

15   **Q.**   -- existence?

16   **A.**   I haven't had them in years.

17   **Q.**   Now, you mentioned, if you were to have a fantasy, or if

18   you did, being able to not act on it.

19   **A.**   Right.  That's a coping response.  You can have thoughts,

20   but you don't have to act on them.  This is some of the stuff

21   in the program that I -- I never realized that I had

22   thoughts, even, because you don't pay attention to them on a

23   daily basis, usually.  Who actually thinks what they're

24   thinking all the time.  But through the program, I realized

25   that I did have these thoughts.  And there's a three-second

1    rule that I use all the time and with anybody under the age

2    of 18.

3              And by looking at them for more than three seconds,

4    that would me objectifying somebody.  And I have to be aware

5    of that.  Dr. Cusack and I talk about that all the time.

6    It's called the three-second rule.  And he's right, you

7    shouldn't be looking at people, especially if you have the

8    label pedophile.  Just the perception of looking at somebody

9    is not a good thing to have.  So you have to have coping

10   responses to deal with this and I do.

11   **Q.**  Now, was empathy one of the topics that you worked on in

12   the commitment and treatment program?

13   **A.**  Yes, it was.  And when I was offending, I didn't have

14   empathy for my victims.  I thought it was okay to pay for

15   sex, because that's what I did.  But later on, even in New

16   York State prison, I took a program that was relapse

17   prevention and that wasn't a good program, but I did get a

18   lot out of it.  Empathy is a big thing.  And when you don't

19   have it, that's when you can reoffend.  That can be a trigger

20   for reoffending.  You have to have empathy for people.

21             It's hard to explain, but you have to internalize

22   it and see the empathy.  But it's a thought process,

23   actually, that you internalize all of this and empathy is a

24   big thing.  If you don't have empathy, it's very easy to

25   reoffend.

1          As I stated earlier, with pedophilia, there's

2    actually no cure.  I don't care what anybody says, there's no

3    cure, but there is management.  And you better be good at it

4    if you want to live a good life.  And I think I've tried to

5    prove that every day, that I deserve that chance of getting

6    out of Butner.  It's not easy for a Federal Bureau of Prisons

7    warden to sign off on you getting out of prison.  It's -- he

8    has to be almost sure that you're not going to reoffend.

9          MS. SERAFYN:  Your Honor, I think this is beyond

10   the question at this point.  The answer to the question that

11   was posed.

12          MR. HUNT:  Did I say something wrong?

13          MR. GOLD:  No, no.

14          THE COURT:  That's fine.

15   BY MR. GOLD:

16   Q.   Mr. Hunt, why do you intend to keep seeing Dr. Cusack?

17   A.   He's like an anchor, if you want to call it that.  It's

18   somebody to go and talk to, without being judged, so to

19   speak.  He just helps me ground myself.  If I have any

20   problems, I can talk it out.  It's much easier that way.  You

21   know, it reduces my risk of reoffense.  That's probably the

22   best way to put it.  And see, my insurance pays for it, so

23   there's no reason that I wouldn't do it.

24   Q.   And Mr. Hunt, could you please explain or describe for

25   the Court your relationship with your daughter today and

1   recent outings that you've had?

2   **A.**   Sure.  I have a great relationship with my daughter and

3   my grandchildren and now I have four great grandchildren, so

4   I keep telling them, you're showing my age.  But I bring them

5   up -- I brought them up last year and we went whale watching,

6   which they loved.  And the year before that, I took them to

7   New York City, and we went to the 9-11 Museum.

8          Now, probation gave me permission to leave the

9   state.  I did it all by their rules and I think I had Brett

10  Weinberg at that point.  He talked to my daughter and I know

11  Chris talked to her.  So there was no problem.  They are very

12  aware of my situation.  And I -- you know, just knowing that

13  I shouldn't be around children without supervision.

14  **Q.**   And is your daughter aware of the nature of your past

15  offenses?

16  **A.**   Oh, yes, definitely.

17  **Q.**   Mr. Hunt, is it difficult for you to refrain from

18  offending today?

19  **A.**   Say that again.

20  **Q.**   Is it difficult for you to refrain from sexual offending?

21  **A.**   No.  I have no desire to have sexual contact with anybody

22  under the age of 18, probably under the age of 50.

23  **Q.**   Mr. Hunt, when you were offending, did you arrange your

24  environment to make offending possible?

25  **A.**   Yes, I did.  I bought a carnival and moving all over the

1   place with the carnival gave me access to children.  I had --

2   I made the environment, I groomed people, and I paid for sex.

3   There's no ifs ands or buts, what I did.  I did it.  I regret

4   it, but I actually made the environment for offending.  I'm

5   not going to blame it on when I was a kid, I was molested.

6   I'm not going to do that.  I take responsibility for doing

7   what I did and I do have the regrets.  But I did make the

8   whole environment.

9   **Q.**  Is the environment that you live in today conducive to

10  offending?

11  **A.**  Oh, no, no, no.  First of all, there's no children in the

12  building, you know.  Very rarely we see children in that

13  building.  But again, that don't mean that I couldn't have

14  access to them, because it's right next to Government Center,

15  where a lot goes on.  But if I get myself in a situation, I

16  leave and I've never had a problem with that.  I don't want

17  to reoffend.  You know, it's my -- it's my wish, or my duty

18  to not reoffend.

19          You know, I've got to start living as a private

20  citizen and I try to give the center the best name.  They

21  gave me a chance, they gave me housing.  I mean, you can't

22  let these people down there, you know, to bring a stigma

23  on -- the veteran's housing there, I couldn't do it.  I got

24  too much respect for the people who were helping me.

25  **Q.**  Mr. Hunt, just a couple more questions.  So you say you

1    don't want to offend.  Is your freedom a component of your

2    desire not to offend?

3    **A.**  Oh, of course.  I spent 27 years in prison.  I know what

4    freedom is.  Most people haven't been locked up, don't know

5    what freedom is.  After 27 years, it was like a new world

6    coming out.  You know, I didn't even know what a cell phone

7    was.  So it's -- it's amazing being free and keeping myself

8    free.  You know, it took -- it takes management, for me.  And

9    I think I've shown that I can do it.  I don't -- there's

10   nothing else I can do except stay -- stay in the moment and

11   do what I've been doing.  I don't know how to put it any

12   simpler.

13   **Q.**  No, that is very good, Mr. Hunt.

14            And you mentioned, or we discussed empathy before.

15   Is that a factor in your desire not to offend?

16   **A.**  It's a big factor.  I mean, without empathy, it could

17   lead to reoffending.  Anybody without empathy could do

18   anything they want and justify it.  So you've got to have

19   empathy.  If you don't, you've got a problem.

20   **Q.**  And Mr. Hunt, the last question.  But you've heard

21   discussion in the Court about the role that being on

22   conditional release is playing in this reasoning that you're

23   talking about, about not wanting to offend.  Can you respond

24   or talk about the role that being supervised by US probation

25   has in your current life, in your view?

1    **A.**   Right now, not a whole lot.  I do this because I want to,

2    not because probation is looking over my head.  They give me

3    a lot of rein.  You know, they used to say they give you

4    enough rope to hang yourself, well, they do.  They give you

5    enough rope and I proved to them that I can be reliable.

6              Could I have been?  Of course I could.  If I was so

7    desired, but I don't, because it's not because somebody is

8    looking over my shoulder, it's because of consequences.

9    That's a big factor today.  With everything you do, there's a

10   consequence, good or bad.  So I want the good consequences,

11   not the bad ones.  You know, if I hadn't learned something in

12   27 years in prison, I don't deserve to be here.

13             MR. GOLD:  No further questions.

14             THE COURT:  Ms. Serafyn?

15             MS. SERAFYN:  Thank you, Your Honor.

16             **CROSS-EXAMINATION BY COUNSEL FOR PETITIONER**

17   BY MS. SERAFYN:

18   **Q.**   Hi, Mr. Hunt.

19             THE COURT:  Maybe you should move over to the end

20   so he can see you.  It looks like it's hard for him to turn.

21   BY MS. SERAFYN:

22   **Q.**   Hi, Mr. Hunt, is this okay?

23   **A.**   Yes.

24   **Q.**   Mr. Hunt, it sounds like you've had a pretty good

25   relationship with probation over the past seven years.  Is

1    that fair?

2    **A.**   I really have, yes.

3    **Q.**   And that started with Mr. Smith, right?

4    **A.**   Yes, it had.

5    **Q.**   Okay.  He's in the courtroom now, by the way.  He's in

6    the back.  And now you have Mr. Foster that you're working

7    with, right?

8    **A.**   That's correct.

9    **Q.**   And probation set you up with housing, when you first got

10   out, right?

11   **A.**   They said -- they took me to the shelter, but housing, I

12   had to do on my own in the shelter.

13   **Q.**   Okay.

14   **A.**   They were supportive, but I had to go like to HomeStart,

15   apply for a voucher and all that.  It took about three years

16   to get permanent housing.

17   **Q.**   And the single room occupancy place that you live in now

18   is above the shelter that you first started in; is that

19   right?

20   **A.**   No, it's not above it.  The part of the building has the

21   shelter.  I live in the 10-story building that's attached to

22   it.

23   **Q.**   Okay.  And probation also set you up with Dr. Cusack,

24   right?

25   **A.**   Yes, that's correct.

1    **Q.**  And that's worked out well for you over these past seven

2    years?

3    **A.**  Yes, it has.

4    **Q.**  And Mr. Foster, he doesn't bother you too much, does he?

5    **A.**  Oh, no.  Because I always dealt with him, or any

6    probation officer open, no secrets.  If I want to do

7    something, I ask.  And I don't think there's been a time

8    where they've said no.

9    **Q.**  And you meet with Mr. Foster about once every month or

10   so?

11   **A.**  I'd say that.

12   **Q.**  So your involvement with probation isn't too onerous with

13   you for your life right now, right?

14   **A.**  No, it's not.

15          MS. SERAFYN:  Thank you, no further questions, Your

16   Honor.

17          THE COURT:  Any redirect?

18          MR. GOLD:  No, Your Honor.

19          THE COURT:  All right.  Thank you very much,

20   Mr. Hunt.  You can return to the counsel table.

21          MR. HUNT:  Thank you.

22          THE COURT:  Oh, I have one other question,

23   actually.  Sorry.  Hold on a minute, Mr. Hunt.

24          How do you sail?  Sorry, I have one more question.

25   How do you sail?

1       MR. HUNT:  Oh, they bring me over into the boat on

2  a sling and I usually bring somebody with me to handle the

3  sails.  I can do the tiller, but I can't do the sails.

4  They're too heavy.

5       THE COURT:  And where do you sail?

6       MR. HUNT:  Out of Piers Park.

7       THE COURT:  In East Boston?

8       MR. HUNT:  East Boston, yes.

9       THE COURT:  I see.  Is that part of a program

10  through the veterans.

11       MR. HUNT:  They have a program for veterans.  I got

12  my certification, so I can take people out.

13       THE COURT:  I see.  Okay.

14       Does that occasion questions for either of you?  If

15  you want to ask further questions in light of that, you can.

16       **REDIRECT EXAMINATION BY COUNSEL FOR RESPONDENT**

17  BY MR. GOLD:

18  **Q.**  Mr. Hunt, did you get out this season to sail?

19  **A.**  No, my arm was bothering me, I got to get a shot of

20  Cortisone in it.

21  **Q.**  But you look forward to next season?

22  **A.**  Oh, yes.  Yes.

23       MS. SERAFYN:  Can I just ask a couple questions,

24  based on the sailing?

25       THE COURT:  Sure.  Of course.

**RECROSS-EXAMINATION BY COUNSEL FOR PETITIONER**

1

2   BY MS. SERAFYN:

3   **Q.**  Mr. Hunt, at one point, you wanted to go sailing, but you

4   were concerned about a summer camp with kids in the area; is

5   that right?

6   **A.**  That's correct.  Sometimes they have sailing for youth

7   there.  So I always make sure that I'm not there at the time

8   they are.  And if it means me not going sailing, that's the

9   way it's got to be.

10   **Q.**  And is this something that you talk about or have talked

11   about with Mr. Foster?

12   **A.**  Yeah, I think I mentioned that to him.  Again, there's no

13   secrets.  If I have a concern, I talk to him.  That's what

14   he's there for.

15   **Q.**  And you talk to Dr. Cusack about this, too?

16   **A.**  Of course.

17   **Q.**  So everyone in that part of your treatment plan can get

18   on the same page about what your triggers might be?

19   **A.**  Of course.

20          MS. SERAFYN:  No further questions.

21          MR. GOLD:  No more.

22          THE COURT:  Thank you, Mr. Hunt, now you can return

23   to counsel table.

24          MR. HUNT:  Thank you, Your Honor.

25          THE COURT:  Mr. Gold, any other witnesses?

```
 1              MR. GOLD:  No, Your Honor.  We rest.

 2              MR. HUNT:  My jacket fell down, and I also rolled

 3    over it.  Thank you.

 4              THE COURT:  Okay.  I'm sorry, you say you rest,

 5    Mr. Gold?

 6              MR. GOLD:  Yes.

 7              THE COURT: All right.  Ms. Serafyn, any witnesses?

 8              MS. SERAFYN:  No, Your Honor.

 9              THE COURT:  Okay.

10         So I think, in fairness, I'd like to read

11    Dr. Plaud's report that I got this morning, which I've

12    skimmed, but I haven't really read, and I'd like to read

13    Mr. Foster's memo.  I don't recall whether I've seen it

14    before or not.  So if I did, I think I need to reread it, in

15    any event.  I take it you both -- do you both want to say

16    something?

17              MR. GOLD:  You know, I'm a lawyer.  I could.  It

18    really depends -- I had a few things to say, but it depends

19    on your feelings, Your Honor.

20              THE COURT:  So I think what I would like to do is

21    maybe take a break and read these two documents and then come

22    back and then if I have questions for either of you, I can

23    ask them and you don't have to say anything, but if you wish

24    to say something, then I certainly would permit you to do

25    that, now that you've heard the evidence.  Does that sound
```

1    reasonable?

2              MR. GOLD:  Great.

3              MS. SERAFYN:  That does.  Thank you, Your Honor.

4              THE COURT:  I think the -- maybe it would -- hold

5    on one second.  I just want to look at my calendar.

6              Is there any reason we couldn't come -- I'm just

7    thinking I might want to collect my thoughts a little bit,

8    too.  Maybe we come back at 2 o'clock.  Does that work?

9              MR. GOLD:  That's fine for me.

10             MS. SERAFYN:  That's fine, Your Honor.

11             THE COURT:  All right.  Fine.  And then Mr. Foster,

12   can you come back then, just in case, notwithstanding, that

13   nobody called you as a witness?  I'm not saying that I would

14   want to, but I think that --

15             MR. FOSTER:  Absolutely, Your Honor.

16             THE COURT:  But if something came to my mind from

17   thinking about all of this and if I wanted to ask you

18   questions, I might want to do that.

19             MR. FOSTER:  Absolutely, Your Honor.

20             THE COURT:  All right.  Fine.  I'll see you all at

21   2 O'clock.  We'll stand in recess.

22             THE DEPUTY CLERK:  All rise, this matter is in

23   recess.

24             (Court in recess at 11:29 a.m.

25             and reconvened at 2:03 p.m.)

```
 1              THE COURT:  Please be seated.  I see all counsel
 2    and Mr. Hunt and Mr. Foster from probation.
 3              So I just have a couple of questions.  One is,
 4    Mr. Foster, did you see the report in Dr. Plaud's report of
 5    what Dr. Cusack -- what he says Dr. Cusack said?
 6              MR. FOSTER:  Can I have a moment to review it?
 7              THE COURT:  Yeah, he -- I'll tell you.
 8              Maybe you know where it is, Mr. Gold.
 9              MR. GOLD:  Oh, sure.
10              THE COURT:  Here it is.  Page 5.  He says that he
11    talked to Dr. Cusack and he said Cusack said that, as of
12    May 2019, he has no concerns, that Mr. Hunt has significant
13    insight, that he works really hard.  He does a really good
14    job in his treatment.  I just wanted to know if that squares
15    with you -- you've had regular communication with Dr. Cusack?
16              MR. FOSTER:  That's correct, Your Honor.
17              THE COURT:  Regarding Mr. Hunt?
18              MR. FOSTER:  That's correct, Your Honor.
19              THE COURT:  Reporting with Dr. Cusack on reports of
20    Mr. Hunt's treatment.
21              MR. FOSTER:  Yes, Your Honor, that is correct.  Dr.
22    Cusack is very supportive of Mr. Hunt and the progress he's
23    made in the community and in treatment.
24              THE COURT:  Is that -- do you have -- is there
25    anything from what you have heard from Dr. Cusack -- I
```

1    haven't heard directly from Dr. Cusack.  Is there anything

2    you've heard from Dr. Cusack that is different than that?

3              MR. FOSTER:  No.  That's spot on.

4              THE COURT:  That's fair.

5              MR. FOSTER:  That's his assessment.

6              THE COURT:  So my question for you, Ms. Serafyn, as

7    I understand it -- well, number one.  There's three things in

8    play.  I'm persuaded that -- there's no dispute, Mr. Hunt has

9    a history of abusing, criminally sexually abusing boys.

10             Two, the question, does he have prong two, which is

11   the mental disease or abnormality.  I don't quite have the

12   statutory language right.  I'm persuaded that he does.  I

13   don't think, although there's a sort of objection, but not

14   really.  But in any event, to the extent there is, I'm

15   persuaded that he has that.

16             So the question is really, as a third prong, as a

17   result of that, does he have a serious difficulty in not

18   engaging in the prohibited -- the conduct identified in the

19   statute as prohibited.  And as to that, he bears the burden

20   of proof by a preponderance of the evidence to show that he

21   doesn't have a serious difficulty doing those things, right?

22   That's sort of in the negative.

23             MS. SERAFYN:  That's right.  Yes, that's right.

24             THE COURT:  So my question is, is it your position

25   that he hasn't -- that he hasn't met his burden of proof by

1    preponderance to show that?

2         MS. SERAFYN:  Well, that's a good question, Your

3    Honor.

4         THE COURT:  Because let me just step back.

5         MS. SERAFYN:  Okay.

6         THE COURT:  And the question is not whether what

7    Mr. Hunt did is sufficient to authorize me -- if Mr. Hunt

8    were before me for sentencing today, for the offenses, some

9    or all of the offenses which he committed in mid '80s and

10   earlier, the notion of those offenses giving rise to a

11   lifetime term of supervision in the community, with the

12   restrictions on liberty that come with that, assuming he were

13   out in the community as a result of that sentencing, I'll be

14   frank with both of you, would not trouble me.

15        Whether at some point of time on supervised

16   release, it would be terminated under the supervised release

17   standards, maybe, maybe not, but it certainly generally

18   wouldn't trouble me.  But that's not the question before me.

19   And the question before me isn't whether that -- the

20   restriction on liberty, which is imposed on him is reasonable

21   or fair, or what have you.  The question is, under this

22   separate statute.  So that's why -- because I think -- that's

23   essentially -- legally he's saying -- I assume he's going to

24   stand up, Mr. Gold, and say he proved it by preponderance.

25        That's your position, Mr. Gold, isn't it?

1    MR. GOLD:  That accurately characterizes my

2    position.

3    THE COURT:  So I'm wondering first, is it the

4    Government's position that he hasn't proved it?

5    MS. SERAFYN:  I'm feeling boxed in here, Your

6    Honor.  So maybe I can --

7    THE COURT:  Well, let me just say, look, okay.  To

8    be fair, the United States Attorney's -- you're here for the

9    US Attorney and the Department of Justice.  It's the US

10   Attorney, right?  It's the US Attorney case.  So the law and

11   the rules, as far as I know, unless there's a new policy from

12   DOJ, which I would be stunned by, that we live in a -- we

13   live in a law-bound society, where the rules govern.  So I'm

14   not -- you might agree, that doesn't bind me.  I could

15   disagree, you both could agree, and I could still disagree.

16   But before I make my decision -- I know what Mr. Gold and

17   Mr. Hunt's position is, I want to know what the Government's

18   position is and that's the legal question.  I appreciate your

19   candor, but at the end of the day, having heard all the

20   evidence, the office has to decide, is its position that he

21   approved it, or he didn't.  And if he didn't, you know what

22   my next question is.

23   MS. SERAFYN:  Why.  It's true, Your Honor.  So I

24   want to give you the one-word, yes or no answer, but before I

25   do that, you know, maybe I can just tell you some of the

1   things that factor into this and why it's difficult to give

2   you that yes or no right off the bat.  And that goes back to

3   maybe how Mr. Gold started this, by giving the Court some of

4   the history.

5           We haven't had a case like this before, ever, in

6   the country.  We have had two cases in this district,

7   Mr. Shields and Mr. Carta, where they have both been released

8   from their conditions of supervision, but those were not

9   hearings that were contested in this way.  So in Mr. Shields'

10  case, what we did is we actually incrementally stepped down

11  from certain conditions.

12          THE COURT:  So one of the thoughts that I had --

13  I'll give you the chance to finish what you want to say, but

14  one of the thoughts I had for the two of you was what is it

15  about the conditions that is limiting Mr. Hunt at the moment?

16          Mr. Gold.

17          MR. GOLD:  Well, Mr. Hunt testified -- first of

18  all, I'd say, Your Honor, that the focus of the Government's

19  presentation is completely irrelevant, in a sense.

20          THE COURT:  That's not the question.

21          MR. GOLD:  But it has to do with this --

22          THE COURT:  Well, it can be relevant, in fairness,

23  and she's telling me what the precedent is and she's trying

24  to explain to me --

25          MR. GOLD:  No, no, not what she just said.  I mean,

1    I think it is relevant.  I think the -- what's bothering him

2    about the conditions is irrelevant.  Right?  The legal

3    question is the relevant question.  So I just want to keep

4    them separate.

5              THE COURT:  I understand that.

6              MR. GOLD:  But Mr. Hunt testified about the main

7    practical impediment, there are two.  One is being on

8    supervised release of any kind prevents him from moving

9    forward in his life in terms of getting --

10             THE COURT:  Getting the apartment.

11             MR. GOLD:  Getting the apartment and living a

12   better life in that sense.

13             THE COURT:  Well, I see how it affects the

14   apartment.  I don't see how it affects anything else.  I see

15   how it's an infringement on liberty.

16             MR. GOLD:  Yeah.

17             THE COURT:  But I don't see how that infringement

18   on liberty is preventing him from doing things, other than

19   the apartment.

20             MR. GOLD:  Well, the apartment is one thing that we

21   identified.  I think that also -- this is a legal question, I

22   will say that it's my opinion, that it hurts his case to get

23   to a lower level of sex offender registration in

24   Massachusetts.  That's possible.

25             THE COURT:  By being on supervised release.

```
 1              MR. GOLD:  Because that's a factor where, I
 2      think -- so if he were to be terminated he would have a
 3      better case in front of the Sex Offender Registry Board.
 4              THE COURT:  Mr. Foster, do you agree, if you know,
 5      that the existence of his supervision precludes him from
 6      obtaining the apartment he says he wants?
 7              MR. FOSTER:  I'm not sure, Your Honor, as to the
 8      answer of that.  I haven't heard.
 9              THE COURT:  You don't know either way; you wouldn't
10      be able to say either way?
11              MR. FOSTER:  I don't.  I do know, regarding the Sex
12      Offender Registry Board, they do look at all of the different
13      factors.  One of which is supervision, so that could weigh
14      in, so I couldn't speak to the other piece.
15              THE COURT:  And go ahead, Ms. Serafyn --
16              MR. GOLD:  And just one -- to piggy-back on that,
17      the level-3 piece.
18              THE COURT:  Level 3 state sex offender?
19              MR. GOLD:  Yeah, the level, has all sorts of kind
20      of cascading effects.  So there's certain benefits, housing
21      benefits that he can't -- I mean, he alluded to one.  You
22      can't interact with HUD.  Now, if you are a level two, your
23      picture is still up on the Internet, it's still quite a
24      burden, and it still has whatever protective value it has,
25      but you open up some doors in terms of federal and other
```

1    benefits.

2             THE COURT:  Go ahead.

3             MS. SERAFYN:  Thank you, Your Honor.  So I suppose

4    the nuance that I want to focus on is the role that probation

5    plays in ensuring that Mr. Hunt continues to be successful.

6    So I think, you know, at bottom, really what we're trying to

7    do here is balance Mr. Hunt's liberty interests.  I mean,

8    certainly he is free in the community, but he does have some

9    restrictions on what he can and can't do.  So balancing those

10   interests with public safety.  And I think the evidence shows

11   that probation has been such a support to Mr. Hunt that it

12   certainly is not hurting in any way, or in most ways -- I

13   don't know about this housing issue that you just asked

14   Mr. Foster about, but Mr. Hunt testified that he's gone whale

15   watching, he's gone on a trip to New York City.  He testified

16   that his relationships with Mr. Foster and probation has

17   been --

18             THE COURT:  But all that cuts both ways, because

19   the -- I will tell you both that I have no doubt that the

20   success that Mr. Hunt has had is, in large measure, due to

21   probation.  It's because of -- that he had -- the transition

22   from where he was at Butner, to where he is, is a difficult

23   transition, especially at the beginning, and probation, I

24   have no doubt, made a big difference in that.

25             But if -- if he wins on the law, he wins on the

1   law.  And the fact that, you know, that probation is not only

2   helpful, but reasonable, which is -- comes as no surprise to

3   me, doesn't -- it doesn't -- in that sense, then it

4   doesn't -- if I -- if he shows by a preponderance that he's

5   not a serious difficulty, then the fact that probation is not

6   too much of a thorn in his side, or too much of an

7   infringement on his liberty isn't really the question.  The

8   basis, he sort of -- if he can prove that, he establishes his

9   right to not have the infringement on liberty.

10          MS. SERAFYN:  Given the cases that we've had in the

11  past, what I think would have made this a clearer case is if

12  Dr. Plaud had, perhaps, done the PPG, which we talked about

13  as an instrument that can measure sexual arousal, based on

14  pictures and videos.  If there had been -- if he had actually

15  administered the actuarial instrument.

16          THE COURT:  But let me -- but like I'm -- let me

17  put it this way.  I think the legal question is the

18  fundamental question, which is whether they proved by

19  preponderance.  Okay.  On his best day, the Government is not

20  prepared to say that he hasn't proved it by preponderance.

21  You haven't yet said it and you haven't yet taken that formal

22  position and the trial brief doesn't actually assert that he

23  hasn't proved it.

24          I understand why you're -- I understand the larger

25  issues here and what drives it, but you haven't said it.  You

1    didn't say it in the papers, you didn't say it there.

2    Mr. Hunt -- I don't know whether the Government is prepared

3    to say it or not.  But on Mr. Hunt's best day of all of this,

4    he has the Government not saying it.  That's his best day.

5    You certainly haven't said it and I'm not sure that it's

6    right -- I don't mean this with respect to you, I'm not sure

7    it's right that the Government can have its sort of cake and

8    eat it, too, and oppose it, but not be prepared to formally,

9    subject to all of the considerations that restrict lawyers

10   and the like, and Government offices, and say he didn't meet

11   the legal standard.  Anymore in a criminal case, you can't

12   stand up in front of the jury and say, look, he's a bad guy

13   and there's a lot of evidence and we can't prove it beyond a

14   reasonable doubt, but you should still convict him.  Right?

15   That would be wrong and it would be improper for the

16   Government to take that formal position.

17          But on his best day, the Government's position is

18   he hasn't -- that they're unwilling to say that he hasn't met

19   his burden of proof, but I still have to decide -- and I'm

20   not trying to -- I'm not trying to make your life difficult,

21   Ms. Serafyn, but I do think that's the question and I do

22   think that the office has to decide, in cases like this, like

23   fundamentally, at the end of the evidence, like you have to

24   have like a basis in the law that is still how this all

25   works, a basis in the law, the facts that are before the

1    Court that are credible in the law to reach a position.

2              Anyway, but the reason -- I'm not going to make

3    your life more difficult than I've already made it, because

4    even if your position is that you don't think that he has

5    proved it, which is the best-case scenario, I don't think I'm

6    ready today, on the evidence that I've heard, to find that he

7    has proved it and I'll tell you why.  It's a close case,

8    because of the -- for a couple reasons, which are obvious.

9    His success in the Butner program, his relative success in

10   the period after the Butner program, and his success in

11   prison, and then his -- the seven years as documented by

12   Mr. Foster and on his conditional discharge.  But what -- the

13   reason that I'm not persuaded is that -- a couple things.

14             One is that Mr. Hunt, himself, said that he manages

15   this every day.  He's doing an impressive job, I think, in

16   managing it.  It's unusual to see somebody in his situation

17   with -- he seemed -- struck me as sincere and forthright, and

18   honest, with a lot of insight, Mr. Hunt, and so I respect

19   that.  There was no -- I didn't see him minimizing things and

20   it seemed candid and forthright.  So...

21             But I think that there's still a fair bit of

22   oversight and structure on Mr. Hunt, and that, in my view, I

23   part ways with Dr. Plaud on this.  But in my view, that

24   structure and oversight is part of the management of -- for

25   Mr. Hunt and it has an effect.

1          It was one reason I think I delayed this was you

2    said to me, Ms. Serafyn, that he's going to transition, if I

3    remember right, to individual therapy, less frequent therapy,

4    January 2019.  And you said, well, we don't know what the

5    Government's position is, but you'd like to see that and see

6    what happens, and then you -- and that tapering makes sense,

7    just as Judge Tauro, when he found that there was no reason

8    to keep Mr. Hunt in prison anymore, didn't decide, well, he

9    can get out of prison and we're all done.  He imposed those

10   conditions.

11         Some of those conditions have been lifted, like the

12   curfew was lifted, expired after six months, and nobody has

13   ever suggested that the curfew should be reimposed; is that

14   right?

15         MR. FOSTER:  That's correct, Your Honor.

16         THE COURT:  And I infer the reason no one suggested

17   the curfew should be reimposed is because Mr. Hunt was doing

18   very well, all indications were that he didn't need to have

19   the curfew reimposed.

20         And so I have -- so there are a couple of pathways

21   forward that occurred to me.  One is that what Mr. Hunt is

22   asking for, as a practical matter, is that he should have

23   self-control over his destiny, without any Government

24   oversight.  That is, without the oversight of the Court.  And

25   so I'm not prepared to do that today.

1          If you want me to render a formal, final ruling, of

2     some form, that might be subject to appeal, I would be

3     prepared -- I think I could do that orally and express it in

4     more detail, if you want, Mr. Gold.  And you could think

5     about that.  I'm not trying to prevent, if that's what you

6     want, I'm prepared to do that.

7          But one suggestion that I have is that -- if that's

8     what Mr. Hunt wants, his request, legally, his position is

9     not -- he has -- there's some merit to his position.  That's

10    one reason you are struggling, Ms. Serafyn, because it's not

11    an easy case, because he has a lot of pretty good evidence,

12    right?

13         And so one possibility is all of you get together

14    and think about, with Mr. Hunt having a voice, in what kind

15    of ways his conditions, while he'd still be under -- while

16    he'd still be subject to supervision by the Court, it might

17    be less.  I suggest that as a possibility, because what

18    Mr. Hunt is striving for, in the end, is self-control over

19    that destiny.  Like if I remove all your conditions,

20    Mr. Hunt, if I agree with you and your lawyer, you're in

21    charge of your life, unless you do something that gives a

22    court control over your life again, but if you don't do that,

23    and I accept that you do not want to do that and that you

24    are -- have built your life these last seven years to be what

25    your life is, which sounds like a very good life, and that's

1    a credit to you that you've built that life.

2          So I'm prepared to let you all talk to each other,

3    if you want and you come back and propose some reduction in

4    restrictions.  If you want to -- and that gives Mr. Hunt a

5    chance to have a voice in that.  So that's one option.

6          If you prefer, all of you want, I'm prepared to

7    just address the conditions myself, but I thought that since

8    what he's asking for is self-control, that giving him a

9    voice, you could all reach an agreement, you don't have to

10   reach an agreement.  If you don't reach an agreement, you

11   could say we agree on this, but not that, and it's all

12   subject to my approval, in any event.  So you could -- you

13   can try that process or not, as you wish, and then otherwise

14   what I would do is make a ruling along the lines of what I

15   described and I might reduce some of the conditions.

16         On the other hand, if there's something you want to

17   see and that might change everything, you know, you could

18   seek to get that.  Refer to like the test.  I hadn't -- I'm

19   not thinking I would order further testing and I'm not

20   adverse to it.  If you want it, I'd be happy to order it, I

21   think.  But does that -- anybody need any further

22   illumination of what I'm thinking about?

23         MR. GOLD:  I have a few things to say.  I don't

24   know if --

25         THE COURT:  Go ahead.

1          MR. GOLD:  -- now is the time.

2          I see this as -- I don't think -- I can speak with

3     Mr. Hunt about it and I'm always open to talking about

4     things, but this, to me, as the Court was talking about a

5     rule of law issue.  It's not a termination of supervised

6     release issue, where we are kind of appealing to the --

7          THE COURT:  Mercy.

8          MR. GOLD:  -- mercy or the pragmatic sense of the

9     Court.  It's simply the law.  And if we can't show, with what

10    we showed today, by, you know, that there's an absence of

11    serious difficulty controlling behavior, if that phrase has

12    any meaning at all, I mean, I would ask the Court, how would

13    Mr. Hunt prove it.  It really doesn't have to do here with

14    what makes sense.  You know, Ms. --

15         THE COURT:  Fine.  So what I understand that to be,

16    is that you think the sensible way to go is me make a formal

17    filing ruling, I either allow it or I don't, and then if I

18    don't, if I want to address the conditions, I can address the

19    conditions and then he has -- if the -- if one of you --

20    well, one of you will likely be aggrieved by what I do, that

21    is if I don't allow it, you can appeal, and if I do allow it,

22    they can appeal.

23         MR. GOLD:  Yeah, I suppose maybe we can brief it or

24    something like that.  I mean, I would just say what

25    Ms. Serafyn was starting to say about the PPG, I mean, if we

1    get into the weeds, we can get into the weeds.  There was a

2    PPG done back at Butner.  Dr. Plaud had, basically, medical

3    reasons why it wasn't indicated to do now.  So he started to

4    talk about those.  Because of the interaction of the other

5    factors so we could engage on this.

6            But I would just say, and you know, I started out

7    sort of -- and I was talking with Mr. Hunt during the break,

8    about the burden of proof issue.  And this is a -- a good

9    example of sort of the bind that a petitioner or respondent

10   such as Mr. Hunt is in.  So you can -- you know, what can you

11   show?  If I were to distill the Government's argument, I

12   think it's a good one, distilled, or it's not -- there are

13   three categories.  There's committed, SDP, not dangerous, so

14   long as there's conditional release, and then outright

15   discharge.

16           So to what extent are these conditions playing a

17   role?  I -- you know, it's unprovable.  It really is like

18   something that you just don't know.  The conditions are

19   there, I think, but what we have here is a behavioral track

20   record, you know, Plaud aside, whatever.  There is such a --

21   the Westlaw reports are a landscape littered with incidents

22   of folks violating in all sorts of ways and that's being used

23   as evidence against them.  What you have here is kind of an

24   example of behavioral stability and internalization of these

25   ideas.

1          That's just -- I don't think you can get -- like

2     what Mr. Hunt says, I think what -- when he says he manages

3     is, is the best you're going to do.  If you get somebody who

4     says I have nothing to manage, you're probably talking to

5     someone who's not telling the truth.

6          THE COURT:  I thought he was very sincere and

7     candid when he said that.

8          MR. GOLD:  So I guess that's all I would say about

9     this, that I think we are -- that's not what we're about

10    here.  I mean, we're very reasonable.  No one is not getting

11    along or anything like that.

12         THE COURT:  I understand.  So this is what I'm

13    going to do, then.  I think you have crystallized what the

14    nub of the issue is.

15         Does probation have a position in this?

16         MR. FOSTER:  Your Honor, my only concern is --

17         THE COURT:  You don't have to.  I just want to know

18    if you do.  The Government has to have a position, because

19    they're a party.  You don't have to have a position.

20         MR. FOSTER:  No, I don't have a position.

21         THE COURT:  Okay.  So this is what I'm going to do.

22    This is a close and difficult case.  I think Ms. Serafyn has

23    done a superb job in representing the Government, and I think

24    she's been forthright and candid and thought about her

25    obligations.  It's a pleasure to have lawyers in front of me

1  like her and Mr. Gold, who are advocates for their position,

2  but are also honest about the law, forthright, and candid,

3  and I appreciate that.

4        That said, it's not really clear to me that the

5  Government has staked out a position -- is prepared to say,

6  formally, that, in fact, he hasn't met his burden of proof.

7  They haven't said that he hasn't, either.  But in any event,

8  the way -- but I feel like he hasn't quite met his burden of

9  proof and I'll explain to you why first, which is there's

10  really no dispute about his conduct and I find that he was a

11  sincere and forthright witness and I accept his testimony and

12  I accept and credit the report from Mr. Foster, that -- and I

13  don't think there's really any dispute about what is in

14  there.  The --

15        It is a difficult thing to sort of -- how do you

16  prove, when you're on supervision, that you'll be -- you

17  won't have serious difficulty when you're not.  That is --

18  and obviously, if you fail on supervision, it's pretty clear

19  that you won't be able to succeed on -- without supervision.

20  But here, the -- he has succeeded on supervision.

21        There are a couple of things, though, that give me

22  pause, and the reason that I say now that he hasn't.  One is

23  that the history that Mr. Hunt had is a very serious,

24  substantial, long history.  Albeit, a long time ago, 35

25  years -- 34 years by my count since the last offense conduct.

1    And at least my memory of the evidence is, his time in

2    federal prison, which would have been some number of years

3    prior to the 2008 or '09 sexual dangerousness determination,

4    and then after that on his civil commitment in federal

5    prison, that his behavior was appropriate, which is a

6    relevant factor, which is why I think Judge Tauro let him

7    out.

8         In other words, he earned his way out by his

9    conduct.  So I think that though -- though given the issues

10   and the description that Mr. Hunt gave me, that I credit, and

11   the course, successful course of both improvement in his life

12   over your seven years on release, Mr. Hunt.  You are in a

13   better position today than you were in 2013 or 2014.  You

14   have a better life today.  That's what I understand you to

15   have told me.

16        MR. HUNT:  Yes.

17        THE COURT:  And I credit that and I think that's

18   true.  So -- but since the burden is on you, Mr. Hunt and

19   Mr. Gold, albeit only by a preponderance, but it's on you,

20   that there's still a fair amount of restrictions and

21   oversight.  And those, in my general experience, upon which I

22   draw, those boundaries and oversight by probation, for

23   somebody in Mr. Hunt's position and for Mr. Hunt, I find, are

24   a, itself, form of potential consequence, limitation,

25   control, and socialization.

1          So I'm not persuaded that, at the moment, that

2    lifting all of those at the present spot we're in would --

3    that those in place are not part of the reason controlling a

4    serious difficulty that he plainly had in the past, and it's

5    your burden to show that he doesn't have the difficulty, even

6    without those things and I'm not persuaded that you've proved

7    to me that.  So for those general reasons, I am denying the

8    request for discharge.

9          But I am persuaded that Mr. Hunt has progressed

10   successfully, compared to when he was released.  That over

11   time he has done better and better, that he shows insight

12   into his problem, that he manages it well himself.  That,

13   throughout this course, there's been a general reduction by

14   probation, appropriately, of oversight and treatment.  He's

15   now down to once a month individual, once a month group.

16   That seems sensible and appropriate.

17         And I'm not persuaded by Dr. Plaud's view, that

18   once you learn the skills, the treatment has no more sexual

19   offender purpose.  And I can see a -- for me, it seems -- my

20   understanding, I think from any treatment modalities, there

21   is a purpose for ongoing treatment, albeit at a lower level,

22   and Mr. Hunt seems to perceive that, because he expresses a

23   desire, with or without probation, to continue in that

24   regard.  So my -- given what I've heard, subject to -- and

25   I'll give you all a chance to comment on this, it would be my

1    thought that I would reduce his restrictions or his

2    oversight.

3              And the reason that I would reduce it is, one, he's

4    doing very well and it seems to me that there should be some

5    correlation between, even in this context, between the

6    conditions and his behavior, documented by probation over a

7    substantial period of time.  So --

8              And my thought would be to, looking at the document

9    number 101, which is the order of conditions, the question

10   would be why shouldn't I lift all of the conditions, other

11   than number five, which is the limitation on contact with

12   minors, number eight, which is the limitation on loitering in

13   restrooms and other places, which is essentially like -- a

14   variation on number five, and number 22, he can't leave the

15   district without permission.

16             That would be -- in other words, Mr. Hunt has done

17   pretty well.  What he's asking me for is self-control over

18   his life.  There isn't anything in the monitoring software or

19   in lots of the other conditions that has produced anything

20   negative in the last couple of years.  So -- but I'm not --

21   I'm not lifting the restrictions at this moment.  I'm saying

22   that's what -- I've made the ruling, I'm not -- I've denied

23   the petition.  Haven't heard what I heard, my question is why

24   shouldn't I lift many of the restrictions.

25             And just looking it over, the three that I

1   identified are ones that I would certainly continue, you

2   could -- any one of you tell me why I thought to lift one of

3   those, given, without waiving your objection, Mr. Gold, to my

4   ruling.

5          And you, Ms. Serafyn or Mr. Foster, can tell me why

6   I should not lift one or more of the other conditions.  If

7   you want the opportunity to think about this, I don't have a

8   problem with letting you think about it, talk about it, and

9   you could simply -- in fact, that might make the most sense.

10          Why don't you think about that and I will -- and

11  you could -- if you want, Mr. Gold, to lift one of the

12  further -- one of the three I said are in your place, file

13  something by next Friday, just explaining which one you want

14  lifted and briefly why you think you should it should be

15  lifted and if you want to impose more than those three, tell

16  me -- and if next Friday is enough time for you, tell me

17  which ones you want me to impose, or if you want a different

18  one that is not in there and tell me why briefly you want it

19  imposed.  Or not -- either imposed if it's new, or continued

20  if it's already there.

21          You should just talk to Mr. Gold about it, so you

22  can tell me his position on it, so then I know.  If you tell

23  me he agrees, then I wont wait for a further filing.  Or if

24  you tell me you want condition 12, or I don't know what 12

25  is, but one other condition, and he says he agrees, then I

1    won't wait for further briefing.  I'll just look at it and if

2    it makes sense, I'll just make a ruling on it.

3            How's that?

4            MS. SERAFYN:  That sounds good from the

5    Government's perspective, Your Honor.

6            MR. GOLD:  That's fine.  So then we got two things

7    going.

8            THE COURT:  So what I'm going to do is enter an

9    order that simply says that the petition for unconditional

10   discharge is denied for the reasons stated in open court.

11           MR. GOLD:  Okay.  And then we can work on this

12   other stuff.

13           THE COURT:  And then this other issue I'm not going

14   to enter any written order about, you can work on it.  Then

15   you can do what you wish with -- I think that would give you

16   a final order, if you wish to appeal.

17           MR. GOLD:  Okay.  I mean, I guess my one thought is

18   what -- what behavioral evidence would the -- because it

19   seems to me, what -- maybe we would ask the Court for

20   guidance as to what the Court would expect to see beyond what

21   was presented today, in terms of a quantum of evidence for --

22   to get out of the category.  And maybe that's not a question

23   that can be asked, but that's the thought that --

24           THE COURT:  So I think the way I would put it is,

25   with respect to particular tests, such as the one referred to

1    by Ms. Serafyn, I am not prepared to say the absence of the

2    results of a particular tests are not the reason I've made my

3    ruling.  If I had the results of such a test and if they were

4    favorable, that might influence my ruling, but I'm not

5    denying the discharge merely for the absence of a -- the

6    results of a particular test that wasn't done.  I've denied

7    it for the reasons that I've stated.

8            The results of the test, they've given to me, would

9    have whatever weight seemed appropriate.  I can't -- I don't

10   know that a negative PPG would be powerful proof that have --

11   in his favor, which is the best result for you, right, if

12   it's negative, or it wouldn't be.  I don't -- without hearing

13   an expert talk about that, I -- but that isn't the reason

14   that I denied it, the absence of that.

15           So I denied it for largely the reasons that I

16   stated.  I do think that the conditions of probation that are

17   in place in docket 101 impose a kind of restraint and

18   structure and so the reason that I'm proposing removing some

19   of those is because of the evidence I heard with respect to

20   conduct and because one of the questions in my mind is, is

21   the reason that there's no -- is part -- how much of the

22   reason of the success that Mr. Hunt has had is a result of

23   the involvement of probation and the conditions.

24           And so he's doing very well.  Tapering, in my

25   oversight role, seems reasonable, given what I've heard.  And

1    then so that's -- and since it's your burden of proof, I
2    can't really totally determine that, for the reasons that I
3    expressed.  I think, in my view, it hasn't been there.  The
4    Court of Appeals may disagree and that's fine if they do.
5    But that's my judgment, for the reasons that I stated already
6    on the record and I don't know if that provides you the kind
7    of answer.

8              MR. GOLD:  No, that's helpful, Judge.  Thank you.
9    We'll work it out.  We'll figure out what to do.  So I'll
10   order the transcript from today.

11             THE COURT:  Yes, we'll enter an order not tomorrow,
12   Monday.  Maybe today, but certainly Monday.

13             So Mr. Hunt, just a few words for you.  You've done
14   very well on probation.  I know this outcome, this result
15   that I've just rendered is not the result that you were
16   wishing for today, but I would tell you this.  That what you
17   testified to and what I believed is that you are on -- that
18   you took to heart the words that that psychologist at Butner
19   told you, years ago, when that person says you've lived your
20   life one way for 60 years.  Now, the psychologist said, live
21   my, the psychologist's, way.  You took that to heart, and
22   you've been trying to do that ever since.

23             And it appears from all of the evidence -- from the
24   evidence before me, that you have been doing it successfully.
25   So what I will tell you is to keep your eye on that ball.

1    That's the goal.  Just like you said.  You get up every day
2    and you think about that.  You get up every day and you keep
3    doing that.  And that's how you've built the life that you
4    have, which seems like a good life.  And you should keep your
5    eye on that ball in doing that, which is not to say -- you
6    can do whatever you want with your lawyer and I don't hold
7    that against you at all.  But make sure you keep focused on
8    that, because that is the most important thing.
9              MR. HUNT:  Thank you, Your Honor.
10             THE COURT:  You're welcome.
11             All right.  Anything else from anybody?
12             MS. SERAFYN:  No, Your Honor.  Thank you.
13             Anything else, Mr. Foster?
14             MR. FOSTER:  No, Your Honor.
15             THE COURT:  Anything else, Mr. Gold?
16             MR. GOLD:  No, Judge.
17             THE COURT:  All right.  We're adjourned.  Thank you
18   very much.
19             (Court in recess at 2:43 p.m.)
20
21
22
23
24
25

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4          I, Rachel M. Lopez, Certified Realtime Reporter, in

5    and for the United States District Court for the District of

6    Massachusetts, do hereby certify that pursuant to Section

7    753, Title 28, United States Code, the foregoing pages

8    are a true and correct transcript of the stenographically

9    reported proceedings held in the above-entitled matter and

10   that the transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13                          Dated this 29th day of October, 2019.

14

15

16

17                     /s/ RACHEL M. LOPEZ

18

19

20          _____

21          Rachel M. Lopez, CRR
            Official Court Reporter

22

23

24

25